**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 25-5144, 25-5145**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————

PATSY WIDAKUSWARA, *et al.*

Plaintiffs-Appellees,

v.

KARI LAKE, *et al.*

Defendants-Appellants.

————————

MICHAEL ABRAMOWITZ, *et al.*

Plaintiffs-Appellees,

v.

KARI LAKE, *et al.*

Defendants-Appellants.

————————

***WIDAKUSWARA* PLAINTIFFS-APPELLEES' OPPOSITION TO**
**DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR AN**
**ADMINISTRATIVE STAY AND PARTIAL STAY PENDING APPEAL**

————————

ANDREW G. CELLI, JR.
DEBRA GREENBERGER
DANIEL M. EISENBERG
NICK BOURLAND
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

*(Additional counsel listed on signature block)*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

**A. Parties**

All parties appearing before the district court and in this Court are listed in Defendants-Appellants' Motion.

**B. Rulings under review**

The rulings under review can be found at Defendants' Addendum 1-43 and Plaintiffs' Addendum 124-29.

**C. Related cases**

This case has not previously been before this Court. There are two related cases before this Court. *See Radio Free Asia v. United States*, 25-5150 (D.C. Cir.); *Middle East Broadcasting Networks, Inc. v. United States*, 25-5151 (D.C. Cir.). In addition, there are two related cases pending in the United States District Court for the District of Columbia. *See RFE/RL, Inc. v. Lake*, 25-cv-799 (D.D.C.); *Open Technology Fund v. Lake*, 25-cv-840 (D.D.C.).


Dated: April 29, 2025                         <u>*s/Daniel M. Eisenberg*</u>
                                              Daniel M. Eisenberg

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Plaintiffs-Appellees Reporters Sans Frontières, Reporters Without Borders, Inc.; American Federation of State, County and Municipal Employees ("AFSCME"); American Federation of Government Employees ("AFGE"); American Foreign Service Association ("AFSA"); and The NewsGuild-CWA ("TNG-CWA") make the following disclosures:

Plaintiff-Appellee Reporters Without Borders, Inc. is a 501(c)(3) non-profit organization headquartered in Washington, D.C. and is the United States affiliate of Plaintiff-Appellee Reporters Sans Frontières, which is headquartered in Paris, France.

Plaintiff-Appellee AFSCME is a national labor organization and unincorporated membership association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States.

Plaintiff-Appellee AFGE is a labor organization and unincorporated association headquartered in Washington, D.C. AFGE is the largest federal employee union.

Plaintiff AFSA is a professional association and labor organization headquartered in Washington, D.C. AFSA is the sole labor organization for the United States Foreign Service.

Plaintiff TNG-CWA is a labor union representing more than 27,000 employees. It is the largest labor union representing journalists and media workers in North America.

No Plaintiff-Appellee has a parent corporation, and no publicly held company owns 10% or more of any Plaintiff-Appellee's stock.

## INTRODUCTION

A coalition of plaintiffs with diverse, yet uniformly irreparable and immediate harms challenge Defendants' patent failure to abide by their statutorily mandated duties and their arrogation of authority that rightfully belongs to Congress. In moving for a stay pending appeal, Defendants gloss over the blatant unlawfulness of their actions and the serious harm that will befall Plaintiffs if it is not enjoined, focusing instead on arguments that an Article III court is powerless to stop this conduct. Defendants have failed to demonstrate that they are entitled to a stay pending appeal. Plaintiffs respectfully ask that this Court deny the motion.

## BACKGROUND

### I.     Factual Background

On March 14, 2025, the White House issued Executive Order 14238, directing the U.S. Agency for Global Media ("USAGM") to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Add. 2.[1] The next day, a Saturday, USAGM placed 1,042 out of its 1,147 full-time employees on administrative leave. Add. 4-5 ¶¶ 3, 5. It terminated every single one of its 598 personal service contractors. *Id*. It instructed radio broadcast technicians, who are required to be on-

---

[1] References to "Add." are to Plaintiffs' Addendum and "Defs' Add." are to Defendants' Addendum.

site 24/7 to keep Voice of America broadcasts running, to finish their programs and leave the building. Add. 11 ¶ 11. And it cancelled its grant agreements with its statutory grantees. Add. 20 ¶ 9.

A little over a week later, on March 25, and after this lawsuit was filed, USAGM sent reduction-in-force notices to Plaintiffs AFSCME and AFGE, expressing its intent to eliminate the entire bargaining unit of radio broadcast technicians, without whom Voice of America ("VOA") cannot broadcast, Add. 48-49 ¶¶ 3-6, and to terminate an additional 594 VOA employees, including international broadcasters, technicians, budget analysts, and electronics engineers, *see* Add. 58-59 ¶¶ 3-5. To date, more than a month after being taken off the air, and notwithstanding the injunction the district court entered last Tuesday, the only broadcast that has resumed is the Office of Cuba Broadcasting ("OCB"), which is apparently being carried out by 33 people. Add. 5 ¶¶ 6-7.[2]

## II.    Statutory Requirements

USAGM is a Congressionally established independent agency. 22 U.S.C. § 6203(a). It is governed by broadcasting standards and principles, including, among other requirements, that U.S. international broadcasting "shall be designed

---

[2] Defendants say they "reinstated" all PSCs on March 28. Br. at 7. In fact, they "advised [PSCs] that the termination of [their] personal services contract[s are] on hold until further notice" on March 29, the day after Judge Oetken entered a temporary restraining order requiring them to do so. Add. 107-08 ¶¶ 5-6; Add. 109.

so as to effectively reach a significant audience," and "shall include news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6202(a)(7), (b)(1).

VOA is an integral part of USAGM's pursuit of those mandates. Congress requires that "[VOA] must win the attention and respect of listeners." 22 U.S.C. § 6202(c). To do so Congress mandates:

> (1) VOA *will serve* as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.

> (2) VOA *will represent* America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

> (3) VOA *will present* the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies.

*Id*. (emphasis added).

USAGM is also required by statute to fund statutory grantees, including Radio Free Asia ("RFA"), a private entity that carries out specific statutory broadcasting duties. *See* 22 U.S.C. § 6208.

### III.   Appropriations Act

For Fiscal Year 2025, Congress appropriated $875 million for USAGM's international communication activities. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) ("2024 Appropriations Act"); Full-Year Continuing Appropriations and Extensions Act,

2025, Pub. L. No. 119-4, div. A, § 1101, 139 Stat. 9, 10-12 (2025) (extending same

funding for FY25 under the same "conditions provided in" FY24). Importantly,

Congress specified that this appropriation "shall be allocated" in accordance with a

table that delineates funding amounts program by program and grantee by

grantee[3]:

```
              United States Agency for Global Media


            INTERNATIONAL BROADCASTING OPERATIONS

       The agreement includes $857,214,000 for International
     Broadcasting Operations, of which $42,861,000 may remain
     available until September 30, 2025. Funds appropriated under
     this heading are allocated according to the following table:

             INTERNATIONAL BROADCASTING OPERATIONS
             [Budget authority in thousands of dollars]
     -----------------------------------------------------------------
                                                          Budget
                      Entities/Grantees                  Authority
     -----------------------------------------------------------------
     Federal Entities
       Mission Support.......................................  225,640
         Office of Technology, Services, and Innovation......  174,440
       Office of Cuba Broadcasting...........................   25,000
       Voice of America.....................................   260,032
       Subtotal.............................................   510,672
                                                         ---------------
     Independent Grantee Organizations
       Radio Free Europe/Radio Liberty......................  142,212
       Radio Free Asia......................................   60,830
       Middle East Broadcasting Networks....................  100,000
       Open Technology Fund.................................   43,500
                                                         ---------------
       Subtotal.............................................  346,542
                                                         ---------------
         Total...............................................  857,214
     -----------------------------------------------------------------
```

---

[3] *See* 2024 Appropriations Act, 138 Stat. 460, 735 (requiring funds to be allocated
in accordance with table in "the explanatory statement described in section 4"); *id.*
§ 4 (identifying explanatory statement).

Explanatory Statement Submitted by Ms. Granger, Chair of the House Cmte. on Approps., Regarding H.R. 2882, 2024 Appropriations Act, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

USAGM may not, under any circumstances, reprogram more than 5% of any designated amount. 2024 Appropriations Act, div. F, tit. I, 138 Stat. 460, 735. If it wishes to move around 5% or less of any given item, it must notify Congress. *Id*.; *see* Explanatory Statement, 170 Cong. Rec. at H2087 (defining "regular notification procedures").

Congress also placed limits on USAGM's ability to shut down more discrete items. USAGM may not suspend or eliminate any "program, project, or activity," or downsize any "bureaus, centers, or offices," unless it gives the congressional appropriations committees at least 15 days' advance notice. 2024 Appropriations Act, div. F, Sec. 7015, 138 Stat. 460, 766. No such notice has been provided.

## ARGUMENT

A party seeking a discretionary stay pending appeal bears the burden to show, at a minimum, that (1) they are likely to succeed on the merits; (2) they will be irreparably harmed absent a stay; (3) a stay will not substantially injure the other parties interested in the proceedings; and (4) the public interest favors a stay. *Nken v. Holder*, 556 U.S. 418, 433 (2009). "A stay is not a matter of right, even if irreparable injury might otherwise result." *Id*. (cleaned up). Defendants have not

established a single stay factor—let along all of them—and therefore have not

carried their burden.

## I.    Defendants Mischaracterize the Basis and Scope of the Injunction

"Crafting a preliminary injunction is an exercise of discretion and

judgment." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025). So is the decision

whether to enter a stay pending appeal. *Nken*, 556 U.S. at 433. Defendants have

demonstrated no abuse of the district court's discretion in crafting the injunction

and therefore provide no basis for this Court to grant a stay.

Defendants fault the district court for ordering the reinstatement of USAGM

employees and contractors to their pre-March 14 status, claiming that such relief is

untethered to the "claims as to which it concluded that plaintiffs had a likelihood of

success," and that the relief is "overbroad" like the relief in *NTEU v. Vought*, No.

25-5091 (D.C. Cir. Apr. 11, 2025). Br. at 4-5, 22. These are quibbles with the basis

for, and the scope of, the district court's relief, that are untethered from the district

court's actual opinion and order.

Starting with the basis for relief: Returning employees and contractors to

their pre-March 14 status was precisely tailored to the violation at issue. The

district court could not "fathom a more straightforward display of arbitrary and

capricious actions" than Defendants' silencing of USAGM. Defs' Add. 30. To

remediate an agency's arbitrary and capricious conduct, courts are to "set [it]

aside." 5 U.S.C. § 706(2)(A); *see also Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. Nat'l Lab. Rels. Bd*., 61 F.4th 169, 180 (D.C. Cir. 2023) (when faced with unreasoned agency action that fails to account for reliance interests, court is "left with no choice but to vacate"). Returning employees and contractors to their status before the agency executed its arbitrary and capricious action does exactly that.

Next to the scope: Defendants are wrong that the district court's injunction "strip[s] the Agency of authority to manage its workforce, run its day-to-day affairs, or make operational decisions." Br. at 4. The order says no such thing, and unlike the district court in *NTEU*, the district court here has disavowed such a scope:

> When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order, such as "misconduct, performance issues, or security violations" to which they allude—such execution of normal operations would, to the contrary, be in accordance with the status quo pre-March 14.

Add. 128.

Defendants do not explain why the district court was wrong to order the reinstatement of employees and contractors who, the court found, were fired uniformly and only in pursuit of unlawful, arbitrary and capricious agency action. The idea that USAGM made "a multitude of individual employment decisions" that require individualized assessment, Br. at 20, is utterly belied by the record,

which shows USAGM itself made no individualized assessments regarding any employees, but rather took blanket actions without regard for performance, merit, or misconduct. *See* Add. 105 (administrative leave placement "is not being done for any disciplinary purpose."); Add. 51 (attributing RIF notices solely to executive order); Add. 62 (same); Add. 111-12 ¶¶ 6, 9-10 (USAGM HR Director attributing administrative leave and RIFs solely to executive order); Add. 4-5 ¶¶ 5, 8-9 (same). Nor have Defendants ever argued in this litigation that their actions were based on an assessment of which staff were essential to USAGM's minimum statutory functions. Nor could they, as the record shows, and Defendants have never disputed, that eliminating all radio broadcast technicians, as Defendants planned, would render VOA unable to broadcast. Add. 48-49 ¶¶ 3-6.

The injunction thus appropriately returns the parties to the "last uncontested status which preceded the pending controversy"—precisely what a preliminary injunction is meant to do. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). This is particularly clear in light of this Court's recent decision to restore part of the *NTEU* injunction prohibiting reductions in force to "ensure that plaintiffs can receive meaningful final relief should the defendants not prevail in this appeal." *NTEU*, No. 25-5091 (D.C. Cir. Apr. 28, 2025).

## II.    Defendants Show No Likelihood of Success on the Merits

As in the district court, Defendants make no attempt to defend the legality of their actions. Instead, they rehash arguments (rejected below) that a challenge to the near total shuttering of an agency that performs mandatory statutory functions and that is funded by specific, non-fungible appropriations cannot be brought before an Article III district court.  Those arguments are wrong.

### a.  The District Court Appropriately Ordered Restoration of USAGM Grants

Starting with USAGM grants: Defendants do not defend the legality of their actions but argue the Tucker Act divests the district court of jurisdiction. But the Tucker Act does not apply here.

True, the Tucker Act "provid[es] the exclusive remedy for contract claims against the government." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *overruled in part on other grounds*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). But the involvement of a contract is not enough to make something a "contract claim"; instead, that turns on whether the claims "are founded *only* on a contract, or whether they stem from a statute or the Constitution." *Id.* (emphasis added). The Tucker Act only applies where the claim is "at its essence" contractual. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1102 (D.C. Cir. 2022); *see Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982).

9

In seeking a stay, Defendants ignore two crucial facts that make this case unlike any Defendants rely on. *First*, Congress has said, via statute, to whom and for what purpose the money at issue is to be disbursed: USAGM "shall" "make annual grants for the purpose of carrying out radio broadcasting to Asia" to "Radio Free Asia." 22 U.S.C. § 6208(a). And for Fiscal Year 2025, it has said that $60 million "shall be allocated" to RFA. *See supra*. USAGM may only divert grants away from RFA upon a finding that the entity "is not carrying out the functions described in this section in an effective and economical manner." 22 U.S.C. § 6208(g).[4]  Defendants' claim that the "source of plaintiffs' rights is contained in their grant agreements—not any statute," ignores these statutory commands. Br. at 15; *cf. United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465 (TNM), 2025 WL 763738, at *1, *7 (D.D.C. Mar. 11, 2025) ("*USCCB*") (statutory framework providing for discretionary grants). Defendants cite the records in *other* cases to insert, for the first time, the terms of the RFA and MBN grant agreements into this litigation. Br. at 6. But the terms of those grant agreements are irrelevant to Plaintiffs' claims here because Plaintiffs seek to

---

[4] The government's claim that it would be "without recourse" if "a grantee violated the terms of its grant agreement," (Br. at 16-17) similarly blinks reality. The statute says when the government may pull its funding from RFA, 22 U.S.C. § 6208(g), but Defendants have not even tried to show that provision has been triggered.

enforce the *statutes*. Defendants do not cite a single case in which a court found the Tucker Act divested it of jurisdiction over a similar statutory claim.

*Second*, none of the Plaintiffs has a grant agreement with Defendants—and so have no contractual rights they could sue to vindicate. Plaintiffs instead seek to remediate harms caused by Defendants' failure to comply with their statutory obligations to disburse grant money to RFA. Specifically, Plaintiff The NewsGuild-CWA ("TNG-CWA") represents 100 employees of RFA, a statutory grantee of USAGM, whose employees have been furloughed because of the grant termination. *See* Add. 18-21 ¶¶ 3-6, 9-10. TNG-CWA's members also stand to lose their work visas and be sent back to autocratic countries if funding is not immediately restored. Add. 24-25 ¶ 20; Add. 30-31, 43-44. Additionally, TNG-CWA members who do not work for RFA, but who are journalists who travel abroad for their work, rely on USAGM's reporting abroad to inform their own work and their personal safety as journalists operating in countries that do not tolerate a free press. Add. 23 ¶¶ 15-16; Add. 135-26 ¶¶ 4-6. Plaintiffs Reporters Sans Frontieres and Reporters Without Borders, Inc.'s (together, the "RSF Plaintiffs") members experience this same irreparable listener harm stemming from the silencing of RFA's feeds. *See* Add. 116-22 ¶¶ 11-26.

Defendants rely heavily on the Supreme Court's recent emergency-docket order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per

11

curiam), which is factually distinct. In *California*, the Court stayed a temporary restraining order enjoining the government from terminating various competitive grants and requiring it to pay out "grant obligations" because the Court found it "likely" that the district court lacked jurisdiction to grant such relief. *California*, 145 S. Ct. at 968.

As the district court recognized here, the claims in *California* were meaningfully different: "[i]n *California*, the source of the rights relied on by the plaintiffs were contained *in the grant agreements*—the relevant statute did not entitle any particular grantee to the funds." Defs' Add. 21. The relevant statute directed the Secretary of Education to "use certain funds to make grants to entities" that would recruit and train teachers. *California v. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir. Mar. 21, 2025) (citing various statutory provisions). The statute did not entitle any particular grantee to the funds; rather, grants were awarded pursuant to a "competitive application process." *Id.* As detailed above, that is inapposite here; there is no competitive application process but rather a congressional command that the statutory grantees receive these funds.

Additionally, the plaintiffs in *California* were (effectively) the grantees— they were states whose public instrumentalities had received the grants at issue, and who had standing to sue on those instrumentalities' behalf. *See California v. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825, at *1 n.2 (D. Mass. Mar. 10,

2025). And their allegations focused on the terms of those particular grant agreements and the individual termination decisions. *See, e.g.*, Complaint ¶¶ 165-66, 180-84, *California v. Dep't of Educ.*, 25-cv-10548 (D. Mass), ECF No. 1 (alleging that the terminations were not made pursuant to the terms and conditions of the grant agreements). Not so here.

Defendants' argument also cannot be reconciled with the Supreme Court's denial of a stay pending appeal in *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753, 753 (2025). Over Tucker Act objections like those Defendants make here, the Supreme Court declined to stay the disbursement of substantially more money than is at issue here to fulfill the government's commitments, via grants and cooperative agreements, to fund foreign assistance efforts. *See generally AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 485324, at *1 (D.D.C. Feb. 13, 2025).

This case is simply not about contracts and therefore rightfully belongs in this Court. *See, e.g.*, *Crowley Gov't Servs.*, 38 F.4th at 1102 (exercising jurisdiction over a claim "to be free from government action beyond [its] congressional authority).

### b. There Is No Alternative, Comprehensive Statutory Scheme that Could Resolve this Dispute

In arguing that this case should be channeled to either the Merit Systems Protection Board, the Office of Special Counsel, or the Federal Labor Relations

Authority, Defendants again try to divorce the district court's injunction from its finding that the agency acted arbitrarily and capriciously, thereby requiring it to vacate the unlawful agency action and reinstate all employees and contractors affected thereby. *See* Br. at 21.

Defendants then glancingly argue that Plaintiffs should have brought their "employment disputes" through an administrative review process, citing *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), and *United States v. Fausto*, 484 U.S.439 (1988). Notably, neither case involved challenging the dismantling of an entire federal agency; in those cases it was plausible the administrative agencies could resolve the plaintiffs' claims on a statutory basis. Not so here. In failing to acknowledge these differences, Defendants leave unrebutted the basis for the district court's holding that this case is not channeled to agency review. Defs' Add. 22-24.

Defendants also do not contend with the district court's assessment that "there is no meaningful review available from the MSPB and OSC for the wholesale placement of employees on administrative leave and the silencing of VOA." *Id.* at 22 n.22. Nor do Defendants acknowledge the court's additional observation that the public-sector unions' organizational standing claims are not channeled, *id*. at 21 n.20, and that the RSF plaintiffs, TNG-CWA, and Does 3 and

14

4 "are not implicated" in channeling "as non-governmental entities and contractors." *Id*. at 21.

Defendants' quick treatment of channeling is indicative of the weakness of that argument. As the district court held, the claims in this case simply do not implicate federal employment statutes. But even if *Thunder Basin Coal Co. v. Reich* were applicable, the claims at issue are not "of the type Congress intended to be reviewed within th[e] statutory structure." 510 U.S. 200, 212 (1994). Three disjunctive guideposts inform the *Thunder Basin* jurisdictional assessment: (a) whether denying district court jurisdiction could "foreclose all meaningful judicial review" of the claim; (b) whether the claim is "entirely collateral" to the statute's review provisions; and (c) whether the claim is "outside the agency's expertise." 510 U.S. at 212-13. All three reinforce this Court's jurisdiction and its concomitant duty to resolve the case. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them").

a. This is a case about reviving a Congressionally mandated independent agency. Judicial review under Civil Service Reform Act or Foreign Service Act would come only after multiple layers of agency review, a process that could take years. *See* 5 U.S.C. § 7703 (judicial review provision in CSRA); 22 U.S.C. § 4140 (judicial review provision in FSA); *cf. Axon Enter., Inc. v. Fed. Trade Comm'n*,

15

598 U.S. 175, 212-16 (2023) (Gorsuch, J., concurring) (describing multi-year history of cases subject to statutory administrative review). By that time, USAGM itself would be dead and buried, its audience lost, and its staff scattered, rendering judicial review of Plaintiffs' core claims meaningless.

b. The issues in this case are collateral to CSRA and FSA review provisions. This case does not challenge employment actions directed at specific employees, but rather challenges the prior controlling decision to dismantle an agency in defiance of explicit congressional will. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 900057, at *3 (N.D. Cal. Mar. 24, 2025). Moreover, Plaintiffs could not get the relief they seek— an order that USAGM, among other things, resume broadcasting VOA—through administrative channels. *Cf. AFGE*, 929 F.3d at 760.

c. This case involves fundamental questions about an agency's prerogative to ignore statutory mandates, decidedly not the type of questions the relevant administrative bodies "customarily handle[]," placing it outside the agency's expertise. *Axon*, 598 U.S. at 186. There are no threshold employment questions that would benefit from agency expertise, nor could an administrative agency obviate the need for federal court review. *See AFGE*, 929 F.3d at 761; *OPM*, 2025 WL 900057, at *2; *Axon,* 598 U.S. at 906 ("[U]nlike in *Elgin,* ruling for [Plaintiffs] on expertise-laden grounds would not 'obviate the need' to address their

16

constitutional claims—which, again, allege injury not from this or that ruling but from a more fundamental constitutional injury."). Even if certain individual USAGM employees successfully navigated the administrative review process, challenging their placement on administrative leave or terminations, there would be no agency to return them to. All *Thunder Basin* factors say this is a federal-court controversy.

Moreover, even assuming Congress intended the CSRA/FSA to channel Plaintiffs' claims to administrative bodies, the current Administration's actions to decimate those channels in violation of the relevant laws defeat any *Thunder Basin* inference. *Thunder Basin* channeling is an implied doctrine based on the existence—and congressional intent discernible from—a comprehensive statutory structure. 510 U.S. at 207. Part of the structure of the CSRA (and the FSLMRS housed therein) is the promise of for-cause removal protections for the MSPB and the OSC. *See* 5 U.S.C. §§ 1202(d), 1211(b). But President Trump has fired *without cause* members of each of those bodies; officials who have been terminated by the President without cause are no longer heading either the MSPB or OSC. *See Trump v. Wilcox*, No. 24A966, 2025 WL 1063917 (U.S. Apr. 9, 2025) (administratively staying reinstatement of MSPB Chair); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025) (staying reinstatement of OSC Special Counsel).

Regardless of whether removal protections are constitutional, they are part of the CSRA's comprehensive scheme from which every decision Defendants cite inferred Congressional intent to limit judicial review. The President's violation of that component of the statutory scheme—lawful or not—defeats any channeling inference that may have attached had those bodies remained constituted according to the statute, or simply been without a quorum because of the expiration of a statutory term. The President's actions have effectively erased a statutory provision that Congress enacted and thus intended be honored.  In order "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim," this Court should exercise review. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

### c.  This Is Not a Programmatic Challenge

Defendants next paint this case as a "programmatic challenge to agency operations or personnel," unreviewable under *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) and *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). Br. at 25-26. Defendants thereby gloss over the distinction between court orders requiring an agency to take legally compelled action (this case), and those micromanaging the way an agency fulfills its statutory duties (not this case). *See Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016) (citing *Norton*, 542 U.S. at 65). In simplest terms, Plaintiffs' APA

18

claims pointed to mandatory statutory directives on the one hand, and the unreasoned and unexplained radio silence of VOA programming on the other (as well as cessation of mandatory grants), and asked the district court to mandate compliance. This is a classic APA action, the scope of which is large only because of the magnitude of Defendants' noncompliance. *See Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (APA relief awarded where agency did not comply with statutory commands).

### III.    Defendants Will Not Be Irreparably Harmed Absent a Stay

Defendants claim they will be irreparably harmed absent a stay in two ways: by disbursing funds as Congress directed and by "requiring the Agency to employ particular personnel against its will and superintending its own judgment about requisite agency staffing." Br. at 26-27.

The second point is easily dispensed with, given that the district court's order does no such thing. *See supra* and Add. 128.

As to the first alleged harm, Defendants have yet to explain why distributing funds as Congress mandated would harm the public fisc. The table *supra* is clear. Notably, Defendants have never attempted to defend the legality of their decision.

### IV.    Plaintiffs Will Suffer Irreparable Harm Upon a Stay

Defendants' argument that the harm accruing to Plaintiffs from the withholding of grant money "is monetary" ignores the record. Br. at 25. Plaintiffs

19

are *not* grantees and therefore there is no guarantee that, if successful, "they will receive the funds to the extent required by law." *Id*. To the contrary, Plaintiffs include TNG-CWA, which represents people employed by a grantee, RFA. Members who work at RFA have been furloughed without pay since March 21. RFA cannot return those employees to pay status until USAGM agrees to resume its grant funding on a consistent basis. Add. 131-32 ¶¶ 5-6. As a result of their extended furlough, TNG-CWA members "will lose their health insurance as soon as May 1." Defs' Add. 35-36; Add. 131 ¶ 6. These members include individuals with serious health conditions who rely on their health insurance to cover life-saving treatment. Add. 132-33 ¶ 7. Such harm is irreparable. *See Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002). TNG-CWA members also include people "with H1-B visas [who] face deportation to their home countries where they could face threats, harassment, or imprisonment for their work as journalists as a result of their furlough status." Defs' Add. 35-36. Such harm cannot be remedied after the fact by the disbursement of grant funds.

That context distinguishes this case from *California*, 145 S. Ct. 966. The plaintiffs in that case conceded that "they ha[d] the financial wherewithal to keep their programs running" absent immediate disbursement of their grant money. *Id*. at 969. Not so here. Defendants cannot erase the very real and imminent

irreparable harm TNG-CWA members face by simply ignoring it. *See Nken*, 556 U.S. at 426.

In writing off the remaining irreparable harms the district court relied on as "the employment portion," Defendants ignore that the district court found "the RSF plaintiffs who rely on VOA while living and reporting abroad" are irreparably harmed by its silence. Defs' Add. 35.[5] Defendants also do not address the risk that Does 3 and 4 face upon the expiration of their visas, should they be terminated. *Id.*

Defendants next fault the district court for not accounting for "Agency employees and contractors currently on administrative leave with full pay and benefits," which it says is "hardly a situation rising to the level of irreparable harm." Br. at 29. But the reason those employees are on administrative leave and not terminated is because of the injunctive relief in place—the agency was set to dispense with a majority of its staff immediately before the temporary restraining order issued. Add. 48-103 (evidence of impending reductions in force). Absent injunctive relief, the *sui generis* agency to which they have devoted their careers will collapse and they will be left in the "genuinely extraordinary situation" of being unable to "ever find work approaching what [they] now do[]." *Sampson v.*

---

[5] This same harm accrues to TNG-CWA members who work at other news outlets, travel abroad for their reporting, and rely on USAGM programming to inform their own reporting and personal safety. *See* Add. 23 ¶¶ 15-16; Add. 135-36 ¶¶ 4-6.

*Murray*, 415 U.S. 61, 92 n.68 (1974) (first quotation); *Bonds v. Heyman*, 950 F.

Supp. 1202, 1215 (D.D.C. 1997) (second quotation).

Finally, although the district court did not premise its injunction on these

facts, Plaintiffs have another irreparable harm arising from the APA violations that

Defendants failed to grapple with below and similarly ignore here. USAGM

intends to eliminate the entire unit of radio broadcast technicians—wiping out an

entire AFSCME Local. *See League of Women Voters of United States v. Newby*,

838 F.3d 1, 8-9 (D.C. Cir. 2016) ("obstacles" that "make it more difficult for"

organizations "to accomplish their primary mission . . . provide injury for purposes

both of standing and irreparable harm"). Add. 48-49 ¶¶ 3-6.

**V.    The Balance of Equities and Public Interest Favor Plaintiffs**

Defendants' sole argument on this factor is that there is a public interest in

allowing the executive to carry out Executive Order 14238. But Defendants have

never tried to demonstrate that their actions here do that, nor could they. *See* Defs'

Add. 36 (holding Defendants "have likely violated [the EO] by reducing

USAGM's activities to levels far below the constitutional and statutory

minimums.").

"There is generally no public interest in the perpetuation of unlawful agency

action," and "there is a substantial public interest in having governmental agencies

abide by the federal laws that govern their existence and operations." *Newby*, 838

F.3d at 12. Defendants do not contest that Plaintiffs have made a strong showing on the merits of their claims that Defendants are violating the APA and the Constitution and therefore have not met their burden on this factor.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' stay motion.

Dated:          April 29, 2025                    Respectfully Submitted,

GOVERNMENT                                        EMERY CELLI BRINCKERHOFF
ACCOUNTABILITY PROJECT                            ABADY WARD & MAAZEL LLP

_____/s/_____                            _____/s/_____
David Z. Seide                                    Andrew G. Celli, Jr.
1612 K Street, NW                                 Debra L. Greenberger
Washington, DC 20006                              Daniel M. Eisenberg
(202) 457-0034                                    Nick Bourland
davids@whistleblower.org                          One Rockefeller Plaza, 8th Floor
                                                  New York, New York 10020
*Counsel for Plaintiffs-Appellees Patsy*          (212) 763-5000
*Widakuswara, Jessica Jerreat,*                   acelli@ecbawm.com
*Kathryn Neeper, John Doe 1, John*                dgreenberger@ecbawm.com
*Doe 2, John Doe 3, and John Doe 4*               deisenberg@ecbawm.com
                                                  nbourland@ecbawm.com
AMERICAN FEDERATION OF
STATE, COUNTY, AND                                *Counsel for Plaintiffs-Appellees Patsy*
MUNICIPAL EMPLOYEES, AFL-                         *Widakuswara, Jessica Jerreat,*
CIO (AFSCME)                                      *Kathryn Neeper, John Doe 1, John*
                                                  *Doe 2, John Doe 3, John Doe 4,*
_____/s/_____                            *American Federation of State, County*
Teague Paterson                                   *and Municipal Employees*
Matthew Blumin                                    *(AFSCME); American Federation of*
Georgina Yeomans                                  *Government Employees (AFGE);*
1625 L Street, N.W.                               *American Foreign Service*
Washington, D.C. 20036                            *Association (AFSA); and the*
(202) 775-5900                                    *NewsGuild-CWA*
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff-Appellee*
*American Federation of State,*
*County, and Municipal Employees,*
*AFL-CIO (AFSCME)*

24

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____/s/_____
Sharon Papp
Raeka Safai
2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff-Appellee*
*American Foreign Service*
*Association (AFSA)*
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL-CIO

_____/s/_____
Rushab Sanghvi
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for Plaintiff-Appellee*
*American Federation of Government*
*Employees, AFL-CIO (AFGE).*

DEMOCRACY FORWARD
FOUNDATION

_____/s/_____
Kristin Bateman
Robin F. Thurston
Skye L. Perryman
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs-Appellees*
*American Federation of State, County*
*and Municipal Employees*
*(AFSCME); American Federation of*
*Government Employees (AFGE);*
*American Foreign Service*
*Association (AFSA); and the*
*NewsGuild-CWA*

STATE DEMOCRACY
DEFENDERS FUND

_____/s/_____
Norman L. Eisen
Joshua Kolb
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans*
*Frontières, Reporters Without*
*Borders, Inc., American Federation of*
*State, County and Municipal*
*Employees (AFSCME); and American*
*Federation of Government Employees*
*(AFGE)*

MEDIA FREEDOM &
INFORMATION ACCESS CLINIC -
YALE LAW SCHOOL[1]

_____/s/_____
David A. Schulz
127 Wall Street
New Haven, CT 06520
(212) 663-6162
David.schulz@YLSClinics.org

*Counsel for Plaintiffs Patsy*
*Widakuswara, Jessica Jerreat,*
*Kathryn Neeper, and John Does 1-4*

---

[1] The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,008 words. This brief also complies with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared using Times New Roman, a proportionally spaced typeface.

Dated: April 29, 2025                    *s/Daniel M. Eisenberg*
                                         Daniel M. Eisenberg

# ADDENDUM

## <u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

Mar. 14, 2025 Executive Order (Dkt. 16-1) ........................................Add. 1

Apr. 14, 2025 Decl. of Crystal Thomas (Dkt. 88-4).........................Add. 4

Mar. 22, 2025 Decl. of John Dryden (Dkt. 16-13) ...........................Add. 8

Mar. 23, 2025 Decl. of Jon Schleuss (Dkt. 16-16) .........................Add. 16

Mar. 26, 2025 Supp. Decl. of John Dryden (Dkt. 33-2) .................Add. 47

Mar. 26, 2025 Supp. Decl. of Paula Hickey (Dkt. 33-3) ................Add. 57

Mar. 15, 2025 Email from Crystal Thomas,
    Director, Office of Human Resources, USAGM (Dkt. 16-9)..................Add. 104

Apr. 16, 2025 Decl. of John Doe 4 (Dkt. 92-3) ..............................Add. 107

Mar. 27, 2025 Decl. of Crystal Thomas (Dkt. 43)..........................Add. 110

Mar. 23, 2025 Decl. of Thibaut Bruttin (Dkt. 16-15) ....................Add. 114

*Widakuswara v. Lake*, No. 25-cv-1015 (RCL) (D.D.C), Apr. 25, 2025
    Order Denying Defendants' Motion for a Partial Stay Pending
    Appeal (Dkt. 104) ...............................................................Add. 124

Apr. 14, 2025 Decl. of Jon Schleuss (Dkt. 92-1).........................Add. 130

Apr. 17, 2025 Decl. of John Dryden (Dkt. 95) .............................Add. 135

# EXHIBIT A

LIVE NOW

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

CONTINUING THE REDUCTION OF THE FEDERAL BUREAUCRACY

The White House

March 14, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. This order continues the reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary.

Sec. 2. Reducing the Scope of the Federal Bureaucracy.

(a) Except as provided in subsection (b) of this section, the non-statutory components and functions of the following governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law:

(i)   the Federal Mediation and Conciliation Service;

(ii)   the United States Agency for Global Media;

(iii)  the Woodrow Wilson International Center for Scholars in the Smithsonian Institution;

(iv)  the Institute of Museum and Library Services;

(v)   the United States Interagency Council on Homelessness;

(vi)  the Community Development Financial Institutions Fund; and

**Add. 2**

(vii)  the Minority Business Development Agency.

(b)  Within 7 days of the date of this order, the head of each governmental entity listed in subsection (a) of this section shall submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent.

(c)  In reviewing budget requests submitted by the governmental entities listed in subsection (a) of this section, the Director of the Office of Management and Budget or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order.

Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or  the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
March 14, 2025.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

       Plaintiffs,

    v.

KARI LAKE, Senior Advisor to the Acting
CEO of U.S. Agency for Global Media, et al.,

       Defendants.

Civil Action No. 25-1015 (RCL)

**DECLARATION OF CRYSTAL THOMAS**

I, CRYSTAL THOMAS, hereby make the following declaration pursuant to 28 U.S.C. § 1746:

1.     I have been the Director of Human Resources for the U.S. Agency for Global Media ("USAGM") since 2024. I base this declaration on knowledge and information I have gained in the course of performing my official duties.

2.     In that capacity, I have personal knowledge of, and direct involvement, in personnel decisions for USAGM.

3.     USAGM currently employs a total of approximately 1,147 full-time employees. As of March 14, 2025, USAGM had active employment contracts with 598 personal service contractors.

4.     On March 14, 2025, President Trump issued an Executive Order directing that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law" (the

Add. 4

"Executive Order"). *See* Continuing the Reduction of the Federal Bureaucracy, https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ (Mar. 14, 2025).

5.      On March 15, 2025, pursuant to the Executive Order, USAGM placed 1,042 full-time employees on administrative leave with full pay and benefits. On March 16, 2025, and terminated the contracts with all personal services contractors. On March 26, 2025, all personal services contractors were reinstated and are receiving full pay and benefits, but they are not currently working. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order.

6.      In the course of that implementation, on March 25, 2025, I sent an email to 33 employees who work at Office of Cuba Broadcasting recalling them from administrative leave effective March 26, 2025. As of the end of the day on March 26, 2025, I can confirm that all employees were on work status. I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025.

7.      In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 69 other employees from administrative leave to provide mission support including broadcasting support for the Office of Cuba Broadcasting, facilities management, contracts management, and IT support. No additional employees have been placed on administrative leave.

8.      The American Federal Government Employees Local 1812 ("AFGE") serves as the exclusive representative for a bargaining unit consisting of approximately 713 USAGM employees. On March 25, 2025, I sent an email to the AFGE Local 1812 President enclosing a preliminary notification to the union stating USAGM's intent to implement a reduction in force ("RIF") for multiple competitive areas in USAGM in furtherance of the Executive Order.

9.     The American Federation of State, County and Municipal Employees Local 1418, AFL-CIO ("AFSCME") serves as the exclusive representative for a bargaining unit consisting of approximately 33 USAGM employees.  On March 25, 2025, I sent an email to the AFSCME Local 1418 President, enclosing a preliminary notification to the union stating USAGM's intent to implement a RIF for multiple competitive areas in furtherance of the Executive Order.

10.     Both of the foregoing notifications informed the respective unions of USAGM's intention to implement a RIF in a manner consistent with USAGM's Negotiated Labor Management Agreements ("NLMA") with each union.

11.     The notifications that were issued will not directly result in the termination of any USAGM employee.  Rather, it is a first step in the process of conducting a RIF, pursuant to the NLMAs with each respective union.  Additional steps in the RIF process with both unions will include, among other things, impact and implementation bargaining to the extent requested by the unions; providing additional information to the unions, including responding to union information requests; providing the unions with retention registers; and specific notice to bargaining unit employees.  Each of these steps would occur prior to removing any bargaining unit employees in the RIF implementation process.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 14, 2025
          Washington, District Columbia


                                        _____
                                        CRYSTAL THOMAS

Add. 6

# EXHIBIT M

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

Case 1:25-cv-01013-RCL    Document 16-13    Filed 03/24/25    Page 2 of 10
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 41 of 169

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                              Plaintiffs,

        -against-

KARI LAKE, et al.,

                              Defendants.

No. 25 Civ. 2390

## DECLARATION OF JOHN DRYDEN

I, John Dryden, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the president of the Voice of America Employees Union, Local 1418, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 1418" or "Union"). AFSCME Local 1418 is affiliated with AFSCME District Council 20 and AFSCME International Union. District Council 20, through its constituent local unions like Local 1418, represents federal civilian employees in agencies and departments across the federal government. I have served as president of Local 1418 since August 2020.

3. Both before and since becoming the local union president, I have been employed by the U.S. Agency for Global Media (USAGM) as a Radio Broadcast Technician for the Voice of America (VOA) in its Radio Studios. I have been employed at VOA for 17 years. VOA is overseen by USAGM, and is an international broadcasting state media network funded by the federal government. Its primary mission is to provide objective news and

1

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

Case 1:25-cv-01015-RCL    Document 16-13    Filed 03/24/25    Page 3 of 10
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 42 of 169

information about the U.S., the audience's specific region and the world to people who
lack access to objective information. For over 80 years, VOA has broadcast content over
the radio, television, or the internet in almost 50 languages all over the world.

4.  AFSCME Local 1418 represents a collective bargaining unit of approximately 32
employees who work for USAGM on VOA.  The collective bargaining agreement
covering these workers is applicable, by its terms, to "all non-supervisory Radio
Broadcast Technicians employed by USAGM in the Radio Master Control" and "Radio
Studios" in Washington, D.C., as well as those "assigned to the New York News Bureau"
in New York City, NY.  Currently, all members of the bargaining unit work in
Washington, D.C. Some bargaining unit members have been in the past, and may also be
periodically in the future pursuant to the collective bargaining agreement, assigned to the
New York News Bureau, which mainly covers the United Nations, when the bureau there
produces radio programing or audio support for television.

5.  Under the collective bargaining agreement, AFSCME Local 1418 represents two types of
employees: Radio Broadcast Technicians (RBT) who work in Radio Studios and RBTs
who work in the Radio Master Control. These employees are generally responsible for
being present at each language service live broadcast studio at the time the language
service is producing a live show and engineering the live show for broadcast. These
employees are responsible for engineering live broadcasts of radio programing by
running the mixing console in the Radio Studios or working in the Radio Master Control.
Most of the bargaining unit members work in the Radio Studios. VOA broadcasts
approximately 49 live radio programs in different languages that these employees must
engineer to be broadcast. Some of these programs also have video components that are

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2DB1AD

broadcast on television or the internet. Engineering the radio programming includes setting up and running equipment for the radio broadcasts such as computer programs, audio and video files, microphones, lights, and cameras for programs with video components. Working under the direction of bilingual directors and producers who understand the language of the programing and can communicate in English with the RBTs, these employees operate the broadcast mechanics of live radio programs. RBTs are essential employees that are vital to maintaining uninterrupted broadcasting operations for VOA. For example, these employees are in the building 24 hours during snow emergencies, continued working during the entire pandemic, and must work during government shutdowns as essential staff.

6. AFSCME Local 1418 represents the interests of the VOA's Radio Broadcast Technicians. Our core functions include providing support, guidance, and resources to bargaining unit employees as their officially recognized exclusive representative.

7. As the exclusive representative for the nonsupervisory RBTs, AFSCME Local 1418 enters into collective bargaining negotiations with the USAGM, VOA on a wide variety of terms and conditions of employment and represents bargaining unit members through the negotiated grievance process.

8. AFSCME Local 1418 and the USAGM, VOA are parties to a collective bargaining agreement that memorializes negotiated terms and conditions of employment, benefits, rules, a grievance procedure and other procedures of the workplace.

9. Early on Saturday, March 15, 2025, I received a notice from the Director of Human Resources, Crystal G. Thomas, to my VOA email address informing me that "[p]ursuant to the Presidential Executive Order Continuing the Reduction of the Federal Bureaucracy

Add. 10

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

– The White House and the Office of Personnel Management Guidance on Probationary Periods, Administrative Leave and Details and additional authorities, including but not limited to, 5 C.F.R. § 630.1403, effective immediately, the United States Agency for Global Media (USAGM) is placing you on administrative leave with full pay and benefits until otherwise notified." The email notice also stated that I no longer had access to USAGM systems or premises and may be required to return government property. The notice further stated that "[w]hile on administrative leave, you remain an employee of the Agency. You are required to comply with the instructions of your supervisors, all laws and regulations, and agency policies, including the Broadcasting Administrative Manual (BAM)." A true and correct copy of this notice is attached hereto as Exhibit 1.

10. Soon after receiving the administrative leave notice, bargaining unit members began notifying the union by phone, email and text message that the USAGM sent these employees the same administrative leave email that I received. I also received a call from a VOA supervisor informing me of the decision to place all bargaining unit members on administrative leave and that employees were prohibited from accessing the VOA offices.

11. On Saturday, March 15, 2025, several bargaining unit members were at the VOA offices working on weekend programing; because Master Control RBTs are required to be present in-person to broadcast programming, we have bargaining unit members on-site 24/7. These members were told by their supervisors to finish their live broadcasts and then to vacate the building because they needed to clear the building out. At approximately 5:00 p.m. on the same day, bargaining unit members lost access to USAGM systems, including email.

Add. 11

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

12. All bargaining unit members were placed on administrative leave on March 15, 2025. USAGM did not provide the union advance notice of the decision to place employees on administrative leave or provide the union with a list of all affected bargaining unit members.

13. On March 19, 2025, I received an email from the USAGM Human Resources Director informing me that I was no longer on administrative leave, and I regained access to my VOA email. However, I was not returned to work as an RBT. As of the date of this declaration, I am not aware of any other bargaining unit members who have been removed from administrative leave and reinstated to their duties of broadcasting radio programing as RBTs.

14. VOA broadcasting ended and went dark on Saturday March 15, 2025 for the first time in the over 80-year history of the agency and radio broadcasting has not resumed as of the date of this declaration. For more than 80 years, a Master Control RBT was required to be in the Radio Master Control Facility 24/7 to make sure the VOA's radio programming was broadcast around the world and for the first time, the Radio Master Control Facility went dark when all RBTs were told they needed to vacate the building.

15. Since the administrative leave notices were sent to affected employees, the union has been flooded with emails, texts, and phone calls from affected employees and other bargaining unit members who are distraught and are concerned about their livelihoods and the mission of their agency. Affected employees have contacted the union to seek information, guidance, and explanations of their rights, including retirement rights for those of retirement age because they are receiving only scant guidance from USAGM.

16. Affected employees are physically and emotionally stressed by the negative impact of the USAGM's decision to place all employees on administrative leave and the implications of this decision on their future employment with the VOA and their livelihoods. Members are worried about their ability to pay for housing, education, daycare, and to provide food for their families. Some members have decided to retire early because they cannot handle the financial uncertainty. Others are concerned that the agency's action will negatively impact their ability to retire. Affected employees are looking to their union to protect them and to provide information on their options if they are eventually terminated. The union has had to research information that in normal circumstances would have been provided by the agency to provide to members and has been forced to seek legal advice and resources from AFSCME International, the parent labor federation of AFSCME District Council 20, on union on members' legal rights.

17. The Union continues to respond to a flood of calls, texts, and emails from bargaining unit members. Members are asking for information on the future of their employment, as they are not getting information from the USAGM. Members are asking how long they will be on administrative leave; how payroll will be processed; how employees can submit timesheets for hours worked up until Saturday March 15 without access to USAGM systems; how can they retrieve their personal belongings left behind at the office; and how their retirement benefits will be affected if the VOA is shutdown. Those that are retirement eligible are asking the Union for advice on submitting retirement applications. The Union is providing almost daily updates by emails and text messages to the entire bargaining unit about what we know and can share about potential legal actions to

challenge the shuttering of the VOA, whether brought by our Union or other parties, and its critical work of broadcasting news and content to the global community.

18. Bargaining unit members and the Union are concerned about the negative impact of the USAGM's decision to shutter the VOA on its critical mission to provide information to people around the world who lack access to objective news. In Broadcasting, if your programing is on every day and suddenly you stop broadcasting your program, the station will begin to lose its audience, and you will never gain them all back. The taxpayers have invested more than 80 years into VOA programing that has built a loyal and broad global audience, and this investment can be destroyed in a very short amount of time. The danger to the public is that the global audience will not get any objective news about their own country or about the U.S. The mission of the agency is not being fulfilled by not broadcasting its programing and paying skilled and essential workers to stay home and not do their important work.  And many of our members do this work because of how deeply we believe in its mission, so we are deeply distraught to see that mission destroyed.

19. One of the most important parts of the VOA's programing that fulfilled the VOA's mission was the daily North Korean program. This broadcast is one of the few ways people in North Korea can get objective news of what is happening in the rest of the world. This programming delivers content that is critical to the North Korean people. For example, this program has a longer than usual weather news cast that provides detailed information about the weather because when people want to defect to China, they must walk there. Being able to check the weather for favorable conditions is crucial for their survival during the dangerous journey. Another important program is the broadcast into

Add. 14

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

Iran, where the public does not have access to objective news about the outside world and

can receive VOA's satellite television broadcast.

20. Since the USAGM decided to place all VOA employees on administrative leave, the

Union has had to divert virtually all of its time and resources to engage with the

membership on this issue and address their concerns. Since the agency's decision,

member representation has become my full-time job. I have been spending at least 8

hours per day addressing the concerns of bargaining unit members who are concerned

about the future of their employment and their livelihoods. I have also had to coordinate

with the local's executive board, District Council 20 and AFSCME International on how

to communicate advice and counsel to our members. The local's vice president has also

worked extensive hours each day assisting our affected members and investigating the

issue. This representational work for the Union is only increasing because of the mass

confusion caused by the abrupt shuttering of the VOA.

21. The substantial increase in emails, phone calls, text messages, and requests for

counseling concerning the closing of VOA has diverted resources and time that the union

dedicates to its mission of advocating and negotiating for improved workplace

conditions, organizing new members, representing employees, and the administrative

tasks to maintain the union.

22. Members of the VOA bargaining unit pay voluntary membership dues to the union,

which is the union's overwhelming source of operational funding.  The union's budget

will be negatively impacted because of the loss of dues if members are terminated, and its

bargaining power will be diminished because of the loss of members due to potential

terminations. We will also lose membership and dues if members choose to retire as a

Docusign Envelope ID: DAF4B163-466E-4E5C-B429-EBC0BC2D81AD

result of the uncertainty the USAGM has caused. To my knowledge, three members have submitted retirement applications and others are considering doing the same.

23. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Germantown, MD on the 22nd day of March, 2025.

Signed by:

*John Dryden*

98042BA9D222416

John Dryden

**Add. 16**

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 2390

### DECLARATION OF JON SCHLEUSS

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the International President of The NewsGuild-CWA, AFL-CIO ("TNG-CWA"), a labor union representing more than 27,000 employees. TNG-CWA is the largest labor union representing journalists and media workers in North America.

3. TNG-CWA represents a bargaining unit of about 100 employees of Radio Free Asia (RFA), a news service that provides news, analysis, commentary, and cultural programming to a weekly audience of nearly 60 million who lack access to a free press or live in media environments vulnerable to authoritarian disinformation.

4. RFA operates under a Congressional mandate to deliver uncensored, domestic news and information to China, Tibet, North Korea, Vietnam, Cambodia, Laos, and Burma, among other places in Asia with poor media environments and few, if any, free speech protections. RFA produces news in Burmese, Cantonese, Khmer, Korean, Lao, Mandarin, Tibetan, Uyghur, and Vietnamese for shortwave and medium wave radio, satellite

1

**Add. 18**

television, and online through websites, apps, and social media platforms. RFA's news

programming in nine languages provides accurate and timely information in countries

whose governments prohibit access to a free press.

5. RFA is a private, nonprofit corporation, funded by the U.S. Congress through an annual

grant from the U.S. Agency for Global Media (USAGM), an independent federal

government agency that oversees all U.S. civilian international media.

6. The mission of USAGM is to inform, engage, and connect people around the world in

support of freedom and democracy. USAGM programs—Voice of America, Radio Free

Europe, Office of Cuba Broadcasting (Radio Marti), RFA, and the Middle East

Broadcasting Networks—all share in common a mission to promote democratic values by

providing accurate, uncensored news and open debate in countries where a free press is

threatened and disinformation is pervasive.

7. TNG-CWA, through its local union, the Washington-Baltimore News Guild, and RFA

are signatories to a private-sector collective bargaining agreement ("CBA"), governed by

the National Labor Relations Act (NLRA), which governs wages, benefits, and other

terms and conditions of employment and runs through December 31, 2025.  Under the

CBA, TNG-CWA is recognized as the exclusive collective bargaining agent of all full-

time and regular part-time language service employees, including Journalists, Digital

Content Producers, Administrative Assistants, Administrative/Productive Assistants,

Web/Social Media Editors, Web Outreach Specialists, Production Coordinators, and

Production Specialists employed by RFA in Washington, DC, but excluding all Senior

Editors, including Senior Web/Social Media Editors, Senior Digital Content Producers,

Senior Multimedia Producers, editorial department employees, contractors, professional

Add. 19

employees, managers, guards, and supervisors as defined in the National Labor Relations Act.

8.  On March 13, 2025, a TNG-CWA member at RFA received confirmation from RFA's Executive Editor that USAGM had cut RFA's wire services contracts with the Associated Press and Agence France-Presse—which are an essential tool for journalists that provide the right to republish news produced by hundreds of journalists from those newsrooms. The Executive Editor said RFA employees would lose access to these necessary work tools at the end of that day.

9.  On March 15, 2025, RFA's President issued a press release stating that RFA had been informed that day by USAGM that RFA's federal grant agreement, which makes possible RFA's operations in Asia and globally, had been terminated. RFA's President issued a statement that "[t]he termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would like nothing better than to have their influence go unchecked in the information space. RFA has been foundational in helping U.S. policymakers understand the reality of what's happening in China and other closed countries, bringing transparency and accountability where there is none…. Today's notice not only disenfranchises the nearly 60 million people who turn to RFA's reporting on a weekly basis to learn the truth, but it also benefits America's adversaries at our own expense."

10. On March 19, 2025, RFA employees received notices stating 75% of the U.S. based staff would be placed on unpaid furloughs starting on Friday, March 21, 2025, which is the furloughed employees' last day of pay. RFA's human resources department notified employees on March 19, 2025 who would be subject to furlough. RFA management

Add. 20

asked TNG-CWA for the ability to determine which employees will be furloughed. RFA management said employees located in other countries will not be subject to the furlough. RFA did not indicate how long the furlough will last, but RFA stated that health insurance and other benefits like life insurance, disability, dental and vision will only be maintained through the end of April 2025, after which RFA will inform furloughed employees of any changes. RFA has, however, already provided employees with information on how to obtain healthcare coverage in anticipation of employees losing health insurance after April 2025.

11. As President of TNG-CWA, these events at RFA have been reported to me directly by bargaining unit members who work for RFA. A core function of our union includes providing support, guidance, and resources to bargaining unit employees as their statutory representative under the NLRA. The changes to the working conditions at RFA due to USAGM funding cuts will require TNG-CWA to bargain over the effects of those changes with RFA. And because the overwhelming majority of TNG-CWA funding comes from bargaining unit employees' membership dues and fees deducted from their paychecks, the furlough and any other action that reduces worker wages due to USAGM cuts will harm TNG-CWA directly by reducing the income it receives and uses to represent the employees' interests.

12. Affected RFA employees are heartbroken and stressed by the negative impact of unpaid furloughs for a large number of colleagues, RFA funding writ large, and the unexpected and abrupt cancellation of their news wire services. These sweeping changes put pressure on their lives, the lives of their families, and decimate their important work for RFA fighting anti-democratic forces by producing news and promoting a free press. For

instance, a Uyghur Service employee reports that their work at RFA has already resulted in severe consequences for their family in China. Due to their reporting on human rights abuses against Uyghurs, they have lost all contact with relatives in China, witnessed family members being harassed by authorities, and had loved ones detained or sent to internment camps as punishment for their work at RFA. The impending furlough exacerbates these risks, as family members may be seen as even more vulnerable to retaliation. Moreover, the silencing of these journalists weakens global efforts to hold authoritarian governments accountable for their actions.

13. The situation at RFA is extremely time-sensitive and requires immediate action. A number of RFA employees are present in the country and work for RFA pursuant to nonimmigrant work visas. RFA has thus far prioritized continuing the employment for employees in the U.S. on nonimmigrant work visas, while furloughing other staffers. However, because of losing their grant from the U.S. Agency for Global Media, RFA will likely soon not have the resources to continue employing staff in the U.S. on nonimmigrant work visas. If that happens RFA will terminate these employees, requiring them to uproot their lives and return to their home countries where several are likely to face retaliation and persecution because of their press freedom work at RFA. This creates a serious risk of immediate harm. For instance, the majority of employees in Cantonese Service fled from Hong Kong when the Chinese Communist Party led a brutal crackdown on democracy advocates and journalists. They will be targeted by the Chinese government if they are forced to return.

14. Before becoming President of TNG-CWA, I was a journalist for many years, including at the Los Angeles Times where I was a member of TNG-CWA. TNG-CWA also represents

5

journalists at major news organizations such as the New York Times, Wall Street Journal, the Associated Press, Agence France-Presse, the Philadelphia Inquirer, Boston Globe, and many more.

15. Although TNG-CWA members' jobs are based in the United States and Canada, some members, such as reporters and photojournalists, report on stories that require travel to other countries, including countries where USAGM programs, such as RFA, broadcast to combat the lack of a free press.

16. For example, the 2022 Olympic Games were held in Beijing, China—and many stateside TNG-CWA members attended to report. Ahead of the 2022 Olympics, RFA itself reported on the risks to reporters of being present in China where there is no media freedom. "The Chinese government had pledged to respect media freedom, labor rights and peaceful demonstrations during the Olympics. But there is no evidence that it has followed through," RFA reported, citing Amnesty International.  And during the games, Human Rights Watch reported that Chinese media censorship continued, including on both state television and the internet as accessible in China. But the in-country availability of RFA helped to mitigate the inherent dangers to journalists stemming from censorship, by allowing for the free flow of information, over radio airwaves and online, into China.

17. Maintaining a free and independent press is fundamental to the journalistic profession— TNG-CWA members simply cannot do their jobs without it, and the promotion of freedom of the press worldwide is a core part of TNG-CWA's mission.  Article I of the TNG-CWA Constitution, titled "Name and Object," includes in its mission "to improve the working conditions of its members; to guarantee . . . constant honesty in news,

Add. 23

editorials, advertising, and business practices; [and] to raise the standards of journalism and ethics of the industry."

18. USAGM programs, including but not limited to RFA, further TNG-CWA's fundamental organizational mission by (1) improving its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protecting their safety in those countries by allowing for the free flow of information into countries otherwise beset with government censorship; and (3) promoting the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

19. The furlough will also adversely impact the work of these journalists. I know from my own experience as a radio journalist that listeners can be lost when broadcasts go silent. The people who listen to RFA are dependent on it for unbiased news in the despotic countries where they reside and are inundated with state media that is nothing more than propaganda. When RFA goes silent, these people will not only give up on RFA as a news source but also on the ideals of democracy, a free press, and free speech that RFA has fostered in these countries. Even if RFA resumed or was replaced in the future, there is no guarantee listeners will return once the broadcast goes silent. Once listeners or viewers lose access to RFA's programming, they may turn to other sources of information, including state-controlled media, and may not return even if RFA's services are eventually restored. This could result in an irreversible setback to RFA's mission of providing uncensored news and promoting democratic values in these regions.

20. I've received more than two dozen statements from our union members at RFA explaining the impacts the furloughs will have on their personal lives and on their role as

journalists. These statements are attached to this declaration as Exhibit 1, with union members' names redacted to protect the privacy and safety of these workers. Some of these statements note the risk to RFA journalists personally of losing their nonimmigrant work visas and having to return home to countries where they could be persecuted due to their work for RFA as journalists, such as Vietnam, or China, or the danger that a loss of RFA programing will expose their family members to retaliation abroad. Several of our members highlight their roles as the chief breadwinner in their households, supporting spouses, children and elderly parents. Several identified medical issues that are treated through their employer-provided health insurance. Our members also highlight the value of their work, from reporting on human traffickers, to genocide to coverage of North Korean defectors, and emphasize how the role of the free press in the countries served by RFA will be undermined if RFA's broadcasts are curtailed or eliminated.

Executed at Washington, D.C. on the 23rd day of March, 2025.

_____

JON SCHLEUSS

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 10 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 59 of 169

Exhibit 1
Schleuss Declaration

███████████

I was raised in South Korea by my grandfather, who came from North Korea.

I was fortunate to study in the United States and was drawn to the mission of delivering information to North Korean citizens.

This passion led me to join Radio Free Asia (RFA), where I have been working for the past three years. I have always found deep fulfillment in my work, but recently, I was hit with the shocking news that the company might shut down.

I had been planning to stay in the U.S. through my work and eventually become an American citizen, but this unexpected development has put my future in jeopardy. Just last year, I purchased a home and am still paying off the mortgage. On top of that, my wife is currently pregnant, and we are expecting our child soon.

Beyond the financial strain, my family is experiencing significant emotional distress due to the uncertainty surrounding our future. I am determined to return to my work—not only for my family but also for the North Korean people who rely on our broadcasts.

I would be truly grateful for any support you can provide.

███████████

I am a Researcher at Radio Free Asia (RFA), specializing in audience research across all of RFA's language services. My work ensures that RFA's reporting reaches people in repressive environments where independent news is blocked.

The funding freeze by the U.S. Agency for Global Media (USAGM) has already disrupted my work and created constant uncertainty about my job. I'm worried about my future. My salary covers rent, bills, and daily expenses—losing it suddenly would be devastating for me and my family. The fear of job loss, combined with the intensity of my work, has affected my sleep, focus, and overall well-being.

This is more than just a job to me. My work is highly specialized, and if I'm forced out, I may not find another role like this. The freeze has already stalled my growth and left me feeling stuck.

The funding freeze has taken a great toll on me —financially, emotionally, and professionally. I urge the court to act now and restore RFA's funding before the damage becomes irreversible.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 11 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 159 of 239

Exhibit 1
Schleuss Declaration

---

█████████

RFA Korean Service has a mission to broadcast radio programs to North Korea, providing them with external information and ensuring their right to know. In addition, through the testimonies of North Korean escapees who have settled in countries such as the United States, South Korea, and Europe, RFA continues to raise issues and hold accountable the human rights violations occurring in North Korea. Escapees have few platforms where they can cautiously share the painful experiences they went through in North Korea and during their escape, including violence, sexual violence, human trafficking, persecution, detention, and forced repatriation.

At RFA, we believe that the ability to send messages to North Korea allows the North Korean people to realize they live without freedom. In particular, North Korean escapees who were caught by Chinese authorities during their escape, are not recognized as refugees. Not recognizing them as refugees is against the international law because they will face serious persecution and imprisonment, and in the worst case, execution if repatriated to North Korea. Escapees speak out for their families and friends who are going through such ordeals, urging an end to these practices.

If the RFA broadcasts stop, the opportunity for people in North Korea to hear the truth will disappear. This is a matter directly connected to the safety and lives of North Korean people. The North Korean regime thoroughly bans its citizens from listening to foreign broadcasts, yet it listens to them itself.

Then the regime impose even harsher laws and policies to control the people. RFA is a critical mechanism that upholds a core value pursued by the United States: protecting freedom of speech and standing against authoritarian systems.

---

█████████

I am ███ from RFA Burmese Service. I have been working at RFA for over seven years. Back in my country, Myanmar, people have been struggling in many different ways after the coup.

Countless innocent lives have been lost to military attacks. Many civilians are arrested just for opposing the junta. The future of our youth is shattered under military conscription. Refugee numbers keep rising as people flee for their lives.

Many people are suffering due to civil war and economic crisis, struggling to survive each day.

Moreover, they are helpless and hopeless in the presence of human rights violations and crimes against humanity.

Through RFA, we share with the world how Burmese people are being oppressed under military rule. Their voices must be heard. Their suffering must not be ignored. And their fight for freedom must not be forgotten.

Especially, in most areas, where the internet access is blocked, people rely on RFA radio for news and information. Our broadcasts remain a vital lifeline for them.

They need RFA as a trusted voice to bring the truth to those who need it most.

I am a journalist at Radio Free Asia's (RFA) Uyghur language service, where I have spent the past 15 years investigating state repression in China, particularly in the Uyghur region (Xinjiang). My reporting has exposed the mass surveillance, arbitrary detention, and forced labor that Uyghurs and other ethnic minorities endure.

The funding freeze imposed by the U.S. Agency for Global Media (USAGM) is devastating, not only for RFA's mission but for me personally. This freeze has put my family's financial stability at risk. My salary covers our mortgage, bills, and daily expenses, and I am now deeply worried about how we will make ends meet if RFA is unable to pay us. Even more critically, my health insurance—and that of my entire family—is tied to my employment.

As someone battling diabetes, I rely on daily insulin shots to survive. Losing my job would mean losing my healthcare, putting my health in immediate danger. The stress and uncertainty caused by this funding freeze have severely impacted my mental and physical health. Since learning about USAGM's decision to cancel RFA's grant, I have been unable to sleep properly and frequently suffer from headaches, nausea, and extreme stress. My blood glucose levels—despite daily insulin shots—have skyrocketed, putting me at even greater medical risk.

This situation is not just a financial crisis   it is a direct threat to my health, my family's well-being, and my ability to continue my work. I urge the court to immediately restore RFA's funding before the harm becomes irreversible.

My name is ███████████ and I worked as a journalist at Radio Free Asia (RFA) for seven years, directly contributing to broadcasting efforts targeting North Korea.
I am a South Korean national living alone in the United States, and my employment at RFA has been my sole means of financial support.

The USAGM's decision to freeze funding for RFA, along with the looming possibility of sudden termination, poses an immediate and severe threat to my livelihood. If I am furloughed and subsequently laid off without any preparation or financial assistance, I will face the following challenges:

1. As a South Korean national living alone in the U.S., I will struggle to meet my basic living expenses.

2. My salary is the sole source of income covering my monthly mortgage and other essential costs. Without my job, I will be forced to rely on unemployment benefits, which will be insufficient to cover my mortgage and basic living expenses.

I immigrated to the United States 16 years ago and legally obtained permanent residency. I also relocated to Washington, D.C., specifically for my role at RFA. If my job is abruptly eliminated, I will be left in an extremely precarious financial situation within just one month.

I urge those in decision-making positions to recognize the devastating impact of this funding freeze and potential termination, not only on me but also on many other dedicated journalists who have committed their careers to the mission of independent journalism.

---

███████

I am writing to you today with a heavy heart to express my profound concern regarding the announced closure of Radio Free Asia (RFA). I have dedicated the past 17 years of my life to RFA, having joined the organization in 2008.

On the partition wall of my desk at the RFA office in Washington, D.C., I have proudly displayed a letter from North Korea titled "To ██████████, Reporter, Radio Free Asia, Washington, D.C., USA." This letter, a fax I received in April 2012 from a North Korean defector named ██████████, began with the words, "Greetings, I am ██████████ from North Korea. I am currently in a small city in ██████████, China."

In her message, ██████████ explained that she had been listening to RFA broadcasts and had memorized my name and fax number. Desperate to escape the watchful eyes of the North Korean authorities in China and reach the free world, she pleaded for our assistance.

This letter served as undeniable proof that our broadcasts reached the people of North Korea and could profoundly impact their destinies. It is with this understanding and a deep sense of purpose that I have spent the last 17 years working joyfully and gratefully at RFA.

My time at RFA has been filled with meaningful experiences. In 2013, I was honored to receive a Bronze Award at the New York Radio Festival for a program I produced covering North Korean defectors who had settled in London after the 2012 Olympics. Despite their newfound freedom, their longing for their homeland remained, evident in their passionate support for the North Korean athletes. This story highlighted the complex emotions and enduring connections of those who have left North Korea.

Just as my broadcasting career flourished at RFA, so too did my family. My two daughters, who were seven and four years old when I joined RFA, have now grown into university students. I have always cherished my work at RFA, finding immense satisfaction in serving as a voice for the voiceless in North Korea.

Therefore, it was with utter shock and devastation that I received the news in March 2025 that RFA, an organization I consider my "home," would be closing its doors. Having built my entire life in the United States alongside my work at RFA, this news has been more impactful than any other event in my life. Sleepless nights are now common as I face the daunting reality of covering my daughters' university tuition and our home mortgage. Furthermore, the prospect of no longer being able to connect with and broadcast to our North Korean listeners, the very people who made my work so fulfilling, is a source of deep despair.

I implore you, esteemed members of Congress, to please extend your support to ensure that RFA can continue its vital broadcasts to the people of North Korea.

When I immigrated to the United States in my thirties after getting married, I carried with me the hope of achieving the "American Dream." I earnestly request your assistance in ensuring that this dream can still have a happy ending.

Thank you for your time and consideration of this urgent matter.

---

My name is ▮▮▮▮ and I joined RFA in January 2025 as a Digital Content Producer. At RFA, I have produced videos and podcasts on topics the Vietnamese government desperately wants to keep hidden. My reporting has exposed political corruption, the suppression of free speech, and human rights abuses.

Unlike many of my colleagues who use pseudonyms to protect their identities, I chose to appear on camera, making my face and name publicly known. I believed that reporting from the United States - and RFA's affiliation with the U.S. government - would offer me protection.

Exhibit 1

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 15 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 64 of 169
Schleuss Declaration

On March 14, 2025, an executive order titled "Continuing the Reduction of the Federal Bureaucracy" was signed by President Donald Trump, mandating cuts to the United States Agency for Global Media (USAGM), RFA's overseer. Because my H-1B visa is directly tied to my employment with RFA, the potential dismantling of USAGM now hinders my ability to remain in the U.S.

If I lose my job, I could be forced to return to Vietnam - where I am now a known figure in independent journalism and a direct target for government retaliation.

The Vietnamese government has a long history of persecuting journalists, particularly those affiliated with RFA. Many of my colleagues have been harassed, detained, or imprisoned for their reporting.

I am at high risk of harassment and intimidation by Vietnamese authorities, a prolonged prison sentence for "anti-government propaganda" charges and both physical, psychological abuse. The constant fear of persecution, imprisonment, and potential torture also take a severe toll on my mental health, subjecting me to relentless anxiety, stress, and psychological distress.

Returning to Vietnam is not just a risk - it is a direct threat to my safety. I have spent my career fighting for the truth, and now, that very truth puts me in danger.

I am seeking protection because I know that I will be threatened and tortured if I return. The Vietnamese government sees me and my work as a threat, and they have repeatedly demonstrated that they will go to great lengths to silence voices like mine.

---

I've been working at Radio Free Asia since May 2017. I started as a contractor and became a regular employee in April 2019. My family grew with Radio Free Asia.

During my employment, I got married, had a baby, and bought a house. This company means so much to me and my family.

What RFA is experiencing now, and what I'm about to experience, furlough or layoff will have a significant impact on my loving family financially.

My family's monthly income is my family's monthly spending. What I get in my paycheck has to be spent in order to sustain my family's daily living.

Case 1:25-cv-01015-RCL     Document 16-16     Filed 03/24/25     Page 16 of 30
USCA Case #25-5144     Document #2113400     Filed: 04/29/2025     Page 65 of 169

Exhibit 1
Schleuss Declaration

With a serious car accident I had in October last year, it already added financial burden to my
family with car payment for a new car, on top of more than $2500 mortgage per month. Without
consistent income from RFA, I do not see a future for my family. Dismantling RFA will also
dismantle my family's life.

Not only financially it will impact my family, it will also be a threat to my family's health. With
uncertainty that health insurance would continue, we are on the edge of harming my husband's
medical condition. My husband, a loving father, is a patient who must take a certain medication
daily. I also have a six year old daughter, a kindergartener who is vulnerable to severe illness
from various viruses and diseases.

Not only in my personal life, but my heart is also with all those people living in closed countries
where they don't have freedom of press. Radio Free Asia's mission to deliver uncensored news is
my mission…our mission which must continue.

---

My name is ██████, and for the past three years, I have worked as a journalist for the
Korean service at Radio Free Asia (RFA), under the U.S. Agency for Global Media (USAGM).
The recent executive order demanding the termination of non-essential USAGM activities and
staff layoffs has put my livelihood and the mission I've dedicated myself to at risk. I am writing
this letter to share my personal struggles and the devastating impact this decision will have on
me and the North Korean people I serve.

For three years, I've poured my heart into delivering uncensored news to the people of North
Korea, a country where freedom of the press does not exist. One of the most meaningful
moments in my career came when North Korean defectors who visited our office told me they
had listened to Radio Free Asia and, through our broadcasts, awakened to the value of
democracy—ultimately inspiring them to escape. That day, I felt an overwhelming sense of
purpose, knowing my work wasn't just reporting but a lifeline of hope for people yearning for
freedom. Now, if this broadcast is silenced, North Koreans will be left with only the state-
controlled media, further deepening their indoctrination. The thought of this breaks my heart.

On a personal level, I am consumed with anxiety. The fear of losing the job I love—due to the
cutoff of government funding—haunts me every day. I left my beloved parents in South Korea
and have endured loneliness and hardship in the U.S., all because I take pride in countering

authoritarian propaganda with truth. But if I lose my job, I won't be able to pay my rent, and the uncertainty keeps me awake at night. Every morning feels like a struggle to face the day.

I have always believed, without a doubt, that America is a great nation. I trust that Congress has the power to stop this crisis. You've allocated funds to USAGM, including Radio Free Asia, to support this mission—a mission that's not just about my job but about keeping hope alive for millions in North Korea. I beg you to hear our voices and take action to reverse this situation.

<hr>

████████████

6:10 AM. In front of the IMF headquarters building. I am the last passenger. After getting off the bus, I absentmindedly walk away as if it were my habit. It takes about 15 minutes to walk to work. I have been doing this for the past three years. I have no choice but to interview North Korean defectors in South Korea. I have been doing this for three years.

I joined RFA at the end of 2010. Thinking back, 15 years have already passed. This is the first time I have worked at one company for this long. The reason I applied to RFA was because it was 'special.' It was special that it was an American broadcasting station, but it broadcasted in Korean, and the fact that the listeners were North Koreans was special. Before I knew it, I was becoming a special reporter.

The purpose of RFA's Korean broadcasting is to deliver accurate and fast news of the world to North Koreans who are living a difficult life in North Korea. It is not a propaganda broadcast that says, "Abolish the leader and gain freedom." Our job is to convey things as they are.

I visited Tanzania in Africa to cover North Korean medical staff who gave patients unnamed medicine and treated them illegally. I met North Korean workers in Kuwait, a Middle Eastern country where they work hard in the middle of the desert while being hit by sandstorms, but most of their income is taken away by North Korean authorities under the pretext of loyalty funds. I drew a lot of attention by analyzing satellite photos and reporting that North Korea was pouring waste from uranium mines directly into the river.

As a result, all North Korean hospitals in Tanzania were closed, and all North Korean workers in Kuwait returned to North Korea due to the timing of the report and the sanctions against North Korea.

I was living with pride in doing meaningful work for the North Korean people, but when I suddenly heard the news that the broadcasting station was closing and that a significant number of employees would be laid off, my heart was truly broken.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 18 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 67 of 169

Exhibit 1
Schleuss Declaration

I was worried about how I was going to live right now. How was I going to pay the mortgage, water bill, and other utility bills? Tuition and living expenses for my children who are attending graduate school and college are also issues, but what I am most worried about is health insurance. Without health insurance, I would not be able to afford the cost of the medicine I am currently taking. I would not be able to go to the hospital if my children suddenly get sick or get hurt.

I hope that everyone will pay attention and support me so that my family's safety and stability, and my determination to work for the freedom of North Korean people that I made when I joined the company, do not break or disappear in the middle.

---

██████████

I am writing this letter to formally testify to the anticipated impact that my upcoming furlough from Radio Free Asia's (RFA) Uyghur Service will have on my life, my family's financial stability, and the safety of my relatives abroad. While I have not yet been furloughed, my employment at RFA has already exposed me and my loved ones to harassment, intimidation, and retaliation by the Chinese government.

Financial and Personal Hardship

The prospect of losing my position at RFA is already causing significant distress and uncertainty for my family. As the primary provider, I am deeply concerned about my ability to:
• Pay rent and mortgage to ensure stable housing for my family.
• Cover daily living expenses, including food, utilities, and childcare.
• Support my children's education, which could be affected by financial instability.

Without this job, I will lose not only my livelihood but also the sense of security and stability that my family depends on. The stress and anxiety surrounding this situation have already begun affecting our daily lives.

Retaliation Against My Family and Loss of Contact

Even before my impending furlough, my employment at RFA has already resulted in severe consequences for my family back home. Due to my work exposing the Chinese government's human rights abuses against Uyghurs, I have:
• Lost all contact with my relatives in China—the Chinese government has cut off communication, making it impossible for me to check on their safety.
• Witnessed my family members being harassed by authorities simply because they are related to me.
• Had loved ones detained or sent to internment camps as punishment for my work at RFA.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 19 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 68 of 169

Exhibit 1
Schleuss Declaration

This is not just a fear—it is a reality that has already unfolded for me and my family. The Chinese government has a long history of punishing Uyghurs abroad by targeting their relatives. I have lived under this threat for years, knowing that my reporting at RFA has put my family at risk. Now, with my impending furlough, I fear that my relatives will face even greater danger, as they will be seen as even more vulnerable.

Impact on My Daily Life and Future

Beyond financial and safety concerns, this furlough will have a significant impact on my mental and emotional well-being. I anticipate facing:
• Uncertainty in my career, with limited job opportunities in my field.
• Inability to continue my crucial work, which will hinder efforts to expose human rights abuses in my community.
• Emotional distress, knowing that my family may be at greater risk while I lose my primary platform for advocacy.

This is not just about my personal employment—it is about the silencing of journalists who have dedicated their careers to exposing injustice. The decision to furlough Uyghur journalists from RFA will not only impact our livelihoods but will also weaken global efforts to hold the Chinese government accountable for its actions against Uyghurs.

I urge you to consider the serious consequences of this furlough on my life, my family's security, and the broader Uyghur community. This is not just a personal crisis but a broader issue of press freedom and human rights.

Thank you for your time and attention.

---

I have a thyroid condition that requires regular medical checkups. This August, I have my annual thyroid ultrasound to make sure things haven't gotten worse. I need to monitor it regularly to check for any signs of cancer. Without my company's health insurance, I simply can't afford the high cost of these medical expenses.

I also have to support my parents. My parents are elderly and already struggling with health issues. They're not in a position to work and earn money.

I'm 35 years old this year. I have to put off my plans to start a family and have children. Brining a child into the world is in such an unstable situation would be the most reckless decision my husband and I could make.

My husband's salary barely covers our mortgage, insurance, and other essentials – there's nothing left after that. And unemployment benefits? There's no way they'll be enough to support a family of four.

Losing my job so suddenly is terrifying—it feels like my entire life is being upended overnight. How am I supposed to survive in this insane economy with no income? This situation isn't just stressful—it's devastating. Please take this situation into consideration and help save me and my colleagues. Thank you.

---

███████████████████

For the past three years, I have been reporting on human trafficking stories.

I began, after a mother contacted me, asking for help in rescuing her daughter.

I am proud, that I've been able to help re-unite so many young Lao people with their families.

They called me, asking RFA to help, as authorities in Laos told them they could not do nothing.

Many trafficking victims come from poor families. They have no money to pay the Chinese scammers for their freedom.

Both parents and the young people trapped in scammed centres, all told me that without RFA's help, they would have no future.

Seeing the thousands of people released from scam centres this year, I know that media coverage and RFA helped make that happen.

---

███████████████████

My name is ████████████, senior editor of RFA's Lao Service.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 21 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 71 of 169

Exhibit 1
Schleuss Declaration

I have worked with RFA for 11 years, covered and reported many issues. In particular, human rights violation is the main issue the Lao people are facing. RFA has played an important role in letting their voices be heard outside.

In September 2019, I covered a man arrested with court warrant for land conflict with local authorities. After his arrest was published and human rights group alarmed, he was released in November.

In January 2024, I also reported exclusive news on the arrest of six people in Xieng Khoaung province, northern Laos because they staged the protest for land conflict. In February, they were released.

There are also corruptions, environmental issues, displacement of local people due to hydropower projects I have not stated in the statement since I worked with RFA. For Lao people, RFA not only reports news, but also has become a symbol of speech.

---

My name is ██████████████████████ from Cantonese Service of Radio Free Asia (RFA) and an asylum seeker from Hong Kong. I am deeply grateful for the U.S. government and RFA for giving me a safe space to practice independent journalism. To me, it is a very rare opportunity allowing me to keep on fighting for Hong Kong's press freedom and democracy after I was forced to leave my homeland in fear of persecution. I want to keep on fighting with all these brave RFA journalists on the Land of the Free. We don't want to stop here, leaving an unfinished mission with regrets.

All my personal friends, either in Hong Kong or self-exiled to Taiwan or the UK, counted on RFA as the only source of reliable news when Hong Kong is flooded with lies and propaganda of the Beijing authorities. Termination of funding to RFA means the fall of the last bastion of press freedom of Hong Kong, leaving Hongkongers in complete darkness and fear.

I am the only breadwinner of my family. As an alien seeking asylum here in the U.S., I used to be proud of my self-sufficient when I worked for RFA. The closure of RFA just makes my world up-side-down. My mother, who is 89, has just been discharged from the hospital this week after surgeries for her acute internal bleeding and kidney failure. The funding freeze of RFA would make me impossible to pay for my mother's huge medical bills and her follow-up healthcare costs, not to mention my taxes due soon.

Some of my colleagues are relocated to the U.S. office under working visa after RFA closed our Hong Kong office under the threat of the National Security Law. The Hong Kong government

had repeatedly alleged RFA Cantonese journalists for "smearing" the authority, which could be an offence under the draconian national security laws of the city. The shutdown of RFA means my colleagues, and me as well if my asylum application is not approved, would have no choice but return to our homeland and face the persecution of the Hong Kong and Beijing authority for working with RFA, alone!

I sincerely urge the Congress' help to resume funding to RFA.

---

█████████████

When I joined RFA nine months ago, it felt unreal. Surrounded by dedicated individuals working on stories half-a-world away and truly making a difference gave me assurance that my work would also have a real impact on people's lives.

Today, as I learned that I and many of my colleagues have been furloughed due to the funding freeze, I cannot help but feel for our organization. Our journalism shines a light on autocratic regimes and provides an alternative voice to their propaganda.

In Laos, the media is controlled by the state. So-called development projects have disrupted the lives of ordinary people. Their concerns often go unheard and unresolved. We are the voice for those people. They message us and ask us to tell their stories. Because of the loss of land and access to resources, many seek labor in neighboring countries, often risking their health and safety. They turn to us when they lose hope. RFA Lao Service has reported these injustices and helped to free victims of scam centers. I am proud to help do this work.

This funding freeze has affected me personally. Not producing content informing our online audience now, I will not be able to survive for more than a couple of months without any income. I moved to the DC area from another state, leaving my home and hoping to make a new start doing something I have come to love. My wife, who has an auto-immune disease, needs constant medical care. I don't know what we will do, where we will soon live, and how my wife will deal with the loss of medical care.

I implore the members of Congress to take action and restore funding to RFA for the sake of my colleagues, for the thousands of whom RFA has helped, and for the millions of people who rely on our honest and courageous reporting.

---

████████

I am writing to you as a dedicated employee of Radio Free Asia (RFA) and someone from Taiwan to share my testimony and urge your support in preventing the dismantling of this vital organization. As a younger member of RFA's workforce, I have had the privilege of working with the organization for over three years, serving both at its headquarters in Washington, D.C., and at its overseas office in Taipei, Taiwan—my home. Through this experience, I have seen firsthand the critical role RFA plays in delivering accurate, unbiased information, especially as tensions between Taiwan and the People's Republic of China grow increasingly tense.

I am deeply troubled by the prospect of RFA's shutdown, particularly given the current situation in the Taiwan Strait. As someone from Taiwan, I have watched with concern as the PRC intensifies its military drills and as my country responds with rare practices of rapid troop mobilization—a step Taiwan does not often take. These developments point to a dangerous escalation, with some warning that conflict could erupt as early as 2027. If war breaks out, misinformation from mainland China will flood the internet, obscuring the truth about what is happening in my region.

Radio Free Asia is uniquely equipped to counter this threat. For years, RFA has provided reliable reporting that cuts through propaganda, offering clarity not only to the U.S. government but also to the global public—including people in Taiwan and beyond. In the event of a conflict, RFA would be an indispensable resource, ensuring that accurate information reaches American policymakers and citizens worldwide who seek to understand the stakes. Shutting it down now, when its work is more essential than ever, would be a profound loss.

I respectfully urge you to advocate for the preservation of Radio Free Asia and to oppose any efforts to dismantle it. This is not just about an organization—it's about ensuring that truth and transparency prevail at a time when they are desperately needed.

Thank you for your time, consideration, and leadership. I hope you will lend your voice to this urgent cause.

---

█████████████████

I have been working at RFA for 19 years and seven months, covering human rights issues such as land confiscation, labor rights, children and women's rights, and environmental concerns and others.

RFA serves as a vital source of information for Burmese people living under military rule. Media in Burma has faced strict censorship since the military coup of 1962.

In 2024 Reporters without Borders (RSF) World Press Freedom Index, Burma ranked 140th out of 180 countries, reflecting its ongoing repression of press freedom.

Burmese people, living under severe restrictions on information, rely on RFA to stay informed about events in the country- news they cannot access through local media and military mouthpiece media.

If RFA cannot operate normally, people lose access to reliable information about what is truly happening in Burma, benefiting the military rulersas they continue to suppress the people.

--------------------------------------------------------------------------------

████████████████████

My name is ████████████, and I have been a journalist with Radio Free Asia's Lao Service for 25 years. I am here to advocate for continued funding of independent journalism and free press initiatives in Southeast Asia.

Over the decades, I have witnessed our journalists report in countries where news is heavily censored, providing critical information to those who lack access to diverse news sources. In Laos, where people are often afraid to speak to their authorities, RFA serves as a vital platform, amplifying their voices and shedding light on issues that would otherwise remain hidden. Our work:

- Promotes transparency in governance
- Empowers citizens with factual information
- Counters misinformation
- Gives voice to the voiceless.

RFA adheres to strict journalistic ethics, ensuring unbiased, fact-based reporting. I urge you to recognize the essential role RFA plays in promoting democracy, human rights, and freedom of information. Supporting our mission ensures that the people of Laos and beyond continue to have a voice.

--------------------------------------------------------------------------------

████████████████

I write with deep concern regarding the proposed funding cuts to Radio Free Asia (RFA), an organization that has been my professional home for over 15 years and represents a critical pillar of America's commitment to press freedom across Asia.

Since December 2009, I have dedicated my professional life to RFA's mission of providing accurate, unbiased news to people living under authoritarian regimes. My work has focused particularly on human rights, democracy, and women's issues affecting Tibetans and other ethnic

Exhibit 1

Case 1:25-cv-01015-RCL   Document 16-16   Filed 03/24/25   Page 25 of 30
USCA Case #25-5144   Document #2113400   Filed: 04/29/2025   Schleuss Declaration
Add. 46

groups with limited access to free press. I have crafted well-organized, distinctively original stories on sensitive topics, utilizing multiple sources to ensure balanced coverage—all while maintaining the highest standards of journalistic integrity.

The proposed funding cuts to RFA come at a time when authoritarian regimes are intensifying their efforts to control information. RFA serves as a vital lifeline for millions seeking accurate information about their own countries and the world beyond. The elimination or reduction of RFA's funding would create an information vacuum that would quickly be filled by state-controlled media serving authoritarian interests.

We have already begun receiving heartbreaking messages from listeners inside Tibet who have heard rumors of these potential cuts. They describe RFA as "the only light in the darkness" and express profound sadness at the prospect of losing access to free news under the repressive Chinese regime. These listeners risk their safety to tune in to our broadcasts, demonstrating the irreplaceable value of our service. For many, RFA represents their sole connection to unfiltered information and the outside world.

Beyond the professional impact, these potential cuts would devastate my family's financial stability. With two children aged 13 and 10 approaching high school and college, I am deeply concerned about funding their education. Without my current position at RFA, I would struggle to build the savings necessary for their tuition and future opportunities.

The uncertainty has already begun affecting our daily lives. I find myself worried about covering our mortgage payments, health insurance premiums, and even weekly grocery bills. These financial concerns have taken a significant toll on my mental wellbeing, as I lie awake at night contemplating how to provide for my family's basic needs should these cuts proceed. My retirement security is also at risk. After 15 years of dedicated service, the prospect of starting over in a new organization at this stage of my career is daunting. The specialized skills I've developed serving RFA's unique mission may not easily transfer to other media organizations.

I respectfully urge you to reconsider the proposed funding cuts to Radio Free Asia. The cost of maintaining RFA's operations is minimal compared to the immense strategic value it provides. By preserving RFA's funding, you will ensure that America continues to stand with those fighting for truth and freedom while protecting the livelihoods of dedicated professionals who have given their careers to this vital mission.

-------------------------------------------------------------------------------

███████████

My name is ██████████, and I am a designer and web developer at Radio Free Asia's Global Mandarin Service. I previously worked in the Hong Kong office for

two years until it was forced to shut down due to the implementation of Article 23. Fearing persecution, RFA helped me secure a visa to relocate to the U.S. headquarters. Over the past year, I have worked hard to build a new life here—finding housing, handling legal paperwork, making friends, and integrating into American society.

But just as I believed I was finding stability, the White House issued an executive order to shut down Radio Free Asia. My team created *Wainao*, a platform dedicated to telling young Chinese readers the truth about what is happening in China. What we do is not just a job—it is meaningful, it makes a difference. Yesterday, due to funding cuts, *Wainao* went dark, and my entire team was furloughed. The only reason I have not been furloughed yet is because my company, out of deep concern for my visa status, has made every effort to keep my position. But without funding, I will soon lose my visa and face the risk of deportation.

Just a few days ago, I had a job I loved—doing work that mattered. Now, in an instant, I am at risk of losing my legal status in the U.S. and being forced to return to Hong Kong, a place that has been swallowed by the Chinese regime, where independent media and activists are being silenced.

I urge you to recognize the significance of Radio Free Asia, especially in an era where authoritarianism is encroaching on democratic freedoms. Its shutdown would not only be a devastating loss for press freedom but would also personally place me in serious jeopardy.

Thank you for your time and consideration.

---

██████

My name is ████████, and I have been a journalist with Radio Free Asia (RFA), Burmese Service, since 2008. Over the past 17 years, I have dedicated my career to providing vital news and information to the Burmese people, many of whom live under oppressive regimes where freedom of the press is severely restricted.

I am writing this statement in response to the recent decision to terminate Radio Free Asia, a move that threatens not only my livelihood but also the lives of millions of Burmese people who rely on RFA for accurate, unbiased information. This decision by the Trump administration will have severe consequences on the ability of the Burmese people to access independent news and information, especially at a time when the country faces unprecedented challenges.

Case 1:25-cv-01015-RCL   Document 16-16   Filed 03/24/25   Page 27 of 30
USCA Case #25-5144   Document #2113400      Filed: 04/29/2025   Page 76 of 169

Exhibit 1
Schleuss Declaration

For many years, I have worked diligently to provide comprehensive coverage of the situation in Burma, including human rights violations, political repression, and the struggles of ordinary citizens who face censorship and persecution. The Burmese Service of RFA has been a critical source of news for the people of Burma, offering them a chance to learn the truth in an environment where state-controlled media spreads propaganda and misinformation.

The people of Burma deserve the right to access independent news, and this decision will silence a crucial platform that has been their source of hope, information, and accountability. Additionally, the funding cut will have a significant personal impact on my family. As a single mother and the sole provider for my household, I carry the responsibility of ensuring my two daughters are safe, cared for, and given every opportunity to thrive. Their well-being— everything from their education to their everyday needs—depends entirely on my ability to maintain my job.

I urge that this decision be reversed to ensure that the voices of the Burmese people continue to be heard and that independent journalism remains a critical part of our global commitment to human rights and democracy, and the families of the people who have lost their jobs can continue doing their best to hold everything together. I'm asking for your understanding and compassion.

Thank you for your time and consideration.

---

███████████

My name is ██████████, I joined RFA's Vietnamese Service in September 2022 after graduating from ████████ MA program in Journalism.

This decision came with considerable security risks both to myself and my family who is still living in Vietnam, but I made it with their consent because we all knew it was the right thing to do.

Having lived under Vietnam's Communist Regime our entire life, we have witnessed first-hand serious violations of human rights, in the form of wrongful arrests and unjust deaths in the penitentiary system dating all the way back to aftermath of Vietnam War, when several of my relatives lost their lives in Viet Cong's re-education camps.

The injustice lasted all the way into the modern day, in the form of systemic corruption within Vietnam's federal and local government. The most recent example of this is Decree 168, which allowed the police to issue traffic fines that are multiple times heavier than before, and for the Ministry of Public Security to pocket most of it. And in the last several years, there are hundreds of Vietnamese who are arrested for speaking out for others' human rights, and for their own.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 28 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 78 of 169

Exhibit 1
Schleuss Declaration

With RFA's grant terminated and the company potentially closing down for good, I face the risk of returning to Vietnam and being arrested immediately upon re-entry because I'm not a Green Card holder yet. And my situation isn't the only precarious one in RFA. On a bigger scale, RFA's potential closure will deprive tens of millions of Vietnamese people of a reliable and uncensored source of news, and effectively give Vietnam's Communist government complete monopoly over the media landscape.

---

████████████

My name is ██████████████, Radio production Coordinator & Administrative Assistance for the Lao Service. I have worked at the RFA for 26 years.

During those 26 years I have experienced and witnessed the efforts of journalists and the daily production of news programs.
RFA staff regularly receives letters, emails, and phone calls from people on a variety of stories and topics we report that their local news will not address.

RFA does not just report news, it has come to be a resource to help document and assist victims from human trafficking, including missing persons, land conflicts, and other human rights concerns. People frequently contact RFA when they feel they cannot get support from their own government officials. I have seen examples where parents and human tracking victims reach out to RFA to report stories and share photographs. And in many cases RFA has been able to verify stories and help reunite families. People will often say they trust RFA more than local authorities to take action and assist with location and reunification.

---

████████████

I was an audience member of RFA decades ago in my homeland, East Turkistan (also known as XUAR). At that time, the RFA Uyghur Service was the only window to the Free World for the Uyghur people. At first, we used shortwave radio, but after the government shut it down, we relied on VPNs. People risked harsh government punishment just to hear the voice of freedom, sharing the daily program's MP3 files with each other. It was like the Statue of Liberty offering hope, a sense of justice, and faith in victory to those in darkness. Many people were detained and punished by the government simply for listening to this voice of freedom.

Ten years ago, I came to the Free World. Six years ago, I was honored to become a member of Radio Free Asia, at a time when the Uyghur people were facing an ongoing genocide. The RFA Uyghur Service remains the only reliable source for the world to know what is happening to

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 29 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 79 of 169

Exhibit 1
Schleuss Declaration

Uyghurs and other Turkic people in the region. In 2020, the first Trump administration officially declared the Uyghur genocide based on our brave Uyghur journalists' firsthand reporting. Everyone on our team has at least one or more relatives imprisoned or detained in concentration camps.

For us, this job goes far beyond regular journalism—it is a frontline battle against the Chinese Communist Party's autocratic regime. It is the lifeline for Uyghur people seeking help from the outside world. Churchill's words about the brave British fighter pilots perfectly describe our mission: "Never in the field of human conflict was so much owed by so many to so few." Right now, this team and its very foundation are facing dismantlement. Please, save us—not just for the Uyghurs, but for the values that America was founded upon and for the Free World. As my wife said, we will try to endure the personal hardships caused by this abrupt dismantling, but the world cannot. The Uyghurs, Tibetans, Cambodians, Rohingya, and North Koreans—those still living in darkness—cannot. Please, preserve our hope!

---

█████████

My name is ██████████. I have been a journalist at Radio Free Asia (RFA) 's Vietnamese service for three years.

In 2011, as an ordinary citizen in Vietnam, I joined a peaceful protest against China's violation of Vietnam's territorial waters. Shortly after, I was arrested, detained, and interrogated by Vietnamese police for an entire day and night. It was a frightening experience, I felt completely isolated, unsure of what would happen to me. But RFA journalists reported on my case, making me realize I was not alone. Their coverage showed me that many people cared and supported those who stood up for their country and freedom.

Since 2022, I have been working for RFA to report on issues that the Vietnamese government tries to hide. I have covered stories about farmers losing their land without fair compensation, fishermen suffering from environmental disasters caused by the Formosa company, and thousands of ethnic minorities facing religious persecution for practicing Christianity. These stories would never appear in state-controlled media, but thanks to RFA, they reached both the public and the international community.

Shutting down RFA would mean that millions of people lose access to an independent and reliable news source. This decision would not only affect journalists like me but also enable authoritarian governments in Vietnam, China, and North Korea to tighten their control over information, suppress free speech, and worsen human rights violations.

I urge Congress to reconsider the decision to cut RFA's funding and restore the necessary budget so that RFA can continue its vital mission.

Case 1:25-cv-01015-RCL     Document 16-16     Filed 03/24/25     Page 30 of 30
USCA Case #25-5144     Document #2113400     Filed: 04/29/2025     Page 79 of 169

Exhibit 1
Schleuss Declaration

---

<span style="display:inline-block;width:120px;height:18px;background:black"></span>

The termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would relish the opportunity to have their influence go unchecked in the information space.

I am a Web Editor II who worked for the Uyghur Service at RFA for 15 years, starting in 2010. The Uyghur Service has been pivotal in helping U.S. policymakers understand the harsh realities of what's happening in the Uyghur Autonomous Region of China. It has provided a crucial platform to spotlight the struggles of the Uyghur people and drawn global attention to the severe human rights violations they endure. The Uyghur Service's breakthrough reporting on Xinjiang led the first Trump Administration to formally declare genocide against the Chinese government. The courage and dedication of the journalists and staff who have risked their lives to expose and report on the genocide of the Uyghur community are nothing short of remarkable and must be acknowledged.

The decision to shut down this critical service is alarming and raises profound concerns. The Uyghur Service has been a beacon of hope and resilience for countless Uyghurs, serving as a vital channel for international media, activists, and human rights organizations. Its relentless work in exposing the realities on the ground has been instrumental in raising global awareness and shaping policies.

Preserving this service is not just about maintaining a media outlet; it's about defending the fundamental values of freedom, democracy, and human dignity. Uyghurs, whether in their homeland or in the diaspora, deserve to have their voices heard and their stories shared with the world. Within the broader context of U.S.-China relations, the Uyghur Service is an indispensable pillar in combating propaganda and reaffirming the commitment to human rights and the fight against oppression.

I strongly urge decision-makers to reassess the significance of Radio Free Asia's Uyghur Service and recognize its unique and undeniable role in addressing these dire global challenges. At this pivotal moment in history, the international community cannot afford to remain silent in the face of such a critical voice.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                    Plaintiffs,

    -against-

KARI LAKE, et al.,

                    Defendants.

No. 25 Civ. 2390

### SUPPLEMENTAL DECLARATION OF JOHN DRYDEN

I, John Dryden, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the president of the Voice of America Employees Union, Local 1418, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 1418" or "Union").

3. At 10:50 p.m. EST on March 25, 2025, I received an email from the U.S. Agency for Global Media's (USAGM) Director of Human Resources that included two attachments, a "Reduction in Force Notification" and an excel spreadsheet with data on the employees affected by the Reduction in Force (RIF). The notice states "This is a notice of management's decision to implement a [RIF] for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months." The notice further states that

1

**Add. 48**

Docusign Envelope ID: 7F8CFC39-1871-4417-9DBB-1340B18037E3

Case 1:25-cv-01015-RCL     Document 33-2     Filed 03/26/25     Page 3 of 10
USCA Case #25-5144     Document #2113400     Filed: 04/29/2025     Page 82 of 169

at least 29 AFSCME Local 1418 bargaining unit members will be affected by the RIF. A true and correct copy of this notice is attached hereto as Exhibit 1.

4. Also included in the email from the USAGM Human Resources Director is an excel spreadsheet with data on the 29 affected employees, which includes 23 Radio Broadcast Technicians (RBT) who work in Radio Studios and 6 who work in Radio Master Control. A true and correct copy of this document is attached hereto as Exhibit 2.

5. AFSCME Local 1418 represents a collective bargaining unit of approximately 32 employees in the position of RBT who work for USAGM at Voice of America (VOA), of which 26 work in Radio Studios and 6 work in Radio Master Control. To my knowledge, 3 members have submitted retirement applications.

6. If USAGM terminates the 29 listed employees and the 3 members referenced above retire, the entire bargaining unit of VOA RBTs will be eliminated. Without any RBTs to engineer radio programing, VOA will not be able to broadcast any live radio programing.

7. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Germantown, MD on the 26th day of March, 2025.

Signed by:

*John Dryden*

John Dryden

98042BA9D222416...

# EXHIBIT 1



330 Independence Ave SW, Washington, D.C. 20237

MEMORANDUM FOR          AFSCME

FROM:                              CRYSTAL THOMAS
                                        Director of Human Resources

DATE:                              March 25, 2025

SUBJECT:                        Reduction in Force Notification

This is a notice of management's decision to implement a reduction in force (RIF) for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months.

1. The reason for the reduction in force:

The President's March 14, 2025, executive order *Continuing the Reduction of the Federal Bureaucracy*. Statutory positions and functions will remain.

2. The approximate number of employees who may be affected initially:

Approximately 29 AFSCME bargaining unit employees, but this number is subject to change.

3. The competitive areas and levels that may initially be involved in a reduction in force:

See the accompanying attachment for the competitive areas and levels.

4. The anticipated effective date of the action.

Termination notices may be sent in the next few weeks, with a 60-calendar day period prior to the effective date.

Add. 51

# EXHIBIT 2

| Competitive Area | AFSCME |
|---|---|
| Washington, DC | 29 |

| Position ID |
| --- |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170275 |
| V170156 |
| V170156 |
| V170156 |
| V170290 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170275 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170290 |
| V170156 |
| V170156 |
| V170275 |
| V170156 |

| Position Title |
| --- |
| V170156.RADIO BROADCAST TECHNICIAN.18660.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16457.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16234.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16246.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.16525.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.17102.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16241.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16452.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16238.IB00.APPR |
| V170290.RADIO BROADCAST TECHNICIAN BROADCAST TECHNICIAN.16557.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16441.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16455.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16440.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18633.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18230.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.17414.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18835.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16237.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16720.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16498.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16236.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16449.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16450.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18783.IB00.APPR |
| V170290.RADIO BROADCAST TECHNICIAN BROADCAST TECHNICIAN.16554.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16451.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.19037.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18391.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18707.IB00.APPR |

| Grade | Competitive Geo |
|-------|-----------------|
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                    Plaintiffs,                              No. 25 Civ. 2390

          -against-

KARI LAKE, et al.,

                    Defendants.

**SUPPLEMENTAL DECLARATION OF PAULA HICKEY**

I, Paula Hickey, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

following is true and correct:

1.  I am over 18 year of age and competent to give this declaration. This declaration is based

    on my personal knowledge, information, and belief.

2.  I am the Local President of the American Federation of Government Employees, AFL-

    CIO, Local 1812 ("Local 1812") a labor organization and unincorporated association that

    represents federal employees at the Voice of America (VOA) within the United States

    Agency for Global Media (USAGM). Local 1812 is an affiliate of the American

    Federation of Government Employees ("AFGE").

3.  At 10:49 p.m. EST on March 25, 2025, I received an email from the USAGM Director

    for Human Resources that included two attachments, a "Reduction in Force Notification"

    and an excel spreadsheet with data on the employees affected by the Reduction in Force

    (RIF). The notice states "This is a notice of management's decision to implement a [RIF]

    for multiple competitive areas. The agency plans to send termination notices to

    employees in the next few weeks. Extraordinary circumstances, driven by the President's

**Add. 58**

March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months." The notice further states that at least 594 Local 1812 bargaining unit members will be affected by the RIF. A true and correct copy of this notice is attached hereto as Exhibit 1.

4. Also included in the email from the USAGM Human Resources Director is an excel spreadsheet with data on 594 affected employees, which includes International Broadcasters for Radio, Internet, TV, and Multimedia in dozens of different languages, Technicians, Budget Analysts, and Electronics Engineers, among others. My position was listed at the top of the spreadsheet. A true and correct copy of this document is attached hereto as Exhibit 2.

5. If USAGM terminates the 594 listed employees, the bargaining unit represented by Local 1812 will effectively cease to exist. Without the International Broadcasters, Technicians, Budget Analysts, and Electronics Engineers, or the hundreds of employees encumbering other vital positions, VOA will not be able to provide the services it has offered for 83 years and therefore will not be able to meet its mission to counter propaganda and spread freedom and democracy abroad.

6. VOA broadcasts to populations under authoritarian rule who turn to VOA as a trusted source of news. If VOA cannot meet its mission, the United States will be giving up its voice and leaving open a global communication void.

7. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Mitchellville, Maryland on the 26th day of March, 2025.

Paula Hickey

# EXHIBIT 1



330 Independence Ave SW, Washington, D.C. 20237

MEMORANDUM FOR          AFGE

FROM:                                CRYSTAL THOMAS
                                          Director of Human Resources

DATE:                                March 25, 2025

SUBJECT:                          Reduction in Force Notification

This is a notice of management's decision to implement a reduction in force (RIF) for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months.

1. The reason for the reduction in force:

The President's March 14, 2025, executive order *Continuing the Reduction of the Federal Bureaucracy*. Statutory positions and functions will remain.

2. The approximate number of employees who may be affected initially:

Approximately 594 AFGE bargaining unit employees, but this number is subject to change.

3. The competitive areas and levels that may initially be involved in a reduction in force:

See the accompanying attachment for the competitive areas and levels.

4. The anticipated effective date of the action.

Termination notices may be sent in the next few weeks, with a 60-calendar day period prior to the effective date.

**Add. 62**

# EXHIBIT 2

| Competitive Area | AFGE |
|---|---|
| Washington, DC | 570 |
| N    or , N | 9 |
| SA  EM,MARION,OR | 1 |
| SAN ANTONIO,BE  AR,T | 1 |
| CAPE CORA , EE, | 1 |
| WARSAW,RICHMOND,VA | 1 |
| NOR O    IND CIT  ,VA | 1 |
| HI  H  AND,MADISON,I | 1 |
| PHOENI  ,MARICOPA,A | 1 |
| CR STA   A E,MCHENR ,I | 1 |
| ISSIMMEE,OSCEO A, | 1 |
| PORT AND,C  MBER AND,ME | 1 |
| OS AN  E ES, OS AN  E ES,CA | 1 |
| PA M BA ,BREVARD, | 1 |
| A SA  E,I | 1 |
| PASADENA, OS AN  E ES,CA | 1 |
| RANCONIA, RA TON,NH | 1 |

| Position ID |
| --- |
| V136191 |
| V3134 |
| V170260 |
| V158000 |
| V147138 |
| V3317 |
| V169178 |
| V210136 |
| V210135 |
| V220148 |
| V210085 |
| V220009 |
| V158079 |
| V170217 |
| V169161 |
| V240007 |
| V210139 |
| V240051 |
| V210103 |
| V20017 |
| V210085 |
| V210098 |
| V169188 |
| V169188 |
| V170215 |
| V136064 |
| V136087 |
| V136087 |
| V191056 |
| V169161 |
| V220038 |
| V210098 |
| V170213 |
| V190202 |
| V158083 |
| V169188 |
| V210147 |
| V147055 |
| V169077 |
| V210147 |
| V169084 |
| V190166 |
| V220063 |
| V220113 |
| V169188 |

V158083
V210064
V158145
V190202
V210141
V169188
V136206
V170216
V170213
V170216
V170213
V4102
V210064
V8211
V210210
V240028
V210143
V210133
V210142
V210145
V158006
V210064
V7487
V170217
V136064
V8598
V8388
V240071
V220210
V200034
V220032
V230026
170273
V200093
V190170
V170259
V169067
V180183
V210081
V169181
V250010
V4090
V114282
V170041
V158098
V170091
V4102

V17210
V170194
V210021
V169083
V190065
V17210
V17210
V17210
V190065
V180025
V17210
V210021
V17210
V170170
V180025
V180025
V210166
V170247
V210166
V180025
V190065
V180025
V190065
V180025
V190065
V210080
V190065
V169083
V190065
V170247
V170158
V190064
V190142
V190041
V190064
V170194
V170194
V190065
V180025
V17210
V170194
V170210
V170194
V220004
V200087
V220004
V190065

V190065
V190065
V170247
V180025
V169011
V170247
V190041
V190041
V220005
V190065
V17210
V170194
V170194
V5733
V170194
V200087
V170194
V9020
V190065
V180025
V190065
V180025
V180025
V180025
V114183
V2049
V190065
V7909
V190065
V180025
V180025
V180172
V180129
V240018
V3134
V3134
V3134
V3134
V3134
V3134
V210124
V136175
V240135
V180174
V170268
V220146
V220054

V114213
V114218
V114213
V200125
V210040
V0921
V114224
V114224
V210040
V158092
V210008
V114213
V114219
V210040
V136192
V190205
V125031
V210123
V210123
V210122
V210122
V230051
V190114
V114177
V210122
V210122
V8084
V210122
V200057
V114139
V190063
V170264
V136052
V147011
V180069
V210040
V170191
V230145
V158177
V200121
V200121
V210167
V220123
V7917
V200121
V210016
V240006

V200070
V220069
V240027
V230146
V180131
V7916
V180050
V180043
V190217
V136122
V136122
V220053
V220039
V210047
V230093
V136231
V230022
V180067
V169122
V210154
V210013
V210013
V169115
V158094
V158094
V230013
V158092
V7916
V230146
V136231
V158092
V136122
V147148
V169159
V7916
V180050
V7916
V158177
V7916
V1018
V158178
V158127
V158177
V7916
V158178
V210027
V7916

V210010
V1017
V136123
V200121
V158178
V210047
V136096
V1020
V3219
V3360
V3220
V7814
V220121
V210171
V240040
V220191
V169132
V170280
V180063
V230116
V7432
V180063
V210047
V158092
V210040
V169101
V0934
V8159
V6666
V170128
V169099
V180128
V7113
V169069
V136051
V200155
V210026
V220015
V230014
V230014
V210083
V190226
V220034
V190221
V220163
V220087
V200071

V220058
V210028
V180122
V190221
V169107
V230117
V210028
V230144
V190221
V169028
V169173
V230053
V210050
V158010
V158206
V190112
V190048
V220168
V170173
V3208
V114268
V220171
V190235
V114317
V210050
V240139
V220156
V170097
V3109
V4084
V158198
V170097
V169028
V250005
V240113
V114197
V210117
V114197
V114267
V136150
V136014
V136014
V210052
V8592
V240085
V158003
V170023

V125184
V169043
V158213
V158002
V125109
V170062
V230139
V230110
V210084
V210009
V136178
V169162
V210084
V240107
V7726
V7217
V190248
V200001
V190159
V169162
V169024
V6422
V5756
V125137
V190249
V6613
V170043
V230103
V190027
V147134
V147118
V190027
V170022
V7907
V180077
V3336
V240056
V136144
V170232
V3334
V210006
V170232
V136144
V210037
V210006
V170057
V210006

V170057
V136144
V136144
V210006
V210006
V136144
V136144
V210006
V210006
V220164
V136144
V136144
V136144
V136144
V210006
V136144
V136144
V136144
V136144
V210006
V210207
V230017
V3324
V3324
V3106
V210006
V158013
V158013
V170232
V170043
V210156
V170065
V8533
V210042
V136181
V180149
V180078
V240009
V240009
V240009
V220075
V220075
V169232
V200107
V1175
V220150
V200107

V200117
V240116
V190031
V180022
V180065
V170207
V4075
V240110
V136035
V240008
V158029
V220150
V220169
V169199
V220208
V210051
V169157
V169157
V114240
V169141
V114240
V169157
V210104
V1114
V210044
V158034
V136125
V114240
V147012
V7228
V200085
V1175
V200085
V200127
V1175
V200114
V170133
V170135
V200110
V190224
V190237
V147085
V210099
V170155
V147015
V210100
V180108

V169169
V230089
V169039
V230130
V170134
V169044
V169171
V169036
V170134
V136246
V180156
V180156
V0903
V0903
V7501
V180156
V190214
V190214
V190214
V158189
V190036
V190036
V190214
V158189
V158140
V169013
V158189
V240039
V240075
V220107
V240031
V240033
V158187
V4090
V4090
V220061
V210066
V210066
V3116
V3116
VV220029
V210217
V210098
V210098
V220036
V180007
V158132

V210098
V210098
V4090
V4090
V220176
V230067
V220151
V210014
V147027
V1156
V3116
V114262
V147026
V220061
V136106
V136106
V147149
V158198
V136106
V158132
V158132
V136192
V7857
V3116
V210014
V210014
V3104
V3116
V170054
V169164
V136153
V8014

| Position Title |
|---|
| V136191.TECHNICA  IN  ORMATION SPECIA IST  IN  EST COORDINATOR .13913.IB00.APPR |
| V3134.B  D  ET ANA   ST.15589.IB00.APPR |
| V170260.RECORDS AND IN  ORMATION MANA  EMENT SPECIA IST.16468.IB00.APPR |
| V158000.ADMINSTRATIVE O   ICER.14587.IB00.APPR |
| V147138.ADMINISTRATIVE O   ICER.14531.IB00.APPR |
| V3317.M   TIMEDIA PROD  CTION SPECIA IST.13080.IB00.APPR |
| V169178.INT BROADCASTER  M   TIMEDIA   RENCH .15831.IB00.APPR |
| V210136.M   TIMEDIA SPECIA IST  AMHARIC .18287.IB00.APPR |
| V210135.M   TIMEDIA SPECIA IST  AMHARIC .19562.IB00.APPR |
| V220148.INTERNATIONA  BROADCASTER M   TIMEDIA   RENCH .18793.IB00.APPR |
| V210085.INT BROADCASTER  M   TIMEDIA  SWAHI I .18540.IB00.APPR |
| V220009.INT BROADCASTER  M   TIMEDIA   A AN OROMO .18543.IB00.APPR |
| V158079.INT BROADCASTER  M   TIMEDIA   RENCH .18681.IB00.APPR |
| V170217.INT BROADCASTER  M   TIMEDIA  AMHARIC .18713.IB00.APPR |
| V169161.INT BROADCASTER  M   TIMEDIA  HA SA .18714.IB00.APPR |
| V240007.INTERNATIONA  BROADCASTER M   TIMEDIA   RENCH .19561.IB00.APPR |
| V210139.M   TIMEDIA SPECIA IST  EN   ISH .18282.IB00.APPR |
| V240051.INT BROADCASTER  M   TIMEDIA   IR NDI  IN ARWANDA .19954.IB00.APPR |
| V210103.M   TIMEDIA SPECIA IST  HA SA .18209.IB00.APPR |
| V20017.INT BROADCASTER  M   TIMEDIA   IR NDI  IN ARWANDA  .17558.IB00.APPR |
| V210085.INT BROADCASTER  M   TIMEDIA  SWAHI I .17993.IB00.APPR |
| V210098.M   TIMEDIA SPECIA IST  EN   ISH .18033.IB00.APPR |
| V169188.INT BROADCASTER  M   TIMEDIA   RENCH .17522.IB00.APPR |
| V169188.INT BROADCASTER  M   TIMEDIA   RENCH .17527.IB00.APPR |
| V170215.INT BROADCASTER  M   TIMEDIA  AMHARIC .17557.IB00.APPR |
| V136064.INTERNATIONA  BROADCASTER RADIO INTERNET   IR NDI  IN ARWA.17358.IB00.APPR |
| V136087.INT BROADCASTER  M   TIMEDIA  HA SA .16894.IB00.APPR |
| V136087.INT BROADCASTER  M   TIMEDIA  HA SA .16997.IB00.APPR |
| V191056.INT BROADCASTER  M   TIMEDIA  SHONA NDEBE E .17324.IB00.APPR |
| V169161.INT BROADCASTER  M   TIMEDIA  HA SA .17201.IB00.APPR |
| V220038.INTERNATIONA  BROADCASTER M   TIMEDIA  SHONA NDEBE E .18403.IB00.APPR |
| V210098.M   TIMEDIA SPECIA IST  EN   ISH .18252.IB00.APPR |
| V170213.INT BROADCASTER  M   TIMEDIA  TI RI NA .17361.IB00.APPR |
| V190202.INT BROADCASTER  M   TIMEDIA  HA SA .17962.IB00.APPR |
| V158083.INT BROADCASTER  M   TIMEDIA  SOMA I .16956.IB00.APPR |
| V169188.INT BROADCASTER  M   TIMEDIA   RENCH .16739.IB00.APPR |
| V210147.M   TIMEDIA SPECIA IST  AMHARIC  A AN OROMO TI  RI NA .18173.IB00.APPR |
| V147055.M   TIMEDIA PROD  CTION SPECIA IST.15752.IB00.APPR |
| V169077.INT BROADCASTER  M   TIMEDIA  SOMA I .15797.IB00.APPR |
| V210147.M   TIMEDIA SPECIA IST  AMHARIC  A AN OROMO TI  RI NA .18172.IB00.APPR |
| V169084.INT BROADCASTER  M   TIMEDIA  BAMBARA .15556.IB00.APPR |
| V190166.INT BROADCASTER  M   TIMEDIA  SOMA I .17215.IB00.APPR |
| V220063.DI ITA MANA  IN   EDITOR  SWAHI I .19496.IB00.APPR |
| V220113.INTERNATIONA  BROADCASTER  M   TIMEDIA  HA SA .18760.IB00.APPR |
| V169188.INTERNATIONA  BROADCASTER  M   TIMEDIA   RENCH .17543.IB00.APPR |

V158083.INT BROADCASTER  M   TIMEDIA  SOMA I .14916.IB00.APPR
V210064.M   TIMEDIA SPECIA IST   RENCH .17961.IB00.APPR
V158145.INT BROADCASTER  RADIO TV   SWAHI I .15055.IB00.APPR
V190202.INT BROADCASTER  M   TIMEDIA  HA SA .17267.IB00.APPR
V210141.M   TIMEDIA SPECIA IST  EN   ISH .18175.IB00.APPR
V169188.INT BROADCASTER  M   TIMEDIA   RENCH .16957.IB00.APPR
V136206.IB  M  TIMEDIA  PORT    ESE .14833.IB00.APPR
V170216.INT BROADCASTER  M   TIMEDIA  A AN OROMO .16353.IB00.APPR
V170213.INT BROADCASTER  M   TIMEDIA  TI RI NA .16355.IB00.APPR
V170216.INT BROADCASTER  M   TIMEDIA  A AN OROMO .16352.IB00.APPR
V170213.INT BROADCASTER  M   TIMEDIA  TI RI NA .16354.IB00.APPR
V4102.INT BROADCASTER  SWAHI I .12753.IB00.APPR
V210064.M   TIMEDIA SPECIA IST   RENCH .17924.IB00.APPR
V8211.RADIO PROD  CTION SPEC.9698.IB00.APPR
V210210.INT BROADCASTER  TI RI NA  M   TIMEDIA  TEAM  EAD .18636.IB00.APPR
V240028.INTERNATIONA  BROADCASTER  AMHARIC  M   TIMEDIA  TEAM  EAD .20191.IB00.APPR
V210143.M   TIMEDIA SPECIA IST  EN   ISH .18185.IB00.APPR
V210133.PROD  CER-DIRECTOR.18147.IB00.APPR
V210142.M   TIMEDIA SPECIA IST  EN   ISH .18171.IB00.APPR
V210145.M   TIMEDIA SPECIA IST  EN   ISH .18186.IB00.APPR
V158006.INT BROADCASTER  IR  NDI .14620.IB00.APPR
V210064.M   TIMEDIA SPECIA IST   RENCH .17960.IB00.APPR
V7487.INT BROADCASTER  RADIO   INTERNET    IN  ARWANDA .8300.IB00.APPR
V170217.INT BROADCASTER  M   TIMEDIA  AMHARIC .16349.IB00.APPR
V136064.INT BROADCASTER  RADIO INTERNET    IN  ARWANDA .14066.IB00.APPR
V8598.INT BROADCASTER  RADIO  EN   ISH .12016.IB00.APPR
V8388.INT BROADCASTER  RADIO  PORT    ESE .10197.IB00.APPR
V240071.INTERNATIONA  BROADCASTER.20213.IB00.APPR
V220210.PRO  RAM COORDINATOR.18708.IB00.APPR
V200034.E  EC  TIVE PROD  CER TV  HA SA .17403.IB00.APPR
V220032.M   TIMEDIA SPECIA IST  EN   ISH .18363.IB00.APPR
V230026.INTERNATIONA  BROADCASTER  M   TIMEDIA  PORT    ESE .18761.IB00.APPR
  170273.INTERNATIONA  BROADCASTER  M   TIMEDIA   RENCH .16496.IB00.APPR
V200093.INTERNATIONA  BROADCASTER  M   TIMEDIA .17484.IB00.APPR
V190170.INT BROADCASTER  M   TIMEDIA  SOMA I .17218.IB00.APPR
V170259.INT BROADCASTER  M   TIMEDIA  SOMA I .16475.IB00.APPR
V169067.E  EC  TIVE PROD  CER TV  SWAHI I .16828.IB00.APPR
V180183.DI  ITA    RAPHICS ARTIST.16925.IB00.APPR
V210081.INT BROADCASTER  M   TIMEDIA  SWAHI I .18069.IB00.APPR
V169181.E  EC  TIVE PROD  CER TV  SOMA I .15725.IB00.APPR
V250010.INTERNATIONA  BROADCASTER - EDITOR.20490.IB00.APPR
V4090.  ENERA  ASSI  NMENTS REPORTER  EN   ISH .12592.IB00.APPR
V114282.M   TIMEDIA PROD  CTION SPEC.12936.IB00.APPR
V170041.INT BROADCASTER  RADIO  EN   ISH .15954.IB00.APPR
V158098.PRO  ECT MANA  ER.14942.IB00.APPR
V170091.E  EC  TIVE PROD  CER  TE  EVISION .16016.IB00.APPR
V4102.INT BROADCASTER  SWAHI I .16829.IB00.APPR

Add. 79

V17210.TV BROADCAST TECHNICIAN  A  DIO .16335.IB00.APPR
V170194.M MASTER CONTRO  TECHNICIAN.17486.IB00.APPR
V210021.M  TIMEDIA SPECIA IST   RAPHICS .17809.IB00.APPR
V169083.IT SPECIA IST  C  STSPT .18955.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST  TV PROD  CTION A  TOMATION .18782.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16333.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16331.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16330.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST  TV PROD  CTION A  TOMATION .18837.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M  TIMEDIA .18682.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16332.IB00.APPR
V210021.M  TIMEDIA SPECIA IST   RAPHICS .17810.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16329.IB00.APPR
V170170.TV BROADCAST TECHNICIAN  CAMERA   R DIR  I  HTIN .16341.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M  TIMEDIA .18496.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M  TIMEDIA .17242.IB00.APPR
V210166.BROADCAST TECHNICIAN.18205.IB00.APPR
V170247.TE ECOMM  NICATIONS SPECIA IST.20415.IB00.APPR
V210166.BROADCAST TECHNICIAN.18204.IB00.APPR
V180025.BROADCAST MAINTENCE TECHNICIAN  M  TIMEDIA .16804.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST  TV PROD  CTION A  TOMATION .18309.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M  TIMEDIA .17296.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPEC  TV PROD  CTION A  TOMATION .17378.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M  TIMEDIA .17295.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST.17700.IB00.APPR
V210080.IT SPECIA IST  S  SADMIN .19160.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST.17699.IB00.APPR
V169083. EAD IT SPECIA IST  C  STSPT .15527.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST.17702.IB00.APPR
V170247.TE ECOMM  NICATIONS SPECIA IST.20414.IB00.APPR
V170158.PRO  RAM COORDINATOR.16741.IB00.APPR
V190064.TV BROADCAST TECHNICIAN  VIDEO EDITOR .17123.IB00.APPR
V190142.TV MASTER CONTRO  TECHNICIAN.17529.IB00.APPR
V190041.IT SPECIA IST  C  STSPT .17300.IB00.APPR
V190064.TV BROADCAST TECHNICIAN  VIDEO EDITOR .17969.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.18392.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.16270.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPEC  TV PROD  CTION A  TOMATION .17418.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M  TIMEDIA .18618.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16334.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.16266.IB00.APPR
V170210.TV BROADCAST TECHNICIAN  A  DIO .16328.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.16296.IB00.APPR
V220004.TV BROADCAST TECHNICIAN  VIDEO EDITOR .18325.IB00.APPR
V200087.A  DIOVIS  A  PROD  CTION SPECIA IST.17460.IB00.APPR
V220004.TV BROADCAST TECHNICIAN  VIDEO EDITOR .18324.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPEC  TV PROD  CTION A  TOMATION .17339.IB00.APPR

V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .17487.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .17417.IB00.APPR
V170247.TE ECOMM NICATIONS SPECIA IST.16485.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .18546.IB00.APPR
V169011.IT SPECIA IST S SADMIN .15714.IB00.APPR
V170247.TE ECOMM NICATIONS SPECIA IST.16481.IB00.APPR
V190041.IT SPECIA IST C STSPT .17299.IB00.APPR
V190041.IT SPECIA IST C STSPT .17149.IB00.APPR
V220005.TV BROADCAST TECHNICIAN VIDEO EDITOR .18302.IB00.APPR
V190065.A DIOVIS A PROD CTION SPECIA IST TV PROD CTION A TOMATION .19152.IB00.APPR
V17210.TV BROADCAST TECHNICIAN A DIO .19026.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16272.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16298.IB00.APPR
V5733.TV BROADCAST TECHNICIAN.11228.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16293.IB00.APPR
V200087.A DIOVIS A PROD CTION SPECIA IST.17462.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16292.IB00.APPR
V9020.TV PROD CTION SPEC.4625.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .18232.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .17253.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .17367.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .16846.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20112.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20151.IB00.APPR
V114183. EAD TE ECOMM NICATIONS SPECIA IST.16864.IB00.APPR
V2049.IT SPECIA IST C STSPT .11614.IB00.APPR
V190065.A DIOVIS A PROD CTION SPECIA IST TV PROD CTION A TOMATION .18311.IB00.APPR
V7909.IT SPECIA IST S SADMIN .9399.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .18306.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20092.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20131.IB00.APPR
V180172.TV BROADCAST TECHNICIAN.16862.IB00.APPR
V180129.IT SPECIA IST P C P N .16792.IB00.APPR
V240018.B D ET ANA ST.19326.IB00.APPR
V3134.B D ET ANA ST.17851.IB00.APPR
V3134.B D ET ANA ST.17852.IB00.APPR
V3134.B D ET ANA ST.18429.IB00.APPR
V3134.B D ET ANA ST.12873.IB00.APPR
V3134.B D ET ANA ST.13598.IB00.APPR
V3134.B D ET ANA ST.13611.IB00.APPR
V210124.PRO ECT MANA ER.18131.IB00.APPR
V136175.DI ITA CONTENT COORDINATOR.13902.IB00.APPR
V240135.DEVE OPMENT AND TRAININ PRO ECT MANA ER.20336.IB00.APPR
V180174.IN ORMATION TECHNO O SPECIA IST APPSW .16865.IB00.APPR
V170268.S PV IT SPECIA IST INET .16866.IB00.APPR
V220146.INT BROADCASTER M TIMEDIA .18493.IB00.APPR
V220054.INTERNATIONA BROADCASTER M TIMEDIA MANDARIN .18444.IB00.APPR

V114213.INT BROADCASTER  TV   MANDARIN .15148.IB00.APPR
V114218.INTERNATIONA  BROADCASTER  TE EVISION   MANDARIN .13755.IB00.APPR
V114213.INTERNATIONA  BROADCASTER  TE EVISION   MANDARIN .13753.IB00.APPR
V200125.M   TIMEDIA SPECIA  IST  MANDARIN .17553.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .18382.IB00.APPR
V0921.INT BROADCASTER  CANTONESE .13085.IB00.APPR
V114224.INT BROADCASTER  MANDARIN .12808.IB00.APPR
V114224.INT BROADCASTER  MANDARIN .12804.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .17798.IB00.APPR
V158092.INTERNATIONA  BROADCASTER  M   TIMEDIA   MANDARIN .16652.IB00.APPR
V210008.M   TIMEDIA SPECIA  IST  CANTONESE .17916.IB00.APPR
V114213.INT BROADCASTER  TV   MANDARIN .12803.IB00.APPR
V114219.INTERNATIONA  BROADCASTER  MANDARIN .13649.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .17801.IB00.APPR
V136192.INTERNATIONA  BROADCASTER.15926.IB00.APPR
V190205.INTERNATIONA  BROADCASTER  M   TIMEDIA   MANDARIN .17274.IB00.APPR
V125031.INT BROADCASTER  MANDARIN .13193.IB00.APPR
V210123.CONTRACT SPECIA  IST.20333.IB00.APPR
V210123.CONTRACT SPECIA  IST.18685.IB00.APPR
V210122.CONTRACT SPECIA  IST.19428.IB00.APPR
V210122.CONTRACT SPECIA  IST.20289.IB00.APPR
V230051.PROC  REMENT ANA   ST.19038.IB00.APPR
V190114.CONTRACT SPECIA  IST.18737.IB00.APPR
V114177.O   ICE M   R.13405.IB00.APPR
V210122.CONTRACT SPECIA  IST.19090.IB00.APPR
V210122.CONTRACT SPECIA  IST.19501.IB00.APPR
V8084.CONTRACT SPECIA  IST  SIMP  I  IED AC    ISITIONS .12451.IB00.APPR
V210122.CONTRACT SPECIA  IST.20311.IB00.APPR
V200057.PROC  REMENT ANA   ST.17530.IB00.APPR
V114139.PROC  REMENT ASSISTANT.12835.IB00.APPR
V190063.A  DIENCE EN  A  EMENT ANA   ST.17594.IB00.APPR
V170264.RESEARCH ANA   ST.16472.IB00.APPR
V136052.WEB DESI   NER.13739.IB00.APPR
V147011.IT SPECIA  IST  INET  WEB DEVE  OPER.14111.IB00.APPR
V180069.PRO  RAM ANA   ST  METRICS .16693.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .17795.IB00.APPR
V170191.INTERNATIONA  BROADCASTER  MANDARIN .16260.IB00.APPR
V230145.M   TIMEDIA SPECIA  IST   HMER .19454.IB00.APPR
V158177.INTERNATIONA  BROADCASTER  M   TIMEDIA  INDONESIAN .15507.IB00.APPR
V200121.M   TIMEDIA SPECIA  IST  INDONESIAN .19210.IB00.APPR
V200121.M   TIMEDIA SPECIA  IST  INDONESIAN .19211.IB00.APPR
V210167.M   TIMEDIA SPECIA  IST  TIBETAN .18369.IB00.APPR
V220123.INTERNATIONA  BROADCASTER  M   TIMEDIA  B  RMESE .18704.IB00.APPR
V7917.INTERNATIONA  BROADCASTER  M   TIMEDIA  B  RMESE .17401.IB00.APPR
V200121.M   TIMEDIA SPECIA  IST  INDONESIAN .17899.IB00.APPR
V210016.INTERNATIONA  BROADCASTER  M   TIMEDIA  VIETNAMESE .17735.IB00.APPR
V240006.INTERNATIONA  BROADCASTER  M   TIMEDIA   AO .19458.IB00.APPR

V200070.RADIO PROD  CTION SPECIA IST   OREAN .17503.IB00.APPR
V220069.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .18384.IB00.APPR
V240027.M   TIMEDIA SPECIA IST  VIETNAMESE .19955.IB00.APPR
V230146.INTERNATIONA  BROADCASTER M   TIMEDIA   HMER .19457.IB00.APPR
V180131.INT  BROADCASTER M   TIMEDIA  VIETNAMESE .16816.IB00.APPR
V7916.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .17154.IB00.APPR
V180050.INT BROADCASTER M   TIMEDIA  B  RMESE .16692.IB00.APPR
V180043.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .16646.IB00.APPR
V190217.INTERNATIONA  BROADCASTER M   TIMEDIA  TIBETAN .17297.IB00.APPR
V136122.ITN  BROADCASTER   OREAN .16926.IB00.APPR
V136122.INTERNATIONA  BROADCASTER M   TIMEDIA   OREAN .17130.IB00.APPR
V220053.INT BROADCASTER M   TIMEDIA  VIETNAMESE .18623.IB00.APPR
V220039.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .18405.IB00.APPR
V210047.M   TIMEDIA SPECIA IST  INDONESIAN .17898.IB00.APPR
V230093.INTERNATIONA  BROADCASTER M   TIMEDIA   HMER .19151.IB00.APPR
V136231.INTERNATIONA  BROADCASTER M   TIMEDIA   HMER .16762.IB00.APPR
V230022.INTERNATIONA  BROADCASTER   OREAN .18759.IB00.APPR
V180067.INTERNATIONA  BROADCASTER M   TIMEDIA  THAI .17713.IB00.APPR
V169122.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .15610.IB00.APPR
V210154.M   TIMEDIA SPECIA IST   OREAN .18183.IB00.APPR
V210013.M   TIMEDIA SPECIA IST   OREAN .17709.IB00.APPR
V210013.M   TIMEDIA SPECIA IST   OREAN .17710.IB00.APPR
V169115.INTERNATIONA  BROADCASTER M   TIMEDIA   AO .16361.IB00.APPR
V158094.INTERNATIONA  BROADCASTER M   TIMEDIA  MANDARIN .16599.IB00.APPR
V158094.INTERNATIONA  BROADCASTER M   TIMEDIA  MANDARIN .16592.IB00.APPR
V230013.INT BROADCASTER M   TIMEDIA  MANDARIN .18754.IB00.APPR
V158092.INTERNATIONA  BROADCASTER M   TIMEDIA  MANDARIN .17335.IB00.APPR
V7916.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .17397.IB00.APPR
V230146.INTERNATIONA  BROADCASTER M   TIMEDIA   HMER .19453.IB00.APPR
V136231.INTERNATIONA  BROADCASTER M   TIMEDIA   HMER .15306.IB00.APPR
V158092.INTERNATIONA  BROADCASTER M   TIMEDIA  MANDARIN .15609.IB00.APPR
V136122.INTERNATIONA  BROADCASTER M   TIMEDIA   OREAN .17195.IB00.APPR
V147148.INT BROADCASTER  TIBETAN .14570.IB00.APPR
V169159.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .16369.IB00.APPR
V7916.INTERNATIONA  BROADCASTER  B  RMESE .14828.IB00.APPR
V180050.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .17841.IB00.APPR
V7916.INT BROADCASTER  B  RMESE .14400.IB00.APPR
V158177.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .16306.IB00.APPR
V7916.INTERNATIONA  BROADCASTER  B  RMESE .14402.IB00.APPR
V1018.INTERNATIONA  BROADCASTER   OREAN .14627.IB00.APPR
V158178.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .15582.IB00.APPR
V158127.INTERNATIONA  BROADCASTER M   TIMEDIA   HMER .14992.IB00.APPR
V158177.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .15506.IB00.APPR
V7916.INTERNATIONA  BROADCASTER  B  RMESE .14401.IB00.APPR
V158178.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .15584.IB00.APPR
V210027.M   TIMEDIA SPECIA IST  THAI .17734.IB00.APPR
V7916.INT BROADCASTER  B  RMESE .16389.IB00.APPR

V210010.M   TIMEDIA SPECIA IST   HMER .17706.IB00.APPR
V1017.RADIO PROD  CTION SPECIA IST   OREAN .16653.IB00.APPR
V136123.INT  BROADCASTER M   TIMEDIA   OREAN .15738.IB00.APPR
V200121.M   TIMEDIA SPECIA IST  INDONESIAN .17807.IB00.APPR
V158178.INTERNATIONA  BROADCASTER M   TIMEDIA   INDONESIAN .15100.IB00.APPR
V210047.M   TIMEDIA SPECIA IST  INDONESIAN .17806.IB00.APPR
V136096.INTERNATIONA  BROADCASTER M   TIMEDIA   INDONESIAN .15570.IB00.APPR
V1020.INT BROADCASTER   OREAN .11203.IB00.APPR
V3219.INT BROADCASTER  TV   TIBETAN .12004.IB00.APPR
V3360.INT BROADCASTER  INDONESIAN .12270.IB00.APPR
V3220.INT BROADCASTER  TV   TIBETAN .12001.IB00.APPR
V7814.INT BROADCASTER  TIBETAN .8754.IB00.APPR
V220121.DI  ITA  EDITOR   OREAN .18491.IB00.APPR
V210171.INTERNATIONA  BROADCASTER M   TIMEDIA  MANDARIN .18213.IB00.APPR
V240040.INT BROADCASTER M   TIMEDIA   OREAN .19819.IB00.APPR
V220191.INTERNATIONA  BROADCASTER M   TIMEDIA   OREAN .18732.IB00.APPR
V169132.M   TIMEDIA PROD  CTION SPECIA IST  TIBETAN .17017.IB00.APPR
V170280.INTERNATIONA  BROADCASTER  TIBETAN .16609.IB00.APPR
V180063.INT BROADCASTER   OREAN .18178.IB00.APPR
V230116.INTERNATIONA  BROADCASTER M   TIMEDIA   OREAN .19150.IB00.APPR
V7432.TV PROD  CTION SPEC  DIRECTOR   INDONESIAN .8764.IB00.APPR
V180063.INT BROADCASTER   OREAN .18072.IB00.APPR
V210047.M   TIMEDIA SPECIA IST  INDONESIAN .17805.IB00.APPR
V158092.INTERNATIONA  BROADCASTER M   TIMEDIA   MANDARIN .16914.IB00.APPR
V210040.M   TIMEDIA SPECIA IST  MANDARIN .17799.IB00.APPR
V169101.E  ECTRONICS EN  INEER.16492.IB00.APPR
V0934.TE  ECOMM  NICATIONS SPEC.11178.IB00.APPR
V8159.PROPERT   MANA  EMENT SPEC.10098.IB00.APPR
V6666.E  ECTRONICS EN  INEER.10426.IB00.APPR
V170128.MECHANICA  EN  INEER.17323.IB00.APPR
V169099. O  ISTICS MANA  EMENT SPECIA  IST.16782.IB00.APPR
V180128.E  ECTRONICS EN  INEER.16789.IB00.APPR
V7113.CIVI  EN  INEER.8347.IB00.APPR
V169069.MEDIA DE  IVER  S  STEMS O  ICER.15511.IB00.APPR
V136051.INTERNATIONA  BROADCASTER  ON INE   R  SSIAN .13648.IB00.APPR
V200155. EAD MANA  IN  EDITOR  R  SSIAN .17619.IB00.APPR
V210026.INTERNATIONA  BROADCASTER M   TIMEDIA  R  SSIAN .17817.IB00.APPR
V220015.DI  ITA  MEDIA SPECIA IST  R  SSIAN .19015.IB00.APPR
V230014.M   TIMEDIA SPECIA IST  R  SSIAN .18957.IB00.APPR
V230014.M   TIMEDIA SPECIA IST  R  SSIAN .18994.IB00.APPR
V210083.M   TIMEDIA  RAPHICS SPECIA IST R  SSIAN .18953.IB00.APPR
V190226.INTERNATIONA  BROADCASTER TV ON INE   A BANIAN .18422.IB00.APPR
V220034.INT BROADCASTER  TV ON INE   SERBIAN .18651.IB00.APPR
V190221.INTERNATIONA  BROADCASTER TV ON INE   SERBIAN .19956.IB00.APPR
V220163.PRO  RAM COORDINATOR.18848.IB00.APPR
V220087.DI  ITA  MEDIA SPECIA IST    RAINIAN .18630.IB00.APPR
V200071.INTERNATIONA  BROADCASTER M   TIMEDIA  BOSNIAN .17554.IB00.APPR

Add. 84

V220058.M   TIMEDIA  RAPHICS SPECIA IST  R  SSIAN .18541.IB00.APPR
V210028.INTERNATIONA  BROADCASTER M  TIMEDIA      RAINIAN .18399.IB00.APPR
V180122.INT BROADCASTER M  TIMEDIA    RAINIAN .16935.IB00.APPR
V190221.INTERNATIONA  BROADCASTER TV ON INE  SERBIAN .17502.IB00.APPR
V169107.INT BROADCASTER TV ON INE    RAINIAN .15778.IB00.APPR
V230117.M   TIMEDIA SPECIA IST  R  SSIAN .19089.IB00.APPR
V210028.INTERNATIONA  BROADCASTER M  TIMEDIA    RAINIAN .17819.IB00.APPR
V230144.INTERNATIONA  BROADCASTER TV ON INE  A  BANIAN .19310.IB00.APPR
V190221.INTERNATIONA  BROADCASTER TV ON INE  SERBIAN .17501.IB00.APPR
V169028.INT BROADCASTER TV ON INE  R  SSIAN .16187.IB00.APPR
V169173.INT BROADCASTER TV ON INE  R  SSIAN .15775.IB00.APPR
V230053.INTERNATIONA  BROADCASTER TV ON INE  R  SSIAN .19498.IB00.APPR
V210050.M   TIMEDIA SPECIA IST  A  BANIAN .17813.IB00.APPR
V158010.INT BROADCASTER TV ON INE  R  SSIAN .15731.IB00.APPR
V158206.INT BROADCASTER TV ON INE  MACEDONIAN .15146.IB00.APPR
V190112.INT BROADCASTER TV ON INE  R  SSIAN .17167.IB00.APPR
V190048.INT BROADCASTER TV ON INE  R  SSIAN .17112.IB00.APPR
V220168.MANA  EMENT AND PRO  RAM ANA   ST   INANCIA  .18547.IB00.APPR
V170173.INVESTI  ATIVE WRITER-EDITOR.19127.IB00.APPR
V3208.INT BROADCASTER  SERBIAN .11977.IB00.APPR
V114268.INT BROADCASTER   EOR  IAN .13046.IB00.APPR
V220171.INTERNATIONA  BROADCASTER R  SSIAN  ON INE.18840.IB00.APPR
V190235.INTERNATIONA  BROADCASTER V   A BANIAN .17419.IB00.APPR
V114317.INT BROADCASTER  TV   BOSNIAN .12988.IB00.APPR
V210050.M   TIMEDIA SPECIA IST  A  BANIAN .17814.IB00.APPR
V240139.M   TIMEDIA  RAPHICS DESI  NER.20434.IB00.APPR
V220156.INT BROADCASTER  M   TIMEDIA  R  SSIAN .18642.IB00.APPR
V170097.INT BROADCASTER  M   TIMEDIA  R  SSIAN .16021.IB00.APPR
V3109.SENIOR ANA   ST.18375.IB00.APPR
V4084.INT BROADCASTER  TV     RAINIAN .12895.IB00.APPR
V158198.EDITOR  SPECIA T  .15157.IB00.APPR
V170097.INT BROADCASTER  M   TIMEDIA  R  SSIAN .16022.IB00.APPR
V169028.INT BROADCASTER TV ON INE  R  SSIAN .16647.IB00.APPR
V250005.INT BROADCASTER  TV ON INE     RAINIAN .20431.IB00.APPR
V240113. INANCIA  SPECIA IST.20225.IB00.APPR
V114197.ACCO  NTANT  INTERNA  CONTRO S .18794.IB00.APPR
V210117.PA RO   SPECIA IST.18254.IB00.APPR
V114197.ACCO  NTANT  INTERNA  CONTRO  .18806.IB00.APPR
V114267.ACCO  NTANT  ANA   SIS REPORTIN   AND COMP IANCE .17282.IB00.APPR
V136150.SENIOR ACCO  NTANT.13830.IB00.APPR
V136014.M   TIMEDIA PROD  CTION SPECIA IST.13602.IB00.APPR
V136014.M   TIMEDIA PROD  CTION SPECIA IST.14837.IB00.APPR
V210052.PROD  CER.17821.IB00.APPR
V8592.IB  RADIO TV   EN   ISH .10660.IB00.APPR
V240085.H  MAN RESO  RCES SPECIA IST.20214.IB00.APPR
V158003.IT SPECIA IST  S  SADMIN .14575.IB00.APPR
V170023.IT SPECIA IST  INET .15861.IB00.APPR

V125184.IT SPECIA IST  PRO M  T .14853.IB00.APPR
V169043.IT SPECIA IST  IN  OSEC .15276.IB00.APPR
V158213.IT SPECIA IST  S  SADMIN .15739.IB00.APPR
V158002.IT SPECIA IST  S  SADMIN .14576.IB00.APPR
V125109.IT SPECIA IST  S  SADMIN .12949.IB00.APPR
V170062.IT SPECIA IST  IN  OSEC .16797.IB00.APPR
V230139.IT SPECIA IST  S  SADMIN .19497.IB00.APPR
V230110.INTERNATIONA  BROADCASTER  CREO E .19459.IB00.APPR
V210084.M   TIMEDIA SPECIA IST  SPANISH .18201.IB00.APPR
V210009.M   TIMEDIA SPECIA IST  SPANISH .17693.IB00.APPR
V136178.INTERNATIONA  BROADCASTER  M   TIMEDIA  SPANISH .14975.IB00.APPR
V169162.INTERNATIONA  BROADCASTER  CREO E .15673.IB00.APPR
V210084.M   TIMEDIA SPECIA IST  SPANISH .18169.IB00.APPR
V240107.INTERNET EDITOR  SPANISH .20171.IB00.APPR
V7726.INT BROADCASTER  TV RADIO   SPANISH .9034.IB00.APPR
V7217.INT RADIO BROADCASTER  SPANISH .8122.IB00.APPR
V190248.INTERNATIONA  BROADCASTER  M   TIMEDIA  SPANISH .18076.IB00.APPR
V200001.P  ANNIN   PROD  CER EDITOR  SPANISH .17705.IB00.APPR
V190159.INTERNATIONA  BROADCASTER  SPANISH .17618.IB00.APPR
V169162.INTERNATIONA  BROADCASTER  CREO E .15672.IB00.APPR
V169024.INTERNATIONA  BROADCASTER  M   TIMEDIA   SPANISH .16000.IB00.APPR
V6422.WRITER.10444.IB00.APPR
V5756.WRITER.3835.IB00.APPR
V125137. RAPHICS S  PPORT SPECIA IST.16092.IB00.APPR
V190249.VIDEO PROD  CTION SPECIA IST.17717.IB00.APPR
V6613.VIS  A  IN  ORMATION SPEC.8504.IB00.APPR
V170043.P  B  IC A   AIRS SPECIA IST.16854.IB00.APPR
V230103.TE ECOMM  NICATIONS SPECIA IST.20011.IB00.APPR
V190027.TE ECOMM  NICATIONS SPECIA IST.18005.IB00.APPR
V147134.IT SPECIA IST  NETWOR  .14495.IB00.APPR
V147118.IT SPECIA IST  NETWOR  .14411.IB00.APPR
V190027.TE ECOMM  NICATIONS SPEC.17942.IB00.APPR
V170022. EAD IT SPECIA IST  INET .15860.IB00.APPR
V7907.IT SPECIA IST  NETWOR  .9349.IB00.APPR
V180077.TE ECOMM  NICATIONS SPECIA IST.16712.IB00.APPR
V3336.INT BROADCASTER  PERSIAN .12152.IB00.APPR
V240056.TE EVISION E  EC  TIVE PROD  CER  PERSIAN .19913.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .16670.IB00.APPR
V170232.MANA  EMENT AND PRO  RAM ANA   ST   INANCIA  .18291.IB00.APPR
V3334.TV PROD  CTION SPECIA IST  PERSIAN .17587.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .18270.IB00.APPR
V170232.MANA  EMENT AND PRO  RAM ANA   ST   INANCIA  .17902.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .17842.IB00.APPR
V210037.PROD  CER.17732.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17790.IB00.APPR
V170057. EAD TV PROD  CTION SPECIA IST  PERSIAN .19607.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17730.IB00.APPR

V170057. EAD TV PROD  CTION SPECIA  IST.18088.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14753.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .15003.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17727.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17729.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14685.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14751.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17728.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17789.IB00.APPR
V220164.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .18715.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14680.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14679.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .13831.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14712.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17788.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14677.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14750.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14758.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .14757.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17786.IB00.APPR
V210207.INT BROADCASTER  DOMESTIC BEAT CORRESPONDENT  PERSIAN .18320.IB00.APPR
V230017.INTERNATIONA  BROADCASTER M   TIMEDIA   PERSIAN .18678.IB00.APPR
V3324.INT BROADCASTER  SENIOR CORRESPONDENT   PERSIAN .12194.IB00.APPR
V3324.INT BROADCASTER  SENIOR CORRESPONDENT   PERSIAN .13143.IB00.APPR
V3106.INT BROADCASTER  EN    ISH- EAT  RES .12351.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .18307.IB00.APPR
V158013.PER  ORMANCE REVIEW ANA   ST.18686.IB00.APPR
V158013.PER  ORMANCE REVIEW ANA   ST.18687.IB00.APPR
V170232.MANA  EMENT AND PRO  RAM ANA  ST  INANCIA .20335.IB00.APPR
V170043.P  B  IC A   AIRS SPECIA  IST.18780.IB00.APPR
V210156.P  B  IC A   AIRS SPECIA  IST.18357.IB00.APPR
V170065.MANA  EMENT AND PRO  RAM ANA   ST.15972.IB00.APPR
V8533.MAI  OPERATIONS ASSISTANT.11621.IB00.APPR
V210042.ADMINISTRATIVE O   ICER.18361.IB00.APPR
V136181.ADMINISTRATIVE O   ICER.13961.IB00.APPR
V180149.ADMINISTRATIVE ASSISTANT  OA .16820.IB00.APPR
V180078.PRO  RAM ANA   ST.16716.IB00.APPR
V240009.IT PRO  ECT MANA  ER  P  C  P  N .19804.IB00.APPR
V240009.IT PRO  ECT MANA  ER  P  C  P  N .19267.IB00.APPR
V240009.IT PRO  ECT MANA  ER  P  C  P  N .19268.IB00.APPR
V220075.  ENERA  SERVICES SPECIA  IST.18745.IB00.APPR
V220075.  ENERA  SERVICES SPECIA  IST.20455.IB00.APPR
V169232.SA  ET  AND EMER  ENC  PREPAREDNESS SPECIA  IST.19287.IB00.APPR
V200107.DI  ITA  MEDIA SPECIA IST  PASHTO .17534.IB00.APPR
V1175.M   TIMEDIA SPECIA IST  PASHTO .18753.IB00.APPR
V220150.MANA  EMENT AND PRO  RAM ANA  ST  INANCIA .19912.IB00.APPR
V200107.DI  ITA  MEDIA SPECIA IST  PASHTO .18085.IB00.APPR

V200117.DI ITA NEWS EDITOR    RDISH .17994.IB00.APPR
V240116.INTERNATIONA BROADCASTER DI ITA   T R ISH .20458.IB00.APPR
V190031. RAPHIC ARTIST DI ITA MEDIA .17155.IB00.APPR
V180022.INT BROADCASTER M  TIMEDIA T R ISH   RDISH .16843.IB00.APPR
V180065.INT BROADCASTER V    RD .16730.IB00.APPR
V170207.INT BROADCASTER M  TIMEDIA PASHTO .16676.IB00.APPR
V4075.INT BROADCASTER ON INE  T R ISH .15010.IB00.APPR
V240110.INT BROADCASTER M  TIMEDIA  T R ISH .20416.IB00.APPR
V136035.INT BROADCASTER PASHTO .14117.IB00.APPR
V240008.INTERNATIONA BROADCASTER M  TIMEDIA  T R ISH .19429.IB00.APPR
V158029.INT BROADCASTER ON INE    RDISH .14805.IB00.APPR
V220150.MANA EMENT AND PRO RAM ANA  ST  INANCIA .18520.IB00.APPR
V220169.MANA EMENT AND PRO RAM ANA  ST  INANCIA .18548.IB00.APPR
V169199.INT BROADCASTER M  TIMEDIA BAN  A .15722.IB00.APPR
V220208.E EC TIVE PROD CER.18993.IB00.APPR
V210051.M  TIMEDIA SPECIA IST DARI .17816.IB00.APPR
V169157.INT BROADCASTER M  TIMEDIA PASHTO .15720.IB00.APPR
V169157.INT BROADCASTER M  TIMEDIA PASHTO .15718.IB00.APPR
V114240.INT BROADCASTER M  TIMEDIA PASHTO .17205.IB00.APPR
V169141.INT BROADCASTER M  TIMEDIA   RD .15632.IB00.APPR
V114240.INTERNATIONA BROADCASTER PASHTO .13773.IB00.APPR
V169157.INT BROADCASTER M  TIMEDIA PASHTO .16461.IB00.APPR
V210104.INTERNATIONA BROADCASTER M  TIMEDIA BAN  A .18023.IB00.APPR
V1114.INT BROADCASTER DARI .15412.IB00.APPR
V210044.M  TIMEDIA SPECIA IST PASHTO .17802.IB00.APPR
V158034.INT BROADCASTER   BE .14804.IB00.APPR
V136125.INTERNATIONA BROADCASTER M  TIMEDIA  DARI .13774.IB00.APPR
V114240.INT BROADCASTER M  TIMEDIA PASHTO .16763.IB00.APPR
V147012.INT BROADCASTER BAN  A .14161.IB00.APPR
V7228.INT BROADCASTER A ERBAI ANI .7329.IB00.APPR
V200085.INTERNATIONA BROADCASTER M  TIMEDIA   RD .17474.IB00.APPR
V1175.INT BROADCASTER PASHTO .11861.IB00.APPR
V200085.INTERNATIONA BROADCASTER M  TIMEDIA   RD .17473.IB00.APPR
V200127.SENIOR TE EVISION SPECIA IST PROD CER    RDISH .18108.IB00.APPR
V1175.M  TIMEDIA SPECIA IST PASHTO .18383.IB00.APPR
V200114.M  TIMEDIA SPECIA IST PASHTO .17545.IB00.APPR
V170133.INT BROADCASTER M  TIMEDIA T R ISH .16119.IB00.APPR
V170135.INT BROADCASTER M  TIMEDIA PASHTO .16139.IB00.APPR
V200110.M  TIMEDIA SPECIA IST T R ISH .17541.IB00.APPR
V190224.EDITOR BRID E .17547.IB00.APPR
V190237.E EC TIVE PROD CER TV   RD .17329.IB00.APPR
V147085.TV PROD CTION SPECIA IST   RD .14533.IB00.APPR
V210099.INTERNATIONA BROADCASTER M  TIMEDIA PASHTO .18177.IB00.APPR
V170155.INT BROADCASTER M  TIMEDIA PASHTO .16186.IB00.APPR
V147015.INT BROADCASTER DARI .14116.IB00.APPR
V210100.INTERNATIONA BROADCASTER M  TIMEDIA  DARI .18176.IB00.APPR
V180108.EDITOR DI ITA   DEEWA .17111.IB00.APPR

V169169.SPECIA  PRO ECTS MANA  ER.15683.IB00.APPR
V230089.A DIOVIS A  PROD  CTION SPECIA IST.19023.IB00.APPR
V169039.E EC TIVE PROD  CER TV  T R ISH .15267.IB00.APPR
V230130.E EC TIVE PROD  CER TV .19067.IB00.APPR
V170134.INT BROADCASTER M  TIMEDIA    RDISH .19016.IB00.APPR
V169044.E EC TIVE PROD  CER TV    RDISH .18622.IB00.APPR
V169171.SENIOR EDITOR M  TIMEDIA  DARI .15681.IB00.APPR
V169036.INT BROADCASTER M  TIMEDIA    BE .15261.IB00.APPR
V170134.INT BROADCASTER M  TIMEDIA    RDISH .16142.IB00.APPR
V136246.SENIOR ANA  ST.16175.IB00.APPR
V180156.IT SPECIA IST C  STSPT .17896.IB00.APPR
V180156.IT SPECIA IST C  STSPT .17897.IB00.APPR
V0903.IT SPECIA IST C  STSPT .12014.IB00.APPR
V0903.IT SPECIA IST C  STSPT .12013.IB00.APPR
V7501.IT SPECIA IST C  STSPT .12885.IB00.APPR
V180156.IT SPECIA IST C  STSPT .17220.IB00.APPR
V190214.TE ECOMM  NICATIONS SPECIA IST BROADCASTIN  MEDIA TECHNO O  .18083.IB00.APPR
V190214.TE ECOMM  NICATIONS SPECIA IST  BROADCAST MEDIA TECHNO O  .17995.IB00.APPR
V190214.TE ECOMM  NICATIONS SPECIA IST BROADCASTIN  MEDIA TECHNO O  .18181.IB00.APPR
V158189.TE ECOMM  NICATIONS SPECIA IST.17190.IB00.APPR
V190036.IN ORMATION TECHNO O  SPECIA IST C  STSPT .17116.IB00.APPR
V190036.IN ORMATION TECHNO O  SPECIA IST C  STSPT .17115.IB00.APPR
V190214.TE ECOMM  NICATIONS SPECIA IST BROADCASTIN  MEDIA TECHNO O  .18056.IB00.APPR
V158189.TE ECOMM  NICATIONS SPECIA IST.17191.IB00.APPR
V158140.IT SPECIA IST C  STSPT .15016.IB00.APPR
V169013. EAD IT SPECIA IST C  STSPT .15210.IB00.APPR
V158189.TE ECOMM  NICATIONS SPEC.15139.IB00.APPR
V240039.IT SPECIA IST S SADMIN .19903.IB00.APPR
V240075.IT SPECIA IST C  STSPT .20226.IB00.APPR
V220107.MANA  EMENT AND PRO  RAM ANA  ST.20470.IB00.APPR
V240031.BROADCAST MAINTENANCE TECHNICIAN M  TIMEDIA .19456.IB00.APPR
V240033. EAD TV PROD  CTION SPECIA IST.19495.IB00.APPR
V158187.IB M  TIMEDIA .19579.IB00.APPR
V4090. ENERA  ASSI NMENTS REPORTER EN  ISH .12591.IB00.APPR
V4090. ENERA  ASSI NMENTS REPORTER EN  ISH .18071.IB00.APPR
V220061.INT BROADCASTER EN  ISH .18711.IB00.APPR
V210066.A DIENCE EN A  EMENT ANA  ST.17938.IB00.APPR
V210066.A DIENCE EN A  EMENT ANA  ST.18430.IB00.APPR
V3116.INTERNATIONA  BROADCASTER EN  ISH .12357.IB00.APPR
V3116.INT BROADCASTER EN  ISH .12364.IB00.APPR
VV220029.PRESS  REEDOM M  TIMEDIA REPORTER.18812.IB00.APPR
V210217.  .S . PO ITICS AND PO IC  REPORTER.18658.IB00.APPR
V210098.INTERNATIONA  BROADCASTER  DOMESTIC BEAT .18170.IB00.APPR
V210098.INTERNATIONA  BROADCASTER  DOMESTIC BEAT CORRESPONDENT .18014.IB00.APPR
V220036.EDITOR  BRID  E .18350.IB00.APPR
V180007.  RAPHIC ARTIST.16578.IB00.APPR
V158132.EDITOR  STOR  .17303.IB00.APPR

V210098.INTERNATIONA  BROADCASTER  DOMESTIC BEAT CORRESPONDENT .18017.IB00.APPR
V210098.INTERNATIONA  BROADCASTER  DOMESTIC BEAT CORRESPONDENT .18015.IB00.APPR
V4090.  ENERA  ASSI  NMENTS REPORTER  EN    ISH .13978.IB00.APPR
V4090.  ENERA  ASSI  NMENTS REPORTER  EN    ISH .12589.IB00.APPR
V220176.MEDIA ASSET DISPOSITION SPECIA  IST.18573.IB00.APPR
V230067.IT SPECIA  IST  INET .18828.IB00.APPR
V220151.MANA  EMENT AND PRO  RAM ANA   ST   INANCIA  .18519.IB00.APPR
V210014.A  DIOVIS  A  PROD  CTION SPECIA  IST.17695.IB00.APPR
V147027.INTERNATIONA  BROADCASTER  TV  INTERNET .14135.IB00.APPR
V1156.INT BROADCASTER  INTERNET .11423.IB00.APPR
V3116.INT BROADCASTER  EN    ISH .12363.IB00.APPR
V114262.INT BROADCASTER  EN    ISH .12378.IB00.APPR
V147026.TV PROD  CTION SPECIA  IST.14137.IB00.APPR
V220061.INT BROADCASTER  EN    ISH .18627.IB00.APPR
V136106.WRITER EDITOR  INTERNET .19348.IB00.APPR
V136106.WRITER EDITOR  INTERNET .13814.IB00.APPR
V147149.INT BROADCASTER  M    TIMEDIA .14910.IB00.APPR
V158198.EDITOR  SPECIA  T  .15156.IB00.APPR
V136106.WRITER EDITOR  INTERNET .18891.IB00.APPR
V158132.EDITOR  STOR  .15037.IB00.APPR
V158132.EDITOR  STOR  .15042.IB00.APPR
V136192.INTERNATIONA  BROADCASTER.14622.IB00.APPR
V7857.TECHNICA  IN  ORMATION SPECIA  IST.14347.IB00.APPR
V3116.INT BROADCASTER  EN    ISH .12370.IB00.APPR
V210014.A  DIOVIS  A  PROD  CTION SPECIA  IST.17694.IB00.APPR
V210014.A  DIOVIS  A  PROD  CTION SPECIA  IST.17697.IB00.APPR
V3104.INT BROADCASTER  VIDEO PHOTO  RAPHER .12301.IB00.APPR
V3116.INTERNATIONA  BROADCASTER EN    ISH .13640.IB00.APPR
V170054.TECHNICA  IN  ORMATION SPECIA  IST DI  ITA  ASSET .15950.IB00.APPR
V169164.INTERNATIONA  BROADCASTER.19860.IB00.APPR
V136153.TECHNICA  IN  ORMATION SPECIA  IST DI  ITA  ASSET .13839.IB00.APPR
V8014.STA    ASSISTANT  T  PIN  .9256.IB00.APPR

| Grade | Competitive Geo |
|-------|-----------------|
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-11 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|---|---|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |

| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | PA  M BA  ,BREVARD, |
| S-14 | PASADENA,  OS AN   E ES,CA |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |

| | |
|---|---|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | PHOENI ,MARICOPA,A |
| S-13 | PORT AND,C MBER AND,ME |
| S-12 | SAN ANTONIO,BE AR,T |
| S-12 | HI H AND,MADISON,I |
| S-09 | SA EM,MARION,OR |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | NOR O    IND CIT  ,VA |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-09 | Washington, DC |
| S-09 | Washington, DC |
| S-13 | ISSIMMEE,OSCEO A, |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | N    or , N |
| S-12 | N    or , N |
| S-12 | CR STA  A E,MCHENR  ,I |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |

| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| | |
|---|---|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | RANCONIA,  RA TON,NH |
| S-13 | Washington, DC |
| S-11 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-15 | Washington, DC |
| S-12 | N    or , N |
| S-13 | N    or , N |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | CAPE CORA , EE, |
| S-12 | WARSAW,RICHMOND,VA |
| S-11 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |

| | |
|---|---|
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-15 | Washington, DC |
| S-12 | N    or , N |
| S-13 | N    or , N |
| S-12 | OS AN  E ES, OS AN  E ES,CA |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-06 | Washington, DC |
| S-11 | Washington, DC |
| S-11 | Washington, DC |
| S-08 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| | |
|---|---|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| -12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |

| | |
|---|---|
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | N      or , N |
| S-13 | N      or , N |
| S-13 | N      or , N |
| S-13 |  A SA   E,I |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |

| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-11 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-07 | Washington, DC |

# EXHIBIT I

Add. 104

Outlook

---

**Important Information: Placement on Administrative Leave**

---

**From** Crystal Thomas <cthomas@usagm.gov>

**Date** Sat 3/15/2025 9:57 AM

**This email provides important information regarding your employment status.**

Pursuant to the Presidential Executive Order Continuing the Reduction of the Federal Bureaucracy – The White House  and the Office of Personnel Management Guidance on Probationary Periods, Administrative Leave and Details and additional authorities, including but not limited to, 5 C.F.R. § 630,1403, effective immediately, the United States Agency for Global Media (USAGM) is placing you on administrative leave with full pay and benefits until otherwise notified. This administrative leave is not being done for any disciplinary purpose.

Please note the following:

- **Access to Premises and Systems:** During the period that you are on administrative leave, you are not to enter USAGM premises, access USAGM systems, or attempt to use your position or authority with USAGM in any way without my prior permission or prior permission of a supervisor in your chain of command.

- **Government Property:** Since you will not have any official business during this time, upon request, you will be expected to immediately surrender your official USAGM identification badge and press pass, as well as any keys or other official government property, including documents, records, electronic and telephone devices, and other equipment.

While you are on administrative leave with pay, you must be available by your personal telephone and personal e-mail during normal business hours, as it may be necessary for Agency officials to contact you. To that end, from your personal email, please send an email to HRcustomerservice@usagm.gov providing your personal contact information, including your phone number, email address, and mailing address by Monday, March 17, 2025.

You also must remain available to report to work if directed to do so and will be required to do so within one (1) business day of being contacted by an Agency representative, whether telephonically or electronically. If a situation occurs that would prevent you from reporting to work if contacted (*e.g.*, travel outside of the area, medical circumstances, jury duty, etc.), you must contact Crystal Thomas at CThomas@usagm.gov and provide the information as to your unavailability, so that your administrative leave can be changed to the appropriate leave category.

While on administrative leave, you remain an employee of the Agency.  You are required to comply with the instructions of your supervisors, all laws and regulations, and agency policies, including the Broadcasting Administrative Manual (BAM).

We will provide you with updates as soon as they are available. We appreciate your patience and cooperation.

If you have any concerns or questions, please contact Crystal Thomas at cthomas@usagm.gov.

Crystal G. Thomas
Director
Office of Human Resources

P: 202-920-2401
M: 202-765-7950
cthomas@usagm.gov



## DECLARATION OF JOHN DOE 4

I, John Doe 4, declare under penalty of perjury that the foregoing is true and correct:

1. I am a plaintiff in this case, captioned as *Widakuswara v. Lake*, No. 25-cv-01015-RCL (D.D.C).

2. I am a PSC (Personal Service Contractor) and a member of the US Agency for Global Media (USAGM) workforce.

3. On March 16, 2025, I was informed that my contract was to be terminated, effective March 31, 2025.

4. On March 28, 2025, a Temporary Restraining Order (TRO) was entered in this case (ECF No. 54). The TRO temporarily enjoins the defendants, including USAGM, from taking "any action to reduce USAGM's workforce (whether employees, contractors, or grantees)."

5. On March 29, 2025, I received an email from USAGM, with the subject "PSC Status," stating:

   > Please be advised that the termination of your personal services contract is on hold until further notice. During this time, you will remain on administrative leave and will continue to receive your regular pay and benefits. We will keep you informed as the situation develops.

Add. 107

6.  A copy of the email is attached as Exhibit 1.  USAGM did not reinstate my contract or suspend its termination at any time prior to March 29.

7.  On April 15, 2025, I also learned that USAGM has informed the PSC health insurance carriers that coverage is to terminate April 30, 2025.

8.  My concern about involuntary termination and the required departure from the United States remains.  I am a visible member of the media and fear that my friends and family members residing in my home country risk retaliation for their associations with me should I be forced to leave the United States in the very public manner associated with the present circumstances.

Dated;  April 16, 2025

_____
/s/

JOHN DOE 4

Add. 108

## EXHIBIT 1

From: **J.R. Hill** <chill@usagm.gov>
Date: Sat, Mar 29, 2025 at 5:36 PM
Subject: PSC Status
To: J.R. Hill <chill@usagm.gov>
Cc: John Hoddinott <jhoddinott@usagm.gov>, PSC Inquiries <pscinquiries@usagm.gov>


Good evening

 Please be advised that the termination of your personal services contract is on hold
until further notice. During this time, you will remain on administrative leave and will
continue to receive your regular pay and benefits. We will keep you informed as the
situation develops.

If you have any questions, please don't hesitate to reach out.



Thank you



J.R. Hill

USAGM/CON

Branch Chief

VOA, OCB and USAGM

 o

 c

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATSY WIDAKUSWARA, *et al.*,

                              Plaintiffs,

                    - v -

KARI LAKE, *et al.*,

                              Defendants.

No. 25 Civ. 2390 (JPO)

---

### DECLARATION OF CRYSTAL THOMAS

I, CRYSTAL THOMAS, hereby make the following declaration pursuant to 28 U.S.C. § 1746:

1.    I have been the Director of Human Resources for the U.S. Agency for Global Media ("USAGM") since 2024.   I base this declaration on knowledge and information I have gained in the course of performing my official duties.

2.    In that capacity, I have personal knowledge of, and direct involvement, in personnel decisions for USAGM.

3.    USAGM currently employs a total of approximately 1,147 full-time employees.  As of March 14, 2025, USAGM had active employment contracts with 598 personal service contractors.

4.    Nearly all of USAGM's workforce has been located in the Washington, D.C. area. Specifically, USAGM currently has approximately 1,040 full time federal employees with duty stations in the Washington, D.C. area.  In addition, as of March 14, 2025, USAGM contracted with approximately 475 personal services contractors in the Washington, D.C. area.  In contrast, as of the same date, USAGM employed only 14 full-time federal employees and contracted with only 25 personal services contractors in the New York City area.

5.      On March 14, 2025, President Trump issued an Executive Order directing that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law" (the "Executive Order").   *See* Continuing the Reduction of the Federal Bureaucracy, https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ (Mar. 14, 2025).

6.      On March 15, 2025, pursuant to the Executive Order, USAGM placed 1,042 full-time employees on administrative leave with full pay and benefits. On March 16, 2025, and terminated the contracts with all personal services contractors, who will be paid through March 31, 2025. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order.

7.      In the course of that implementation, on March 25, 2025, I sent an email to 33 employees who work at Office of Cuba Broadcasting recalling them from administrative leave effective March 26, 2025. As of the end of the day on March 26, 2025, I can confirm that all employees were on work status. I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025.

8.      In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 31 other employees from administrative leave.

9.      The American Federal Government Employees Local 1812 ("AFGE") serves as the exclusive representative for a bargaining unit consisting of approximately 713 USAGM employees. On March 25, 2025, I sent an email to the AFGE Local 1812 President enclosing a preliminary

2

notification to the union stating USAGM's intent to implement a reduction in force ("RIF") for multiple competitive areas in USAGM in furtherance of the Executive Order.

10.     The American Federation of State, County and Municipal Employees Local 1418, AFL-CIO ("AFSCME") serves as the exclusive representative for a bargaining unit consisting of approximately 33 USAGM employees.  On March 25, 2025, I sent an email to the AFSCME Local 1418 President, enclosing a preliminary notification to the union stating USAGM's intent to implement a RIF for multiple competitive areas in furtherance of the Executive Order.

11.     Both of the foregoing notifications informed the respective unions of USAGM's intention to implement a RIF in a manner consistent with USAGM's Negotiated Labor Management Agreements ("NLMA") with each union.

12.     The notifications that were issued will not directly result in the termination of any USAGM employee.  Rather, it is a first step in the process of conducting a RIF, pursuant to the NLMAs with each respective union.  Additional steps in the RIF process with both unions will include, among other things, impact and implementation bargaining to the extent requested by the unions; providing additional information to the unions, including responding to union information requests; providing the unions with retention registers; and specific notice to bargaining unit employees.  Each of these steps would occur prior to removing any bargaining unit employees in the RIF implementation process.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: March 27, 2025
          Washington, District Columbia

Crystal G Thomas
Digitally signed by Crystal G Thomas
Date: 2025.03.27 14:09:55 -04'00'

CRYSTAL THOMAS

3

# EXHIBIT O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATSY WIDAKUSWARA, et al., | |
| Plaintiffs, | No. 25 Civ. 2390 |
| -against- | |
| KARI LAKE, et al., | |
| Defendants. | |

**DECLARATION OF THIBAUT BRUTTIN**

I, Thibaut Bruttin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the Director General of Reporters Sans Frontières ("RSF"). I have worked for RSF for 10 years.

3.      RSF is an international non-profit, non-governmental organization dedicated to protecting the freedom, pluralism and independence of journalism, and to defending those who embody these ideals. Our mission spans from reporting on censorship and attacks on journalists, to advocating for press freedom and the right of the public to access reliable information through government engagement, to directly supporting journalists with physical security and legal assistance.

4.      RSF's correspondents around the globe rely on reporting from Voice of America ("VOA") and the United States Agency for Global Media ("USAGM") grantee networks to perform essential functions.

1

**Add. 114**

5.     The shutdown of USAGM, and VOA in particular, has caused and will continue to cause irreparable harm to RSF as an advocacy organization, to the correspondents they represent and who affiliate with them, and to the individuals throughout the world who depend on that work and whose interests RSF champions.

6.     Those irreparable harms include depriving correspondents of a trustworthy source of news and information in countries and landlocked or remote regions where VOA is one of the few, if not the only, sources of independent and reliable news; stopping RSF from receiving then disseminating vital public interest information for journalists and public safety; reducing the opportunities for persecuted correspondents' stories to be highlighted and potentially protected; and significantly interfering with the organization's ability to advocate for a free press. The silencing of VOA also impedes RSF's ability to function and forces the organization to lose and waste material resources it otherwise would not have spent and upon which it relies. These harms are not abstract or speculative — they are tangible, ongoing, and in many cases, life-threatening.

7.     RSF has over 150 correspondents who are media workers around the world. In many of the threatened and at-risk countries where RSF and its correspondents operate, VOA is among the most authoritative and indispensable sources of information or provides unique coverage otherwise unavailable. Those countries of operation include Afghanistan, Armenia, Azerbaijan, Bangladesh, Burundi, Cambodia, China (including Hong Kong and Tibet), Colombia, Democratic Republic of Congo, Myanmar, Ukraine, Pakistan, Venezuela, El Salvador, Vietnam, and Zimbabwe.

8.     The destruction of VOA is causing and will continue to cause immediate irreparable damage to RSF. For RSF and its correspondents, VOA is a critical reliable source for monitoring press freedom and political developments.

9.      RSF correspondents rely on VOA and USAGM grantees networks as listeners in places where the local media is unreliable. These correspondents — many of whom operate in hostile environments with limited access to credible local media — are now deprived of a trusted source that shaped their reporting, informed RSF's advocacy, and protected their safety. In regions where media is tightly controlled, including parts of Central Europe, Central Asia, Sub-Saharan Africa, Latin America, and Southeast Asia, VOA broadcasts in local languages and provides coverage that cannot be replicated by domestic outlets. Losing VOA erases a critical flow of information for our correspondents.

10.      In Vietnam, an RSF correspondent relies on VOA for many of their news and analytical reports. Without VOA, their work will be severely curtailed, and they will have to expend further energy and resources to gather the information they need — costs that will be billed to RSF, causing further irreparable loss to the organization — and potentially expose themselves to greater danger. That danger stems from having to cultivate additional sources which, in an authoritarian regime, can be perilous, as Vietnam's continuous policy of mass imprisonment of media personnel and the high number of journalistic fatalities around the world attest. In Vietnam alone, VOA journalist Pham Chi Dung is serving a 15-year sentence and three freelance journalists with USAGM grantee Radio Free Asia are also arbitrarily detained because of performing their journalistic activity (Truong Duy Nhat, sentenced to 10 years in prison in 2020; Nguyen Tuong Thuy, sentenced to 11 years in prison in 2021; and Nguyen Lan Thang, sentenced to 6 years in custody in 2023). It is also the case in Myanmar where VOA journalist Sithu Aung Myint was arrested in 2021 on charges of inciting crime, defaming the military and sedition.

11.      For a Tibetan RSF correspondent, one of their main sources of information on the coverage of Tibetan Media organizations comes from two major organizations with the resources

3

to get accurate information out of Tibet to the wider world: Radio Free Asia (which is a USAGM grantee) and VOA Tibetan Services. Defendants' actions will eradicate this essential stream of information that people around the world are entitled to receive, stifle the expression of Tibetans, and irreparably damage the RSF's correspondent's ability to fulfill their journalistic obligations.

12.    RSF's Kenyan correspondent also relies on VOA reporting, especially for information from other African countries. They said that they used VOA "a lot as a source of [their] news and understanding what was happening elsewhere in the continent." That knowledge is an important resource that informs their work.

13.    At a basic level, reporters depend on each other to do their jobs and removing VOA journalists from the equation interferes with that. Shutting off access to trustworthy journalism irreparably prevents journalists and RSF correspondents from performing a crucial function: collaborating to identify reliable information. RSF's Burundian correspondent, for instance, exchanged information with VOA journalists on an ongoing regular basis. He says, "Now I find myself somewhat orphaned, it's as if I've lost friends who encouraged me, who pushed me to improve, to dare to dig for good information."

14.    Every story that doesn't appear, or that is hampered, by the lack of VOA is itself an injury that can never be repaired.

15.    Those irreparable injuries are compounded for RSF correspondents and journalists working in dangerous regions. They don't just rely on VOA to do their jobs but for their own personal safety.

16.    For example, in Ethiopia, VOA is one of the key sources of regular and objective news on Ethiopian affairs and is broadcast in three languages to reach the majority of Ethiopians. VOA's services have been essential sources of information for RSF during critical elections and

episodes of political, ethnic and other forms of violence. Our media worker reports, "As a correspondent, I have multiple times used VOA reporting to verify information received from sources on the arrest, prosecution, disappearance and court proceedings of journalists persecuted by all kinds of interest groups in Ethiopia…The loss of VOA services would lead to a closure of a crucial source of information on all press freedom issues and encourage those engaged in the persecution of journalists." In a nation where journalists have been arrested in large numbers, beaten, and even killed, that constitutes a substantial and irreparable harm.

17.    In the Democratic Republic of Congo ("DRC"), journalists must operate in a highly perilous environment, where organized and violent rebels endanger the lives of journalists — including RSF's correspondent — and the populace. Accordingly, since January 2025 RSF was called to provide life-saving support for more than 30 journalists and documented over 50 attacks on newsrooms and journalists in North Kivu in less than a year. VOA's reporting is essential for the people of the country to understand the circumstances in which they find themselves and to respond accordingly. While the people in DRC are under constant threat from M23 Rebels, and local media is prevented from independently reporting on the ongoing conflict via explicit orders and under threat of physical harm, VOA broadcasts honest and indispensable information that would otherwise be censored. Its journalists uncover stories others are unable to report — VOA reporters are famous in DRC for establishing contacts, specifically in Swahili, with the general population and with the average civilian facing danger. Our correspondent journalist in turns relies upon VOA to inform their reporting. With the absence of VOA, both the journalists and the public they serve are deprived of critical information. That is by itself an irreparable injury, and also exposes them to other grave harms and even mortal peril.

18.    The dismantling of VOA impedes RSF's ability to function and forces our organization to waste material resources it otherwise would not have spent and upon which it relies. Because of USAGM's actions, RSF will incur substantial costs through its assistance programs. We have already provided material support for VOA journalists and anticipate spending more for journalists impacted by VOA's shutdown. These expenses include travel and relocation grants, IT, and other financial and material support. Total spending on assistance to individual journalists in 2024 was around one million Euros, or $1,087,725.02 U.S. dollars. Of that, support to VOA was about 25,000 Euros, or $27,193.13 U.S. dollars. We anticipate spending roughly 125,000 Euros, or $135,965.63 U.S. dollars, on future VOA related cases in the upcoming weeks/months — notwithstanding specific needs-assessment based calculation.

19.    VOA frequently covers RSF's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention; the loss of VOA weakens our ability to amplify press freedom concerns throughout the world. Owing to its foundational mission to expand press freedom around the world, VOA is perhaps the only American media outlet with a dedicated "press freedom desk" that regularly investigates and covers stories concerning press freedom in the United States and around the world. Moreover, there is no media outlet comparable to VOA — its mission, language diversity, reach, and reliability are sui generis. Without VOA, we lose a critical channel for our work. Our operations have already been irreparably frustrated. Because of this, the visibility of press freedom violations has also been reduced, rendering advocacy efforts — including RSF's — less effective and more cost- and labor-intensive, to the detriment of our organization.

20.    RSF correspondents worldwide also rely on VOA to amplify independent journalism and reporting to remote audiences. VOA is one of the few, if not the only, sources of

6

independent and reliable news in remote regions that have limited access to independent media and journalism. Our correspondents in Bangladesh, Ethiopia, Kenya, Pakistan, South Africa, and Zimbabwe report that rural regions in these nations remain mostly or entirely reliant on radio for news coverage. Consequently, VOA is often the only source of independent, reliable information in these areas, providing programming across multiple languages, including minority languages.

21.    Indeed, where our correspondents rely on VOA to spread stories and protect the free flow of information in regions that don't have access to government and other radio services, the silencing of VOA has already caused significant and irreplaceable loss. Our Zimbabwe correspondent stated that the withdrawal has "brought an end to 23 years of radio services to marginalized areas in remote parts of the country that had become accustomed to Studio 7," VOA's Zimbabwe program, with no practical alternative. Due to its long-standing presence in these regions, communities have become reliant on VOA for critical information. Our Bangladeshi RSF correspondent highlighted that VOA was a source of information during its government transition and continues to help safeguard democracy because it has been a trusted outlet in Bangladesh for so long (he noted that he has listened to "VOA broadcasts since he was a school student").

22.    In China, Hong Kong, and Tibet, VOA provides information that is inaccessible elsewhere and serves a vital role to expose the dangers journalists face, including our RSF Press Freedom laureates Zhang Zhan and Huang Qi. In addition to breaking news of human rights violations, VOA's services disseminate reporting on detained journalists and their families and updates from jails that would otherwise be unavailable without their coverage.

23.    These types of irreparable injuries to the interests of RSF, and to journalism and democracy itself, are precisely why the dismantling of VOA has been cheered by authoritarian regimes, including China, that are notorious for media repression. USAGM's actions will

Add. 120

undoubtedly encourage harsher crackdowns against journalists and press freedom. Actions taken by repressive governments will put RSF staff, their correspondents, their volunteers, and their supporters in grave danger and ultimately cause them further irreparable harm. As part of its work, RSF combats censorship, propaganda, disinformation and rumor. Without VOA, those efforts have been damaged, forcing us to exhaust the organization's resources to replace the lost functionality of VOA.

24.     VOA frequently covers RSF's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention. The eradication of VOA immediately damages our ability to advocate and operate in the most sensitive global hotspots where information warfare dominates and our work is especially important.  In Ukraine, VOA reaches audiences in Russian-occupied territories, which has allowed RSF's message — including exposing threats to the free press, journalists, and affected populations — to reach critical populations and offering an alternative to Kremlin-controlled narratives. That vital  medium has been destroyed. Losing this source will create an information vacuum that will be exploited by pro-Russian media, further limiting the availability of fact-based reporting in areas where it could be a matter of life and death.

25.     RSF's mission is to advocate for the right of every individual, regardless of where they live, to access reliable and independent information. In many regions, VOA has been among the only outlets providing this invaluable resource. For example, VOA was one of the few media outlets that was still able to report on Laos despite its continued repression of journalists, providing Laotian audiences with news in their local languages. Without VOA, Laos will truly become a black hole of information. That is because VOA information from outside and inside of Laos will

Add. 121

vanish — depriving both Laotians and the rest of the world of valuable information and hampering RSF's mission of tracking press freedoms and the security of journalists.

26.    The same is true in Afghanistan. The Taliban has severely restricted local media, and our RSF correspondent reports that VOA's absence will make challenging the Taliban's crackdown on the press increasingly difficult. Both VOA and Radio Free Europe/Azadi Radio have been major sources of information for Afghani journalists and the public, attracting large audiences by covering the country's situation more comprehensively and freely. These two media outlets have a long history of providing information during Afghanistan's tumultuous and war-torn conditions and have become vital information sources. Their absence is an immediate loss that will harm local media and journalists, who will no longer have a reliable source of information. It will take considerable time for any new media organization to build an audience and reach a similar level of credibility and influence with Persian/Dari and Pashto speakers, assuming that a media with such a will exists or could exist given the tremendous pressure exerted by the regime on journalistic work.

27.    USAGM's actions have already and will continue to make RSF's work more difficult, causing irreparable damage. The sudden elimination of VOA has harmed journalists who it is our mission to protect, both in the United States and throughout the world. Many have lost their jobs and livelihoods. Our organization tracks attacks on press freedom, the struggles of journalists, and advocates for free exchange of information globally. Defendants have catalyzed a crisis in all three areas, forcing us to strain resources at a moment when our work is more essential than ever. Without VOA, a domino effect of second-order harms in media ecosystems worldwide has begun. For example, our Latin American correspondents report that, since the shutdown of

VOA, many local media outlets no longer carry international news in their programming. As nations' information spaces silo, RSF's work has been hamstrung.

28.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Paris, France on the 23rd day of March, 2025.

_____
Thibaut Bruttin

10

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PATSY WIDAKUSWARA**, *et al.*, | |
| *Plaintiffs*, | **Case No. 1:25-cv-1015-RCL** |
| **v.** | **Case No. 1:25-cv-0887-RCL** |
| **KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*, | |
| *Defendants*. | |
| **MICHAEL ABRAMOWITZ**, et al., | |
| *Plaintiffs*, | |
| **v.** | |
| **KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*, | |
| *Defendants*. | |

**ORDER**

On April 22, 2025, this Court entered a preliminary injunction (PI) after concluding that

the defendants' actions pursuant to Executive Order 14238, "Continuing the Reduction of the

Federal Bureaucracy," violated numerous provisions of the Administrative Procedure Act (APA).

*See* Order, No. 25-cv-1015 (RCL) ("*Widakuswara* Docket"), ECF No. 99; Order, No. 25-cv-887

(RCL) ("*Abramowitz* Docket"), ECF No. 29.  The Court enjoined the defendants as follows:

> 1) take all necessary steps to return USAGM employees and contractors to their
> status prior to the March 14, 2025 Executive Order 14238, "Continuing the
> Reduction of the Federal Bureaucracy," including by restoring all USAGM

1

**Add. 124**

employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA [Voice of America] programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).

Order, *Widakuswara* Docket, ECF No. 99. The Court entered a corresponding PI in *Abramowitz* specifically tailored to the defendants' actions regarding VOA. Order, Abramowitz Docket, ECF No. 29. The defendants have filed a "Motion for a Partial Stay Pending Appeal" in both cases [ECF No. 102, *Widakuswara* Docket] [ECF No. 32, *Abramowitz* Docket]. For the reasons contained herein, the defendants' Motion is **DENIED**.

Of note, the defendants characterize this Motion as a "partial stay" because they claim that they are not seeking a stay of the third portion of the Court's PI: to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." Mot. at 10 (citing this Court's PI Order). Notwithstanding the defendants' characterization, the effect of the order they request would be to stay the third portion of the PI Order: a stay of the first portion of the PI would stay the implementation of the third, because VOA cannot resume programming if all staff remains on leave indefinitely. And in their Motion and accompanying declarations, defendants do not indicate any plans to resume VOA broadcasting, as is required by the third portion of the PI order. The Court therefore analyzes this Motion as one for a full stay of this Court's PI order.

"[T]he factors regulating the issuance of a stay" include "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  The Court addresses each in turn.

As the Court discussed in its Memorandum Opinion accompanying the PI Order, the defendants are not likely to succeed on the merits, and indeed, have opted not to argue the merits of the plaintiffs' arbitrary and capricious challenge at all, which formed the bedrock of this Court's holding. *See Widakuswara v. Lake*, No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *13 (D.D.C. Apr. 22, 2025).

The defendants also do not establish that irreparable harm to the government would occur absent a stay.  Regarding the Court's injunction mandating compliance with congressional appropriations statutes, defendants argue that this obligation will cause irreparable harm to the government because the government is "unlikely to recover" the funds in the event that the D.C. Circuit finds that the defendants have been wrongfully enjoined.  Mot. at 10.  But this is not an accurate characterization of the defendants' harm: financial harm is typically not irreparable unless "the loss threatens the very existence of the movant's business." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  Though USAGM must continue to dispense congressional appropriations to RFA and MBN under this Court's injunction, if the D.C. Circuit later holds for the defendants, the money that was disbursed will not "threaten the very existence" of USAGM, and the defendants could seek to recover the funds via other litigation avenues in the future.  In short, ordering the payment of congressionally appropriated money to the intended recipient, and for its intended use, does not amount to irreparable harm to the federal government.  The indefinite withholding of appropriations from international broadcasting outlets,

Add. 126

however, does cause irreparable harm.  *See Widakuswara*, 2025 WL 1166400, *16 (detailing irreparable harm to the network grantees, including the shuttering of their businesses entirely).

The defendants devote more discussion to the purported irreparable harm to the defendants regarding the impact on their personnel actions.  Defendants represent their understanding of the preliminary injunction as follows: "Rather than narrowing [the injunction] to those employees or contractors who may have been removed or terminated as a result of Executive Order 14238, the Court includes every single 'employee and contractor, who were placed on leave or terminated,' which includes those who may have been placed on administrative leave or terminated for other causes, including, but not limited to, misconduct, performance issues, or security violations."  Mot. at 6.  Notably, this is the first time in this litigation that the defendants have argued that any of the personnel actions taken since March 14, 2025 were taken for any reason *other than* in response to the Executive Order.  And the record belies this belated characterization—indeed, in the March 15 email placing 1,300 VOA employees on administrative leave, the USAGM Director of HR states that the placement was "not for any 'disciplinary purpose.'"  Compl. ¶ 74, *Widakuswara* Docket, ECF No. 1.  If anything, the defendants have consistently represented that every action at issue in this litigation taken since March 14, 2025, has been in direct response to the Executive Order.  *See* Defs.' Opp'n to Mot. for Preliminary Injunction, ECF No. 88, at 3 (listing the actions taken by USAGM since March 14, 2025 and characterizing them as "[i]n furtherance of the OPM Memorandum and the Executive Order.").  The PI therefore orders the defendants to return all those employees and contractors affected by the defendants' actions to their status pre-March 14, 2025, the day the Executive Order issued.  Such relief is properly tailored to undo the defendants' actions here.

Furthermore, the defendants interpret the injunction as "prevent[ing] [USAGM] from executing any employment action, including placing any employee on administrative leave for any reason whatsoever." Mot. at 10. They argue that this "creates irreparable harm by hamstringing the agency's personnel operations," Mot. at 4, and also believe that "the Court has prohibited the Agency from making use of any reductions in force regardless of reason," Mot. at 7. But the Court's preliminary injunction does not reach so far. The injunction is tailored to undoing the agency's unlawful actions in furtherance of the Executive Order and returning to the pre-March 14 status quo. When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order, such as "misconduct, performance issues, or security violations" to which they allude—such execution of normal operations would, to the contrary, be in accordance with the status quo pre-March 14.[1]

This is not, as the defendants believe, a determination by the Court that USAGM's status pre-March 14, 2025 is the "benchmark for minimum statutory compliance." Mot. at 2. This Court's relief is based on a finding that defendants' actions since March 14, 2025, in their purported attempt to comply with the Executive Order, have likely contravened the APA. Because a PI "is a stopgap measure . . . intended to maintain a status quo,'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012), it is appropriately tailored relief to order the defendants to reverse their illegal actions and return to the status quo before the illegal actions took place.

---

[1] The defendants also argue that "[t]he injunction prohibits [USAGM] from engaging in contract negotiations, oversteps [USAGM's] broad discretion in setting terms of the grant agreements, and prevents [USAGM] from finalizing any subsequent contract termination even if [USAGM] determines that the contracts are unnecessary for the agency to fulfill its statutory functions." Mot. at 7. But the PI does not bar any of these activities. USAGM can still, with this PI in place, take actions pursuant to its statutory mandate and in compliance with the APA. The actions that the plaintiffs challenge in this lawsuit likely contravene the APA, as the Court has found. *See generally Widakuswara*, 2025 WL 1166400.

Add. 128

As for the final two *Hilton* considerations, the issuance of the stay will "substantially injure the other parties interested in the proceeding." *Hilton*, 481 U.S. at 776. Immediate compliance with the PI is necessary to avert the irreparable harm that is soon to befall the plaintiffs. *See Widakuswara*, 2025 WL 1166400, at *16–17 (detailing the irreparable harm to the plaintiffs absent injunctive relief). And staying the Court's PI is not in the public interest, particularly given that absent the PI, the defendants will continue their actions in contravention of numerous federal laws, including the International Broadcasting Act, relevant congressional appropriations acts, and the APA.

For the foregoing reasons, it is hereby **ORDERED** that the defendants' Motion for Partial Stay Pending Appeal is **DENIED**.

The defendants also request that "even if the Court is not prepared to issue a stay that lasts throughout appellate proceedings," that "the Court issue a temporary stay of these aspects of the injunction until the D.C. Circuit resolves a motion for a partial stay that Defendants intend to file" later today. Mot. at 4. For the same reasons explained *supra*, this request is **DENIED**.

**IT IS SO ORDERED.**

Date: April $\underline{25}$, 2025

$3:45$ P.m.

Royce C. Lamberth
United States District Judge

6

**Add. 129**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

          Plaintiffs,

   -against-

KARI LAKE, et al.,

          Defendants.

Index No. 25 Civ. 1015-RCL

### DECLARATION OF JON SCHLEUSS

     I, Jon Schleuss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

     1.     I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

     2.     I have previously provided testimony in declarations dated March 23, 2025, and March 27, 2025. I am the President of The NewsGuild-CWA ("TNG-CWA"), a labor union that represents a private sector bargaining unit of Radio Free Asia ("RFA") employees. RFA is a broadcaster that is funded by grants from the United States Agency for Global Media ("USAGM").

     3.     RFA management conveyed to me that, as of the date of this declaration, USAGM provided RFA funds it owed for March, but hasn't provided funds owed for April. Typically, USAGM sends a request at the end of each month for funds due in the upcoming month. Those funds are typically approved and released to RFA within the first week of that month. RFA submitted a financial plan and requested the rest of the funds due to RFA through

1

September, which covers the period of Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("2025 Continuing Resolution"). RFA management told me that, prior to the March 14 executive order, they met weekly with USAGM staff, but that USAGM hasn't been communicating with RFA since mid-March.

4.      On March 21, RFA furloughed the majority of its employees in the bargaining unit represented by TNG-CWA. That staff remains in unpaid status. TNG-CWA members have now received their last, partial paycheck, covering the period they worked before the furloughs. As a result, TNG-CWA is now losing those members' dues. RFA management told me that they are unable to bring back furloughed employees because of uncertainty regarding what USAGM will do.

5.      RFA announced to staff on April 11 that "Due to uncertainty regarding April funds and future fund distributions to all grantees, RFA is forced to maintain our current furlough status for the foreseeable future. It's still nearly impossible to determine what the remaining FY25 or FY26 budget allocations will be, which is requiring us to prepare our organization's contingency plans in case RFA's current and future budget stays flat or is decreased." RFA management has clarified to me that, as long as there remains uncertainty regarding whether USAGM will comply fully with its obligation to disburse grant funds to RFA throughout the entire fiscal year, RFA will not be able to return staff to paid status.

6.      If USAGM doesn't distribute funds to RFA in a reliable way guaranteeing several months of stability, furloughed staff may lose health insurance coverage as soon as May 1. RFA told staff on April 11 that they will tell staff during the week of April 14 whether RFA will have the funds to extend health benefits to furloughed staff in May. RFA said it has to prioritize using the delayed March funds to cover deferred expenditures from that month. And even if RFA can

2

Add. 131

afford to extend health insurance benefits for furloughed workers, RFA's insurance provider will not cover employees who have not worked for 60 days. That means insurance will end for workers furloughed on March 21 by the end of May unless RFA is able to bring furloughed staff back into work status.

7.       Losing health insurance coverage would be devastating to our members, as the examples below show. Each of the individuals discussed below is a member of TNG-CWA employed by RFA. Each wishes to remain anonymous for fear of reprisal and because they are sharing personal and sensitive health information.

   a.   James Doe 1 is a furloughed worker with several chronic health issues. He has Parkinson's disease and diabetes. He takes medicine that is uncommon and would be expensive without health insurance. He takes two types of medications to treat his diabetes and two types to treat his Parkinson's disease. Without insurance, he would not be able to afford to treat his medical issues. Moreover, his whole family is on his health insurance plan through RFA, including his wife and two children.

   b.   James Doe 2 is a furloughed worker with several health issues. He has diabetes that requires insulin and high blood pressure that requires regular medicine. He has suffered at least two strokes and takes medication as a result. He had a kidney transplant in 2010 and takes medicine for that condition. He also goes to therapy regularly. He depends on health insurance in order to afford treatment for his medical conditions. His wife and daughter are also on his employer-provided health insurance.

Add. 132

    c. Jane Doe 1 is currently furloughed from RFA and has several chronic health issues that are treated with her employer-provided health insurance. She takes medicine and daily insulin shots to treat her diabetes. She also takes medicine daily to treat her cholesterol and high blood pressure. She would not be able to afford her medication without health insurance.

8.    RFA employs 35 workers on H1B visas, including TNG-CWA members. Many are from repressive countries, including Vietnam and Hong Kong, that persecute journalists for reporting the news. RFA has prioritized keeping those employees in pay status, but because of USAGM's recent inconsistency in funding, RFA has begun to furlough employees working in the United States on work visas. RFA management began notifying employees, including TNG-CWA members, on April 14 that some employees on H1B visas will be furloughed beginning April 18.  If USAGM continues to refuse to fund RFA's grant, RFA management told me that RFA will continue to furlough employees, placing visa-holding employees at risk of being deported to their home countries where they could face threats, harassment, or imprisonment for their work as journalists.

9.    RFA broadcasts news on shortwave and medium wave radio, satellite television and publishes news online through websites, apps and social media platforms. RFA broadcasts its programs over shortwave radio through a combination of U.S. government-operated transmitters and a variety of short-wave lease facilities. I understand from RFA management that USAGM has cut RFA's access to these transmitters under contract with USAGM. I understand from RFA management that USAGM has, without notice, shuttered their ability to broadcast over satellite and radio, shrinking their transmission time down from 56 hours to 7 hours over the last month. These broadcasts previously reached audiences in Tibet, North Korea and other

Add. 134

5

locations where governments suppress access to a free press. RFA journalists told me that listeners have called them asking for the broadcasts to be turned back on.

Executed in Washington, D.C. on April 14, 2025.

Jon Schleuss

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

               Plaintiffs,

    -against-

KARI LAKE, et al.,

              Defendants.

Index No. 25 Civ. 1015-RCL

### **DECLARATION OF JON SCHLEUSS**

I, Jon Schleuss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    I have previously provided testimony in declarations filed in this case. I am the President of The NewsGuild-CWA ("TNG-CWA"), a labor union that represents a private sector bargaining unit of Radio Free Asia ("RFA") employees. RFA is a broadcaster that is funded by grants from the United States Agency for Global Media ("USAGM").

3.    In my prior declaration dated March 23, 2025, I testified that TNG-CWA members report on stories that require travel to other countries, including countries where USAGM programs broadcast.

4.    I also testified that TNG-CWA members rely on USAGM programs because they (1) improve its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protect their safety in those countries by allowing

for the free flow of information into countries otherwise beset with government censorship; and (3) promote the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

5.    Specifically, TNG-CWA members rely on RFA broadcasts while abroad. They also rely on Voice of America and Radio Free Europe/Radio Liberty news reporting and broadcasts.

6.    The silencing of these broadcasts and online reporting has harmed TNG-CWA members by depriving them of access to information that informs their professional work and their personal safety while reporting abroad.

Executed in Washington, D.C. on April 17, 2025.

Jon Schleuss