**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————

PATSY WIDAKUSWARA, *et al.*

> Plaintiffs-Appellees,

v.

KARI LAKE, *et al.*

> Defendants-Appellants.

————————

MICHAEL ABRAMOWITZ, *et al.*

> Plaintiffs-Appellees,

v.

KARI LAKE, *et al.*

> Defendants-Appellants.

————————

On Appeal from the U.S. District Court for the District of Columbia

Nos. 25-cv-1015-RCL, 25-cv-887-RCL

Hon. Royce C. Lamberth, U.S. District Judge

————————

***WIDAKUSWARA* PLAINTIFFS-APPELLEES'
PETITION FOR REHEARING EN BANC**

————————

| | |
|---|---|
| ANDREW G. CELLI, JR. | TEAGUE PATERSON |
| DEBRA GREENBERGER | MATTHEW BLUMIN |
| DANIEL M. EISENBERG | GEORGINA YEOMANS |
| NICK BOURLAND | AMERICAN FEDERATION OF STATE, |
| EMERY CELLI BRINCKERHOFF | COUNTY, AND MUNICIPAL EMPLOYEES, |
| ABADY WARD & MAAZEL LLP | AFL-CIO (AFSCME) |
| One Rockefeller Plaza, 8th Floor | 1625 L Street, N.W. |
| New York, New York 10020 | Washington, D.C. 20036 |
| (212) 763-5000 | (202) 775-5900 |

*(Additional counsel listed on signature block)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties

Plaintiffs-Appellees are Patsy Widakuswara; Jessica Jerreat; Kathryn Neeper; John Does 1-4; Reporters Sans Frontieres; Reporters Without Borders, Inc.; American Federation of State, County and Municipal Employees (AFSCME), American Federation of Government Employees (AFGE), American Foreign Service Association (AFSA), and The NewsGuild-CWA.

Defendants-Appellants are Kari Lake, Victor Morales, and the United States Agency for Global Media.

## B. Rulings under review

Plaintiffs-Appellees seek en banc reconsideration of the special panel's stay decision in No. 25-5144, issued May 3, 2025. The district court rulings under review can be found at Defendants' Addendum to their motion to stay pending appeal, pages 1-43, and Plaintiffs' Addendum to their opposition thereto, pages 124-29.

## C. Related cases

There are three related cases before this Court. *Radio Free Asia v. United States*, 25-5150 (D.C. Cir.); *Middle East Broadcasting Networks, Inc. v. United States*, 25-5151 (D.C. Cir.); *RFE/RL, Inc. v. Lake*, 25-5158 (D.C. Cir.). In addition,

there is a related case pending in the United States District Court for the District of Columbia. *See Open Technology Fund v. Lake*, 25-cv-840 (D.D.C.).


Dated: May 5, 2025                                          *s/Daniel M. Eisenberg*
                                                            Daniel M. Eisenberg

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Plaintiffs-Appellees Reporters Sans Frontières, Reporters Without Borders, Inc.; American Federation of State, County and Municipal Employees ("AFSCME"); American Federation of Government Employees ("AFGE"); American Foreign Service Association ("AFSA"); and The NewsGuild-CWA ("TNG-CWA") make the following disclosures:

Plaintiff-Appellee Reporters Without Borders, Inc. is a 501(c)(3) non-profit organization headquartered in Washington, D.C. and is the United States affiliate of Plaintiff-Appellee Reporters Sans Frontières, which is headquartered in Paris, France.

Plaintiff-Appellee AFSCME is a national labor organization and unincorporated membership association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States.

Plaintiff-Appellee AFGE is a labor organization and unincorporated association headquartered in Washington, D.C. AFGE is the largest federal employee union.

Plaintiff AFSA is a professional association and labor organization headquartered in Washington, D.C. AFSA is the sole labor organization for the United States Foreign Service.

Plaintiff TNG-CWA is a labor union representing more than 27,000 employees. It is the largest labor union representing journalists and media workers in North America.

No Plaintiff-Appellee has a parent corporation, and no publicly held company owns 10% or more of any Plaintiff-Appellee's stock.

# TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ..............................................................................vi-viii

INTRODUCTION ................................................................................................1

STATEMENT OF THE CASE ..............................................................................2

ARGUMENT ........................................................................................................7

    I.     This Case Is Not Channeled to Agency Review ..................................9

    II.    This Is Not a Tucker Act Case ..........................................................15

    III.   The Remaining Stay Factors Favor Plaintiffs ...................................16

CONCLUSION ..................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
 No. 25-1677, 2025 WL 914823 (9th Cir. Mar. 26, 2025) ...........................12

*AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
 No. C 25-01780 WHA, 2025 WL 660053 (N.D. Cal. Feb. 28, 2025) ..........12

*AFSA v. Trump*,
 No. 1:25-cv-352 (D.D.C. 2025) .......................................................................14

*Am. Assoc. of People with Disabilities v. Dudek*,
 No. 1:25-cv-977 (D.D.C.) ................................................................................14

*Am. Library Ass'n v. Sonderling*,
 No. 1:25-cv-1050 (D.D.C.) ..............................................................................14

*Andrade v. Lauer*,
 729 F.2d 1475 (D.C. Cir. 1984) ......................................................................13

*Assoc. for Ed. Finance and Policy Inc. v. McMahon*,
 1:25-cv-999 (D.D.C.) ......................................................................................14

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
 598 U.S. 175 (2023) .................................................................................. 12, 13

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988) ........................................................................................15

*Brehm v. Marocco*,
 No. 1:25-cv-660 (D.D.C.) ................................................................................14

*Carter v. Dep't of Ed.*,
 1:25-cv-744 (D.D.C.) ......................................................................................14

*City of N.Y. v. Nat'l R.R. Passenger Corp.*,
 776 F.3d 11 (D.C. Cir. 2015) ..........................................................................14

*Colorado River Water Conservation Dist. v. United States*,
 424 U.S. 800 (1976) ..........................................................................................1

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022)........................................................16

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013)........................................................9

*Leedom v. Kyne*,
358 U.S. 184 (1958)........................................................1

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................17

*OPM v. AFGE*,
No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ...................................12

*Pueblo of Isleta v. Sec'y of Dep't of Interior*,
No. 1:25-cv-696 (D.D.C.)........................................................14

*Robert F. Kennedy Human Rights v. U.S. Dep't of Homeland Sec.*,
1:25-cv-1270 (D.D.C.)........................................................14

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994)........................................................ 2, 11, 12

*Weaver v. U.S. Info. Agency*,
87 F.3d 1429 (D.C. Cir. 1996)........................................................13

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*,
586 U.S. 9 (2018)........................................................1

*Widakuswara v. Lake*,
No. 25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ..... 6, 7, 9

*Widakuswara v. Lake*,
No. 25-CV-2390, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ........... passim

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)........................................................1, 9

**Statutes**

22 U.S.C. § 6202 ........................................................2, 7

22 U.S.C. § 6203 ........................................................2

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

5 U.S.C. § 702 ...................................................................................1

**Other Authorities**

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47,
    div. F, tit. I, 138 Stat. 460 (2024) ...................................................3

**Rules**

Fed. R. App. P. 40(b) ........................................................................8

**INTRODUCTION**

Two simple, foundational principles are at stake in this case: First, the executive may act only pursuant to "an act of Congress" or constitutional power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (Jackson, J., concurring). Second, the federal courts have a "virtually unflagging obligation" to "exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

As to the first principle, Defendants have acted unlawfully, ignoring congressional mandates without justification in constitutional right or power. Two district courts have found as much on the record in this case.

As to the second principle, federal courts have a grant of general jurisdiction to hear cases arising under the Constitution or federal law, 28 U.S.C. § 1331, and this Court has jurisdiction to hear appeals of the same, 28 U.S.C. § 1291. Federal courts are also empowered to stop unlawful executive agency conduct. 5 U.S.C. § 702; *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 22 (2018) (noting "basic presumption of judicial review for one suffering legal wrongs because of agency action"). And federal courts also have inherent jurisdiction to correct harmful executive overreach. *Leedom v. Kyne*, 358 U.S. 184, 191 (1958).

The per curiam order concludes the judiciary is powerless in the face of uncontroverted executive overreach. In doing so, it extends jurisdiction stripping

by implication under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), beyond that case's plausible reach. It creates confusion by contradicting an earlier stay order from this same special panel. It ignores multiple non-federal-employee Plaintiffs. And it will almost certainly result in the gutting of the U.S. Agency for Global Media ("USAGM") before the case is decided on the merits.

This case is unprecedented, but it is no longer unique. The executive has been upfront about its intention to unilaterally remake or eliminate executive agencies irrespective of congressional will; the per curiam order will only embolden those efforts. The en banc Court should step in to clarify the standard for these recurring and exceptionally important cases.

## STATEMENT OF THE CASE

### A. Statutory Framework

USAGM is a congressionally established independent agency. 22 U.S.C. § 6203(a). It is required under law to produce and disseminate international broadcasting "designed so as to effectively reach a significant audience," "includ[ing] news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. §§ 6202(a)(7), (b)(1).

Voice of America ("VOA") is an integral part of USAGM's pursuit of those mandates. Congress requires that "[VOA] must win the attention and respect of listeners." 22 U.S.C. § 6202(c). To do so Congress mandates:

(1) VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.

(2) VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

(3) VOA will present the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies.

*Id*.

Congress bolstered these clear mandates by appropriating $875 million to the Agency, dictating by line item how the money is to be used, and forbidding the Agency from repurposing more than 5% of any line-item funding. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) ("2024 Appropriations Act"); Explanatory Statement Submitted by Ms. Granger, Chair of the House Cmte. on Approps., Regarding H.R. 2882, 2024 Appropriations Act, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101, 139 Stat. 9, 10-12 (2025).

It has also forbidden USAGM from suspending or eliminating any "program, project, or activity," or downsizing any "bureaus, centers, or offices," without 15 days' advance notice to Congress. 138 Stat. 460, 766.

## B. Defendants' Decimation of USAGM and Plaintiff's Resulting Irreparable Harms

On March 14, 2025, the White House issued Executive Order 14238, directing USAGM to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Add. 2.[1]

Despite the unequivocal congressional directives in USAGM's governing statutes and the appropriations laws, the day after EO 14238 was published, USAGM turned off *all* its broadcasts and began shutting the Agency down. It instructed radio broadcast technicians, who are required to be on-site 24/7 to keep VOA broadcasts running, to finish their programs and leave the building. Add. 11 ¶ 11. It placed 1,042 out of its 1,147 full-time employees on administrative leave. Add. 4-5 ¶¶ 3, 5. It terminated every single one of its 598 personal service contractors. *Id*. And it cancelled its grant agreements with its statutory grantee networks. Add. 20 ¶ 9.

On March 25, USAGM stated its intention to terminate over 600 full-time employees, including the entire bargaining unit of radio broadcast technicians, without whom VOA cannot broadcast. Add. 48-49 ¶¶ 3-6, 58-59 ¶¶ 3-5. To date, nearly two months after being taken off the air, and notwithstanding the district

---

[1] References to "Add." are to Plaintiffs' Addendum (Doc. #2113400) and "Defs' Add." are to Defendants' Addendum (Doc. #2113018).

4

court's injunction two weeks ago, the only broadcast that has resumed is the Office of Cuba Broadcasting ("OCB"), with 33 staff. Add. 5 ¶¶ 6-7.

Each day that USAGM programming is silent, it becomes less likely that the Agency will ever replicate the reach it accrued over its 80-year history. *See* Dissent at 19-20; Add. 14 ¶ 18. The silencing and dismantling of USAGM harms Plaintiffs in irreparable ways. For example, Does 3 and 4 face deportation to inhospitable countries because of the cancellation of their contracts. Dissent at 20. Some members of the Plaintiff The NewsGuild-CWA ("TNG-CWA") similarly face deportation and others face the imminent loss of health insurance. Dissent at 21-22; Defs' Add. 35-36; Add. 131-33. Plaintiffs Reporters sans Frontieres and Reporters Without Borders, Inc. (together, the "RSF") and TNG-CWA each represent journalists who rely on USAGM programming for their own work and safety while reporting abroad. *See* Add. 23 ¶¶ 15-16; Add. 135-26 ¶¶ 4-6; Add. 116-22 ¶¶ 11-26. The lack of programming puts their safety at risk. It also injures RSF's "ability to distribute its broadcasting and amplify press freedom concerns." Dissent at 21. And the union Plaintiffs stand to be decimated, with AFSCME Local 1418 losing its entire membership and AFGE losing nearly its entire membership. Add. 48-49 ¶¶ 3-6; Add. 58-59 ¶¶ 3-5.

## C. Procedural History

On March 21, Plaintiffs sued USAGM and its leadership, alleging that the Agency's self-imposed radio silence and its actions to dismantle itself violated statutory law, the separation of powers, the First Amendment, and the Appointments Clause. Plaintiffs brought Administrative Procedure Act ("APA") and constitutional claims.

On March 28, the District Court for the Southern District of New York entered a temporary restraining order, finding Defendants likely violated the APA and the Constitution and that Plaintiffs face a "laundry list of injuries" absent emergency relief. *Widakuswara v. Lake*, No. 25-CV-2390, 2025 WL 945869, at *10 (S.D.N.Y. Mar. 28, 2025). On April 4, the case was transferred to the District Court for the District of Columbia.

After additional briefing and oral argument, the District Court for the District of Columbia entered the instant preliminary injunction. *Widakuswara v. Lake*, No. 25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025). The injunction required Defendants to (1) "take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025, Executive Order"; (2) "restore the FY 2025 grants with USAGM Networks Radio Free Asia [("RFA")] and Middle East Broadcasting Networks [("MBN")]"; and (3) "restore

VOA programming such that USAGM fulfills its statutory mandate" embodied in 22 U.S.C. § 6202(c).

Defendants moved for a stay pending appeal, which the district court denied. The district court also corrected Defendants' misunderstanding of the scope of the injunction: Part (1) of the injunction does not prohibit the Agency from making personnel decisions, but is instead "tailored to undoing the agency's unlawful actions in furtherance of the Executive Order." *Widakuswara v. Lake*, No. 25-CV-0887-RCL, 2025 WL 1210937, at *3 (D.D.C. Apr. 25, 2025). "When USAGM returns to pre-March 14 functioning . . . the injunction does not prevent USAGM from executing personnel decision for reasons unrelated to the Executive Order." *Id.*

Defendants also moved this Court for an emergency stay pending appeal. A divided special panel granted Defendants' motion.

## ARGUMENT

The per curiam order involves a question of exceptional importance: Whether the judiciary is powerless to stop the executive branch from dismantling executive agencies, in clear defiance of congressional will, merely because such dismantling is carried out by dispensing with federal personnel. In the per curiam's view, Congress, in enacting the Civil Service Reform Act and the Foreign Service Act, silently stripped the federal courts of jurisdiction over challenges to executive

branch overreach and reassigned that role to a subpart of the executive that was designed to hear individual employment-related administrative claims. If not corrected by this Court en banc, the per curiam's overreading of *Thunder Basin* will expand the channeling doctrine far beyond its guardrails.

The per curiam order also overlooks that multiple Plaintiffs have no relationship to federal employment and therefore cannot be channeled to administrative agencies. On this basis alone, the per curiam order is fatally flawed.

The order is also inconsistent with a recent order of the same special panel in *NTEU v. Vought*, No. 25-5091, causing confusion about when channeling attaches to the dismantling of an executive agency and when it does not. This confusion will be particularly disruptive because this and other Courts are now regularly hearing challenges to the executive's dismantling of federal agencies without congressional input.

The per curiam's invocation of the Tucker Act is similarly flawed, expanding beyond recognition the reach of jurisdiction stripping by implication and ignoring certain Plaintiffs' status as third parties to the grants at issue.

Because the per curiam order involves a question of exceptional importance, distorts Supreme Court precedent, ignores parties to the case, and conflicts with prior orders of the same panel, the Court should grant en banc review and vacate the stay. *See* Fed. R. App. P. 40(b).

# I.    THIS CASE IS NOT CHANNELED TO AGENCY REVIEW

At stake here is nothing less than the separation of powers—the foundational premise of our constitutional structure.

"When the President takes measures incompatible with the express or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637. "To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.).

Prior to the per curiam order, it was uncontroversial that the judiciary played an integral role in preserving this boundary. Courts were to "scrutinize[] with caution" a "Presidential claim to power at once so conclusive and preclusive . . . for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 637.

Defendants here have acted contrary to the express will of Congress and have not raised any justifying constitutional authority inherent to the Presidency. "[I]ndeed, [they] have opted not to argue the merits of the plaintiffs' arbitrary and capricious challenge at all, which formed the bedrock of" the preliminary injunction opinion and the TRO opinion. *Widakuswara*, 2025 WL 1210937, at *2; *see Widakuswara*, 2025 WL 945869, at *5. They have simply said the judiciary is powerless to stop them.

The per curiam adopted Defendants' narrative that this is a case about personnel issues and that the sheer scale of illegality afoot divests the federal courts of the power to intervene. In doing so, the per curiam ignores the record and all but ensures the demise of USAGM.

1. This is not a case about "personnel actions." Order at 2. "The plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work of [VOA] and shutting it down." Dissent at 5-6. The fact that the agency would eliminate employees, just as it would close offices and turn off the lights, does not make this unlawful decision a personnel action any more than it makes this case about facilities maintenance. The district court's factual finding that this was not a "personnel dispute" but a "breaking" of the agency was not clear error. 2025 WL 1166400, at *11; *Awad v. Obama*, 608 F.3d 1, 6–7 (D.C. Cir. 2010).

In point of fact, Defendants have never attributed their mass administrative leave placements and terminations to anything other than the blanket effort to dismantle the agency. *See* Add. 105 (administrative leave placement "is not being done for any disciplinary purpose."); Add. 51 (attributing reduction in force ("RIF") notices solely to executive order); Add. 62 (same); Add. 111-12 ¶¶ 6, 9-10 (USAGM HR Director attributing administrative leave and RIFs solely to executive order); Add. 4-5 ¶¶ 5, 8-9 (same).

2. This case independently has no place in administrative channels because multiple Plaintiffs have no connection to federal employment—a fact the per curiam ignores. RSF and TNG-CWA represent journalists who rely on USAGM programming for their work and safety while reporting abroad. *See* Add. 23 ¶¶ 15-16; Add. 135-26 ¶¶ 4-6; Add. 116-22 ¶¶ 11-26. In order to remediate their harms, Defendants must resume broadcasting, which requires reinstating agency personnel. *See Widakuswara*, 2025 WL 1210937, at *1. There is "no basis to conclude the threshold challenge to the district court's jurisdiction to hear these plaintiffs' APA and constitutional claims is likely to succeed." Dissent at 6; *see also* Per Curiam at 4 (concluding "USAGM's employees and contractors . . . must [pursue their claims] through other remedial channels," but saying nothing about the other plaintiffs). The per curiam offers no such basis, instead ignoring these parties' presence in the case.

3. Alternatively, if the per curiam order implicitly held that "[t]he district court likely lacked jurisdiction over USAGM's personnel actions," Order at 2, as to *all* Plaintiffs, it has extended *Thunder Basin* channeling well beyond any prior court.

The mere fact that a federal personnel action is "embedded within [a] dispute" between the government and private third parties does not divest federal courts of subject matter jurisdiction. *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S.*

*Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 660053, at *7 (N.D. Cal. Feb. 28, 2025) ("*OPM*"); *see Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, No. 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (affirming district court's view that third parties are not channeled).[2] Moreover, a "statutory review scheme [that precludes district court jurisdiction] does not necessarily extend to every claim concerning agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). Here, either the per curiam panel incorrectly held that it does, or it failed entirely to consider an independent basis for this Court's jurisdiction.

4. The dissent correctly concluded that "[t]he administrative channeling defense is inapposite here." Dissent at 4. It then correctly determined that even under *Thunder Basin*'s own terms, it does not apply. *See* 510 U.S. at 212-13.

"Channeling plaintiffs' claims . . . would entirely shut off meaningful judicial review." Dissent at 5. The per curiam disputes this by pointing out that "administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters," pointing to the now-abandoned request by the now-terminated special counsel to stay the mass firing of federal probationary employees on personnel-rule grounds. Per Curiam at 3 n.2. But the question here is

---

[2] The Supreme Court recently stayed the order in *OPM*, but acted only on the basis of the third parties' standing, not channeling grounds. *See OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025).

not whether the MSPB could order USAGM to reinstate individual employees on personnel-rule grounds. The question is whether the MSPB is the venue to determine if the agency must continue to exist and perform its statutory functions, which it can only do with staff. *See* Defs. Add. 24 n.22. The per curiam order does not address the agency's self-evident impotence to undertake that sweeping task.

Plaintiffs' claims are collateral to administrative review in at least two ways: (1) the agency dispensed with its staff en masse only in service of its dismantling; and (2) Plaintiffs' constitutional claims are not employment-based. Dissent at 6 (citing *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996)).

And the relevant administrative agencies lack "expertise or capacity to address plaintiffs' properly framed APA and constitutional claims." Dissent at 6-7 (citing *Axon*, 598 U.S. at 194).

4. Further crying out for en banc review is the per curiam order's inconsistency with the same panel's recent actions in *NTEU v. Vought*, No. 25-5091. There, the panel unanimously required that the CFPB reinstate employees necessary to the performance of the agency's statutory duties. *See* Doc. #2110720, No. 25-5091 (D.C. Cir. Apr. 11, 2025). After the agency responded by announcing its intention to terminate 90% of its workforce, the panel reinstated the district court's injunction precluding the agency from carrying out any RIFs. Doc.

#2113309, No. 25-5091 (Apr. 28, 2025). Defendants in *NTEU* did not raise the channeling issue in their stay motion, but this Court has "an independent obligation to assure [itself] of jurisdiction," rendering Defendants' failure to raise it a difference creating no distinction. *City of N.Y. v. Nat'l R.R. Passenger Corp.*, 776 F.3d 11, 14 (D.C. Cir. 2015). Because the question of federal-court jurisdiction over agency dismantling is certain to recur in the district court and this Court, the en banc Court should clarify the correct standard.[3] *See* Dissent at 9.

5. Finally, to the extent the per curiam held this case presents unreviewable agency action because it amounts to a programmatic challenge, *see* Per Curiam at 4 n.3, it fails to grapple with the fact that Plaintiffs "asked the district court to revive and protect . . . no more than what Congress prescribed," Dissent at 8. The fact that Defendants walked away from multiple unambiguous and nondiscretionary mandates does not divest APA review. *See id.* at 9.

---

[3] *See, e.g.*, *AFSA v. Trump*, No. 1:25-cv-352 (D.D.C. 2025) (USAID); *Brehm v. Marocco*, No. 1:25-cv-660 (D.D.C.) (USADF); *Carter v. Dep't of Ed.*, 1:25-cv-744 (D.D.C.) (Department of Education); *Assoc. for Ed. Finance and Policy Inc. v. McMahon*, 1:25-cv-999 (D.D.C.) (Department of Education Institute of Education Sciences); *Robert F. Kennedy Human Rights v. U.S. Dep't of Homeland Sec.*, 1:25-cv-1270 (D.D.C.) (DHS Office for Civil Rights and Civil Liberties); *Pueblo of Isleta v. Sec'y of Dep't of Interior*, No. 1:25-cv-696 (D.D.C.) (Bureau of Indian Education); *Am. Assoc. of People with Disabilities v. Dudek*, No. 1:25-cv-977 (D.D.C.) (Social Security Administration); *Am. Library Ass'n v. Sonderling*, No. 1:25-cv-1050 (D.D.C.) (dismantling IMLS).

14

## II. THIS IS NOT A TUCKER ACT CASE

The per curiam also erred in holding the Tucker Act likely divests this Court of jurisdiction to review the executive's decision to flout mandatory statutory directives that it fund network grantees including RFA and MBN. Plaintiffs incorporate and adopt the arguments set forth in the en banc petition filed by those parties in Nos. 25-5150, 25-5151.

Plaintiffs in this case are not subject to Tucker Act jurisdiction for another reason: They are not grantees, but rather third parties harmed as a result of Defendants' unlawful withholding. They seek relief entirely "unavailable in the Court of Federal Claims." *See* Dissent at 17 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)).

Plaintiffs' harms, like the grantees', cannot be remedied after-the-fact: TNG-CWA members who work at RFA have been furloughed without pay since March 21. RFA cannot return those employees to pay status until USAGM resumes its grant funding on a consistent basis. Add. 131-32 ¶¶ 5-6. As a result of their extended furlough, TNG-CWA members are losing health insurance this month. Defs' Add. 35-36; Add. 131 ¶ 6. These members include individuals with serious health conditions who rely on their health insurance to cover life-saving treatment. Add. 132-33 ¶ 7. TNG-CWA members also include people "with H1-B visas" who, "as a result of their furlough status," "face deportation to their home countries

where they could face threats, harassment, or imprisonment for their work as journalists." Defs' Add. 35-36. These harms cannot be remedied after-the-fact and certainly not in the Court of Federal Claims.

## III. THE REMAINING STAY FACTORS FAVOR PLAINTIFFS

The per curiam's assessment of the remaining stay factors was similarly flawed and provides no basis to stay the district court's injunction.

1. In staying part (1) of the district court's injunction, the per curiam held Defendants would be harmed by the loss of "control over personnel matters." Per Curiam at 9-10. In so holding, the per curiam joins the government in overreading the scope of the district court's order. *See Widakuswara*, 2025 WL 1210937, at *2.

It also overlooks the purpose of injunctive relief: to return the parties to the "last uncontested status which preceded the pending controversy," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022); provide "necessary [interim] relief to the plaintiffs"; and "preserve the relative positions of the parties" so that effective relief remains available at the end of litigation, Dissent at 23-24. Defendants have moved quickly to dismantle USAGM and slowly to comply with court orders meant to pause or undo their damage. *See* Dissent at 2-3. Absent the injunction, there is little hope that USAGM and its broadcasters can be put back together at the end of litigation. Dissent 19-20; Add. 14 ¶ 18. True, Defendants have not asked to stay part (3) of the injunction, but there is "no reason to conclude

that the government is in fact complying with" part (3). Dissent at 3. Just today, counsel learned the Agency has once again revoked staff email access that was restored last week. "VOA cannot resume programming if all staff remains on leave indefinitely." Add. 125. Parts (1) and (3) of the injunction are inextricably linked and together provide necessary relief.

2. On the other side of the harm equation are the Plaintiffs' "various" harms whose "gravity" the per curiam "appreciate[s]," but nonetheless holds can be remediated through other means and therefore apparently considers undeserving of weight in the forum in which Plaintiffs have chosen to litigate. Per Curiam at 11. The dissent saw clearly the harm that a stay will precipitate and granted it the weight it deserves under the law. Dissent at 19-23; *see Nken v. Holder*, 556 U.S. 418, 435 (2009).

3. The only public interest the per curiam identifies to counteract the profound public interest in an executive branch that follows the law is "potentially costly claims" to the "public fisc" arising from "personnel . . . disputes." Per Curiam at 12. Of course, no Plaintiff seeks back pay or any other monetary remedy from Defendants. The only cost, therefore, is retaining staff who already work for the Agency unless there is a reason apart from the Executive Order to dismiss them. *See Widakuswara*, 2025 WL 1210937, at *3.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully urge this Court to grant en banc rehearing and deny Defendants' emergency motion for a stay.

Dated:      May 5, 2025                    Respectfully Submitted,


GOVERNMENT                            EMERY CELLI BRINCKERHOFF
ACCOUNTABILITY PROJECT                ABADY WARD & MAAZEL LLP


_____/s/_____                _____/s/_____
David Z. Seide                         Andrew G. Celli, Jr.
1612 K Street, NW                      Debra L. Greenberger
Washington, DC 20006                   Daniel M. Eisenberg
(202) 457-0034                         Nick Bourland
davids@whistleblower.org               One Rockefeller Plaza, 8th Floor
                                       New York, New York 10020
*Counsel for Plaintiffs-Appellees Patsy*   (212) 763-5000
*Widakuswara, Jessica Jerreat,*         acelli@ecbawm.com
*Kathryn Neeper, John Doe 1, John*      dgreenberger@ecbawm.com
*Doe 2, John Doe 3, and John Doe 4*     deisenberg@ecbawm.com
                                       nbourland@ecbawm.com
AMERICAN FEDERATION OF
STATE, COUNTY, AND                     *Counsel for Plaintiffs-Appellees Patsy*
MUNICIPAL EMPLOYEES, AFL-              *Widakuswara, Jessica Jerreat,*
CIO (AFSCME)                           *Kathryn Neeper, John Doe 1, John*
                                       *Doe 2, John Doe 3, John Doe 4,*
                                       *American Federation of State, County*
_____/s/_____                *and Municipal Employees*
Teague Paterson                        *(AFSCME); American Federation of*
Matthew Blumin                         *Government Employees (AFGE);*
Georgina Yeomans                       *American Foreign Service*
1625 L Street, N.W.                     *Association (AFSA); and the*
Washington, D.C. 20036                 *NewsGuild-CWA*
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff-Appellee*
*American Federation of State,*
*County, and Municipal Employees,*
*AFL-CIO (AFSCME)*

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____/s/_____
Sharon Papp
Raeka Safai
2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff-Appellee*
*American Foreign Service*
*Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL-CIO

_____/s/_____
Rushab Sanghvi
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for Plaintiff-Appellee*
*American Federation of Government*
*Employees, AFL-CIO (AFGE).*

DEMOCRACY FORWARD
FOUNDATION

_____/s/_____
Kristin Bateman
Robin F. Thurston
Skye L. Perryman
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs-Appellees*
*American Federation of State, County*
*and Municipal Employees*
*(AFSCME); American Federation of*
*Government Employees (AFGE);*
*American Foreign Service*
*Association (AFSA); and the*
*NewsGuild-CWA*

STATE DEMOCRACY
DEFENDERS FUND

_____ /s/ _____
Norman L. Eisen
Joshua Kolb
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans
Frontières, Reporters Without
Borders, Inc., American Federation of
State, County and Municipal
Employees (AFSCME); and American
Federation of Government Employees
(AFGE)*

MEDIA FREEDOM &
INFORMATION ACCESS CLINIC -
YALE LAW SCHOOL[1]

_____ /s/ _____
David A. Schulz
127 Wall Street
New Haven, CT 06520
(212) 663-6162
David.schulz@YLSClinics.org

*Counsel for Plaintiffs Patsy
Widakuswara, Jessica Jerreat,
Kathryn Neeper, and John Does 1-4*

_____

[1] The views expressed herein do not purport to represent the institutional views of
Yale Law School, if any.

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,900 words. This brief also complies with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared using Times New Roman, a proportionally spaced typeface.

Dated: May 5, 2025                    _s/Daniel M. Eisenberg_
                                      Daniel M. Eisenberg

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 3, 2025

Patsy Widakuswara, et al.,

      Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

      Appellants


**No. 25-5145**                                    **1:25-cv-00887-RCL**


Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

      Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                              **September Term, 2024**

**No. 25-5150**

**1:25-cv-00966-RCL**

Middle East Broadcasting Networks, Inc.,

      Appellee

   v.

United States of America, et al.,

      Appellants

**No. 25-5151**

**1:25-cv-00907-RCL**

Radio Free Asia,

      Appellee

   v.

United States of America, et al.,

      Appellants

**BEFORE:**     Pillard*, Katsas, and Rao, Circuit Judges

## O R D E R

      Upon consideration of the motions for stay pending appeal filed in the above-captioned cases, the responses thereto, and the replies; and the administrative stay entered on May 1, 2025, it is

\*Judge Pillard dissents from the grant of the motions for stay.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5144**                                                    **September Term, 2024**

 **ORDERED** that the motions for stay pending appeal be granted.  The following orders, or parts thereof, are stayed pending further order of the court:

 In No. 25-5144, provisions (1) and (2) of the district court's preliminary injunction filed April 22, 2025;

 In No. 25-5145, the district court's preliminary injunction filed April 22, 2025, to the extent the relief granted falls within provisions (1) and (2) of the April 22, 2025 preliminary injunction in No. 25-5144;

 In No. 25-5150, the district court's preliminary injunction filed April 25, 2025;

 In No. 25-5151, the district court's preliminary injunction filed April 25, 2025.

 A *per curiam* concurring statement and a dissenting statement of Judge Pillard are attached.  It is

 **FURTHER ORDERED** that the administrative stay entered in Nos. 25-5144, 25-5150, and 25-5151 be dissolved.

### Per Curiam

 **FOR THE COURT:**
 Clifton B. Cislak, Clerk

 BY:   /s/
          Amy Yacisin
          Deputy Clerk

PER CURIAM:  For the following reasons, we grant the government's motion for a stay pending appeal.

I

The United States Agency for Global Media oversees six federally funded broadcast networks.  One of these, Voice of America, is operated by government employees and contractors.  Others, including Radio Free Asia and Middle East Broadcasting Networks, operate as private, non-profit corporations.  Through appropriations, Congress has allocated specific funding for the private networks, which USAGM disburses through grants.  *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043.  In response, USAGM placed over 1,000 employees on administrative leave, terminated nearly 600 personal-service contractors, and terminated RFA's and MBN's grant agreements for the 2025 fiscal year. *Widakuswara v. Lake*, No. 25-CV-1015, 2025 WL 1166400, at *3 (D.D.C. Apr. 22, 2025).  USAGM further directed its personnel abroad to cease broadcasting through VOA.  *Id.*

Various plaintiffs, including USAGM employees, contractors, and grantees, filed lawsuits to challenge these actions in our district court.  In one of the cases, the district court granted a preliminary injunction requiring USAGM to (1) restore its employees and contractors to their pre-March 14 status, (2) restore its FY 2025 grants with RFA and MBN, and (3) restore VOA as "a consistently reliable and authoritative

2

source of news." *Widakuswara*, 2025 WL 1166400, at *18. The court granted parallel relief in the other cases.

USAGM appealed and sought a stay of the first two portions of the preliminary injunction. Because of imminent funding deadlines, parties on both sides have requested expedited consideration of the stay motion.[1]

II

To resolve the stay motion, we consider whether the government is likely to prevail on appeal, any irreparable harm to the government, harms to the plaintiffs and others, and the public interest. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009). Applying these factors, we conclude that a stay is warranted.

A

The government is likely to succeed on the merits because the district court likely lacked subject-matter jurisdiction to enjoin USAGM's personnel actions and to compel the agency to restore RFA's and MBN's FY 2025 grants.

1

The district court likely lacked jurisdiction over USAGM's personnel actions. "We have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't*

---

[1] Radio Free Europe, another private network funded by USAGM, filed a similar suit and received a temporary restraining order. *See RFE/RL, Inc. v. Lake*, No. 25-CV-799, 2025 WL 1232863 (D.D.C. Apr. 29, 2025). The government has filed a separate motion to stay that order, which we do not resolve here.

3

*of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government.[2] *See, e.g.*, 5 U.S.C. §§ 1204, 7121–22, 7701 (Merit Systems Protection Board); *id.* § 1214 (Office of the Special Counsel); *id.* § 7104 (Federal Labor Relations Authority); 22 U.S.C. § 4107 (Foreign Service Labor Relations Board); *id.* § 4136 (Foreign Service Grievance Board); 41 U.S.C. §§ 7103–05 (Civilian Board of Contract Appeals). These remedial schemes "provide[] the exclusive procedures by which federal employees" may pursue employment- and contractor-related claims. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019); *see, e.g.*, *Am. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460, 1461–62 (D.C. Cir. 1990) (foreign-service labor-related claims must go through FSLRB); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) (Contract Disputes Act provides exclusive remedial scheme for covered contracts). "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009). "And that principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

---

[2] The dissent doubts that Congress's chosen administrative methods could meaningfully process agency-wide claims for over 1,000 employees. But administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters. *See* Order on Stay Request, *Special Counsel ex rel. John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5 (single MSPB order staying termination of nearly 6,000 employees).

4

The district court nonetheless justified the injunction on the ground that "this case is not simply a collection of employment disputes" because the "facts on the record and on the ground" suggest USAGM is being "dismantl[ed]." *Widakuswara*, 2025 WL 1166400, at *11. And in their stay briefing, plaintiffs expressly frame their claims as challenging the "wholesale shuttering of VOA" and seeking to undo "broad government actions" to "dismantl[e] an entire federal agency." Abramowitz Opp'n to Stay Mot. at 13, 18; Widakuswara Opp'n to Stay Mot. at 14. Yet plaintiffs may not use the APA to mount "wholesale" challenges to an agency's "entire program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) (cleaned up). The APA cause of action, like its sovereign-immunity waiver, provides for judicial review of "discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see* 5 U.S.C. §§ 702, 704. The "dismantling" that plaintiffs allege is a collection of "many individual actions" that cannot be packaged together and "laid before the courts for wholesale correction under the APA." *Nat'l Wildlife Fed'n*, 497 U.S. at 893.[3] Thus, while USAGM's employees and contractors might have viable, discrete claims with respect to their individual personnel actions, those claims must be pursued through other remedial channels.

2

The district court also likely lacked jurisdiction to restore RFA's and MBN's FY 2025 grants.

---

[3] Before the district court and here, the government maintained that plaintiffs fail to challenge any discrete, circumscribed agency action as required under the APA and instead seek judicial review of the agency's general compliance with its statutory mandate. *See* Opp. to Preliminary Injunction 30; Stay Mot. 22–23.

5

The Tucker Act vests the Court of Federal Claims with jurisdiction over claims against the United States "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). We have long held that this jurisdictional grant, where it applies, is exclusive and thus bars application of the sovereign-immunity waiver set forth in the APA. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022); *see* 5 U.S.C. § 702 (providing that APA waiver of sovereign immunity is inapplicable where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"). For Tucker Act purposes, whether a claim is "founded upon" a contract hinges on "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Crowley*, 38 F.3d at 1106 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). If a claim against the United States is contractual "at its essence," district courts have no power to resolve it. *Id.* (quoting *Megapulse*, 672 F.2d at 967). The same rule applies to claims for breach of grant agreements executed through binding government contracts. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–40 (Fed. Cir. 2021).

The Supreme Court recently applied these principles to issue a stay pending appeal in a case substantially similar to this one. In *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), a district court entered an order "enjoining the Government from terminating various education-related grants." *Id.* at 968. The Supreme Court stayed the order pending the disposition of an appeal to the First Circuit and any ensuing petition for certiorari. *Id.* at 696. The Court concluded that the district court likely lacked jurisdiction to bar termination of the grants, because the Tucker Act likely conferred jurisdiction over the dispute on the CFC. *Id*. Therefore, "the APA's limited waiver of immunity d[id]

6

not extend" to the injunction at issue, which the Court described as an "order[] to enforce a contractual obligation to pay money." *Id.* (cleaned up).

That reasoning controls this case. Congress created a contractual scheme for allocating funds to the grantees. It authorizes USAGM to fund RFA, MBN, and other networks through "grants and cooperative agreements." 22 U.S.C. § 6204(a)(5). Likewise, the governing appropriation statute allocates specific funding amounts for "grants" to those networks. 2024 Appropriations Act, 138 Stat. at 735. In the grants at issue here, USAGM, acting through its Chief Executive Officer, promised to pay the appropriated funds to the networks in monthly installments. In return, the networks promised to use the funds to advance statutory objectives and to comply with all program requirements. These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes. *Columbus Reg'l Hosp.*, 990 F.3d at 1338–39.

By the district court's own telling, the dispute here arose when USAGM terminated these agreements. *Widakuswara*, 2025 WL 1166400, at *3. The district court ordered "restor[ation] [of] the FY 2025 grants" and "disbursement to RFA and MBN of the funds Congress appropriated." *Id.* at *18. Whether phrased as a declaration that the agreements remain in force, or an order to pay the money committed by those agreements, the injunction in substance orders specific performance of the grant agreements—a quintessentially contractual remedy. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985). And it is the inherently contractual nature of the relief afforded—

7

*not* any characterization of the relief as money damages—that makes the CFC the exclusive forum for this suit.  *See Ingersoll-Rand*, 780 F.2d at 79–80 (holding a plaintiff "may not sidestep" CFC jurisdiction by "avoiding a request for damages," when their request relief "amount[s] to a request for specific performance"); *see also Crowley*, 38 F.4th at 1107 (cautioning against "creative drafting of complaints … to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)).

To distinguish *California*, the plaintiffs stress that Congress appropriated specific sums for RFA and MBN. Accordingly, plaintiffs contend, they may file an APA claim—independent of and antecedent to their grant agreements—to force USAGM to disburse the appropriated amounts.  But plaintiffs overread the governing statutes, which do not give the networks an unqualified right to the appropriated funds. Rather, they allocate funds for the networks, which may be disbursed only as grants.  *See* 2024 Appropriations Act, 138 Stat. at 735.  If these statutes created any entitlement for the networks at all, they at most would require USAGM to enter grants obligating the appropriated amounts to the networks.  *Cf. Train v. City of New York*, 420 U.S. 35, 40–43 & n.9 (1975).[4] Thus, any APA claim under these statutes would have to allege that the government failed to enter a grant agreement obligating

---

[4]  And even then, USAGM may impose various conditions on a network's receipt of the appropriated funds.  *See* 22 U.S.C. § 6208(c) (listing "limitations and restrictions" to be contained in "[a]ny grant agreement"); 2024 Appropriations Act, 138 Stat. at 735 ("funds appropriated under this heading shall be made available in accordance with the principles and standards" of the statute). Moreover, even after USAGM has entered into grant agreements, the agency still may "award the grant … to another entity" if, "at any time," it determines that the network "is not carrying out the [statutory] functions … in an effective and economical manner." 22 U.S.C. § 6208(g).

8

the appropriated amount. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199–200 (Fed. Cir. 1997) (*NCMS*). But here, USAGM *did* obligate the appropriated funds through grants, thereby satisfying whatever duty (if any) it had under the appropriation statutes. *See Widakuswara*, 2025 WL 1166400, at *4–*5. Once the agency entered these contracts, it incurred a new obligation: Unlike the relevant statutes, the grant agreements require the government to make *monthly* payments to the networks—the very obligation prompting this highly expedited stay litigation. Accordingly, the claims of government nonpayment necessarily challenge its performance under the grants. Such claims are squarely contract claims under the Tucker Act. *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368–69 (Fed. Cir. 2021) (explaining *NCMS*); *see also Ingersoll-Rand*, 780 F.2d at 78–80 (Tucker Act applies to claims that the government's termination of a contract violated statutes or regulations incorporated therein).[5]

The plaintiffs' non-APA claims regarding grant money are unlikely to fare any better. Below, plaintiffs raised mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers,

---

[5] The dissent describes 22 U.S.C. § 6208(c)(5) as significantly limiting the circumstances in which USAGM may terminate grants. However, that provision sets forth when grants may be "terminated *without fiscal obligation to the United States*." 22 U.S.C. § 6208(c)(5) (emphasis added). It thus confirms our conclusion that Congress contemplated financial liability under the grant as the remedy for any breach. The dissent also notes that the government cannot prevent enforcement of statutes through the APA merely by incorporating the statutes into contracts. The dissent is correct on that point. *See Megapulse*, 672 F.2d at 967. But in this statute, Congress chose to use a contractual mechanism for obligating the appropriated funds, rather than creating a freestanding statutory entitlement.

9

and *ultra vires* claims. And before our Court, plaintiffs argue that "serious constitutional question[s]" would arise if we concluded that the CFC had exclusive jurisdiction, as that would deprive them of meaningful judicial review of their constitutional claims. Widakuswara Opp'n to Stay Mot. at 18 (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). But these constitutional claims simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims. *Dalton v. Specter*, 511 U.S. 462, 472–74 (1994); *see also Ingersoll-Rand*, 780 F.2d at 78 (Tucker Act governs challenge to contract termination, "despite plaintiff's allegations of statutory and constitutional violations" (cleaned up)).[6] Moreover, these claims fall short for the same reason as plaintiffs' APA claims: At most, the statutes in question required USAGM to allocate the appropriated amounts through grants enforceable as contracts, which USAGM has done.

B

On balance, the remaining *Nken* factors support a stay.

*Irreparable Harm.* The government has shown that it will face irreparable harm absent a stay. As to the reinstatement of USAGM employees and personal-service contractors: The Executive Branch has a significant interest in maintaining control over personnel matters. *See Sampson v. Murray*, 415

---

[6] In the district court, the *Widakuswara* plaintiffs also raised Appointments Clause and First Amendment claims. The district court did not address them in granting the preliminary injunction, *Widakuswara*, 2025 WL 1166400, at *5 n.13, *15 n.26, and the plaintiffs do not assert them as grounds for denying a stay. So, we do not consider these claims in resolving these stay motions.

10

U.S. 61, 83 (1974). In requiring the restoration of all employees and contractors to their pre-March 14 status, the injunction interferes with this important responsibility. This intrusion is particularly harmful because it implicates the Executive Branch's foreign-affairs authority. USAGM is responsible for "present[ing] the views of the United States Government" and "support[ing] United States foreign policy objectives" in the international community. 22 U.S.C. § 6202(b)(3), (4). By depriving the Executive Branch of control over the individuals involved in its international broadcasting, the injunction threatens its prerogative to "speak with one voice" on behalf of the United States in foreign affairs. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

As to the restoration of the grants: Absent a stay, USAGM would be forced to imminently pay out some $15 million to RFA and MBN. And RFA and MBN have attested they intend to spend these funds "immediately." Network Opp'n to Stay Mot. at 22. Because the district court did not require plaintiffs to post any injunction bond, *Widakuswara*, 2025 WL 1166400, at *17,[7] USAGM cannot recover these funds even if it should prevail in its appeal. Under these circumstances, harm to the government is irreparable. *See California*, 145 S. Ct. at 969.

---

[7] Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The "precise purpose" of such a bond is to ensure that a defendant can be fairly compensated for injury stemming from a wrongfully granted injunction. *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).

11

*Harm to Others*.  Plaintiffs identify various harms that they and others may incur absent a stay, including loss of employment, the possible collapse of MBN and RFA, the elimination of a union's bargaining unit, and the removal of alien employees and contractors to countries hostile to the free press.  Although we appreciate the gravity of these harms, there remain several avenues for their remediation.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("[T]he injury must be beyond remediation.").  Loss of government employment generally does not constitute irreparable injury, *see Sampson*, 415 U.S at 91–92 & n.68, especially since employees seeking to challenge their termination or placement on administrative leave may seek emergency stays from the Office of Special Counsel and MSPB, *see* 5 U.S.C. § 1214(b).  Personal-service contractors may likewise challenge their termination under the Contract Disputes Act, and unions may file complaints on behalf of their members before the FLRA.  *E.g.*, *Ho v. United States*, 49 Fed. Cl. 96, 101 (2001) (CFC exercising jurisdiction over personal-service contract), *aff'd*, 30 F. App'x 964 (Fed. Cir. 2002); *see* 41 U.S.C. § 7101 *et seq.*; 5 U.S.C. § 7118.  Journalists may seek relief in immigration proceedings to avoid potential persecution based on their political opinions.  *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158 (asylum); *id.* § 1231(b)(3) (withholding of removal).  As for MBN and RFA, they may seek to recover any wrongfully withheld grant funds in the CFC.  28 U.S.C. § 1491(a)(1). Indeed, for almost a month, the Supreme Court has made clear that the CFC is likely the only forum open to them. *See California*, 145 S. Ct. at 968.[8]

---

[8] We need not consider any potential harm from shuttering VOA; the district court ordered USAGM to resume VOA's statutorily required programming levels, and the government has not sought to stay that provision of the injunction.

12

*Public Interest*. Plaintiffs allege that USAGM's implementation of the Executive Order has violated numerous statutory requirements. At this stage of the litigation, the government has raised jurisdictional, not merits, defenses. Of course, we recognize that the public has an interest in the Executive Branch's compliance with congressional mandates. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). By the same token, however, the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress. Because personnel and grant disputes directly concern the public fisc, Congress has limited the resolution of these potentially costly claims to specialized tribunals such as the MSPB and the CFC. We must respect those boundaries no less than the substantive and appropriations provisions governing the operation of USAGM.

PILLARD, *Circuit Judge*, dissenting: Defendants are unlikely to succeed on the merits: They have not persuasively established that the district court lacked authority to enter the preliminary injunction. Meanwhile, Voice of America, Radio Free Asia, and Middle East Broadcasting Networks face severe and irreparable harm absent injunctive relief. Voice of America has gone dark for the first time since 1942. Radio Free Asia and Middle East Broadcasting Networks face imminent collapse if they do not receive the funding Congress directed to each of them by name. The purpose of a stay pending appeal is to maintain the status quo until a case can be fully adjudicated on its merits. This stay does the opposite, silencing Voice of America for the foreseeable future and eliminating Radio Free Asia and Middle East Broadcasting Networks' ability to see this case through to the end.

## I.

Defendants are not likely to succeed on the merits. They do not claim that any court would likely hold that they are carrying out the will of Congress. They argue instead that other entities should have heard plaintiffs' claims. Part A describes the strong likelihood that the plaintiffs who worked for Voice of America did not have to spend years attempting to channel their claims through federal labor and employment administrative processes before they could file this suit under the Administrative Procedure Act to set aside the Agency's efforts to dismantle the work of Congress. It also defends the scope of the district court's preliminary injunction as commensurate with defendants' baby-with-the-bathwater approach to asserting their "policy priorities." Part B turns to the strong likelihood that the district court had jurisdiction over the claims of Radio Free Asia and Middle East Broadcasting

2

Networks, contrary to contentions that those claims belong in the Court of Federal Claims.

## A.

On March 14, 2025, the President signed Executive Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, directing USAGM to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law," and to eliminate "the non-statutory components and functions" of the agency "to the maximum extent consistent with applicable law." 90 Fed. Reg. 13043 (Mar. 14, 2025). The EO directed the head of USAGM to report its compliance to OMB with an explanation of "which components or functions of the governmental entity, *if any*, are statutorily required and to what extent." *Id*. (emphasis added).

The very next day, USAGM's website featured a statement announcing that the Agency—which it described as producing "radical propaganda," "rot from top to bottom"—is "irretrievably broken" and "not salvageable."[1] Apparently having concluded that *none* of the functions of Voice of America or the foreign affiliate networks is statutorily required, the agency's acting leadership proceeded to dismantle all of them.

To that end, the district court found, defendants "took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions." *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025). The day

---

[1] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://perma.cc/YQA4-3TVA.

3

after the EO was signed, the agency's acting leadership sent a boilerplate e-mail to 1,042 of the 1,147 full-time employees placing them on administrative leave and another such email to each USAGM affiliated network terminating its grant on the ground that it "no longer effectuates agency priorities." *Id.* at *3 & n.5. The next day, the government cancelled all USAGM personal service contracts. It then instructed all the USAGM foreign news services to shut down their transmitters and place locally employed staff on leave. USAGM prepared to send termination notices to every radio broadcast technician working for it anywhere in the world who was not already in the process of retiring. *Id.* at *3. The government informed plaintiff AFGE of its plan to terminate 594 employees who are AFGE members. *Id.*

As a result of those wholesale actions, USAGM's flagship station, Voice of America, stopped reporting the news "for the first time in its 80-year existence." *Id.* Voice of America's affiliate networks abroad went dark or switched to airing only music. Widakuswara Compl. ¶ 82.

The statute is clear: Voice of America must "serve as a consistently reliable and authoritative source of news." 22 U.S.C. § 6202(c)(1). The government touts that it did not challenge part (3) of the injunction compelling its compliance with that statutory directive. Gov't Stay Mot. 1. But the significance of that caveat—beyond the purely symbolic—remains a mystery. The district court found as fact that the Agency has placed on leave or terminated all the VOA employees and contractors who are necessary to fulfilling that mandate. *See* Widakuswara Compl. ¶ 83 (*all* transmitters abroad shuttered and *all* locally employed staff placed on administrative leave). And there is no reason to conclude that the government is in fact complying with the injunction to get Voice of America back up and running. Plaintiff Abramowitz

4

emailed Defendants Lake and Morales the morning after the district court entered the injunction, asking about their plans to bring VOA staff back to work. He received no response. Abramowitz Opp'n 21. No status report or other filing or source of information suggests that Voice of America has resumed broadcasting the news.

In support of its emergency motion for a stay pending appeal in the Voice of America cases, the government contends it is likely to succeed on the merits in its defense against the claims of Voice of America's employees for two related reasons. First, as a threshold matter, it asserts that the district court lacked jurisdiction over the employee plaintiffs' claims because the employees did not first seek relief from the Merit Systems Protection Board (MSPB) (for employment disputes), the Federal Labor Relations Authority (FLRA) (for labor disputes), or the Office of Special Counsel (for prohibited personnel practices). Gov't Stay Mot. 20-21. Second, the government argues that the preliminary injunction is overbroad in ways that are unsupported by the claims the district court held were likely to succeed. Gov't Stay Mot. 19-21.

1. The administrative channeling defense is inapposite here. The government contends that plaintiffs must treat their wholesale removal from the workplace as if it were an aggregation of individualized employment actions. It suggests that the correct response is for each of the hundreds of employees to proceed with a separate, identical administrative claim at the MSPB or FLRA. I would not indulge any such fiction. Defendants themselves never did. They took broad, blunt, and decisive action to gut USAGM and VOA. They sent identical notices to all VOA employees. Widakuswara Compl. ¶ 74. Nothing about each decision or its execution was individualized. No employment-related rationale was

5

offered—except the cold comfort that the action was *not* for any "disciplinary purpose." *Id.*

Defendants give no realistic indication why administrative exhaustion is required here other than to weakly suggest that, viewed as individual employment actions, some "may be entirely lawful." Gov't Stay Mot. 21. The government leaves unsaid how review by the agencies it identifies could discern in any individualized sense how a wholesale removal of public sector employees from their jobs without employment-related grounds, notice, or prospects for return "may" be found to be lawful—or not—by the employment-review agencies to which they would direct the plaintiffs.

Even taken at face value, the government's channeling argument is unlikely to succeed. *See Widakuswara*, 2025 WL 1166400, at *10-11. Channeling plaintiffs' claims to administrative bodies designed to adjudicate individual employment or labor disputes would entirely shut off meaningful judicial review of the claims plaintiffs assert. The VOA plaintiffs challenge the dismantling of USAGM through the wholesale placement of employees on administrative leave with one boilerplate letter. The agency took that action without any employee-related justification. The announced reason defendants acted as they did was to dismantle a broadcaster whose mission and operation they disdain. That is not a "*covered* agency action[]" that must proceed through the administrative review scheme. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6, 10 (2012) (emphasis added). Nor is the action challenged here a matter of federal sector "employee relations" that must proceed through the Federal Labor Relations Authority. *Cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). The plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as

6

it is the means by which they challenge defendants' unlawfully halting the work of Voice of America and shutting it down.

The channeling defense does not in any event reach all claims in the VOA cases.  As the district court pointed out, *Widakuswara*, 2025 WL 1166400, at *10, there is no scenario in which the claims the nonprofit press organizations or personal service contractors raise could conceivably be channeled through the Federal Service Labor-Management Relations Statute, the Civil Service Reform Act, or the Foreign Service Act.  There is no administrative agency from which plaintiffs Reporters Without Borders, Reporters Sans Frontières, or personal service contractors John Does 3 and 4 might seek relief, even if it made sense for them to try.  Given defendants' failure to acknowledge or address the lack of any administrative process available to these plaintiffs, there is no basis to conclude the threshold challenge to the district court's jurisdiction to hear these plaintiffs' APA and constitutional claims is likely to succeed.

Plus, all the employees raise constitutional claims, including under the First Amendment, separation of powers, and the Take Care Clause.  The government fails to acknowledge those claims.  Constitutional claims are collateral to any review afforded by the Civil Service Reform Act and the Federal Service Labor-Management Relations Statute.  Article III courts may retain jurisdiction over employment claims of federal employees that raise constitutional challenges.  *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984) (retaining jurisdiction over allegation that officials responsible for reduction-in-force action held office in violation of the Appointments Clause); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996) (retaining jurisdiction over employee's First Amendment claim).  The agencies' lack of expertise or capacity to address plaintiffs' properly framed

7

APA and constitutional claims is another reason the channeling requirement is unlikely to apply to them. *See generally*, *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 194 (2023) ("The Commission knows a good deal about competition policy, but nothing special about the separation of powers."). Far more likely—and certainly more appropriate in every practical sense—is that the government's mass action to eliminate virtually all the agency's employees, like its action of wholesale elimination of the agency's contractors, is subject to review directly in the district court to determine whether it was arbitrary or unlawful under the APA and in excess of the executive's unilateral authority.

2.    The plaintiffs are also likely to succeed in defending the district court's injunction restoring the VOA employees to their pre-March 15 status as relief properly tailored to the employee-plaintiffs' claims.  The government protests that the district court issued a "broad programmatic order" to enforce compliance with a "broad statutory mandate," which they claim exceeds the bounds of judicial review of agency actions set by *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) and *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55 (2004). Gov't Stay Mot. 22-23.  The fashioning of effective equitable relief is highly discretionary and context-specific.  As applied here, the government's cookie-cutter objection to the injunction in this case, entered by a highly experienced and able district judge based on a powerful record of extraordinary and categorical government conduct, does not persuade.

The scope of plaintiffs' claims and the preliminary relief granted to preserve their chance of permanent relief should they prevail differs in important ways from what the Court deemed problematic in *Lujan* and *SUWA*.  The plaintiffs in *Lujan* challenged the Department of the Interior's operations in reviewing, classifying, and developing plans for various public

8

lands. 497 U.S. at 890. As the Supreme Court observed, the "so-called 'land withdrawal review program'" they challenged was plaintiffs' own construct. *Id*. The complaint did not "refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations," but to a "continuing" and "constantly changing" amalgam of discretionary activities. *Id*. Unsurprisingly, the Court saw no final, reviewable agency action in the "program" to which plaintiffs objected. The conduct plaintiffs challenge in this case is discrete and clear: halting the work of virtually all the employees working at Voice of America and bringing the operation of that station to a halt. What they asked the district court to revive and protect is no more than what Congress prescribed. The kind of difficulty described in *Lujan* is absent here. Here, there is no "continuing" and "constantly changing" set of agency operations being placed before the court.

This case is also not a "programmatic" challenge to agency policies and does not, contrary to the government's remonstrance, require the court to run the agency. Defendants rely on *SUWA*, in which the Supreme Court rejected plaintiffs' request to force the Bureau of Land Management to comply with a statutory obligation to manage certain public lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 542 U.S. at 65 (quoting 43 U.S.C. § 1782(c)). Plaintiffs there urged the district court to order their preferred managerial regime by making the agency promulgate rules to prohibit the use of off-road vehicles. The Court observed that the statute at issue "assuredly [did] not mandate, with the clarity necessary to support judicial action . . . the total exclusion of [off-road vehicle] use." *Id.* at 66. Unlike in *SUWA*, plaintiffs are not seeking to direct the court to bring into being an alternative suite of broadcast stations to the one that Congress defined and funded. Instead, there is a "completed universe" of agency actions that plaintiffs have alleged, and the

9

district court agreed, are unlawful. Again, because they are
likely to succeed in that claim, I would deny the stay.

The government cannot seriously contend on this posture
that the relevant statutes—or more foundationally the
constitutional separation of powers—permit the President to
wholly scupper Voice of America and its affiliated Networks.
Defendants characterize the claims as an impermissible attempt
to clump together "many individual actions" and
impermissibly challenge them as one under the APA. The fact
that the government elected to take many unlawful agency
actions in short order—thereby putting the whole agency on the
chopping block—does not exempt their violations from
judicial scrutiny. See *Widakuswara*, 2025 WL 1166400, at
*11. Yes, the pace and scope of the government's destructive
efforts present the courts with remedial challenges in this and
many other recent cases. But the very volume of lawbreaking
and the scope of operational functioning laid waste does not
add up to courts losing the power to determine the lawfulness
of agency action. And the government has not meaningfully
disputed that the statute mandates "with the clarity necessary
to support judicial action" that the USAGM operations
Congress ordered be established and funded must continue to
exist absent congressional action to the contrary.

**B.**

Defendants are similarly unlikely to succeed on the merits
of their challenge to the preliminary injunction as it applies to
Radio Free Asia (RFA) and Middle East Broadcasting
Networks (MBN) (the Networks). Federal laws passed by
Congress require the allocation of specified grant funding to
the Networks. Nonetheless, defendants purported to terminate
the Networks' grant agreements and are withholding funds
allocated to them on the stated grounds that each grant award

10

"no longer effectuates agency priorities." Plaintiffs sued to halt defendants' impoundment of those funds.

The Networks claim that the defendants' funding freeze is in violation of the International Broadcasting Act and related statutes, and that its defiance of Congress's directives in those laws is *ultra vires* and unconstitutional. The government counters that plaintiffs' claims sound in contract, so must be dismissed because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over contract claims against the federal government. That "restrictive—and unprecedented— interpretation of [the district court's jurisdiction] should be rejected because the remedy available to the [plaintiffs] in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA" and the Constitution. *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988).

"This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969-70 (D.C. Cir. 1982), and it is clear from the Networks' complaint that this is not a "disguised," *id.* at 969, run-of-the-mill contract action "within the unique expertise of the Court of Claims," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). At its core, the Networks' suit challenges the government's assertion that it may disregard specific congressional funding directives when it disagrees with Congress's policy choices. Interpreting the Tucker Act to deny the district court jurisdiction over a matter with such "serious implications for our constitutional structure," *In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013), is utterly inconsistent with both this court's and the Supreme Court's longstanding understanding of the Tucker Act as providing the exclusive forum for a narrow category of

11

"actions based on government contracts." *Megapulse*, 672 F.2d at 967; *see also United States v. Mottaz*, 476 U.S. 834, 851 (1986) (describing "the essence of a Tucker Act claim for monetary relief" as one requesting "damages for the Government's past acts"); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("[W]e have explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'") (quoting *Megapulse*, 672 F.2d at 967-68). "It [is] nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of [constitutional law] to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487 U.S. at 908.

To determine whether the Court of Federal Claims has exclusive jurisdiction, we must look to the source of the rights plaintiffs assert and the nature of the relief they seek. "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968. The following explains in more detail why the district court likely had jurisdiction to declare unlawful and enjoin the challenged agency action.

1. Consider the source of plaintiffs' rights. In identifying their source, we consider factors including whether "the plaintiff's asserted rights and the government's purported authority arise from statute," and "whether the plaintiff's rights exist prior to and apart from rights created under the contract." *Crowley*, 38 F.4th at 1107 (internal citations omitted and

12

formatting altered).  Here, the plaintiffs' asserted rights arise from federal statutes and the Constitution, and they exist independent of any contract with USAGM.  *See* MBN Compl. ¶¶ 58-60, 65-68, 77-97; RFA Compl. ¶¶ 58-60, 65-68, 77-97. As such, the Networks' claims belong in the district court, not the Court of Claims.

First, the Networks claim that the government has acted contrary to the APA, the Networks' governing statutes, and congressional appropriations.  By freezing their funding, defendants have placed them in dire financial consequences and will force them out of existence within a matter of days. Federal law established Radio Free Asia and Middle East Broadcasting Networks and required allocation of funds to those specific, named entities to enable them to "provide accurate and timely information, news, and commentary" to Asia and the Middle East, and to "be a forum for a variety of opinions and voices from within Asian nations whose people do not fully enjoy freedom of expression."  22 U.S.C. § 6208(a)-(b);  *see* Emergency Wartime Supplemental Appropriations Act of 2003, Pub. L. No. 108-11, 117 Stat. 559, 562 (2003).  Congress, with the President's approval, appropriated funds earmarked for MBN and RFA to carry out statutorily assigned functions.  Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (requiring appropriated funds to be "allocated in accordance with the table included … in the explanatory statement described in section 4"); Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (table designating $60,830,000 to be allocated to RFA and $100,000,000 to MBN).

13

The Networks also point to Congress's direction that funds appropriated for RFA and MBN "*shall* be allocated" to those entities. 2024 Appropriations Act, 138 Stat. at 735 (emphasis added); 22 U.S.C. § 6204(a)(5) (USAGM is to "make and supervise" the grants to the networks). And Congress expressly requires USAGM to provide RFA and MBN virtually all the funds appropriated for each network, strictly confining USAGM's reprogramming authority to at most 5% of a network's allocation. 2024 Appropriations Act, 138 Stat. at 735; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025). The statute allows USAGM to terminate a grant to RFA only for "failure to comply with" the requirement "that grant funds be used only for activities consistent with" the statute. 22 U.S.C. § 6208(c)(5). Those specific provisions govern over the general regulatory prerogative the government cites. The Agency has not asserted that RFA or MBN did anything inconsistent with their statutory mandates, but it has nonetheless acted to "terminate" their grants and freeze all their funding. Plaintiffs bring a classic APA challenge to the Agency's impoundment of funds—agency action that is both arbitrary and heedless of Congress's commands.

In sum, Congress called for the Networks to be established as private nonprofit entities supported by federal appropriations. It called for them to be maintained for the purpose of broadcasting uncensored journalism, especially to countries that restrict freedom of speech. And Congress made appropriations explicitly allocating funds to RFA and MBN by name. Those provisions tightly restrict the use of the Networks' funds for any other purpose. The Networks claim that the Agency acted contrary to those congressional directives when it impounded funds appropriated to support their operations. Their claims that the Agency violated the

14

International Broadcasting Act and the 2024 and 2025 Appropriations Acts thus arise from statute, not from contract.

Second, the complaint raises various constitutional claims. Plaintiffs allege that defendants acted beyond the Executive's authority by effectively repealing duly enacted law establishing the Networks for specified purposes and by freezing the funds Congress allotted to them. They frame those claims as violations of the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause. MBN Compl. ¶¶ 77-97; RFA Compl. ¶¶ 77-97. Constitutional claims for injunctive or declaratory relief face no sovereign immunity bar, per the *Larson-Dugan* exception. *See Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under [the *Larson-Dugan*] exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity") (internal quotation marks omitted); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963). The government's stay motion does not dispute that the Court of Claims could not adjudicate plaintiffs' constitutional claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and the government does not appear to contest the district court's jurisdiction over them.

Defendants dispute plaintiffs' framing of their claims as statutory and constitutional. They argue that, because the Networks are funded by grants, plaintiffs' challenge to the impoundment must be treated as a breach of contract claim that belongs in the Court of Claims. Reply at 3. That misapprehends the plaintiffs' case. Their claim of entitlement rests on USAGM's alleged contravention of applicable statutory and constitutional constraints—not the terms of any particular contract. As the Networks note, if the grant

15

agreements never existed at all, they would have the same claims against USAGM. RFA/MBN Br. 14. The Congressional basis of their entitlement precedes the individual grants that deliver their allocations. *Cf. Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). USAGM's use of grants as a vehicle to deliver appropriated funds to the Networks does not "automatically transform" their case into a contract action. *Megapulse*, 672 F.2d at 968.

What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual. *Crowley*, 38 F.4th at 1109-10 (claim was statutory, not contractual, when it "require[d] primarily an examination of the statutes"). Judge Bork's opinion for our court in *Maryland Department of Human Resources v. U.S. Department of Health and Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), illustrates the point. We recognized there that the state's claim to funding under a federal grant-in-aid program for social workers' training expenses bore some resemblance to "a request for specific performance of a contract that obliges the promisor to pay money." *Id*. at 1449. But we held that, because "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," the state's claim of entitlement was not within the Court of Claims' jurisdiction over contracts with the government. *Id*. (quoting *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985)).

The majority submits that, "[o]nce the agency entered these contracts" appropriating the congressionally specified funds to the Networks, "it incurred a new obligation" to make monthly grant payments, and any claims of nonpayment "are squarely contract claims under the Tucker Act." Maj. at 8. But

16

we have long since rejected the notion that "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971. As we explained in *Megapulse*, the majority's premise allows the government to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities. Because government involvement in any such activities would thereby also constitute a breach of a contract term, any injunction would be equivalent to an award of specific performance, which, as a matter of public policy, is not available against the government." *Id*. There, we held that "[w]e cannot accept such an interpretation of the law." *Id*. The majority does not explain under what authority or reasoning it decides that it can accept such an interpretation today.

2. Consider next the type of relief sought. On this point, "[t]he crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit." *Crowley*, 38 F.4th at 1107. Here we must look at the causes of action in plaintiffs' complaints. *Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007) ("Jurisdiction is determined by looking to the complaint."). RFA and MBN seek injunctive and declaratory relief. No count sounds in contract, and none seeks money damages for breach. Plaintiffs' claims therefore do not belong in the Court of Claims, which exists to provide a centralized, specialized forum to resolve "actions based on government contracts," *Megapulse*, 672 F.2d at 967, which result in "naked money judgment[s] against the United States," *Bowen*, 487 U.S. at 905; *see also Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

True, courts must be wary of plaintiffs who seek to avoid Tucker Act jurisdiction by "disguising a money claim as a claim requesting a form of equitable relief." *Kidwell*, 56 F.3d

17

at 284.  But that risk is not present here.  The reality that the Networks' *funding* is at stake does not change the analysis: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Bowen*, 487 U.S. at 893; *Kidwell*, 56 F.3d at 284 (prospect that "success on the merits may obligate the United States to pay the complainant" does not make a claim one for "money damages").

The Supreme Court in *Bowen* distinguished orders for specific relief—there, an order directing the Secretary to reverse his refusal to financially reimburse the state—from money damages.  Money damages "refers to a sum of money used as compensatory relief" that "substitutes for that which ought to have been done."  487 U.S. at 895, 910.  When plaintiffs seek funds under statutory entitlement, rather than as compensation for losses suffered, the funds are not "money damages" for purposes of the Tucker Act.  *Md. Dep't of Hum. Res.*, 763 F.2d at 1446; *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997).  Unlike disgorgement of funds owed, "money damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost."  *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).

The type of relief plaintiffs seek is unavailable in the Court of Federal Claims, which "has no power to grant equitable relief."  *Bowen*, 487 U.S. at 905.  RFA and MBN are seeking more than the restoration of their past-due funding for April; they also request a declaration that USAGM is "required by law to take all necessary steps" to ensure that USAGM disburses to them "all congressionally appropriated funds through September 30, 2025" and an injunction against future withholding of congressionally appropriated funds.  RFA Compl. 24-25; MBN Compl. 24-25.  The Court of Federal

18

Claims' lack of authority to address these aspects of plaintiffs' claims underscores why it is not the appropriate court. *See Crowley*, 38 F.4th at 1109; *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201. When a private entity funded by federal appropriations has "a cooperative, ongoing relationship" with the agency "in the allocation and use of the funds," a simple money judgment is unlikely to be fitting relief. *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201.

3. The stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not change the landscape. Unlike the Networks here, the *Department of Education* plaintiffs raised no constitutional claim. Their only claim was to sums awarded to them in previously awarded discretionary grants. Those plaintiffs were not entities created by statute and designated by Congress to receive specified sums. The equities there were also very different: The Court relied on the *Department of Education* plaintiffs' representation that they had financial resources, even without the grant funding, to keep their programs running during the litigation. RFA and MBN have no financial cushion and are on the verge of collapse.

This case is more like *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025), in which the Supreme Court declined to stay interim injunctive relief despite assertions that the plaintiffs' statutory claims were really claims for monetary relief that belonged in the Court of Claims. *See id.* at 756 (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, JJ., dissenting from the denial of the application to vacate the district court's order). The plaintiffs in *AIDS Vaccine Advocacy Coalition*, like the Networks here, claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the

19

Constitution. As here, their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes. To the extent that the Supreme Court's action on emergency stay orders influences how we apply binding precedent of that court and this one, it favors denying the stay here as in *AIDS Vaccine Advocacy Coalition*.

## II.

1. Plaintiffs in each case have established that they will suffer irreparable injury if the district court's preliminary injunction is stayed. The plaintiffs in the two VOA lawsuits will be substantially and irreparably injured by the stay. VOA has not published or aired a single piece of news content since March 15, 2025. Abramowitz Decl. ¶ 33. "Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered." *Id.* VOA's journalists have been unable to exercise their First Amendment rights to free speech and free press. And the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Nat'l Ass'n v. Mfrs. v. SEC*, 800 F.3d 518, 559 (D.C. Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

Each day that passes without VOA publishing any content only compounds the irreparable harm: The stifling of its distinctive journalistic voice, the erosion of its audience, and the breach of the trust of every reporter and listener who has relied on its broadcasts. The blight on VOA's reputation, and that of the United States, when a publicly sponsored news source with an eight-decade track record of reliability is shuttered under accusations of fraud, waste, and producing "anti-American content," Abramowitz Decl. ¶¶ 44-45, will

20

only fester while the preliminary injunction is stayed. The asserted harm to VOA's reputation is irreparable. *See, e.g.*, *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

VOA employees also will be exposed to irreparable professional and personal consequences absent injunctive relief. For example, plaintiff John Doe 3, a foreign national on a J-1 visa, is a journalist working for VOA as a personal service contractor. Widakuswara Compl. ¶ 22. His home country is governed by an authoritarian regime that has labeled VOA a "subversive organization." *Id*. John Doe 4 is a VOA contractor whose home country is hostile to LGBTQ people like himself. *Id.* ¶ 23. The district court found that "defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately," and may face elevated risks in their home countries because of the work they did under the auspices of USAGM. *Widakuswara*, 2025 WL 1166400, at *16.

That the USAGM employees and personal service contractors are currently receiving full pay and benefits does not erase the harm. The government's own announced assessment that the existing agency was beyond repair spells widespread terminations once the injunction is stayed. The district court recounted the March 25, 2025, notice from USAGM's HR Director to Plaintiff AFGE that it had decided to terminate 594 AFGE members working for USAGM. *Widakuswara*, 2025 WL 1166400, at *3. That notice is a red flag for USAGM employees once the preliminary injunction is lifted. As to the personal service contractors, they are currently receiving full pay and benefits only because of court intervention; USAGM withheld the termination order only after the U.S. District Court for the Southern District of New York issued a temporary restraining order to halt it.

21

Widakuswara Opp'n 2 n.2. The district court also foresaw irreparable harm to plaintiff Reporters Sans Frontières in the absence of a preliminary injunction because "VOA's silence injured [its] ability to distribute its broadcasting and amplify press freedom concerns." *Widakuswara*, 2025 WL 1166400, at *8. Defendants have not challenged that finding on appeal.

2. RFA and MBN face existential harm absent injunctive relief. Contrary to defendants' assertions, the imminent injuries that the affiliated Networks and their employees face cannot be remedied by money damages at some unspecified date in the future. RFA "now expects that it does not have enough funds to get through May 9, 2025, absent extreme measures." Second Fleming Decl. ¶ 8. At the start of this litigation, MBN employed more than 500 people. Because USAGM withheld its statutorily mandated funding, by April 12 MBN had been forced to lay off 90 per cent of those employees. Second Kline Decl. ¶ 3. Layoffs of remaining staff and the organization's bankruptcy are imminent once the preliminary injunction is stayed. *Id.* ¶ 12. The network "will cease to exist except on paper" no later than May 31, 2025. *Id.* ¶ 15. That existential threat should have moved this court to deny the government's stay motion.

RFA employees, represented by Plaintiff NewsGuild-CWA in the *Widakuswara* suit, also face unplanned, costly, and stressful dislocations they would not have suffered absent the agency's challenged actions. Many RFA employees, including NewsGuild members—work in the United States under H1-B visas. Schleuss Decl. ¶ 8. Losing their jobs likely means deportation to their home countries. Professionals who have served the USAGM mission of bringing objective news coverage to people living under repressive regimes, including in some cases their own home countries, may have to return to countries "that persecute journalists for reporting the news,"

22

making them all the more vulnerable because of the service they have rendered to USAGM. *Id.*

3.    Meanwhile, the government is unable to identify substantial harm it would suffer if the preliminary injunction were not stayed.  It principally points to the order's restriction of its authority to manage the agency and its employees.  The nature of injunctive relief is to interfere with what the enjoined party would otherwise do.  And when agency action that a court concludes is likely unlawful is on a grand scale, an appropriate preliminary injunction must have scope commensurate to that of the challenged deeds.  That much is unavoidable.  The district court nonetheless made clear it respected the government's lawful prerogatives.  In denying its motion for stay pending appeal, the court reiterated that USAGM retains its discretionary management authority:  "When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order . . . such execution of normal operations would, to the contrary, be *in accordance with* the status quo pre-March 14." Order Denying Motion for Stay Pending Appeal at 5 [ECF No. 104] (emphasis added).

Defendants also protest that the preliminary injunction "does not account for the various costs associated with reinstating all employees and contractors."  Gov't Stay Mot. 25.  Again, the cost of that restoration is proportionate to the dislocation the government chose to undertake.  There are less precarious ways to effect institutional change that might be easier to dial back.  In eschewing them, the government presumably accepts the heightened risk calculus attending its preferred approach.  But it cannot "be heard to complain about damage inflicted by its own hand."  *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

23

Nor has the government demonstrated that restoration of congressionally appropriated funds to the Networks amounts to irreparable harm. Plaintiffs have shown that they are likely entitled to that relief. The government may be right that it would be unable to recover that money once handed over. The Networks are entirely dependent on it to stay afloat and, if they had it in hand, would promptly use it for that purpose. That said, the harm to the government from being required to release funds that are statutorily earmarked for the very purpose and entity to which the injunction directs them—funds that are legally restricted against reprogramming to other functions or entities—seems less substantial than the loss of the same amount of money might be in another circumstance.

4. That leaves only the public interest. Duly enacted legislation, fashioned by Congress and signed by the President, is a strong indicator of where the public interest lies. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Congress founded, supported, and expanded the family of USAGM broadcast networks. It started with Voice of America to counter Nazi propaganda. In response to the need to more actively counter anti-American narratives with concrete and timely factual reporting, Congress has established affiliate networks in various regions of the world— Europe, Asia, and the Middle East. Dismantling that family of networks cannot be squared with the public interest. By contrast, restoring VOA, RFA, and MBN to operate as Congress intended, providing news that that is "consistently reliable and authoritative, accurate, objective, and comprehensive" serves the interest of the American people. 22 U.S.C. § 6202(b).

The district court's preliminary injunction was tailored to provide necessary relief to the plaintiffs while the courts work to resolve their claims on the merits. The panel errs in staying

24

that injunction.  Rather than preserving the relative positions of the parties, this stay all but guarantees that the networks will no longer exist in any meaningful form by the time this case is fully adjudicated.  I regret that networks charged with exemplifying the ideals of free speech, free opinion, and a free press to the world at large are silenced by our own government's action in disregard of the expressed will of Congress—actions that, as the district court most ably explained, are likely to be found unlawful.

I respectfully dissent.

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

Mar. 14, 2025 Executive Order (Dkt. 16-1) .......................................................Add. 1

Apr. 14, 2025 Decl. of Crystal Thomas (Dkt. 88-4).........................................Add. 4

Mar. 22, 2025 Decl. of John Dryden (Dkt. 16-13) ...........................................Add. 8

Mar. 23, 2025 Decl. of Jon Schleuss (Dkt. 16-16) .........................................Add. 16

Mar. 26, 2025 Supp. Decl. of John Dryden (Dkt. 33-2) .................................Add. 47

Mar. 26, 2025 Supp. Decl. of Paula Hickey (Dkt. 33-3) ................................Add. 57

Mar. 15, 2025 Email from Crystal Thomas,
     Director, Office of Human Resources, USAGM (Dkt. 16-9)....................Add. 104

Apr. 16, 2025 Decl. of John Doe 4 (Dkt. 92-3) ...............................................Add. 107

Mar. 27, 2025 Decl. of Crystal Thomas (Dkt. 43)...........................................Add. 110

Mar. 23, 2025 Decl. of Thibaut Bruttin (Dkt. 16-15) ....................................Add. 114

*Widakuswara v. Lake*, No. 25-cv-1015 (RCL) (D.D.C), Apr. 25, 2025
     Order Denying Defendants' Motion for a Partial Stay Pending
     Appeal (Dkt. 104) ....................................................................................Add. 124

Apr. 14, 2025 Decl. of Jon Schleuss (Dkt. 92-1).........................................Add. 130

Apr. 17, 2025 Decl. of John Dryden (Dkt. 95) .............................................Add. 135

# EXHIBIT A

LIVE NOW

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

CONTINUING THE REDUCTION OF THE FEDERAL BUREAUCRACY

The White House

March 14, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  This order continues the reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary.

Sec. 2.  Reducing the Scope of the Federal Bureaucracy.

(a)  Except as provided in subsection (b) of this section, the non–statutory components and functions of the following governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law:

(i)   the Federal Mediation and Conciliation Service;

(ii)  the United States Agency for Global Media;

(iii) the Woodrow Wilson International Center for Scholars in the Smithsonian Institution;

(iv)  the Institute of Museum and Library Services;

(v)   the United States Interagency Council on Homelessness;

(vi)  the Community Development Financial Institutions Fund; and

**Add. 2**

(vii)  the Minority Business Development Agency.

(b)  Within 7 days of the date of this order, the head of each governmental entity listed in subsection (a) of this section shall submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent.

(c)  In reviewing budget requests submitted by the governmental entities listed in subsection (a) of this section, the Director of the Office of Management and Budget or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order.

 Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or  the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
March 14, 2025.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

Plaintiffs,

v.

KARI LAKE, Senior Advisor to the Acting
CEO of U.S. Agency for Global Media, et al.,

Defendants.

Civil Action No. 25-1015 (RCL)

**DECLARATION OF CRYSTAL THOMAS**

I, CRYSTAL THOMAS, hereby make the following declaration pursuant to 28 U.S.C. §

1746:

1.      I have been the Director of Human Resources for the U.S. Agency for Global Media

("USAGM") since 2024.  I base this declaration on knowledge and information I have gained in

the course of performing my official duties.

2.      In that capacity, I have personal knowledge of, and direct involvement, in personnel

decisions for USAGM.

3.      USAGM currently employs a total of approximately 1,147 full-time employees.  As

of March 14, 2025, USAGM had active employment contracts with 598 personal service

contractors.

4.      On March 14, 2025, President Trump issued an Executive Order directing that "the

non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent

consistent with applicable law, and such entities shall reduce the performance of their statutory

functions and associated personnel to the minimum presence and function required by law" (the

Add. 4

"Executive Order"). *See* Continuing the Reduction of the Federal Bureaucracy, https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ (Mar. 14, 2025).

5.      On March 15, 2025, pursuant to the Executive Order, USAGM placed 1,042 full-time employees on administrative leave with full pay and benefits. On March 16, 2025, and terminated the contracts with all personal services contractors. On March 26, 2025, all personal services contractors were reinstated and are receiving full pay and benefits, but they are not currently working. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order.

6.      In the course of that implementation, on March 25, 2025, I sent an email to 33 employees who work at Office of Cuba Broadcasting recalling them from administrative leave effective March 26, 2025. As of the end of the day on March 26, 2025, I can confirm that all employees were on work status. I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025.

7.      In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 69 other employees from administrative leave to provide mission support including broadcasting support for the Office of Cuba Broadcasting, facilities management, contracts management, and IT support. No additional employees have been placed on administrative leave.

8.      The American Federal Government Employees Local 1812 ("AFGE") serves as the exclusive representative for a bargaining unit consisting of approximately 713 USAGM employees. On March 25, 2025, I sent an email to the AFGE Local 1812 President enclosing a preliminary notification to the union stating USAGM's intent to implement a reduction in force ("RIF") for multiple competitive areas in USAGM in furtherance of the Executive Order.

9.     The American Federation of State, County and Municipal Employees Local 1418, AFL-CIO ("AFSCME") serves as the exclusive representative for a bargaining unit consisting of approximately 33 USAGM employees.  On March 25, 2025, I sent an email to the AFSCME Local 1418 President, enclosing a preliminary notification to the union stating USAGM's intent to implement a RIF for multiple competitive areas in furtherance of the Executive Order.

10.     Both of the foregoing notifications informed the respective unions of USAGM's intention to implement a RIF in a manner consistent with USAGM's Negotiated Labor Management Agreements ("NLMA") with each union.

11.     The notifications that were issued will not directly result in the termination of any USAGM employee.  Rather, it is a first step in the process of conducting a RIF, pursuant to the NLMAs with each respective union.  Additional steps in the RIF process with both unions will include, among other things, impact and implementation bargaining to the extent requested by the unions; providing additional information to the unions, including responding to union information requests; providing the unions with retention registers; and specific notice to bargaining unit employees.  Each of these steps would occur prior to removing any bargaining unit employees in the RIF implementation process.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 14, 2025
        Washington, District Columbia



                                        _____
                                        CRYSTAL THOMAS




3

Add. 6

# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

      Plaintiffs,

  -against-

KARI LAKE, et al.,

      Defendants.

No. 25 Civ. 2390

## DECLARATION OF JOHN DRYDEN

  I, John Dryden, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the president of the Voice of America Employees Union, Local 1418, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 1418" or "Union"). AFSCME Local 1418 is affiliated with AFSCME District Council 20 and AFSCME International Union. District Council 20, through its constituent local unions like Local 1418, represents federal civilian employees in agencies and departments across the federal government. I have served as president of Local 1418 since August 2020.

3. Both before and since becoming the local union president, I have been employed by the U.S. Agency for Global Media (USAGM) as a Radio Broadcast Technician for the Voice of America (VOA) in its Radio Studios. I have been employed at VOA for 17 years. VOA is overseen by USAGM, and is an international broadcasting state media network funded by the federal government. Its primary mission is to provide objective news and

1

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

information about the U.S., the audience's specific region and the world to people who

lack access to objective information. For over 80 years, VOA has broadcast content over

the radio, television, or the internet in almost 50 languages all over the world.

4.  AFSCME Local 1418 represents a collective bargaining unit of approximately 32

employees who work for USAGM on VOA.  The collective bargaining agreement

covering these workers is applicable, by its terms, to "all non-supervisory Radio

Broadcast Technicians employed by USAGM in the Radio Master Control" and "Radio

Studios" in Washington, D.C., as well as those "assigned to the New York News Bureau"

in New York City, NY.  Currently, all members of the bargaining unit work in

Washington, D.C. Some bargaining unit members have been in the past, and may also be

periodically in the future pursuant to the collective bargaining agreement, assigned to the

New York News Bureau, which mainly covers the United Nations, when the bureau there

produces radio programing or audio support for television.

5.  Under the collective bargaining agreement, AFSCME Local 1418 represents two types of

employees: Radio Broadcast Technicians (RBT) who work in Radio Studios and RBTs

who work in the Radio Master Control. These employees are generally responsible for

being present at each language service live broadcast studio at the time the language

service is producing a live show and engineering the live show for broadcast. These

employees are responsible for engineering live broadcasts of radio programing by

running the mixing console in the Radio Studios or working in the Radio Master Control.

Most of the bargaining unit members work in the Radio Studios. VOA broadcasts

approximately 49 live radio programs in different languages that these employees must

engineer to be broadcast. Some of these programs also have video components that are

Add. 9

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

broadcast on television or the internet. Engineering the radio programming includes setting up and running equipment for the radio broadcasts such as computer programs, audio and video files, microphones, lights, and cameras for programs with video components. Working under the direction of bilingual directors and producers who understand the language of the programing and can communicate in English with the RBTs, these employees operate the broadcast mechanics of live radio programs. RBTs are essential employees that are vital to maintaining uninterrupted broadcasting operations for VOA. For example, these employees are in the building 24 hours during snow emergencies, continued working during the entire pandemic, and must work during government shutdowns as essential staff.

6.   AFSCME Local 1418 represents the interests of the VOA's Radio Broadcast Technicians. Our core functions include providing support, guidance, and resources to bargaining unit employees as their officially recognized exclusive representative.

7.   As the exclusive representative for the nonsupervisory RBTs, AFSCME Local 1418 enters into collective bargaining negotiations with the USAGM, VOA on a wide variety of terms and conditions of employment and represents bargaining unit members through the negotiated grievance process.

8.   AFSCME Local 1418 and the USAGM, VOA are parties to a collective bargaining agreement that memorializes negotiated terms and conditions of employment, benefits, rules, a grievance procedure and other procedures of the workplace.

9.   Early on Saturday, March 15, 2025, I received a notice from the Director of Human Resources, Crystal G. Thomas, to my VOA email address informing me that "[p]ursuant to the Presidential Executive Order Continuing the Reduction of the Federal Bureaucracy

Add. 10

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

Case 1:25-cv-01015-RCL    Document 16-13    Filed 03/24/25    Page 5 of 10
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 44 of 169

– The White House and the Office of Personnel Management Guidance on Probationary Periods, Administrative Leave and Details and additional authorities, including but not limited to, 5 C.F.R. § 630.1403, effective immediately, the United States Agency for Global Media (USAGM) is placing you on administrative leave with full pay and benefits until otherwise notified." The email notice also stated that I no longer had access to USAGM systems or premises and may be required to return government property. The notice further stated that "[w]hile on administrative leave, you remain an employee of the Agency. You are required to comply with the instructions of your supervisors, all laws and regulations, and agency policies, including the Broadcasting Administrative Manual (BAM)." A true and correct copy of this notice is attached hereto as Exhibit 1.

10. Soon after receiving the administrative leave notice, bargaining unit members began notifying the union by phone, email and text message that the USAGM sent these employees the same administrative leave email that I received. I also received a call from a VOA supervisor informing me of the decision to place all bargaining unit members on administrative leave and that employees were prohibited from accessing the VOA offices.

11. On Saturday, March 15, 2025, several bargaining unit members were at the VOA offices working on weekend programing; because Master Control RBTs are required to be present in-person to broadcast programming, we have bargaining unit members on-site 24/7. These members were told by their supervisors to finish their live broadcasts and then to vacate the building because they needed to clear the building out. At approximately 5:00 p.m. on the same day, bargaining unit members lost access to USAGM systems, including email.

12. All bargaining unit members were placed on administrative leave on March 15, 2025.
USAGM did not provide the union advance notice of the decision to place employees on
administrative leave or provide the union with a list of all affected bargaining unit
members.

13. On March 19, 2025, I received an email from the USAGM Human Resources Director
informing me that I was no longer on administrative leave, and I regained access to my
VOA email. However, I was not returned to work as an RBT. As of the date of this
declaration, I am not aware of any other bargaining unit members who have been
removed from administrative leave and reinstated to their duties of broadcasting radio
programing as RBTs.

14. VOA broadcasting ended and went dark on Saturday March 15, 2025 for the first time in
the over 80-year history of the agency and radio broadcasting has not resumed as of the
date of this declaration. For more than 80 years, a Master Control RBT was required to be
in the Radio Master Control Facility 24/7 to make sure the VOA's radio programming
was broadcast around the world and for the first time, the Radio Master Control Facility
went dark when all RBTs were told they needed to vacate the building.

15. Since the administrative leave notices were sent to affected employees, the union has
been flooded with emails, texts, and phone calls from affected employees and other
bargaining unit members who are distraught and are concerned about their livelihoods
and the mission of their agency. Affected employees have contacted the union to seek
information, guidance, and explanations of their rights, including retirement rights for
those of retirement age because they are receiving only scant guidance from USAGM.

16. Affected employees are physically and emotionally stressed by the negative impact of the USAGM's decision to place all employees on administrative leave and the implications of this decision on their future employment with the VOA and their livelihoods. Members are worried about their ability to pay for housing, education, daycare, and to provide food for their families. Some members have decided to retire early because they cannot handle the financial uncertainty. Others are concerned that the agency's action will negatively impact their ability to retire. Affected employees are looking to their union to protect them and to provide information on their options if they are eventually terminated. The union has had to research information that in normal circumstances would have been provided by the agency to provide to members and has been forced to seek legal advice and resources from AFSCME International, the parent labor federation of AFSCME District Council 20, on union on members' legal rights.

17. The Union continues to respond to a flood of calls, texts, and emails from bargaining unit members. Members are asking for information on the future of their employment, as they are not getting information from the USAGM. Members are asking how long they will be on administrative leave; how payroll will be processed; how employees can submit timesheets for hours worked up until Saturday March 15 without access to USAGM systems; how can they retrieve their personal belongings left behind at the office; and how their retirement benefits will be affected if the VOA is shutdown. Those that are retirement eligible are asking the Union for advice on submitting retirement applications. The Union is providing almost daily updates by emails and text messages to the entire bargaining unit about what we know and can share about potential legal actions to

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

Case 1:25-cv-01015-RCL   Document 16-13   Filed 03/24/25   Page 8 of 10
USCA Case #25-5144   Document #2113400   Filed: 04/29/2025   Page 47 of 169

challenge the shuttering of the VOA, whether brought by our Union or other parties, and its critical work of broadcasting news and content to the global community.

18. Bargaining unit members and the Union are concerned about the negative impact of the USAGM's decision to shutter the VOA on its critical mission to provide information to people around the world who lack access to objective news. In Broadcasting, if your programing is on every day and suddenly you stop broadcasting your program, the station will begin to lose its audience, and you will never gain them all back. The taxpayers have invested more than 80 years into VOA programing that has built a loyal and broad global audience, and this investment can be destroyed in a very short amount of time. The danger to the public is that the global audience will not get any objective news about their own country or about the U.S. The mission of the agency is not being fulfilled by not broadcasting its programing and paying skilled and essential workers to stay home and not do their important work.  And many of our members do this work because of how deeply we believe in its mission, so we are deeply distraught to see that mission destroyed.

19. One of the most important parts of the VOA's programing that fulfilled the VOA's mission was the daily North Korean program. This broadcast is one of the few ways people in North Korea can get objective news of what is happening in the rest of the world. This programming delivers content that is critical to the North Korean people. For example, this program has a longer than usual weather news cast that provides detailed information about the weather because when people want to defect to China, they must walk there. Being able to check the weather for favorable conditions is crucial for their survival during the dangerous journey. Another important program is the broadcast into

7

Docusign Envelope ID: DAE4B163-A66E-4E5C-B439-EBC9BC2D81AD

Iran, where the public does not have access to objective news about the outside world and can receive VOA's satellite television broadcast.

20. Since the USAGM decided to place all VOA employees on administrative leave, the Union has had to divert virtually all of its time and resources to engage with the membership on this issue and address their concerns. Since the agency's decision, member representation has become my full-time job. I have been spending at least 8 hours per day addressing the concerns of bargaining unit members who are concerned about the future of their employment and their livelihoods. I have also had to coordinate with the local's executive board, District Council 20 and AFSCME International on how to communicate advice and counsel to our members. The local's vice president has also worked extensive hours each day assisting our affected members and investigating the issue. This representational work for the Union is only increasing because of the mass confusion caused by the abrupt shuttering of the VOA.

21. The substantial increase in emails, phone calls, text messages, and requests for counseling concerning the closing of VOA has diverted resources and time that the union dedicates to its mission of advocating and negotiating for improved workplace conditions, organizing new members, representing employees, and the administrative tasks to maintain the union.

22. Members of the VOA bargaining unit pay voluntary membership dues to the union, which is the union's overwhelming source of operational funding.  The union's budget will be negatively impacted because of the loss of dues if members are terminated, and its bargaining power will be diminished because of the loss of members due to potential terminations. We will also lose membership and dues if members choose to retire as a

Add. 15

Docusign Envelope ID: DAF4B163-466E-4E5C-B429-EBC0BC2D81AD

Case 1:25-cv-01015-RCL     Document 16-13     Filed 03/24/25     Page 10 of 10
USCA Case #25-5144     Document #2113400     Filed: 04/29/2025     Page 49 of 169

result of the uncertainty the USAGM has caused. To my knowledge, three members have submitted retirement applications and others are considering doing the same.

23. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Germantown, MD on the 22nd day of March, 2025.

Signed by:

*John Dryden*

98042BA9D222416

John Dryden

**Add. 16**

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                 Plaintiffs,

   -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 2390

**DECLARATION OF JON SCHLEUSS**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the International President of The NewsGuild-CWA, AFL-CIO ("TNG-CWA"), a labor union representing more than 27,000 employees. TNG-CWA is the largest labor union representing journalists and media workers in North America.

3. TNG-CWA represents a bargaining unit of about 100 employees of Radio Free Asia (RFA), a news service that provides news, analysis, commentary, and cultural programming to a weekly audience of nearly 60 million who lack access to a free press or live in media environments vulnerable to authoritarian disinformation.

4. RFA operates under a Congressional mandate to deliver uncensored, domestic news and information to China, Tibet, North Korea, Vietnam, Cambodia, Laos, and Burma, among other places in Asia with poor media environments and few, if any, free speech protections. RFA produces news in Burmese, Cantonese, Khmer, Korean, Lao, Mandarin, Tibetan, Uyghur, and Vietnamese for shortwave and medium wave radio, satellite

1

**Add. 18**

television, and online through websites, apps, and social media platforms. RFA's news

programming in nine languages provides accurate and timely information in countries

whose governments prohibit access to a free press.

5. RFA is a private, nonprofit corporation, funded by the U.S. Congress through an annual

grant from the U.S. Agency for Global Media (USAGM), an independent federal

government agency that oversees all U.S. civilian international media.

6. The mission of USAGM is to inform, engage, and connect people around the world in

support of freedom and democracy. USAGM programs—Voice of America, Radio Free

Europe, Office of Cuba Broadcasting (Radio Marti), RFA, and the Middle East

Broadcasting Networks—all share in common a mission to promote democratic values by

providing accurate, uncensored news and open debate in countries where a free press is

threatened and disinformation is pervasive.

7. TNG-CWA, through its local union, the Washington-Baltimore News Guild, and RFA

are signatories to a private-sector collective bargaining agreement ("CBA"), governed by

the National Labor Relations Act (NLRA), which governs wages, benefits, and other

terms and conditions of employment and runs through December 31, 2025.  Under the

CBA, TNG-CWA is recognized as the exclusive collective bargaining agent of all full-

time and regular part-time language service employees, including Journalists, Digital

Content Producers, Administrative Assistants, Administrative/Productive Assistants,

Web/Social Media Editors, Web Outreach Specialists, Production Coordinators, and

Production Specialists employed by RFA in Washington, DC, but excluding all Senior

Editors, including Senior Web/Social Media Editors, Senior Digital Content Producers,

Senior Multimedia Producers, editorial department employees, contractors, professional

Add. 19

employees, managers, guards, and supervisors as defined in the National Labor Relations Act.

8. On March 13, 2025, a TNG-CWA member at RFA received confirmation from RFA's Executive Editor that USAGM had cut RFA's wire services contracts with the Associated Press and Agence France-Presse—which are an essential tool for journalists that provide the right to republish news produced by hundreds of journalists from those newsrooms. The Executive Editor said RFA employees would lose access to these necessary work tools at the end of that day.

9. On March 15, 2025, RFA's President issued a press release stating that RFA had been informed that day by USAGM that RFA's federal grant agreement, which makes possible RFA's operations in Asia and globally, had been terminated. RFA's President issued a statement that "[t]he termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would like nothing better than to have their influence go unchecked in the information space. RFA has been foundational in helping U.S. policymakers understand the reality of what's happening in China and other closed countries, bringing transparency and accountability where there is none…. Today's notice not only disenfranchises the nearly 60 million people who turn to RFA's reporting on a weekly basis to learn the truth, but it also benefits America's adversaries at our own expense."

10. On March 19, 2025, RFA employees received notices stating 75% of the U.S. based staff would be placed on unpaid furloughs starting on Friday, March 21, 2025, which is the furloughed employees' last day of pay. RFA's human resources department notified employees on March 19, 2025 who would be subject to furlough. RFA management

asked TNG-CWA for the ability to determine which employees will be furloughed. RFA management said employees located in other countries will not be subject to the furlough. RFA did not indicate how long the furlough will last, but RFA stated that health insurance and other benefits like life insurance, disability, dental and vision will only be maintained through the end of April 2025, after which RFA will inform furloughed employees of any changes. RFA has, however, already provided employees with information on how to obtain healthcare coverage in anticipation of employees losing health insurance after April 2025.

11. As President of TNG-CWA, these events at RFA have been reported to me directly by bargaining unit members who work for RFA. A core function of our union includes providing support, guidance, and resources to bargaining unit employees as their statutory representative under the NLRA. The changes to the working conditions at RFA due to USAGM funding cuts will require TNG-CWA to bargain over the effects of those changes with RFA. And because the overwhelming majority of TNG-CWA funding comes from bargaining unit employees' membership dues and fees deducted from their paychecks, the furlough and any other action that reduces worker wages due to USAGM cuts will harm TNG-CWA directly by reducing the income it receives and uses to represent the employees' interests.

12. Affected RFA employees are heartbroken and stressed by the negative impact of unpaid furloughs for a large number of colleagues, RFA funding writ large, and the unexpected and abrupt cancellation of their news wire services. These sweeping changes put pressure on their lives, the lives of their families, and decimate their important work for RFA fighting anti-democratic forces by producing news and promoting a free press. For

instance, a Uyghur Service employee reports that their work at RFA has already resulted in severe consequences for their family in China. Due to their reporting on human rights abuses against Uyghurs, they have lost all contact with relatives in China, witnessed family members being harassed by authorities, and had loved ones detained or sent to internment camps as punishment for their work at RFA. The impending furlough exacerbates these risks, as family members may be seen as even more vulnerable to retaliation. Moreover, the silencing of these journalists weakens global efforts to hold authoritarian governments accountable for their actions.

13. The situation at RFA is extremely time-sensitive and requires immediate action. A number of RFA employees are present in the country and work for RFA pursuant to nonimmigrant work visas. RFA has thus far prioritized continuing the employment for employees in the U.S. on nonimmigrant work visas, while furloughing other staffers. However, because of losing their grant from the U.S. Agency for Global Media, RFA will likely soon not have the resources to continue employing staff in the U.S. on nonimmigrant work visas. If that happens RFA will terminate these employees, requiring them to uproot their lives and return to their home countries where several are likely to face retaliation and persecution because of their press freedom work at RFA. This creates a serious risk of immediate harm. For instance, the majority of employees in Cantonese Service fled from Hong Kong when the Chinese Communist Party led a brutal crackdown on democracy advocates and journalists. They will be targeted by the Chinese government if they are forced to return.

14. Before becoming President of TNG-CWA, I was a journalist for many years, including at the Los Angeles Times where I was a member of TNG-CWA. TNG-CWA also represents

5

journalists at major news organizations such as the New York Times, Wall Street Journal, the Associated Press, Agence France-Presse, the Philadelphia Inquirer, Boston Globe, and many more.

15. Although TNG-CWA members' jobs are based in the United States and Canada, some members, such as reporters and photojournalists, report on stories that require travel to other countries, including countries where USAGM programs, such as RFA, broadcast to combat the lack of a free press.

16. For example, the 2022 Olympic Games were held in Beijing, China—and many stateside TNG-CWA members attended to report. Ahead of the 2022 Olympics, RFA itself reported on the risks to reporters of being present in China where there is no media freedom. "The Chinese government had pledged to respect media freedom, labor rights and peaceful demonstrations during the Olympics. But there is no evidence that it has followed through," RFA reported, citing Amnesty International. And during the games, Human Rights Watch reported that Chinese media censorship continued, including on both state television and the internet as accessible in China. But the in-country availability of RFA helped to mitigate the inherent dangers to journalists stemming from censorship, by allowing for the free flow of information, over radio airwaves and online, into China.

17. Maintaining a free and independent press is fundamental to the journalistic profession—TNG-CWA members simply cannot do their jobs without it, and the promotion of freedom of the press worldwide is a core part of TNG-CWA's mission. Article I of the TNG-CWA Constitution, titled "Name and Object," includes in its mission "to improve the working conditions of its members; to guarantee . . . constant honesty in news,

Add. 23

editorials, advertising, and business practices; [and] to raise the standards of journalism and ethics of the industry."

18. USAGM programs, including but not limited to RFA, further TNG-CWA's fundamental organizational mission by (1) improving its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protecting their safety in those countries by allowing for the free flow of information into countries otherwise beset with government censorship; and (3) promoting the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

19. The furlough will also adversely impact the work of these journalists. I know from my own experience as a radio journalist that listeners can be lost when broadcasts go silent. The people who listen to RFA are dependent on it for unbiased news in the despotic countries where they reside and are inundated with state media that is nothing more than propaganda. When RFA goes silent, these people will not only give up on RFA as a news source but also on the ideals of democracy, a free press, and free speech that RFA has fostered in these countries. Even if RFA resumed or was replaced in the future, there is no guarantee listeners will return once the broadcast goes silent. Once listeners or viewers lose access to RFA's programming, they may turn to other sources of information, including state-controlled media, and may not return even if RFA's services are eventually restored. This could result in an irreversible setback to RFA's mission of providing uncensored news and promoting democratic values in these regions.

20. I've received more than two dozen statements from our union members at RFA explaining the impacts the furloughs will have on their personal lives and on their role as

Add. 24

journalists. These statements are attached to this declaration as Exhibit 1, with union

members' names redacted to protect the privacy and safety of these workers. Some of

these statements note the risk to RFA journalists personally of losing their nonimmigrant

work visas and having to return home to countries where they could be persecuted due to

their work for RFA as journalists, such as Vietnam, or China, or the danger that a loss of

RFA programing will expose their family members to retaliation abroad. Several of our

members highlight their roles as the chief breadwinner in their households, supporting

spouses, children and elderly parents. Several identified medical issues that are treated

through their employer-provided health insurance. Our members also highlight the value

of their work, from reporting on human traffickers, to genocide to coverage of North

Korean defectors, and emphasize how the role of the free press in the countries served by

RFA will be undermined if RFA's broadcasts are curtailed or eliminated.


Executed at Washington, D.C. on the 23rd day of March, 2025.


_____
                    JON SCHLEUSS

Add. 25

▮▮▮▮▮

I was raised in South Korea by my grandfather, who came from North Korea.

I was fortunate to study in the United States and was drawn to the mission of delivering information to North Korean citizens.

This passion led me to join Radio Free Asia (RFA), where I have been working for the past three years. I have always found deep fulfillment in my work, but recently, I was hit with the shocking news that the company might shut down.

I had been planning to stay in the U.S. through my work and eventually become an American citizen, but this unexpected development has put my future in jeopardy. Just last year, I purchased a home and am still paying off the mortgage. On top of that, my wife is currently pregnant, and we are expecting our child soon.

Beyond the financial strain, my family is experiencing significant emotional distress due to the uncertainty surrounding our future. I am determined to return to my work—not only for my family but also for the North Korean people who rely on our broadcasts.

I would be truly grateful for any support you can provide.

▮▮▮▮▮

I am a Researcher at Radio Free Asia (RFA), specializing in audience research across all of RFA's language services. My work ensures that RFA's reporting reaches people in repressive environments where independent news is blocked.

The funding freeze by the U.S. Agency for Global Media (USAGM) has already disrupted my work and created constant uncertainty about my job. I'm worried about my future. My salary covers rent, bills, and daily expenses—losing it suddenly would be devastating for me and my family. The fear of job loss, combined with the intensity of my work, has affected my sleep, focus, and overall well-being.

This is more than just a job to me. My work is highly specialized, and if I'm forced out, I may not find another role like this. The freeze has already stalled my growth and left me feeling stuck.

The funding freeze has taken a great toll on me —financially, emotionally, and professionally. I urge the court to act now and restore RFA's funding before the damage becomes irreversible.

████████

RFA Korean Service has a mission to broadcast radio programs to North Korea, providing them with external information and ensuring their right to know. In addition, through the testimonies of North Korean escapees who have settled in countries such as the United States, South Korea, and Europe, RFA continues to raise issues and hold accountable the human rights violations occurring in North Korea. Escapees have few platforms where they can cautiously share the painful experiences they went through in North Korea and during their escape, including violence, sexual violence, human trafficking, persecution, detention, and forced repatriation.

At RFA, we believe that the ability to send messages to North Korea allows the North Korean people to realize they live without freedom. In particular, North Korean escapees who were caught by Chinese authorities during their escape, are not recognized as refugees. Not recognizing them as refugees is against the international law because they will face serious persecution and imprisonment, and in the worst case, execution if repatriated to North Korea. Escapees speak out for their families and friends who are going through such ordeals, urging an end to these practices.

If the RFA broadcasts stop, the opportunity for people in North Korea to hear the truth will disappear. This is a matter directly connected to the safety and lives of North Korean people. The North Korean regime thoroughly bans its citizens from listening to foreign broadcasts, yet it listens to them itself.

Then the regime impose even harsher laws and policies to control the people. RFA is a critical mechanism that upholds a core value pursued by the United States: protecting freedom of speech and standing against authoritarian systems.

████████

I am ███ from RFA Burmese Service. I have been working at RFA for over seven years. Back in my country, Myanmar, people have been struggling in many different ways after the coup.

Countless innocent lives have been lost to military attacks. Many civilians are arrested just for opposing the junta. The future of our youth is shattered under military conscription. Refugee numbers keep rising as people flee for their lives.

Many people are suffering due to civil war and economic crisis, struggling to survive each day.

Exhibit 1
Schleuss Declaration

Moreover, they are helpless and hopeless in the presence of human rights violations and crimes against humanity.

Through RFA, we share with the world how Burmese people are being oppressed under military rule. Their voices must be heard. Their suffering must not be ignored. And their fight for freedom must not be forgotten.

Especially, in most areas, where the internet access is blocked, people rely on RFA radio for news and information. Our broadcasts remain a vital lifeline for them.

They need RFA as a trusted voice to bring the truth to those who need it most.

I am a journalist at Radio Free Asia's (RFA) Uyghur language service, where I have spent the past 15 years investigating state repression in China, particularly in the Uyghur region (Xinjiang). My reporting has exposed the mass surveillance, arbitrary detention, and forced labor that Uyghurs and other ethnic minorities endure.

The funding freeze imposed by the U.S. Agency for Global Media (USAGM) is devastating, not only for RFA's mission but for me personally. This freeze has put my family's financial stability at risk. My salary covers our mortgage, bills, and daily expenses, and I am now deeply worried about how we will make ends meet if RFA is unable to pay us. Even more critically, my health insurance—and that of my entire family—is tied to my employment.

As someone battling diabetes, I rely on daily insulin shots to survive. Losing my job would mean losing my healthcare, putting my health in immediate danger. The stress and uncertainty caused by this funding freeze have severely impacted my mental and physical health. Since learning about USAGM's decision to cancel RFA's grant, I have been unable to sleep properly and frequently suffer from headaches, nausea, and extreme stress. My blood glucose levels—despite daily insulin shots—have skyrocketed, putting me at even greater medical risk.

This situation is not just a financial crisis   it is a direct threat to my health, my family's well-being, and my ability to continue my work. I urge the court to immediately restore RFA's funding before the harm becomes irreversible.

My name is ▮▮▮▮▮▮▮ and I worked as a journalist at Radio Free Asia (RFA) for seven years, directly contributing to broadcasting efforts targeting North Korea.
I am a South Korean national living alone in the United States, and my employment at RFA has been my sole means of financial support.

The USAGM's decision to freeze funding for RFA, along with the looming possibility of sudden termination, poses an immediate and severe threat to my livelihood. If I am furloughed and subsequently laid off without any preparation or financial assistance, I will face the following challenges:

1.  As a South Korean national living alone in the U.S., I will struggle to meet my basic living expenses.

2.  My salary is the sole source of income covering my monthly mortgage and other essential costs. Without my job, I will be forced to rely on unemployment benefits, which will be insufficient to cover my mortgage and basic living expenses.

I immigrated to the United States 16 years ago and legally obtained permanent residency. I also relocated to Washington, D.C., specifically for my role at RFA. If my job is abruptly eliminated, I will be left in an extremely precarious financial situation within just one month.

I urge those in decision-making positions to recognize the devastating impact of this funding freeze and potential termination, not only on me but also on many other dedicated journalists who have committed their careers to the mission of independent journalism.

---

▮▮▮▮▮▮▮

I am writing to you today with a heavy heart to express my profound concern regarding the announced closure of Radio Free Asia (RFA). I have dedicated the past 17 years of my life to RFA, having joined the organization in 2008.

On the partition wall of my desk at the RFA office in Washington, D.C., I have proudly displayed a letter from North Korea titled "To ▮▮▮▮▮▮▮, Reporter, Radio Free Asia, Washington, D.C., USA." This letter, a fax I received in April 2012 from a North Korean defector named ▮▮▮▮▮▮▮, began with the words, "Greetings, I am ▮▮▮▮▮▮▮ from North Korea. I am currently in a small city in ▮▮▮▮▮▮▮, China."

In her message, ▮▮▮▮▮▮▮ explained that she had been listening to RFA broadcasts and had memorized my name and fax number. Desperate to escape the watchful eyes of the North Korean authorities in China and reach the free world, she pleaded for our assistance.

This letter served as undeniable proof that our broadcasts reached the people of North Korea and could profoundly impact their destinies. It is with this understanding and a deep sense of purpose that I have spent the last 17 years working joyfully and gratefully at RFA.

My time at RFA has been filled with meaningful experiences. In 2013, I was honored to receive a Bronze Award at the New York Radio Festival for a program I produced covering North Korean defectors who had settled in London after the 2012 Olympics. Despite their newfound freedom, their longing for their homeland remained, evident in their passionate support for the North Korean athletes. This story highlighted the complex emotions and enduring connections of those who have left North Korea.

Just as my broadcasting career flourished at RFA, so too did my family. My two daughters, who were seven and four years old when I joined RFA, have now grown into university students. I have always cherished my work at RFA, finding immense satisfaction in serving as a voice for the voiceless in North Korea.

Therefore, it was with utter shock and devastation that I received the news in March 2025 that RFA, an organization I consider my "home," would be closing its doors. Having built my entire life in the United States alongside my work at RFA, this news has been more impactful than any other event in my life. Sleepless nights are now common as I face the daunting reality of covering my daughters' university tuition and our home mortgage. Furthermore, the prospect of no longer being able to connect with and broadcast to our North Korean listeners, the very people who made my work so fulfilling, is a source of deep despair.

I implore you, esteemed members of Congress, to please extend your support to ensure that RFA can continue its vital broadcasts to the people of North Korea.

When I immigrated to the United States in my thirties after getting married, I carried with me the hope of achieving the "American Dream." I earnestly request your assistance in ensuring that this dream can still have a happy ending.

Thank you for your time and consideration of this urgent matter.

---

My name is ▮▮▮▮ and I joined RFA in January 2025 as a Digital Content Producer. At RFA, I have produced videos and podcasts on topics the Vietnamese government desperately wants to keep hidden. My reporting has exposed political corruption, the suppression of free speech, and human rights abuses.

Unlike many of my colleagues who use pseudonyms to protect their identities, I chose to appear on camera, making my face and name publicly known. I believed that reporting from the United States - and RFA's affiliation with the U.S. government - would offer me protection.

On March 14, 2025, an executive order titled "Continuing the Reduction of the Federal Bureaucracy" was signed by President Donald Trump, mandating cuts to the United States Agency for Global Media (USAGM), RFA's overseer. Because my H-1B visa is directly tied to my employment with RFA, the potential dismantling of USAGM now hinders my ability to remain in the U.S.

If I lose my job, I could be forced to return to Vietnam - where I am now a known figure in independent journalism and a direct target for government retaliation.

The Vietnamese government has a long history of persecuting journalists, particularly those affiliated with RFA. Many of my colleagues have been harassed, detained, or imprisoned for their reporting.

I am at high risk of harassment and intimidation by Vietnamese authorities, a prolonged prison sentence for "anti-government propaganda" charges and both physical, psychological abuse. The constant fear of persecution, imprisonment, and potential torture also take a severe toll on my mental health, subjecting me to relentless anxiety, stress, and psychological distress.

Returning to Vietnam is not just a risk - it is a direct threat to my safety. I have spent my career fighting for the truth, and now, that very truth puts me in danger.

I am seeking protection because I know that I will be threatened and tortured if I return. The Vietnamese government sees me and my work as a threat, and they have repeatedly demonstrated that they will go to great lengths to silence voices like mine.

---

██████████

I've been working at Radio Free Asia since May 2017. I started as a contractor and became a regular employee in April 2019. My family grew with Radio Free Asia.

During my employment, I got married, had a baby, and bought a house. This company means so much to me and my family.

What RFA is experiencing now, and what I'm about to experience, furlough or layoff will have a significant impact on my loving family financially.

My family's monthly income is my family's monthly spending. What I get in my paycheck has to be spent in order to sustain my family's daily living.

With a serious car accident I had in October last year, it already added financial burden to my family with car payment for a new car, on top of more than $2500 mortgage per month. Without consistent income from RFA, I do not see a future for my family. Dismantling RFA will also dismantle my family's life.

Not only financially it will impact my family, it will also be a threat to my family's health. With uncertainty that health insurance would continue, we are on the edge of harming my husband's medical condition. My husband, a loving father, is a patient who must take a certain medication daily. I also have a six year old daughter, a kindergartener who is vulnerable to severe illness from various viruses and diseases.

Not only in my personal life, but my heart is also with all those people living in closed countries where they don't have freedom of press. Radio Free Asia's mission to deliver uncensored news is my mission…our mission which must continue.

---

My name is ████████, and for the past three years, I have worked as a journalist for the Korean service at Radio Free Asia (RFA), under the U.S. Agency for Global Media (USAGM). The recent executive order demanding the termination of non-essential USAGM activities and staff layoffs has put my livelihood and the mission I've dedicated myself to at risk. I am writing this letter to share my personal struggles and the devastating impact this decision will have on me and the North Korean people I serve.

For three years, I've poured my heart into delivering uncensored news to the people of North Korea, a country where freedom of the press does not exist. One of the most meaningful moments in my career came when North Korean defectors who visited our office told me they had listened to Radio Free Asia and, through our broadcasts, awakened to the value of democracy—ultimately inspiring them to escape. That day, I felt an overwhelming sense of purpose, knowing my work wasn't just reporting but a lifeline of hope for people yearning for freedom. Now, if this broadcast is silenced, North Koreans will be left with only the state-controlled media, further deepening their indoctrination. The thought of this breaks my heart.

On a personal level, I am consumed with anxiety. The fear of losing the job I love—due to the cutoff of government funding—haunts me every day. I left my beloved parents in South Korea and have endured loneliness and hardship in the U.S., all because I take pride in countering

authoritarian propaganda with truth. But if I lose my job, I won't be able to pay my rent, and the uncertainty keeps me awake at night. Every morning feels like a struggle to face the day.

I have always believed, without a doubt, that America is a great nation. I trust that Congress has the power to stop this crisis. You've allocated funds to USAGM, including Radio Free Asia, to support this mission—a mission that's not just about my job but about keeping hope alive for millions in North Korea. I beg you to hear our voices and take action to reverse this situation.

6:10 AM. In front of the IMF headquarters building. I am the last passenger. After getting off the bus, I absentmindedly walk away as if it were my habit. It takes about 15 minutes to walk to work. I have been doing this for the past three years. I have no choice but to interview North Korean defectors in South Korea. I have been doing this for three years.

I joined RFA at the end of 2010. Thinking back, 15 years have already passed. This is the first time I have worked at one company for this long. The reason I applied to RFA was because it was 'special.' It was special that it was an American broadcasting station, but it broadcasted in Korean, and the fact that the listeners were North Koreans was special. Before I knew it, I was becoming a special reporter.

The purpose of RFA's Korean broadcasting is to deliver accurate and fast news of the world to North Koreans who are living a difficult life in North Korea. It is not a propaganda broadcast that says, "Abolish the leader and gain freedom." Our job is to convey things as they are.

I visited Tanzania in Africa to cover North Korean medical staff who gave patients unnamed medicine and treated them illegally. I met North Korean workers in Kuwait, a Middle Eastern country where they work hard in the middle of the desert while being hit by sandstorms, but most of their income is taken away by North Korean authorities under the pretext of loyalty funds. I drew a lot of attention by analyzing satellite photos and reporting that North Korea was pouring waste from uranium mines directly into the river.

As a result, all North Korean hospitals in Tanzania were closed, and all North Korean workers in Kuwait returned to North Korea due to the timing of the report and the sanctions against North Korea.

I was living with pride in doing meaningful work for the North Korean people, but when I suddenly heard the news that the broadcasting station was closing and that a significant number of employees would be laid off, my heart was truly broken.

I was worried about how I was going to live right now. How was I going to pay the mortgage, water bill, and other utility bills? Tuition and living expenses for my children who are attending graduate school and college are also issues, but what I am most worried about is health insurance. Without health insurance, I would not be able to afford the cost of the medicine I am currently taking. I would not be able to go to the hospital if my children suddenly get sick or get hurt.

I hope that everyone will pay attention and support me so that my family's safety and stability, and my determination to work for the freedom of North Korean people that I made when I joined the company, do not break or disappear in the middle.

---

████████████

I am writing this letter to formally testify to the anticipated impact that my upcoming furlough from Radio Free Asia's (RFA) Uyghur Service will have on my life, my family's financial stability, and the safety of my relatives abroad. While I have not yet been furloughed, my employment at RFA has already exposed me and my loved ones to harassment, intimidation, and retaliation by the Chinese government.

Financial and Personal Hardship

The prospect of losing my position at RFA is already causing significant distress and uncertainty for my family. As the primary provider, I am deeply concerned about my ability to:
• Pay rent and mortgage to ensure stable housing for my family.
• Cover daily living expenses, including food, utilities, and childcare.
• Support my children's education, which could be affected by financial instability.

Without this job, I will lose not only my livelihood but also the sense of security and stability that my family depends on. The stress and anxiety surrounding this situation have already begun affecting our daily lives.

Retaliation Against My Family and Loss of Contact

Even before my impending furlough, my employment at RFA has already resulted in severe consequences for my family back home. Due to my work exposing the Chinese government's human rights abuses against Uyghurs, I have:
• Lost all contact with my relatives in China—the Chinese government has cut off communication, making it impossible for me to check on their safety.
• Witnessed my family members being harassed by authorities simply because they are related to me.
• Had loved ones detained or sent to internment camps as punishment for my work at RFA.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 19 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 107 of 208

Exhibit 1
Schleuss Declaration

This is not just a fear—it is a reality that has already unfolded for me and my family. The Chinese government has a long history of punishing Uyghurs abroad by targeting their relatives. I have lived under this threat for years, knowing that my reporting at RFA has put my family at risk. Now, with my impending furlough, I fear that my relatives will face even greater danger, as they will be seen as even more vulnerable.

Impact on My Daily Life and Future

Beyond financial and safety concerns, this furlough will have a significant impact on my mental and emotional well-being. I anticipate facing:
• Uncertainty in my career, with limited job opportunities in my field.
• Inability to continue my crucial work, which will hinder efforts to expose human rights abuses in my community.
• Emotional distress, knowing that my family may be at greater risk while I lose my primary platform for advocacy.

This is not just about my personal employment—it is about the silencing of journalists who have dedicated their careers to exposing injustice. The decision to furlough Uyghur journalists from RFA will not only impact our livelihoods but will also weaken global efforts to hold the Chinese government accountable for its actions against Uyghurs.

I urge you to consider the serious consequences of this furlough on my life, my family's security, and the broader Uyghur community. This is not just a personal crisis but a broader issue of press freedom and human rights.

Thank you for your time and attention.

---

I have a thyroid condition that requires regular medical checkups. This August, I have my annual thyroid ultrasound to make sure things haven't gotten worse. I need to monitor it regularly to check for any signs of cancer. Without my company's health insurance, I simply can't afford the high cost of these medical expenses.

I also have to support my parents. My parents are elderly and already struggling with health issues. They're not in a position to work and earn money.

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 20 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 108 of 209

Exhibit 1
Schleuss Declaration

I'm 35 years old this year. I have to put off my plans to start a family and have children. Brining a child into the world is in such an unstable situation would be the most reckless decision my husband and I could make.

My husband's salary barely covers our mortgage, insurance, and other essentials – there's nothing left after that. And unemployment benefits? There's no way they'll be enough to support a family of four.

Losing my job so suddenly is terrifying—it feels like my entire life is being upended overnight. How am I supposed to survive in this insane economy with no income? This situation isn't just stressful—it's devastating. Please take this situation into consideration and help save me and my colleagues. Thank you.

---

█████████████

For the past three years, I have been reporting on human trafficking stories.

I began, after a mother contacted me, asking for help in rescuing her daughter.

I am proud, that I've been able to help re-unite so many young Lao people with their families.

They called me, asking RFA to help, as authorities in Laos told them they could not do nothing.

Many trafficking victims come from poor families. They have no money to pay the Chinese scammers for their freedom.

Both parents and the young people trapped in scammed centres, all told me that without RFA's help, they would have no future.

Seeing the thousands of people released from scam centres this year, I know that media coverage and RFA helped make that happen.

---

████████████

My name is ████████████, senior editor of RFA's Lao Service.

I have worked with RFA for 11 years, covered and reported many issues. In particular, human rights violation is the main issue the Lao people are facing. RFA has played an important role in letting their voices be heard outside.

In September 2019, I covered a man arrested with court warrant for land conflict with local authorities. After his arrest was published and human rights group alarmed, he was released in November.

In January 2024, I also reported exclusive news on the arrest of six people in Xieng Khoaung province, northern Laos because they staged the protest for land conflict. In February, they were released.

There are also corruptions, environmental issues, displacement of local people due to hydropower projects I have not stated in the statement since I worked with RFA. For Lao people, RFA not only reports news, but also has become a symbol of speech.

---

My name is ████████████████████████ from Cantonese Service of Radio Free Asia (RFA) and an asylum seeker from Hong Kong. I am deeply grateful for the U.S. government and RFA for giving me a safe space to practice independent journalism. To me, it is a very rare opportunity allowing me to keep on fighting for Hong Kong's press freedom and democracy after I was forced to leave my homeland in fear of persecution. I want to keep on fighting with all these brave RFA journalists on the Land of the Free. We don't want to stop here, leaving an unfinished mission with regrets.

All my personal friends, either in Hong Kong or self-exiled to Taiwan or the UK, counted on RFA as the only source of reliable news when Hong Kong is flooded with lies and propaganda of the Beijing authorities. Termination of funding to RFA means the fall of the last bastion of press freedom of Hong Kong, leaving Hongkongers in complete darkness and fear.

I am the only breadwinner of my family. As an alien seeking asylum here in the U.S., I used to be proud of my self-sufficient when I worked for RFA. The closure of RFA just makes my world up-side-down. My mother, who is 89, has just been discharged from the hospital this week after surgeries for her acute internal bleeding and kidney failure. The funding freeze of RFA would make me impossible to pay for my mother's huge medical bills and her follow-up healthcare costs, not to mention my taxes due soon.

Some of my colleagues are relocated to the U.S. office under working visa after RFA closed our Hong Kong office under the threat of the National Security Law. The Hong Kong government

had repeatedly alleged RFA Cantonese journalists for "smearing" the authority, which could be
an offence under the draconian national security laws of the city.  The shutdown of RFA means
my colleagues, and me as well if my asylum application is not approved, would have no choice
but return to our homeland and face the persecution of the Hong Kong and Beijing authority for
working with RFA, alone!

I sincerely urge the Congress' help to resume funding to RFA.

---

█████████████

When I joined RFA nine months ago, it felt unreal. Surrounded by dedicated individuals working
on stories half-a-world away and truly making a difference gave me assurance that my work
would also have a real impact on people's lives.

Today, as I learned that I and many of my colleagues have been furloughed due to the funding
freeze, I cannot help but feel for our organization. Our journalism shines a light on autocratic
regimes and provides an alternative voice to their propaganda.

In Laos, the media is controlled by the state. So-called development projects have disrupted the
lives of ordinary people. Their concerns often go unheard and unresolved. We are the voice for
those people. They message us and ask us to tell their stories. Because of the loss of land and
access to resources, many seek labor in neighboring countries, often risking their health and
safety. They turn to us when they lose hope. RFA Lao Service has reported these injustices and
helped to free victims of scam centers. I am proud to help do this work.

This funding freeze has affected me personally. Not producing content informing our online
audience now, I will not be able to survive for more than a couple of months without any income.
I moved to the DC area from another state, leaving my home and hoping to make a new start
doing something I have come to love. My wife, who has an auto-immune disease, needs constant
medical care. I don't know what we will do, where we will soon live, and how my wife will deal
with the loss of medical care.

I implore the members of Congress to take action and restore funding to RFA for the sake of my
colleagues, for the thousands of whom RFA has helped, and for the millions of people who rely
on our honest and courageous reporting.

---

████████████

Exhibit 1
Schleuss Declaration

I am writing to you as a dedicated employee of Radio Free Asia (RFA) and someone from Taiwan to share my testimony and urge your support in preventing the dismantling of this vital organization. As a younger member of RFA's workforce, I have had the privilege of working with the organization for over three years, serving both at its headquarters in Washington, D.C., and at its overseas office in Taipei, Taiwan—my home. Through this experience, I have seen firsthand the critical role RFA plays in delivering accurate, unbiased information, especially as tensions between Taiwan and the People's Republic of China grow increasingly tense.

I am deeply troubled by the prospect of RFA's shutdown, particularly given the current situation in the Taiwan Strait. As someone from Taiwan, I have watched with concern as the PRC intensifies its military drills and as my country responds with rare practices of rapid troop mobilization—a step Taiwan does not often take. These developments point to a dangerous escalation, with some warning that conflict could erupt as early as 2027. If war breaks out, misinformation from mainland China will flood the internet, obscuring the truth about what is happening in my region.

Radio Free Asia is uniquely equipped to counter this threat. For years, RFA has provided reliable reporting that cuts through propaganda, offering clarity not only to the U.S. government but also to the global public—including people in Taiwan and beyond. In the event of a conflict, RFA would be an indispensable resource, ensuring that accurate information reaches American policymakers and citizens worldwide who seek to understand the stakes. Shutting it down now, when its work is more essential than ever, would be a profound loss.

I respectfully urge you to advocate for the preservation of Radio Free Asia and to oppose any efforts to dismantle it. This is not just about an organization—it's about ensuring that truth and transparency prevail at a time when they are desperately needed.

Thank you for your time, consideration, and leadership. I hope you will lend your voice to this urgent cause.

---

I have been working at RFA for 19 years and seven months, covering human rights issues such as land confiscation, labor rights, children and women's rights, and environmental concerns and others.

RFA serves as a vital source of information for Burmese people living under military rule. Media in Burma has faced strict censorship since the military coup of 1962.

In 2024 Reporters without Borders (RSF) World Press Freedom Index, Burma ranked 140th out of 180 countries, reflecting its ongoing repression of press freedom.

Case 1:25-cv-01015-RCL   Document 16-16   Filed 03/24/25   Page 24 of 30
USCA Case #25-5144   Document #2113400   Filed: 04/29/2025   Page 113 of 209

Exhibit 1
Schleuss Declaration

Burmese people, living under severe restrictions on information, rely on RFA to stay informed about events in the country- news they cannot access through local media and military mouthpiece media.

If RFA cannot operate normally, people lose access to reliable information about what is truly happening in Burma, benefiting the military rulers as they continue to suppress the people.

---

████████████████

My name is ████████████, and I have been a journalist with Radio Free Asia's Lao Service for 25 years. I am here to advocate for continued funding of independent journalism and free press initiatives in Southeast Asia.
Over the decades, I have witnessed our journalists report in countries where news is heavily censored, providing critical information to those who lack access to diverse news sources. In Laos, where people are often afraid to speak to their authorities, RFA serves as a vital platform, amplifying their voices and shedding light on issues that would otherwise remain hidden. Our work:

- Promotes transparency in governance
- Empowers citizens with factual information
- Counters misinformation
- Gives voice to the voiceless.

RFA adheres to strict journalistic ethics, ensuring unbiased, fact-based reporting. I urge you to recognize the essential role RFA plays in promoting democracy, human rights, and freedom of information. Supporting our mission ensures that the people of Laos and beyond continue to have a voice.

---

████████████

I write with deep concern regarding the proposed funding cuts to Radio Free Asia (RFA), an organization that has been my professional home for over 15 years and represents a critical pillar of America's commitment to press freedom across Asia.

Since December 2009, I have dedicated my professional life to RFA's mission of providing accurate, unbiased news to people living under authoritarian regimes. My work has focused particularly on human rights, democracy, and women's issues affecting Tibetans and other ethnic

groups with limited access to free press. I have crafted well-organized, distinctively original stories on sensitive topics, utilizing multiple sources to ensure balanced coverage—all while maintaining the highest standards of journalistic integrity.

The proposed funding cuts to RFA come at a time when authoritarian regimes are intensifying their efforts to control information. RFA serves as a vital lifeline for millions seeking accurate information about their own countries and the world beyond. The elimination or reduction of RFA's funding would create an information vacuum that would quickly be filled by state-controlled media serving authoritarian interests.

We have already begun receiving heartbreaking messages from listeners inside Tibet who have heard rumors of these potential cuts. They describe RFA as "the only light in the darkness" and express profound sadness at the prospect of losing access to free news under the repressive Chinese regime. These listeners risk their safety to tune in to our broadcasts, demonstrating the irreplaceable value of our service. For many, RFA represents their sole connection to unfiltered information and the outside world.

Beyond the professional impact, these potential cuts would devastate my family's financial stability. With two children aged 13 and 10 approaching high school and college, I am deeply concerned about funding their education. Without my current position at RFA, I would struggle to build the savings necessary for their tuition and future opportunities.

The uncertainty has already begun affecting our daily lives. I find myself worried about covering our mortgage payments, health insurance premiums, and even weekly grocery bills. These financial concerns have taken a significant toll on my mental wellbeing, as I lie awake at night contemplating how to provide for my family's basic needs should these cuts proceed. My retirement security is also at risk. After 15 years of dedicated service, the prospect of starting over in a new organization at this stage of my career is daunting. The specialized skills I've developed serving RFA's unique mission may not easily transfer to other media organizations.

I respectfully urge you to reconsider the proposed funding cuts to Radio Free Asia. The cost of maintaining RFA's operations is minimal compared to the immense strategic value it provides. By preserving RFA's funding, you will ensure that America continues to stand with those fighting for truth and freedom while protecting the livelihoods of dedicated professionals who have given their careers to this vital mission.

My name is ███████ , and I am a designer and web developer at Radio Free Asia's Global Mandarin Service. I previously worked in the Hong Kong office for

two years until it was forced to shut down due to the implementation of Article 23. Fearing persecution, RFA helped me secure a visa to relocate to the U.S. headquarters. Over the past year, I have worked hard to build a new life here—finding housing, handling legal paperwork, making friends, and integrating into American society.

But just as I believed I was finding stability, the White House issued an executive order to shut down Radio Free Asia. My team created *Wainao*, a platform dedicated to telling young Chinese readers the truth about what is happening in China. What we do is not just a job—it is meaningful, it makes a difference. Yesterday, due to funding cuts, *Wainao* went dark, and my entire team was furloughed. The only reason I have not been furloughed yet is because my company, out of deep concern for my visa status, has made every effort to keep my position. But without funding, I will soon lose my visa and face the risk of deportation.

Just a few days ago, I had a job I loved—doing work that mattered. Now, in an instant, I am at risk of losing my legal status in the U.S. and being forced to return to Hong Kong, a place that has been swallowed by the Chinese regime, where independent media and activists are being silenced.

I urge you to recognize the significance of Radio Free Asia, especially in an era where authoritarianism is encroaching on democratic freedoms. Its shutdown would not only be a devastating loss for press freedom but would also personally place me in serious jeopardy.

Thank you for your time and consideration.

---

███████

My name is ████████, and I have been a journalist with Radio Free Asia (RFA), Burmese Service, since 2008. Over the past 17 years, I have dedicated my career to providing vital news and information to the Burmese people, many of whom live under oppressive regimes where freedom of the press is severely restricted.

I am writing this statement in response to the recent decision to terminate Radio Free Asia, a move that threatens not only my livelihood but also the lives of millions of Burmese people who rely on RFA for accurate, unbiased information. This decision by the Trump administration will have severe consequences on the ability of the Burmese people to access independent news and information, especially at a time when the country faces unprecedented challenges.

For many years, I have worked diligently to provide comprehensive coverage of the situation in Burma, including human rights violations, political repression, and the struggles of ordinary citizens who face censorship and persecution. The Burmese Service of RFA has been a critical source of news for the people of Burma, offering them a chance to learn the truth in an environment where state-controlled media spreads propaganda and misinformation.

The people of Burma deserve the right to access independent news, and this decision will silence a crucial platform that has been their source of hope, information, and accountability. Additionally, the funding cut will have a significant personal impact on my family. As a single mother and the sole provider for my household, I carry the responsibility of ensuring my two daughters are safe, cared for, and given every opportunity to thrive. Their well-being—everything from their education to their everyday needs—depends entirely on my ability to maintain my job.

I urge that this decision be reversed to ensure that the voices of the Burmese people continue to be heard and that independent journalism remains a critical part of our global commitment to human rights and democracy, and the families of the people who have lost their jobs can continue doing their best to hold everything together. I'm asking for your understanding and compassion.

Thank you for your time and consideration.

---

████████

My name is ████████, I joined RFA's Vietnamese Service in September 2022 after graduating from ████ MA program in Journalism.

This decision came with considerable security risks both to myself and my family who is still living in Vietnam, but I made it with their consent because we all knew it was the right thing to do.

Having lived under Vietnam's Communist Regime our entire life, we have witnessed first-hand serious violations of human rights, in the form of wrongful arrests and unjust deaths in the penitentiary system dating all the way back to aftermath of Vietnam War, when several of my relatives lost their lives in Viet Cong's re-education camps.

The injustice lasted all the way into the modern day, in the form of systemic corruption within Vietnam's federal and local government. The most recent example of this is Decree 168, which allowed the police to issue traffic fines that are multiple times heavier than before, and for the Ministry of Public Security to pocket most of it. And in the last several years, there are hundreds of Vietnamese who are arrested for speaking out for others' human rights, and for their own.

With RFA's grant terminated and the company potentially closing down for good, I face the risk of returning to Vietnam and being arrested immediately upon re-entry because I'm not a Green Card holder yet. And my situation isn't the only precarious one in RFA. On a bigger scale, RFA's potential closure will deprive tens of millions of Vietnamese people of a reliable and uncensored source of news, and effectively give Vietnam's Communist government complete monopoly over the media landscape.

---

███████████

My name is ████████████, Radio production Coordinator & Administrative Assistance for the Lao Service. I have worked at the RFA for 26 years.

During those 26 years I have experienced and witnessed the efforts of journalists and the daily production of news programs.
RFA staff regularly receives letters, emails, and phone calls from people on a variety of stories and topics we report that their local news will not address.

RFA does not just report news, it has come to be a resource to help document and assist victims from human trafficking, including missing persons, land conflicts, and other human rights concerns. People frequently contact RFA when they feel they cannot get support from their own government officials. I have seen examples where parents and human tracking victims reach out to RFA to report stories and share photographs. And in many cases RFA has been able to verify stories and help reunite families. People will often say they trust RFA more than local authorities to take action and assist with location and reunification.

---

███████████

I was an audience member of RFA decades ago in my homeland, East Turkistan (also known as XUAR). At that time, the RFA Uyghur Service was the only window to the Free World for the Uyghur people. At first, we used shortwave radio, but after the government shut it down, we relied on VPNs. People risked harsh government punishment just to hear the voice of freedom, sharing the daily program's MP3 files with each other. It was like the Statue of Liberty offering hope, a sense of justice, and faith in victory to those in darkness. Many people were detained and punished by the government simply for listening to this voice of freedom.

Ten years ago, I came to the Free World. Six years ago, I was honored to become a member of Radio Free Asia, at a time when the Uyghur people were facing an ongoing genocide. The RFA Uyghur Service remains the only reliable source for the world to know what is happening to

Case 1:25-cv-01015-RCL    Document 16-16    Filed 03/24/25    Page 29 of 30
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 118 of 209

Exhibit 1
Scheuss Declaration

Uyghurs and other Turkic people in the region. In 2020, the first Trump administration officially declared the Uyghur genocide based on our brave Uyghur journalists' firsthand reporting. Everyone on our team has at least one or more relatives imprisoned or detained in concentration camps.

For us, this job goes far beyond regular journalism—it is a frontline battle against the Chinese Communist Party's autocratic regime. It is the lifeline for Uyghur people seeking help from the outside world. Churchill's words about the brave British fighter pilots perfectly describe our mission: "Never in the field of human conflict was so much owed by so many to so few." Right now, this team and its very foundation are facing dismantlement. Please, save us—not just for the Uyghurs, but for the values that America was founded upon and for the Free World. As my wife said, we will try to endure the personal hardships caused by this abrupt dismantling, but the world cannot. The Uyghurs, Tibetans, Cambodians, Rohingya, and North Koreans—those still living in darkness—cannot. Please, preserve our hope!

---

My name is ███████. I have been a journalist at Radio Free Asia (RFA) 's Vietnamese service for three years.

In 2011, as an ordinary citizen in Vietnam, I joined a peaceful protest against China's violation of Vietnam's territorial waters. Shortly after, I was arrested, detained, and interrogated by Vietnamese police for an entire day and night. It was a frightening experience, I felt completely isolated, unsure of what would happen to me. But RFA journalists reported on my case, making me realize I was not alone. Their coverage showed me that many people cared and supported those who stood up for their country and freedom.

Since 2022, I have been working for RFA to report on issues that the Vietnamese government tries to hide. I have covered stories about farmers losing their land without fair compensation, fishermen suffering from environmental disasters caused by the Formosa company, and thousands of ethnic minorities facing religious persecution for practicing Christianity. These stories would never appear in state-controlled media, but thanks to RFA, they reached both the public and the international community.

Shutting down RFA would mean that millions of people lose access to an independent and reliable news source. This decision would not only affect journalists like me but also enable authoritarian governments in Vietnam, China, and North Korea to tighten their control over information, suppress free speech, and worsen human rights violations.

I urge Congress to reconsider the decision to cut RFA's funding and restore the necessary budget so that RFA can continue its vital mission.

Exhibit 1
Schleuss Declaration

---

█████████████

The termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would relish the opportunity to have their influence go unchecked in the information space.

I am a Web Editor II who worked for the Uyghur Service at RFA for 15 years, starting in 2010. The Uyghur Service has been pivotal in helping U.S. policymakers understand the harsh realities of what's happening in the Uyghur Autonomous Region of China. It has provided a crucial platform to spotlight the struggles of the Uyghur people and drawn global attention to the severe human rights violations they endure. The Uyghur Service's breakthrough reporting on Xinjiang led the first Trump Administration to formally declare genocide against the Chinese government. The courage and dedication of the journalists and staff who have risked their lives to expose and report on the genocide of the Uyghur community are nothing short of remarkable and must be acknowledged.

The decision to shut down this critical service is alarming and raises profound concerns. The Uyghur Service has been a beacon of hope and resilience for countless Uyghurs, serving as a vital channel for international media, activists, and human rights organizations. Its relentless work in exposing the realities on the ground has been instrumental in raising global awareness and shaping policies.

Preserving this service is not just about maintaining a media outlet; it's about defending the fundamental values of freedom, democracy, and human dignity. Uyghurs, whether in their homeland or in the diaspora, deserve to have their voices heard and their stories shared with the world. Within the broader context of U.S.-China relations, the Uyghur Service is an indispensable pillar in combating propaganda and reaffirming the commitment to human rights and the fight against oppression.

I strongly urge decision-makers to reassess the significance of Radio Free Asia's Uyghur Service and recognize its unique and undeniable role in addressing these dire global challenges. At this pivotal moment in history, the international community cannot afford to remain silent in the face of such a critical voice.

# Exhibit B

Add. 47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

             Plaintiffs,

    -against-

KARI LAKE, et al.,

             Defendants.

No. 25 Civ. 2390

## SUPPLEMENTAL DECLARATION OF JOHN DRYDEN

I, John Dryden, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the president of the Voice of America Employees Union, Local 1418, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 1418" or "Union").

3. At 10:50 p.m. EST on March 25, 2025, I received an email from the U.S. Agency for Global Media's (USAGM) Director of Human Resources that included two attachments, a "Reduction in Force Notification" and an excel spreadsheet with data on the employees affected by the Reduction in Force (RIF). The notice states "This is a notice of management's decision to implement a [RIF] for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months." The notice further states that

1

Docusign Envelope ID: 7F8CEC39-4871-4417-9DBB-1340B18037E3

Case 1:25-cv-01015-RCL    Document 33-2    Filed 03/26/25    Page 3 of 10
USCA Case #25-5144    Document #2113400    Filed: 04/29/2025    Page 82 of 169

at least 29 AFSCME Local 1418 bargaining unit members will be affected by the RIF. A

true and correct copy of this notice is attached hereto as Exhibit 1.

4. Also included in the email from the USAGM Human Resources Director is an excel

spreadsheet with data on the 29 affected employees, which includes 23 Radio Broadcast

Technicians (RBT) who work in Radio Studios and 6 who work in Radio Master Control.

A true and correct copy of this document is attached hereto as Exhibit 2.

5. AFSCME Local 1418 represents a collective bargaining unit of approximately 32

employees in the position of RBT who work for USAGM at Voice of America (VOA), of

which 26 work in Radio Studios and 6 work in Radio Master Control. To my knowledge,

3 members have submitted retirement applications.

6. If USAGM terminates the 29 listed employees and the 3 members referenced above

retire, the entire bargaining unit of VOA RBTs will be eliminated. Without any RBTs to

engineer radio programing, VOA will not be able to broadcast any live radio programing.

7. I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed at Germantown, MD on the 26th day of March, 2025.

Signed by:

*John Dryden*

John Dryden
98042BA9D222416...

2

# EXHIBIT 1



330 Independence Ave SW, Washington, D.C. 20237

MEMORANDUM FOR        AFSCME

FROM:                        CRYSTAL THOMAS
                             Director of Human Resources

DATE:                        March 25, 2025

SUBJECT:                     Reduction in Force Notification

This is a notice of management's decision to implement a reduction in force (RIF) for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months.

1. The reason for the reduction in force:

The President's March 14, 2025, executive order *Continuing the Reduction of the Federal Bureaucracy*. Statutory positions and functions will remain.

2. The approximate number of employees who may be affected initially:

Approximately 29 AFSCME bargaining unit employees, but this number is subject to change.

3. The competitive areas and levels that may initially be involved in a reduction in force:

See the accompanying attachment for the competitive areas and levels.

4. The anticipated effective date of the action.

Termination notices may be sent in the next few weeks, with a 60-calendar day period prior to the effective date.

Add. 51

# EXHIBIT 2

| Competitive Area | AFSCME |
|---|---|
| Washington, DC | 29 |

| Position ID |
| --- |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170275 |
| V170156 |
| V170156 |
| V170156 |
| V170290 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170275 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170290 |
| V170156 |
| V170156 |
| V170275 |
| V170156 |

**Add. 54**

| Position Title |
| --- |
| V170156.RADIO BROADCAST TECHNICIAN.18660.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16457.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16234.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16246.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.16525.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.17102.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16241.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16452.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16238.IB00.APPR |
| V170290.RADIO BROADCAST TECHNICIAN BROADCAST TECHNICIAN.16557.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16441.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16455.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16440.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18633.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18230.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.17414.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18835.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16237.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16720.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16498.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16236.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16449.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16450.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18783.IB00.APPR |
| V170290.RADIO BROADCAST TECHNICIAN BROADCAST TECHNICIAN.16554.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16451.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.19037.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18391.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18707.IB00.APPR |

| Grade | Competitive Geo |
|-------|-----------------|
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                    Plaintiffs,                          No. 25 Civ. 2390

        -against-

KARI LAKE, et al.,

                    Defendants.

**SUPPLEMENTAL DECLARATION OF PAULA HICKEY**

    I, Paula Hickey, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

following is true and correct:

1.   I am over 18 year of age and competent to give this declaration. This declaration is based

    on my personal knowledge, information, and belief.

2.   I am the Local President of the American Federation of Government Employees, AFL-

    CIO, Local 1812 ("Local 1812") a labor organization and unincorporated association that

    represents federal employees at the Voice of America (VOA) within the United States

    Agency for Global Media (USAGM). Local 1812 is an affiliate of the American

    Federation of Government Employees ("AFGE").

3.   At 10:49 p.m. EST on March 25, 2025, I received an email from the USAGM Director

    for Human Resources that included two attachments, a "Reduction in Force Notification"

    and an excel spreadsheet with data on the employees affected by the Reduction in Force

    (RIF). The notice states "This is a notice of management's decision to implement a [RIF]

    for multiple competitive areas. The agency plans to send termination notices to

    employees in the next few weeks. Extraordinary circumstances, driven by the President's

**Add. 58**

March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months." The notice further states that at least 594 Local 1812 bargaining unit members will be affected by the RIF. A true and correct copy of this notice is attached hereto as Exhibit 1.

4.  Also included in the email from the USAGM Human Resources Director is an excel spreadsheet with data on 594 affected employees, which includes International Broadcasters for Radio, Internet, TV, and Multimedia in dozens of different languages, Technicians, Budget Analysts, and Electronics Engineers, among others. My position was listed at the top of the spreadsheet. A true and correct copy of this document is attached hereto as Exhibit 2.

5.  If USAGM terminates the 594 listed employees, the bargaining unit represented by Local 1812 will effectively cease to exist. Without the International Broadcasters, Technicians, Budget Analysts, and Electronics Engineers, or the hundreds of employees encumbering other vital positions, VOA will not be able to provide the services it has offered for 83 years and therefore will not be able to meet its mission to counter propaganda and spread freedom and democracy abroad.

6.  VOA broadcasts to populations under authoritarian rule who turn to VOA as a trusted source of news. If VOA cannot meet its mission, the United States will be giving up its voice and leaving open a global communication void.

7.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Mitchellville, Maryland on the 26th day of March, 2025.

Paula Hickey

# EXHIBIT 1



330 Independence Ave SW, Washington, D.C. 20237

MEMORANDUM FOR          AFGE

FROM:                              CRYSTAL THOMAS
                                         Director of Human Resources

DATE:                              March 25, 2025

SUBJECT:                         Reduction in Force Notification

This is a notice of management's decision to implement a reduction in force (RIF) for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months.

1. The reason for the reduction in force:

The President's March 14, 2025, executive order *Continuing the Reduction of the Federal Bureaucracy*. Statutory positions and functions will remain.

2. The approximate number of employees who may be affected initially:

Approximately 594 AFGE bargaining unit employees, but this number is subject to change.

3. The competitive areas and levels that may initially be involved in a reduction in force:

See the accompanying attachment for the competitive areas and levels.

4. The anticipated effective date of the action.

Termination notices may be sent in the next few weeks, with a 60-calendar day period prior to the effective date.

Add. 62

# EXHIBIT 2

| Competitive Area | AFGE |
|---|---|
| Washington, DC | 570 |
| N    or , N | 9 |
| SA  EM,MARION,OR | 1 |
| SAN ANTONIO,BE  AR,T | 1 |
| CAPE CORA , EE, | 1 |
| WARSAW,RICHMOND,VA | 1 |
| NOR O    IND CIT  ,VA | 1 |
| HI  H  AND,MADISON,I | 1 |
| PHOENI  ,MARICOPA,A | 1 |
| CR STA   A E,MCHENR ,I | 1 |
| ISSIMMEE,OSCEO  A, | 1 |
| PORT  AND,C  MBER  AND,ME | 1 |
| OS AN  E ES, OS AN  E ES,CA | 1 |
| PA  M BA ,BREVARD, | 1 |
| A SA   E,I | 1 |
| PASADENA, OS AN  E ES,CA | 1 |
| RANCONIA,  RA TON,NH | 1 |

| Position ID |
| --- |
| V136191 |
| V3134 |
| V170260 |
| V158000 |
| V147138 |
| V3317 |
| V169178 |
| V210136 |
| V210135 |
| V220148 |
| V210085 |
| V220009 |
| V158079 |
| V170217 |
| V169161 |
| V240007 |
| V210139 |
| V240051 |
| V210103 |
| V20017 |
| V210085 |
| V210098 |
| V169188 |
| V169188 |
| V170215 |
| V136064 |
| V136087 |
| V136087 |
| V191056 |
| V169161 |
| V220038 |
| V210098 |
| V170213 |
| V190202 |
| V158083 |
| V169188 |
| V210147 |
| V147055 |
| V169077 |
| V210147 |
| V169084 |
| V190166 |
| V220063 |
| V220113 |
| V169188 |

V158083
V210064
V158145
V190202
V210141
V169188
V136206
V170216
V170213
V170216
V170213
V4102
V210064
V8211
V210210
V240028
V210143
V210133
V210142
V210145
V158006
V210064
V7487
V170217
V136064
V8598
V8388
V240071
V220210
V200034
V220032
V230026
170273
V200093
V190170
V170259
V169067
V180183
V210081
V169181
V250010
V4090
V114282
V170041
V158098
V170091
V4102

V17210
V170194
V210021
V169083
V190065
V17210
V17210
V17210
V190065
V180025
V17210
V210021
V17210
V170170
V180025
V180025
V210166
V170247
V210166
V180025
V190065
V180025
V190065
V180025
V190065
V210080
V190065
V169083
V190065
V170247
V170158
V190064
V190142
V190041
V190064
V170194
V170194
V190065
V180025
V17210
V170194
V170210
V170194
V220004
V200087
V220004
V190065

V190065
V190065
V170247
V180025
V169011
V170247
V190041
V190041
V220005
V190065
V17210
V170194
V170194
V5733
V170194
V200087
V170194
V9020
V190065
V180025
V190065
V180025
V180025
V180025
V114183
V2049
V190065
V7909
V190065
V180025
V180025
V180172
V180129
V240018
V3134
V3134
V3134
V3134
V3134
V3134
V210124
V136175
V240135
V180174
V170268
V220146
V220054

V114213
V114218
V114213
V200125
V210040
V0921
V114224
V114224
V210040
V158092
V210008
V114213
V114219
V210040
V136192
V190205
V125031
V210123
V210123
V210122
V210122
V230051
V190114
V114177
V210122
V210122
V8084
V210122
V200057
V114139
V190063
V170264
V136052
V147011
V180069
V210040
V170191
V230145
V158177
V200121
V200121
V210167
V220123
V7917
V200121
V210016
V240006

V200070
V220069
V240027
V230146
V180131
V7916
V180050
V180043
V190217
V136122
V136122
V220053
V220039
V210047
V230093
V136231
V230022
V180067
V169122
V210154
V210013
V210013
V169115
V158094
V158094
V230013
V158092
V7916
V230146
V136231
V158092
V136122
V147148
V169159
V7916
V180050
V7916
V158177
V7916
V1018
V158178
V158127
V158177
V7916
V158178
V210027
V7916

V210010
V1017
V136123
V200121
V158178
V210047
V136096
V1020
V3219
V3360
V3220
V7814
V220121
V210171
V240040
V220191
V169132
V170280
V180063
V230116
V7432
V180063
V210047
V158092
V210040
V169101
V0934
V8159
V6666
V170128
V169099
V180128
V7113
V169069
V136051
V200155
V210026
V220015
V230014
V230014
V210083
V190226
V220034
V190221
V220163
V220087
V200071

V220058
V210028
V180122
V190221
V169107
V230117
V210028
V230144
V190221
V169028
V169173
V230053
V210050
V158010
V158206
V190112
V190048
V220168
V170173
V3208
V114268
V220171
V190235
V114317
V210050
V240139
V220156
V170097
V3109
V4084
V158198
V170097
V169028
V250005
V240113
V114197
V210117
V114197
V114267
V136150
V136014
V136014
V210052
V8592
V240085
V158003
V170023

V125184
V169043
V158213
V158002
V125109
V170062
V230139
V230110
V210084
V210009
V136178
V169162
V210084
V240107
V7726
V7217
V190248
V200001
V190159
V169162
V169024
V6422
V5756
V125137
V190249
V6613
V170043
V230103
V190027
V147134
V147118
V190027
V170022
V7907
V180077
V3336
V240056
V136144
V170232
V3334
V210006
V170232
V136144
V210037
V210006
V170057
V210006

V170057
V136144
V136144
V210006
V210006
V136144
V136144
V210006
V210006
V220164
V136144
V136144
V136144
V136144
V210006
V136144
V136144
V136144
V136144
V210006
V210207
V230017
V3324
V3324
V3106
V210006
V158013
V158013
V170232
V170043
V210156
V170065
V8533
V210042
V136181
V180149
V180078
V240009
V240009
V240009
V220075
V220075
V169232
V200107
V1175
V220150
V200107

V200117
V240116
V190031
V180022
V180065
V170207
V4075
V240110
V136035
V240008
V158029
V220150
V220169
V169199
V220208
V210051
V169157
V169157
V114240
V169141
V114240
V169157
V210104
V1114
V210044
V158034
V136125
V114240
V147012
V7228
V200085
V1175
V200085
V200127
V1175
V200114
V170133
V170135
V200110
V190224
V190237
V147085
V210099
V170155
V147015
V210100
V180108

V169169
V230089
V169039
V230130
V170134
V169044
V169171
V169036
V170134
V136246
V180156
V180156
V0903
V0903
V7501
V180156
V190214
V190214
V190214
V158189
V190036
V190036
V190214
V158189
V158140
V169013
V158189
V240039
V240075
V220107
V240031
V240033
V158187
V4090
V4090
V220061
V210066
V210066
V3116
V3116
VV220029
V210217
V210098
V210098
V220036
V180007
V158132

V210098
V210098
V4090
V4090
V220176
V230067
V220151
V210014
V147027
V1156
V3116
V114262
V147026
V220061
V136106
V136106
V147149
V158198
V136106
V158132
V158132
V136192
V7857
V3116
V210014
V210014
V3104
V3116
V170054
V169164
V136153
V8014

| Position Title |
|---|
| V136191.TECHNICA  IN  ORMATION SPECIA IST  IN   EST COORDINATOR .13913.IB00.APPR |
| V3134.B  D  ET ANA   ST.15589.IB00.APPR |
| V170260.RECORDS AND IN  ORMATION MANA  EMENT SPECIA IST.16468.IB00.APPR |
| V158000.ADMINSTRATIVE O   ICER.14587.IB00.APPR |
| V147138.ADMINISTRATIVE O   ICER.14531.IB00.APPR |
| V3317.M   TIMEDIA PROD  CTION SPECIA IST.13080.IB00.APPR |
| V169178.INT BROADCASTER  M   TIMEDIA    RENCH .15831.IB00.APPR |
| V210136.M   TIMEDIA SPECIA IST  AMHARIC .18287.IB00.APPR |
| V210135.M   TIMEDIA SPECIA IST  AMHARIC .19562.IB00.APPR |
| V220148.INTERNATIONA  BROADCASTER M   TIMEDIA    RENCH .18793.IB00.APPR |
| V210085.INT BROADCASTER  M   TIMEDIA   SWAHI  I .18540.IB00.APPR |
| V220009.INT BROADCASTER  M   TIMEDIA   A AN OROMO .18543.IB00.APPR |
| V158079.INT BROADCASTER  M   TIMEDIA    RENCH .18681.IB00.APPR |
| V170217.INT BROADCASTER  M   TIMEDIA  AMHARIC .18713.IB00.APPR |
| V169161.INT BROADCASTER  M   TIMEDIA   HA  SA .18714.IB00.APPR |
| V240007.INTERNATIONA  BROADCASTER M   TIMEDIA    RENCH .19561.IB00.APPR |
| V210139.M   TIMEDIA SPECIA IST  EN   ISH .18282.IB00.APPR |
| V240051.INT BROADCASTER  M   TIMEDIA    IR  NDI   IN ARWANDA .19954.IB00.APPR |
| V210103.M   TIMEDIA SPECIA IST  HA  SA .18209.IB00.APPR |
| V20017.INT BROADCASTER  M   TIMEDIA    IR  NDI   IN ARWANDA  .17558.IB00.APPR |
| V210085.INT BROADCASTER  M   TIMEDIA   SWAHI  I .17993.IB00.APPR |
| V210098.M   TIMEDIA SPECIA IST  EN   ISH .18033.IB00.APPR |
| V169188.INT BROADCASTER  M   TIMEDIA    RENCH .17522.IB00.APPR |
| V169188.INT BROADCASTER  M   TIMEDIA    RENCH .17527.IB00.APPR |
| V170215.INT BROADCASTER  M   TIMEDIA  AMHARIC .17557.IB00.APPR |
| V136064.INTERNATIONA  BROADCASTER RADIO INTERNET    IR  NDI   IN ARWA.17358.IB00.APPR |
| V136087.INT BROADCASTER  M   TIMEDIA   HA  SA .16894.IB00.APPR |
| V136087.INT BROADCASTER  M   TIMEDIA   HA  SA .16997.IB00.APPR |
| V191056.INT BROADCASTER  M   TIMEDIA  SHONA NDEBE  E .17324.IB00.APPR |
| V169161.INT BROADCASTER  M   TIMEDIA   HA  SA .17201.IB00.APPR |
| V220038.INTERNATIONA  BROADCASTER M   TIMEDIA   SHONA NDEBE  E .18403.IB00.APPR |
| V210098.M   TIMEDIA SPECIA IST  EN   ISH .18252.IB00.APPR |
| V170213.INT BROADCASTER  M   TIMEDIA  TI  RI  NA .17361.IB00.APPR |
| V190202.INT BROADCASTER  M   TIMEDIA   HA  SA .17962.IB00.APPR |
| V158083.INT BROADCASTER  M   TIMEDIA   SOMA  I .16956.IB00.APPR |
| V169188.INT BROADCASTER  M   TIMEDIA    RENCH .16739.IB00.APPR |
| V210147.M   TIMEDIA SPECIA IST  AMHARIC A AN OROMO TI  RI  NA .18173.IB00.APPR |
| V147055.M   TIMEDIA PROD  CTION SPECIA IST.15752.IB00.APPR |
| V169077.INT BROADCASTER  M   TIMEDIA   SOMA  I .15797.IB00.APPR |
| V210147.M   TIMEDIA SPECIA IST  AMHARIC A AN OROMO TI  RI  NA .18172.IB00.APPR |
| V169084.INT BROADCASTER  M   TIMEDIA   BAMBARA .15556.IB00.APPR |
| V190166.INT BROADCASTER  M   TIMEDIA   SOMA  I .17215.IB00.APPR |
| V220063.DI  ITA  MANA  IN   EDITOR  SWAHI  I .19496.IB00.APPR |
| V220113.INTERNATIONA  BROADCASTER M   TIMEDIA  HA  SA .18760.IB00.APPR |
| V169188.INTERNATIONA  BROADCASTER M   TIMEDIA    RENCH .17543.IB00.APPR |

V158083.INT BROADCASTER  M    TIMEDIA   SOMA  I .14916.IB00.APPR
V210064.M    TIMEDIA SPECIA IST    RENCH .17961.IB00.APPR
V158145.INT BROADCASTER  RADIO TV    SWAHI  I .15055.IB00.APPR
V190202.INT BROADCASTER  M    TIMEDIA   HA  SA .17267.IB00.APPR
V210141.M    TIMEDIA SPECIA IST  EN    ISH .18175.IB00.APPR
V169188.INT BROADCASTER  M    TIMEDIA    RENCH .16957.IB00.APPR
V136206.IB  M   TIMEDIA  PORT    ESE .14833.IB00.APPR
V170216.INT BROADCASTER  M    TIMEDIA   A  AN OROMO .16353.IB00.APPR
V170213.INT BROADCASTER  M    TIMEDIA   TI  RI  NA .16355.IB00.APPR
V170216.INT BROADCASTER  M    TIMEDIA   A  AN OROMO .16352.IB00.APPR
V170213.INT BROADCASTER  M    TIMEDIA   TI  RI  NA .16354.IB00.APPR
V4102.INT BROADCASTER  SWAHI  I .12753.IB00.APPR
V210064.M    TIMEDIA SPECIA IST    RENCH .17924.IB00.APPR
V8211.RADIO PROD   CTION SPEC.9698.IB00.APPR
V210210.INT BROADCASTER  TI  RI  NA  M    TIMEDIA   TEAM  EAD .18636.IB00.APPR
V240028.INTERNATIONA  BROADCASTER  AMHARIC  M    TIMEDIA   TEAM  EAD .20191.IB00.APPR
V210143.M    TIMEDIA SPECIA IST  EN    ISH .18185.IB00.APPR
V210133.PROD   CER-DIRECTOR.18147.IB00.APPR
V210142.M    TIMEDIA SPECIA IST  EN    ISH .18171.IB00.APPR
V210145.M    TIMEDIA SPECIA IST  EN    ISH .18186.IB00.APPR
V158006.INT BROADCASTER   IR  NDI .14620.IB00.APPR
V210064.M    TIMEDIA SPECIA IST    RENCH .17960.IB00.APPR
V7487.INT BROADCASTER  RADIO    INTERNET    IN  ARWANDA .8300.IB00.APPR
V170217.INT BROADCASTER  M    TIMEDIA   AMHARIC .16349.IB00.APPR
V136064.INT BROADCASTER  RADIO INTERNET    IN  ARWANDA .14066.IB00.APPR
V8598.INT BROADCASTER  RADIO  EN    ISH .12016.IB00.APPR
V8388.INT BROADCASTER  RADIO  PORT    ESE .10197.IB00.APPR
V240071.INTERNATIONA  BROADCASTER.20213.IB00.APPR
V220210.PRO   RAM COORDINATOR.18708.IB00.APPR
V200034.E  EC  TIVE PROD   CER TV  HA  SA .17403.IB00.APPR
V220032.M    TIMEDIA SPECIA IST  EN    ISH .18363.IB00.APPR
V230026.INTERNATIONA  BROADCASTER  M    TIMEDIA  PORT    ESE .18761.IB00.APPR
  170273.INTERNATIONA  BROADCASTER  M    TIMEDIA    RENCH .16496.IB00.APPR
V200093.INTERNATIONA  BROADCASTER  M    TIMEDIA .17484.IB00.APPR
V190170.INT BROADCASTER  M    TIMEDIA  SOMA  I .17218.IB00.APPR
V170259.INT BROADCASTER  M    TIMEDIA  SOMA  I .16475.IB00.APPR
V169067.E  EC  TIVE PROD   CER TV  SWAHI  I .16828.IB00.APPR
V180183.DI  ITA    RAPHICS ARTIST.16925.IB00.APPR
V210081.INT BROADCASTER  M    TIMEDIA   SWAHI  I .18069.IB00.APPR
V169181.E  EC  TIVE PROD   CER TV  SOMA  I .15725.IB00.APPR
V250010.INTERNATIONA   BROADCASTER - EDITOR.20490.IB00.APPR
V4090.  ENERA  ASSI  NMENTS REPORTER  EN    ISH .12592.IB00.APPR
V114282.M    TIMEDIA PROD   CTION SPEC.12936.IB00.APPR
V170041.INT BROADCASTER  RADIO  EN    ISH .15954.IB00.APPR
V158098.PRO  ECT MANA   ER.14942.IB00.APPR
V170091.E  EC  TIVE PROD   CER  TE  EVISION .16016.IB00.APPR
V4102.INT BROADCASTER  SWAHI  I .16829.IB00.APPR

V17210.TV BROADCAST TECHNICIAN  A  DIO .16335.IB00.APPR
V170194.M MASTER CONTRO  TECHNICIAN.17486.IB00.APPR
V210021.M  TIMEDIA SPECIA IST   RAPHICS .17809.IB00.APPR
V169083.IT SPECIA IST  C  STSPT .18955.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST  TV PROD  CTION A  TOMATION .18782.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16333.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16331.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16330.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST  TV PROD  CTION A  TOMATION .18837.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M   TIMEDIA .18682.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16332.IB00.APPR
V210021.M  TIMEDIA SPECIA IST   RAPHICS .17810.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16329.IB00.APPR
V170170.TV BROADCAST TECHNICIAN  CAMERA   R DIR  I  HTIN .16341.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M   TIMEDIA .18496.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M   TIMEDIA .17242.IB00.APPR
V210166.BROADCAST TECHNICIAN.18205.IB00.APPR
V170247.TE ECOMM  NICATIONS SPECIA IST.20415.IB00.APPR
V210166.BROADCAST TECHNICIAN.18204.IB00.APPR
V180025.BROADCAST MAINTENCE TECHNICIAN  M   TIMEDIA .16804.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST  TV PROD  CTION A  TOMATION .18309.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M   TIMEDIA .17296.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPEC  TV PROD  CTION A  TOMATION .17378.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M   TIMEDIA .17295.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST.17700.IB00.APPR
V210080.IT SPECIA IST  S  SADMIN .19160.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST.17699.IB00.APPR
V169083. EAD IT SPECIA IST  C  STSPT .15527.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPECIA IST.17702.IB00.APPR
V170247.TE ECOMM  NICATIONS SPECIA IST.20414.IB00.APPR
V170158.PRO  RAM COORDINATOR.16741.IB00.APPR
V190064.TV BROADCAST TECHNICIAN  VIDEO EDITOR .17123.IB00.APPR
V190142.TV MASTER CONTRO  TECHNICIAN.17529.IB00.APPR
V190041.IT SPECIA IST  C  STSPT .17300.IB00.APPR
V190064.TV BROADCAST TECHNICIAN  VIDEO EDITOR .17969.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.18392.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.16270.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPEC  TV PROD  CTION A  TOMATION .17418.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN  M   TIMEDIA .18618.IB00.APPR
V17210.TV BROADCAST TECHNICIAN  A  DIO .16334.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.16266.IB00.APPR
V170210.TV BROADCAST TECHNICIAN  A  DIO .16328.IB00.APPR
V170194.TV MASTER CONTRO  TECHNICIAN.16296.IB00.APPR
V220004.TV BROADCAST TECHNICIAN  VIDEO EDITOR .18325.IB00.APPR
V200087.A  DIOVIS  A  PROD  CTION SPECIA IST.17460.IB00.APPR
V220004.TV BROADCAST TECHNICIAN  VIDEO EDITOR .18324.IB00.APPR
V190065.A  DIOVIS  A  PROD  CTION SPEC  TV PROD  CTION A  TOMATION .17339.IB00.APPR

V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .17487.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .17417.IB00.APPR
V170247.TE ECOMM NICATIONS SPECIA IST.16485.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .18546.IB00.APPR
V169011.IT SPECIA IST S SADMIN .15714.IB00.APPR
V170247.TE ECOMM NICATIONS SPECIA IST.16481.IB00.APPR
V190041.IT SPECIA IST C STSPT .17299.IB00.APPR
V190041.IT SPECIA IST C STSPT .17149.IB00.APPR
V220005.TV BROADCAST TECHNICIAN VIDEO EDITOR .18302.IB00.APPR
V190065.A DIOVIS A PROD CTION SPECIA IST TV PROD CTION A TOMATION .19152.IB00.APPR
V17210.TV BROADCAST TECHNICIAN A DIO .19026.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16272.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16298.IB00.APPR
V5733.TV BROADCAST TECHNICIAN.11228.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16293.IB00.APPR
V200087.A DIOVIS A PROD CTION SPECIA IST.17462.IB00.APPR
V170194.TV MASTER CONTRO TECHNICIAN.16292.IB00.APPR
V9020.TV PROD CTION SPEC.4625.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .18232.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .17253.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .17367.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .16846.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20112.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20151.IB00.APPR
V114183. EAD TE ECOMM NICATIONS SPECIA IST.16864.IB00.APPR
V2049.IT SPECIA IST C STSPT .11614.IB00.APPR
V190065.A DIOVIS A PROD CTION SPECIA IST TV PROD CTION A TOMATION .18311.IB00.APPR
V7909.IT SPECIA IST S SADMIN .9399.IB00.APPR
V190065.A DIOVIS A PROD CTION SPEC TV PROD CTION A TOMATION .18306.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20092.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .20131.IB00.APPR
V180172.TV BROADCAST TECHNICIAN.16862.IB00.APPR
V180129.IT SPECIA IST P C P N .16792.IB00.APPR
V240018.B D ET ANA ST.19326.IB00.APPR
V3134.B D ET ANA ST.17851.IB00.APPR
V3134.B D ET ANA ST.17852.IB00.APPR
V3134.B D ET ANA ST.18429.IB00.APPR
V3134.B D ET ANA ST.12873.IB00.APPR
V3134.B D ET ANA ST.13598.IB00.APPR
V3134.B D ET ANA ST.13611.IB00.APPR
V210124.PRO ECT MANA ER.18131.IB00.APPR
V136175.DI ITA CONTENT COORDINATOR.13902.IB00.APPR
V240135.DEVE OPMENT AND TRAININ PRO ECT MANA ER.20336.IB00.APPR
V180174.IN ORMATION TECHNO O SPECIA IST APPSW .16865.IB00.APPR
V170268.S PV IT SPECIA IST INET .16866.IB00.APPR
V220146.INT BROADCASTER M TIMEDIA .18493.IB00.APPR
V220054.INTERNATIONA BROADCASTER M TIMEDIA MANDARIN .18444.IB00.APPR

V114213.INT BROADCASTER  TV   MANDARIN .15148.IB00.APPR
V114218.INTERNATIONA  BROADCASTER  TE EVISION   MANDARIN .13755.IB00.APPR
V114213.INTERNATIONA  BROADCASTER  TE EVISION   MANDARIN .13753.IB00.APPR
V200125.M   TIMEDIA SPECIA  IST  MANDARIN .17553.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .18382.IB00.APPR
V0921.INT BROADCASTER  CANTONESE .13085.IB00.APPR
V114224.INT BROADCASTER  MANDARIN .12808.IB00.APPR
V114224.INT BROADCASTER  MANDARIN .12804.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .17798.IB00.APPR
V158092.INTERNATIONA  BROADCASTER  M   TIMEDIA   MANDARIN .16652.IB00.APPR
V210008.M   TIMEDIA SPECIA  IST  CANTONESE .17916.IB00.APPR
V114213.INT BROADCASTER  TV   MANDARIN .12803.IB00.APPR
V114219.INTERNATIONA  BROADCASTER  MANDARIN .13649.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .17801.IB00.APPR
V136192.INTERNATIONA  BROADCASTER.15926.IB00.APPR
V190205.INTERNATIONA  BROADCASTER  M   TIMEDIA   MANDARIN .17274.IB00.APPR
V125031.INT BROADCASTER  MANDARIN .13193.IB00.APPR
V210123.CONTRACT SPECIA  IST.20333.IB00.APPR
V210123.CONTRACT SPECIA  IST.18685.IB00.APPR
V210122.CONTRACT SPECIA  IST.19428.IB00.APPR
V210122.CONTRACT SPECIA  IST.20289.IB00.APPR
V230051.PROC  REMENT ANA   ST.19038.IB00.APPR
V190114.CONTRACT SPECIA  IST.18737.IB00.APPR
V114177.O   ICE M   R.13405.IB00.APPR
V210122.CONTRACT SPECIA  IST.19090.IB00.APPR
V210122.CONTRACT SPECIA  IST.19501.IB00.APPR
V8084.CONTRACT SPECIA  IST  SIMP  I IED AC    ISITIONS .12451.IB00.APPR
V210122.CONTRACT SPECIA  IST.20311.IB00.APPR
V200057.PROC  REMENT ANA   ST.17530.IB00.APPR
V114139.PROC  REMENT ASSISTANT.12835.IB00.APPR
V190063.A  DIENCE EN  A  EMENT ANA   ST.17594.IB00.APPR
V170264.RESEARCH ANA   ST.16472.IB00.APPR
V136052.WEB DESI  NER.13739.IB00.APPR
V147011.IT SPECIA  IST  INET  WEB DEVE  OPER.14111.IB00.APPR
V180069.PRO  RAM ANA   ST  METRICS .16693.IB00.APPR
V210040.M   TIMEDIA SPECIA  IST  MANDARIN .17795.IB00.APPR
V170191.INTERNATIONA  BROADCASTER  MANDARIN .16260.IB00.APPR
V230145.M   TIMEDIA SPECIA  IST   HMER .19454.IB00.APPR
V158177.INTERNATIONA  BROADCASTER  M   TIMEDIA   INDONESIAN .15507.IB00.APPR
V200121.M   TIMEDIA SPECIA  IST  INDONESIAN .19210.IB00.APPR
V200121.M   TIMEDIA SPECIA  IST  INDONESIAN .19211.IB00.APPR
V210167.M   TIMEDIA SPECIA  IST  TIBETAN .18369.IB00.APPR
V220123.INTERNATIONA  BROADCASTER  M   TIMEDIA  B  RMESE .18704.IB00.APPR
V7917.INTERNATIONA  BROADCASTER  M   TIMEDIA  B  RMESE .17401.IB00.APPR
V200121.M   TIMEDIA SPECIA  IST  INDONESIAN .17899.IB00.APPR
V210016.INTERNATIONA  BROADCASTER  M   TIMEDIA  VIETNAMESE .17735.IB00.APPR
V240006.INTERNATIONA  BROADCASTER  M   TIMEDIA   AO .19458.IB00.APPR

V200070.RADIO PROD  CTION SPECIA IST   OREAN .17503.IB00.APPR
V220069.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .18384.IB00.APPR
V240027.M   TIMEDIA SPECIA IST  VIETNAMESE .19955.IB00.APPR
V230146.INTERNATIONA  BROADCASTER M   TIMEDIA    HMER .19457.IB00.APPR
V180131.INT  BROADCASTER M   TIMEDIA  VIETNAMESE .16816.IB00.APPR
V7916.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .17154.IB00.APPR
V180050.INT BROADCASTER  M   TIMEDIA  B  RMESE .16692.IB00.APPR
V180043.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .16646.IB00.APPR
V190217.INTERNATIONA  BROADCASTER M   TIMEDIA  TIBETAN .17297.IB00.APPR
V136122.ITN  BROADCASTER   OREAN .16926.IB00.APPR
V136122.INTERNATIONA  BROADCASTER M   TIMEDIA    OREAN .17130.IB00.APPR
V220053.INT BROADCASTER M   TIMEDIA  VIETNAMESE .18623.IB00.APPR
V220039.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .18405.IB00.APPR
V210047.M   TIMEDIA SPECIA IST  INDONESIAN .17898.IB00.APPR
V230093.INTERNATIONA  BROADCASTER M   TIMEDIA    HMER .19151.IB00.APPR
V136231.INTERNATIONA  BROADCASTER M   TIMEDIA    HMER .16762.IB00.APPR
V230022.INTERNATIONA  BROADCASTER   OREAN .18759.IB00.APPR
V180067.INTERNATIONA  BROADCASTER M   TIMEDIA  THAI .17713.IB00.APPR
V169122.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .15610.IB00.APPR
V210154.M   TIMEDIA SPECIA IST   OREAN .18183.IB00.APPR
V210013.M   TIMEDIA SPECIA IST   OREAN .17709.IB00.APPR
V210013.M   TIMEDIA SPECIA IST   OREAN .17710.IB00.APPR
V169115.INTERNATIONA  BROADCASTER M   TIMEDIA    AO .16361.IB00.APPR
V158094.INTERNATIONA  BROADCASTER M   TIMEDIA   MANDARIN .16599.IB00.APPR
V158094.INTERNATIONA  BROADCASTER M   TIMEDIA   MANDARIN .16592.IB00.APPR
V230013.INT BROADCASTER  M   TIMEDIA   MANDARIN .18754.IB00.APPR
V158092.INTERNATIONA  BROADCASTER M   TIMEDIA   MANDARIN .17335.IB00.APPR
V7916.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .17397.IB00.APPR
V230146.INTERNATIONA  BROADCASTER M   TIMEDIA    HMER .19453.IB00.APPR
V136231.INTERNATIONA  BROADCASTER M   TIMEDIA    HMER .15306.IB00.APPR
V158092.INTERNATIONA  BROADCASTER M   TIMEDIA   MANDARIN .15609.IB00.APPR
V136122.INTERNATIONA  BROADCASTER M   TIMEDIA    OREAN .17195.IB00.APPR
V147148.INT BROADCASTER  TIBETAN .14570.IB00.APPR
V169159.INTERNATIONA  BROADCASTER M   TIMEDIA  VIETNAMESE .16369.IB00.APPR
V7916.INTERNATIONA  BROADCASTER  B  RMESE .14828.IB00.APPR
V180050.INTERNATIONA  BROADCASTER M   TIMEDIA  B  RMESE .17841.IB00.APPR
V7916.INT BROADCASTER  B  RMESE .14400.IB00.APPR
V158177.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .16306.IB00.APPR
V7916.INTERNATIONA  BROADCASTER  B  RMESE .14402.IB00.APPR
V1018.INTERNATIONA  BROADCASTER   OREAN .14627.IB00.APPR
V158178.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .15582.IB00.APPR
V158127.INTERNATIONA  BROADCASTER M   TIMEDIA    HMER .14992.IB00.APPR
V158177.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .15506.IB00.APPR
V7916.INTERNATIONA  BROADCASTER  B  RMESE .14401.IB00.APPR
V158178.INTERNATIONA  BROADCASTER M   TIMEDIA  INDONESIAN .15584.IB00.APPR
V210027.M   TIMEDIA SPECIA IST  THAI .17734.IB00.APPR
V7916.INT BROADCASTER  B  RMESE .16389.IB00.APPR

V210010.M   TIMEDIA SPECIA IST   HMER .17706.IB00.APPR
V1017.RADIO PROD  CTION SPECIA IST   OREAN .16653.IB00.APPR
V136123.INT  BROADCASTER  M   TIMEDIA   OREAN .15738.IB00.APPR
V200121.M   TIMEDIA SPECIA IST  INDONESIAN .17807.IB00.APPR
V158178.INTERNATIONA  BROADCASTER  M   TIMEDIA   INDONESIAN .15100.IB00.APPR
V210047.M   TIMEDIA SPECIA IST  INDONESIAN .17806.IB00.APPR
V136096.INTERNATIONA  BROADCASTER  M   TIMEDIA   INDONESIAN .15570.IB00.APPR
V1020.INT BROADCASTER   OREAN .11203.IB00.APPR
V3219.INT BROADCASTER  TV   TIBETAN .12004.IB00.APPR
V3360.INT BROADCASTER  INDONESIAN .12270.IB00.APPR
V3220.INT BROADCASTER  TV   TIBETAN .12001.IB00.APPR
V7814.INT BROADCASTER  TIBETAN .8754.IB00.APPR
V220121.DI  ITA  EDITOR   OREAN .18491.IB00.APPR
V210171.INTERNATIONA  BROADCASTER  M   TIMEDIA  MANDARIN .18213.IB00.APPR
V240040.INT BROADCASTER  M   TIMEDIA   OREAN .19819.IB00.APPR
V220191.INTERNATIONA  BROADCASTER  M   TIMEDIA   OREAN .18732.IB00.APPR
V169132.M   TIMEDIA PROD  CTION SPECIA IST  TIBETAN .17017.IB00.APPR
V170280.INTERNATIONA  BROADCASTER  TIBETAN .16609.IB00.APPR
V180063.INT BROADCASTER   OREAN .18178.IB00.APPR
V230116.INTERNATIONA  BROADCASTER  M   TIMEDIA   OREAN .19150.IB00.APPR
V7432.TV PROD  CTION SPEC  DIRECTOR   INDONESIAN .8764.IB00.APPR
V180063.INT BROADCASTER   OREAN .18072.IB00.APPR
V210047.M   TIMEDIA SPECIA IST  INDONESIAN .17805.IB00.APPR
V158092.INTERNATIONA  BROADCASTER  M   TIMEDIA   MANDARIN .16914.IB00.APPR
V210040.M   TIMEDIA SPECIA IST  MANDARIN .17799.IB00.APPR
V169101.E  ECTRONICS EN  INEER.16492.IB00.APPR
V0934.TE  ECOMM  NICATIONS SPEC.11178.IB00.APPR
V8159.PROPERT  MANA  EMENT SPEC.10098.IB00.APPR
V6666.E  ECTRONICS EN  INEER.10426.IB00.APPR
V170128.MECHANICA  EN  INEER.17323.IB00.APPR
V169099. O  ISTICS MANA  EMENT SPECIA IST.16782.IB00.APPR
V180128.E  ECTRONICS EN  INEER.16789.IB00.APPR
V7113.CIVI  EN  INEER.8347.IB00.APPR
V169069.MEDIA DE IVER  S  STEMS O  ICER.15511.IB00.APPR
V136051.INTERNATIONA  BROADCASTER  ON INE  R  SSIAN .13648.IB00.APPR
V200155. EAD MANA  IN  EDITOR R  SSIAN .17619.IB00.APPR
V210026.INTERNATIONA  BROADCASTER  M   TIMEDIA  R  SSIAN .17817.IB00.APPR
V220015.DI  ITA  MEDIA SPECIA IST  R  SSIAN .19015.IB00.APPR
V230014.M   TIMEDIA SPECIA IST  R  SSIAN .18957.IB00.APPR
V230014.M   TIMEDIA SPECIA IST  R  SSIAN .18994.IB00.APPR
V210083.M   TIMEDIA  RAPHICS SPECIA IST R  SSIAN .18953.IB00.APPR
V190226.INTERNATIONA  BROADCASTER  TV ON INE  A BANIAN .18422.IB00.APPR
V220034.INT BROADCASTER  TV ON INE  SERBIAN .18651.IB00.APPR
V190221.INTERNATIONA  BROADCASTER  TV ON INE  SERBIAN .19956.IB00.APPR
V220163.PRO  RAM COORDINATOR.18848.IB00.APPR
V220087.DI  ITA  MEDIA SPECIA IST   RAINIAN .18630.IB00.APPR
V200071.INTERNATIONA  BROADCASTER  M   TIMEDIA  BOSNIAN .17554.IB00.APPR

V220058.M   TIMEDIA   RAPHICS SPECIA IST  R  SSIAN .18541.IB00.APPR
V210028.INTERNATIONA  BROADCASTER M   TIMEDIA       RAINIAN .18399.IB00.APPR
V180122.INT BROADCASTER  M   TIMEDIA     RAINIAN .16935.IB00.APPR
V190221.INTERNATIONA  BROADCASTER TV ON INE   SERBIAN .17502.IB00.APPR
V169107.INT BROADCASTER  TV ON INE     RAINIAN .15778.IB00.APPR
V230117.M   TIMEDIA SPECIA IST  R  SSIAN .19089.IB00.APPR
V210028.INTERNATIONA  BROADCASTER M   TIMEDIA       RAINIAN .17819.IB00.APPR
V230144.INTERNATIONA  BROADCASTER TV ON INE   A BANIAN .19310.IB00.APPR
V190221.INTERNATIONA  BROADCASTER TV ON INE   SERBIAN .17501.IB00.APPR
V169028.INT BROADCASTER  TV ON INE  R  SSIAN .16187.IB00.APPR
V169173.INT BROADCASTER  TV ON INE  R  SSIAN .15775.IB00.APPR
V230053.INTERNATIONA  BROADCASTER TV ON INE  R  SSIAN .19498.IB00.APPR
V210050.M   TIMEDIA SPECIA IST  A BANIAN .17813.IB00.APPR
V158010.INT BROADCASTER  TV ON INE  R  SSIAN .15731.IB00.APPR
V158206.INT BROADCASTER  TV ON INE   MACEDONIAN .15146.IB00.APPR
V190112.INT BROADCASTER  TV ON INE  R  SSIAN .17167.IB00.APPR
V190048.INT BROADCASTER  TV ON INE  R  SSIAN .17112.IB00.APPR
V220168.MANA  EMENT AND PRO  RAM ANA   ST   INANCIA .18547.IB00.APPR
V170173.INVESTI  ATIVE WRITER-EDITOR.19127.IB00.APPR
V3208.INT BROADCASTER  SERBIAN .11977.IB00.APPR
V114268.INT BROADCASTER    EOR IAN .13046.IB00.APPR
V220171.INTERNATIONA  BROADCASTER R  SSIAN  ON INE.18840.IB00.APPR
V190235.INTERNATIONA  BROADCASTER V   A BANIAN .17419.IB00.APPR
V114317.INT BROADCASTER  TV   BOSNIAN .12988.IB00.APPR
V210050.M   TIMEDIA SPECIA IST  A BANIAN .17814.IB00.APPR
V240139.M   TIMEDIA   RAPHICS DESI  NER.20434.IB00.APPR
V220156.INT BROADCASTER  M   TIMEDIA  R  SSIAN .18642.IB00.APPR
V170097.INT BROADCASTER  M   TIMEDIA  R  SSIAN .16021.IB00.APPR
V3109.SENIOR ANA   ST.18375.IB00.APPR
V4084.INT BROADCASTER  TV      RAINIAN .12895.IB00.APPR
V158198.EDITOR  SPECIA T  .15157.IB00.APPR
V170097.INT BROADCASTER  M   TIMEDIA  R  SSIAN .16022.IB00.APPR
V169028.INT BROADCASTER  TV ON INE  R  SSIAN .16647.IB00.APPR
V250005.INT BROADCASTER  TV ON INE     RAINIAN .20431.IB00.APPR
V240113. INANCIA  SPECIA IST.20225.IB00.APPR
V114197.ACCO  NTANT  INTERNA  CONTRO S .18794.IB00.APPR
V210117.PA RO    SPECIA IST.18254.IB00.APPR
V114197.ACCO  NTANT  INTERNA  CONTRO  .18806.IB00.APPR
V114267.ACCO  NTANT  ANA   SIS REPORTIN   AND COMP IANCE .17282.IB00.APPR
V136150.SENIOR ACCO  NTANT.13830.IB00.APPR
V136014.M   TIMEDIA PROD  CTION SPECIA IST.13602.IB00.APPR
V136014.M   TIMEDIA PROD  CTION SPECIA IST.14837.IB00.APPR
V210052.PROD  CER.17821.IB00.APPR
V8592.IB  RADIO TV   EN   ISH .10660.IB00.APPR
V240085.H  MAN RESO  RCES SPECIA IST.20214.IB00.APPR
V158003.IT SPECIA IST  S  SADMIN .14575.IB00.APPR
V170023.IT SPECIA IST  INET .15861.IB00.APPR

V125184.IT SPECIA IST  PRO M  T .14853.IB00.APPR
V169043.IT SPECIA IST  IN  OSEC .15276.IB00.APPR
V158213.IT SPECIA IST  S  SADMIN .15739.IB00.APPR
V158002.IT SPECIA IST  S  SADMIN .14576.IB00.APPR
V125109.IT SPECIA IST  S  SADMIN .12949.IB00.APPR
V170062.IT SPECIA IST  IN  OSEC .16797.IB00.APPR
V230139.IT SPECIA IST  S  SADMIN .19497.IB00.APPR
V230110.INTERNATIONA  BROADCASTER  CREO E .19459.IB00.APPR
V210084.M   TIMEDIA SPECIA IST  SPANISH .18201.IB00.APPR
V210009.M   TIMEDIA SPECIA IST  SPANISH .17693.IB00.APPR
V136178.INTERNATIONA  BROADCASTER M   TIMEDIA  SPANISH .14975.IB00.APPR
V169162.INTERNATIONA  BROADCASTER  CREO E .15673.IB00.APPR
V210084.M   TIMEDIA SPECIA IST  SPANISH .18169.IB00.APPR
V240107.INTERNET EDITOR  SPANISH .20171.IB00.APPR
V7726.INT BROADCASTER  TV RADIO   SPANISH .9034.IB00.APPR
V7217.INT RADIO BROADCASTER  SPANISH .8122.IB00.APPR
V190248.INTERNATIONA  BROADCASTER M   TIMEDIA  SPANISH .18076.IB00.APPR
V200001.P ANNIN   PROD  CER EDITOR SPANISH .17705.IB00.APPR
V190159.INTERNATIONA  BROADCASTER  SPANISH .17618.IB00.APPR
V169162.INTERNATIONA  BROADCASTER  CREO E .15672.IB00.APPR
V169024.INTERNATIONA  BROADCASTER M   TIMEDIA   SPANISH .16000.IB00.APPR
V6422.WRITER.10444.IB00.APPR
V5756.WRITER.3835.IB00.APPR
V125137. RAPHICS S  PPORT SPECIA IST.16092.IB00.APPR
V190249.VIDEO PROD  CTION SPECIA IST.17717.IB00.APPR
V6613.VIS  A  IN  ORMATION SPEC.8504.IB00.APPR
V170043.P  B IC A   AIRS SPECIA IST.16854.IB00.APPR
V230103.TE ECOMM  NICATIONS SPECIA IST.20011.IB00.APPR
V190027.TE ECOMM  NICATIONS SPECIA IST.18005.IB00.APPR
V147134.IT SPECIA IST  NETWOR  .14495.IB00.APPR
V147118.IT SPECIA IST  NETWOR  .14411.IB00.APPR
V190027.TE ECOMM  NICATIONS SPEC.17942.IB00.APPR
V170022. EAD IT SPECIA IST  INET .15860.IB00.APPR
V7907.IT SPECIA IST  NETWOR  .9349.IB00.APPR
V180077.TE ECOMM  NICATIONS SPECIA IST.16712.IB00.APPR
V3336.INT BROADCASTER  PERSIAN .12152.IB00.APPR
V240056.TE EVISION E  EC  TIVE PROD  CER  PERSIAN .19913.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .16670.IB00.APPR
V170232.MANA  EMENT AND PRO  RAM ANA  ST  INANCIA  .18291.IB00.APPR
V3334.TV PROD  CTION SPECIA IST  PERSIAN .17587.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .18270.IB00.APPR
V170232.MANA  EMENT AND PRO  RAM ANA  ST  INANCIA  .17902.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .17842.IB00.APPR
V210037.PROD  CER.17732.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17790.IB00.APPR
V170057. EAD TV PROD  CTION SPECIA IST  PERSIAN .19607.IB00.APPR
V210006.M   TIMEDIA SPECIA IST  PERSIAN .17730.IB00.APPR

V170057. EAD TV PROD  CTION SPECIA  IST.18088.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14753.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .15003.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .17727.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .17729.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14685.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14751.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .17728.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .17789.IB00.APPR
V220164.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .18715.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14680.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14679.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .13831.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14712.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .17788.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14677.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14750.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14758.IB00.APPR
V136144.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .14757.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .17786.IB00.APPR
V210207.INT BROADCASTER  DOMESTIC BEAT CORRESPONDENT  PERSIAN .18320.IB00.APPR
V230017.INTERNATIONA  BROADCASTER M   TIMEDIA  PERSIAN .18678.IB00.APPR
V3324.INT BROADCASTER  SENIOR CORRESPONDENT  PERSIAN .12194.IB00.APPR
V3324.INT BROADCASTER  SENIOR CORRESPONDENT  PERSIAN .13143.IB00.APPR
V3106.INT BROADCASTER  EN   ISH- EAT  RES .12351.IB00.APPR
V210006.M   TIMEDIA SPECIA  IST  PERSIAN .18307.IB00.APPR
V158013.PER  ORMANCE REVIEW ANA   ST.18686.IB00.APPR
V158013.PER  ORMANCE REVIEW ANA   ST.18687.IB00.APPR
V170232.MANA  EMENT AND PRO  RAM ANA  ST  INANCIA .20335.IB00.APPR
V170043.P  B  IC A   AIRS SPECIA  IST.18780.IB00.APPR
V210156.P  B  IC A   AIRS SPECIA  IST.18357.IB00.APPR
V170065.MANA  EMENT AND PRO  RAM ANA   ST.15972.IB00.APPR
V8533.MAI  OPERATIONS ASSISTANT.11621.IB00.APPR
V210042.ADMINISTRATIVE O   ICER.18361.IB00.APPR
V136181.ADMINISTRATIVE O   ICER.13961.IB00.APPR
V180149.ADMINISTRATIVE ASSISTANT  OA .16820.IB00.APPR
V180078.PRO  RAM ANA   ST.16716.IB00.APPR
V240009.IT PRO ECT MANA  ER  P  C  P  N .19804.IB00.APPR
V240009.IT PRO ECT MANA  ER  P  C  P  N .19267.IB00.APPR
V240009.IT PRO ECT MANA  ER  P  C  P  N .19268.IB00.APPR
V220075.  ENERA  SERVICES SPECIA  IST.18745.IB00.APPR
V220075.  ENERA  SERVICES SPECIA  IST.20455.IB00.APPR
V169232.SA  ET  AND EMER  ENC  PREPAREDNESS SPECIA  IST.19287.IB00.APPR
V200107.DI  ITA  MEDIA SPECIA  IST  PASHTO .17534.IB00.APPR
V1175.M   TIMEDIA SPECIA  IST  PASHTO .18753.IB00.APPR
V220150.MANA  EMENT AND PRO  RAM ANA  ST  INANCIA .19912.IB00.APPR
V200107.DI  ITA  MEDIA SPECIA  IST  PASHTO .18085.IB00.APPR

V200117.DI ITA NEWS EDITOR    RDISH .17994.IB00.APPR
V240116.INTERNATIONA BROADCASTER DI ITA   T R ISH .20458.IB00.APPR
V190031. RAPHIC ARTIST DI ITA MEDIA .17155.IB00.APPR
V180022.INT BROADCASTER M  TIMEDIA  T R ISH   RDISH .16843.IB00.APPR
V180065.INT BROADCASTER V    RD .16730.IB00.APPR
V170207.INT BROADCASTER M  TIMEDIA PASHTO .16676.IB00.APPR
V4075.INT BROADCASTER ON INE  T R ISH .15010.IB00.APPR
V240110.INT BROADCASTER M  TIMEDIA  T R ISH .20416.IB00.APPR
V136035.INT BROADCASTER PASHTO .14117.IB00.APPR
V240008.INTERNATIONA BROADCASTER M  TIMEDIA  T R ISH .19429.IB00.APPR
V158029.INT BROADCASTER ON INE    RDISH .14805.IB00.APPR
V220150.MANA EMENT AND PRO RAM ANA  ST INANCIA .18520.IB00.APPR
V220169.MANA EMENT AND PRO RAM ANA  ST INANCIA .18548.IB00.APPR
V169199.INT BROADCASTER M  TIMEDIA BAN  A .15722.IB00.APPR
V220208.E EC TIVE PROD CER.18993.IB00.APPR
V210051.M  TIMEDIA SPECIA IST DARI .17816.IB00.APPR
V169157.INT BROADCASTER M  TIMEDIA PASHTO .15720.IB00.APPR
V169157.INT BROADCASTER M  TIMEDIA PASHTO .15718.IB00.APPR
V114240.INT BROADCASTER M  TIMEDIA PASHTO .17205.IB00.APPR
V169141.INT BROADCASTER M  TIMEDIA    RD .15632.IB00.APPR
V114240.INTERNATIONA BROADCASTER PASHTO .13773.IB00.APPR
V169157.INT BROADCASTER M  TIMEDIA PASHTO .16461.IB00.APPR
V210104.INTERNATIONA BROADCASTER M  TIMEDIA BAN  A .18023.IB00.APPR
V1114.INT BROADCASTER DARI .15412.IB00.APPR
V210044.M  TIMEDIA SPECIA IST PASHTO .17802.IB00.APPR
V158034.INT BROADCASTER    BE .14804.IB00.APPR
V136125.INTERNATIONA BROADCASTER M  TIMEDIA DARI .13774.IB00.APPR
V114240.INT BROADCASTER M  TIMEDIA PASHTO .16763.IB00.APPR
V147012.INT BROADCASTER BAN  A .14161.IB00.APPR
V7228.INT BROADCASTER A ERBAI ANI .7329.IB00.APPR
V200085.INTERNATIONA BROADCASTER M  TIMEDIA    RD .17474.IB00.APPR
V1175.INT BROADCASTER PASHTO .11861.IB00.APPR
V200085.INTERNATIONA BROADCASTER M  TIMEDIA    RD .17473.IB00.APPR
V200127.SENIOR TE EVISION SPECIA IST PROD CER    RDISH .18108.IB00.APPR
V1175.M  TIMEDIA SPECIA IST PASHTO .18383.IB00.APPR
V200114.M  TIMEDIA SPECIA IST PASHTO .17545.IB00.APPR
V170133.INT BROADCASTER M  TIMEDIA  T R ISH .16119.IB00.APPR
V170135.INT BROADCASTER M  TIMEDIA PASHTO .16139.IB00.APPR
V200110.M  TIMEDIA SPECIA IST  T R ISH .17541.IB00.APPR
V190224.EDITOR BRID E .17547.IB00.APPR
V190237.E EC TIVE PROD CER TV    RD .17329.IB00.APPR
V147085.TV PROD CTION SPECIA IST    RD .14533.IB00.APPR
V210099.INTERNATIONA BROADCASTER M  TIMEDIA PASHTO .18177.IB00.APPR
V170155.INT BROADCASTER M  TIMEDIA PASHTO .16186.IB00.APPR
V147015.INT BROADCASTER DARI .14116.IB00.APPR
V210100.INTERNATIONA BROADCASTER M  TIMEDIA DARI .18176.IB00.APPR
V180108.EDITOR DI ITA   DEEWA .17111.IB00.APPR

V169169.SPECIA  PRO ECTS MANA  ER.15683.IB00.APPR
V230089.A DIOVIS A PROD CTION SPECIA IST.19023.IB00.APPR
V169039.E EC TIVE PROD CER TV  T R ISH .15267.IB00.APPR
V230130.E EC TIVE PROD CER TV .19067.IB00.APPR
V170134.INT BROADCASTER M TIMEDIA   RDISH .19016.IB00.APPR
V169044.E EC TIVE PROD CER TV   RDISH .18622.IB00.APPR
V169171.SENIOR EDITOR M TIMEDIA DARI .15681.IB00.APPR
V169036.INT BROADCASTER M TIMEDIA   BE .15261.IB00.APPR
V170134.INT BROADCASTER M TIMEDIA   RDISH .16142.IB00.APPR
V136246.SENIOR ANA ST.16175.IB00.APPR
V180156.IT SPECIA IST C STSPT .17896.IB00.APPR
V180156.IT SPECIA IST C STSPT .17897.IB00.APPR
V0903.IT SPECIA IST C STSPT .12014.IB00.APPR
V0903.IT SPECIA IST C STSPT .12013.IB00.APPR
V7501.IT SPECIA IST C STSPT .12885.IB00.APPR
V180156.IT SPECIA IST C STSPT .17220.IB00.APPR
V190214.TE ECOMM NICATIONS SPECIA IST BROADCASTIN  MEDIA TECHNO O  .18083.IB00.APPR
V190214.TE ECOMM NICATIONS SPECIA IST BROADCAST MEDIA TECHNO O  .17995.IB00.APPR
V190214.TE ECOMM NICATIONS SPECIA IST BROADCASTIN  MEDIA TECHNO O  .18181.IB00.APPR
V158189.TE ECOMM NICATIONS SPECIA IST.17190.IB00.APPR
V190036.IN ORMATION TECHNO O  SPECIA IST C STSPT .17116.IB00.APPR
V190036.IN ORMATION TECHNO O  SPECIA IST C STSPT .17115.IB00.APPR
V190214.TE ECOMM NICATIONS SPECIA IST BROADCASTIN  MEDIA TECHNO O  .18056.IB00.APPR
V158189.TE ECOMM NICATIONS SPECIA IST.17191.IB00.APPR
V158140.IT SPECIA IST C STSPT .15016.IB00.APPR
V169013. EAD IT SPECIA IST C STSPT .15210.IB00.APPR
V158189.TE ECOMM NICATIONS SPEC.15139.IB00.APPR
V240039.IT SPECIA IST S SADMIN .19903.IB00.APPR
V240075.IT SPECIA IST C STSPT .20226.IB00.APPR
V220107.MANA EMENT AND PRO RAM ANA ST.20470.IB00.APPR
V240031.BROADCAST MAINTENANCE TECHNICIAN M TIMEDIA .19456.IB00.APPR
V240033. EAD TV PROD CTION SPECIA IST.19495.IB00.APPR
V158187.IB M TIMEDIA .19579.IB00.APPR
V4090. ENERA ASSI NMENTS REPORTER EN ISH .12591.IB00.APPR
V4090. ENERA ASSI NMENTS REPORTER EN ISH .18071.IB00.APPR
V220061.INT BROADCASTER EN ISH .18711.IB00.APPR
V210066.A DIENCE EN A EMENT ANA ST.17938.IB00.APPR
V210066.A DIENCE EN A EMENT ANA ST.18430.IB00.APPR
V3116.INTERNATIONA BROADCASTER EN ISH .12357.IB00.APPR
V3116.INT BROADCASTER EN ISH .12364.IB00.APPR
VV220029.PRESS REEDOM M TIMEDIA REPORTER.18812.IB00.APPR
V210217.  .S . PO ITICS AND PO IC REPORTER.18658.IB00.APPR
V210098.INTERNATIONA BROADCASTER DOMESTIC BEAT .18170.IB00.APPR
V210098.INTERNATIONA BROADCASTER DOMESTIC BEAT CORRESPONDENT .18014.IB00.APPR
V220036.EDITOR BRID E .18350.IB00.APPR
V180007. RAPHIC ARTIST.16578.IB00.APPR
V158132.EDITOR STOR .17303.IB00.APPR

Add. 89

V210098.INTERNATIONA  BROADCASTER  DOMESTIC BEAT CORRESPONDENT .18017.IB00.APPR

V210098.INTERNATIONA  BROADCASTER  DOMESTIC BEAT CORRESPONDENT .18015.IB00.APPR

V4090.  ENERA  ASSI  NMENTS REPORTER  EN    ISH .13978.IB00.APPR

V4090.  ENERA  ASSI  NMENTS REPORTER  EN    ISH .12589.IB00.APPR

V220176.MEDIA ASSET DISPOSITION SPECIA  IST.18573.IB00.APPR

V230067.IT SPECIA  IST  INET .18828.IB00.APPR

V220151.MANA  EMENT AND PRO  RAM ANA   ST   INANCIA  .18519.IB00.APPR

V210014.A  DIOVIS  A  PROD  CTION SPECIA  IST.17695.IB00.APPR

V147027.INTERNATIONA  BROADCASTER  TV INTERNET .14135.IB00.APPR

V1156.INT BROADCASTER  INTERNET .11423.IB00.APPR

V3116.INT BROADCASTER  EN    ISH .12363.IB00.APPR

V114262.INT BROADCASTER  EN    ISH .12378.IB00.APPR

V147026.TV PROD  CTION SPECIA  IST.14137.IB00.APPR

V220061.INT BROADCASTER  EN    ISH .18627.IB00.APPR

V136106.WRITER EDITOR  INTERNET .19348.IB00.APPR

V136106.WRITER EDITOR  INTERNET .13814.IB00.APPR

V147149.INT BROADCASTER  M   TIMEDIA .14910.IB00.APPR

V158198.EDITOR  SPECIA  T  .15156.IB00.APPR

V136106.WRITER EDITOR  INTERNET .18891.IB00.APPR

V158132.EDITOR  STOR  .15037.IB00.APPR

V158132.EDITOR  STOR  .15042.IB00.APPR

V136192.INTERNATIONA  BROADCASTER.14622.IB00.APPR

V7857.TECHNICA  IN  ORMATION SPECIA  IST.14347.IB00.APPR

V3116.INT BROADCASTER  EN    ISH .12370.IB00.APPR

V210014.A  DIOVIS  A  PROD  CTION SPECIA  IST.17694.IB00.APPR

V210014.A  DIOVIS  A  PROD  CTION SPECIA  IST.17697.IB00.APPR

V3104.INT BROADCASTER  VIDEO PHOTO  RAPHER .12301.IB00.APPR

V3116.INTERNATIONA  BROADCASTER EN    ISH .13640.IB00.APPR

V170054.TECHNICA  IN  ORMATION SPECIA  IST DI  ITA  ASSET .15950.IB00.APPR

V169164.INTERNATIONA  BROADCASTER.19860.IB00.APPR

V136153.TECHNICA  IN  ORMATION SPECIA  IST DI  ITA  ASSET .13839.IB00.APPR

V8014.STA    ASSISTANT  T  PIN  .9256.IB00.APPR

| Grade | Competitive Geo |
|-------|-----------------|
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-11 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -13  | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| -13  | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |

| S-13 | Washington, DC |
|------|----------------|
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | PA  M BA  ,BREVARD, |
| S-14 | PASADENA,  OS AN   E ES,CA |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | PHOENI ,MARICOPA,A |
| S-13 | PORT AND,C MBER AND,ME |
| S-12 | SAN ANTONIO,BE AR,T |
| S-12 | HI H AND,MADISON,I |
| S-09 | SA EM,MARION,OR |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | NOR O    IND CIT  ,VA |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-09 | Washington, DC |
| S-09 | Washington, DC |
| S-13 | ISSIMMEE,OSCEO A, |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | N    or , N |
| S-12 | N    or , N |
| S-12 | CR STA  A E,MCHENR ,I |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |

| -12 | Washington, DC |
|-----|----------------|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| | |
|---|---|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | RANCONIA,  RA TON,NH |
| S-13 | Washington, DC |
| S-11 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-15 | Washington, DC |
| S-12 | N     or , N |
| S-13 | N     or , N |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | CAPE CORA , EE, |
| S-12 | WARSAW,RICHMOND,VA |
| S-11 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |

| S-13 | Washington, DC |
|---|---|
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-15 | Washington, DC |
| S-12 | N    or , N |
| S-13 | N    or , N |
| S-12 | OS AN  E ES, OS AN  E ES,CA |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-06 | Washington, DC |
| S-11 | Washington, DC |
| S-11 | Washington, DC |
| S-08 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |

| S-12 | Washington, DC |
|------|----------------|
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| -12  | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| -12  | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |

| | |
|---|---|
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-14 | Washington, DC |
| S-14 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | N      or , N |
| S-13 | N      or , N |
| S-13 | N      or , N |
| S-13 |  A SA   E,I |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |

| S-13 | Washington, DC |
|------|----------------|
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-11 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-13 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-12 | Washington, DC |
| S-07 | Washington, DC |

# EXHIBIT I

Add. 104

🅞 Outlook

---

**Important Information: Placement on Administrative Leave**

---

**From** Crystal Thomas <cthomas@usagm.gov>

**Date** Sat 3/15/2025 9:57 AM

**This email provides important information regarding your employment status.**

Pursuant to the Presidential Executive Order Continuing the Reduction of the Federal Bureaucracy – The White House and the Office of Personnel Management Guidance on Probationary Periods, Administrative Leave and Details and additional authorities, including but not limited to, 5 C.F.R. § 630.1403, effective immediately, the United States Agency for Global Media (USAGM) is placing you on administrative leave with full pay and benefits until otherwise notified. This administrative leave is not being done for any disciplinary purpose.

Please note the following:

- **Access to Premises and Systems:** During the period that you are on administrative leave, you are not to enter USAGM premises, access USAGM systems, or attempt to use your position or authority with USAGM in any way without my prior permission or prior permission of a supervisor in your chain of command.

- **Government Property:** Since you will not have any official business during this time, upon request, you will be expected to immediately surrender your official USAGM identification badge and press pass, as well as any keys or other official government property, including documents, records, electronic and telephone devices, and other equipment.

While you are on administrative leave with pay, you must be available by your personal telephone and personal e-mail during normal business hours, as it may be necessary for Agency officials to contact you. To that end, from your personal email, please send an email to HRcustomerservice@usagm.gov providing your personal contact information, including your phone number, email address, and mailing address by Monday, March 17, 2025.

You also must remain available to report to work if directed to do so and will be required to do so within one (1) business day of being contacted by an Agency representative, whether telephonically or electronically. If a situation occurs that would prevent you from reporting to work if contacted (*e.g.*, travel outside of the area, medical circumstances, jury duty, etc.), you must contact Crystal Thomas at CThomas@usagm.gov and provide the information as to your unavailability, so that your administrative leave can be changed to the appropriate leave category.

While on administrative leave, you remain an employee of the Agency. You are required to comply with the instructions of your supervisors, all laws and regulations, and agency policies, including the Broadcasting Administrative Manual (BAM).

We will provide you with updates as soon as they are available. We appreciate your patience and cooperation.

If you have any concerns or questions, please contact Crystal Thomas at cthomas@usagm.gov.

Crystal G. Thomas
Director
Office of Human Resources

P: 202-920-2401
M: 202-765-7950
cthomas@usagm.gov



## DECLARATION OF JOHN DOE 4

I, John Doe 4, declare under penalty of perjury that the foregoing is true and correct:

1. I am a plaintiff in this case, captioned as *Widakuswara v. Lake*, No. 25-cv-01015-RCL (D.D.C).

2. I am a PSC (Personal Service Contractor) and a member of the US Agency for Global Media (USAGM) workforce.

3. On March 16, 2025, I was informed that my contract was to be terminated, effective March 31, 2025.

4. On March 28, 2025, a Temporary Restraining Order (TRO) was entered in this case (ECF No. 54). The TRO temporarily enjoins the defendants, including USAGM, from taking "any action to reduce USAGM's workforce (whether employees, contractors, or grantees)."

5. On March 29, 2025, I received an email from USAGM, with the subject "PSC Status," stating:

> Please be advised that the termination of your personal services contract is on hold until further notice. During this time, you will remain on administrative leave and will continue to receive your regular pay and benefits. We will keep you informed as the situation develops.

Add. 107

6.  A copy of the email is attached as Exhibit 1.  USAGM did not reinstate my
    contract or suspend its termination at any time prior to March 29.

7.  On April 15, 2025, I also learned that USAGM has informed the PSC health
    insurance carriers that coverage is to terminate April 30, 2025.

8.  My concern about involuntary termination and the required departure from
    the United States remains.  I am a visible member of the media and fear that
    my friends and family members residing in my home country risk retaliation
    for their associations with me should I be forced to leave the United States in
    the very public manner associated with the present circumstances.

Dated;  April 16, 2025

_____
/s/

JOHN DOE 4

Add. 108

# EXHIBIT 1

From: **J.R. Hill** <chill@usagm.gov>
Date: Sat, Mar 29, 2025 at 5:36 PM
Subject: PSC Status
To: J.R. Hill <chill@usagm.gov>
Cc: John Hoddinott <jhoddinott@usagm.gov>, PSC Inquiries <pscinquiries@usagm.gov>


Good evening

 Please be advised that the termination of your personal services contract is on hold until further notice. During this time, you will remain on administrative leave and will continue to receive your regular pay and benefits. We will keep you informed as the situation develops.

If you have any questions, please don't hesitate to reach out.



Thank you



J.R. Hill

USAGM/CON

Branch Chief

VOA, OCB and USAGM

 o

c

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, *et al.*,

                Plaintiffs,

         - v -

KARI LAKE, *et al.*,

                Defendants.

No. 25 Civ. 2390 (JPO)

### DECLARATION OF CRYSTAL THOMAS

      I, CRYSTAL THOMAS, hereby make the following declaration pursuant to 28 U.S.C. § 1746:

      1.      I have been the Director of Human Resources for the U.S. Agency for Global Media ("USAGM") since 2024.   I base this declaration on knowledge and information I have gained in the course of performing my official duties.

      2.      In that capacity, I have personal knowledge of, and direct involvement, in personnel decisions for USAGM.

      3.      USAGM currently employs a total of approximately 1,147 full-time employees.  As of March 14, 2025, USAGM had active employment contracts with 598 personal service contractors.

      4.      Nearly all of USAGM's workforce has been located in the Washington, D.C. area. Specifically, USAGM currently has approximately 1,040 full time federal employees with duty stations in the Washington, D.C. area.  In addition, as of March 14, 2025, USAGM contracted with approximately 475 personal services contractors in the Washington, D.C. area.  In contrast, as of the same date, USAGM employed only 14 full-time federal employees and contracted with only 25 personal services contractors in the New York City area.

**Add. 110**

5.      On March 14, 2025, President Trump issued an Executive Order directing that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law" (the "Executive Order").      *See* Continuing the Reduction of the Federal Bureaucracy, https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ (Mar. 14, 2025).

6.      On March 15, 2025, pursuant to the Executive Order, USAGM placed 1,042 full-time employees on administrative leave with full pay and benefits. On March 16, 2025, and terminated the contracts with all personal services contractors, who will be paid through March 31, 2025. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order.

7.      In the course of that implementation, on March 25, 2025, I sent an email to 33 employees who work at Office of Cuba Broadcasting recalling them from administrative leave effective March 26, 2025. As of the end of the day on March 26, 2025, I can confirm that all employees were on work status. I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025.

8.      In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 31 other employees from administrative leave.

9.      The American Federal Government Employees Local 1812 ("AFGE") serves as the exclusive representative for a bargaining unit consisting of approximately 713 USAGM employees. On March 25, 2025, I sent an email to the AFGE Local 1812 President enclosing a preliminary

2

**Add. 111**

notification to the union stating USAGM's intent to implement a reduction in force ("RIF") for multiple competitive areas in USAGM in furtherance of the Executive Order.

10.     The American Federation of State, County and Municipal Employees Local 1418, AFL-CIO ("AFSCME") serves as the exclusive representative for a bargaining unit consisting of approximately 33 USAGM employees.  On March 25, 2025, I sent an email to the AFSCME Local 1418 President, enclosing a preliminary notification to the union stating USAGM's intent to implement a RIF for multiple competitive areas in furtherance of the Executive Order.

11.     Both of the foregoing notifications informed the respective unions of USAGM's intention to implement a RIF in a manner consistent with USAGM's Negotiated Labor Management Agreements ("NLMA") with each union.

12.     The notifications that were issued will not directly result in the termination of any USAGM employee.  Rather, it is a first step in the process of conducting a RIF, pursuant to the NLMAs with each respective union.  Additional steps in the RIF process with both unions will include, among other things, impact and implementation bargaining to the extent requested by the unions; providing additional information to the unions, including responding to union information requests; providing the unions with retention registers; and specific notice to bargaining unit employees.  Each of these steps would occur prior to removing any bargaining unit employees in the RIF implementation process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 27, 2025
          Washington, District Columbia

**Crystal G Thomas**
Digitally signed by
Crystal G Thomas
Date: 2025.03.27
14:09:55 -04'00'

CRYSTAL THOMAS

3

# EXHIBIT O

Add. 113

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                  Plaintiffs,

    -against-

KARI LAKE, et al.,

                  Defendants.

No. 25 Civ. 2390

## DECLARATION OF THIBAUT BRUTTIN

I, Thibaut Bruttin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    I am the Director General of Reporters Sans Frontières ("RSF"). I have worked for RSF for 10 years.

3.    RSF is an international non-profit, non-governmental organization dedicated to protecting the freedom, pluralism and independence of journalism, and to defending those who embody these ideals. Our mission spans from reporting on censorship and attacks on journalists, to advocating for press freedom and the right of the public to access reliable information through government engagement, to directly supporting journalists with physical security and legal assistance.

4.    RSF's correspondents around the globe rely on reporting from Voice of America ("VOA") and the United States Agency for Global Media ("USAGM") grantee networks to perform essential functions.

1

5.      The shutdown of USAGM, and VOA in particular, has caused and will continue to cause irreparable harm to RSF as an advocacy organization, to the correspondents they represent and who affiliate with them, and to the individuals throughout the world who depend on that work and whose interests RSF champions.

6.      Those irreparable harms include depriving correspondents of a trustworthy source of news and information in countries and landlocked or remote regions where VOA is one of the few, if not the only, sources of independent and reliable news; stopping RSF from receiving then disseminating vital public interest information for journalists and public safety; reducing the opportunities for persecuted correspondents' stories to be highlighted and potentially protected; and significantly interfering with the organization's ability to advocate for a free press. The silencing of VOA also impedes RSF's ability to function and forces the organization to lose and waste material resources it otherwise would not have spent and upon which it relies. These harms are not abstract or speculative — they are tangible, ongoing, and in many cases, life-threatening.

7.      RSF has over 150 correspondents who are media workers around the world. In many of the threatened and at-risk countries where RSF and its correspondents operate, VOA is among the most authoritative and indispensable sources of information or provides unique coverage otherwise unavailable. Those countries of operation include Afghanistan, Armenia, Azerbaijan, Bangladesh, Burundi, Cambodia, China (including Hong Kong and Tibet), Colombia, Democratic Republic of Congo, Myanmar, Ukraine, Pakistan, Venezuela, El Salvador, Vietnam, and Zimbabwe.

8.      The destruction of VOA is causing and will continue to cause immediate irreparable damage to RSF. For RSF and its correspondents, VOA is a critical reliable source for monitoring press freedom and political developments.

Add. 115

9.      RSF correspondents rely on VOA and USAGM grantees networks as listeners in places where the local media is unreliable. These correspondents — many of whom operate in hostile environments with limited access to credible local media — are now deprived of a trusted source that shaped their reporting, informed RSF's advocacy, and protected their safety. In regions where media is tightly controlled, including parts of Central Europe, Central Asia, Sub-Saharan Africa, Latin America, and Southeast Asia, VOA broadcasts in local languages and provides coverage that cannot be replicated by domestic outlets. Losing VOA erases a critical flow of information for our correspondents.

10.      In Vietnam, an RSF correspondent relies on VOA for many of their news and analytical reports. Without VOA, their work will be severely curtailed, and they will have to expend further energy and resources to gather the information they need — costs that will be billed to RSF, causing further irreparable loss to the organization — and potentially expose themselves to greater danger. That danger stems from having to cultivate additional sources which, in an authoritarian regime, can be perilous, as Vietnam's continuous policy of mass imprisonment of media personnel and the high number of journalistic fatalities around the world attest. In Vietnam alone, VOA journalist Pham Chi Dung is serving a 15-year sentence and three freelance journalists with USAGM grantee Radio Free Asia are also arbitrarily detained because of performing their journalistic activity (Truong Duy Nhat, sentenced to 10 years in prison in 2020; Nguyen Tuong Thuy, sentenced to 11 years in prison in 2021; and Nguyen Lan Thang, sentenced to 6 years in custody in 2023). It is also the case in Myanmar where VOA journalist Sithu Aung Myint was arrested in 2021 on charges of inciting crime, defaming the military and sedition.

11.      For a Tibetan RSF correspondent, one of their main sources of information on the coverage of Tibetan Media organizations comes from two major organizations with the resources

3

Add. 116

to get accurate information out of Tibet to the wider world: Radio Free Asia (which is a USAGM grantee) and VOA Tibetan Services. Defendants' actions will eradicate this essential stream of information that people around the world are entitled to receive, stifle the expression of Tibetans, and irreparably damage the RSF's correspondent's ability to fulfill their journalistic obligations.

12.    RSF's Kenyan correspondent also relies on VOA reporting, especially for information from other African countries. They said that they used VOA "a lot as a source of [their] news and understanding what was happening elsewhere in the continent." That knowledge is an important resource that informs their work.

13.    At a basic level, reporters depend on each other to do their jobs and removing VOA journalists from the equation interferes with that. Shutting off access to trustworthy journalism irreparably prevents journalists and RSF correspondents from performing a crucial function: collaborating to identify reliable information. RSF's Burundian correspondent, for instance, exchanged information with VOA journalists on an ongoing regular basis. He says, "Now I find myself somewhat orphaned, it's as if I've lost friends who encouraged me, who pushed me to improve, to dare to dig for good information."

14.    Every story that doesn't appear, or that is hampered, by the lack of VOA is itself an injury that can never be repaired.

15.    Those irreparable injuries are compounded for RSF correspondents and journalists working in dangerous regions. They don't just rely on VOA to do their jobs but for their own personal safety.

16.    For example, in Ethiopia, VOA is one of the key sources of regular and objective news on Ethiopian affairs and is broadcast in three languages to reach the majority of Ethiopians. VOA's services have been essential sources of information for RSF during critical elections and

Add. 117

episodes of political, ethnic and other forms of violence. Our media worker reports, "As a correspondent, I have multiple times used VOA reporting to verify information received from sources on the arrest, prosecution, disappearance and court proceedings of journalists persecuted by all kinds of interest groups in Ethiopia…The loss of VOA services would lead to a closure of a crucial source of information on all press freedom issues and encourage those engaged in the persecution of journalists." In a nation where journalists have been arrested in large numbers, beaten, and even killed, that constitutes a substantial and irreparable harm.

17.    In the Democratic Republic of Congo ("DRC"), journalists must operate in a highly perilous environment, where organized and violent rebels endanger the lives of journalists — including RSF's correspondent — and the populace. Accordingly, since January 2025 RSF was called to provide life-saving support for more than 30 journalists and documented over 50 attacks on newsrooms and journalists in North Kivu in less than a year. VOA's reporting is essential for the people of the country to understand the circumstances in which they find themselves and to respond accordingly. While the people in DRC are under constant threat from M23 Rebels, and local media is prevented from independently reporting on the ongoing conflict via explicit orders and under threat of physical harm, VOA broadcasts honest and indispensable information that would otherwise be censored. Its journalists uncover stories others are unable to report — VOA reporters are famous in DRC for establishing contacts, specifically in Swahili, with the general population and with the average civilian facing danger. Our correspondent journalist in turns relies upon VOA to inform their reporting. With the absence of VOA, both the journalists and the public they serve are deprived of critical information. That is by itself an irreparable injury, and also exposes them to other grave harms and even mortal peril.

18.    The dismantling of VOA impedes RSF's ability to function and forces our organization to waste material resources it otherwise would not have spent and upon which it relies. Because of USAGM's actions, RSF will incur substantial costs through its assistance programs. We have already provided material support for VOA journalists and anticipate spending more for journalists impacted by VOA's shutdown. These expenses include travel and relocation grants, IT, and other financial and material support. Total spending on assistance to individual journalists in 2024 was around one million Euros, or $1,087,725.02 U.S. dollars. Of that, support to VOA was about 25,000 Euros, or $27,193.13 U.S. dollars. We anticipate spending roughly 125,000 Euros, or $135,965.63 U.S. dollars, on future VOA related cases in the upcoming weeks/months — notwithstanding specific needs-assessment based calculation.

19.    VOA frequently covers RSF's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention; the loss of VOA weakens our ability to amplify press freedom concerns throughout the world. Owing to its foundational mission to expand press freedom around the world, VOA is perhaps the only American media outlet with a dedicated "press freedom desk" that regularly investigates and covers stories concerning press freedom in the United States and around the world. Moreover, there is no media outlet comparable to VOA — its mission, language diversity, reach, and reliability are sui generis. Without VOA, we lose a critical channel for our work. Our operations have already been irreparably frustrated. Because of this, the visibility of press freedom violations has also been reduced, rendering advocacy efforts — including RSF's — less effective and more cost- and labor-intensive, to the detriment of our organization.

20.    RSF correspondents worldwide also rely on VOA to amplify independent journalism and reporting to remote audiences. VOA is one of the few, if not the only, sources of

6

independent and reliable news in remote regions that have limited access to independent media and journalism. Our correspondents in Bangladesh, Ethiopia, Kenya, Pakistan, South Africa, and Zimbabwe report that rural regions in these nations remain mostly or entirely reliant on radio for news coverage. Consequently, VOA is often the only source of independent, reliable information in these areas, providing programming across multiple languages, including minority languages.

21.    Indeed, where our correspondents rely on VOA to spread stories and protect the free flow of information in regions that don't have access to government and other radio services, the silencing of VOA has already caused significant and irreplaceable loss. Our Zimbabwe correspondent stated that the withdrawal has "brought an end to 23 years of radio services to marginalized areas in remote parts of the country that had become accustomed to Studio 7," VOA's Zimbabwe program, with no practical alternative. Due to its long-standing presence in these regions, communities have become reliant on VOA for critical information. Our Bangladeshi RSF correspondent highlighted that VOA was a source of information during its government transition and continues to help safeguard democracy because it has been a trusted outlet in Bangladesh for so long (he noted that he has listened to "VOA broadcasts since he was a school student").

22.    In China, Hong Kong, and Tibet, VOA provides information that is inaccessible elsewhere and serves a vital role to expose the dangers journalists face, including our RSF Press Freedom laureates Zhang Zhan and Huang Qi. In addition to breaking news of human rights violations, VOA's services disseminate reporting on detained journalists and their families and updates from jails that would otherwise be unavailable without their coverage.

23.    These types of irreparable injuries to the interests of RSF, and to journalism and democracy itself, are precisely why the dismantling of VOA has been cheered by authoritarian regimes, including China, that are notorious for media repression. USAGM's actions will

**Add. 120**

undoubtedly encourage harsher crackdowns against journalists and press freedom. Actions taken by repressive governments will put RSF staff, their correspondents, their volunteers, and their supporters in grave danger and ultimately cause them further irreparable harm. As part of its work, RSF combats censorship, propaganda, disinformation and rumor. Without VOA, those efforts have been damaged, forcing us to exhaust the organization's resources to replace the lost functionality of VOA.

24.    VOA frequently covers RSF's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention. The eradication of VOA immediately damages our ability to advocate and operate in the most sensitive global hotspots where information warfare dominates and our work is especially important.  In Ukraine, VOA reaches audiences in Russian-occupied territories, which has allowed RSF's message — including exposing threats to the free press, journalists, and affected populations — to reach critical populations and offering an alternative to Kremlin-controlled narratives. That vital  medium has been destroyed. Losing this source will create an information vacuum that will be exploited by pro-Russian media, further limiting the availability of fact-based reporting in areas where it could be a matter of life and death.

25.    RSF's mission is to advocate for the right of every individual, regardless of where they live, to access reliable and independent information. In many regions, VOA has been among the only outlets providing this invaluable resource. For example, VOA was one of the few media outlets that was still able to report on Laos despite its continued repression of journalists, providing Laotian audiences with news in their local languages. Without VOA, Laos will truly become a black hole of information. That is because VOA information from outside and inside of Laos will

Add. 121

vanish — depriving both Laotians and the rest of the world of valuable information and hampering RSF's mission of tracking press freedoms and the security of journalists.

26.    The same is true in Afghanistan. The Taliban has severely restricted local media, and our RSF correspondent reports that VOA's absence will make challenging the Taliban's crackdown on the press increasingly difficult. Both VOA and Radio Free Europe/Azadi Radio have been major sources of information for Afghani journalists and the public, attracting large audiences by covering the country's situation more comprehensively and freely. These two media outlets have a long history of providing information during Afghanistan's tumultuous and war-torn conditions and have become vital information sources. Their absence is an immediate loss that will harm local media and journalists, who will no longer have a reliable source of information. It will take considerable time for any new media organization to build an audience and reach a similar level of credibility and influence with Persian/Dari and Pashto speakers, assuming that a media with such a will exists or could exist given the tremendous pressure exerted by the regime on journalistic work.

27.    USAGM's actions have already and will continue to make RSF's work more difficult, causing irreparable damage. The sudden elimination of VOA has harmed journalists who it is our mission to protect, both in the United States and throughout the world. Many have lost their jobs and livelihoods. Our organization tracks attacks on press freedom, the struggles of journalists, and advocates for free exchange of information globally. Defendants have catalyzed a crisis in all three areas, forcing us to strain resources at a moment when our work is more essential than ever. Without VOA, a domino effect of second-order harms in media ecosystems worldwide has begun. For example, our Latin American correspondents report that, since the shutdown of

Add. 122

VOA, many local media outlets no longer carry international news in their programming. As nations' information spaces silo, RSF's work has been hamstrung.

28.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Paris, France on the 23rd day of March, 2025.

_____
                                                     Thibaut Bruttin

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATSY WIDAKUSWARA**, *et al.*,<br><br>     *Plaintiffs*,<br><br>**v.**<br><br>**KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*,<br><br>     *Defendants*. | **Case No. 1:25-cv-1015-RCL**<br>**Case No. 1:25-cv-0887-RCL** |
| **MICHAEL ABRAMOWITZ**, et al.,<br><br>     *Plaintiffs*,<br><br>**v.**<br><br>**KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*,<br><br>     *Defendants*. | |

## <u>ORDER</u>

On April 22, 2025, this Court entered a preliminary injunction (PI) after concluding that the defendants' actions pursuant to Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," violated numerous provisions of the Administrative Procedure Act (APA). *See* Order, No. 25-cv-1015 (RCL) ("*Widakuswara* Docket"), ECF No. 99; Order, No. 25-cv-887 (RCL) ("*Abramowitz* Docket"), ECF No. 29.  The Court enjoined the defendants as follows:

> 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM

1

**Add. 124**

employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA [Voice of America] programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).

Order, *Widakuswara* Docket, ECF No. 99. The Court entered a corresponding PI in *Abramowitz* specifically tailored to the defendants' actions regarding VOA. Order, Abramowitz Docket, ECF No. 29. The defendants have filed a "Motion for a Partial Stay Pending Appeal" in both cases [ECF No. 102, *Widakuswara* Docket] [ECF No. 32, *Abramowitz* Docket]. For the reasons contained herein, the defendants' Motion is **DENIED**.

Of note, the defendants characterize this Motion as a "partial stay" because they claim that they are not seeking a stay of the third portion of the Court's PI: to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." Mot. at 10 (citing this Court's PI Order). Notwithstanding the defendants' characterization, the effect of the order they request would be to stay the third portion of the PI Order: a stay of the first portion of the PI would stay the implementation of the third, because VOA cannot resume programming if all staff remains on leave indefinitely. And in their Motion and accompanying declarations, defendants do not indicate any plans to resume VOA broadcasting, as is required by the third portion of the PI order. The Court therefore analyzes this Motion as one for a full stay of this Court's PI order.

"[T]he factors regulating the issuance of a stay" include "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Court addresses each in turn.

As the Court discussed in its Memorandum Opinion accompanying the PI Order, the defendants are not likely to succeed on the merits, and indeed, have opted not to argue the merits of the plaintiffs' arbitrary and capricious challenge at all, which formed the bedrock of this Court's holding. *See Widakuswara v. Lake*, No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *13 (D.D.C. Apr. 22, 2025).

The defendants also do not establish that irreparable harm to the government would occur absent a stay. Regarding the Court's injunction mandating compliance with congressional appropriations statutes, defendants argue that this obligation will cause irreparable harm to the government because the government is "unlikely to recover" the funds in the event that the D.C. Circuit finds that the defendants have been wrongfully enjoined. Mot. at 10. But this is not an accurate characterization of the defendants' harm: financial harm is typically not irreparable unless "the loss threatens the very existence of the movant's business." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Though USAGM must continue to dispense congressional appropriations to RFA and MBN under this Court's injunction, if the D.C. Circuit later holds for the defendants, the money that was disbursed will not "threaten the very existence" of USAGM, and the defendants could seek to recover the funds via other litigation avenues in the future. In short, ordering the payment of congressionally appropriated money to the intended recipient, and for its intended use, does not amount to irreparable harm to the federal government. The indefinite withholding of appropriations from international broadcasting outlets,

however, does cause irreparable harm.  *See Widakuswara*, 2025 WL 1166400, *16 (detailing irreparable harm to the network grantees, including the shuttering of their businesses entirely).

The defendants devote more discussion to the purported irreparable harm to the defendants regarding the impact on their personnel actions.  Defendants represent their understanding of the preliminary injunction as follows: "Rather than narrowing [the injunction] to those employees or contractors who may have been removed or terminated as a result of Executive Order 14238, the Court includes every single 'employee and contractor, who were placed on leave or terminated,' which includes those who may have been placed on administrative leave or terminated for other causes, including, but not limited to, misconduct, performance issues, or security violations."  Mot. at 6.  Notably, this is the first time in this litigation that the defendants have argued that any of the personnel actions taken since March 14, 2025 were taken for any reason *other than* in response to the Executive Order.  And the record belies this belated characterization—indeed, in the March 15 email placing 1,300 VOA employees on administrative leave, the USAGM Director of HR states that the placement was "not for any 'disciplinary purpose.'"  Compl. ¶ 74, *Widakuswara* Docket, ECF No. 1.  If anything, the defendants have consistently represented that every action at issue in this litigation taken since March 14, 2025, has been in direct response to the Executive Order.  *See* Defs.' Opp'n to Mot. for Preliminary Injunction, ECF No. 88, at 3 (listing the actions taken by USAGM since March 14, 2025 and characterizing them as "[i]n furtherance of the OPM Memorandum and the Executive Order.").  The PI therefore orders the defendants to return all those employees and contractors affected by the defendants' actions to their status pre-March 14, 2025, the day the Executive Order issued.  Such relief is properly tailored to undo the defendants' actions here.

Furthermore, the defendants interpret the injunction as "prevent[ing] [USAGM] from executing any employment action, including placing any employee on administrative leave for any reason whatsoever." Mot. at 10. They argue that this "creates irreparable harm by hamstringing the agency's personnel operations," Mot. at 4, and also believe that "the Court has prohibited the Agency from making use of any reductions in force regardless of reason," Mot. at 7. But the Court's preliminary injunction does not reach so far. The injunction is tailored to undoing the agency's unlawful actions in furtherance of the Executive Order and returning to the pre-March 14 status quo. When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order, such as "misconduct, performance issues, or security violations" to which they allude—such execution of normal operations would, to the contrary, be in accordance with the status quo pre-March 14.[1]

This is not, as the defendants believe, a determination by the Court that USAGM's status pre-March 14, 2025 is the "benchmark for minimum statutory compliance." Mot. at 2. This Court's relief is based on a finding that defendants' actions since March 14, 2025, in their purported attempt to comply with the Executive Order, have likely contravened the APA. Because a PI "is a stopgap measure . . . intended to maintain a status quo,'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012), it is appropriately tailored relief to order the defendants to reverse their illegal actions and return to the status quo before the illegal actions took place.

---

[1] The defendants also argue that "[t]he injunction prohibits [USAGM] from engaging in contract negotiations, oversteps [USAGM's] broad discretion in setting terms of the grant agreements, and prevents [USAGM] from finalizing any subsequent contract termination even if [USAGM] determines that the contracts are unnecessary for the agency to fulfill its statutory functions." Mot. at 7. But the PI does not bar any of these activities. USAGM can still, with this PI in place, take actions pursuant to its statutory mandate and in compliance with the APA. The actions that the plaintiffs challenge in this lawsuit likely contravene the APA, as the Court has found. *See generally Widakuswara*, 2025 WL 1166400.

Add. 128

As for the final two *Hilton* considerations, the issuance of the stay will "substantially injure the other parties interested in the proceeding." *Hilton*, 481 U.S. at 776. Immediate compliance with the PI is necessary to avert the irreparable harm that is soon to befall the plaintiffs. *See Widakuswara*, 2025 WL 1166400, at *16–17 (detailing the irreparable harm to the plaintiffs absent injunctive relief). And staying the Court's PI is not in the public interest, particularly given that absent the PI, the defendants will continue their actions in contravention of numerous federal laws, including the International Broadcasting Act, relevant congressional appropriations acts, and the APA.

For the foregoing reasons, it is hereby **ORDERED** that the defendants' Motion for Partial Stay Pending Appeal is **DENIED**.

The defendants also request that "even if the Court is not prepared to issue a stay that lasts throughout appellate proceedings," that "the Court issue a temporary stay of these aspects of the injunction until the D.C. Circuit resolves a motion for a partial stay that Defendants intend to file" later today. Mot. at 4. For the same reasons explained *supra*, this request is **DENIED**.

**IT IS SO ORDERED.**

Date: April 2 5, 2025
3:45 P.M.

Royce C. Lamberth
United States District Judge

6

**Add. 129**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

            Plaintiffs,

    -against-

KARI LAKE, et al.,

            Defendants.

Index No. 25 Civ. 1015-RCL

## **DECLARATION OF JON SCHLEUSS**

I, Jon Schleuss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I have previously provided testimony in declarations dated March 23, 2025, and March 27, 2025. I am the President of The NewsGuild-CWA ("TNG-CWA"), a labor union that represents a private sector bargaining unit of Radio Free Asia ("RFA") employees. RFA is a broadcaster that is funded by grants from the United States Agency for Global Media ("USAGM").

3.      RFA management conveyed to me that, as of the date of this declaration, USAGM provided RFA funds it owed for March, but hasn't provided funds owed for April. Typically, USAGM sends a request at the end of each month for funds due in the upcoming month. Those funds are typically approved and released to RFA within the first week of that month. RFA submitted a financial plan and requested the rest of the funds due to RFA through

**Add. 130**

September, which covers the period of Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("2025 Continuing Resolution"). RFA management told me that, prior to the March 14 executive order, they met weekly with USAGM staff, but that USAGM hasn't been communicating with RFA since mid-March.

4.    On March 21, RFA furloughed the majority of its employees in the bargaining unit represented by TNG-CWA. That staff remains in unpaid status. TNG-CWA members have now received their last, partial paycheck, covering the period they worked before the furloughs. As a result, TNG-CWA is now losing those members' dues. RFA management told me that they are unable to bring back furloughed employees because of uncertainty regarding what USAGM will do.

5.    RFA announced to staff on April 11 that "Due to uncertainty regarding April funds and future fund distributions to all grantees, RFA is forced to maintain our current furlough status for the foreseeable future. It's still nearly impossible to determine what the remaining FY25 or FY26 budget allocations will be, which is requiring us to prepare our organization's contingency plans in case RFA's current and future budget stays flat or is decreased." RFA management has clarified to me that, as long as there remains uncertainty regarding whether USAGM will comply fully with its obligation to disburse grant funds to RFA throughout the entire fiscal year, RFA will not be able to return staff to paid status.

6.    If USAGM doesn't distribute funds to RFA in a reliable way guaranteeing several months of stability, furloughed staff may lose health insurance coverage as soon as May 1. RFA told staff on April 11 that they will tell staff during the week of April 14 whether RFA will have the funds to extend health benefits to furloughed staff in May. RFA said it has to prioritize using the delayed March funds to cover deferred expenditures from that month. And even if RFA can

Add. 131

afford to extend health insurance benefits for furloughed workers, RFA's insurance provider will not cover employees who have not worked for 60 days. That means insurance will end for workers furloughed on March 21 by the end of May unless RFA is able to bring furloughed staff back into work status.

      7.      Losing health insurance coverage would be devastating to our members, as the examples below show. Each of the individuals discussed below is a member of TNG-CWA employed by RFA. Each wishes to remain anonymous for fear of reprisal and because they are sharing personal and sensitive health information.

      a.    James Doe 1 is a furloughed worker with several chronic health issues. He has Parkinson's disease and diabetes. He takes medicine that is uncommon and would be expensive without health insurance. He takes two types of medications to treat his diabetes and two types to treat his Parkinson's disease. Without insurance, he would not be able to afford to treat his medical issues. Moreover, his whole family is on his health insurance plan through RFA, including his wife and two children.

      b.    James Doe 2 is a furloughed worker with several health issues. He has diabetes that requires insulin and high blood pressure that requires regular medicine. He has suffered at least two strokes and takes medication as a result. He had a kidney transplant in 2010 and takes medicine for that condition. He also goes to therapy regularly. He depends on health insurance in order to afford treatment for his medical conditions. His wife and daughter are also on his employer-provided health insurance.

Add. 132

     c. Jane Doe 1 is currently furloughed from RFA and has several chronic health
issues that are treated with her employer-provided health insurance. She takes
medicine and daily insulin shots to treat her diabetes. She also takes medicine
daily to treat her cholesterol and high blood pressure. She would not be able to
afford her medication without health insurance.

8.    RFA employs 35 workers on H1B visas, including TNG-CWA members. Many
are from repressive countries, including Vietnam and Hong Kong, that persecute journalists for
reporting the news. RFA has prioritized keeping those employees in pay status, but because of
USAGM's recent inconsistency in funding, RFA has begun to furlough employees working in
the United States on work visas. RFA management began notifying employees, including TNG-
CWA members, on April 14 that some employees on H1B visas will be furloughed beginning
April 18.  If USAGM continues to refuse to fund RFA's grant, RFA management told me that
RFA will continue to furlough employees, placing visa-holding employees at risk of being
deported to their home countries where they could face threats, harassment, or imprisonment for
their work as journalists.

9.    RFA broadcasts news on shortwave and medium wave radio, satellite television
and publishes news online through websites, apps and social media platforms. RFA broadcasts
its programs over shortwave radio through a combination of U.S. government-operated
transmitters and a variety of short-wave lease facilities. I understand from RFA management that
USAGM has cut RFA's access to these transmitters under contract with USAGM. I understand
from RFA management that USAGM has, without notice, shuttered their ability to broadcast
over satellite and radio, shrinking their transmission time down from 56 hours to 7 hours over the
last month. These broadcasts previously reached audiences in Tibet, North Korea and other

Add. 133

5

locations where governments suppress access to a free press. RFA journalists told me that

listeners have called for them asking for the broadcasts to be turned back on.

Executed in Washington, D.C. on April 14, 2025.

Jon Schleuss

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

      -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 1015-RCL

## DECLARATION OF JON SCHLEUSS

      I, Jon Schleuss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

      1.      I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

      2.      I have previously provided testimony in declarations filed in this case. I am the President of The NewsGuild-CWA ("TNG-CWA"), a labor union that represents a private sector bargaining unit of Radio Free Asia ("RFA") employees. RFA is a broadcaster that is funded by grants from the United States Agency for Global Media ("USAGM").

      3.      In my prior declaration dated March 23, 2025, I testified that TNG-CWA members report on stories that require travel to other countries, including countries where USAGM programs broadcast.

      4.      I also testified that TNG-CWA members rely on USAGM programs because they (1) improve its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protect their safety in those countries by allowing

for the free flow of information into countries otherwise beset with government censorship; and (3) promote the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

5.     Specifically, TNG-CWA members rely on RFA broadcasts while abroad. They also rely on Voice of America and Radio Free Europe/Radio Liberty news reporting and broadcasts.

6.     The silencing of these broadcasts and online reporting has harmed TNG-CWA members by depriving them of access to information that informs their professional work and their personal safety while reporting abroad.

Executed in Washington, D.C. on April 17, 2025.

Jon Schleuss