**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5144**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

PATSY WIDAKUSWARA, *et al.*,

Plaintiffs-Appellees,

v.

KARI LAKE, *et al.*,

Defendants-Appellants.

————————————

**UNDERLYING DECISION**

————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ABIGAIL STOUT
 *Attorneys*
 *Civil Division, Room 7215*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-1838*
 *daniel.tenny@usdoj.gov*

## UNDERLYING DECISION

Defendants-Appellants attach the underlying district court order and

decision from which this appeal arises.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney
General*

ERIC D. McARTHUR
*Deputy Assistant Attorney
General*

MARK R. FREEMAN

*/s/ Daniel Tenny*
DANIEL TENNY
ABIGAIL STOUT
*Attorneys, Appellate Staff
Civil Division, Room 7215
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-1838
daniel.tenny@usdoj.gov*

## CERTIFICATE OF SERVICE

I certify that on May 27, 2025, a true and correct copy of this

document was filed with the Clerk for the United States Court of Appeals

for the District of Columbia Circuit via the Court's electronic filing system,

which will forward a copy to all counsel of record

*/s/ Daniel Tenny*
Daniel Tenny

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PATSY WIDAKUSWARA**, *et al.*,

     *Plaintiffs,*

**v.**

                                         Case No. 1:25-cv-1015-RCL

**KARI LAKE,** *in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media*, *et al.*,

     *Defendants*.

## MEMORANDUM OPINION

Before the Court is the plaintiffs' Motion for a Preliminary Injunction, which seeks to enjoin the defendants from dismantling the United States Agency for Global Media (USAGM) in response to Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," announced by President Trump on March 14, 2025. The plaintiffs allege that USAGM's actions, purportedly in furtherance of the Executive Order—terminating and threatening to terminate the majority of USAGM staff, ending grants to its affiliates, and silencing programming—violate the First Amendment, constitutional separation of powers principles, the Take Care Clause, and statutory provisions including the Administrative Procedure Act (APA), International Broadcasting Act, and congressional appropriations acts. Broadly, the plaintiffs ask this Court to order the defendants to take all necessary steps to return USAGM and its employees, contractors, and grantees to their status prior to the March 14, 2025 Executive Order.

For the reasons contained herein, the Motion for a Preliminary Injunction will be **GRANTED IN PART** and **DENIED IN PART**. The Court will **GRANT** the Motion as it applies to the defendants' actions to shutter the USAGM entities Voice of America, Radio Free Asia, and

Middle East Broadcasting Networks.  The Court will **DENY** the Motion as to the other affiliated network entities.

## I.    BACKGROUND

### A.  Factual History

USAGM is an independent executive agency established by Congress with the mission to "inform, engage, and connect people around the world in support of freedom and democracy." Mission, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/mission/ [https://perma.cc/PK9M-Y32T].  It oversees six federally funded broadcast networks, the largest being Voice of America (VOA).  VOA's first broadcast took place during World War II, uttering the now "immortal words": "The news may be good or bad; we shall tell you the truth."  History, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/history/ [https://perma.cc/27Y5-A8CP].  Congress codified that promise into law in 1976 in VOA's charter, declaring that VOA "will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive."  22 U.S.C. § 6202(c).

Since then, five related entities have been established to further USAGM's mission: a federal entity within USAGM known as the Office of Cuba Broadcasting (OCB), and four independent networks: Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), Middle East Broadcasting Network (MBN), and the Open Technology Fund (OTF) (collectively, "the Networks").[1]  Together, these entities have "exported the cardinal American values of free

---

[1] Each of the Networks has filed a lawsuit in this Court seeking disbursement of congressionally appropriated funds. *See RFE/RL v. Lake*, 25-cv-799 (RCL) (filed Mar. 18, 2025); *Open Technology Fund v. Lake*, 25-cv-840 (RCL) (filed Mar. 20, 2025); *Radio Free Asia v. United States*, 25-cv-907 (RCL) (filed Mar. 27, 2025); *Middle East Broadcast Networks v. United States*, 25-cv-966 (RCL) (filed Apr. 1, 2025).  OTF originally sought injunctive relief for access to its March funding, but before the Court ruled on its motion, the government processed OTF's March drawdown request.  *See* Notice of Withdrawal of TRO Motion, *Open Technology Fund v. Lake*, 25-cv-840 (RCL), ECF No. 19. OTF has not moved for any additional injunctive relief since, and as such, the Court will cabin the relief granted herein

speech, freedom of the press, and open debate to the dark corners of the world where independent, objective coverage of current events is otherwise unavailable." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341–42 (D.D.C. 2020).

All six of these entities are funded by the United States government. Specifically, VOA and OCB are located within the federal government, whereas RFA, RFE/RL, MBN, and OTF are private non-profit organizations that receive funding through congressional appropriations disbursed via grant agreements with USAGM. Structure, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/organizational-chart/ [https://perma.cc/ZWY5-GGDB]. Every year, Congress appropriates funds to USAGM and further allocates those funds to VOA, OCB, and each of the Networks, with a line-item amount designated to each entity. As is relevant here, in the 2024 Appropriations Act, Congress appropriated $857 million to USAGM for Fiscal Year (FY) 2024 and mandated how those funds "shall be allocated" pursuant to an "explanatory statement." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (requiring funds to be allocated in accordance with table in "the explanatory statement" described in section 4"); *id.* § 4 (identifying explanatory statement). The explanatory statement sets forth a table with earmarked funding amounts for VOA, OCB, and each of the Networks. Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (providing table designating how funds appropriated for international broadcasting "are allocated"). For FY 2024, Congress allocated

---

to only those USAGM affiliated networks that have outstanding motions for injunctive relief. The status of RFE/RL, RFA, and MBN's lawsuits is detailed at Section I.B.i, *infra*.

The OCB, though initially shut down by the EO, has resumed functioning; OCB employees who were placed on administrative leave were called back to work on March 26, 2025, and OCB resumed radio service and television broadcasting within a day. *See* Second Decl. of Crystal Thomas, Human Resources Director for USAGM ("Second Thomas Decl."), at ¶ 6, ECF No. 88-4.

$260 million for VOA; $25 million for OCB; $142.2 million for RFE/RL; $60.8 million for RFA; $100 million for MBN; and $43.5 million for OTF. *Id* (listing each entity with a corresponding funding amount for the fiscal year).

In three continuing resolutions covering FY 2025, Congress funded USAGM at the same levels, and subject to the same conditions, as it funded USAGM in FY 2024. *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY 2024 appropriations laws and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025). Most relevant here, effective March 15, 2025, Congress passed and President Trump signed into law the Third Continuing Resolution, which appropriates funding to USAGM and the associated Networks through September 30, 2025. Under the appropriations acts, USAGM has limited discretion to "reprogram" a small fraction of these funds among different programs, but only if it gives the House and Senate Appropriations Committees fifteen days' advance notice. 2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see* 170 Cong. Rec. at H2087. And in no event may any reprogramming reduce funding for a program by more than five percent of what Congress designated. *Id.*

On March 14, 2025, President Donald Trump issued Executive Order 14238 entitled "Continuing the Reduction of the Federal Bureaucracy" (the "EO"). 90 Fed. Reg. 13043 (Mar.

14, 2025).[2]  The EO demands that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law," and directs the head of USAGM to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent."  *Id.*

The following day, on March 15, 2025, the White House published an article entitled "The Voice of Radical America," which states: "President Donald J. Trump's [EO] on Friday will ensure that taxpayers are no longer on the hook for radical propaganda."[3]  USAGM also posted an update on its website stating: "This agency is not salvageable.  From top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken.  While there are bright spots within the agency with personnel who are talented and dedicated public servants, this is the exception rather than the rule."[4]

From March 15, 2025 onward, the acting leadership of USAGM has taken a series of actions purportedly in furtherance of the EO's directive.  On March 15, 2025, USAGM placed 1,042 employees on administrative leave.[5]  First Declaration of Crystal Thomas, Human Resources Director for USAGM ("First Thomas Decl.") ¶ 6, ECF No. 43.  That same day, all USAGM grantee networks received an identical letter from the agency immediately terminating their operative grant

---

[2] https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ [https://perma.cc/J4WD-Q2UU].

[3] *The Voice of Radical America*, THE WHITE HOUSE (Mar. 15, 2025), https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/ [https://perma.cc/HL9E-5JBE].

[4] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/ [https://perma.cc/YQA4-3TVA].

[5] USAGM employs 1,147 full-time employees and, as of March 14, 2025, had active employment contracts with approximately 598 personal service contractors (PSCs).  Thomas Decl. ¶ 3.

agreements, with no explanation other than the boilerplate language that "[t]he award no longer effectuates agency priorities" and citing the EO.  Compl. ¶ 78.  On March 16, 2025 "USAGM terminated contracts with all [approximately 598] personal services contractors ["PSCs"]," whose pay was scheduled to end on March 31, 2025.  First Thomas Decl. ¶ 6.[6]  On March 17, 2025, USAGM instructed "all USAGM Foreign Service employees" to shut down all transmitters at their respective stations, place locally employed staff on leave, and expect to be placed on administrative leave themselves within two days.  Compl. ¶ 83.  On March 25, 2025, USAGM's HR Director notified union officials at American Federation of State, County and Municipal Employees, AFL-CIO ("ASFCME," a plaintiff in this case) that USAGM intended to "send termination notices" to 29 of USAGM's 32 radio broadcast technicians ("RBT")[7]—and because the three remaining RBTs had already submitted retirement applications, this move would effectively eliminate all RBTs.  March 26 Letter to the Court, ECF No. 33 at 2.  Also on March 25, USAGM's HR Director sent a notice to American Federation of Government Employees, AFL-CIO ("AFGE," also a plaintiff in this case) conveying USAGM's decision to terminate 594 AFGE members "including broadcast journalists, technicians, budget analysts, electronics engineers, and others" within weeks.  *Id.*

As a result of the defendants' actions, VOA is not reporting the news for the first time in its 80-year existence.  Its website has not been updated since March 15, 2025, and radio stations abroad that rely on VOA's programming have either gone dark or air only music.  Compl. ¶ 82.

---

[6] The defendants represent that on March 28, 2025, all PSCs were reinstated with full pay and benefits but are not currently working.  PI Opp'n at 3 (citing Second Thomas Decl. ¶ 6).  This appears to be a direct result of the March 28 TRO in this case.  The March 28 TRO, explained in detail *infra*, enjoined the defendants from "proceeding with terminating any USAGM [PSC] who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025."  *See* Op. and Order Granting Pls.' Mot for Temp. Restraining Order ("March 28 TRO"), ECF No. 54, at 22.

[7] RBTs are essential to carry out broadcasting, as they are required to be on-site 24/7 to broadcast programming, and "it is not possible to operate VOA without radio engineers."  March 26 Letter to the Court, ECF No. 33 at 2.

All VOA employees remain on administrative leave with no indication of returning. *Id.* ¶¶ 74–75, 85. PSCs face termination of their contracts and those working in the United States with J1 visas face the possibility of deportation to home countries, in some instances those with authoritarian regimes that are hostile to a free press. *Id.* ¶¶ 22–23. USAGM's FY 2025 grants with the Networks either remain terminated in the cases of RFA and MBN, or simply lapsed with no other agreement in place in the case of RFE/RL, and none of these Networks have received their congressionally appropriated funds for the month of April, forcing them to wind down operations and in some instances furlough their employees without pay. The status of each Network and their lawsuit in this Court is detailed below.

### B. Procedural History

#### i. Network Lawsuits

##### a. Radio Free Europe/Radio Liberty, No. 25-cv-799 (RCL)

RFE/RL began broadcasting in 1953 and has been funded by the United States government ever since. *See* No. 25-cv-799 (RCL), 2025 WL 900481, at *1 (D.D.C. Mar. 25, 2025) (providing an overview of RFE/RL's history and funding structure). Following the passage of the First and Second Continuing Resolutions in which Congress renewed RFE/RL's funding, USAGM executed grant agreements obligating those funds to RFE/RL through February 28, 2025.[8] *RFE/RL v. Lake*, No. 25-cv-799 (RCL) ("RFE/RL Docket"), Compl. ¶ 30, ECF No. 1. In late February 2025, RFE/RL and USAGM exchanged drafts of a FY 2025 grant agreement to cover funding appropriated to RFE/RL through the end of the fiscal year. *Id.* ¶ 32. On February 27, 2025,

---

[8] To be clear, under the Second Continuing Resolution, Congress appropriated funds for RFE/RL through March 14, 2025. USAGM did not, however, obligate the March 1–14, 2025, funds— which total approximately $7.5 million— in the grant agreement. Throughout December 2024, USAGM informed RFE/RL that the reason for not obligating the funds was a policy of not providing partial-month payments to grantees. *RFE/RL v. Lake*, No. 25-cv-799, Compl. ¶ 32. The Third Continuing Resolution, signed on March 15, 2025, appropriates funds to RFE/RL from March 15 through September 30, 2025. *Id.* ¶ 28.

USAGM sent a final version of the grant agreement to RFE/RL and requested a "signed version of this Master Grant Agreement at your earliest convenience." RFE/RL responded with the signed grant agreement that same day, but USAGM never countersigned. *Id.*

On March 15, 2025, RFE/RL received the termination letter from USAGM. RFE/RL filed its Complaint on March 18 and moved for preliminary injunctive relief the next day—specifically, RFE/RL sought a TRO for disbursement of funds for the March 1–15 period of performance, and a PI ordering USAGM to effectuate further grant agreements with RFE/RL to disburse the funds that Congress had appropriated through September 30, 2025. On March 24, just hours before a scheduled hearing on the TRO motion, USAGM disbursed RFE/RL's funds to cover the March 1–15 grant period, but the Court still granted RFE/RL's TRO to enjoin the "close-out" procedures detailed in the termination letter. *See RFE/RL*, 2025 WL 900481, at *2–5.

On March 26, the day after the Court issued its TRO, USAGM rescinded the termination letter. RFE/RL Docket, Notice of Withdrawal of Grant Termination, ECF No. 15. The grant was therefore "back in effect," according to USAGM. *Id.* RFE/RL has now received its funds for all of March but has not received any funds for April (or the rest of FY 25) because the prior grant agreement has expired—and as stated *supra*, the fully negotiated FY 25 grant agreement was never signed by USAGM. USAGM sent a new proposed FY 25 grant agreement to RFE/RL on April 8, 2025, prompting RFE/RL to file a renewed TRO, which is still pending. RFE/RL Docket, ECF No. 28. RFE/RL argues in its TRO motion that it will soon be forced to shut down without access to its April funds and that the proposed FY 25 grant agreement from USAGM is unreasonable and a pretext for denying RFE/RL its congressional appropriations.

### b. Radio Free Asia, No. 25-cv-907 (RCL) and Middle East Broadcast Networks, No. 25-cv-966 (RCL)

RFA was established in 1996 and relies entirely on USAGM grants to fund its operations. Fleming Decl. ¶ 10–11, *Radio Free Asia v. United States*, No. 25-cv-907 (RCL) ("RFA Docket"), ECF No. 12-2. As it has every year for the last three decades, RFA entered a master agreement with USAGM for "FY 2025," which was scheduled to remain in effect through September 30, 2025. RFA Docket, ECF No. 19-2. Like the other Networks, RFA received a termination letter on March 15, 2025. RFA Docket, Fleming Decl. Ex. 1.[9] RFA filed its Complaint on March 27, 2025, and a motion for a TRO,[10] ECF No. 12, the following day. Before this Court acted on the motion, however, Defendants represented that they believed the grant termination had been enjoined by the March 28 TRO, issued by Judge Oetken of the Southern District of New York before the case was transferred to this Court. *See* Op. and Order Granting Pls.' Mot for Temp. Restraining Order ("March 28 TRO"), ECF No. 54, at 22 (enjoining Defendants from "terminating (or proceeding with terminating as announced) any USAGM grant or contract"). Then, on April 9, 2025, with the TRO still in place, RFA received the funding it was due through the end of March. RFA Docket, Request for Hearing at 2, ECF No. 14. On April 11, 2025, the Defendants emailed RFA representatives with a "revision to the RFA FY-25 Master Grant Agreement between USAGM and RFA," which Defendants encouraged RFA to sign "in order to expedite the payment

---

[9] While the termination letter provided RFA the right to appeal its termination, that turned out to be an empty offer. After RFA "promptly filed an appeal," USAGM informed them that Defendant Lake "did not intend to respond to its appeal." Fleming Decl. ¶ 23.

[10] The TRO motion has since been converted into a PI motion, per agreement from both parties. RFA Docket, Proposed Order, ECF No. 20-5.

process" for their April funding.[11]  However, the termination of RFA's grant was never rescinded, and the termination remains in effect.

MBN sits in a similar position as RFA.  MBN has received funding via grant agreements with USAGM since its inception in 2004.  MBN and USAGM entered into a master grant agreement for FY 2025, scheduled to remain in effect through September 30, 2025.  Def.'s Opp'n. App'x. C at 3, *Middle East Broadcasting Networks, Inc. v. United States of America*, No. 25-cv-966 (RCL) ("MBN Docket"), ECF No. 20-2.  Like the other Networks, MBN received the March 15 termination letter,[12] filed a Complaint on April 1, 2025, and filed a motion for a PI, ECF No. 11, on April 9, 2025.  MBN's grant remains terminated absent injunctive relief.

RFA and MBN seek the same relief in their respective PI motions.  They ask for the Court to enter an order enjoining the Defendants "from impounding, blocking, or otherwise interfering with payment of funds appropriated to Plaintiffs" and "from enforcing or otherwise giving effect to the termination of Plaintiffs' grants[.]"  RFA Docket, Proposed Order, ECF No.12-4; MBN Docket, Proposed Order, ECF No. 18-5.

### ii.    The Instant Lawsuit

The plaintiffs in this lawsuit are Patsy Widakuswara, the VOA White House Bureau Chief; Jessica Jerreat, the VOA Press Freedom Editor; Kathryn Neeper, the Director of Strategy and Performance Assessment at USAGM; John Does 1 and 2, journalists at VOA; John Does 3 and 4, independent freelance journalists working as personal service contractors (PSCs) with VOA; Reporters Sans Frontières ("RSF") and Reporters Without Borders, Inc. ("RSF USA"),

---

[11] It is not clear why Defendants styled the new agreement a "revision" while simultaneously representing that the FY-25 Master Agreement has been terminated.

[12] Like RFA, MBN appealed the termination of its grant and requested a response by March 31, 2025, but received none to date.  MBN Docket, Kline Decl. ¶ 33, ECF No. 11-3.

nongovernmental organizations of independent journalists; AFSCME, AFGE, and the American

Foreign Service Association ("AFSA") (collectively, the "public-sector unions"); and The

NewsGuild-CWA, AFL-CIO ("TNG-CWA"), a labor organization of private sector employees

who work for Radio Free Asia.  The plaintiffs filed this lawsuit on March 21, 2025, in the Southern

District of New York against Defendant Kari Lake, Senior Advisor to the Acting CEO of the

USAGM, and Defendant Victor Morales, Acting CEO of USAGM, in their official capacities, as

well as USAGM as an organization (collectively, the "defendants").  Compl., ECF No. 1.  The

plaintiffs allege that the defendants' actions in "dismantling" USAGM violate the plaintiffs' First

Amendment rights, the APA, the constitutional principle of the separation of powers and the Take

Care Clause, the Appointments Clause,[13] congressional appropriations acts, and numerous other

statutory provisions under the International Broadcasting Act and other relevant statues governing

foreign relations and broadcasting.  Compl. ¶¶ 2, 102–60.

On March 24, 2025, the plaintiffs sought emergency relief by filing a motion (styled as a

proposed order to show cause) for a TRO and PI, with an accompanying memorandum in support.

*See* Proposed Order to Show Cause with Emergency Relief, ECF No. 15; Mem. in Support of

Proposed Order to Show Cause (hereinafter "PI Mot."), ECF No. 17.  On March 28, 2025, Judge

Oetken of the Southern District of New York granted the motion for a TRO, concluding that the

defendants likely violated several provisions of the APA, and ordered as follows:

> Defendants, and those acting in concert with them, are temporarily enjoined from
> taking any further actions to implement or effectuate the March 14, 2025 Executive
> Order entitled "Continuing the Reduction of the Federal Bureaucracy" as to
> USAGM and the March 15, 2025 email issued to all VOA staff, or take any action
> to reduce USAGM's workforce (whether employees, contractors, or grantees),
> included but not limited to

---

[13] Plaintiffs did not move for emergency relief based on their Appointments Clause claim (Count IX).  PI Reply, ECF No. 92, at 21 n.8.

    (i)      proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee, or contractor,

    (ii)     terminating (or proceeding with terminating as announced) any USAGM grant or contract or proceeding with terminating any USAGM Personal Services Contractors (PSCs) who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025, or

    (iii)    closing any USAGM office or requiring employees or contractors in overseas offices to return to the United States.

March 28 TRO at 21–22. The TRO was to remain in place "pending the hearing and determination of Plaintiffs motion for a preliminary injunction." *Id.* at 21. One week later, Judge Oetken granted the defendants' motion to transfer to the District of Columbia on April 4, 2025. *See* Transfer Order, ECF No. 61. The case was then assigned to the undersigned on April 8, 2025, with the PI motion still pending. *See* ECF No. 68.

On April 8, the defendants moved to vacate the March 28 TRO. Mot. to Vacate, ECF No. 73. The parties suggested that they cross-brief the PI motion alongside the defendants' motion to vacate on the same expedited schedule. *See* ECF Nos. 78, 79. To that end, on April 14, 2025, the defendants filed an Opposition to the PI Motion ("PI Opp'n"), ECF No. 88, and the plaintiffs filed an Opposition to the motion to vacate ("Mot. to Vacate Opp'n"), ECF No. 89, that same day. On April 16, the plaintiffs filed a reply in support of their PI Motion ("PI Reply"), ECF No. 92, and the defendants filed a reply in support of their Motion to Vacate ("Mot. to Vacate Reply"), ECF No. 93. The Court held a hearing on Thursday, April 17, 2025, during which counsel for the plaintiffs here, as well as counsel for the plaintiffs in a related case, *Abramowitz v. Lake*, 25-cv-887, and the defendants (which are the same in both cases), all presented argument. The Motion for a Preliminary Injunction is now ripe for review.[14]

---

[14] The Court will refer to and incorporate arguments presented in the Motion to Vacate the TRO given the significant overlap with the arguments in opposition to the PI, but because the TRO is expires on April 22, 2025 with this Court's ruling on the preliminary injunction, *see* March 28 TRO at 21–22, the Motion to Vacate the TRO is moot.

## II.    LEGAL STANDARDS

### A.  Preliminary Injunction

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  It is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20.  "Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public." *RFE/RL*, 2025 WL 900481, at *2 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts in this Circuit have adopted a "sliding scale" approach to the preliminary relief analysis, "whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential." *Id.* (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

## III.    DISCUSSION

### A.  Plaintiffs Have Sufficiently Shown Standing.

"[A] party who seeks a preliminary injunction 'must show a substantial likelihood of standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Obama v. Klayman*, 800 F.3d 559, 568 (D.C. Cir. 2015)).  The defendants argue that the organizational plaintiffs AFSCME, AFGE, and AFSA (the public-sector unions) and RSF and

RSF-USA (nongovernmental organizations of independent journalists) have failed to make this showing. PI Opp'n at 4.

Membership-based associations can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Here, all organizational plaintiffs have asserted both associational and organizational standing. PI Mot. 34–38. Despite the defendants' arguments to the contrary, the Court concludes that all organizational plaintiffs have shown a "substantial likelihood" of both associational and organizational standing.

### i.    Associational Standing

To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted, nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). The defendants argue that the union members placed on administrative leave are not injured because "[a]lthough Plaintiffs fear what may happen next in the future, this 'amounts to nothing more than speculation about future events that may or may not occur,' especially given [USAGM] remains operational, contrary to what Plaintiffs suggest." PI Opp'n at 5 (quoting *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002)). This argument is easily dispensed with—Defendant Lake has stated that what's "coming up next" is that the agency "is going to be decreased in size significantly" because there is "too much rot in the agency

to salvage it," Compl. ¶ 89, [15] plainly illustrating that the union members are relying on more than

mere speculation.  Moreover, as the plaintiffs point out, this position is "flatly inconsistent with

[the Defendants'] later insistence that the same exact action could be brought before the MSPB as

a prohibited personnel practice."  PI Reply at 4.[16]  It also does not account for the defendants'

stated decision to terminate over 600 AFGE and AFSCME members, all employees of VOA.

March 26 Letter to the Court, ECF No. 33.  Regarding prongs two and three of the associational

standing test (which the defendants do not challenge), it is certainly germane to the unions' purpose

to defend "the existence of the agency where their members work, or that funds their members'

work," and "the relief that Plaintiffs seek pertains to Defendants' wholesale dissolution of

USAGM and does not depend on the individual circumstances of any union member."  PI Mot. at

36.  Thus, the Court concludes that the unions have associational standing.[17]

### ii.    Organizational Standing

An organization can establish organizational standing "if it can show that the defendant's

actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more

than simply a setback to the organization's abstract social interests.'"  *Am. Soc'y for Prevention*

*of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  The organization must satisfy two criteria: (1) the

---

[15] Citing Bannon's War Room, "It Is Full of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America Layoffs, Rumble (Mar. 17, 2025), https://rumble.com/v6qs70g-it-is-full-of-waste-fraud-and-abuse.-kari-lake-reacts-to-1300-voice-of-amer.html [https://perma.cc/YC6G-KEXK].

[16] To the extent the defendants are arguing that the public-sector union plaintiffs cannot bring suit on behalf of their members because the members' claims are channeled to the MSPB, the Court addresses that issue below and resolves it in the plaintiffs' favor.  *See* Section II.C, *infra*.

[17] The defendants do not contest RSF and RSF-USA's associational standing, *see* PI Opp'n at 4–5, and the Court is satisfied that RSF and RSF-USA have met the standard for associational standing at this juncture.  *See* PI Mot. at 35–36 ("RSF's members include journalists who travel to dangerous foreign countries where USAGM broadcasts to report the news.  These journalists have been made less safe and seen their mission of promoting free press severely damaged by the shuttering of USAGM operations. . . . Bringing this lawsuit to defend . . . the continued viability of the international free press to which they have dedicated their careers, is germane to that purpose.").

defendants' "action or omission . . . injured the organization's interest;" and (2) the organization "used its resources to counteract that harm." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (internal citations and quotations omitted).

The defendants argue that the organizational plaintiffs have not identified a "concrete and demonstrable injury to [their] activities," but only speculative ones, because "[VOA] has not been dismantled and [USAGM] remains operational." PI Opp'n at 6. Of course, as this quote concedes, VOA *itself* is not operational, and the Networks are winding down operations. That harm is not speculative—it is currently unfolding. The defendants' actions have interfered with the unions' "core business interests," injuring their ability to provide representational services to employees in affected bargaining units. PI Mot. at 36–37 (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Moreover, the defendants have decided to eliminate an entire AFSCME bargaining unit and terminate 594 AFGE members, thereby depriving both unions of dues and "existentially threatening" AFSCME's RBT unit. *See* PI Reply at 3–4; *Nat'l Treasury Emps. Union v. I.R.S.*, No. 04-cv-0820, 2006 WL 416161, at *2 (D.D.C. Feb. 22, 2006) (loss of dues confers standing). As for RSF and RSF-USA, VOA "frequently [reports on] RSF's reports and advocacy efforts," meaning that VOA's silence injured RSF's ability to distribute its broadcasting and amplify press freedom concerns. Declaration of Thibaut Bruttin, Director General of RSF ("Bruttin Decl."), ¶ 19, ECF No. 16-15.[18]

---

[18] Plaintiffs also allege that RSF and RSF-USA have organizational standing "with respect to their First Amendment right-to-receive claim." PI Mot. at 37. However, with the instant PI, the Court does not reach Plaintiffs' First Amendment challenges, and will therefore not address this avenue of establishing standing.

Regarding the second prong of organizational standing, the plaintiffs' Complaint, briefing and accompanying declarations show that the public-sector unions are "expending significant resources to counteract USAGM's obstruction of their ability to perform their core services [such as] advising members about the terms of their employment and the implication of Defendants' actions." PI Reply at 3; *see* Compl. ¶¶ 99–101 (explaining the activities of each union in response to Defendants actions since March 15, 2025). The Complaint also indicates that RSF and RSF-USA have used resources to counteract the harm at issue here because "[t]he silencing of VOA . . . force[s] [RSF and RSF USA] to lose and waste material resources it otherwise would not have spent and upon which it relies." Compl. ¶¶ 24, 97. The Court finds these representations sufficient to show a "substantial likelihood" of organizational standing.

Notably, nowhere do the defendants argue that TNG-CWA, the other organizational plaintiff in this case, lacks standing. TNG-CWA represents private sector reporters who work for RFA and who rely on USAGM programs "including but not limited to RFA." First Declaration of Jon Schleuss, President of TNG-CWA ¶ 18, ECF No. 16-16. The defendants' actions directly interfere with TNG-CWA's journalist-members' ability to access VOA and other USAGM grantee broadcasts, which provide a "free flow of information, over radio airwaves and online" in countries where "there is no media freedom." *Id.* ¶¶ 15–17. As of March 21, 2025, 75% of TNG-CWA's members have been indefinitely furloughed without pay and they stand to lose their medical and life insurance at the end of April. Second Declaration of Jon Schleuss, President of TNG-CWA, ¶ 18, ECF No. 92-1. Many of TNG-CWA's members are on nonimmigrant visas and face return to their home countries where they fear potential retaliation from repressive regimes. *Id.* ¶ 8. The Court is satisfied that TNG-CWA has shown a "substantial likelihood" of standing, in addition to

all other organizational plaintiffs, and concludes that the defendants' challenges to the contrary are unavailing.

**B. The Court has Jurisdiction over the Plaintiffs' Claims Regarding the Withholding of Congressional Appropriations from Networks.**

As part of their requested relief, the plaintiffs seek to enjoin the defendants from terminating the grants that Congress directed USAGM to provide to the specified broadcasting Networks in congressionally appropriated amounts. Proposed PI Order, ECF No. 15 at 2. The defendants argue that this Court lacks jurisdiction to hear this portion of the dispute, characterizing it as strictly a contractual in nature, but the Court concludes otherwise.

In opposing the initial TRO Motion in the Southern District of New York, the defendants briefly argued that Plaintiffs could not bring that challenge in federal district court because the Tucker Act barred their claims. *See* ECF. No. 41 at 20 n.3 (Defendants' TRO opposition). The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over suits based on 'any express or implied contract with the United States.'" 28 U.S.C. §1491(a)(1). Judge Oetken, however, disposed of this challenge quickly. *See* March 28 TRO at 6 n.5 ("While Plaintiffs have certainly raised the cancellation of grant contracts as one concerning fact in a constellation of actions Defendants took to rapidly dismantle USAGM, 'the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have.'") (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

To challenge that conclusion here, the defendants rely on the intervening Supreme Court emergency-docket order, *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), arguing that it "clarifies" that the plaintiffs' claims regarding USAGM's termination of grants cannot be heard in this Court. Mot. to Vacate at 6; PI Opp'n at 33–34. That argument fails.

In *California*, grantees of the Department of Education sued under the APA to challenge the termination of their grants. 145 S. Ct. at 968. The grantees relied on relevant statutory provisions that directed the Secretary of Education to "use certain funds to make grants to entities," which were awarded pursuant to a "competitive application process." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir. 2025). The district court entered a TRO, enjoining the government from terminating the grants and requiring the government to pay out grant obligations to those plaintiffs who had applied for and received a grant award. *California v. U.S. Dep't of Educ.*, No. 25-cv-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). The Supreme Court stayed the TRO because the Court found it "likely" that the district court lacked jurisdiction to issue such relief. *California*, 145 S. Ct. at 968. In so ruling, the Court reiterated that the APA's waiver of sovereign immunity "does not extend to orders to enforce a contractual obligation to pay money," and that, instead, "suits based on 'any express or implied contract with the United States'" must go to the Court of Federal Claims under the Tucker Act. *Id.*

But *California* does not change the conclusion in the March 28 TRO, because *California* does not change the governing law. It was true before *California*, and it remains true now, that "[w]hether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 968). In *California*, the source of the rights relied on by the plaintiffs were contained *in the grant agreements*—the relevant statute did not entitle any particular grantee to the funds. Here, by contrast, the source of the Networks' rights is not rooted in the grant agreements with USAGM—grants are involved only as a vehicle to distribute congressionally appropriated funds to the Networks because Congress passed laws directing

USAGM to provide grants to specific grantees, and appropriated funds for those grantees specifically. *See*, *e.g.*, 22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208 (International Broadcasting Act); Pub. L. No. 119-4, div. A, § 1101 (2025) (Congressional Appropriations Act).

The D.C. Circuit has cautioned that the Tucker Act should not be interpreted "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government," *Megapulse*, 672 F.2d at 968, and a claim of entitlement to congressional appropriations is certainly one over which the Court can exercise jurisdiction. *See Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("[Plaintiff] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [Plaintiff] will suffer or has suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) ("[Plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages.'"). Therefore, the Court has jurisdiction to review the defendants' termination of congressionally appropriated funds to the Networks.

## C. The Court Has Jurisdiction Over Plaintiffs' Claims Regarding the Defendants' Personnel Actions.

The defendants argue that the Court lacks jurisdiction to enjoin USAGM's personnel actions as to individual plaintiff employees because the Federal Service Labor–Management Relations Statute ("FSL-MRS"), the Civil Service Reform Act ("CSRA"), and the Foreign Service Act ("FSA") govern review of employment disputes between the federal government and its employees, thereby channeling claims to either the Merit Systems Protection Board ("MSPB") for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel ("OSC") for certain "prohibited personnel practices." PI Opp'n at 8–14; Mot to

Vacate at 7–8.  And as stated *supra*, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *California*, 145 S. Ct. at 968 (quoting 5 U.S.C. § 702).  At the outset, the Court observes that this purported jurisdictional bar would only apply to the individual plaintiffs employed by USAGM (Patsy Widakuswara, Jessica Jarreat, Kathryn Neeper, and Does 1 and 2), and the public-sector unions purporting to represent terminated employees via associational standing (AFSCME, AFGE, and AFSA), but RSF and RSF-USA, TNG-CWA, and John Does 3 and 4 (PSCs of VOA)[19] are not implicated as non-governmental entities and contractors.[20]  In any event, the Court finds that the individual government employee plaintiffs are not barred from challenging the dismantling of USAGM because this case is not simply a collection of employment disputes.

Defendants rely primarily on *AFSA v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025), to argue that Plaintiffs claims should be channeled to the federal administrative employment dispute process.  In *AFSA*, two unions representing USAID employees sought to enjoin the dismantling of USAID, effectuated in part by the placement of employees on administrative leave.  The court denied the plaintiffs' motion for a PI, concluding that the plaintiffs' claims were "archetypal complaints about changed employment conditions and their

---

[19] The defendants argue that because John Does 3 and 4 are PSCs, their claims are governed by the Contract Disputes Act (CDA) and must be heard in the Court of Federal Claims. PI Opp'n at 7, 14–19.  The relevant inquiry under the CDA is identical to that under the Tucker Act: "whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution."  *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added); *see Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76 (D.C. Cir. 1985) (applying the Tucker Act inquiry to determine whether a claim falls under the CDA).  Here, as with the other individual plaintiffs, the "source of the rights" Does 3 and 4 rely upon do not derive from any contracts, but rather, upon various constitutional and statutory rights that USAGM has allegedly violated.

[20] It is also the case that the public-sector unions' assertion of organizational standing is not implicated by this jurisdictional bar, because in that capacity, the unions are suing on their own behalf, not that of their members. However, the unions "have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of 'great' harms that could warrant a preliminary injunction."  *AFSA v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *7 n.3 (D.D.C. Feb. 21, 2025).  Thus, though the public-sector unions have asserted organizational standing, their allegations of organizational harm (i.e. loss of dues and diminished bargaining power, *see* PI Mot. at 30–31) are not strong enough to warrant preliminary relief.

follow-on effects—which at this point appear to be largely financial." *Id.* at *7.  In so holding, the court noted that "it may be the case that, at a high level of generality and in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," but found that "at present, the agency is still standing," so the employees' allegations boiled down to a quotidian employment dispute that fell within the statutory schemes of the FSL-MRS, CSRA, and FSA.  *Id.* at *7, 11.  Here, such a conclusion would ignore the facts on the record and on the ground.  It strains credulity to conclude the USAGM is "still standing" when its 80-year-old flagship news service, VOA, has gone completely dark with no signs of returning, when USAGM has stopped the disbursement of funds to statutorily created, congressionally funded networks, and when USAGM leadership has called the agency "not salvageable" and "a giant rot from top to bottom."[21]  It appears to this Court that USAGM has already reached the breaking point about which the *ASFA* court opined.  The Court therefore concludes that this is not simply an employment dispute, and it has jurisdiction to hear the plaintiffs' claims. [22]

---

[21] Moreover, to the degree that the defendants argue that the agency still functions—albeit as a skeletal version of its former self—that is due in no small part to the successive bouts of injunctive relief (the March 28 TRO and this Court's TRO in *RFE/RL*), each of which has been necessary to keep USAGM afloat.

[22] The Court has also considered the framework in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–13 (1994), to arrive at this conclusion.  Under *Thunder Basin*, a district court lacks jurisdiction over a dispute when the intent for exclusive review is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  *See id.* at 755 (citations omitted).  Claims that otherwise would be covered by the federal employment statutory scheme may instead proceed in federal district court if "'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13).  Such considerations favor the Court's review here.  There is no meaningful review available from the MSPB and OSC for the wholesale placement of employees on administrative leave and the silencing VOA.  For example, even if Plaintiff Widakuswara took her leave placement to the MSPB and was ultimately reinstated, she would return to an empty agency with no infrastructure to carry out VOA's programming.  And the MSPB and OSC have no jurisdiction to review the cancelation of congressional appropriations.  This case "raise[s] 'standard questions of administrative' and constitutional law, detached from" any issues related to federal employment.  *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 194 (quoting *Free Enter. Fund*, 561 U.S. at 491).  Therefore, the Court has jurisdiction to hear this dispute.

### D. PI Factor 1: Likelihood of Success on the Merits

#### i.    APA

The APA permits judicial review of "circumscribed, discrete agency actions."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  The defendants argue that the plaintiffs do not seek review of a "discrete" agency action, because they seek review of the dismantling of USAGM across the board, by challenging a host of individual actions.  Therefore, granting the plaintiffs' requested relief, the defendants argue, "would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function." PI Opp'n at 31.

The Court is not persuaded by this argument.  The "discrete" requirement does not mean that if an agency takes a slew of actions quickly, the Court loses its ability to review each of them under the APA.  The Court must, of course, review whether agency actions contravene the agency's statutorily mandated duties, even if there are a lot of actions at issue.  The plaintiffs here have identified the series of actions taken by USAGM since March 15, detailed in Section I.A, *supra*, which are under review here.

The APA also only permits judicial review of "final agency action."  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Courts "are to apply the finality requirement in a 'flexible' and 'pragmatic' way."  *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality").

As Judge Oetken concluded in granting the TRO, the defendants' actions constitute final agency actions. *See* March 28 TRO at 7 ("The termination of contracts with partner organizations and the dismantling of critical infrastructure leading to the complete halt of agency programming are final agency actions.") (citing *Biden v. Texas*, 597 U.S. 785, 807 (2022)).  And although a "closer call," Judge Oetken concluded that this applied to the mass placement of USAGM employees on administrative leave, particularly given USAGM's stated intent to fire over 600 VOA employees in the AFSCME and AFGE bargaining units and public statements from USAGM acting leadership that the agency is "irretrievably broken" and "a giant rot from top to bottom." *Id.* at 8.  The defendants hardly challenge this conclusion now, only mentioning finality in a footnote, where they argue that the actions are not final because of "the operations that are ongoing and the fact that [USAGM] has only paused other activities while it determines next steps to bring the agency into compliance with the Executive Order . . . ."  PI Opp'n at 31 n.5.  But this argument is unconvincing because *final* does not mean *permanent*—just because USAGM maintains the ability to reverse these actions at some unidentified point in the future, that does not change the fact that the agency has made decisions, communicated them to their employees, contractors, and grantees, and thereby altered their rights and obligations.  *See Ciba-Geigy Corp.*, 801 F.2d at 436 (an "indicia of finality" is if the agency action causes a "direct and immediate . . . effect on the day-to-day business of the parties challenging the action") (internal quotations omitted).  The agency actions at issue—blanket placement of employees on administrative leave, termination of entire bargaining units of employees, termination of PSCs, and cancellation of grants dispensing

congressionally appropriated funds—are, with one exception,[23] discrete, final agency actions subject to judicial review.

### a.  Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts arbitrarily and capriciously when it fails to "supply a reasoned analysis" for a change in policy.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  To constitute "reasoned analysis," the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *State Farm*, 463 U.S. at 43).  Thus, "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  *Id.*

Not only is there an absence of "reasoned analysis" from the defendants; there is an absence of any analysis whatsoever.  The EO states that only "non-statutory components and functions" of USAGM be eliminated "to the maximum extent consistent with applicable law," 90 Fed. Reg. 13043 (Mar. 14, 2025), but the defendants have provided no indication that an analysis was undertaken to determine which aspects of USAGM are statutorily required and which are not.  In

---

[23] The termination of RFE/RL's grant, one of the agency actions at issue here, sits in a different posture rendering it not a "final" agency action.  The initial termination of RFE/RL's grant was rescinded by USAGM, and then that grant lapsed, with no grant in place to cover the period of FY 2025 from March 15 to September 30—because the previously negotiated grant agreement for FY 2025, signed by RFE/RL in February 2025, was never signed by USAGM.  *See* Section I.B.i.a, *supra*.  RFE/RL and USAGM are presently engaged in grant negotiations for the remainder of FY 2025, though RFE/RL has a pending TRO motion arguing that certain grant provisions proposed by USAGM are "poison pills" or otherwise illegal.  *RFE/RL v. Lake*, 25-cv-799, Mot. for TRO, ECF No. 28.  Nonetheless, at this juncture, in the midst of negotiations, court intervention would be premature.  However, the Court observes that delayed, broken down grant negotiations and indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review.

opposing the initial TRO in the Southern District of New York, the defendants only gave *one line* of reasoning for their actions since March 15, 2025: that they were acting "[i]n furtherance of the OPM Memorandum[24] and the [EO]." *See* ECF. No. 41 at 9. This lack of analysis formed the basis of the March 28 TRO, in which the court held that the defendants' actions were arbitrary and capricious. March 28 TRO at 9 ("This single line, devoid of data or any independent explanation, is grossly insufficient and falls far short of reasoned analysis.").

The defendants have offered no further analysis since. In their briefing before this Court, they do not even use the words "arbitrary" or "capricious" anywhere, even though the central holding of the TRO was that the defendants' actions were arbitrary and capricious. The defendants have also offered no further explanation for the termination of the Network grants, other than the one sentence contained in each termination letter: that the grant "no longer effectuates agency priorities." Compl. ¶ 78. And at this Court's PI hearing, the defendants opted not to argue the merits of the arbitrary and capricious challenge despite being given several opportunities to do so. Tr. of Apr. 17 Hearing, 67:3–9 ("We don't even get to the arbitrary and capricious because there is no final agency decision yet."); *see also* Tr. of Apr. 17 Hearing, 82: 17–18. The defendants solely relied on their threshold, jurisdictional arguments, which this Court has resolved in the plaintiffs' favor *supra*.

Rather than argue that their actions are not arbitrary and capricious, the defendants simply state that USAGM is currently in the process of figuring out how to comply with the EO. Tr. of Apr. 17 Hearing, 45:14–15 ("Right now, the agency is determining how it will best go about

---

[24] The Office of Personnel Management memorandum, or "OPM Memorandum," refers to the memorandum issued on Jan 20, 2025, and amended on March 4, 2025, titled "Guidance on Probationary Periods, Administrative Leave and Details," available at https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf. The memorandum provides that federal agencies "have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so." *See* ECF. No. 41 at 9.

complying with [the EO].”; *see also* PI Opp'n at 43 (USAGM "has placed its employees on administrative leave temporarily to determine how to bring the agency into compliance with the Executive Order"). But that necessarily means that the defendants took the actions at issue here without any "reasoned analysis" as to what was "statutorily required" under the EO and what was not. *State Farm*, 463 U.S. at 43. And the actions taken reflect a hasty, indiscriminate approach: for example, the Networks received the termination letters *on the exact same day* that President Trump signed the Third Continuing Resolution appropriating line-item funds to the Networks through the end of the fiscal year. Certainly, disbursing congressional appropriations are statutorily required, and the agency axed them the very same day they were enacted.

Furthermore, the defendants failed to account for any reliance interests, contributing to this Court's conclusion that their actions were arbitrary and capricious. "When an agency changes course, as [USAGM] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 212). VOA has been operating under statutory mandate and with steady congressional appropriations for over eighty years, and in so doing, has cultivated an audience of 425 million listeners who rely on VOA's output—particularly in areas of the world where a free press is otherwise unavailable. The Networks have contributed to U.S. international broadcasting by almost exclusively relying on their yearly congressional appropriations, which have been uninterrupted for decades before March 15, 2025. There is no sign that the defendants considered these longstanding reliance interests before taking the sweeping actions at issue here.[25]

---

[25] Though the Court declines to reach the First Amendment claims at issue, the defendants' attempts to argue that they are not engaging in viewpoint discrimination ironically serve to highlight their arbitrary and capricious approach to whittling down the agency. They argue that these Plaintiffs' First Amendment rights are not implicated here because

In short, the defendants had no method or approach towards shutting down USAGM that

this Court can discern.  They took immediate and drastic action to slash USAGM, without

considering its statutorily or constitutionally required functions as required by the plain language

of the EO, and without regard to the harm inflicted on employees, contractors, journalists, and

media consumers around the world.  It is hard to fathom a more straightforward display of arbitrary

and capricious actions than the Defendants' actions here.

### b.  "Not in Accordance with the Law," 5 U.S.C. § 706(2)(A)

The defendants have also likely violated the APA because their actions are "not in

accordance with law."  5 U.S.C. 706(2)(A).  This rule applies to actions that "failed to meet

statutory, procedural, or constitutional requirements."  *Citizens to Pres. Overton Park, Inc. v.*

*Volpe*, 401 U.S. 402, 414 (1971).  The Court adopts the conclusions from the March 28 TRO and

reproduces a sampling of the likely statutory and constitutional violations by the defendants below.

### 1.  *International Broadcasting Act and the Congressional Appropriations Acts*

The defendants are likely in direct violation of numerous federal laws.  For one, VOA's

congressionally established charter in the International Broadcasting Act states that VOA "will

serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and

comprehensive," 22 U.S.C. § 6202(c), but the defendants have silenced VOA for the first time

ever.  The International Broadcasting Act further states that U.S. international broadcasting "shall

. . . be designed so as to effectively reach a significant audience," and "include news which is

---

they have halted all journalism at VOA and grantee broadcasters, and not "singled out any one viewpoint."  PI Opp'n
at 24.  Because the defendants have eliminated the agency's functions across the board, the argument seems to go,
there is no viewpoint discrimination.  For one, the Court finds this argument troubling—it cannot be the case that by
shutting down all content at an agency, which current leadership has deemed "radical" and "so far to the left," Compl.
¶ 90, the defendants have avoided any First Amendment transgressions.  But moreover, even if the defendants were
not motivated by viewpoint (which this Court finds dubious, *see* Tr. of Apr. 17 Hearing, 22:19–21), their stance
acknowledges that their actions have effectively shut down the agency wholesale, and they have not offered any
"reasoned analysis" for doing so.

consistently reliable and authoritative, accurate, objective, and comprehensive."  22 U.S.C. § 6202(a), (b).  But as of now, it appears that the only operational unit of USAGM is the Office of Cuba Broadcasting, and there is no indication that this office of thirty-three individuals can fulfill USAGM's broad statutory mandate by itself.

Finally, the defendants' decision to cut all grant funding to the Networks directly violates congressional appropriations laws.  "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill."  *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  As explained *supra*, USAGM may to some extent reprogram funds among different programs, but any such reprogramming efforts may only reduce funding for a program by five percent or less of what Congress designated—certainly, no law gives the agency the power to cut funding to the drastic degree that is alleged.  Additionally, USAGM may only reprogram if it gives the House and Senate Appropriations Committees fifteen days' advance notice, which has not happened here.

The Court therefore concludes that the defendants are likely contravening the APA by acting "not in accordance" with several International Broadcasting Act provisions and congressional appropriations acts.

## 2. *Take Care Clause and Separation of Powers Principles*

"Under the Constitution, the President must 'take care that the laws be faithfully executed,' U.S. Const. art. II, § 3, across the entire Executive Branch—including 'independent' agencies." *Eng. v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018).  And because federal agencies are

"creatures of statute," and "the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, 'possess[ing] only the authority that Congress has provided them.'" *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024) (quoting *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022)).  By violating the International Broadcasting Act and the relevant congressional appropriations acts, the defendants likely contravene the Take Care Clause.  *See* March 28 TRO at 12 ("Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause].").

"Related to Plaintiffs' Take Care Clause claim is their argument that Defendants' actions violate the separation of powers implicit in our constitutional design."  March 28 TRO at 12.  The power to make law resides exclusively with the legislative branch, U.S. CONST. art. I, § 1, and the executive branch may not 'enact, [] amend, or [] repeal statutes.'"  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  Specifically, the Court highlights again here that the defendants' unwillingness to expend funds in accordance with the congressional appropriations laws is a direct affront to the power of the legislative branch.  Congress possesses the "power of the purse," which is "the ultimate check on the . . . power of the Executive."  *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015).  Here, the defendants' termination of grants to the Networks and shutting down VOA "potentially run roughshod over a 'bulwark of the Constitution' by interfering with Congress's appropriation of federal funds."  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012)).

### c.  "Unlawfully Withheld or Unreasonably Delayed," 5 U.S.C. § 706(1)

The APA also provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1).  This type of APA claim arises "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton*, 542 U.S. at 64 (emphases in original).  Here, it is likely that the defendants have also violated section 706(1) of the APA by unlawfully withholding the international broadcasting programming and grants that USAGM is statutorily required to provide.  At the PI hearing, in response to the Court's inquiry regarding the withholding of appropriated funds and the need for recission, the defendants argued that such concerns are not ripe for adjudication.  Tr. of Apr. 17 Hearing, 79:18–19, 80:12–14.  Of course, this argument ignores the fact that, but for the March 28 TRO, the grants to RFA and MBN are currently terminated by the letters from USAGM.  And the defendants have not provided any indication that the $260 million in VOA appropriations is being spent to fulfill its statutory mandate to provide a "consistently reliable" source of news.  22 U.S.C. § 6202(c).  Indeed, at the PI hearing, defense counsel declined to make any representation regarding the planned use of VOA's earmarked funds, while VOA remains silent indefinitely.  Tr. of Apr. 17 Hearing, 81:18–82:5.  These facts suggest that Defendants are "unlawfully withholding" or "unreasonably delaying" required agency action to fund the Networks and carry out international broadcasting mandated by Congress, in violation of Section 706(1) of the APA.[26]

### E.  PI Factor 2: Irreparable Harm

To qualify as irreparable harm, the injuries alleged "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable

---

[26] Because the Court finds that the plaintiffs have demonstrated a likelihood of success on the merits of their APA claims, the Court will not reach the plaintiffs' First Amendment claims.  *See* Compl. ¶¶ 102–116.

relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

(quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).   Here, the

showing of irreparable harm that formed the basis of the March 28 TRO remains compelling.   *See*

March 28 TRO at 16 ("The dismantling of USAGM would clearly cause employees, contractors,

and grantees irreparable harm.   And Plaintiffs have offered sufficient evidence that Defendants are

doing just that.").   The defendants have already placed a total of "[a]pproximately 1,300 VOA

journalists and other employees" on administrative leave, furloughed others, and stated that over

600 more employees will be terminated within weeks.   Compl. ¶¶ 75, 80; March 26 Letter to the

Court, ECF No. 33 at 2.   "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff]

to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm."

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

The defendants argue that the plaintiffs "fundamentally complain of adverse employment

actions . . . that can be remedied by money damages at the end of the litigation."   PI Opp'n at 42.

While the defendants are correct that "ordinary economic injuries are usually insufficient to require

injunctive relief," *Wis. Gas,* 758 F.2d at 674, it is also true that "financial harm can 'constitute

irreparable harm . . . where the loss threatens the very existence of the movant's business,'"

*Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C.

Mar. 18, 2025) (quoting *Wis. Gas,* 758 F.2d at 674).   The defendants have silenced VOA, canceled

funds to affiliate Networks, and shut down all transmitters at foreign service stations abroad.

Compl. ¶¶ 78–83.   "[T]hese furloughs and lay-offs entail the dismantling of human infrastructure

required to run USAGM, VOA, and USAGM's grantees."   March 28 TRO at 17.   "[S]hutting down

necessary systems, laying off personnel, and terminating contracts, even ones that might be able

to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the

agency in the long-term. . . . In short, these harms cannot be remedied with mere money damages." *Id.*

The Court also concludes that the harm to Does 3 and 4, foreign nationals working as PSCs with VOA, from the looming loss of their J-1 visas constitutes irreparable harm. In opposing the March 28 TRO, the defendants argued that the revocation of these J-1 visas is not irreparable harm because it merely forces them to leave the country "earlier than scheduled." March 28 TRO at 19 (quoting Defs.' TRO Opp'n at 13). The court dispensed with that argument then, and the Court adopts the same reasoning here: the *immediate* termination of John Does 3 and 4's contracts and visas is "not merely speeding up the inevitable" because the hastiness of the defendants' actions eliminates the notice that Does 3 and 4 would otherwise have "to find a new job to sponsor a subsequent visa, or to apply for another kind of visa to stay in the country." March 28 TRO at 19–20. The defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately.

The defendants do not appear to challenge the plaintiffs' showing of irreparable harm to RSF plaintiffs who rely on VOA while living and reporting abroad, or the harm to TNG-CWA (labor organization of RFA employees). The Court finds these allegations of irreparable harm compelling as well. *See* Brunnit Decl. ¶ 6 (offering testimony of irreparable harm to RSF Plaintiffs because the shutdown of VOA "depriv[es] correspondents of a trustworthy source of news" in countries "where VOA is one of the few, if not the only, sources of independent and reliable news," and impedes RSF's ability to "dissemina[te] vital public interest information for journalists and public safety . . . ."); Second Schleuss Decl. ¶¶ 4–6 (testifying that TNG-CWA members will lose their health insurance as soon as May 1 and describing the medical consequences of such a result, and testifying that TNG-CWA members with H1-B visas face "deport[ation] to their home

countries where they could face threats, harassment, or imprisonment for their work as journalists"
as a result of their furlough status).

In sum, the irreparable harm that the plaintiffs allege impacts the very existence of
USAGM, the health and safety of its journalists and employees, and the interests of the millions
of reporters and listeners who depend on USAGM's programming. For all of these reasons, the
Court concludes that the plaintiffs' have demonstrated irreparable harm warranting the issuance of
a preliminary injunction.

### F. PI Factors 3 and 4: Balance of Equities and Public Interest

These final PI factors "merge when the government is the opposing party." *Am. Ass'n of
Pol. Consultants v. U.S. Small Bus. Admin.*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting
*Nken*, 556 U.S. at 435, 129 S.Ct. 1749). "[C]ourts must balance the competing claims of injury
and must consider the effect on each party of the granting or withholding of the requested relief[,]
. . . pay[ing] particular regard for the public consequences" that would result in granting the
emergency relief sought. *Winter*, 555 U.S. at 24 (quotation marks omitted). Here, as noted in the
March 28 TRO, while the plaintiffs "have put forward a laundry list of injuries" that would occur
absent injunctive relief, the defendants only seem to assert that injunctive relief would disrupt their
ability to comply with the EO. March 28 TRO at 20. However, the defendants are apparently still
in the process of determining *how* to comply with the EO. In doing so, they have likely violated
it by reducing USAGM's activities to levels far below the constitutional and statutory minimums.
Therefore, there is no competing harm to the government with the issuance of preliminary relief
that orders compliance with governing statutes and the Constitution, while "[t]here is a substantial
public interest 'in having governmental agencies abide by the federal laws that govern their
existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted). Moreover, Congress has

"enshrined into law that '[i]t is in the interest of the United States to support broadcasting to other nations.'" *RFE/RL, Inc. v. Lake*, 2025 WL 900481, at *4 (quoting 22 U.S.C. § 6201(3)). It is, therefore, *Congress's* "longstanding determination" that international broadcasting activities, which the defendants have eliminated, are in the public interest. *Id.* The Court therefore concludes that these final PI factors weigh in favor of a preliminary injunction.

### G. The Court will Not Impose Bond.

Under Federal Rule of Civil Procedure 65(c), a Court may require a party to post bond for "costs and damages sustained" by the defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). A district court's failure to require the posting of a bond has been held reversible error in some Circuits, while others have found reversible error only when the district court failed to expressly consider the question of requiring a bond. Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed. April 2025).

The Court has considered the question of whether to impose bond and declines to do so, following the practice of other courts in this Circuit faced with a similar posture. "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)). Such a situation arises where a bond would "hold Plaintiffs hostage" for the harm from the government's unlawful withholding of "previously committed funds." *Id.* (noting that defendants "will personally face no monetary injury from the injunction"). That is squarely the case here, where the defendants are already constitutionally required to distribute funds in accordance with the yearly appropriations bill, so a bond would merely impose a financial barrier to litigation for plaintiffs seeking to vindicate their statutory and constitutional rights. In cases such as this one

where funds are committed by Congress for specific programs, "public policy mandate[s] that parties . . . adversely affected by improper administration of programs . . . be strongly encouraged to correct such errors."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (quoting *Bass v. Richardson*, 338 F. Supp. 478, 491 (S.D.N.Y. 1971)).  To that end, the Court will not impose bond.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for a Preliminary Injunction will be **GRANTED** as follows: The Court will preliminarily enjoin the defendants, pending further order of this Court, to 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).  The Court will **DENY** the Motion for a Preliminary Injunction, at this time, as it relates to RFE/RL and OTF, in light of their current status.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: _____4-22-25_____
          2:45 p.m.

_____
Royce C. Lamberth
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PATSY WIDAKUSWARA**, *et al.*,

      *Plaintiffs,*

**v.**

**KARI LAKE,** *in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al.*,

      *Defendants.*

Case No. 1:25-cv-1015-RCL

### <u>ORDER</u>

For the reasons contained in the accompanying Memorandum Opinion, the plaintiffs' Motion for a Preliminary Injunction [ECF No. 17][1] is **GRANTED** as follows:

The Court will preliminarily enjoin the defendants, pending further order of this Court, to: 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025; 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the

---

[1] The plaintiffs sought emergency relief by filing a motion (styled as a proposed order to show cause) for a preliminary injunction. *See* Proposed Order to Show Cause with Emergency Relief, ECF No. 15; Mem. in Support of Proposed Order to Show Cause, ECF No. 17.

disbursement to RFA and MBN of the funds Congress appropriated; and 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C § 6202(c).  The Court **DENIES** the Motion for a Preliminary Injunction, at this time, as it relates to RFE/RL and OTF, in light of their current status.


       **IT IS SO ORDERED.**


Date: _____4-22-25_____
              2:45 a.m.

                                        _Royce C. Lamberth_
                                        Royce C. Lamberth
                                        United States District Judge