## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

PATSY WIDAKUSWARA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE ACTING
CEO OF THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MICHAEL ABRAMOWITZ, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF VOICE OF
AMERICA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE ACTING
CEO OF THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MIDDLE EAST BROADCASTING NETWORKS, INC.,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

RADIO FREE ASIA,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

On Appeals from the United States District Court for the District of Columbia
Nos. 25-cv-1015, 25-cv-887, 25-cv-966, 25-cv-907 (Hon. Royce C. Lamberth)

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ABIGAIL STOUT
*Attorneys*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1838*
*daniel.tenny@usdoj.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.     Parties and Amici

In *Widakuswara*, No. 25-5144, plaintiffs-appellees are Patsy Widakuswara; Jessica Jerreat; Kathryn Neeper; John Does 1-4; Reporters Sans Frontieres; Reporters Without Borders, Inc.; American Federation of State, County and Municipal Employees; American Federation of Government Employees; American Foreign Service Association; and NewsGuild-Communications Workers of America. Defendants-appellants are Kari Lake, in her official capacity as Senior Advisor to the Acting Chief Executive Officer (CEO) of the U.S. Agency for Global Media; Victor Morales, in his official capacity as Acting CEO of the U.S. Agency for Global Media; and the U.S. Agency for Global Media. Reporters Committee for Freedom of the Press was granted leave to file an amicus brief in district court.

In *Abramowitz*, No. 25-5145, plaintiffs-appellees are Michael Abramowitz, in his official capacity as Director of Voice of America;

Anthony Michael Labruto; J. Doe 1; and J. Doe 2. Defendants-appellants are Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; Victor Morales in his official capacity as Acting CEO of the U.S. Agency for Global Media; and the U.S. Agency for Global Media.

In *Middle East Broadcasting Networks, Inc.*, 25-5150, plaintiff-appellee is Middle East Broadcasting Networks, Inc. In *Radio Free Asia*, No. 25-5151, plaintiff-appellee is Radio Free Asia. Defendants-appellants in both cases are the United States of America; the U.S. Agency for Global Media; Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; Victor Morales, in his official capacity as Acting CEO of the U.S. Agency for Global Media; the Office of Management and Budget; Russell T. Vought, in his official capacity as Director of the United States Office of Management and Budget; the United States Department of the Treasury; and Scott Bessent, in his official capacity as United States Secretary of the Treasury.

## B.    Rulings Under Review

Appellants have appealed the memorandum opinion and the orders granting plaintiffs' motion for a preliminary injunction in *Widakuswara. v.*

*Lake*, No. 25-cv-1015 (D.D.C.), as Dkt. Nos. 98, 99, and *Abramowitz v. Lake*, No. 25-cv-887 (D.D.C.), as Dkt. No. 29.  Additionally, appellants have appealed the orders granting plaintiffs' motions for preliminary injunction, entered in *Radio Free Asia v. United States*, No. 25-cv-907 (D.D.C.), as Dkt. No. 25 and in *Middle East Broadcasting Networks, Inc. v. United States*, No. 25-cv-966 (D.D.C.), as Dkt. No. 23.

### C.    Related Cases

This case has not previously been before this Court. There are two other related cases currently pending in the United States District Court for the District of Columbia or on appeal. *See RFE/RL, Inc. v. Lake*, 25-cv-799 (D.D.C.), *appeal docketed*, No. 25-5158 (D.C. Cir.); *Open Tech. Fund v. Lake*, 25-cv-840 (D.D.C.).


<span> /s/ Daniel Tenny               </span>
Daniel Tenny

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 2

STATEMENT OF THE ISSUES ........................................................... 3

PERTINENT STATUTES AND REGULATIONS ................................... 4

STATEMENT OF THE CASE .............................................................. 4

    A.    Statutory and Regulatory Background ................................... 4

    i.    *International Broadcasting Act of 1994* ............................... 4

    ii.    *Appropriations Statutes* ......................................................... 7

    iii.    *Applicable Regulations* ............................................................ 8

    iv.    *Grant Terms* ............................................................................. 8

    v.    *Executive Order 14,238* ......................................................... 9

    B.    Factual Background ................................................................. 9

    C.    Procedural Background ......................................................... 10

SUMMARY OF ARGUMENT .............................................................. 21

STANDARD OF REVIEW ................................................................... 24

ARGUMENT ...................................................................................... 25

I.    Plaintiffs are not likely to succeed on the merits of their
      claims ........................................................................... 26

      A.    The district court erred by ordering reinstatement of
            all the Agency's employees and contractors ........................ 26

            1.    The district court lacked jurisdiction over the
                  Agency's personnel actions .......................................... 26

            2.    Even if these employment claims could be bought
                  under the APA, plaintiffs' claim is not cognizable
                  because plaintiffs identify no final agency action ...... 37

            3.    The Agency's personnel decisions are committed
                  to Agency discretion .................................................... 42

      B.    Plaintiffs' APA claims regarding grants are in essence
            contract claims and must be brought in the Court of
            Federal Claims .................................................................... 45

II.   The remaining injunction factors overwhelmingly weigh
      against an injunction ................................................................... 62

CONCLUSION ...................................................................................... 68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Aids Vaccine Advocacy Coal. v. U.S. Dep't of State,*
770 F. Supp. 3d 121 (D.D.C. 2025) .................................... 62

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve
Emp. Benefits Sys.,*
357 F.3d 62 (D.C. Cir. 2004) ........................................... 47

*American Fed'n of Gov't Emps. v. Secretary of the Air Force,*
716 F.3d 633 (D.C. Cir. 2013) ................................. 22, 27, 30

*American Fed'n of Gov't Emps. v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ............................ 22, 26, 27, 30, 33, 37

*Association for Educ. Fin. & Pol'y, Inc. v. McMahon,*
Nos. 1:25-cv-00999 (TNM), 25-cv-01266 (TNM),
2025 WL 1568301 (D.D.C. June 3, 2025) ......................... 61

*Atlas Air, Inc. v. International Bhd. of Teamsters,*
928 F.3d 1102 (D.C. Cir. 2019) ....................................... 24

*Baker v. Carr,*
369 U.S. 186 (1962) ....................................................... 34

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................... 39, 41

*Block v. Community Nutrition Inst.,*
467 U.S. 340 (1984) ................................................... 31, 60

*Boaz Hous. Auth. v. United States,*
994 F.3d 1359 (Fed. Cir. 2021) ....................................... 47

*Columbus Reg'l Hosp. v. United States,*
990 F.3d 1330 (Fed. Cir. 2021) ....................................... 50

*Crowley Gov't Servs., Inc. v. General Servs. Admin.,*
38 F.4th 1099 (D.C. Cir. 2022) ................... 46, 48, 49, 50, 51

*Dennis Melancon, Inc. v. City of New Orleans,*
703 F.3d 262 (5th Cir. 2012) ......................................... 65

*Department of Educ. v. California*,
　145 S. Ct. 966 (2025) ................................................ 16, 51, 52, 64, 66

*Drake v. Federal Aviation Admin.*,
　291 F.3d 59 (D.C. Cir. 2002) ........................................................... 43

*Egbert v. Boule*,
　596 U.S. 482 (2022) ........................................................................ 35

*Elgin v. Department of the Treasury*,
　567 U.S. 1 (2012) .................................................... 21, 26, 32, 33, 36

*Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*,
　423 U.S. 326 (1976) ........................................................................ 40

*Filebark v. U.S. Dep't of Transp.*,
　555 F.3d 1009 (D.C. Cir. 2009) ................................................. 25, 34

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
　561 U.S. 477 (2010) ........................................................................ 28

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
　460 F.3d 13 (D.C. Cir. 2006) ........................................................... 39

*General Land Office v. Biden*,
　722 F. Supp. 3d 710 (S.D. Tex. 2024) ............................................. 59

*Graham v. Ashcroft*,
　358 F.3d 931 (D.C. Cir. 2004) ......................................................... 37

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
　560 F.3d 495 (D.C. Cir. 2009) ................................................... 26, 33

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
　527 U.S. 308 (1999) ................................................................... 34, 35

*Harkrader v. Wadley*,
　172 U.S. 148 (1898) ........................................................................ 35

*Heckler v. Chaney*,
　470 U.S. 821 (1985) ........................................................................ 44

*Ho v. United States*,

49 Fed. Cl. 96 (2001), *aff'd*,
30 F. App'x 964 (Fed. Cir. 2002) ........................................ 29

*Independent Equip. Dealers Ass'n v. Environmental Prot. Agency*,
372 F.3d 420 (D.C. Cir. 2004) ............................................ 38

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ................................ 47, 51, 53, 54

*James v. Caldera*,
159 F.3d 573 (Fed. Cir. 1998) ............................................ 47

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................ 43

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) .................................................. 39, 42

*Maryland v. U.S. Dep't of Agric.*,
No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) .................... 32

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians
v. Patchak*,
567 U.S. 209 (2012) ........................................................ 46

*MediNatura, Inc. v. Food & Drug Admin.*,
998 F.3d 931 (D.C. Cir. 2021) ............................................ 60

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........................................ 48, 49

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ........................................ 64, 65

*National Treasury Emps. Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................ 66

*National Veterans Legal Servs. Program v. U.S. Dep't of Def.*,
990 F.3d 834 (4th Cir. 2021) ............................................ 39

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................ 25

*Norton v. Southern Utah Wilderness All.*,

542 U.S. 55 (2004) ..................................................... 23, 38

*Nyunt v. Chairman, Broad. Bd. of Governors,*
589 F.3d 445 (D.C. Cir. 2009) ................................ 15, 27

*Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.,*
313 F. Supp. 3d 62 (D.D.C. 2018) ...................... 61

*Public Citizen v. Stockman,*
528 F. Supp. 824 (D.D.C. 1981) .......................... 60, 62

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.,*
427 F. Supp. 118 (D.D.C. 1977) .......................... 60, 62

*Sampson v. Murray,*
415 U.S. 61 (1974).......................................... 34, 36

*In re Sawyer,*
124 U.S. 200 (1888)........................................ 34

*Southern Educ. Found. v. United States,*
Civ. No. 25-1079 (PLF),
2025 WL 1453047 (D.D.C. May 21, 2025) ...................... 62

*Spectrum Leasing Corp. v. United States,*
764 F.2d 891 (D.C. Cir. 1985) .......................... 49, 51

*Trump v. Sierra Club,*
140 S. Ct. 1 (2019) ........................................ 60

*United States v. Fausto,*
484 U.S. 439 (1988) ...................................... 30, 32

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State,*
770 F. Supp. 3d 155 (D.D.C. 2025), *dismissed,*
No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025) .................. 61

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def.
Council, Inc.,*
435 U.S. 519 (1978) ...................................... 42

*Walton v. House of Representatives,*
265 U.S. 487 (1924)........................................ 35

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... 25

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................ 65

*White v. Berry*,
    171 U.S. 366 (1898) ........................................................... 35

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 551 .................................................................. 38
    5 U.S.C. § 551(13) ..................................................... 38, 40
    5 U.S.C. § 701(a)(2) ................................................... 43, 44
    5 U.S.C. § 702 ........................................................... 34, 46
    5 U.S.C. § 704 .................................................................. 38
American Relief Act, 2025,
    Pub. L. No. 118-158, 138 Stat. 1722 (2024) ......................... 7

Civil Service Reform Act:
    5 U.S.C. § 1204 ................................................................. 26
    5 U.S.C. § 1214 ................................................................. 26
    5 U.S.C. § 7103(a)(9) ........................................................ 30
    5 U.S.C. § 7104 ................................................................. 26
    5 U.S.C. § 7121(a)(1) ........................................................ 31
    5 U.S.C. §§ 7121-7122 ...................................................... 26
    5 U.S.C. § 7701 ................................................................. 26

Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 118-83, 138 Stat. 1524 (2024) ........................... 7

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 118-4, § 1101(a), 139 Stat. 9, 10-12 ................. 7

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 460 ..................... 7, 50, 54, 56

2 U.S.C. § 683(a) ...................................................................... 58

2 U.S.C. § 684(a) ............................................................. 58

2 U.S.C. § 687 ................................................................. 59

2 U.S.C. § 688 ................................................................. 59

20 U.S.C. § 1022a(a) ........................................................ 52

22 U.S.C § 6208(a) ..................................................... 5, 54

22 U.S.C § 6208(c) ..................................................... 5, 52

22 U.S.C § 6208(c)(5) ................................................. 6, 55

22 U.S.C. § 6201(3) .......................................................... 4

22 U.S.C. § 6202(b) ........................................................ 44

22 U.S.C. § 6202(c) .............................................. 4, 12, 14

22 U.S.C. § 6204 ............................................................... 4

22 U.S.C. § 6204(a)(1) ...................................................... 5

22 U.S.C. § 6204(a)(2) ...................................................... 5

22 U.S.C. § 6204(a)(5) ................................................. 5, 49

22 U.S.C. § 6204(a)(6) ...................................................... 5

22 U.S.C. § 6204(a)(8) ...................................................... 5

22 U.S.C. § 6204(b) ........................................................ 44

22 U.S.C. § 6204(c) ........................................................ 42

22 U.S.C. § 6204(c)(1) ...................................................... 7

22 U.S.C. § 6208 ............................................................... 4

22 U.S.C. § 6208(a) .......................................................... 5

22 U.S.C. § 6208(c) .......................................................... 5

22 U.S.C. § 6208(c)(1) ................................................ 6

22 U.S.C. § 6208(c)(3) ................................................ 6

22 U.S.C. § 6208(c)(4) ................................................ 6

22 U.S.C. § 6208(c)(5) ................................... 6, 55, 56

22 U.S.C. § 6208(g) ............................................. 6, 56

28 U.S.C. § 1292(a)(1) .............................................. 3

28 U.S.C. § 1331 .............................................. 2, 27

28 U.S.C. § 1343 ..................................................... 2

28 U.S.C. § 1346 ..................................................... 3

28 U.S.C. § 1361 ..................................................... 3

28 U.S.C. § 1491(a)(1) ............................................ 47

41 U.S.C. §§ 7103-7105 ........................................... 26

## Regulatory Materials:

2 C.F.R. § 1900.1 ................................................... 8

2 C.F.R. pt. 200 ................................................. 8, 9

2 C.F.R. § 200.340(a)(4) ........................................... 8

Exec. Order No. 14,238,
90 Fed. Reg. 13,043 (Mar. 20, 2025) ........................ 9, 67

## Rules:

Fed. R. App. P. 4(a)(1)(B) ......................................... 3

Fed. R. Civ. P. 65(c) ............................................. 66

# GLOSSARY

Administrative Procedure Act        APA

Chief Executive Officer        CEO

Civil Service Reform Act        CSRA

Federal Service Labor-Management Relations Statute    FSLMRS

Fiscal Year        FY

U.S. Agency for Global Media        Agency

## INTRODUCTION

After President Trump issued an Executive Order calling for the reduction of bureaucracy and for the U.S. Agency for Global Media (Agency) to reduce "the performance of their statutory functions and associated personnel to the minimum presence and function required by law," the Agency took action to implement the Order. The Agency was immediately sued. The district court issued a three-part injunction, only two parts of which are at issue here. The government is not appealing the district court's order requiring Voice of America to carry out its statutory mandate. But the district court went further. In particular, the district court ordered the restoration of certain grant agreements; ordered the government to make payments under those grant agreements; and required the Agency to restore "all employees and contractors" to their pre-March 14 status.

Those orders were erroneous. As a stay panel properly concluded, the district court lacked jurisdiction to order the government to restore employees and contractors. And that aspect of the district court's order was in any event unwarranted on the merits, as nothing in the statute

remotely requires the government to continue the employment and contractor relationships that existed in March 2025.

As the stay panel also concluded—albeit in a portion of its order vacated by the en banc Court, which contemplated further consideration of the question—the portions of the order relating to grants also exceeded the district court's jurisdiction because contractual claims fall within the exclusive jurisdiction of the Court of Federal Claims.

The Court should now vacate the preliminary injunction in relevant part because the district court lacked jurisdiction to enter both forms of relief and issued an injunction that irreparably harms the government by directing monthly disbursement of millions of dollars that cannot be recouped if the government later prevails and by overriding the Agency's judgment about requisite agency staffing and requiring the Agency to employ certain personnel against its will.

## STATEMENT OF JURISDICTION

All plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. The *Widakuswara* plaintiffs also invoked 28 U.S.C. § 1343 (action to redress deprivation of rights secured by the Constitution of the United States). Radio Free Asia and Middle East

Broadcasting Networks, Inc. each also invoked 28 U.S.C. §§ 1346 and 1361. The government contests plaintiffs' basis for jurisdiction over their putative Administrative Procedure Act (APA) claims.

The district court granted the *Widakuswara* and *Abramowitz* plaintiffs' motions for a preliminary injunction on April 22, 2025. The government filed timely notices of appeal on April 24, 2025. *See* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). The district court granted Radio Free Asia and Middle East Broadcasting Networks' motions for a preliminary injunction on April 25, 2025, and the government filed timely notices of appeal the same day. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

This case arises from the Agency's decision to terminate certain grant agreements and make certain personnel decisions. The issues presented are:

1. Whether the district court properly ordered restoration of all of the Agency's employees and contractors to their status prior to March 14, 2025.

2. Whether the district court properly ordered the Agency to resume disbursing funds under Radio Free Asia and Middle East Broadcasting Networks' grant agreements or whether claims regarding those agreements should instead have been pursued in the Court of Federal Claims.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.   Statutory and Regulatory Background

i.   *International Broadcasting Act of 1994*

The International Broadcasting Act of 1994 tasks the Agency with overseeing multiple entities, including Voice of America and various grantees like Radio Free Asia and Middle Eastern Broadcasting Networks. 22 U.S.C. §§ 6201(3), 6202(c), 6204, 6208. Congress granted the Agency's Chief Executive Officer the authority to "supervise all broadcasting activities conducted" by such entities; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United

States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical." *Id.* §§ 6204(a)(1), (a)(2), (a)(8).

Congress further authorized the Agency to employ grants to fund many of the entities under its supervision. Section 6204(a) provides authority for the Agency's Chief Executive Officer to "make and supervise grants and cooperative agreements for broadcasting and related activities" and "allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees, subject to reprogramming notification requirements in law for the reallocation of funds." 22 U.S.C. §§ 6204(a)(5), (a)(6).

The International Broadcasting Act provides that "[g]rants authorized under section 6204 of this title shall be available to make annual grants for the purpose of carrying out radio broadcasting to Asia." *Id.* § 6208(a). "Such broadcasting service shall be referred to as 'Radio Free Asia.'" *Id.* Section 6208(c) sets forth "limitations and restrictions" on any grants or grant agreements issued to Radio Free Asia. *Id.* § 6208(c). Among other limitations, this section requires Radio Free Asia's headquarters to be in "a location which ensures economy,

operational effectiveness, and accountability to the Agency"; addresses assignability of lease agreements; and sets a ceiling for the operating costs of Radio Free Asia for a particular year. *Id.* §§ 6208(c)(1), (c)(3), (c)(4). The statute also provides that "[g]rants awarded under this section shall be made pursuant to a grant agreement which requires that grant funds be used only for activities consistent with this section, and that failure to comply with such requirements shall permit the grant to be terminated without fiscal obligation to the United States." *Id.* § 6208(c)(5). And if "the Chief Executive Officer determines at any time that Radio Free Asia is not carrying out the functions described in this section in an effective and economical manner," the statute provides that "the Agency may award the grant to carry out such functions to another entity." *Id.* § 6208(g).

Additionally, the statute provides that the "Chief Executive Officer may not award any grant . . . [to] Radio Free Asia [or] the Middle East Broadcasting Networks . . . , or any other grantee authorized under this chapter . . . unless the incorporation documents of any such grantee require that the corporate leadership and Board of

Directors of such grantee be selected in accordance with this chapter." 22 U.S.C. § 6204(c)(1).

ii. *Appropriations Statutes*

Appropriations statutes make funding available for grant awards. In particular, Congress provided that appropriated funds should be "allocated" in accordance with a table, and the referenced table specifies amounts to be allocated to particular entities, including Radio Free Asia and Middle East Broadcasting Networks. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 735; *see also* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-4, § 1101(a), 139 Stat. 9, 10-12.

Congress authorized the Agency, however, to "reprogram[]" funds among the various entities listed in the table, subject to certain congressional notification procedures, "except that no such reprogramming may reduce a designated amount by more than 5 percent." Pub. L. No. 118-47, 138 Stat. at 735. Congress further

provided that the funds "shall be made available in accordance with the principles and standards set forth in section 303(a) and (b) of the United States International Broadcasting Act of 1994 (22 U.S.C. 6202) and section 305(b) of such Act (22 U.S.C. 6204)." *Id.*

### iii. *Applicable Regulations*

The Office of Management and Budget promulgates regulations that apply to the Agency and its administration of grants. Those regulations are codified at 2 C.F.R. Part 200 and provide uniform guidance for federal grant awards and agreements, including audit requirements and termination provisions. One such regulation states that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency . . . to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). And the Agency has formally adopted these regulations. *See* 2 C.F.R. § 1900.1.

### iv. *Grant Terms*

In accordance with the above-described statutes and regulations, the Agency entered into grant agreements with Radio Free Asia and Middle East Broadcasting Networks. Among other provisions, both

grant agreements state that "the Parties are subject to all Federal laws and regulations pertaining to Federal grants, including . . . 2 CFR Part 200." JA396, 432. As noted above, 2 C.F.R. Part 200 contains government-wide regulations promulgated by the Office of Management and Budget, including the provision that allows grants to be terminated if they no longer effectuate agency priorities.

v. *Executive Order 14,238*

In March 2025, the President issued Executive Order 14,238 to continue reduction of certain elements of the federal bureaucracy. The Order directed that the Agency's "non-statutory components and functions" be eliminated "to the maximum extent consistent with applicable law" and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14,238, 90 Fed. Reg. 13,043, 13,043 (Mar. 20, 2025). The Order specified that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* at 13,043.

## B.     Factual Background

After the Executive Order was issued, the Agency terminated contracts with all personal services contractors. JA72-73. But shortly thereafter, and without any gap in pay, all personal services contractors were reinstated and were receiving full pay and benefits but not working. JA73. The Agency retained the ability to recall employees from administrative leave to work status as it sought to implement the Executive Order. JA73.

In May 2025, the Agency terminated Radio Free Asia's and Middle East Broadcasting Networks' grant agreements. The Agency also placed 1,042 employees on administrative leave with full pay and benefits. JA.73.

## C.     Procedural Background

The government appeals four separate cases—*Abramowitz v. Lake*; *Widakuswara v. Lake*; *Radio Free Asia v. United States*; and *Middle East Broadcasting Networks, Inc. v. United States*—because the district court ordered overlapping relief in all four cases.

The *Widakuswara* case originated in the Southern District of New York. Plaintiffs challenged the alleged "dismantling" of the Agency and Voice of America, and the judge granted a temporary restraining order

on March 28, 2025, preventing the Agency from taking any further action with respect to its workforce and ordering restoration of the previously terminated grants. That case was subsequently transferred to the District of Columbia, and on April 22, 2025, the district court issued a preliminary injunction, ordering the Agency to: "1) take all necessary steps to return [Agency] employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, 'Continuing the Reduction of the Federal Bureaucracy,' including by restoring all [Agency] employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025; 2) restore the [fiscal year (FY)] 2025 grants with [Agency] Networks Radio Free Asia and Middle East Broadcasting Networks such that international [Agency] outlets can 'provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive,' 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to [Radio Free Asia] and [Middle East Broadcasting Networks] of the funds Congress appropriated; and

3) restore [Voice of America] programming such that [the Agency] fulfills its statutory mandate that [Voice of America] 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." JA38-39.

The *Abramowitz* case originated in the District of Columbia, and once *Widakuswara* was transferred to the District of Columbia, the district court held a consolidated hearing on the *Widakuswara* plaintiffs' and *Abramowitz* plaintiffs' motions for preliminary injunctions. On the same day the district court entered a preliminary injunction in the *Widakuswara* case, the district court entered a preliminary injunction in *Abramowitz*—another case challenging the alleged "shuttering" of Voice of America, albeit while challenging only personnel actions and not grants—concluding that the relief in *Widakuswara* "encompasses" the relief requested in *Abramowitz* but granting the preliminary injunction so that *Abramowitz* could be considered "alongside *Widakuswara* for the purposes of appellate review." JA304, 306.

Both *Radio Free Asia* and *Middle East Broadcasting Networks* were filed in the District of Columbia, and plaintiffs in both cases filed

motions for preliminary injunction. Those motions were pending when the district court entered preliminary injunctions in the *Widakucswara* and *Abramowitz* cases. After the district court issued preliminary injunctions in *Widakuswara* and *Abramowitz* on April 22—which specifically constrained the government's actions with regard to grants that had been awarded to Radio Free Asia and Middle East Broadcasting Networks (collectively, the Networks)—both Networks moved on April 24 for an order granting their pending motions based on the reasoning in the *Widakuswara* order. In order to permit the Networks to enforce the injunction and participate on appeal, the district court entered plaintiffs' requested relief in a single order entered in both the *Radio Free Asia* case and the *Middle East Broadcasting Networks* case. JA328-29. The order exactly mirrors the first prong of the *Widakuswara* injunction, enjoining defendants to "restore the FY 2025 grants with [Agency] Networks Radio Free Asia and Middle East Broadcasting Networks, Inc. such that international [Agency] outlets can 'provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive,' 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the

first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to [Radio Free Asia] and [Middle East Broadcasting Networks] of the funds Congress appropriated." JA328-29.

The government filed notices of appeal in all four cases. The government sought a stay pending appeal regarding the first and second prongs of the *Widakuswara* injunction and the entirety of the Networks' injunctions. The government did not seek a stay regarding the third prong of the *Widakuswara* injunction, which orders the Agency to "restore [Voice of America] programming such that [the Agency] fulfills its statutory mandate that [Voice of America] 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." *See* JA38-39. The government likewise does not challenge that provision now.

After granting a partial administrative stay regarding the grant-related portion of the injunction, the motions panel granted the government's stay motion in all four cases in a per curiam opinion. *See* JA453, 457. First, the panel concluded that the government was likely

to show that the district court lacked jurisdiction to adjudicate the Agency's personnel-related decisions. JA461. The panel reasoned that plaintiffs may not use the APA to challenge agency employment actions because Congress has established "comprehensive statutory schemes for adjudicating employment disputes with the federal government." JA462. And "[t]hat principle applies to a 'systemwide challenge' to an agency policy . . . just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). The panel explained that plaintiffs' "frame their claims as challenging the 'wholesale shuttering of [Voice of America]' and seeking to undo 'broad government actions' to 'dismantl[e] an entire federal agency' but that "plaintiffs may not use the APA to mount wholesale challenges to an agency's entire program." JA463 (quotation omitted). "The 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'" JA463. "Thus," the panel concluded, "while [the Agency's] employees and contractors might have viable, discrete claims with respect to their

individual personnel actions, those claims must be pursued through other remedial channels." JA463.

Next, the panel concluded that the government was likely to show that the district court lacked jurisdiction to adjudicate the Networks' grant terminations. JA463. The panel explained that the Tucker Act vests the Court of Federal Claims with jurisdiction over claims against the United States founded on any express or implied contract with the United States and that this jurisdictional grant, where it applies, is exclusive and thus bars application of the sovereign-immunity waiver set forth in the APA. JA464. The panel concluded that the Supreme Court's recent reasoning in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), "controls this case." JA465. There, the Supreme Court stayed an order pending appeal, concluding that the district court likely lacked jurisdiction to bar the termination of the grants because the Tucker Act likely conferred jurisdiction over the dispute on the Court of Federal Claims. JA465. The APA's limited waiver of immunity did not extend to the injunction at issue, which the Court described as an "order[] to enforce a contractual obligation to pay money." *Department of Educ.*, 145 S. Ct. at 968 (quotation omitted).

Likewise here, the panel explained, Congress created a contractual scheme for allocating funds to grantees, and the Agency and the grantees entered into government contracts to facilitate the exchange of funds in return for the grantees advancing statutory objectives and program requirements. JA465. "By the district court's own telling, the dispute . . . arose when [the Agency] terminated these agreements." JA465. "Whether phrased as a declaration that the agreements remain in force, or an order to pay the money committed by those agreements, the injunction in substance orders specific performance of the grant agreements—a quintessentially contractual remedy." JA465.

"To distinguish [*Department of Education*], the plaintiffs stress that Congress appropriated specific sums for [the Networks]" and may file an APA claim "to force [the Agency] to disburse the appropriated amounts." JA466. "But plaintiffs overread the governing statutes," the panel explained. JA466. The statutes "do not give the [N]etworks an unqualified right to the appropriated funds" but rather "allocate funds for the [N]etworks, which may be disbursed only as grants." JA466. Here, the panel reasoned, the Agency "*did* obligated the appropriated

17

funds through grants, thereby satisfying whatever duty (if any) it had under the appropriations statutes." JA467 (emphasis in original). The panel also concluded that plaintiffs' "non-APA claims regarding grant money are unlikely to fare any better" because any "mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers, and ultra vires claims" "simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims." JA467.

On the other factors, the panel concluded that the "government has shown that it will face irreparable harm absent a stay." JA468. "As to the reinstatement of [Agency] employees and personal-service contractors: The Executive Branch has a significant interest in maintaining control over personnel matters" and ordering restoration of all employees and contractors to their pre-March 14 status "interferes with this important responsibility." JA468-69. "This intrusion is particularly harmful," the panel continued, because the Agency is responsible for presenting the views of the United States and

supporting the United States foreign policy objectives in the international community. JA469. "By depriving the Executive Branch of control over the individuals involved in its international broadcasting, the injunction threatens is prerogative to 'speak with one voice' on behalf of the United States in foreign affairs." JA469. As to the grants, the panel explained that absent a stay, the Agency would be forced to pay out millions to the Networks, which the Networks will immediately spend. JA469. Because the district court did not require plaintiffs to post any injunction bond, the Agency cannot recover these funds even if it should prevail in its appeal. JA469. As to the plaintiffs, the panel explained that there are several avenues available for remediation of any alleged harm. JA470.

Finally, the panel explained that the public interest has an interest in the "Judicial Branch's respect for the jurisdictional boundaries laid down by congress." JA471. "Because personnel and grant disputes directly concern the public fisc, Congress has limited the resolution of these potentially costly claims to specialized tribunals such as the [Merit Systems Protection Board] and [the Court of Federal Claims]." JA471.

Judge Pillard dissented, stating that defendants are unlikely to succeed on the merits. JA472. The dissent posited that the "administrative channeling defense is inapposite" because the district court did not have to treat plaintiffs' "wholesale removal from the workplace as if it were an aggregation of individualized employment actions." JA475. As to the grants-related claims, the dissent concluded that the Tucker Act did not apply because the Networks' claims arose from statute—not from contract. JA482-83.

Subsequently, plaintiffs in all four cases each filed petitions for rehearing en banc. After granting an administrative stay of the grants-related portion of the injunctions, the en banc Court denied the petitions insofar as they related to prong one of the *Widakuswara* and *Abramowitz* injunctions—*i.e.*, the personnel portion of the injunctions— but granted rehearing and vacated the panel's order regarding the Networks' petitions, which relate to grants. *See* JA514, 516. It explained that "[a]t this initial stage, substantially for the reasons explained by Judge Pillard, the government has not made the requisite 'strong showing' of a likelihood of success on the merits of its appeals in these cases." JA518 (citation omitted). The order emphasized that it

"does not constrain the ability of the panel that hears the government's appeals to reach any conclusion following full merits briefing and argument." JA518. Additionally, the en banc Court concluded that the Networks' showing of irreparable harm tipped the equities in their favor. JA518-19. The Court denied the *Widakuswara* petition on the ground that its requested relief regarding grants was addressed by the disposition of the Networks' petitions and denied the *Abramowitz* petition because it had not sought relief regarding grants. JA517-19.

## SUMMARY OF ARGUMENT

The district court's preliminary injunctions, which order the restoration of all employees and contractors to their pre-March 14 status and the restoration of the Networks' grant agreements, are both legally and equitably erroneous and should be vacated.

The district court lacked jurisdiction to order restoration of all Agency contractors and employees. Congress has "established a comprehensive system" that provides the "exclusive means" for administrative and judicial review of disputes between employees and their federal employers. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation omitted). The Civil Service Reform Act (CSRA),

together with the Federal Service Labor-Management Relations Statute (FSLMRS), "create[] an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *American Fed'n of Gov't Emps. v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (cleaned up). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute. *See American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). Accordingly, by statute, any dissatisfaction with the Agency's personnel decisions must be raised through these very specific schemes and fora—not through district court review of an APA claim.

In any event, even if viewed through the lens of the APA, plaintiffs' claims are meritless. For a plaintiff to bring a cognizable APA claim, the plaintiff must challenge a discrete, circumscribed agency action. But here, plaintiffs are challenging the alleged "dismantling" of the Agency—*i.e.*, countless decisions and operations as the Agency has

taken steps to implement Executive Order 14,238. A challenge to the APA does not permit this type of "wholesale" attack on an agency program; rather, plaintiffs must point to "some particular agency action that causes [them] harm," and they have failed to do so. *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (cleaned up).

To the extent there is any common theme to plaintiffs' challenge to the disparate employment actions at issue here, it is that plaintiffs allege that the Agency will no longer be able to carry out its statutory functions. But the district court separately addressed that issue, in a portion of its order that the government does not challenge here. The Agency is entitled to make personnel decisions to carry out its statutory responsibilities as it sees fit, and there is no legal basis for requiring the Agency to restore its employees to their status from months ago.

The district court also lacked jurisdiction over plaintiffs' putative APA claims. Plaintiffs challenge the Agency's termination of their grant agreements and seek disbursement of millions of dollars under those agreements. Although they pursue their claims under the guise of the APA, this Court's precedent makes clear that plaintiffs' claims are, in fact, contract claims that must be adjudicated in the Court of Federal

Claims. The right to payment that plaintiffs seek to vindicate arises from their contracts with the Agency, not any statute or regulation. And the relief they seek—reversal of the termination decisions and the resumption of payments under the grant agreements—amounts to the classic contractual remedy of specific performance. The Supreme Court's recent decision in *Department of Education* leaves no doubt that claims like plaintiffs' belong in the Court of Federal Claims.

The equities cut the same way. Plaintiffs fail to assert how they are irreparably harmed without restoration of the Agency's employees and contractors to their pre-March 14 status. Moreover, the essence of the harm related to the grant terminations is monetary, which is not irreparable. Financial harms would be remedied by a final judgment awarding the Networks the monetary relief they claim entitlement to. By contrast, if the injunction remains in place, the government will lose millions of taxpayer dollars, likely forever.

## STANDARD OF REVIEW

This Court reviews de novo whether a district court had jurisdiction to issue a preliminary injunction. *Atlas Air, Inc. v. International Bhd. of Teamsters*, 928 F.3d 1102, 1108 (D.C. Cir. 2019).

Although this Court reviews a preliminary injunction for abuse of discretion, it reviews the underlying legal conclusions de novo and factual findings for clear error. *Id.* at 1112.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy" that is only "awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The third and fourth factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, all of the factors call for the vacatur of the preliminary injunction that the court issued below.

## I. Plaintiffs are not likely to succeed on the merits of their claims.

### A. The district court erred by ordering reinstatement of all the Agency's employees and contractors.

#### 1. The district court lacked jurisdiction over the Agency's personnel actions.

This Court has "long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government. *See, e.g.*, 5 U.S.C. §§ 1204, 7121-7122, 7701 (Merit Systems Protection Board); *id.* § 1214 (Office of the Special Counsel); *id.* § 7104 (Federal Labor Relations Authority); 41 U.S.C. §§ 7103-7105 (Civilian Board of Contract Appeals). These remedial schemes "provide[] the exclusive procedures by which federal employees" may pursue employment- and contractor-related claims. *American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (quotation omitted). "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497

(D.C. Cir. 2009). And "[t]hat principle applies to a 'systemwide challenge' to an agency policy . . . just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Congress has "established [this] comprehensive system" as the "exclusive means" for reviewing such matters. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation omitted). The Civil Service Reform Act, together with the Federal Service Labor-Management Relations Statute, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *American Fed'n of Gov't Emps.*, 716 F.3d at 636 (cleaned up). Congress allowed certain individual federal employees to challenge agency personnel decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, albeit limited to the claims and remedies provided by Congress. *See American Fed'n of Gov't Emps.*, 929 F.3d at 757. Such an alternative scheme displaces district-court jurisdiction under 28 U.S.C. § 1331 if it "displays a 'fairly discernible intent to limit

jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (cleaned up).

The district court acknowledged this comprehensive scheme but erroneously concluded that plaintiffs' claims fall outside it. The court reasoned that the "individual government employee plaintiffs are not barred from challenging the dismantling of [the Agency] because this case is not simply a collection of employment disputes." JA21. But simply declaring that this case does not involve employment disputes does not make it so. The district court ultimately ordered restoration of all employees and contractors to their pre-March 14 employment status—a remedy that undisputedly addresses "a collection of employment disputes." JA21. Accordingly, these employment claims must be channeled through the appropriate statutory scheme. And if this is not an employment dispute or "collection of" employment disputes, then the district court erred by ordering relief to that effect.

The district court apparently believed that the case was not a collection of employment disputes because, in the court's view, the

Agency was being "dismantled." But the district court addressed that issue separately, ordering the Agency to carry out Voice of America's statutory mandate. Having done so, the district court was not entitled to go further and direct the Agency to do so using particular staff or contractors. To the extent that there is no concrete employment dispute—or collection of employment disputes—in this case, it is because no employee has demonstrated any right whatsoever to continued employment. Plaintiffs have instead relied on generalities about the Agency's statutory mission to justify extremely intrusive relief that interferes with the Agency's management of its workforce.

The district court also concluded that "the public-sector unions purporting to represent terminated employees via associational standing" and the two personal service contractors of Voice of America (John Does 3 and 4) "are not implicated as non-governmental entities and contractors." JA21. But this has it incorrect and backwards. As to John Does 3 and 4, personal-services contractors may challenge their termination under the Contract Disputes Act. *See, e.g.*, *Ho v. United States*, 49 Fed. Cl. 96, 101 (2001) (exercising jurisdiction over personal service contract in Court of Federal Claims), *aff'd*, 30 F. App'x 964 (Fed.

Cir. 2002); *see also* JA470. The "exclusion" of unions "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [them] from seeking review" under other provisions. *United States v. Fausto*, 484 U.S. 439, 455 (1988).

Congress enacted the statutes at issue here to govern "employee relations in the federal sector" and "federal labor-management relations." *American Fed'n of Gov't Emps.*, 929 F.3d at 755 (quotation omitted). Plaintiffs may not evade this scheme by bringing claims as unions asserting harms to their individual members or asserting a loss of membership dues. Otherwise, any unionized employee "could circumvent the CSRA's strictures." *See Air Force*, 716 F.3d at 639. These comprehensive provisions foreclose the union plaintiffs' attempt to raise their labor dispute in district court. Indeed, Congress has provided a particular scheme to account for union grievances too. The Federal Service Labor-Management Relations Statute "establishes a comprehensive scheme to deal with labor relations in federal employment," which channels adjudication to the Federal Labor Relations Authority followed by direct review in the courts of appeals.

Under the statute, unions may file a grievance under preexisting collective bargaining agreements "concerning any matter relating to the employment of any employee," "the effect or interpretation, or a claim of breach, of a collective bargaining agreement," or "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. §§ 7103(a)(9), 7121(a)(1).

For the same reason, the claims cannot be brought by the non-union plaintiffs who assert downstream harms from the Agency's employment decisions. When a comprehensive remedial scheme permits review at the behest of some types of plaintiffs but not others, the proper inference is that the excluded parties cannot bring claims at all. For example, in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed. *Id.* at 346. In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no

"express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

These principles apply to the CSRA. In *Fausto*, the Supreme Court applied *Block* to conclude that federal employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that [law]." 484 U.S. at 448. As the Court explained, "the absence of provision for these employees to obtain judicial review" is a "manifestation of a considered congressional judgment that they should not have statutory entitlement to review." *Id.* at 448-49. And more recently, after a district court enjoined the termination of various federal employees in litigation brought by state governments, the Fourth Circuit entered a stay pending appeal because the government was "likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." *Maryland v. U.S. Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025).

Thus, to the extent plaintiffs here cannot invoke the specialized review schemes, that does not entitle them to circumvent the limits on those schemes and sue in district court. *See Grosdidier*, 560 F.3d at 497. Nor can they evade the CSRA by agglomerating many individual employment actions into one complaint, or by challenging an Executive Order and seeking to raise constitutional claims. *See Elgin*, 567 U.S. at 17. The district court also concluded that plaintiffs raise "standard questions of administrative and constitutional law, detached from any issues related to federal employment." JA22 (quotation omitted). As noted above, the district court addressed the issues that it perceived regarding the Agency's fulfillment of its statutory mandate by ordering the Agency to carry out that mandate. The suggestion that the district court was entitled to unwind a multitude of employment actions based on legal analysis "detached from any issues related to federal employment" is extraordinary. And even to the extent that constitutional or other questions might arise in individual employment disputes, the Supreme Court has held that the CSRA channels review of fundamental questions of constitutional law. See *Elgin*, 567 U.S. at 22-23; *accord American Fed'n of Gov't Emps.*, 929 F.3d at 760-61. For good

reason: When the federal government is the employer, practically any employment or labor-management-relations claim can be dressed up in constitutional garb. Given that the CSRA precludes federal employees and their unions from themselves going to court to raise claims or remedies that the CSRA does not recognize, it would be perverse to read the CSRA to permit third parties who are not directly affected by federal employment decisions to attack those decisions outside the CSRA process. *See Filebark*, 555 F.3d at 1014.

Even if the district court could have exercised jurisdiction over plaintiffs' personnel claims, the preliminary injunction would still be unlawful because it is overbroad, and reinstatement is not an available remedy under the APA. The APA authorizes a court to grant injunctive relief subject to traditional equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement is not a remedy that was traditionally available at equity. *See Sampson v. Murray*, 415 U.S. 61, 83 (1974). To the contrary, courts of equity lacked "the power . . . to

restrain by injunction the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g., Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a sub-ordinate appointee, nor restrain the appointment of another.").

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332. Accordingly, where Congress departs from

equitable tradition, it does so expressly. In the CSRA, for example, Congress authorized the Merit Systems Protection Board to award "reinstatement," as well as "backpay" to prevailing employees. *Elgin*, 567 U.S. at 6 (citations omitted). But of course the plaintiffs here seek to avoid the CSRA's comprehensive scheme, and they identify no other statutory basis for ordering reinstatement in APA litigation.

Moreover, even where Congress has authorized reinstatement, the Supreme Court has recognized that a grant of preliminary injunctive relief in government personnel cases requires an elevated showing. *Sampson*, 415 U.S. at 84. The Court emphasized the historical denial of reinstatement power by courts of equity, "the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs, and the traditional unwillingness of courts of equity to enforce contracts for personal service," instructing that a plaintiff in a "Government personnel case[]" must, "at the very least . . . make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions." *Id.* at 83-84 (cleaned up).  The employee and union plaintiffs made no such showing.

In short, Congress has precluded district-court jurisdiction for employment disputes by establishing an alternative, comprehensive statutory scheme for administrative and judicial review to resolve both disputes between employees and their federal employers and disputes brought by unions representing those employees. *See American Fed'n of Gov't Emps.*, 929 F.3d at 754 (discussing the Federal Service Labor-Management Relations Statute); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (discussing the Civil Service Reform Act more broadly). Plaintiffs do not allege that they have exhausted their administrative remedies, and their employment claims—which complain about Agency personnel being placed on administrative leave or terminated—are plainly subject to this statutory scheme.

> **2.** **Even if these employment claims could be bought under the APA, plaintiffs' claim is not cognizable because plaintiffs identify no final agency action.**

Plaintiffs' claim is independently barred because they identify no final agency action that may be challenged under the APA. Judicial review under the APA is limited to review of discrete agency actions that cause harm to a particular plaintiff. The APA does not permit sweeping, programmatic review and judicial superintendence of the

manner in which an agency conducts its work. Nor does the APA authorize courts to oversee an agency's reorganization efforts to ensure that an agency does not fall short of its statutory responsibilities in the future. Here, the district court engaged in precisely the sort of wholesale review and superintendence of agency operations that the APA does not allow.

The APA contemplates judicial review only of "agency action." 5 U.S.C. §§ 551(13), 704. As the Supreme Court has explained, a reviewable "action" is not just any action; it is a term of art and limited to the set of "circumscribed, discrete agency actions" identified in the APA's definition of "action." *See Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The APA defines "agency action" as "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 551 (separately defining "rule," "order," "license," "sanction," and "relief"). This definition, while expansive, is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Independent Equip. Dealers Ass'n v. Environmental Protection Agency*,

372 F.3d 420, 427 (D.C. Cir. 2004) (second alteration in original).

Importantly, the APA—reflecting constitutional limits on the judicial role—does not permit "general judicial review of [an agency's] day-to-day operations," *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990); nor does it authorize agencies to oversee "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Under these principles, agency plans, strategies, and goals fall outside the APA's defined list of agency actions. *Id.* And even if a challenged act qualifies as an agency action, it is not reviewable unless it is "final," meaning that it "mark[s] the 'consummation' of the agency's decisionmaking process," and is an action by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation omitted).

The alleged "dismantling" of the Agency is not a final agency action. A challenge to the implementation of an Executive Order of the type at issue here is essentially a challenge to agency operations—*i.e.*, the opposite of the discrete, circumscribed agency action that is required for review under the APA. *See Lujan*, 497 U.S. at 891;

*National Veterans Legal Servs. Program v. U.S. Dep't of Def.,* 990 F.3d 834, 839 (4th Cir. 2021) (explaining that final agency action does not include conduct like "operating a program" (quotation omitted)). The agencies' efforts to implement the Executive Order involve countless operational decisions, including determining which functions are statutorily required, which personnel are required to fulfill those functions, and how best to organize its operations consistent with federal law and the Executive Order. These agency operations—which change constantly and are dependent on facts on the ground—are a far cry from a rule, order, license, sanction, or relief—as carefully defined by the APA. 5 U.S.C. § 551(13). Indeed, plaintiffs fail to assert a clear theory about which type of agency action they are advancing.

The district court admitted as much in its opinion. Rather than identifying the concrete and discrete action it was reviewing, the district court explained that it was reviewing a "series of actions taken by [the Agency] since March 15," which it recounted in a different portion of its opinion. JA23. And the district court explained that it must "review whether agency actions contravene the agency's statutorily mandated duties, even if there are a lot of actions at issue."

JA23. But that is the point. The numerous actions at issue defeat the single, discrete agency action requirement that the APA requires.

The district court stated that the "'discrete' requirement does not mean that if an agency takes a slew of actions quickly, the Court loses its ability to review each of them under the APA." JA.23. That is correct as far as it goes. But the district court did not review each of a series of actions—and could not do so here, because the individual actions were all employment actions outside the court's review—and the court provided no explanation for why a "slew" of unreviewable actions could somehow be combined into an individual reviewable one.

For similar reasons, the "decision" to reduce Agency staffing and programming as a general matter is not "final" within the meaning of the APA. The Agency's ongoing implementation of the Executive Order marks the initiation, not the consummation, of the agency's decision-making process. *Bennett*, 520 U.S. at 177-78. And a plan to take action—even if any subsequent action will have definite effects for the public—does not itself create consequences for would-be plaintiffs. And this makes sense because attempting to review ongoing operations is a futile task. Directions may be changed, and operational decisions may

be reversed. The district court nonetheless justified the injunction on the ground that "this case is not simply a collection of employment disputes" because the "facts on the record and on the ground" suggest the Agency is being "dismantl[ed]." JA22. But "[d]ismantling" of the Agency is "simply the name by which [plaintiffs] have . . . referred to the continuing (and thus constantly changing) operations," which are not reviewable agency action. *Lujan*, 497 U.S. at 890.

Thus, while the Agency's employees and contractors might have discrete claims with respect to their individual personnel actions, those claims must be pursued through other remedial channels. Plaintiffs' plea for a court to step in and halt or supervise Agency operations is a request for the sort of programmatic relief reserved for "the offices of the Department or the halls of Congress." *Id.* at 891.

### 3. The Agency's personnel decisions are committed to Agency discretion.

Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524–25 (1978) (quoting *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333

(1976) (per curiam)). Internal staffing decisions are traditionally left to an agency's discretion. *See id*. at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). The district court overrode those principles when it enjoined Agency leadership from exercising procedural control over its staff to ensure that staff are carrying out statutory obligations or otherwise advancing the Agency leadership's policies and priorities. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

"In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. Federal Aviation Admin.*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that defendants' managerial decisions are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (quoting 5 U.S.C. § 701(a)(2)). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best fit[] the agency's overall policies" and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

Second, plaintiffs can point to no particular statute limiting the agency's inherent discretion to make independent staffing decisions. The International Broadcasting Act contains broad standards and, accordingly, bestows wide discretion on the Agency, requiring the exercise of significant Agency discretion and judgment when carrying out its statutory functions. For example, the authorities of the Agency's Chief Executive Officer listed in 22 U.S.C. § 6204(b) call on the Agency's Chief Executive Officer to "respect" the "professional independence" of (among others) the broadcast networks and gives the Chief Executive

Officer broad supervisory authority. 22 U.S.C. § 6204(b); *id.* §§ 6202(b), 6204(c) (requiring the Chief Executive Officer to "supervise" the networks, to "assess" "the professional integrity" of the networks, and to "ensure" that coverage is "balanced and comprehensive"). Accordingly, it is in the Agency's discretion to decide how to carry out those statutory directives—including how many or what particular personnel it needs to do so.

## B. Plaintiffs' APA claims regarding grants are in essence contract claims and must be brought in the Court of Federal Claims.[1]

The district court lacked jurisdiction under the APA to enjoin the Agency to restore Radio Free Asia's and Middle East Broadcasting Networks' grant agreements and then pay out under them. Congress has assigned the Court of Federal Claims exclusive jurisdiction to address the types of assertions here that the government has not honored the terms of its contracts and owes money to private parties as a result. Plaintiffs' claims alleging that the Agency improperly terminated contracts under the terms of those contracts and seeking to

---

[1] When referring to "plaintiffs" in this section, the government excludes the *Abramowitz* plaintiffs, who have disclaimed any grant-related claims or relief.

compel the government to resume contractual payment fall well within that jurisdictional scheme. Because plaintiffs' claims are contractual in nature, the district court's injunction violates Congress's clear jurisdictional boundaries and warrants reversal.

It is well established that "absent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," *id.* (citing 5 U.S.C. § 702), it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (citing 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*, 567 U.S. at 215.

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act

provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This Court has long recognized that "the Tucker Act impliedly forbids" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). That jurisdictional barrier is mandatory and for good reason. It ensures that contract claims against the government are channeled into the court with "unique expertise," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and (importantly here) which Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for

asserted violations of those grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach." *Id.*

In determining whether a "particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court considers two factors. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted). *First*, courts examine "the source of the rights upon which the plaintiff bases its claims." *Crowley*, 38 F.4th at 1106 (quotation omitted). In answering this question, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Id.* at 1107 (cleaned up). *Second*, courts examine the "type of relief sought." *Id.* (quotation marks omitted). This inquiry asks "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the

48

government to pay sums due under the contract, it is a Tucker Act claim, not an APA claim. *See Megapulse*, 672 F.2d at 967-71.

Applying the above principles, plaintiffs' claims fall squarely within the Tucker Act: Plaintiffs seek to enforce a contractual agreement with the federal government and obtain the payment of money. Radio Free Asia's and Middle East Broadcasting Networks' grant agreements are plainly the "source of the rights upon which" plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. And plaintiffs ultimately "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). The district court thus lacked jurisdiction to issue an injunction ordering restoration of the Networks' FY 2025 grants and ordering the disbursement of millions of dollars to the Networks pursuant to the terms of their grant agreements.

Beginning with the first prong, "the source of the [Networks'] rights upon which [they base their] claims" is the grant agreements. *Crowley*, 38 F.4th at 1106 (quotation omitted). Congress created a contractual scheme for allocating funds to Agency grantees. It authorizes the Agency to fund Radio Free Asia, Middle East

49

Broadcasting Networks, and other networks through "grants and cooperative agreements." 22 U.S.C. § 6204(a)(5). And the governing appropriation statute, in turn, allocates specific funding amounts for "grants" to those networks. Pub. L. No. 118-47, 138 Stat. at 735. In the grants at issue here, the Agency, acting through its Chief Executive Officer, promised to pay the appropriated funds to the Networks in monthly installments. In return, the Networks promised to use the funds to advance statutory objectives and to comply with all program requirements. These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–39 (Fed. Cir. 2021).

Turning to the second prong, the type of relief that the Networks seek reinforces that this is a contract dispute.[2] *See Crowley*, 38 F.4th at 1107-08. Whether phrased as a declaration that the agreements remain

---

[2] It is unclear how monetary relief for the Networks also redresses harm to the *Widakuswara* plaintiffs, who are not Agency grantees. Neither Radio Free Asia nor Middle East Broadcasting Networks are parties to the *Widakuswara* case.

in force, or an order to pay the money committed by those agreements, the injunction in substance orders specific performance of the grant agreements' requirement to pay money—a quintessentially contractual remedy. *See Ingersoll-Rand Co.*, 780 F.2d at79–80; *Spectrum Leasing*, 764 F.2d at 894-95. And it is the inherently contractual nature of the relief afforded—*not* any characterization of the relief as money damages—that makes the Court of Federal Claims the exclusive forum for this suit. *See Ingersoll-Rand*, 780 F.2d at 79–80 (holding a plaintiff "may not sidestep" the Claims Court's jurisdiction by "avoiding a request for damages," when their request relief "amount[s] to a request for specific performance"); *see also Crowley*, 38 F.4th at 1107 (cautioning against "creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act" (quotation omitted)). Because "it is possible to conceive of this dispute as entirely contained within the terms of the contract," plaintiffs' claims are essentially contractual. *Ingersoll-Rand*, 780 F.2d at 78. The relief that plaintiffs seek (and that the district court awarded) is likewise contractual in nature.

The Supreme Court's recent order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), confirms the contractual

nature of this case. That case involved a statute that appropriated program funds and authorized the Department of Education to "award grants, on a competitive basis, to eligible partnerships" to carry out the program's purposes. Application to Vacate at 5, *Department of Educ.*, 145 S. Ct. 966 (No. 24A910), 2025 WL 945313, at *5 (quoting 20 U.S.C. § 1022a(a)). And like here, plaintiffs in *Department of Education* challenged the agency's decision to terminate their grant agreements as arbitrary and capricious. *Id.* at 7, 2025 WL 945313, at *7. The district court there "enjoin[ed] the Government from terminating" these grants, effectively ordering the payment of money under the contracts. *Department of Educ.*, 145 S. Ct. at 968.

The Supreme Court granted a stay of that order. In so doing, the Court concluded that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* The Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which the district court's order had, in effect, done. *Id.* So too here.

The district court committed the same error as the district court in *Department of Education*. Purporting to exercise jurisdiction under the APA, it entered an order enjoining the Agency from terminating the Networks' grant agreements and compelling the Agency to resume the disbursement of grant funds to plaintiffs under those agreements. As the Supreme Court concluded, the APA's waiver of sovereign immunity does not extend to such relief.

This Court reached the same conclusion in *Ingersoll-Rand*. There, the Air Force terminated a contract with Ingersoll-Rand and solicited new bids for the contract. 780 F.2d at 75-77. Ingersoll-Rand sued, arguing that the termination violated two federal regulations and was arbitrary and capricious under the APA, and sought an injunction requiring that its contract be reinstated. *Id.* at 77. This Court affirmed the dismissal of Ingersoll-Rand's suit, agreeing with the district court that Ingersoll-Rand's claims were in essence contract claims that belonged in the Court of Federal Claims. *Id.* at 77-80. In so holding, this Court emphasized that Ingersoll-Rand's suit boiled down to whether the contract permitted termination under the circumstances and that the dispute was thus "entirely contained within the terms of the contract."

*Id.* at 78. "That the termination also arguably violates certain other regulations d[id] not transform the action into one based solely on those regulations." *Id.* This Court further concluded that Ingersoll-Rand's request that the contract be reinstated "amount[ed] to a request for specific performance." *Id.* at 80.

To distinguish *Department of Education* and this Court's precedent, plaintiffs contend they have a statutory right to grant funds because Congress appropriated funds specifically for Radio Free Asia and Middle East Broadcasting Networks in the appropriations statutes. Plaintiffs and the stay dissent—ultimately relied on by the en banc Court—point to Congress's direction that funds "shall be allocated" to the Networks. *See* JA484. Accordingly, plaintiffs contend, they have a statutory entitlement to those funds (via the appropriations statute) and may file an APA claim—independent of and antecedent to their grant agreements—to force the Agency to disburse the appropriated amounts.

But the governing statutes do not give the networks an unqualified right to the appropriated funds. Rather, the funds that they allocate for the Networks may be disbursed only as grants. *See* Pub. L.

No. 118-47, 138 Stat. at 735. The statute makes clear that the Networks may receive funding only through grant agreements, *see, e.g.*, 22 U.S.C § 6208(a), (c)(5); the Agency retains broad discretion to craft the terms and conditions of those grant agreements, *see, e.g.*, *id.* § 6208(c); and the Agency can terminate the grant agreements "without fiscal obligation to the United States," *see, e.g.*, *id.* § 6208(c)(5).

Thus, as the stay panel observed, "[i]f these statutes created any entitlement for the networks at all, they at most would require [the Agency] to enter grants obligating the appropriated amounts to the networks." JA466. The Agency plainly carried out that obligation: Grant agreements between the Networks and the Agency were made and entered into and the appropriated funds were allocated pursuant to the appropriations statute. Plaintiffs' claims arose because they argue that the grant agreements were improperly terminated. That is a contract claim, not a statutory one. *See* JA467 ("Once the agency entered these contracts, it incurred a new obligation: Unlike the relevant statutes, the grant agreements require the government to make *monthly* payments to the networks.").

The very appropriations statutes on which plaintiffs rely drive the point home. Those statutes instruct that any funds "shall be made available in accordance with the principles and standards set forth in . . . the United States International Broadcasting Act of 1994." Pub. L. No. 118-47, 138 Stat. at 735. And the International Broadcasting Act, in turn, expressly permits Radio Free Asia's grants "to be terminated without fiscal obligation to the United States," 22 U.S.C. § 6208(c)(5), and to be awarded "to another entity" if "the Chief Executive Officer determines at any time that Radio Free Asia is not carrying out the functions described in this section in an effective and economical manner," *id.* § 6208(g). Likewise, the International Broadcasting Act permits the Agency to "not award any grant . . . [to] Radio Free Asia [or] the Middle East Broadcasting Networks" under certain circumstances. *Id.* § 6204(c)(1). In short, the International Broadcasting Act provides statutorily permissible avenues for the Agency *not* to award a grant to Radio Free Asia or Middle East Broadcasting Networks, or to terminate the grant under certain circumstances. The Networks' claim—that they have a statutory right to the appropriated funds and therefore the Agency cannot terminate their grant agreements—would render these

provisions of the International Broadcasting Act meaningless. The Networks' claim is also inconsistent with the International Broadcasting Act statutory scheme—which contemplates robust oversight over the grantees. If the grantees are entitled to the appropriated funds no matter what, then the Agency would be reduced to a mere pass-through entity—rather than the supervisor that the statute empowers it to be.

The district court correctly concluded that the grants involved are a "vehicle to distribute congressionally appropriated funds to the Networks," JA19, but went astray when it reasoned that the Networks have a statutory right to the funds because Congress appropriated funds for those grantees specifically. The Networks do not have such a right and thus their claim is contractual—not statutory.

Plaintiffs' other statutory and constitutional claims fare no better. The stay dissent repeatedly characterizes plaintiffs' claim as some sort of impoundment claim. *See, e.g.*, JA481 (explaining that plaintiffs are suing to "halt defendants' impoundment of [grant] funds"). But impoundment would relate to a formal determination not to obligate appropriated funds. Here, as noted, the funds have been obligated, and

no such determination has occurred. This case is instead about whether the Agency was entitled under the terms of the contract to terminate the contractual arrangement. A simple hypothetical illustrates the point. If the Networks had committed gross malfeasance and had their contracts terminated, that would plainly not be an impoundment, but rather the faithful stewardship of taxpayer dollars by enforcing the contractual agreement. The difference between that hypothetical case and this one, if there is any difference, is that the grantees dispute the legitimacy of the termination—in particular, the grantees dispute whether the Agency has authority to terminate the agreement in these circumstances. But as discussed above, that is just a contractual claim.

It is therefore unsurprising that none of the plaintiffs brought a claim under the Impoundment Control Act. In addition to the substantive problems with such a claim discussed above, the Impoundment Control Act does not have a private cause of action. As the Impoundment Control Act reflects, Congress has constructed a reticulated scheme to govern the relationship between the Legislative and Executive Branches when it comes to spending appropriated funds. That statute is built around give-and-take between the political

branches. Thus, the statute directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal. And the statute specifies particular forms of legislative action that Congress may undertake to address proposed rescissions. *See id.* § 688.

To the extent that the Impoundment Control Act contemplates litigation to enforce any obligation to spend appropriate funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch. 2 U.S.C. § 687. And the statute imposes limitations on the bringing of any such suit that reinforce Congress's desire to control any response to the Executive's actions: No such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of Representatives and the President of the Senate" and then "25 calendar days of continuous session of the Congress" elapse. *Id.* Regardless of whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of private parties. And

the statute certainly does not contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General. *See General Land Office v. Biden*, 722 F. Supp. 3d 710, 734 (S.D. Tex. 2024) ("In short, an alleged [Impoundment Control Act] violation has only one proper plaintiff: the Comptroller General."); *Public Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977).

As the Supreme Court has recognized, Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties. *Block,* again, is instructive. 467 U.S. at 346-47 (holding that the statutory structure precluded consumers' attempt to challenge milk market orders through the APA, explaining that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose

consumer participation in the regulatory process"). The Impoundment Control Act provides a variety of mechanisms for legislative responses to any proposal by the Executive Branch to defer or rescind appropriated funds and, to the extent it contemplates litigation at all, it contemplates only suits brought by a Legislative Branch official and only after Congress has first had the opportunity to act.

Although plaintiffs never asserted a claim under the Impoundment Control Act, the Networks contend that the Agency acted ultra vires and violated the APA, the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause by "impounding" the Networks' funds. But neither the APA nor some other constitutional claim provides a backdoor to what is essentially a claim to enforce the Impoundment Control Act. And contrary to the panel dissent's assertion that "[p]laintiffs bring a classic APA challenge to the Agency's impoundment of funds," JA484, the government has found no case in this Circuit in which a party has raised an Impoundment Control Act claim or

impoundment theory via the APA.[3] Indeed, the only case addressing the issue suggests that parties may not use the APA in such a manner. *See Public Citizen*, 528 F. Supp. at 830 n.1 (rejecting the plaintiffs' argument that their suit can proceed under the APA if the Impoundment Control Act does not provide a private right of action).

## II. The remaining injunction factors overwhelmingly weigh against an injunction.

The remaining factors likewise weigh decisively in the government's favor. The equitable factors, "the public interest and balance of equities . . . [,] merge" where, as here, "the government is the

---

[3] Only a handful of cases even address both an APA claim and an Impoundment Control Act claim in the same case, and they are always brought as separate claims. *See Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 71, 71 n.4 (D.D.C. 2018); *Association for Educ. Fin. & Pol'y, Inc. v. McMahon*, Nos. 1:25-cv-00999 (TNM), 1:25-cv-01266 (TNM), 2025 WL 1568301, at *10 n.6 (D.D.C. June 3, 2025); *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 161 (D.D.C. 2025), *dismissed*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025); *Rocky Ford Hous. Auth.*, 427 F. Supp. at 131–34. *But see Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 148 (D.D.C. 2025) (analyzing impoundment under a separation of powers claim); *Southern Educ. Found. v. United States*, Civ. No. 25-1079 (PLF), 2025 WL 1453047, at *4 (D.D.C. May 21, 2025) (analyzing impoundment under an ultra vires claim).

party" against whom an injunction is sought. *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 945 (D.C. Cir. 2021).

The preliminary injunction is causing significant and irreparable harm to the government. The preliminary injunction irreparably harms the Agency by impeding its ability to control its operations. By requiring the Agency to reinstate all employees and contractors to their status before the March 14 Executive Order, the district court is requiring the Agency to employ particular personnel against its will and superintending its own judgment about requisite agency staffing— something it has no lawful basis to do. The breadth of the court's order does not contemplate individualized determinations of the appropriateness of returning particular employees to work and does not account for the various costs associated with reinstating all employees and contractors. The preliminary injunction inflicts an irreparable loss of control vested in the Agency and the President and, by extension, an irreparable harm on the public.

By contrast, the district court hardly discusses any alleged irreparable harm to the *Widakuswara* and *Abramowitz* plaintiffs if the personnel-related portion of its injunction were not entered. Instead,

the district court largely focused on the continued functioning of the Agency—not on any need for the broad employment order the district court issued. For any individual employment disputes, there is a currently available and proper forum set out by statute.

As for the grants, month after month, the government is being ordered to shell out millions of dollars on grant agreements it attempted to terminate. The constant flow from the Department of Treasury irreparably harms the public fisc. As in *Department of Education*, the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. No grantee has "promised to return withdrawn funds should its grant termination be reinstated," *id.* (quotation omitted), nor did the district court impose a bond. If the preliminary injunction is stayed, the Agency will retain the grant money at issue, and the grantees may obtain it as money damages if they are ultimately successful in the appropriate forum. But the opposite is not true. If the Networks continue to receive and spend their monthly grant funding, the Agency will be left with no meaningful recourse even if it prevails.

The district court erred in its irreparable harm analysis. For one, the *Widakuswara* plaintiffs can claim no irreparable injury related to the termination of the Networks' grants. And the gravamen of the Networks' asserted harms is monetary—the classic example of reparable harm. Indeed, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (explaining that it is "well settled that economic loss does not, in and of itself, constitute irreparable harm"); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." (cleaned up)). "Financial injury is only irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Mexichem Specialty Resins*, 787 F.3d at 555 (quotation omitted). If plaintiffs ultimately prevail in this litigation (or

in litigation before the Court of Federal Claims), they will receive the funds to which they claim entitlement.

The balance of the equities and public interest also weigh strongly in the government's favor. In concluding otherwise, the district court underappreciated both the clear injury to the Agency's ability to effectuate Executive Branch policy, as well as the substantial and irreparable harm to the public fisc. *See* JA471. The equities weigh against reinstating hundreds of employees. Attempting to reinstate this large group of people, when positions and dynamics have changed at the Agency and people have presumably found other work would be extremely resource intensive and disruptive to Agency operations.

If the grant monies are paid out to the Networks, the Agency has limited ability, if any, to recover the funds—a point neither plaintiffs nor the district court have disputed. *See Department of Educ.*, 145 S. Ct. at 968-69 (finding irreparable harm to the government where the "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). And although the Agency repeatedly requested an adequate bond under Federal Rule of Civil Procedure 65(c), the district court instead

improperly waived the bond requirement. *See* JA35-36. *See also*

*National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL

1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam) (explaining

that "injunction bonds are generally required").

Finally, the district court's order was premised on its view that

the Agency should not be entirely shuttered but provides no basis for

prohibiting the Agency from carrying out the Executive Order's

directive that the Agency's "non-statutory components and functions" be

eliminated and that its "performance of [its] statutory functions and

associated personnel" be reduced to "the minimum presence and

function required by law." Exec. Order No. 14,238, 90 Fed. Reg. at

13,043. The Agency is entitled to carry out this Executive Order, and

the public has an interest in permitting the President to take decisive

action when it comes to setting his policy priorities for the Agency and

its broadcasting networks. The court's injunction displaces and

frustrates the President's decision about how to best address those

issues, causing harm to the public.

In short, this is a case where the merits and the equities point firmly in the same direction—there is no basis for an injunction. The Court should reverse.

## CONCLUSION

For the foregoing reasons, this Court should vacate the challenged portions of the district court's preliminary injunction orders.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN

  */s/ Daniel Tenny*
DANIEL TENNY
ABIGAIL STOUT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

June 2025

68

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,797 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Daniel Tenny*
Daniel Tenny

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel Tenny*
Daniel Tenny

# ADDENDUM

## TABLE OF CONTENTS

22 U.S.C. § 6201 ................................................................. A1

22 U.S.C. § 6202 ................................................................. A2

22 U.S.C. § 6204 ................................................................. A4

22 U.S.C. § 6208 ................................................................. A9

## 22 U.S.C. § 6201. Congressional findings and declaration of purposes.

The Congress makes the following findings and declarations:

**(1)** It is the policy of the United States to promote the right of freedom of opinion and expression, including the freedom "to seek, receive, and impart information and ideas through any media and regardless of frontiers," in accordance with Article 19 of the Universal Declaration of Human Rights.

**(2)** Open communication of information and ideas among the peoples of the world contributes to international peace and stability and the promotion of such communication is in the interests of the United States.

**(3)** It is in the interest of the United States to support broadcasting to other nations consistent with the requirements of this chapter.

**(4)** The continuation of existing United States international broadcasting, and the creation of a new broadcasting service to the people of the People's Republic of China and other countries of Asia which lack adequate sources of free information, would enhance the promotion of information and ideas, while advancing the goals of United States foreign policy.

**(5)** The reorganization and consolidation of United States international broadcasting will achieve important economies and strengthen the capability of the United States to use broadcasting to support freedom and democracy in a rapidly changing international environment.

## 22 U.S.C. § 6202. Standards and principles.

**(a)** BROADCASTING STANDARDS

United States international broadcasting shall—

**(1)** be consistent with the broad foreign policy objectives of the United States;

**(2)** be consistent with the international telecommunications policies and treaty obligations of the United States;

**(3)** not duplicate the activities of private United States broadcasters;

**(4)** not duplicate the activities of government supported broadcasting entities of other democratic nations;

**(5)** be conducted in accordance with the highest professional standards of broadcast journalism;

**(6)** be based on reliable information about its potential audience;

**(7)** be designed so as to effectively reach a significant audience; and

**(8)** promote respect for human rights, including freedom of religion.

**(b)** BROADCASTING PRINCIPLES

United States international broadcasting shall include—

**(1)** news which is consistently reliable and authoritative, accurate, objective, and comprehensive;

**(2)** a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society;

**(3)** clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government;

**(4)** the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;

**(5)** programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations;

**(6)** information about developments in each significant region of the world;

**(7)** a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen;

**(8)** reliable research capacity to meet the criteria under this section;

**(9)** adequate transmitter and relay capacity to support the activities described in this section; and

**(10)** training and technical support for independent indigenous media through government agencies or private United States entities.

**(c)** VOICE OF AMERICA BROADCASTS

The long-range interests of the United States are served by communicating directly with the peoples of the world by radio. To be effective, the Voice of America must win the attention and respect of listeners. These principles will therefore govern Voice of America (VOA) broadcasts:

**(1)** VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.

**(2)** VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

**(3)** VOA will present the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies.

## 22 U.S.C. § 6204. Authorities of Chief Executive Officer.

**(a)** AUTHORITIES

The Chief Executive Officer shall have the following authorities:

**(1)** To supervise all broadcasting activities conducted pursuant to this chapter, the Radio Broadcasting to Cuba Act, the Television Broadcasting to Cuba Act, and Worldnet Television, except as provided in section 6205(b) of this title.

**(2)** To review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such activities within the context of the broad foreign policy objectives of the United States.

**(3)** To ensure that United States international broadcasting is conducted in accordance with the standards and principles contained in section 6202 of this title.

**(4)** To review, evaluate, and determine, at least annually, after consultation with the Secretary of State, the addition or deletion of language services.

**(5)** To make and supervise grants and cooperative agreements for broadcasting and related activities in furtherance of the purposes of this chapter and on behalf of other agencies, accordingly.

**(6)** To allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees, subject to reprogramming notification requirements in law for the reallocation of funds.

**(7)** To review engineering activities to ensure that all broadcasting elements receive the highest quality and cost-effective delivery services.

**(8)** To undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical.

**(9)** To submit to the President and the Congress an annual report which summarizes and evaluates activities under this chapter, the Radio Broadcasting to Cuba Act, and the Television Broadcasting to

Cuba Act. Each annual report shall place special emphasis on the assessment described in paragraph (2).

**(10)** To the extent considered necessary to carry out the functions of the Chief Executive Officer, procure, rent, or lease supplies, services, and other property for journalism, media, production, and broadcasting, and related support services, notwithstanding any other provision of law relating to such acquisition, rental, or lease, and under the same terms and conditions as authorized under section 501(b) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1461(b)), and for multiyear contracts and leases for periods of up to 20 years subject to the requirements of subsections (b) through (f) of section 3903 of title 41.

**(11)** To appoint such personnel for the Chief Executive Officer as the Chief Executive Officer may determine to be necessary, which shall not be subject to the provisions of title 5 governing appointments in the competitive service, and to fix their compensation in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates.

**(12)** To obligate and expend, for official reception and representation expenses, such amount as may be made available through appropriations (which for each of the fiscal years 1998 and 1999 may not exceed the amount made available to the Chief Executive Officer and the International Broadcasting Bureau for such purposes for fiscal year 1997).

**(13)** To make available in the annual report required by paragraph (9) information on funds expended on administrative and managerial services by the Agency and by grantees and the steps the Chief Executive Officer has taken to reduce unnecessary overhead costs for each of the broadcasting services.

**(14)** The Chief Executive Officer may provide for the use of United States Government transmitter capacity for transmission or relay of Radio Free Asia or any other grantee authorized under this chapter.

**(15)**

**(A)** To procure personal services at rates not to exceed the daily equivalent of the rate provided for positions classified above grade GS–15 of the General Schedule under section 5108 of title 5.

**(B)** To allow those providing such services, while away from their homes or their regular places of business, travel expenses (including per diem in lieu of subsistence) as authorized by section 5703 of title 5 for persons in the Government service employed intermittently, while so employed.

**(16)** To procure, pursuant to section 1535 of title 31 (commonly known as the "Economy Act"), such goods and services from other departments or agencies for the Chief Executive Officer and the International Broadcasting Bureau as the Chief Executive Officer determines are appropriate.

**(17)** To utilize the provisions of titles III, IV, V, VII, VIII, IX, and X of the United States Information and Educational Exchange Act of 1948, and section 6 of Reorganization Plan Number 2 of 1977, as in effect on the day before the effective date of title XIII of the Foreign Affairs Agencies Consolidation Act of 1998, to the extent the Chief Executive Officer considers necessary in carrying out the provisions and purposes of this chapter.

**(18)** To utilize the authorities of any other statute, reorganization plan, Executive order, regulation, agreement, determination, or other official document or proceeding that had been available to the Director of the United States Information Agency, the Chief Executive Officer, or the Chief Executive Officer before the effective date of title XIII of the Foreign Affairs Consolidation Act of 1998 for carrying out the broadcasting activities covered by this chapter.

**(19)**

**(A)** To provide for the payment of primary and secondary school expenses for dependents of personnel stationed in the Commonwealth of the Northern Mariana Islands (CNMI) at a cost not to exceed expenses authorized by the Department of Defense for such schooling for dependents of members of the Armed Forces stationed in the Commonwealth, if the Chief Executive Officer determines that

schools available in the Commonwealth are unable to provide adequately for the education of the dependents of such personnel.

**(B)** To provide transportation for dependents of such personnel between their places of residence and those schools for which expenses are provided under subparagraph (A), if the Chief Executive Officer determines that such schools are not accessible by public means of transportation.

**(20)** To redirect or reprogram funds within the scope of any grant or cooperative agreement, or between grantees, as necessary (and not later than 15 days before any such redirection of funds between language services, to notify the Committee on Appropriations and the Committee on Foreign Affairs of the House of Representatives and the Committee on Appropriations and the Committee on Foreign Relations of the Senate regarding such redirection),.[1]

**(21)** To change the name of the Agency pursuant to congressional notification 60 days prior to any such change.

**(22)** To—

**(A)** require annual content reviews of each language service of Voice of America, The Office of Cuba Broadcasting, and each grantee network, consisting of a review of at least 10 percent of available unique weekly content from any selected week from the previous year, which shall be conducted, to the extent practicable, by fluent language speakers and experts without direct affiliation to the language service being reviewed, who are seeking any evidence of inappropriate or unprofessional content, which shall be submitted to the Office of Policy Research, the head and Board of the respective language service, and the Chief Executive Officer;

**(B)** submit to the appropriate congressional committees a list of anomalous reports, including status updates on anomalous services during the 3-year period commencing on the date of receipt of the first report of biased, unprofessional, or otherwise problematic content.”; and

**(C)** launch a review, using external, native-language and regional experts, the results of which are to be reported to the appropriate congressional committees, if a widespread pattern of

violations of the principles, standards, or journalistic code of ethics of a language service or grantee network has been identified.

**(b) PROFESSIONAL INDEPENDENCE OF BROADCASTERS**

The Secretary of State and the Chief Executive Officer, in carrying out their functions, shall respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency.

**(c) LIMITATION ON CORPORATE LEADERSHIP OF GRANTEES**

**(1) In general**

The Chief Executive Officer may not award any grant under subsection (a) to RFE/RL, Inc., Radio Free Asia, the Middle East Broadcasting Networks, the Open Technology Fund, or any other grantee authorized under this chapter (collectively referred to as "Agency Grantee Networks") unless the incorporation documents of any such grantee require that the corporate leadership and Board of Directors of such grantee be selected in accordance with this chapter.

**(2) Conflicts of interest**

**(A) Chief Executive Officer**

The Chief Executive Officer may not serve on any of the corporate boards of any grantee under subsection (a).

**(B) Federal employees**

A full-time employee of a Federal agency may not serve on a corporate board of any grantee under subsection (a).

**(3) Qualifications of grantee board members**

Individuals appointed under subsection (a) to the Board of Directors of any of the Agency Grantee Networks shall have requisite expertise in journalism, technology, broadcasting, or diplomacy, or appropriate language or cultural understanding relevant to the grantee's mission.

## 22 U.S.C. § 6208. Radio Free Asia.

**(a)** AUTHORITY

**(1)** Grants authorized under section 6204 of this title shall be available to make annual grants for the purpose of carrying out radio broadcasting to Asia.

**(2)** Such broadcasting service shall be referred to as "Radio Free Asia".

**(b)** FUNCTIONS

Radio Free Asia shall—

**(1)** provide accurate and timely information, news, and commentary about events in Asia and elsewhere; and

**(2)** be a forum for a variety of opinions and voices from within Asian nations whose people do not fully enjoy freedom of expression.

**(c)** GRANT AGREEMENT

Any grant agreement or grants under this section shall be subject to the following limitations and restrictions:

**(1)** The Agency may not make any grant to Radio Free Asia unless the headquarters of Radio Free Asia and its senior administrative and managerial staff are in a location which ensures economy, operational effectiveness, and accountability to the Agency.

**(2)** Any grant agreement under this section shall require that any contract entered into by Radio Free Asia shall specify that all obligations are assumed by Radio Free Asia and not by the United States Government.

**(3)** Any grant agreement shall require that any lease agreements entered into by Radio Free Asia shall be, to the maximum extent possible, assignable to the United States Government.

**(4)** Grants made for the operating costs of Radio Free Asia may not exceed $30,000,000 in each of the fiscal years 2000 and 2001.

**(5)** Grants awarded under this section shall be made pursuant to a grant agreement which requires that grant funds be used only for activities consistent with this section, and that failure to comply with

such requirements shall permit the grant to be terminated without fiscal obligation to the United States.

**(d)** LIMITATIONS ON ADMINISTRATIVE AND MANAGERIAL COSTS

It is the sense of the Congress that administrative and managerial costs for operation of Radio Free Asia should be kept to a minimum and, to the maximum extent feasible, should not exceed the costs that would have been incurred if Radio Free Asia had been operated as a Federal entity rather than as a grantee.

**(e)** ASSESSMENT OF EFFECTIVENESS OF RADIO FREE ASIA

Not later than 3 years after the date on which initial funding is provided for the purpose of operating Radio Free Asia, the Agency shall submit to the appropriate congressional committees a report on—

**(1)** whether Radio Free Asia is technically sound and cost-effective,

**(2)** whether Radio Free Asia consistently meets the standards for quality and objectivity established by this chapter,

**(3)** whether Radio Free Asia is received by a sufficient audience to warrant its continuation,

**(4)** the extent to which such broadcasting is already being received by the target audience from other credible sources; and

**(5)** the extent to which the interests of the United States are being served by maintaining broadcasting of Radio Free Asia.

**(f)** NOTIFICATION AND CONSULTATION REGARDING DISPLACEMENT OF VOICE OF AMERICA BROADCASTING

**(1) Notification**

The Agency shall notify the appropriate congressional committees before—

**(A)** entering into any agreements for the utilization of Voice of America transmitters, equipment, or other resources that will significantly reduce the broadcasting activities of the Voice of America in Asia or any other region in order to accommodate the broadcasting activities of Radio Free Asia; or

**(B)** entering into any agreements in regard to the utilization of Radio Free Asia transmitters, equipment, or other resources that will significantly reduce the broadcasting activities of Radio Free Asia.

## (2) Consultation

The Chief Executive Officer of the Agency shall consult with such committees on the impact of any such reduction in Voice of America broadcasting activities or Radio Free Asia broadcasting activities.

## (g) Alternative grantee

If the Chief Executive Officer determines at any time that Radio Free Asia is not carrying out the functions described in this section in an effective and economical manner, the Agency may award the grant to carry out such functions to another entity.

## (h) Not a Federal agency or instrumentality

Nothing in this chapter may be construed to make Radio Free Asia a Federal agency or instrumentality.