Nos. 25-5144, 25-5145, 25-5150, 25-5151

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

PATSY WIDAKUSWARA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE
ACTING CEO OF THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MICHAEL ABRAMOWITZ, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
VOICE OF AMERICA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE
ACTING CEO OF THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MIDDLE EAST BROADCASTING NETWORKS, INC.,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

RADIO FREE ASIA,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

On Appeals from the United States District Court for the District of Columbia
Nos. 25-cv-1015, 25-cv-887, 25-cv-966, 25-cv-907 (Hon. Royce C. Lamberth)

## Joint Appendix

*Counsel for Defendants-Appellants and Plaintiffs-Appellees are on the Inside
Cover and Succeeding Pages*

i

DEPARTMENT OF JUSTICE
Daniel Tenny
Abigail Stout
*Counsel for Defendants-Appellants*

DEMOCRACY FORWARD
FOUNDATION
Kristin Bateman
Jennifer Fountain Connolly
Robin F. Thurston
Skye L. Perryman
*Counsel for Plaintiffs-Appellees
American Federation of State, County
and Municipal Employees (AFSCME);
American Federation of Government
Employees (AFGE); American Foreign
Service Association (AFSA); Middle
East Broadcasting Networks, Inc.; the
NewsGuild-CWA; and Radio Free Asia*

ZUCKERMAN SPAEDER LLP
William B. Schultz
Margaret M. Dotzel
Brian J. Beaton, Jr.
*Attorneys for Plaintiffs-Appellees
Michael Abramowitz, Anthony LaBruto,
and J. Doe 2*

GOVERNMENT
ACCOUNTABILITY PROJECT
David Z. Seide
*Counsel for Plaintiffs-Appellees Patsy
Widakuswara, Jessica Jerreat, Kathryn
Neeper, John Doe 1, John Doe 2, John
Doe 3, and John Doe 4*

AMERICAN FEDERATION OF
STATE, COUNTY, AND

MUNGER, TOLLES & OLSON LLP
Donald B. Verrilli, Jr.
Ginger D. Anders
Jeremy S. Kreisberg
Helen E. White
Esthena L. Barlow
Hailyn J. Chen
Adeel Mohammadi
Gabriel M. Bronshteyn
*Counsel for Plaintiffs-Appellees Middle
East Broadcasting Networks, Inc. and
Radio Free Asia*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
Andrew G. Celli, Jr.
Debra L. Greenberger
Daniel M. Eisenberg
Nick Bourland
*Counsel for Plaintiffs-Appellees Patsy
Widakuswara, Jessica Jerreat, Kathryn
Neeper, John Doe 1, John Doe 2, John
Doe 3, John Doe 4, American Federation
of State, County and Municipal
Employees (AFSCME); American
Federation of Government Employees
(AFGE); American Foreign Service
Association (AFSA); and the NewsGuild-
CWA*

AMERICAN FOREIGN SERVICE
ASSOCIATION
Sharon Papp
Raeka Safai
*Counsel for Plaintiff-Appellee American
Foreign Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-
CIO

MUNICIPAL EMPLOYEES, AFL-CIO (AFSCME)
Teague Paterson
Matthew Blumin
Georgina Yeomans
*Counsel for Plaintiff-Appellee American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

STATE DEMOCRACY DEFENDERS FUND
Norman L. Eisen
Joshua Kolb
*Counsel for Reporters Sans Frontières, Reporters Without Borders, Inc., American Federation of State, County and Municipal Employees (AFSCME); and American Federation of Government Employees (AFGE)*

MEDIA FREEDOM & INFORMATION ACCESS CLINIC - YALE LAW SCHOOL
David A. Schulz
*Counsel for Plaintiffs-Appellees Patsy Widakuswara, Jessica Jerreat, Kathryn Neeper, and John Does 1-4*

Rushab Sanghvi
*Counsel for Plaintiff-Appellee American Federation of Government Employees, AFL-CIO (AFGE)*

# TABLE OF CONTENTS

*Widakuswara* Preliminary Injunction Mem. (ECF No. 98) (04/22/25)…………JA1

*Widakuswara* Preliminary Injunction Order (ECF No. 99) (04/22/25)………..JA38

*Widakuswara* LaBruto Personal Services Contract (ECF No. 88-1)
(04/14/25)……………………………………………………………..JA40

*Widakuswara* J. Doe II Personal Services Contract (ECF No. 88-2)
(04/14/25)……………………………………………………………..JA44

*Widakuswara* Agency Personal Services Contractor Handbook (ECF No. 88-3)
(04/14/25)……………………………………………………………JA 48

*Widakuswara* Crystal Thomas Declaration (ECF No. 88-4) (04/14/25)………..JA72

*Widakuswara* Declaration of Andrew Celli and Exhibits (ECF No. 16)
(03/24/25)……………………………………………………………..JA75

*Widakuswara* Supplemental Declaration of John Dryden (ECF No. 33-2)
(03/26/25)……………………………………………………………JA221

*Widakuswara* Supplemental Declaration of Paula Hickey (ECF No. 33-3)
(03/26/25)……………………………………………………………JA231

*Widakuswara* Declaration of Crystal Thomas (ECF No. 43) (03/27/25)……..JA278

*Widakuswara* Declaration of Jon Schleuss (ECF No. 92-1) (04/16/25)……...JA281

*Widakuswara* Declaration of Thomas Yazdgerdi (ECF No. 92-2)
(04/16/25)……………………………………………………………JA286

*Widakuswara* Declaration of John Doe 4 (ECF No. 92-3) (04/16/25)……….JA293

*Widakuswara* Declaration of Jon Schleuss (ECF No. 95) (04/17/25)……….JA296

*Widakuswara* District Court Order on Motion to Stay (ECF No. 104)
(04/25/25)……………………………………………………………JA298

*Abramowitz* Preliminary Injunction Order (ECF No. 29) (04/22/25)………...JA304

*Abramowitz* Declaration of Abramowitz (ECF No. 19-1) (04/02/25)...........JA308

*Abramowitz* Declaration of Abramowitz (ECF No. 4-5) (03/26/25)............JA312

*Abramowitz* Declaration of Anthony Michael LaBruto (ECF No. 4-8)

    (03/26/25)....................................................................................JA323

*Abramowitz* Declaration of J. Doe 2 (ECF No. 4-7) (03/26/25)...............JA325

*RFA* and *MBN* Preliminary Injunction Order (ECF No. 23) (04/25/25)..........JA328

*RFA* Declaration of Kevin Fleming and Exhibit (ECF No. 12-2)

    (03/28/25)...............................................................................JA330

*RFA* Declaration of Tamara Bralo (ECF No. 12-3) (03/28/25).................JA341

*RFA* Supplemental Declaration of Kevin Fleming (ECF No. 22-1)

    (04/17/25)....................................................................................JA346

*MBN* Declaration of Deirdre Kline and Exhibits (ECF No. 11-3–11-5)

    (04/09/25)....................................................................................JA348

*MBN* Supplemental Declaration of Deirdre Kline (ECF No. 20-1)

    (04/17/25)....................................................................................JA367

*MBN* Second Supplemental Declaration of Kevin Fleming (Doc. #2113206)

    (04/28/25)....................................................................................JA371

*MBN* Second Supplemental Declaration of Deirdre Kline (Doc. #2113206)

    (04/28/2025)................................................................................JA374

*RFA/MBN* Budget Authority (ECF No. 17-1) (04/11/25).......................JA377

*RFA* Grant Agreement (ECF No. 17-2) (04/11/25)..............................JA380

*MBN* Grant Agreement (ECF No. 17-3) (04/11/25)..............................JA417

D.C. Circuit Panel's Order on Administrative Stay (Doc. #2113919)

    (05/01/25)....................................................................................JA453

D.C. Circuit Panel's Order on Stay (Doc. #2114139) (05/03/25)...............JA457

En Banc Court's Order on Administrative Stay (Doc. #2114884)

(05/07/25)……………………………………………………JA496

Judge Pillard's Statement on En Banc Court's Administrative Stay

(Doc. #2115063) (05/09/25)…………………………………....JA510

En Banc Court's Order on *Widakuswara* Injunction Prong One (Doc. #2117031)

(05/22/25)……………………………………………………JA514

En Banc Court's Order on Petitions for Review (Doc. #2117911)

(05/28/25)……………………………………………………JA516

Separate Statements on En Banc Court's May 22, 2025 Order (Doc. #2117869)

(05/28/25)……………………………………………………JA522

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PATSY WIDAKUSWARA, *et al.*,

      *Plaintiffs,*

**v.**

KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al.,*

      *Defendants.*

Case No. 1:25-cv-1015-RCL

## MEMORANDUM OPINION

Before the Court is the plaintiffs' Motion for a Preliminary Injunction, which seeks to enjoin the defendants from dismantling the United States Agency for Global Media (USAGM) in response to Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," announced by President Trump on March 14, 2025. The plaintiffs allege that USAGM's actions, purportedly in furtherance of the Executive Order—terminating and threatening to terminate the majority of USAGM staff, ending grants to its affiliates, and silencing programming—violate the First Amendment, constitutional separation of powers principles, the Take Care Clause, and statutory provisions including the Administrative Procedure Act (APA), International Broadcasting Act, and congressional appropriations acts. Broadly, the plaintiffs ask this Court to order the defendants to take all necessary steps to return USAGM and its employees, contractors, and grantees to their status prior to the March 14, 2025 Executive Order.

For the reasons contained herein, the Motion for a Preliminary Injunction will be **GRANTED IN PART** and **DENIED IN PART**. The Court will **GRANT** the Motion as it applies to the defendants' actions to shutter the USAGM entities Voice of America, Radio Free Asia, and

**JA1**

Middle East Broadcasting Networks.  The Court will **DENY** the Motion as to the other affiliated network entities.

## I.    BACKGROUND

### A.  Factual History

USAGM is an independent executive agency established by Congress with the mission to "inform, engage, and connect people around the world in support of freedom and democracy." Mission, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/mission/ [https://perma.cc/PK9M-Y32T].  It oversees six federally funded broadcast networks, the largest being Voice of America (VOA).  VOA's first broadcast took place during World War II, uttering the now "immortal words": "The news may be good or bad; we shall tell you the truth."  History, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/history/ [https://perma.cc/27Y5-A8CP].  Congress codified that promise into law in 1976 in VOA's charter, declaring that VOA "will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive."  22 U.S.C. § 6202(c).

Since then, five related entities have been established to further USAGM's mission: a federal entity within USAGM known as the Office of Cuba Broadcasting (OCB), and four independent networks: Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), Middle East Broadcasting Network (MBN), and the Open Technology Fund (OTF) (collectively, "the Networks").[1]  Together, these entities have "exported the cardinal American values of free

---

[1] Each of the Networks has filed a lawsuit in this Court seeking disbursement of congressionally appropriated funds. *See RFE/RL v. Lake*, 25-cv-799 (RCL) (filed Mar. 18, 2025); *Open Technology Fund v. Lake*, 25-cv-840 (RCL) (filed Mar. 20, 2025); *Radio Free Asia v. United States*, 25-cv-907 (RCL) (filed Mar. 27, 2025); *Middle East Broadcast Networks v. United States*, 25-cv-966 (RCL) (filed Apr. 1, 2025).  OTF originally sought injunctive relief for access to its March funding, but before the Court ruled on its motion, the government processed OTF's March drawdown request.  *See* Notice of Withdrawal of TRO Motion, *Open Technology Fund v. Lake*, 25-cv-840 (RCL), ECF No. 19. OTF has not moved for any additional injunctive relief since, and as such, the Court will cabin the relief granted herein

**JA2**

speech, freedom of the press, and open debate to the dark corners of the world where independent, objective coverage of current events is otherwise unavailable." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341–42 (D.D.C. 2020).

All six of these entities are funded by the United States government. Specifically, VOA and OCB are located within the federal government, whereas RFA, RFE/RL, MBN, and OTF are private non-profit organizations that receive funding through congressional appropriations disbursed via grant agreements with USAGM. Structure, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/organizational-chart/ [https://perma.cc/ZWY5-GGDB]. Every year, Congress appropriates funds to USAGM and further allocates those funds to VOA, OCB, and each of the Networks, with a line-item amount designated to each entity. As is relevant here, in the 2024 Appropriations Act, Congress appropriated $857 million to USAGM for Fiscal Year (FY) 2024 and mandated how those funds "shall be allocated" pursuant to an "explanatory statement." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (requiring funds to be allocated in accordance with table in "the explanatory statement" described in section 4"); *id.* § 4 (identifying explanatory statement). The explanatory statement sets forth a table with earmarked funding amounts for VOA, OCB, and each of the Networks. Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (providing table designating how funds appropriated for international broadcasting "are allocated"). For FY 2024, Congress allocated

---

to only those USAGM affiliated networks that have outstanding motions for injunctive relief. The status of RFE/RL, RFA, and MBN's lawsuits is detailed at Section I.B.i, *infra*.

The OCB, though initially shut down by the EO, has resumed functioning; OCB employees who were placed on administrative leave were called back to work on March 26, 2025, and OCB resumed radio service and television broadcasting within a day. *See* Second Decl. of Crystal Thomas, Human Resources Director for USAGM ("Second Thomas Decl."), at ¶ 6, ECF No. 88-4.

**JA3**

$260 million for VOA; $25 million for OCB; $142.2 million for RFE/RL; $60.8 million for RFA; $100 million for MBN; and $43.5 million for OTF.  *Id* (listing each entity with a corresponding funding amount for the fiscal year).

In three continuing resolutions covering FY 2025, Congress funded USAGM at the same levels, and subject to the same conditions, as it funded USAGM in FY 2024.  *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY 2024 appropriations laws and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025).  Most relevant here, effective March 15, 2025, Congress passed and President Trump signed into law the Third Continuing Resolution, which appropriates funding to USAGM and the associated Networks through September 30, 2025.  Under the appropriations acts, USAGM has limited discretion to "reprogram" a small fraction of these funds among different programs, but only if it gives the House and Senate Appropriations Committees fifteen days' advance notice. 2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see* 170 Cong. Rec. at H2087.  And in no event may any reprogramming reduce funding for a program by more than five percent of what Congress designated.  *Id.*

On March 14, 2025, President Donald Trump issued Executive Order 14238 entitled "Continuing the Reduction of the Federal Bureaucracy" (the "EO").  90 Fed. Reg. 13043 (Mar.

**JA4**

14, 2025).[2]  The EO demands that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law," and directs the head of USAGM to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.*

The following day, on March 15, 2025, the White House published an article entitled "The Voice of Radical America," which states: "President Donald J. Trump's [EO] on Friday will ensure that taxpayers are no longer on the hook for radical propaganda."[3]  USAGM also posted an update on its website stating: "This agency is not salvageable.  From top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken.  While there are bright spots within the agency with personnel who are talented and dedicated public servants, this is the exception rather than the rule."[4]

From March 15, 2025 onward, the acting leadership of USAGM has taken a series of actions purportedly in furtherance of the EO's directive.  On March 15, 2025, USAGM placed 1,042 employees on administrative leave.[5]  First Declaration of Crystal Thomas, Human Resources Director for USAGM ("First Thomas Decl.") ¶ 6, ECF No. 43.  That same day, all USAGM grantee networks received an identical letter from the agency immediately terminating their operative grant

---

[2] https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ [https://perma.cc/J4WD-Q2UU].

[3] *The Voice of Radical America*, THE WHITE HOUSE (Mar. 15, 2025), https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/ [https://perma.cc/HL9E-5JBE].

[4] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/ [https://perma.cc/YQA4-3TVA].

[5] USAGM employs 1,147 full-time employees and, as of March 14, 2025, had active employment contracts with approximately 598 personal service contractors (PSCs).  Thomas Decl. ¶ 3.

agreements, with no explanation other than the boilerplate language that "[t]he award no longer effectuates agency priorities" and citing the EO.  Compl. ¶ 78.  On March 16, 2025 "USAGM terminated contracts with all [approximately 598] personal services contractors ["PSCs"]," whose pay was scheduled to end on March 31, 2025.  First Thomas Decl. ¶ 6.[6]  On March 17, 2025, USAGM instructed "all USAGM Foreign Service employees" to shut down all transmitters at their respective stations, place locally employed staff on leave, and expect to be placed on administrative leave themselves within two days.  Compl. ¶ 83.  On March 25, 2025, USAGM's HR Director notified union officials at American Federation of State, County and Municipal Employees, AFL-CIO ("ASFCME," a plaintiff in this case) that USAGM intended to "send termination notices" to 29 of USAGM's 32 radio broadcast technicians ("RBT")[7]—and because the three remaining RBTs had already submitted retirement applications, this move would effectively eliminate all RBTs.  March 26 Letter to the Court, ECF No. 33 at 2.  Also on March 25, USAGM's HR Director sent a notice to American Federation of Government Employees, AFL-CIO ("AFGE," also a plaintiff in this case) conveying USAGM's decision to terminate 594 AFGE members "including broadcast journalists, technicians, budget analysts, electronics engineers, and others" within weeks.  *Id.*

As a result of the defendants' actions, VOA is not reporting the news for the first time in its 80-year existence.  Its website has not been updated since March 15, 2025, and radio stations abroad that rely on VOA's programming have either gone dark or air only music.  Compl. ¶ 82.

---

[6] The defendants represent that on March 28, 2025, all PSCs were reinstated with full pay and benefits but are not currently working.  PI Opp'n at 3 (citing Second Thomas Decl. ¶ 6).  This appears to be a direct result of the March 28 TRO in this case.  The March 28 TRO, explained in detail *infra*, enjoined the defendants from "proceeding with terminating any USAGM [PSC] who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025."  *See* Op. and Order Granting Pls.' Mot for Temp. Restraining Order ("March 28 TRO"), ECF No. 54, at 22.

[7] RBTs are essential to carry out broadcasting, as they are required to be on-site 24/7 to broadcast programming, and "it is not possible to operate VOA without radio engineers."  March 26 Letter to the Court, ECF No. 33 at 2.

**JA6**

All VOA employees remain on administrative leave with no indication of returning.  *Id.* ¶¶ 74–75,

85.  PSCs face termination of their contracts and those working in the United States with J1 visas

face the possibility of deportation to home countries, in some instances those with authoritarian

regimes that are hostile to a free press.  *Id.* ¶¶ 22–23.  USAGM's FY 2025 grants with the Networks

either remain terminated in the cases of RFA and MBN, or simply lapsed with no other agreement

in place in the case of RFE/RL, and none of these Networks have received their congressionally

appropriated funds for the month of April, forcing them to wind down operations and in some

instances furlough their employees without pay.  The status of each Network and their lawsuit in

this Court is detailed below.

### B.  Procedural History

#### i.     Network Lawsuits

##### a.   Radio Free Europe/Radio Liberty, No. 25-cv-799 (RCL)

RFE/RL began broadcasting in 1953 and has been funded by the United States government

ever since.  *See* No. 25-cv-799 (RCL), 2025 WL 900481, at *1 (D.D.C. Mar. 25, 2025) (providing

an overview of RFE/RL's history and funding structure).  Following the passage of the First and

Second Continuing Resolutions in which Congress renewed RFE/RL's funding, USAGM

executed grant agreements obligating those funds to RFE/RL through February 28, 2025.[8]  *RFE/RL*

*v. Lake*, No. 25-cv-799 (RCL) ("RFE/RL Docket"), Compl. ¶ 30, ECF No. 1.  In late February

2025, RFE/RL and USAGM exchanged drafts of a FY 2025 grant agreement to cover funding

appropriated to RFE/RL through the end of the fiscal year.  *Id.* ¶ 32.  On February 27, 2025,

---

[8] To be clear, under the Second Continuing Resolution, Congress appropriated funds for RFE/RL through March 14, 2025.  USAGM did not, however, obligate the March 1–14, 2025, funds— which total approximately $7.5 million— in the grant agreement.  Throughout December 2024, USAGM informed RFE/RL that the reason for not obligating the funds was a policy of not providing partial-month payments to grantees.  *RFE/RL v. Lake*, No. 25-cv-799, Compl. ¶ 32.  The Third Continuing Resolution, signed on March 15, 2025, appropriates funds to RFE/RL from March 15 through September 30, 2025.  *Id.* ¶ 28.

**JA7**

USAGM sent a final version of the grant agreement to RFE/RL and requested a "signed version of this Master Grant Agreement at your earliest convenience." RFE/RL responded with the signed grant agreement that same day, but USAGM never countersigned. *Id.*

On March 15, 2025, RFE/RL received the termination letter from USAGM. RFE/RL filed its Complaint on March 18 and moved for preliminary injunctive relief the next day—specifically, RFE/RL sought a TRO for disbursement of funds for the March 1–15 period of performance, and a PI ordering USAGM to effectuate further grant agreements with RFE/RL to disburse the funds that Congress had appropriated through September 30, 2025. On March 24, just hours before a scheduled hearing on the TRO motion, USAGM disbursed RFE/RL's funds to cover the March 1–15 grant period, but the Court still granted RFE/RL's TRO to enjoin the "close-out" procedures detailed in the termination letter. *See RFE/RL*, 2025 WL 900481, at *2–5.

On March 26, the day after the Court issued its TRO, USAGM rescinded the termination letter. RFE/RL Docket, Notice of Withdrawal of Grant Termination, ECF No. 15. The grant was therefore "back in effect," according to USAGM. *Id.* RFE/RL has now received its funds for all of March but has not received any funds for April (or the rest of FY 25) because the prior grant agreement has expired—and as stated *supra*, the fully negotiated FY 25 grant agreement was never signed by USAGM. USAGM sent a new proposed FY 25 grant agreement to RFE/RL on April 8, 2025, prompting RFE/RL to file a renewed TRO, which is still pending. RFE/RL Docket, ECF No. 28. RFE/RL argues in its TRO motion that it will soon be forced to shut down without access to its April funds and that the proposed FY 25 grant agreement from USAGM is unreasonable and a pretext for denying RFE/RL its congressional appropriations.

**JA8**

>    **b. Radio Free Asia, No. 25-cv-907 (RCL) and Middle East Broadcast Networks, No. 25-cv-966 (RCL)**

RFA was established in 1996 and relies entirely on USAGM grants to fund its operations. Fleming Decl. ¶ 10–11, *Radio Free Asia v. United States*, No. 25-cv-907 (RCL) ("RFA Docket"), ECF No. 12-2.  As it has every year for the last three decades, RFA entered a master agreement with USAGM for "FY 2025," which was scheduled to remain in effect through September 30, 2025.  RFA Docket, ECF No. 19-2.  Like the other Networks, RFA received a termination letter on March 15, 2025.  RFA Docket, Fleming Decl. Ex. 1.[9]  RFA filed its Complaint on March 27, 2025, and a motion for a TRO,[10] ECF No. 12, the following day.  Before this Court acted on the motion, however, Defendants represented that they believed the grant termination had been enjoined by the March 28 TRO, issued by Judge Oetken of the Southern District of New York before the case was transferred to this Court.  *See* Op. and Order Granting Pls.' Mot for Temp. Restraining Order ("March 28 TRO"), ECF No. 54, at 22 (enjoining Defendants from "terminating (or proceeding with terminating as announced) any USAGM grant or contract").  Then, on April 9, 2025, with the TRO still in place, RFA received the funding it was due through the end of March.  RFA Docket, Request for Hearing at 2, ECF No. 14.  On April 11, 2025, the Defendants emailed RFA representatives with a "revision to the RFA FY-25 Master Grant Agreement between USAGM and RFA," which Defendants encouraged RFA to sign "in order to expedite the payment

---

[9] While the termination letter provided RFA the right to appeal its termination, that turned out to be an empty offer. After RFA "promptly filed an appeal," USAGM informed them that Defendant Lake "did not intend to respond to its appeal."  Fleming Decl. ¶ 23.

[10] The TRO motion has since been converted into a PI motion, per agreement from both parties.  RFA Docket, Proposed Order, ECF No. 20-5.

**JA9**

process" for their April funding.[11]  However, the termination of RFA's grant was never rescinded, and the termination remains in effect.

MBN sits in a similar position as RFA.  MBN has received funding via grant agreements with USAGM since its inception in 2004.  MBN and USAGM entered into a master grant agreement for FY 2025, scheduled to remain in effect through September 30, 2025.  Def.'s Opp'n. App'x. C at 3, *Middle East Broadcasting Networks, Inc. v. United States of America*, No. 25-cv-966 (RCL) ("MBN Docket"), ECF No. 20-2.  Like the other Networks, MBN received the March 15 termination letter,[12] filed a Complaint on April 1, 2025, and filed a motion for a PI, ECF No. 11, on April 9, 2025.  MBN's grant remains terminated absent injunctive relief.

RFA and MBN seek the same relief in their respective PI motions.  They ask for the Court to enter an order enjoining the Defendants "from impounding, blocking, or otherwise interfering with payment of funds appropriated to Plaintiffs" and "from enforcing or otherwise giving effect to the termination of Plaintiffs' grants[.]"  RFA Docket, Proposed Order, ECF No.12-4; MBN Docket, Proposed Order, ECF No. 18-5.

### ii.    The Instant Lawsuit

The plaintiffs in this lawsuit are Patsy Widakuswara, the VOA White House Bureau Chief; Jessica Jerreat, the VOA Press Freedom Editor; Kathryn Neeper, the Director of Strategy and Performance Assessment at USAGM; John Does 1 and 2, journalists at VOA; John Does 3 and 4, independent freelance journalists working as personal service contractors (PSCs) with VOA; Reporters Sans Frontières ("RSF") and Reporters Without Borders, Inc. ("RSF USA"),

---

[11] It is not clear why Defendants styled the new agreement a "revision" while simultaneously representing that the FY-25 Master Agreement has been terminated.

[12] Like RFA, MBN appealed the termination of its grant and requested a response by March 31, 2025, but received none to date.  MBN Docket, Kline Decl. ¶ 33, ECF No. 11-3.

nongovernmental organizations of independent journalists; AFSCME, AFGE, and the American Foreign Service Association ("AFSA") (collectively, the "public-sector unions"); and The NewsGuild-CWA, AFL-CIO ("TNG-CWA"), a labor organization of private sector employees who work for Radio Free Asia.  The plaintiffs filed this lawsuit on March 21, 2025, in the Southern District of New York against Defendant Kari Lake, Senior Advisor to the Acting CEO of the USAGM, and Defendant Victor Morales, Acting CEO of USAGM, in their official capacities, as well as USAGM as an organization (collectively, the "defendants").  Compl., ECF No. 1.  The plaintiffs allege that the defendants' actions in "dismantling" USAGM violate the plaintiffs' First Amendment rights, the APA, the constitutional principle of the separation of powers and the Take Care Clause, the Appointments Clause,[13] congressional appropriations acts, and numerous other statutory provisions under the International Broadcasting Act and other relevant statues governing foreign relations and broadcasting.  Compl. ¶¶ 2, 102–60.

On March 24, 2025, the plaintiffs sought emergency relief by filing a motion (styled as a proposed order to show cause) for a TRO and PI, with an accompanying memorandum in support.  *See* Proposed Order to Show Cause with Emergency Relief, ECF No. 15; Mem. in Support of Proposed Order to Show Cause (hereinafter "PI Mot."), ECF No. 17.  On March 28, 2025, Judge Oetken of the Southern District of New York granted the motion for a TRO, concluding that the defendants likely violated several provisions of the APA, and ordered as follows:

> Defendants, and those acting in concert with them, are temporarily enjoined from taking any further actions to implement or effectuate the March 14, 2025 Executive Order entitled "Continuing the Reduction of the Federal Bureaucracy" as to USAGM and the March 15, 2025 email issued to all VOA staff, or take any action to reduce USAGM's workforce (whether employees, contractors, or grantees), included but not limited to

---

[13] Plaintiffs did not move for emergency relief based on their Appointments Clause claim (Count IX).  PI Reply, ECF No. 92, at 21 n.8.

**JA11**

(i)     proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee, or contractor,

(ii)    terminating (or proceeding with terminating as announced) any USAGM grant or contract or proceeding with terminating any USAGM Personal Services Contractors (PSCs) who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025, or

(iii)   closing any USAGM office or requiring employees or contractors in overseas offices to return to the United States.

March 28 TRO at 21–22.  The TRO was to remain in place "pending the hearing and determination of Plaintiffs motion for a preliminary injunction."  *Id.* at 21.  One week later, Judge Oetken granted the defendants' motion to transfer to the District of Columbia on April 4, 2025.  *See* Transfer Order, ECF No. 61.  The case was then assigned to the undersigned on April 8, 2025, with the PI motion still pending.  *See* ECF No. 68.

On April 8, the defendants moved to vacate the March 28 TRO.  Mot. to Vacate, ECF No. 73.  The parties suggested that they cross-brief the PI motion alongside the defendants' motion to vacate on the same expedited schedule.  *See* ECF Nos. 78, 79.  To that end, on April 14, 2025, the defendants filed an Opposition to the PI Motion ("PI Opp'n"), ECF No. 88, and the plaintiffs filed an Opposition to the motion to vacate ("Mot. to Vacate Opp'n"), ECF No. 89, that same day.  On April 16, the plaintiffs filed a reply in support of their PI Motion ("PI Reply"), ECF No. 92, and the defendants filed a reply in support of their Motion to Vacate ("Mot. to Vacate Reply"), ECF No. 93.  The Court held a hearing on Thursday, April 17, 2025, during which counsel for the plaintiffs here, as well as counsel for the plaintiffs in a related case, *Abramowitz v. Lake*, 25-cv-887, and the defendants (which are the same in both cases), all presented argument.  The Motion for a Preliminary Injunction is now ripe for review.[14]

---

[14] The Court will refer to and incorporate arguments presented in the Motion to Vacate the TRO given the significant overlap with the arguments in opposition to the PI, but because the TRO is expires on April 22, 2025 with this Court's ruling on the preliminary injunction, *see* March 28 TRO at 21–22, the Motion to Vacate the TRO is moot.

**JA12**

## II.    LEGAL STANDARDS

### A.  Preliminary Injunction

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  It is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Id.* at 20.  "Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public."  *RFE/RL*, 2025 WL 900481, at *2 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts in this Circuit have adopted a "sliding scale" approach to the preliminary relief analysis, "whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential."  *Id.* (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

## III.    DISCUSSION

### A.  Plaintiffs Have Sufficiently Shown Standing.

"[A] party who seeks a preliminary injunction 'must show a substantial likelihood of standing.'"  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Obama v. Klayman*, 800 F.3d 559, 568 (D.C. Cir. 2015)).  The defendants argue that the organizational plaintiffs AFSCME, AFGE, and AFSA (the public-sector unions) and RSF and

RSF-USA (nongovernmental organizations of independent journalists) have failed to make this showing.  PI Opp'n at 4.

Membership-based associations can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Here, all organizational plaintiffs have asserted both associational and organizational standing.  PI Mot. 34–38.  Despite the defendants' arguments to the contrary, the Court concludes that all organizational plaintiffs have shown a "substantial likelihood" of both associational and organizational standing.

### i.    Associational Standing

To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted, nor the relief requested requires that an individual member of the association participate in the lawsuit."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  The defendants argue that the union members placed on administrative leave are not injured because "[a]lthough Plaintiffs fear what may happen next in the future, this 'amounts to nothing more than speculation about future events that may or may not occur,' especially given [USAGM] remains operational, contrary to what Plaintiffs suggest."  PI Opp'n at 5 (quoting *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002)).  This argument is easily dispensed with—Defendant Lake has stated that what's "coming up next" is that the agency "is going to be decreased in size significantly" because there is "too much rot in the agency

to salvage it," Compl. ¶ 89, [15] plainly illustrating that the union members are relying on more than mere speculation. Moreover, as the plaintiffs point out, this position is "flatly inconsistent with [the Defendants'] later insistence that the same exact action could be brought before the MSPB as a prohibited personnel practice." PI Reply at 4.[16] It also does not account for the defendants' stated decision to terminate over 600 AFGE and AFSCME members, all employees of VOA. March 26 Letter to the Court, ECF No. 33. Regarding prongs two and three of the associational standing test (which the defendants do not challenge), it is certainly germane to the unions' purpose to defend "the existence of the agency where their members work, or that funds their members' work," and "the relief that Plaintiffs seek pertains to Defendants' wholesale dissolution of USAGM and does not depend on the individual circumstances of any union member." PI Mot. at 36. Thus, the Court concludes that the unions have associational standing.[17]

## ii.    Organizational Standing

An organization can establish organizational standing "if it can show that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The organization must satisfy two criteria: (1) the

---

[15] Citing Bannon's War Room, "It Is Full of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America Layoffs, Rumble (Mar. 17, 2025), https://rumble.com/v6qs70g-it-is-full-of-waste-fraud-and-abuse.-kari-lake-reacts-to-1300-voice-of-amer.html [https://perma.cc/YC6G-KEXK].

[16] To the extent the defendants are arguing that the public-sector union plaintiffs cannot bring suit on behalf of their members because the members' claims are channeled to the MSPB, the Court addresses that issue below and resolves it in the plaintiffs' favor. *See* Section II.C, *infra*.

[17] The defendants do not contest RSF and RSF-USA's associational standing, *see* PI Opp'n at 4–5, and the Court is satisfied that RSF and RSF-USA have met the standard for associational standing at this juncture. *See* PI Mot. at 35–36 ("RSF's members include journalists who travel to dangerous foreign countries where USAGM broadcasts to report the news. These journalists have been made less safe and seen their mission of promoting free press severely damaged by the shuttering of USAGM operations. . . . Bringing this lawsuit to defend . . . the continued viability of the international free press to which they have dedicated their careers, is germane to that purpose.").

defendants' "action or omission . . . injured the organization's interest;" and (2) the organization "used its resources to counteract that harm." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (internal citations and quotations omitted).

The defendants argue that the organizational plaintiffs have not identified a "concrete and demonstrable injury to [their] activities," but only speculative ones, because "[VOA] has not been dismantled and [USAGM] remains operational." PI Opp'n at 6. Of course, as this quote concedes, VOA *itself* is not operational, and the Networks are winding down operations. That harm is not speculative—it is currently unfolding. The defendants' actions have interfered with the unions' "core business interests," injuring their ability to provide representational services to employees in affected bargaining units. PI Mot. at 36–37 (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Moreover, the defendants have decided to eliminate an entire AFSCME bargaining unit and terminate 594 AFGE members, thereby depriving both unions of dues and "existentially threatening" AFSCME's RBT unit. *See* PI Reply at 3–4; *Nat'l Treasury Emps. Union v. I.R.S.*, No. 04-cv-0820, 2006 WL 416161, at *2 (D.D.C. Feb. 22, 2006) (loss of dues confers standing). As for RSF and RSF-USA, VOA "frequently [reports on] RSF's reports and advocacy efforts," meaning that VOA's silence injured RSF's ability to distribute its broadcasting and amplify press freedom concerns. Declaration of Thibaut Bruttin, Director General of RSF ("Bruttin Decl."), ¶ 19, ECF No. 16-15.[18]

---

[18] Plaintiffs also allege that RSF and RSF-USA have organizational standing "with respect to their First Amendment right-to-receive claim." PI Mot. at 37. However, with the instant PI, the Court does not reach Plaintiffs' First Amendment challenges, and will therefore not address this avenue of establishing standing.

**JA16**

Regarding the second prong of organizational standing, the plaintiffs' Complaint, briefing and accompanying declarations show that the public-sector unions are "expending significant resources to counteract USAGM's obstruction of their ability to perform their core services [such as] advising members about the terms of their employment and the implication of Defendants' actions."  PI Reply at 3; *see* Compl. ¶¶ 99–101 (explaining the activities of each union in response to Defendants actions since March 15, 2025).  The Complaint also indicates that RSF and RSF-USA have used resources to counteract the harm at issue here because "[t]he silencing of VOA . . . force[s] [RSF and RSF USA] to lose and waste material resources it otherwise would not have spent and upon which it relies."  Compl. ¶¶ 24, 97.  The Court finds these representations sufficient to show a "substantial likelihood" of organizational standing.

Notably, nowhere do the defendants argue that TNG-CWA, the other organizational plaintiff in this case, lacks standing.  TNG-CWA represents private sector reporters who work for RFA and who rely on USAGM programs "including but not limited to RFA."  First Declaration of Jon Schleuss, President of TNG-CWA ¶ 18, ECF No. 16-16.  The defendants' actions directly interfere with TNG-CWA's journalist-members' ability to access VOA and other USAGM grantee broadcasts, which provide a "free flow of information, over radio airwaves and online" in countries where "there is no media freedom."  *Id.* ¶¶ 15–17.  As of March 21, 2025, 75% of TNG-CWA's members have been indefinitely furloughed without pay and they stand to lose their medical and life insurance at the end of April.  Second Declaration of Jon Schleuss, President of TNG-CWA, ¶ 18, ECF No. 92-1.  Many of TNG-CWA's members are on nonimmigrant visas and face return to their home countries where they fear potential retaliation from repressive regimes.  *Id.* ¶ 8.  The Court is satisfied that TNG-CWA has shown a "substantial likelihood" of standing, in addition to

**JA17**

all other organizational plaintiffs, and concludes that the defendants' challenges to the contrary are unavailing.

**B. The Court has Jurisdiction over the Plaintiffs' Claims Regarding the Withholding of Congressional Appropriations from Networks.**

As part of their requested relief, the plaintiffs seek to enjoin the defendants from terminating the grants that Congress directed USAGM to provide to the specified broadcasting Networks in congressionally appropriated amounts. Proposed PI Order, ECF No. 15 at 2. The defendants argue that this Court lacks jurisdiction to hear this portion of the dispute, characterizing it as strictly a contractual in nature, but the Court concludes otherwise.

In opposing the initial TRO Motion in the Southern District of New York, the defendants briefly argued that Plaintiffs could not bring that challenge in federal district court because the Tucker Act barred their claims. *See* ECF. No. 41 at 20 n.3 (Defendants' TRO opposition). The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over suits based on 'any express or implied contract with the United States.'" 28 U.S.C. §1491(a)(1). Judge Oetken, however, disposed of this challenge quickly. *See* March 28 TRO at 6 n.5 ("While Plaintiffs have certainly raised the cancellation of grant contracts as one concerning fact in a constellation of actions Defendants took to rapidly dismantle USAGM, 'the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have.'") (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

To challenge that conclusion here, the defendants rely on the intervening Supreme Court emergency-docket order, *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), arguing that it "clarifies" that the plaintiffs' claims regarding USAGM's termination of grants cannot be heard in this Court. Mot. to Vacate at 6; PI Opp'n at 33–34. That argument fails.

**JA18**

In *California*, grantees of the Department of Education sued under the APA to challenge the termination of their grants.  145 S. Ct. at 968.  The grantees relied on relevant statutory provisions that directed the Secretary of Education to "use certain funds to make grants to entities," which were awarded pursuant to a "competitive application process."  *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir. 2025).  The district court entered a TRO, enjoining the government from terminating the grants and requiring the government to pay out grant obligations to those plaintiffs who had applied for and received a grant award.  *California v. U.S. Dep't of Educ.*, No. 25-cv-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025).  The Supreme Court stayed the TRO because the Court found it "likely" that the district court lacked jurisdiction to issue such relief.  *California*, 145 S. Ct. at 968.  In so ruling, the Court reiterated that the APA's waiver of sovereign immunity "does not extend to orders to enforce a contractual obligation to pay money," and that, instead, "suits based on 'any express or implied contract with the United States'" must go to the Court of Federal Claims under the Tucker Act.  *Id.*

But *California* does not change the conclusion in the March 28 TRO, because *California* does not change the governing law.  It was true before *California*, and it remains true now, that "[w]hether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 968).  In *California*, the source of the rights relied on by the plaintiffs were contained *in the grant agreements*—the relevant statute did not entitle any particular grantee to the funds.  Here, by contrast, the source of the Networks' rights is not rooted in the grant agreements with USAGM—grants are involved only as a vehicle to distribute congressionally appropriated funds to the Networks because Congress passed laws directing

USAGM to provide grants to specific grantees, and appropriated funds for those grantees specifically. *See*, *e.g.*, 22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208 (International Broadcasting Act); Pub. L. No. 119-4, div. A, § 1101 (2025) (Congressional Appropriations Act).

The D.C. Circuit has cautioned that the Tucker Act should not be interpreted "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government," *Megapulse*, 672 F.2d at 968, and a claim of entitlement to congressional appropriations is certainly one over which the Court can exercise jurisdiction. *See Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("[Plaintiff] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [Plaintiff] will suffer or has suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) ("[Plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages.'"). Therefore, the Court has jurisdiction to review the defendants' termination of congressionally appropriated funds to the Networks.

### C. The Court Has Jurisdiction Over Plaintiffs' Claims Regarding the Defendants' Personnel Actions.

The defendants argue that the Court lacks jurisdiction to enjoin USAGM's personnel actions as to individual plaintiff employees because the Federal Service Labor–Management Relations Statute ("FSL-MRS"), the Civil Service Reform Act ("CSRA"), and the Foreign Service Act ("FSA") govern review of employment disputes between the federal government and its employees, thereby channeling claims to either the Merit Systems Protection Board ("MSPB") for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel ("OSC") for certain "prohibited personnel practices." PI Opp'n at 8–14; Mot to

**JA20**

Vacate at 7–8.  And as stated *supra*, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *California*, 145 S. Ct. at 968 (quoting 5 U.S.C. § 702).  At the outset, the Court observes that this purported jurisdictional bar would only apply to the individual plaintiffs employed by USAGM (Patsy Widakuswara, Jessica Jarreat, Kathryn Neeper, and Does 1 and 2), and the public-sector unions purporting to represent terminated employees via associational standing (AFSCME, AFGE, and AFSA), but RSF and RSF-USA, TNG-CWA, and John Does 3 and 4 (PSCs of VOA)[19] are not implicated as non-governmental entities and contractors.[20]  In any event, the Court finds that the individual government employee plaintiffs are not barred from challenging the dismantling of USAGM because this case is not simply a collection of employment disputes.

Defendants rely primarily on *AFSA v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025), to argue that Plaintiffs claims should be channeled to the federal administrative employment dispute process.  In *AFSA*, two unions representing USAID employees sought to enjoin the dismantling of USAID, effectuated in part by the placement of employees on administrative leave.  The court denied the plaintiffs' motion for a PI, concluding that the plaintiffs' claims were "archetypal complaints about changed employment conditions and their

---

[19] The defendants argue that because John Does 3 and 4 are PSCs, their claims are governed by the Contract Disputes Act (CDA) and must be heard in the Court of Federal Claims. PI Opp'n at 7, 14–19.  The relevant inquiry under the CDA is identical to that under the Tucker Act: "whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution."  *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added); *see Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76 (D.C. Cir. 1985) (applying the Tucker Act inquiry to determine whether a claim falls under the CDA).  Here, as with the other individual plaintiffs, the "source of the rights" Does 3 and 4 rely upon do not derive from any contracts, but rather, upon various constitutional and statutory rights that USAGM has allegedly violated.

[20] It is also the case that the public-sector unions' assertion of organizational standing is not implicated by this jurisdictional bar, because in that capacity, the unions are suing on their own behalf, not that of their members. However, the unions "have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of 'great' harms that could warrant a preliminary injunction."  *AFSA v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *7 n.3 (D.D.C. Feb. 21, 2025).  Thus, though the public-sector unions have asserted organizational standing, their allegations of organizational harm (i.e. loss of dues and diminished bargaining power, *see* PI Mot. at 30–31) are not strong enough to warrant preliminary relief.

JA21

follow-on effects—which at this point appear to be largely financial." *Id.* at *7.  In so holding, the

court noted that "it may be the case that, at a high level of generality and in the long run, plaintiffs'

assertions of harm could flow from their constitutional and APA claims regarding the alleged

unlawful 'dismantl[ing]' of USAID," but found that "at present, the agency is still standing," so

the employees' allegations boiled down to a quotidian employment dispute that fell within the

statutory schemes of the FSL-MRS, CSRA, and FSA.  *Id.* at *7, 11.  Here, such a conclusion would

ignore the facts on the record and on the ground.  It strains credulity to conclude the USAGM is

"still standing" when its 80-year-old flagship news service, VOA, has gone completely dark with

no signs of returning, when USAGM has stopped the disbursement of funds to statutorily created,

congressionally funded networks, and when USAGM leadership has called the agency "not

salvageable" and "a giant rot from top to bottom."[21]  It appears to this Court that USAGM has

already reached the breaking point about which the *ASFA* court opined.  The Court therefore

concludes that this is not simply an employment dispute, and it has jurisdiction to hear the

plaintiffs' claims.[22]

---

[21] Moreover, to the degree that the defendants argue that the agency still functions—albeit as a skeletal version of its former self—that is due in no small part to the successive bouts of injunctive relief (the March 28 TRO and this Court's TRO in *RFE/RL*), each of which has been necessary to keep USAGM afloat.

[22] The Court has also considered the framework in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–13 (1994), to arrive at this conclusion.  Under *Thunder Basin*, a district court lacks jurisdiction over a dispute when the intent for exclusive review is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  *See id.* at 755 (citations omitted).  Claims that otherwise would be covered by the federal employment statutory scheme may instead proceed in federal district court if "'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13).  Such considerations favor the Court's review here.  There is no meaningful review available from the MSPB and OSC for the wholesale placement of employees on administrative leave and the silencing VOA.  For example, even if Plaintiff Widakuswara took her leave placement to the MSPB and was ultimately reinstated, she would return to an empty agency with no infrastructure to carry out VOA's programming.  And the MSPB and OSC have no jurisdiction to review the cancelation of congressional appropriations.  This case "raise[s] 'standard questions of administrative' and constitutional law, detached from" any issues related to federal employment.  *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 194 (quoting *Free Enter. Fund*, 561 U.S. at 491).  Therefore, the Court has jurisdiction to hear this dispute.

**JA22**

**D. PI Factor 1: Likelihood of Success on the Merits**

    **i.       APA**

The APA permits judicial review of "circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The defendants argue that the plaintiffs do not seek review of a "discrete" agency action, because they seek review of the dismantling of USAGM across the board, by challenging a host of individual actions. Therefore, granting the plaintiffs' requested relief, the defendants argue, "would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function." PI Opp'n at 31.

The Court is not persuaded by this argument. The "discrete" requirement does not mean that if an agency takes a slew of actions quickly, the Court loses its ability to review each of them under the APA. The Court must, of course, review whether agency actions contravene the agency's statutorily mandated duties, even if there are a lot of actions at issue. The plaintiffs here have identified the series of actions taken by USAGM since March 15, detailed in Section I.A, *supra*, which are under review here.

The APA also only permits judicial review of "final agency action." To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Courts "are to apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality").

JA23

As Judge Oetken concluded in granting the TRO, the defendants' actions constitute final agency actions. *See* March 28 TRO at 7 ("The termination of contracts with partner organizations and the dismantling of critical infrastructure leading to the complete halt of agency programming are final agency actions.") (citing *Biden v. Texas*, 597 U.S. 785, 807 (2022)). And although a "closer call," Judge Oetken concluded that this applied to the mass placement of USAGM employees on administrative leave, particularly given USAGM's stated intent to fire over 600 VOA employees in the AFSCME and AFGE bargaining units and public statements from USAGM acting leadership that the agency is "irretrievably broken" and "a giant rot from top to bottom." *Id.* at 8. The defendants hardly challenge this conclusion now, only mentioning finality in a footnote, where they argue that the actions are not final because of "the operations that are ongoing and the fact that [USAGM] has only paused other activities while it determines next steps to bring the agency into compliance with the Executive Order . . . ." PI Opp'n at 31 n.5. But this argument is unconvincing because *final* does not mean *permanent*—just because USAGM maintains the ability to reverse these actions at some unidentified point in the future, that does not change the fact that the agency has made decisions, communicated them to their employees, contractors, and grantees, and thereby altered their rights and obligations. *See Ciba-Geigy Corp.*, 801 F.2d at 436 (an "indicia of finality" is if the agency action causes a "direct and immediate . . . effect on the day-to-day business of the parties challenging the action") (internal quotations omitted). The agency actions at issue—blanket placement of employees on administrative leave, termination of entire bargaining units of employees, termination of PSCs, and cancellation of grants dispensing

**JA24**

congressionally appropriated funds—are, with one exception,[23] discrete, final agency actions subject to judicial review.

### a.  Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts arbitrarily and capriciously when it fails to "supply a reasoned analysis" for a change in policy.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  To constitute "reasoned analysis," the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *State Farm*, 463 U.S. at 43).  Thus, "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  *Id.*

Not only is there an absence of "reasoned analysis" from the defendants; there is an absence of any analysis whatsoever.  The EO states that only "non-statutory components and functions" of USAGM be eliminated "to the maximum extent consistent with applicable law," 90 Fed. Reg. 13043 (Mar. 14, 2025), but the defendants have provided no indication that an analysis was undertaken to determine which aspects of USAGM are statutorily required and which are not.  In

---

[23] The termination of RFE/RL's grant, one of the agency actions at issue here, sits in a different posture rendering it not a "final" agency action.  The initial termination of RFE/RL's grant was rescinded by USAGM, and then that grant lapsed, with no grant in place to cover the period of FY 2025 from March 15 to September 30—because the previously negotiated grant agreement for FY 2025, signed by RFE/RL in February 2025, was never signed by USAGM.  *See* Section I.B.i.a, *supra*.  RFE/RL and USAGM are presently engaged in grant negotiations for the remainder of FY 2025, though RFE/RL has a pending TRO motion arguing that certain grant provisions proposed by USAGM are "poison pills" or otherwise illegal.  *RFE/RL v. Lake*, 25-cv-799, Mot. for TRO, ECF No. 28.  Nonetheless, at this juncture, in the midst of negotiations, court intervention would be premature.  However, the Court observes that delayed, broken down grant negotiations and indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review.

opposing the initial TRO in the Southern District of New York, the defendants only gave *one line* of reasoning for their actions since March 15, 2025: that they were acting "[i]n furtherance of the OPM Memorandum[24] and the [EO]." *See* ECF. No. 41 at 9. This lack of analysis formed the basis of the March 28 TRO, in which the court held that the defendants' actions were arbitrary and capricious. March 28 TRO at 9 ("This single line, devoid of data or any independent explanation, is grossly insufficient and falls far short of reasoned analysis.").

The defendants have offered no further analysis since. In their briefing before this Court, they do not even use the words "arbitrary" or "capricious" anywhere, even though the central holding of the TRO was that the defendants' actions were arbitrary and capricious. The defendants have also offered no further explanation for the termination of the Network grants, other than the one sentence contained in each termination letter: that the grant "no longer effectuates agency priorities." Compl. ¶ 78. And at this Court's PI hearing, the defendants opted not to argue the merits of the arbitrary and capricious challenge despite being given several opportunities to do so. Tr. of Apr. 17 Hearing, 67:3–9 ("We don't even get to the arbitrary and capricious because there is no final agency decision yet."); *see also* Tr. of Apr. 17 Hearing, 82: 17–18. The defendants solely relied on their threshold, jurisdictional arguments, which this Court has resolved in the plaintiffs' favor *supra*.

Rather than argue that their actions are not arbitrary and capricious, the defendants simply state that USAGM is currently in the process of figuring out how to comply with the EO. Tr. of Apr. 17 Hearing, 45:14–15 ("Right now, the agency is determining how it will best go about

---

[24] The Office of Personnel Management memorandum, or "OPM Memorandum," refers to the memorandum issued on Jan 20, 2025, and amended on March 4, 2025, titled "Guidance on Probationary Periods, Administrative Leave and Details," available at https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf. The memorandum provides that federal agencies "have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so." *See* ECF. No. 41 at 9.

complying with [the EO].";  *see also* PI Opp'n at 43 (USAGM "has placed its employees on administrative leave temporarily to determine how to bring the agency into compliance with the Executive Order").  But that necessarily means that the defendants took the actions at issue here without any "reasoned analysis" as to what was "statutorily required" under the EO and what was not.  *State Farm*, 463 U.S. at 43.  And the actions taken reflect a hasty, indiscriminate approach: for example, the Networks received the termination letters *on the exact same day* that President Trump signed the Third Continuing Resolution appropriating line-item funds to the Networks through the end of the fiscal year.  Certainly, disbursing congressional appropriations are statutorily required, and the agency axed them the very same day they were enacted.

Furthermore, the defendants failed to account for any reliance interests, contributing to this Court's conclusion that their actions were arbitrary and capricious.  "When an agency changes course, as [USAGM] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 212).  VOA has been operating under statutory mandate and with steady congressional appropriations for over eighty years, and in so doing, has cultivated an audience of 425 million listeners who rely on VOA's output—particularly in areas of the world where a free press is otherwise unavailable.  The Networks have contributed to U.S. international broadcasting by almost exclusively relying on their yearly congressional appropriations, which have been uninterrupted for decades before March 15, 2025.  There is no sign that the defendants considered these longstanding reliance interests before taking the sweeping actions at issue here.[25]

---

[25] Though the Court declines to reach the First Amendment claims at issue, the defendants' attempts to argue that they are not engaging in viewpoint discrimination ironically serve to highlight their arbitrary and capricious approach to whittling down the agency.  They argue that these Plaintiffs' First Amendment rights are not implicated here because

**JA27**

In short, the defendants had no method or approach towards shutting down USAGM that this Court can discern. They took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions as required by the plain language of the EO, and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world. It is hard to fathom a more straightforward display of arbitrary and capricious actions than the Defendants' actions here.

### b. "Not in Accordance with the Law," 5 U.S.C. § 706(2)(A)

The defendants have also likely violated the APA because their actions are "not in accordance with law." 5 U.S.C. 706(2)(A). This rule applies to actions that "failed to meet statutory, procedural, or constitutional requirements." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971). The Court adopts the conclusions from the March 28 TRO and reproduces a sampling of the likely statutory and constitutional violations by the defendants below.

### 1. *International Broadcasting Act and the Congressional Appropriations Acts*

The defendants are likely in direct violation of numerous federal laws. For one, VOA's congressionally established charter in the International Broadcasting Act states that VOA "will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive," 22 U.S.C. § 6202(c), but the defendants have silenced VOA for the first time ever. The International Broadcasting Act further states that U.S. international broadcasting "shall . . . be designed so as to effectively reach a significant audience," and "include news which is

---

they have halted all journalism at VOA and grantee broadcasters, and not "singled out any one viewpoint." PI Opp'n at 24. Because the defendants have eliminated the agency's functions across the board, the argument seems to go, there is no viewpoint discrimination. For one, the Court finds this argument troubling—it cannot be the case that by shutting down all content at an agency, which current leadership has deemed "radical" and "so far to the left," Compl. ¶ 90, the defendants have avoided any First Amendment transgressions. But moreover, even if the defendants were not motivated by viewpoint (which this Court finds dubious, *see* Tr. of Apr. 17 Hearing, 22:19–21), their stance acknowledges that their actions have effectively shut down the agency wholesale, and they have not offered any "reasoned analysis" for doing so.

**JA28**

consistently reliable and authoritative, accurate, objective, and comprehensive."   22 U.S.C. § 6202(a), (b).  But as of now, it appears that the only operational unit of USAGM is the Office of Cuba Broadcasting, and there is no indication that this office of thirty-three individuals can fulfill USAGM's broad statutory mandate by itself.

Finally, the defendants' decision to cut all grant funding to the Networks directly violates congressional appropriations laws.  "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill."  *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  As explained *supra*, USAGM may to some extent reprogram funds among different programs, but any such reprogramming efforts may only reduce funding for a program by five percent or less of what Congress designated—certainly, no law gives the agency the power to cut funding to the drastic degree that is alleged.  Additionally, USAGM may only reprogram if it gives the House and Senate Appropriations Committees fifteen days' advance notice, which has not happened here.

The Court therefore concludes that the defendants are likely contravening the APA by acting "not in accordance" with several International Broadcasting Act provisions and congressional appropriations acts.

### 2.  *Take Care Clause and Separation of Powers Principles*

"Under the Constitution, the President must 'take care that the laws be faithfully executed,' U.S. Const. art. II, § 3, across the entire Executive Branch—including 'independent' agencies." *Eng. v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018).  And because federal agencies are

**JA29**

"creatures of statute," and "the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, 'possess[ing] only the authority that Congress has provided them.'" *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024) (quoting *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022)).  By violating the International Broadcasting Act and the relevant congressional appropriations acts, the defendants likely contravene the Take Care Clause.  *See* March 28 TRO at 12 ("Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause].").

"Related to Plaintiffs' Take Care Clause claim is their argument that Defendants' actions violate the separation of powers implicit in our constitutional design."  March 28 TRO at 12.  The power to make law resides exclusively with the legislative branch, U.S. CONST. art. I, § 1, and the executive branch may not 'enact, [] amend, or [] repeal statutes.'"  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  Specifically, the Court highlights again here that the defendants' unwillingness to expend funds in accordance with the congressional appropriations laws is a direct affront to the power of the legislative branch.  Congress possesses the "power of the purse," which is "the ultimate check on the . . . power of the Executive."  *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015).  Here, the defendants' termination of grants to the Networks and shutting down VOA "potentially run roughshod over a 'bulwark of the Constitution' by interfering with Congress's appropriation of federal funds."  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012)).

### c. "Unlawfully Withheld or Unreasonably Delayed," 5 U.S.C. § 706(1)

The APA also provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). This type of APA claim arises "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphases in original). Here, it is likely that the defendants have also violated section 706(1) of the APA by unlawfully withholding the international broadcasting programming and grants that USAGM is statutorily required to provide. At the PI hearing, in response to the Court's inquiry regarding the withholding of appropriated funds and the need for recission, the defendants argued that such concerns are not ripe for adjudication. Tr. of Apr. 17 Hearing, 79:18–19, 80:12–14. Of course, this argument ignores the fact that, but for the March 28 TRO, the grants to RFA and MBN are currently terminated by the letters from USAGM. And the defendants have not provided any indication that the $260 million in VOA appropriations is being spent to fulfill its statutory mandate to provide a "consistently reliable" source of news. 22 U.S.C. § 6202(c). Indeed, at the PI hearing, defense counsel declined to make any representation regarding the planned use of VOA's earmarked funds, while VOA remains silent indefinitely. Tr. of Apr. 17 Hearing, 81:18–82:5. These facts suggest that Defendants are "unlawfully withholding" or "unreasonably delaying" required agency action to fund the Networks and carry out international broadcasting mandated by Congress, in violation of Section 706(1) of the APA.[26]

### E. PI Factor 2: Irreparable Harm

To qualify as irreparable harm, the injuries alleged "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable

---

[26] Because the Court finds that the plaintiffs have demonstrated a likelihood of success on the merits of their APA claims, the Court will not reach the plaintiffs' First Amendment claims. *See* Compl. ¶¶ 102–116.

relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

(quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  Here, the

showing of irreparable harm that formed the basis of the March 28 TRO remains compelling.  *See*

March 28 TRO at 16 ("The dismantling of USAGM would clearly cause employees, contractors,

and grantees irreparable harm.  And Plaintiffs have offered sufficient evidence that Defendants are

doing just that.").  The defendants have already placed a total of "[a]pproximately 1,300 VOA

journalists and other employees" on administrative leave, furloughed others, and stated that over

600 more employees will be terminated within weeks.  Compl. ¶¶ 75, 80; March 26 Letter to the

Court, ECF No. 33 at 2.  "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff]

to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm."

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

      The defendants argue that the plaintiffs "fundamentally complain of adverse employment

actions . . . that can be remedied by money damages at the end of the litigation."  PI Opp'n at 42.

While the defendants are correct that "ordinary economic injuries are usually insufficient to require

injunctive relief," *Wis. Gas,* 758 F.2d at 674, it is also true that "financial harm can 'constitute

irreparable harm . . . where the loss threatens the very existence of the movant's business,'"

*Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C.

Mar. 18, 2025) (quoting *Wis. Gas,* 758 F.2d at 674).  The defendants have silenced VOA, canceled

funds to affiliate Networks, and shut down all transmitters at foreign service stations abroad.

Compl. ¶¶ 78–83.  "[T]hese furloughs and lay-offs entail the dismantling of human infrastructure

required to run USAGM, VOA, and USAGM's grantees."  March 28 TRO at 17.  "[S]hutting down

necessary systems, laying off personnel, and terminating contracts, even ones that might be able

to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the

**JA32**

agency in the long-term. . . . In short, these harms cannot be remedied with mere money damages." *Id.*

The Court also concludes that the harm to Does 3 and 4, foreign nationals working as PSCs with VOA, from the looming loss of their J-1 visas constitutes irreparable harm. In opposing the March 28 TRO, the defendants argued that the revocation of these J-1 visas is not irreparable harm because it merely forces them to leave the country "earlier than scheduled." March 28 TRO at 19 (quoting Defs.' TRO Opp'n at 13). The court dispensed with that argument then, and the Court adopts the same reasoning here: the *immediate* termination of John Does 3 and 4's contracts and visas is "not merely speeding up the inevitable" because the hastiness of the defendants' actions eliminates the notice that Does 3 and 4 would otherwise have "to find a new job to sponsor a subsequent visa, or to apply for another kind of visa to stay in the country." March 28 TRO at 19–20. The defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately.

The defendants do not appear to challenge the plaintiffs' showing of irreparable harm to RSF plaintiffs who rely on VOA while living and reporting abroad, or the harm to TNG-CWA (labor organization of RFA employees). The Court finds these allegations of irreparable harm compelling as well. *See* Brunnit Decl. ¶ 6 (offering testimony of irreparable harm to RSF Plaintiffs because the shutdown of VOA "depriv[es] correspondents of a trustworthy source of news" in countries "where VOA is one of the few, if not the only, sources of independent and reliable news," and impedes RSF's ability to "dissemina[te] vital public interest information for journalists and public safety . . . ."); Second Schleuss Decl. ¶¶ 4–6 (testifying that TNG-CWA members will lose their health insurance as soon as May 1 and describing the medical consequences of such a result, and testifying that TNG-CWA members with H1-B visas face "deport[ation] to their home

countries where they could face threats, harassment, or imprisonment for their work as journalists" as a result of their furlough status).

In sum, the irreparable harm that the plaintiffs allege impacts the very existence of USAGM, the health and safety of its journalists and employees, and the interests of the millions of reporters and listeners who depend on USAGM's programming. For all of these reasons, the Court concludes that the plaintiffs' have demonstrated irreparable harm warranting the issuance of a preliminary injunction.

### F. PI Factors 3 and 4: Balance of Equities and Public Interest

These final PI factors "merge when the government is the opposing party." *Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken*, 556 U.S. at 435, 129 S.Ct. 1749). "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,] . . . pay[ing] particular regard for the public consequences" that would result in granting the emergency relief sought. *Winter*, 555 U.S. at 24 (quotation marks omitted). Here, as noted in the March 28 TRO, while the plaintiffs "have put forward a laundry list of injuries" that would occur absent injunctive relief, the defendants only seem to assert that injunctive relief would disrupt their ability to comply with the EO. March 28 TRO at 20. However, the defendants are apparently still in the process of determining *how* to comply with the EO. In doing so, they have likely violated it by reducing USAGM's activities to levels far below the constitutional and statutory minimums. Therefore, there is no competing harm to the government with the issuance of preliminary relief that orders compliance with governing statutes and the Constitution, while "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted). Moreover, Congress has

"enshrined into law that '[i]t is in the interest of the United States to support broadcasting to other nations.'" *RFE/RL, Inc. v. Lake*, 2025 WL 900481, at *4 (quoting 22 U.S.C. § 6201(3)). It is, therefore, *Congress's* "longstanding determination" that international broadcasting activities, which the defendants have eliminated, are in the public interest. *Id.* The Court therefore concludes that these final PI factors weigh in favor of a preliminary injunction.

## G. The Court will Not Impose Bond.

Under Federal Rule of Civil Procedure 65(c), a Court may require a party to post bond for "costs and damages sustained" by the defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). A district court's failure to require the posting of a bond has been held reversible error in some Circuits, while others have found reversible error only when the district court failed to expressly consider the question of requiring a bond. Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed. April 2025).

The Court has considered the question of whether to impose bond and declines to do so, following the practice of other courts in this Circuit faced with a similar posture. "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)). Such a situation arises where a bond would "hold Plaintiffs hostage" for the harm from the government's unlawful withholding of "previously committed funds." *Id.* (noting that defendants "will personally face no monetary injury from the injunction"). That is squarely the case here, where the defendants are already constitutionally required to distribute funds in accordance with the yearly appropriations bill, so a bond would merely impose a financial barrier to litigation for plaintiffs seeking to vindicate their statutory and constitutional rights. In cases such as this one

**JA35**

where funds are committed by Congress for specific programs, "public policy mandate[s] that parties . . . adversely affected by improper administration of programs . . . be strongly encouraged to correct such errors."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2954 (quoting *Bass v. Richardson*, 338 F. Supp. 478, 491 (S.D.N.Y. 1971)).  To that end, the Court will not impose bond.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for a Preliminary Injunction will be **GRANTED** as follows: The Court will preliminarily enjoin the defendants, pending further order of this Court, to 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).  The Court will **DENY** the Motion for a Preliminary Injunction, at this time, as it relates to RFE/RL and OTF, in light of their current status.

36

**JA36**

A separate Order consistent with this Memorandum Opinion shall issue.

Date: _____4-22-25_____
       2:45 p.m.

_____
Royce C. Lamberth
United States District Judge

JA37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**PATSY WIDAKUSWARA**, *et al.*,

    *Plaintiffs,*

**v.**

**KARI LAKE,** *in her official capacity as
Senior Advisor to the Acting CEO of the U.S.
Agency for Global Media, et al.,*

    *Defendants.*

Case No. **1:25-cv-1015-RCL**

## ORDER

For the reasons contained in the accompanying Memorandum Opinion, the plaintiffs'
Motion for a Preliminary Injunction [ECF No. 17][1] is **GRANTED** as follows:

The Court will preliminarily enjoin the defendants, pending further order of this Court, to:
1) take all necessary steps to return USAGM employees and contractors to their status prior to the
March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy,"
including by restoring all USAGM employees and personal service contractors, who were placed
on leave or terminated, to their status prior to March 14, 2025; 2) restore the FY 2025 grants with
USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that
international USAGM outlets can "provide news which is consistently reliable and authoritative,
accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide
monthly status reports on the first day of each month apprising the Court of the status of the
defendants' compliance with this Order, including documentation sufficient to show the

---

[1] The plaintiffs sought emergency relief by filing a motion (styled as a proposed order to show cause) for a preliminary
injunction. *See* Proposed Order to Show Cause with Emergency Relief, ECF No. 15; Mem. in Support of Proposed
Order to Show Cause, ECF No. 17.

**JA38**

disbursement to RFA and MBN of the funds Congress appropriated; and 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C § 6202(c). The Court **DENIES** the Motion for a Preliminary Injunction, at this time, as it relates to RFE/RL and OTF, in light of their current status.

**IT IS SO ORDERED.**

Date: _4-22-25_
_2:45 a.m._

Royce C. Lamberth
United States District Judge

**JA39**

DEFENDANT'S
EXHIBIT
**1**

**U.S. AGENCY FOR GLOBAL MEDIA**

UNITED STATES
BROADCASTING
BOARD OF
GOVERNORS

330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

## U.S. AGENCY FOR GLOBAL MEDIA PERSONAL SERVICES CONTRACT AGREEMENT TERMS AND CONDITIONS

Section 305(a) of the International Broadcasting Act, as amended, 22 U.S.C. § 6204(a), authorizes the United States Agency for Global Media (hereinafter referred to as "USAGM", "the Government", or "the Agency") to "procure personal services" to carry out the Agency's mission and in general procure these or any other services to support the Agency's mission "notwithstanding any other provision of law related to such acquisition." 22 U.S.C. § 6204(a)(10), (15).

Pursuant to its authority to procure personal services as set forth herein, the Agency, with its headquarters located at 330 Independence Avenue, S.W., Washington D.C. 20237, requires the personal services of the undersigned (hereinafter referred to as the PSC).

**1. Entire Contract**
These Terms and Conditions, in paragraphs 1 through 19, and the three (3) Attachments hereto that may be amended from time to time at the sole discretion of the Agency as set forth below, are incorporated into and made part of this contract and collectively comprise the entire agreement between USAGM and the PSC (hereinafter referred to as "this Contract").

**2. Effective Date of this Contract**
The PSC may commence work under the terms and conditions set forth herein on the commencement date specified in Attachment A, or on the date that both parties sign this Contract, whichever is later. Notwithstanding any other provision of this contract, this contract does not represent a binding obligation upon the Agency, except as set forth in paragraph 12.

**3. Period of Performance/Contract Term**
Performance of this Contract will commence on the date of execution of this Contract and will continue until June 30 of the Base Year. This contract shall contain a Base Year (July 1, 2024 – June 30, 2025) and Four Option Periods in accordance to FAR 52.217-9 Option to Extend the Term of the Contract. The Options may be exercised or not exercised at the sole discretion of the USAGM. The Agency will provide the PSC written notice of its intent to exercise any option fifteen
(15) calendar days before this Contract expires.

**4. Contract Termination**
Termination of this Contract shall be conducted in accordance with the terms of the attached USAGM Personal Services Contractor Handbook.

**5. Status as a Personal Services Contractor**
The PSC will be performing personal services under this Contract. The PSC understands and acknowledges that the PSC is not a USAGM employee within the competitive or the excepted service or for any other purposes under the law. The PSC understands and acknowledges that this applies notwithstanding any and all provisions of this Contract.

Voice of America | Radio Free Europe/Radio Liberty | Office of Cuba Broadcasting | Radio Free Asia | Middle East Broadcasting Networks

JA40

**6. Services to be Performed**

The PSC agrees to perform assigned duties outlined in the attached the Position Description / Statement of Work (hereinafter referred to as "PD/SOW")[1] in accordance with this Contract.

**7. Compensation**

The PSC agrees to provide services at the hourly rate identified in Attachment A and in accordance with the Personal Services Contractor Handbook.

**8. Benefits**

The Agency agrees to provide benefits to the PSC identified in this Contract in accordance with the Personal Services Contractor Handbook.

**9. Onboarding and Enrollment in PSC Human Capital Management Application**

Prior to beginning performance under this Contract, the PSC must complete certain forms (which may include personally identifiable information) and furnish these forms to the Agency during the onboarding process in order to enroll in the Agency's Human Capital Management ("HCM") application. All personally identifiable information sought by or provided pursuant to such forms will be collected and stored in conformity with the Agency's System of Records Notices. Enrolling in the HCM system is required to complete the onboarding process, report time and attendance, receive regular salary payments, and perform self-service activities including, but not limited to, requesting time off and managing benefits.

**10. Disputes**

This Contract is subject to the Contract Disputes Act of 1978. All dispute resolution between the PSC and the Government arising out of this Contract shall be conducted in accordance with the procedures included in the Personal Services Contractor Handbook.

**11. Assignment of Contract**

The PSC shall not subcontract any part of its obligations under this Contract, nor may it transfer or assign any of its rights, duties, or obligations hereunder to a third party.

**12. Obligations Pursuant to this Contract**

As a contract for personal services, this agreement does not represent a binding obligation for payment on behalf of the Agency. The Agency is only bound to the terms and conditions herein with respect to services actually performed.

Obligations pursuant to this personal services contract are recorded in accordance with 31 U.S.C. § 1501(a)(7), meaning that they only become "obligations at the time . . . when the services are rendered." See Principles of Federal Appropriations Law, 3rd Edition, Volume II (GAO-06-382SP), at page 7-46.[2]

**13. Intellectual Property Rights in Data**

---

[1] For the purposes of this Contract, Position Description and Statement of Work are coterminous, and the PD/SOW refers to the document in the personal services contract with USAGM that describes the work PSC is required to perform.

[2] "Section 1501(a)(7) is not limited to permanent federal employees. It applies as well to persons employed in other capacities, such as temporary or intermittent employees or persons employed under a personal services contract." Principles of Federal Appropriations Law, 3rd Edition, Volume II (GAO-06-382SP), at page 7-46.

**JA41**

The PSC understands and agrees that all deliverables under this Contract of whatever nature, including, without limitation, copyrights, trademarks, domain names, and Data, are and will be, from their inception, owned exclusively by USAGM.  The PSC will make no claim to or challenge the ownership or validity of any and all deliverables under this Contract.  Nothing in this Agreement gives the PSC any intellectual property rights in any deliverable under this Contract, and the PSC shall not attempt to sell, transfer, or donate such intellectual property to any entity, in any form, without the express written consent of USAGM.

Further, USAGM shall have Unlimited Rights in all deliverables in this Contract that are owned by, or licensed to, the PSC prior to the effective date of this Contract.

## 14.  Governing Law
This Contract shall be governed and construed under United States Federal Law.

The Federal Acquisition Regulation ("FAR") does not apply to this Contract, pursuant to the exercise of the Agency's authority under 22 U.S.C. § 6204(a)(10) (to "procure, rent, or lease supplies, services, and other property for journalism, media, production, and broadcasting, and related support services, notwithstanding any other provision of law relating to such acquisition, rental, or lease").  Any use by the Agency of terms that are also included within the FAR, in association with this Contract or its administration, shall not be construed as incorporation or adoption of the FAR.

## 15.  Modification
This Contract may be modified in accordance with paragraph 18.

## 16. Severability
In the event any provision of this Contract shall be determined to be invalid or unenforceable under applicable law, all other provisions of this Contract shall continue in full force and effect.

## 17.  Independent Entities
The parties to this Contract are independent entities under this Contract and nothing in this Contract authorizes a party to act as an agent of the other or bind the other to any transaction or agreement.

## 18. Contract Attachments
The following five documents are attachments to this Contract: A. PSC Offer Letter; B. Journalistic Code; C. Best Practices Guide; and D. Personal Services Contractor Handbook (including Appendix 1); E. Broadcast Administrative Manual (BAM).  Attachments D and E may be amended from time to time at the sole discretion of the Agency.

## 19.  Entire Contract
This Contract contains the entire agreement between the parties.  Attachments to this Contract form an integral part of this Contract. This Contract supersedes all prior negotiations, representations, and agreements, either written or oral.

**JA42**

20. **FAR Clauses**

The following FAR contracting clauses are incorporated into this contract

- FAR 212-4 Contract Terms and Conditions
- FAR 217-8 Option to Extend Services
- FAR 217-9 Option to Extend Term of Contract
- FAR 52-232.18 Availability of Funds
- FAR 52-232.18 Availability of Funds for the Next Fiscal Year

## ATTACHMENTS

- A. **PSC Offer Letter**
- B. **Journalistic Code**
- C. **Best Practices Guide**
- D. **Personal Services Contractor Handbook (including Appendix)**
- E. **Broadcast Administrative Manual**

| PSC Contract Number: | **UNITED STATES AGENCY FOR GLOBAL MEDIA** |
|---|---|
| **Signature of Personal Services Contractor** <br><br> ████████████ <br><br> By signing this Contract, the PSC acknowledges understanding his/her rights and responsibilities pursuant to this Contract and agrees to be bound by its terms. | **Signature of USAGM Official authorized to sign this Contract** <br><br> *J.R. Hill* |
| **Typed or Printed Name** <br> ████████ | **Typed or Printed Name** <br><br> J.R. Hill |
| **Date** <br> ████ | **Date** <br><br> July 1, 2024 |

4

**JA43**

DEFENDANT'S
EXHIBIT

2

**U.S. AGENCY FOR**
**GLOBAL MEDIA**

**UNITED STATES**
**BROADCASTING**
**BOARD OF**
**GOVERNORS**

330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

## U.S. AGENCY FOR GLOBAL MEDIA PERSONAL SERVICES CONTRACT AGREEMENT TERMS AND CONDITIONS

Section 305(a) of the International Broadcasting Act, as amended, 22 U.S.C. § 6204(a), authorizes the United States Agency for Global Media (hereinafter referred to as "USAGM", "the Government", or "the Agency") to "procure personal services" to carry out the Agency's mission and in general procure these or any other services to support the Agency's mission "notwithstanding any other provision of law related to such acquisition." 22 U.S.C. § 6204(a)(10), (15).

Pursuant to its authority to procure personal services as set forth herein, the Agency, with its headquarters located at 330 Independence Avenue, S.W., Washington D.C. 20237, requires the personal services of the undersigned (hereinafter referred to as the PSC).

**1. Entire Contract**
These Terms and Conditions, in paragraphs 1 through 19, and the three (3) Attachments hereto that may be amended from time to time at the sole discretion of the Agency as set forth below, are incorporated into and made part of this contract and collectively comprise the entire agreement between USAGM and the PSC (hereinafter referred to as "this Contract").

**2. Effective Date of this Contract**
The PSC may commence work under the terms and conditions set forth herein on the commencement date specified in Attachment A, or on the date that both parties sign this Contract, whichever is later. Notwithstanding any other provision of this contract, this contract does not represent a binding obligation upon the Agency, except as set forth in paragraph 12.

**3. Period of Performance/Contract Term**
Performance of this Contract will commence on the date of execution of this Contract and will continue until June 30 of the Base Year. This contract shall contain a Base Year (July 1, 2024 – June 30, 2025) and Four Option Periods in accordance to FAR 52.217-9 Option to Extend the Term of the Contract. The Options may be exercised or not exercised at the sole discretion of the USAGM. The Agency will provide the PSC written notice of its intent to exercise any option fifteen
(15) calendar days before this Contract expires.

**4. Contract Termination**
Termination of this Contract shall be conducted in accordance with the terms of the attached USAGM Personal Services Contractor Handbook.

**5. Status as a Personal Services Contractor**
The PSC will be performing personal services under this Contract. The PSC understands and acknowledges that the PSC is not a USAGM employee within the competitive or the excepted service or for any other purposes under the law. The PSC understands and acknowledges that this applies notwithstanding any and all provisions of this Contract.

Voice of America | Radio Free Europe/Radio Liberty | Office of Cuba Broadcasting | Radio Free Asia | Middle East Broadcasting Networks

JA44

**6.  Services to be Performed**

The PSC agrees to perform assigned duties outlined in the attached the Position Description / Statement of Work (hereinafter referred to as "PD/SOW")[1] in accordance with this Contract.

**7.  Compensation**

The PSC agrees to provide services at the hourly rate identified in Attachment A and in accordance with the Personal Services Contractor Handbook.

**8.  Benefits**

The Agency agrees to provide benefits to the PSC identified in this Contract in accordance with the Personal Services Contractor Handbook.

**9.  Onboarding and Enrollment in PSC Human Capital Management Application**

Prior to beginning performance under this Contract, the PSC must complete certain forms (which may include personally identifiable information) and furnish these forms to the Agency during the onboarding process in order to enroll in the Agency's Human Capital Management ("HCM") application. All personally identifiable information sought by or provided pursuant to such forms will be collected and stored in conformity with the Agency's System of Records Notices. Enrolling in the HCM system is required to complete the onboarding process, report time and attendance, receive regular salary payments, and perform self-service activities including, but not limited to, requesting time off and managing benefits.

**10.  Disputes**

This Contract is subject to the Contract Disputes Act of 1978. All dispute resolution between the PSC and the Government arising out of this Contract shall be conducted in accordance with the procedures included in the Personal Services Contractor Handbook.

**11.  Assignment of Contract**

The PSC shall not subcontract any part of its obligations under this Contract, nor may it transfer or assign any of its rights, duties, or obligations hereunder to a third party.

**12.  Obligations Pursuant to this Contract**

As a contract for personal services, this agreement does not represent a binding obligation for payment on behalf of the Agency. The Agency is only bound to the terms and conditions herein with respect to services actually performed.

Obligations pursuant to this personal services contract are recorded in accordance with 31 U.S.C. § 1501(a)(7), meaning that they only become "obligations at the time . . . when the services are rendered." See Principles of Federal Appropriations Law, 3rd Edition, Volume II (GAO-06-382SP), at page 7-46.[2]

**13.  Intellectual Property Rights in Data**

---

[1] For the purposes of this Contract, Position Description and Statement of Work are coterminous, and the PD/SOW refers to the document in the personal services contract with USAGM that describes the work PSC is required to perform.

[2] "Section 1501(a)(7) is not limited to permanent federal employees. It applies as well to persons employed in other capacities, such as temporary or intermittent employees or persons employed under a personal services contract." Principles of Federal Appropriations Law, 3rd Edition, Volume II (GAO-06-382SP), at page 7-46.

2

**JA45**

The PSC understands and agrees that all deliverables under this Contract of whatever nature, including, without limitation, copyrights, trademarks, domain names, and Data, are and will be, from their inception, owned exclusively by USAGM.  The PSC will make no claim to or challenge the ownership or validity of any and all deliverables under this Contract.  Nothing in this Agreement gives the PSC any intellectual property rights in any deliverable under this Contract, and the PSC shall not attempt to sell, transfer, or donate such intellectual property to any entity, in any form, without the express written consent of USAGM.

Further, USAGM shall have Unlimited Rights in all deliverables in this Contract that are owned by, or licensed to, the PSC prior to the effective date of this Contract.

## 14.  Governing Law
This Contract shall be governed and construed under United States Federal Law.

The Federal Acquisition Regulation ("FAR") does not apply to this Contract, pursuant to the exercise of the Agency's authority under 22 U.S.C. § 6204(a)(10) (to "procure, rent, or lease supplies, services, and other property for journalism, media, production, and broadcasting, and related support services, notwithstanding any other provision of law relating to such acquisition, rental, or lease").  Any use by the Agency of terms that are also included within the FAR, in association with this Contract or its administration, shall not be construed as incorporation or adoption of the FAR.

## 15.  Modification
This Contract may be modified in accordance with paragraph 18.

## 16. Severability
In the event any provision of this Contract shall be determined to be invalid or unenforceable under applicable law, all other provisions of this Contract shall continue in full force and effect.

## 17.  Independent Entities
The parties to this Contract are independent entities under this Contract and nothing in this Contract authorizes a party to act as an agent of the other or bind the other to any transaction or agreement.

## 18. Contract Attachments
The following five documents are attachments to this Contract: A. PSC Offer Letter; B. Journalistic Code; C. Best Practices Guide; and D. Personal Services Contractor Handbook (including Appendix 1); E. Broadcast Administrative Manual (BAM).  Attachments D and E may be amended from time to time at the sole discretion of the Agency.

## 19.  Entire Contract
This Contract contains the entire agreement between the parties.  Attachments to this Contract form an integral part of this Contract. This Contract supersedes all prior negotiations, representations, and agreements, either written or oral.

**JA46**

20. **FAR Clauses**

The following FAR contracting clauses are incorporated into this contract

- FAR 212-4 Contract Terms and Conditions
- FAR 217-8 Option to Extend Services
- FAR 217-9 Option to Extend Term of Contract
- FAR 52-232.18 Availability of Funds
- FAR 52-232.18 Availability of Funds for the Next Fiscal Year

**ATTACHMENTS**

A. **PSC Offer Letter**
B. **Journalistic Code**
C. **Best Practices Guide**
D. **Personal Services Contractor Handbook (including Appendix)**
E. **Broadcast Administrative Manual**

| PSC Contract Number: | **UNITED STATES AGENCY FOR GLOBAL MEDIA** |
|---|---|
| **Signature of Personal Services Contractor**<br><br>■■■■■■■■■■■■■■■■■■■<br><br>By signing this Contract, the PSC acknowledges understanding his/her rights and responsibilities pursuant to this Contract and agrees to be bound by its terms. | **Signature of USAGM Official authorized to sign this Contract**<br><br>*J.R. Hill* |
| **Typed or Printed Name**<br>■■■■■■■■ | **Typed or Printed Name**<br><br>J.R. Hill |
| **Date**<br>■■■■■ | **Date**<br><br>July 1, 2024 |

4

**JA47**



**Attachment A**

**U.S. AGENCY FOR GLOBAL MEDIA PERSONAL SERVICES CONTRACTOR HANDBOOK (HANDBOOK)**

The purpose of this Handbook is to inform contractors performing personal services under this Contract with the United States Agency for Global Media (USAGM or "the Agency") about their expected roles and responsibilities, including general work requirements and standards of conduct governing their contractual relationship with the Agency. The following Articles also provide guidelines and procedures for addressing matters of performance, conduct, corrective action and disputes, including a description of certain rights that contractors may assert when performing services under this Contract.

**Table of Contents**

**ARTICLE 1**      Definitions
**ARTICLE 2**      No Creditable Service or Merit Status
**ARTICLE 3**      Responsibility of PSCs
**ARTICLE 4**      Compensation and Taxes
**ARTICLE 5**      Benefits
**ARTICLE 6**      General Work Requirements
**ARTICLE 7**      Work Schedules and Required Approvals
**ARTICLE 8**      Official Travel
**ARTICLE 9**      PSC Performance Standards and Performance Evaluations
**ARTICLE 10**     PSC Performance Awards/Incentives
**ARTICLE 11**     Post-Award Ethical Responsibilities
**ARTICLE 12**     Infractions/Violations of Standards of Conduct, Rules, Regulations and Policies
**ARTICLE 13**     PSC Corrective Action PSC
**ARTICLE 14**     Workplace Disputes
**ARTICLE 15**     Termination of this Contract
**ARTICLE 16**     Departure from the USAGM (Off-boarding)
**ARTICLE 17**     Security
**ARTICLE 18**     Miscellaneous Provisions

**JA48**

**ARTICLE 1 – Definitions**
The definitions in this section apply to terms and conditions used throughout this Contract.

***Authorized Agency Official (AAO)*** – Refers to the USAGM officials or their designees who have final decision-making authority with respect to all matters except for disputes and claims arising out of this Contract.

***This Contract*** – Refers collectively to the terms and conditions delineated in the Final Offer Letter, Personal Services Contract Agreement Terms and Conditions, and PSC Handbook with its Appendices that collectively comprise the entire agreement between USAGM and the PSC, governing the latter's provision of personal services, if any, to USAGM for a given term.

***Contract Disputes Act of 1978*** – Refers to those statutory provisions found in Chapter 71 of Title 41, United States Code, that govern the resolution of all disputes and claims arising out of this Contract, pursuant to the procedures delineated herein.

***Contracting Officer (CO)*** – Refers to the USAGM official who is the official authorized to sign this Contract and make changes to it.

***Court Duty*** – Refers to the following circumstances:
    **(A)** When the PSC is called to serve as a juror;
    **(B)** When the PSC is called to appear in a court for the purpose of qualifying for jury service, regardless of whether the employee is selected for such service.
    **(C)** When the PSC is summoned in a non-official capacity as a witness on behalf of a State or local government, the Federal government, or the government of the District of Columbia; or
    **(D)** When the PSC is appearing as a witness in a non-official capacity on behalf of a private party in connection with any judicial proceeding to which the United States, District of Columbia or a State, or local government is a party

***Data*** – Refers to recorded information, regardless of form or the media on which it may be recorded. The term includes technical data and computer software. The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

***Federal Employee*** – Commensurate with the definition in 5 U.S.C. § 2105, refers to an officer and an individual who is officially appointed in the civil service and engaged in the performance of a federal function under authority of law or an Executive act.

***Team Lead PSC*** – Refers to the PSC who is tasked by a supervisor to exercise team lead responsibilities, which may include assigning work and directing assignments to other members of the team, including other PSCs or Federal Employees. A Team Lead PSC shall not act in a supervisory capacity over a Federal Employee.

**JA49**

***Offer Letter*** – Refers to the letter that the Agency provides to a PSC when offering a contract for personal services. The Offer Letter includes the PSC's general work responsibilities, pay, and benefits.

***Overtime*** – Refers to time worked in excess of 40 hours in a week under a regular two-week work schedule or, pursuant to Article 7, time worked in excess of 80 hours in a two-week pay period under an approved alternate work schedule that allows the PSC to perform more than 40 hours of work in either week of the two-week pay period.

***Personal Services Contract*** – Consistent with the definition in FAR 2.101, refers to a contract that, by its express terms or as administered, makes the contractor personnel appear to be, in effect, Federal Employees. The Agency may enter into personal services contracts with individuals and with organizations to provide the personal services of its employees to the Agency. Those that perform personal services for the Agency are referred to as personal services contractors (PSCs).

***Position Description (PD) or Statement of Work (SOW)*** – Coterminous titles for the document in this Contract that describes the work the PSC is required to perform.

***Supervisor*** – Refers to a Federal Employee charged with supervising a PSC and his/her day-to-day work activities, assigning work to the PSC, establishing performance plans, evaluating the PSC's performance, taking corrective action, and managing the PSC's work schedule and leave requests. "Supervisor" includes all superiors of this Federal Employee within his or her chain of command.

***Work Product*** – Refers to all tangible and intangible results of the services, whether finished or unfinished, including, but not limited to drafts, text, software (including source code), research, reports, proposals, specifications, plans, notes, studies, data, images, photographs, negatives, pictures, drawings, designs, models, surveys, maps, materials, ideas, concepts, and know-how, whether delivered or not delivered.

## <u>ARTICLE 2</u> – No Creditable Service or Merit Status

The PSC performs personal services under this Contract. The PSC is not (i) a Federal Employee within the competitive, excepted, or Senior Executive services; or (ii) an "employee" as that term is defined 5 U.S.C. § 2105, to mean an officer and individual who is appointed into the civil service, for purposes of laws, regulations, policies, and guidance administered or promulgated by the Office of Personnel Management (OPM), including, but not limited to, Chapter 43 of Title 5, United States Code, notwithstanding any and all provisions of this Contract to the contrary. Consequently, the PSC's provision of personal services under this Contract:

    i.   Is not creditable for federal benefits under Title 5, United States Code, and

    ii.   Does not confer eligibility to apply for merit promotion positions pursuant to Chapter 33 of Title 5, United States Code, including those reserved for or restricted to "status candidates", as that term is defined by OPM.

## <u>ARTICLE 3</u> – Responsibility of PSCs

The PSC is responsible for following directions and carrying out assignments from his or her Supervisor and, as applicable, Team Lead PSC. Receiving or maintaining a PSC contract is contingent

**JA50**

on complying with the following policies from the date of contract signature until the expiration or termination of the contract:

    i.    Written and generally acceptable standards of conduct, including the Agency's  Social Media Policy and Policy Statement on the Prohibition of Harassment, as amended and promulgated from time to time at the sole discretion of the Agency;

    ii.    Ethical standards of conduct, as set forth in **Article 11**;

    iii.    The policies, rules and regulations of the Agency applicable to PSCs found throughout the Agency's Broadcasting Administrative Manual (BAM), as amended from time to time at the sole discretion of the Agency;

    iv.    The directives and standard operating procedures of the division, service, bureau, and office to which the PSC is assigned, as amended and promulgated from time to time at the sole discretion of the Agency;

    v.    The United States Information and Educational Exchange Act of 1948, as amended (the "Smith-Mundt Act"), 22 U.S.C. § 1461 *et seq.*;

    vi.    The standards and principles for United States international broadcasting set forth in the United States International Broadcasting Act, 22 U.S.C. § 6202; and

    vii.    This Handbook, as amended from time to time at the sole discretion of the Agency.

Failure to do so may subject the PSC to corrective action (up to and including contract termination) in accordance with **Article 13.**

### ARTICLE 4 – Compensation and Taxes

A. **Regular Pay (Straight Time)** – For performance  of the services described in the PSC's PD/SOW, PSCs will be paid at the gross basic rate of pay identified in the Offer Letter upon the PSC's submission of accurate biweekly time and attendance information in the Agency's Human Capital Management (HCM) application.

B. **Premium Pay (Overtime)** – When a Supervisor provides advance authorization to an eligible PSC for work to be performed on an overtime basis, the PSC will be compensated in accordance with the Fair Labor Standards Act, Chapter 8 of Title 29, United States Code. Overtime that  the PSC accrues without authorization in accordance with **Article 7**, Paragraph G may subject the PSC to corrective action (up to and including contract termination) in accordance with **Article 13.**

C. **Compensatory Time (Overtime)** – In accordance with the Fair Labor Standards Act, Chapter 8 of Title 29, United States Code, an eligible PSC may elect to receive compensatory time in lieu of monetary compensation for overtime. The PSC's use, accrual, and carry-over of compensatory time is not governed by the same Agency policies and guidelines that apply to USAGM Federal Employees, but by the IX BAM 3710 Personal Services Contracts with Individuals and the USAGM Personal Services Leave Policy attached hereto as **Appendix 1**.

D. **Promotions** – At the sole option of the Government, the Agency may determine to promote the PSC to a higher pay grade level. Any such increase in grade level or promotion shall only be made in accordance with maximum grade level supported by the PD/SOW assigned to the PSC. Any change in title, series, PD/SOW or grade above the maximum grade supported by the assigned

PD/SOW identified in the PSC's Offer Letter will be implemented through formal documentation in the Agency's HCM system.

E. **Pay Limitations** – The hourly rate, premium pay, and any allowance, incentive award, or other similar cash payments provided to the PSC are subject to 22 U.S.C. § 6204(a)(15)(A), which prohibits such payments from exceeding the daily equivalent of the rate provided for positions classified above grade GS-15 of the General Schedule under 5 U.S.C. § 5108.

F. **Taxes** – For U.S. citizens, U.S. legal permanent residents, Exchange Visitor Program ("J-1 Visa") participants and other PSCs legally authorized to work in the United States, the Agency will withhold the applicable amounts for the PSC's Federal Insurance Contributions Act (FICA) tax, U.S. Federal income tax, and state tax through regular payroll deductions from the PSC's pay in accordance with Social Security Administration and Internal Revenue Service (IRS) regulations. PSCs holding certain types of nonimmigrant visas, including J-1 visas, may be exempt from FICA withholdings and employer contributions; it is their responsibility to apply for any abatement or refund pursuant to IRS regulations. Notwithstanding the foregoing, the PSC bears the ultimate responsibility for complying with all applicable tax laws, whether domestic or foreign, including the satisfaction of any and all tax liabilities arising from the PSC's performance under this Contract.

G. **Foreign Earned Income** – Pursuant to 26 C.F.R. § 1.911-3(c)(3), compensation paid by the Agency to a PSC for personal services rendered outside of the United States does not qualify as foreign earned income.

## ARTICLE 5 – Benefits

Pursuant to this Contract, USAGM agrees to provide PSCs with the following benefits:

A. **Paid Time Off (PTO)** – The PSC will earn PTO in accordance with the USAGM Personal Services Leave Program, attached hereto as **Appendix 1**.

B. **Family and Medical Leave (FML)**

(1) USAGM will provide unpaid family and medical leave (FML) for eligible PSCs working within the United States or its territories or possessions, in accordance with Title I of the Family and Medical Leave Act of 1993, Chapter 28 of Title 29, United States Code.

(2) Pursuant to 29 C.F.R. § 825.102, the PSC must have provided at least 1,250 hours of personal services in and for a 12-month period to USAGM under this Contract to become eligible for FML. Additional requirements, including the provision of medical certification or documentation, are set forth in the BAM and administered by the Supervisor or Team Lead PSC.

(3) The PSC may, in certain cases and in accordance with 29 C.F.R. § 825.207, elect to or be required by his or her Supervisor or Team Lead PSC to substitute accrued paid leave, including Compensatory Time, earned under this Contract for FML.

C. **Health Insurance** – When required by statute, the Agency will provide the PSC health

insurance benefits that meet the requirements of the Affordable Care Act or its successor legislation. The Agency will contribute towards the cost of the PSC's health benefits. The PSC shall share the cost of Agency-provided health benefits by paying the remaining balance of the monthly premium through regular bi-weekly payroll deductions from the PSC's pay. In the event that the PSC is ineligible for insurance coverage or declines insurance coverage due to being covered by another health insurance plan, such as a spouse's plan, the Agency's contribution for the PSC's healthcare benefits shall be zero dollars.

D. **Worker's Compensation Benefits** – The PSC is eligible to receive worker's compensation benefits in accordance with the Federal Employees' Compensation Act, Chapter 81 of Title 5, United States Code.

E. **Paid Parental Leave** – Please refer to Section 4AE in the BAM for information regarding Paid Parental Leave for PSCs.

### ARTICLE 6 – General Work Requirements

**PSC Place of Performance** – The PSC's primary place of work while providing personal services under this Contract is Agency headquarters, presently located at 330 Independence Ave. S.W., Washington, D.C, unless otherwise specified in this Contract, offer letter, or formal duty station reassignment documentation.

At the Supervisor's discretion, and with written authorization from the Supervisor and official advance notification of Technology, Services and Innovation (TSI) and Security Offices, a PSC may work remotely overseas for up to, but not longer than one month (not inclusive of official overseas travel assignments). A PSC should not work remotely overseas for more than 2 months in a calendar year. It is a PSC's responsibility to determine issues of local taxation, whether a work visa is required to work remotely, or any other issues related to the short-term remote work authorization.

A. **PSC Supervision and Accountability** – As set forth in **Article 3**, the PSC is responsible for following directions and carrying out work assignments from a Supervisor or, as applicable, Team Lead PSC. The responsibilities of the Supervisor include: providing the PSC's work assignments, managing the PSC's daily work schedule, evaluating performance, addressing workplace disputes and PSC conduct issues, taking corrective action, providing technical and policy guidance, establishing relative priorities, and outlining policy goals and objectives.

B. A Supervisor may designate a Team Lead PSC, who may provide assignments to team members, which may include PSCs and Federal Employees.

C. **PSC Contractual Duties** – The duties of a PSC under this Contract, to the extent that the Agency opts to utilize his or her personal services during the term of this Contract, are outlined in the Offer Letter and the PD/SOW.

The list of duties described in the Offer Letter and the PD/SOW is not intended to be exhaustive or limiting. The Supervisor may assign the PSC additional duties or duties that differ from but are related to the duties listed in the Offer Letter and PD/SOW. A PSC's failure to perform the duties

assigned by the Supervisor and, as applicable, communicated by the Team Lead PSC will be grounds for corrective action in accordance with **Article 13** or **Article 15**, as applicable. Any dispute about whether the assigned duties are within the scope of this Contract shall be handled in accordance with **Article 14**.

D. **Quality of Work Products** – PSCs shall be responsible for the quality and technical accuracy of all services or work products they provide or produce. The designated Supervisor has the right to review (inspect and test where applicable) all PSC services and work products, to the extent practicable, at all places and times during the term of this Contract.

If any of the services performed by the PSC do not conform to the Offer Letter, the PD/SOW, requirements set forth by the Supervisor and, as applicable, communicated by the Team Lead PSC, the Voice of America (VOA) Journalistic Code (when applicable), or the VOA Best Practices Guide (when applicable), the PSC may be subject to corrective action or termination in accordance with **Article 13** or **Article 15**, as applicable.

E. **VOA Journalistic Code and VOA Best Practices Guide** – All PSCs that provide personal services for VOA shall be subject to and must adhere to the VOA Journalistic Code and VOA Best Practices Guide at all times during the period of performance of this Contract. Violations of the VOA Journalistic Code or the VOA Best Practices Guide shall be grounds for immediate termination for cause, or other corrective action, in accordance with **Article 13** or **Article 15**, as applicable.

**ARTICLE 7 – Work Schedules and Required Approvals**

A. **PSC Work Schedule** – While this Contract does not represent a binding obligation upon the Agency to make use of a PSC's personal services, a PSC shall be available to provide the number of hours of services per week set forth in his or her Offer Letter and, for days on which the PSC provides 5 hours or more of services, take a non-paid 30-minute or 60-minute bona fide meal break each day. The length of the bona fide meal break will be determined by the PSC's Supervisor and will be incorporated into the PSC's work schedule. The PSC's Supervisor may, at his or her own discretion, approve an alternative work arrangement, such as the use of flexible or alternate work schedules, provided that the arrangement is consistent with the Fair Labor Standards Act and other applicable state and federal labor laws.

B. **PSC Time and Attendance** – The PSC's Supervisor may require the PSC to use sign-in/sign-out logs or other methods of time tracking maintained by the Supervisor, in addition to the automated time-and-attendance HCM application used to track all PSC's time and attendance. USAGM maintains policies governing all aspects of time and attendance, including the recording and reporting of time and attendance. The PSC is required to comply with all provisions of such regulations, except when they conflict with this Contract.

C. **Holidays** – All legal public holidays designated by the United States Congress pursuant to 5 U.S.C. § 6103 are considered regular work days for PSCs, unless the PSC is not scheduled to work on the legal public holiday. If the PSC is scheduled to work on a legal public holiday, the PSC will be paid only at the gross basic rate of pay, unless the work is performed on an Overtime basis.

**JA54**

D. **Telework** – Telework is an arrangement under which a PSC performs duties of its contract from an approved alternative worksite, other than the primary place of performance. PSCs may be authorized to telework, provided they request and receive approval from their Supervisor. Should the Supervisor authorize telework for the PSC, all telework conducted by the PSC shall be in accordance with the following policies:

(1) **Participation** – Recognizing the benefits for the organization and its workforce, it is Agency policy to promote and encourage telework. However, telework is ***not a right***. Telework arrangements are subject to the PSC's assigned duties, needs of the office, and PSC performance, among other factors. In order to participate in telework, the PSC must perform duties that are suitable for telework. Agency Supervisors should deny participation altogether if, by sole determination by the Agency: the PSC's duties require regular and actual presence at the primary place of performance (e.g., providing daily tours, live broadcasts, editing shows, or other duties that cannot be performed as effectively and efficiently at the telework site); the PSC's duties require face-to-face personal contacts that cannot be effectively or efficiently handled via telework (e.g., hands-on contact with equipment or hosting a show); or duties suitable for telework do not fill a full day in the PSC's work schedule.

(2) **Mutual Benefit** – Telework should be a voluntary arrangement that is mutually beneficial to the PSC and the Agency. However, the Agency may require a PSC to telework at management discretion, including but not limited to in emergency situations or when consistent with a government-wide directive.

(3) **Scheduling Telework** – Generally, telework work schedules should parallel the PSC's schedule at the primary place of performance. However, subject to prior supervisory approval, telework schedule adjustments are permitted. Subject to supervisory approval, PSCs may telework on a regular and recurring basis or situationally, up to all of the PSC's scheduled work days (i.e., up to full-time telework). When a Supervisor approves regular or recurring telework (e.g. on specific days of the week or days in a pay period), the PSC may regularly telework according to that schedule unless the supervisor modifies the PSC's telework schedule. Situational telework is for ad hoc/temporary situations. A PSC must request and obtain supervisory approval for situational telework each time before beginning situational telework. Supervisors may approve spans of situational telework days at one time. The Supervisor may allow additional days due to emergencies, such as weather incidents. Situational telework can last no more than 90 consecutive calendar days without a written waiver from the PSC's second-line Supervisor, the Division Director, or a higher official. Working unscheduled telework due to emergencies may require a reduction in a PSC's regularly scheduled telework days. If the PSC cannot telework on a regularly scheduled telework day (e.g., because the telework day fell on a holiday or because the supervisor cancelled the telework day), the PSC cannot automatically substitute another work day as a telework day.

(4) **Availability and Communications** – A teleworker must be available by phone, email, and/or video conference during telework hours. While teleworking, PSCs are required to be accessible and to respond to work requirements with the same efficiency as at the primary place of performance. Teleworkers must participate in meetings, and—when necessary—hold

meetings themselves using available Agency-provided communication software. Telework is not a valid reason to miss a scheduled meeting or to alter meeting times. If at any point a PSC's work requires in-person performance at his or her duty station, the PSC must be available to return to the assigned to Place of Performance within one day's notice by a Supervisor.

(5) **Parity for Teleworking and Non-Teleworking PSC** – Unless otherwise specified, all policies in this Handbook, provisions of the PSC contract, and other workplace policies set by the PSC's Supervisor apply equally to teleworkers and non-teleworkers. Policies that apply equally to teleworkers and non-teleworkers include, but are not limited to, policies on pay, overtime and compensatory time, leave, benefits, work schedules, and certification of time and attendance. Teleworkers shall receive the same treatment and opportunities as non-teleworkers (e.g., work assignments, awards and recognition, development opportunities, promotions, etc.) as practicable.

(6) **Workspace** – Teleworkers who are scheduled for regular or recurring telework for 3 or more days each week may not have a personal workspace assigned to them in Agency facilities. Instead, as needed, the Agency will make shared workspaces available for use by frequent teleworkers who are occasionally required to work from agency facilities. This is commonly called "hoteling," and the shared space "hotel space." Even if a PSC has already been assigned a personal workspace, if the PSC begins teleworking 3 or more regular/recurring telework days each week, the PSC will give up the assigned workspace, and work from the hotel space when required to come into the office.

(7) **Dependent Care** – Telework is not a substitute for childcare, daycare, elder care, or any other type of dependent care. PSCs who have dependents must arrange to be free from dependent care during a telework workday. PSCs unable to be free from dependent care during scheduled telework may request leave; supervisors will give due consideration to such a leave request, work needs permitting.

(8) **Equipment and Utility Expenses** – PSCs who telework may be responsible for providing the necessary equipment to work at the telework site. This may include computers, software, printers, telephone lines, and related supplies. The PSC is responsible for repair and maintenance of personal equipment. PSC supervisors, in consultation with Agency management, may loan Government-owned equipment, such as laptops or printers, to teleworking PSCs. A Supervisor must approve the loan before the Agency incurs any equipment-related expenses (e.g., purchase, installation, etc.). If Government-owned property or equipment on loan to a PSC is damaged or lost due to the PSC's negligence, the PSC will be held liable for the repair or replacement of the equipment to the same extent as non-teleworking PSCs. The Agency will not pay for utility costs at a teleworker's personal residence.

(9) **Modifying or Terminating Telework** – A Supervisor may modify or terminate a PSC's telework arrangement at any time for work-related reasons, including but not limited to PSC failure to comply with all policy applicable to PSCs or PSC's telework arrangement diminishes the PSC's performance or Agency operations. A PSC may request to stop teleworking or to modify their telework arrangement at any time. Any change to a PSC's telework arrangement

requires advance Supervisory approval.

E. **Inclement Weather, Building/Government Closure** – PSCs who are designated as emergency essential personnel are required to render personal services during building and government closures attributable to emergencies, severe weather conditions, security incidents, and natural disasters. During government and building closures, PSCs will be paid their regular rate of pay only if they perform personal services under this Contract during the closure and only for the number of hours of services provided. In the case of conditions that make it unsafe to travel to or perform services at a designated work location, such as adverse weather, the PSC's Supervisor may prohibit the PSC from providing personal services or give the PSC the option of using available PTO if the PSC is not available to perform personal services under this Contract.

F. **Government Shutdowns** – To the extent permitted by law, and consistent with the Agency policies and procedures for operations during a lapse in appropriations and associated OPM guidance, PSCs may be required to perform personal services under this Contract if directed by the PSC's designated Supervisor. Alternatively, PSCs may receive a Stop Work order from a Contracting Officer in the event of a lapse in appropriations

G. **Required Approvals** – PSCs shall request advanced approval from the PSC's Supervisor in accordance with the following terms:

   (1) **Earning Premium Pay and Compensatory Time** – PSCs must request and be granted advance written approval from the PSC's Supervisor prior to providing personal services on an Overtime basis to earn Premium Pay or Compensatory Time. To be eligible to earn Premium Pay or Compensatory Time, the PSC shall submit a request for authorization of Overtime to the PSC's Supervisor for the Supervisor's approval in advance of providing personal services on an Overtime basis. Overtime that the PSC accrues without pre-authorization in accordance with this paragraph may subject the PSC to corrective action or termination in accordance with **Article 13** or **Article 15**, as applicable.

   (2) **Use of Paid Time Off** – The PSC shall request the use of accrued PTO in advance using the Agency's HCM application. The PSC's Supervisor may, at his or her own discretion, grant or deny the PSC's request for use of accrued PTO, in accordance with the USAGM Personal Services Leave Program attached as **Appendix 1**.

   (3) **Use of Sick Time Off (STO)** – When practicable, the PSC shall request the use of accrued STO in advance using the Agency's HCM application. The PSC's Supervisor may, at his or her own discretion, grant the PSC's request for use of accrued STO in accordance with the USAGM Personal Services Leave Program attached as **Appendix 1**.

   (4) **Use of Compensatory Time[1]** – PSCs shall request the use of accrued Compensatory Time in

---

Page 10 of 18

[1] The terms and provisions of this Contract govern the ability for PSCs to earn and use compensatory time.

**JA57**

advance using the Agency's HCM application. The PSC's Supervisor may, at his or her own discretion, grant the PSC's request for use of accrued Compensatory Time in accordance with the USAGM Personal Services Leave Program attached as **Appendix 1**. PSCs are required to use earned Compensatory Time prior to PTO and STO.

(5) **Use of Advanced Leave** – Supervisors may approve the use of Advanced Leave if no PTO or Compensatory Time is available. In such situations, the PSC shall request advanced approval from the PSC's Supervisor to use Advanced Leave through the Agency's HCM application. PSCs may accrue a debt of no more than 40 hours of used Advanced Leave. The PSC's Supervisor may, at his or her own discretion, grant or deny the PSC's request for use of Advanced Leave, in accordance with the USAGM Personal Services Leave Program attached as **Appendix 1**.

If a PSC's contract is terminated, any negative leave balance will be deducted from the PSC's final paycheck at its regular hourly pay rate.

(6) **Use of Leave Without Pay (LWOP)** – PSCs shall request the use of LWOP in advance through the Agency's HCM application and, if for family and medical leave purposes, in accordance with USAGM policy. The PSC's Supervisor may, at his or her own discretion, grant the PSC's request in accordance with USAGM policy and, if for family and medical leave purposes, **Article 5**.

(7) **Outside Employment and Teaching, Speaking, and Writing** – Outside employment and related activities generally are permitted. The PSC must submit a written request to the PSC's Supervisor and receive written clearance **prior** to engaging in outside employment, or engaging in outside teaching, speaking, or writing. More detailed guidance is available in the **VOA Best Practices Guide** and USAGM **Broadcasting Administrative Manual**.

## ARTICLE 8 – Official Travel

PSCs may be required to undertake travel within the U.S. and to foreign locations as deemed necessary by their Supervisor. PSCs shall comply with all travel requirements, including applicable federal travel regulations and rules established by USAGM policy, and they shall use the Agency's E2 travel system to book travel. While on official travel, a PSC's eligibility to receive compensation shall be in accordance with the Fair Labor Standards Act. PSCs may be Government Travel Card holders, and must follow all agency guidance and policies regarding Government Travel Cards.

## ARTICLE 9 – PSC Performance Standards and Performance Evaluations

The PSC's Supervisor will administer performance standards and performance requirements for the PSC as developed by the Agency, measuring and rating the PSC's performance against those standards on a regular basis. Failure on the part of the PSC to meet performance standards may result in reassignment, loss of opportunity for advancement to higher rates of pay, loss of opportunity to participate in special projects, an Offer Letter at a lower rate of pay, or termination of this Contract in accordance with **Article 13** or **Article 15**, as applicable, of this Handbook. Annual performance reviews are required for all PSCs who have been with the Agency for at least 2 months at the start of the review process. PSCs have 20 calendar days from the release of performance evaluations to appeal their

**JA58**

rating.

**ARTICLE 10** – PSC Performance Awards/Incentives

PSCs may receive performance awards/incentives for superior performance. The opportunity to earn a performance award/incentive will be available only during a period in which appropriated funds are available to the Agency to make such awards to PSCs. Eligibility for a performance award/incentive will be based on each PSC's performance during a specific period, as determined and approved by the Supervisor or higher-level Agency authority, as applicable. PSCs must have an active contract to receive a performance or incentive award.

**ARTICLE 11 – Ethical Responsibilities**

Notwithstanding the provisions of **Article 2,** PSCs are subject to the Standards of Ethical Conduct in 5 C.F.R. § 2635 and all other statutory and agency guidelines and requirements regarding ethical conduct.

**ARTICLE 12 – Infractions/Violations of Standards of Conduct, Rules, Regulation and Policies**

PSCs who violate standards of conduct or USAGM rules, regulations or policies (including those detailed in **Article 3** of this Handbook) may be subject to corrective action in accordance with **Article 13** of this Handbook – which may include verbal or written admonishment, suspension without pay based upon failure to meet contractual requirements – or termination, in accordance with **Article 15** of this Handbook. All PSCs must review and familiarize themselves with the relevant and applicable standards of conduct, rules, regulations and policies carefully, since lack of knowledge or familiarity with these, or of the consequences of being found responsible for a violation or infraction of them, will not exempt PSCs from corrective action (up to and including contract termination).

**Effects on Assignments** – PSCs with a history of poor performance under this Contract may be precluded from receiving special assignments, participating in special projects, receiving training, or from being considered for other USAGM opportunities.

**Effects on Incentive/Performance Awards** – Supervisors may consider prior violations of USAGM rules, policies, regulations or standards of conduct during the current performance rating period in determining incentive/performance awards.

**ARTICLE 13 – PSC Corrective Action**

A.  **Admonishment** – PSCs shall be subject to the corrective action of their Supervisor. Corrective action may include verbal or written admonishment. If a PSC believes an admonition is unwarranted, the dispute process in **Article 14** must be used.

B.  **Other than Admonishment** – For any proposed corrective action other than, and more severe than admonishment (up to and including contract termination), the AAO shall provide the CO the grounds for the action. In the event of a serious violation, as determined by the CO, of ethics, rules, policies, regulations, statutes or other guiding principles, the CO may take immediate corrective action prior to providing the PSC with an opportunity to respond.

**JA59**

The CO has the authority to instruct a PSC facing corrective action to temporarily cease providing services to USAGM under his or her contract while the Agency investigates the matter prior to proposing corrective action, or after proposing corrective action. The AAO or CO may place a PSC on administrative leave while an investigation takes place.

Should the Agency determine that corrective action is not appropriate following an investigation, or after considering the PSC's response to a proposed action, the AAO may grant the PSC retroactive pay for the period of time he or she would have worked, pursuant to his or her normal work schedule.

Should the Agency determine that corrective action is appropriate, the CO will issue a written final decision and will notify the PSC of their appeal rights under the Contract Disputes Act of 1978 and any other applicable appeal rights.

Policies, procedures, and guidance concerning performance and conduct-based discipline of Federal Employees, as administered and promulgated by OPM, do not apply to PSCs.

## ARTICLE 14 – PSC Workplace Disputes

PSCs shall always attempt to resolve their workplace disputes at the lowest possible level. In support of this objective, PSCs shall adhere to the following order of precedence for submitting  workplace disputes.

PSCs shall first discuss the workplace dispute with their immediate Supervisor or, as applicable, Team Lead PSC. If resolution of the workplace dispute is not achieved at this level, or if discussing  the workplace dispute with the designated Supervisor is impractical, the PSC shall discuss the workplace dispute with the next highest individual in the supervisory chain. If resolution of the workplace dispute is not achieved after discussion with the Supervisor or, as applicable, Team Lead PSC, the PSC may submit his or her workplace complaint to a higher-level supervisor, PSC Human Resources (HR) representative, the ombudsman, or directly to the AAO for further guidance and assistance. The final Agency authority on workplace disputes arising from performance under this Contract is  the CO, in accordance with the Contract Disputes Act of 1978.

**Note:** Because PSCs are contractors and not Federal Employees, the USAGM Office of Human Resources (OHR) will not assist/resolve PSC workplace disputes; therefore, PSCs shall not submit their workplace disputes to OHR for assistance or resolution. PSCs must follow the procedure outlined above for assistance and resolution of their workplace disputes. The PSC HR representative may include OHR if the dispute involves a Federal Employee.

If a PSC complaint involves discrimination based upon a protected class, they may contact the USAGM Office of Civil Rights (OCR) for counseling.

If a PSC complaint involves suspected fraud, waste, or abuse, the PSC can contact the Office of Inspector General at https://www.stateoig.gov/about-hotline.

**JA60**

**ARTICLE 15 – Termination of This Contract**

A. **Termination of a PSC's Contract for Convenience** – Either party may terminate this Contract with the Agency at any time for any reason by providing the other party with 15 calendar days' written notice. Should the Agency decide to terminate this Contract for Convenience of the Government, the required written notice will be provided by the CO. The written notice will explain the basis for the termination, and the effective date of the termination. USAGM reserves the right to require the PSC to telework while the Agency determines whether to issue a termination notice. USAGM may also place a PSC on administrative leave while determining whether to issue a termination notice.

B. **Termination of a PSC's Contract for Cause** – USAGM may terminate this Contract for cause, at any time and without prior notice. In such instances, the CO will provide written notice to the PSC explaining the basis for the termination, the effective date of the termination, and the PSC's appeal rights under the Contract Disputes Act of 1978. USAGM reserves the right to suspend the PSC without pay or require the PSC to telework while the Agency determines whether to issue a termination notice.

   Examples of situations that may result in a PSC's termination for cause include, but are not limited to: failure of a PSC to obtain and maintain a favorable contractor fitness determination or National Security determination, failure of a PSC to meet the requirements of this Contract, including, but not limited to, failure of a PSC to perform assigned work expeditiously, insubordination (refusal to carry out instructions), discourtesy, disrespect, or other violations of standards of conduct or USAGM rules, regulations or policies (including those detailed in **Article 3**, or violations of the VOA Journalistic Code or the VOA Best Practices Guide.

C. **Voluntary PSC Termination (Resignation)** – PSCs may voluntarily terminate their contract with USAGM by providing at least 15 days' written notice to the AAO when practicable. Upon receipt of such notice, USAGM reserves the right to require the PSC to telework. Failure to provide 15 days' written notice to the AAO shall not limit the PSC's right to terminate the contract.

D. **Termination of a PSC's Contract for Convenience in Lieu of Termination for Cause** – The CO may elect to terminate a PSC contract for convenience in lieu of termination for cause according to the procedures set forth in paragraph B above when termination for cause is appropriate, but the CO determines that it is in the best interest of the Government to terminate for convenience rather than for cause.

**ARTICLE 16 – Departure from USAGM (Off-boarding)**

When departing USAGM due to a termination of this Contract for any reason, the PSC shall comply with the Agency's off-boarding processes, including but not limited to the following requirements to ensure a final contractual reconciliation payment:

A. Ensure final timesheet has been verified and approved through the last day of work;

**JA61**

B. Submit official identification card (security badge), official and/or diplomatic passport(s), and all assigned keys, mobile devices, and other assigned Government equipment to the PSC's Supervisor or, as applicable, Team PSC Lead, or applicable Agency office;

C. Finalize all unused travel advances, outstanding travel vouchers, official documents and materials such as trip reports and program assignments through the applicable system;

D. Schedule and attend a security debriefing with the USAGM Office of Security (SEC), and sign a security debriefing Standard Form 312 when required by SEC; and

E. Deliver all Work Product, completed and work in progress, and such other information and materials as may have been accumulated by the PSC in performing work under this Contract to the PSC's Supervisor or, as applicable, Team Lead PSC.

## ARTICLE 17 – Non-Public Data, Confidentiality, and Security Clearance

A. **Non-Public Data** – PSCs may use, modify, reproduce, release, perform, display, or disclose non-public Data only for government purposes, but shall not do so for any private or commercial purposes and PSCs shall not release, perform, display, or disclose such Data, without the express written permission of their Supervisor. Any breach of this requirement may be cause for immediate termination for cause in accordance with **Article 15.**

B. **Confidentiality** – The PSC shall not divulge any sensitive information, including personally identifiable information, related to or obtained during the course of the PSC's provision of personal services under this Contract. Any breach of this requirement may be cause for immediate termination for cause in accordance with **Article 15.**

C. **Background Investigation** – The PSC is required to complete and submit a variety of security onboarding forms and pass a USAGM security background investigation as a pre-condition to working on-site at USAGM facilities and accessing USAGM information technology networks and systems. The PSC may be required to submit fingerprints and complete Standard Forms (SF-85, SF-85P, or SF-86), available through OPM's e-QIP website. When required, SEC will forward each prospective PSC a link to the e-QIP application. The cost of conducting USAGM's background investigation will be borne by USAGM. If the PSC has not been cleared prior to the required date for commencing work on-site at the USAGM, SEC will provide the PSC with additional instructions.

If it is determined that the PSC is unsuitable for security reasons, the PSC's contract shall be terminated. A PSC may also be terminated when the continued work of the PSC in connection with the Government work is deemed, in the Government's sole determination, inconsistent with the best interests of security, or a potential threat to the health, safety, security, general well-being or operational mission and its population. When a PSC is granted an interim suitability determination, and an unfavorable final suitability (or security clearance) determination is later rendered, the PSC's contract shall be terminated. The PSC shall handle all sensitive or classified

material assigned to or generated by the PSC in accordance with USAGM security regulations regarding the safe handling of classified material.

D. **Identification Badges for Contractor Personnel** – The PSC shall wear a USAGM-issued identification badge while performing his or her work and when present in USAGM facilities. Although the PSC will be provided an identification badge similar to that issued to and worn by Federal Employees, the PSC shall not use it in a manner that could reasonably be construed to imply that the PSC is a Federal Employee.

E. **Identification to Third Parties** – When attending meetings, answering government telephones, and working in other situations where the identity of the PSC is not obvious to third parties, upon inquiry by a third party, the PSC shall identify himself or herself as a contractor providing personal services to the Agency to avoid creating an impression that he or she is an appointed government official.

**ARTICLE 18 – Intellectual Property**

**Work for Hire**. PSC agrees that all services and Data provided to the Agency and the resulting work product, including, but not limited to the contract deliverables (collectively, the "Work Product"), are provided at the Agency's request and the Work Product and each and every aspect thereof is a "work made for hire" (as defined in the United States Copyright Act of 1976 or other applicable laws). Accordingly, the Agency shall be considered the author of the Work Product for all purposes, and the Agency shall be, and remain at all stages of completion, the sole and exclusive owner of the Work Product and all right, title and interest therein. PSC specifically agrees that the Agency shall have the right to revise, condense, abridge, expand, adapt, change, modify, add to, subtract from, or otherwise modify the Work Product and each and every aspect thereof, in any manner the Agency may determine in its sole discretion without the consent of the PSC.

If the Work Product is not deemed to be a work made for hire under applicable law, then to the fullest extent allowable and for the full term of protection otherwise accorded to the Agency under such applicable law, PSC hereby irrevocably grants, transfers, and assigns to the Agency all of PSC's right, title, and interest in the Work Product and any other works now or hereafter created containing the Work Product, including without limitation all rights of copyright (and all renewals, extensions, and reversions thereof), trademark, patents, and other proprietary rights of any kind or nature, in and to the Work Product in perpetuity and throughout the world in all languages and in all media and forms of expression and communication now known or later developed. PSC shall have no rights of any kind in the Work Product, and no rights are reserved by the PSC. All Work Product to be made available for review by and returned to the Agency upon demand.

**ARTICLE 19 – Miscellaneous Provisions**

A. **Training** – The PSC may attend USAGM-provided or external training if such training is authorized by the Supervisor. The USAGM Office of Workforce Support and Development may provide final authorization when necessary. PSCs shall follow established Agency policy and protocols for requesting and attending training.

B. **Court Duty** – A PSC may receive up to five workdays of administrative leave for court duty each

time the PSC is participating in court service at a federal, state, or local court. The amount of administrative leave the PSC may receive for each workday is limited to the number of hours the PSC was scheduled to work on the day the PSC was serving court duty. For court duty that extends beyond 5 workdays, the PSC may request PTO or LWOP. In order to receive administrative leave for court duty, the PSC must provide a copy of the court summons and appropriate documentation to the PSC's Supervisor establishing the amount of court duty service, as well as the AAO or designee. Any payment the PSC receives for court duty may be deducted from the payment for administrative leave, either at the time of payment for the administrative leave or as an adjustment in subsequent pay periods.

C. **Parking** – PSCs are permitted to use USAGM after-hours parking spaces for overnight shifts on a first-come, first-serve basis. After-hours parking begins at 3:30 pm and ends at 6:30 am on weekdays, and includes all day on holidays and weekends. USAGM PSCs interested in after-hours parking spaces must contact their supervisors to receive approval for parking requests.

D. **Agency Purchase Card** – Subject to Agency policies and regulations, PSCs may be Agency credit card holders.

E. **Visa Program Participants** – If the PSC is a participant in the Exchange Visitor Program (J-1 Visa) administered by the U.S. Department of State, or any other visa program administered by the U.S. Citizenship and Immigration Services, the PSC shall adhere to the requirements of the program  to ensure continued eligibility to work in the United States. Should the PSC's visa status change, the PSC is required to notify his or her Supervisor, the PSC HR Director, and the USAGM Office of the Chief Financial Officer (OCFO/Payroll), immediately upon learning of the change in visa status. Failure to notify OCFO will delay necessary changes to the PSC's tax status and potentially subject the PSC to corrective action.  The "Relocation Cost Policy" included in **Appendix 2** of this document details the expenses paid for and allowances provided by the Agency as part of a visa holder coming to USAGM from overseas.

F. **PSC Negligence** – Damage to, or loss of, Government property when it is due to the PSC's negligence, as determined by the CO, may result in the PSC being held liable for repair or replacement thereof at the option of the Government. Tort claims arising as a consequence of the negligent or wrongful act or omission of a PSC within the scope of his or her duties, as outlined in the SOW, shall be considered and determined pursuant to the Federal Tort Claims Act, 5 U.S.C. § 1346, 28 U.S.C. §§ 2671-2680, and Part 511 of the Agency's regulations, 5 C.F.R. § 511.1 *et seq*.

G. **Prohibition on Supervising Government Personnel** – PSCs shall not supervise Federal Employees. However, when assigned by his or her Supervisor, the PSC may serve in a non-supervisory Team Lead capacity by: communicating work assignments to Federal Employees; tracking the status of such assigned work; and reviewing, editing and requiring edits to the assigned work products of Federal Employees.

H. **Changes to Policies** – When USAGM policies referenced in this Handbook are revised,  the revisions will apply to all PSCs.

I. **Conflicting Terms** – When an Agency policy or procedure conflicts with a term or provision in

this Contract, the terms of this Contract shall prevail.

J.  **Protection Against Reprisal** – Pursuant to Section 4712 of Title 41, United States Code, a PSC may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the PSC reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant to (i) a Member of Congress or a representative of a committee of Congress; (ii) an Inspector General; (iii) the Government Accountability Office; (iv) a USAGM Federal Employee responsible for contract or grant oversight; an authorized official of the U.S. Department of Justice or other law enforcement agency; or a court or grand jury.

**END OF PERSONAL SERVICES CONTRACTOR HANDBOOK**

**Appendix 1**

**USAGM Personal Services Leave Program**

The United States Agency for Global Media (USAGM) has established a Personal Services Leave Program (PSLP) with two components: a *Paid Time Off* (PTO) bank and a *Sick Time Off* (STO) bank. This program is intended to afford each personal services contractor (PSC) with a flexible approach to time off. Under the program, a PSC that is regularly scheduled to work 40 hours per week has the opportunity to earn up to a combined total of 208 hours of time off per year; a PSC that is regularly scheduled to work fewer than 40 hours per week may earn a prorated number of hours.

**Paid Time Off**

The PSLP promotes a flexible approach to time off by combining the paid time benefits of vacation, holiday, and personal leave hours into a single bank of PTO hours. Under the PSLP, a PSC will accumulate a specified amount of PTO for each pay period worked that it can use for any reason, such as vacation, illness, caring for children, school activities, personal business, holidays, or emergencies.

A PSC begins to accrue PTO in an individual bank of PTO hours upon hire and may use its available PTO after completing its first full pay period of work. For a PSC that is regularly scheduled to work 40 hours per week, the PTO bank is credited each biweekly pay period with 6 hours of PTO. For a PSC that is regularly scheduled to work fewer than 40 hours per week, the PTO bank is credited each biweekly pay period with a prorated amount of PTO. PTO is paid at a PSC's regular rate of pay and is not subject to overtime premiums. A PSC does not accrue PTO during full pay periods of unpaid and/or unexcused absences.

A PSC may accrue up to 169 hours of PTO in a calendar year, 160 hours of which may be carried over to the next. A PSC may accumulate up to 329 PTO hours into its individual bank in a calendar year. Upon reaching this 329 hour cap, the PSC will not accrue additional PTO hours until the PSC uses some of the accumulated time in the PTO bank, causing the balance to drop below the 329 hour cap. Thereafter, the PSC begin to accrue PTO hours until the PTO bank balance reaches the 329 hour cap.

Unused PTO that exceeds the carryover limit of 160 hours is forfeited and will not be paid out to the PSC. A PSC who resigns or whose contract is terminated will be paid for all accrued but unused PTO.

**Sick Time Off**

The PSLP also provides a STO bank that a PSC may use for medical reasons such as illnesses, extended disability, and approved bereavement leave. A PSC begins to accrue PTO in an individual bank of STO hours upon hire and may use its available STO after completing their first full pay period of work. For a PSC that is regularly scheduled to work 40 hours per week, the STO bank is credited each biweekly pay period with 2 hours of STO. For a PSC that is regularly scheduled to work fewer than 40 hours per week, the STO bank is credited each biweekly pay period with a prorated amount of STO. STO is paid at a PSC's regular rate of pay and is not subject to overtime premiums. A PSC does not accrue STO during full pay periods of unpaid and/or unexcused absences.

There is no limit on the number of STO hours a PSC may accumulate over the course of its contractual relationship with USAGM.

Each PSC accrues STO with the ability to accumulate an unlimited number of STO hours throughout their employment. A PSC that resigns or whose contract is terminated will not be paid for any accrued but unused STO.

**Administrative Leave (AL)**

In exceptional circumstances, the use of Administrative Leave may be authorized by the AAO or the AAO's designee. Administrative Leave is paid time off not deducted from any other type of accrued leave.

**Compensatory Time**

Compensatory Time is earned at a rate of 1.5 hours for every hour worked over 40 hours in a week. Accrued and unused Compensatory Time is paid out to a PSC upon termination of the PSC's contract.

**Leave Donation**

Under the Agency's PSC Leave Transfer Program, a PSC may donate PTO directly to another PSC who has a personal or family medical emergency and who has exhausted their available paid leave (PTO and STO).

A "medical emergency" is defined as a medical condition of either the PSC or the PSC's family member that is likely to require the PSC to be absent from work for a prolonged period and to result in a substantial loss of income because of the PSC's lack of available paid leave.

The term "family member" is defined to mean a spouse, including the individual identified by a PSC as a domestic partner; the parents of a spouse; children, including foster children and

Grand children; the spouses of children; parents; brothers and sisters; the spouses of brothers and sisters; a child who lives with a PSC and for whom the PSC permanently assumes and discharges parental responsibility; and a person with whom the PSC shares or has shared, for not less than the preceding 12 months, a mutual residence and with whom the PSC maintains a committed relationship, defined as a familial relationship between 2 individuals characterized by mutual caring and the sharing of a mutual residence.

A PSC may only donate to and accept PTO from other PSCs. A PSC cannot accept a PTO donation from a PSC over which they exercise supervisory or team lead responsibilities. There is no limit on the amount of donated PTO a leave recipient may receive from the leave donor(s). However, any unused donated leave must be returned to the leave donor(s) when the medical emergency ends.

The determination of whether a PSC is qualified to participate in the Agency's PSC Leave Transfer Program shall be made by the appropriate designee of the director of each federal government element of the Agency. The designee may require proof of medical emergency.

**Guidelines for the PSLP**

- A PSC is required to schedule in advance the use of PTO and STO to the maximum extent practicable.

- Use of PTO and STO is subject to Supervisor approval, which will be based on team and departmental staffing needs.

- The smallest increment of PTO and STO that may be taken is 15 minutes.

- A PSC is required to use earned Compensatory Time before using PTO and STO.

- A PSC does not accrue PTO or STO during unpaid or unexcused absences.

- A PSC may use accrued PTO and STO for absences resulting from a medical condition, obtaining medical care for oneself or family members, or issues pertaining to domestic violence or sexual abuse, as set forth in DC Code § 32–531.02(b).

Supervisors may authorize the use of advance leave.

**PTO and STO Accrual Rates and Limits (Caps)**

PTO accrual rate per biweekly pay period (full time): 6.5 hours

**JA68**

STO accrual rate per biweekly pay period (full-time): 2 hours

Annual PTO accrual (full-time): 169 hours

Annual STO accrual (full-time): 52 hours

Maximum PTO accrual (full-time): 329 hours, of which 160 hours may be carried over to the next year.

Maximum STO accrual: Unlimited accrual and all time earned may be carried over to the next year.

**JA69**

**Appendix 2**

**PSC Relocation Cost Policy**

USAGM may sponsor an Exchange Visitor ("J-1 Visa") or Immigrant Broadcaster Visa for foreign national Personal Services Contractors (PSCs) who accept the terms and conditions stated in the offer letter signed by both the applicant and the relevant VOA Division Director or designated official.

**Travel and Per Diem Expenses**

Upon issuance of a J-1 Visa or Immigrant Broadcaster Visa to the PSC applicant by the U.S. Embassy or Consulate, VOA and the applicant will determine a start date as soon as feasible. The relevant VOA Division will process all travel arrangements through USAGM's E2 Travel System. For all prospective PSCs who can demonstrate permanent residence overseas, VOA will fund a one-way economy or coach class airline ticket for the PSC candidate from the home of record to Washington, DC, in accordance with U.S. Federal Travel Regulation (FTR).

VOA funded travel arrangements will include per diem during travel, up to 2 additional carry-on bags, and up to 3 weeks of accommodation in accordance with published FTR per diem rates and applicable federal travel regulations.

VOA, at its sole discretion, may fund one-way economy class air travel for a PSC's spouse and dependent children who have obtained J-2 Visas and the appropriate travel documents.

After a PSC's arrival to the United States, VOA will provide per diem and reimbursement for temporary accommodations for a period of up to 3 weeks only. PSCs are responsible for their transportation expenses to and from the VOA office. VOA will not provide per diem or additional temporary accommodations for immediate family members of PSCs. VOA will fund return economy-class air travel to the home of record for a J-1 Visa PSCs and previously approved dependents after completion of the PSC's initial 12-month contract. All authorized travel must be arranged through the USAGM E2 Travel System.

To request reimbursement for travel expenses, PSCs must submit a travel claim supported by receipts within one calendar week of arrival in Washington, DC. Reimbursement of travel expenses not booked through the E2 Travel System requires prior authorization by the USAGM travel office.

**Other Expenses**

When authorized in advance, VOA may reimburse PSC candidates for reasonable expenses and fees associated with obtaining physical examinations and inoculations required to

**JA70**

obtain visas and passports, including transportation to and from embassies, consulates, clinics and similar facilities, when these services cannot be obtained free of cost at a U.S. Government dispensary.

**Settling In Allowance**

In addition to travel and per-diem, VOA may provide the PSC with a "settling in" allowance of $2,500.

**Required Health Insurance**

PSCs on J-1 Visas and their dependents are required to maintain health insurance coverage that meets the requirements of the Affordable Care Act (ACA) and other applicable regulations for the duration of their employment with VOA. USAGM provides and pays for health insurance for PSCs on J-1 Visas during their travel to the United States, prior to their eligibility for USAGM sponsored health plans. PSCs are offered health insurance as part of the regular onboarding process that meets ACA requirements. If a PSC accepts VOA-provided health insurance options, which are payable via payroll deduction, the PSC must authorize the deductions in writing. PSCs must be provided with the option of making their own health insurance arrangements. If a PSC elects to obtain his/her own health insurance coverage, the PSC must furnish the VOA with evidence of eligible coverage.

JA71

DEFENDANT'S
EXHIBIT

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

        Plaintiffs,

    v.

KARI LAKE, Senior Advisor to the Acting
CEO of U.S. Agency for Global Media, et al.,

        Defendants.

Civil Action No. 25-1015 (RCL)

## DECLARATION OF CRYSTAL THOMAS

I, CRYSTAL THOMAS, hereby make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I have been the Director of Human Resources for the U.S. Agency for Global Media ("USAGM") since 2024.  I base this declaration on knowledge and information I have gained in the course of performing my official duties.

2.      In that capacity, I have personal knowledge of, and direct involvement, in personnel decisions for USAGM.

3.      USAGM currently employs a total of approximately 1,147 full-time employees.  As of March 14, 2025, USAGM had active employment contracts with 598 personal service contractors.

4.      On March 14, 2025, President Trump issued an Executive Order directing that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law" (the

**JA72**

"Executive Order"). *See* Continuing the Reduction of the Federal Bureaucracy, https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ (Mar. 14, 2025).

5.    On March 15, 2025, pursuant to the Executive Order, USAGM placed 1,042 full-time employees on administrative leave with full pay and benefits. On March 16, 2025, and terminated the contracts with all personal services contractors. On March 26, 2025, all personal services contractors were reinstated and are receiving full pay and benefits, but they are not currently working. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order.

6.    In the course of that implementation, on March 25, 2025, I sent an email to 33 employees who work at Office of Cuba Broadcasting recalling them from administrative leave effective March 26, 2025. As of the end of the day on March 26, 2025, I can confirm that all employees were on work status. I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025.

7.    In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 69 other employees from administrative leave to provide mission support including broadcasting support for the Office of Cuba Broadcasting, facilities management, contracts management, and IT support. No additional employees have been placed on administrative leave.

8.    The American Federal Government Employees Local 1812 ("AFGE") serves as the exclusive representative for a bargaining unit consisting of approximately 713 USAGM employees. On March 25, 2025, I sent an email to the AFGE Local 1812 President enclosing a preliminary notification to the union stating USAGM's intent to implement a reduction in force ("RIF") for multiple competitive areas in USAGM in furtherance of the Executive Order.

**JA73**

9.      The American Federation of State, County and Municipal Employees Local 1418, AFL-CIO ("AFSCME") serves as the exclusive representative for a bargaining unit consisting of approximately 33 USAGM employees.  On March 25, 2025, I sent an email to the AFSCME Local 1418 President, enclosing a preliminary notification to the union stating USAGM's intent to implement a RIF for multiple competitive areas in furtherance of the Executive Order.

10.     Both of the foregoing notifications informed the respective unions of USAGM's intention to implement a RIF in a manner consistent with USAGM's Negotiated Labor Management Agreements ("NLMA") with each union.

11.     The notifications that were issued will not directly result in the termination of any USAGM employee.  Rather, it is a first step in the process of conducting a RIF, pursuant to the NLMAs with each respective union.  Additional steps in the RIF process with both unions will include, among other things, impact and implementation bargaining to the extent requested by the unions; providing additional information to the unions, including responding to union information requests; providing the unions with retention registers; and specific notice to bargaining unit employees.  Each of these steps would occur prior to removing any bargaining unit employees in the RIF implementation process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 14, 2025
       Washington, District Columbia

**Crystal G Thomas** Digitally signed by Crystal G Thomas
Date: 2025.04.14 13:31:30 -04'00'

_____
CRYSTAL THOMAS

**JA74**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                    Plaintiffs,

    -against-

KARI LAKE, et al.,

                    Defendants.

Index No. 25 Civ. 2390

**DECLARATION OF ANDREW G. CELLI, JR.,**

    **ANDREW G. CELLI, JR.**, declares under penalty of perjury, pursuant to 28

U.S.C. § 1746, that the following is true and correct:

    1.     I am a partner in the law firm of Emery Celli Brinckerhoff Abady Ward &

Maazel, LLP.  I am personally familiar with the facts set forth in this Declaration and, if

called, could testify competently thereto.

    2.     Pursuant to Local Rule 6.1(d) of the Local Rules of the United States District

Court for the Southern District of New York, I submit this Declaration in support of

Plaintiffs' Proposed Order to Show Cause for a Temporary Restraining Order and

Preliminary Injunction.

    3.     Proceeding by Order to Show Cause is necessary because Defendants'

continuing unlawful conduct places Plaintiffs at imminent risk of further violations of their

rights secured by the First Amendment as well as irreparable harms resulting from

Defendants' ongoing and unlawful halting of Defendant United States Agency for Global

Media's broadcasters' journalism in violation of Congressional mandates.

**JA75**

4.      By email dated March 23, 2025 at 9:57 a.m., I emailed Jeff Oestreicher, Chief of the Civil Division of the United States Attorney's Office for the Southern District of New York to provide him the Complaint filed on March 21, 2025 and inform him that we would be seeking emergency relief on the morning of March 24, 2025.  He informed us which AUSAs were assigned to the matter.  Contemporaneous with the filing of this declaration, our firm is providing a copy of all the papers supporting Plaintiffs' Motion for a Temporary Restraining Order and Preliminary injunction to those AUSAs by email.

5.      Attached here as Exhibit A is a true and correct copy of Executive Order no. 14238 entitled "Continuing the Reduction of the Federal Bureaucracy" signed on March 14, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/.

6.      Attached here as Exhibit B is a true and correct copy of the White House article "The Voice of Radical America" published on whitehouse.gov on March 14, 2025, available at https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/.

7.      Attached here as Exhibit C is a true and correct copy of the USAGM press release entitled "USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that burdened the taxpayers and enforces Trump's Executive Order to drastically downsize agency", published on March 15, 2025, available at https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/.

8.      Attached here as Exhibit D is a true and correct copy of Donald J. Trump's Truth Social post published on December 11, 2024 at 9:14 PM, available at https://truthsocial.com/@realDonaldTrump/posts/113637437665057869.

JA76

9.    Attached here as Exhibit E is a true and correct copy of Elon Musk's X post published on February 9, 2025 at 8:02 AM, available at

https://x.com/elonmusk/status/1888574212316582230?lang=en.

10.    Attached here as Exhibit F is a true and correct copy of Kari Lake's X post published on March 17, 2025 at 7:56 AM, available at

https://x.com/KariLake/status/1901603528168161683.

11.    Attached here as Exhibit G is a true and correct copy of Kari Lake's X post published on March 19, 2025 at 9:27 PM, available at

https://x.com/KariLake/status/1902532400183206000.

12.    Attached here as Exhibit H is a true and correct copy of Kari Lake's X post published on March 13, 2025 at 3:46 PM, no longer publicly available.

13.    Attached here as Exhibit I is a true and correct copy of the email sent by Crystal Thomas regarding "Important Information: Placement on Administrative Leave" on March 15, 2025.

14.    Attached here as Exhibit J is a true and correct copy of the USAGM House Announcements email regarding "Please welcome Kari Lake" to All Staff on February 27, 2025 at 9:33 AM.

15.    Attached here as Exhibit K is a true and correct copy of the USAGM House Announcements email regarding "Message from Acting CEO Regarding Newswire Services" to All Staff on March 14, 2025 at 2:39 PM.

16.    Attached here as Exhibit L is a true and correct copy of Kari Lake's X post published on March 15, 2025 at 9:40 AM, no longer publicly available.

**JA77**

17.     Attached here as Exhibit M is a true and correct copy of the declaration of John Dryden, signed on March 22, 2025.

18.     Attached here as Exhibit N is a true and correct copy of the declaration of Paula Hickey, signed on March 21, 2025.

19.     Attached here as Exhibit O is a true and correct copy of the declaration of Thibaut Bruttin, Director General of Reporters Sans Frontières', signed on March 23, 2025.

20.     Attached here as Exhibit P is a true and correct copy of the declaration of Jon Schleuss, International President of The NewsGuild-CWA, AFL-CIO, with Exhibit 1, signed on March 23, 2025.

21.     Attached here as Exhibit Q is a true and correct copy of the declaration of Steven L. Herman, signed on March 23, 2025.

22.     Attached here as Exhibit R is a true and correct copy of the declaration of Patsy Widakuswara, signed on March 23, 2025.

23.     Attached here as Exhibit S is a true and correct copy of the declaration of Jessica Jerreat, signed on March 23, 2025.

24.     Attached here as Exhibit T is a true and correct copy of the declaration of Kathryn Neeper, signed on March 23, 2025.

25.     Attached here as Exhibit U is a true and correct copy of the declaration of John Doe 1, signed on March 23, 2025.

26.     Attached here as Exhibit V is a true and correct copy of the declaration of John Doe 2, signed on March 23, 2025.

27.     Attached here as Exhibit W is a true and correct copy of the declaration of John Doe 3, signed on March 23, 2025

JA78

28.     Attached here as Exhibit X is a true and correct copy of the declaration of John Doe 4, signed on March 23, 2025.

29.     Attached here as Exhibit Y is a true and correct copy of the declaration of Clayton Weimers, Executive Director of Reporters for Freedom US, signed on March 23, 2025.

30.     Attached here as Exhibit Z is a true and correct copy of the Rapid Response 47 X post published on March 15, 2025 at 12:05 PM, available at

https://x.com/RapidResponse47/status/1900941154748887501.

31.     Attached here as Exhibit AA is a true and correct copy of the USAGM House Announcements email to All Staff on March 6, 2025 at 7:08 PM.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in New York, New York on March 23, 2025.

Dated: March 23, 2025

                                        /s
                                Andrew G. Celli

**JA79**

# EXHIBIT A

JA80

LIVE NOW

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

CONTINUING THE REDUCTION OF THE FEDERAL BUREAUCRACY

The White House

March 14, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  This order continues the reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary.

Sec. 2.  Reducing the Scope of the Federal Bureaucracy.

(a)  Except as provided in subsection (b) of this section, the non-statutory components and functions of the following governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law:

(i)   the Federal Mediation and Conciliation Service;

(ii)  the United States Agency for Global Media;

(iii) the Woodrow Wilson International Center for Scholars in the Smithsonian Institution;

(iv)  the Institute of Museum and Library Services;

(v)   the United States Interagency Council on Homelessness;

(vi)  the Community Development Financial Institutions Fund; and

**JA81**

(vii)  the Minority Business Development Agency.

(b)  Within 7 days of the date of this order, the head of each governmental entity listed in subsection (a) of this section shall submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent.

(c)  In reviewing budget requests submitted by the governmental entities listed in subsection (a) of this section, the Director of the Office of Management and Budget or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order.

Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
March 14, 2025.

JA82

# EXHIBIT B

**JA83**

LIVE NOW

*The* WHITE HOUSE

ARTICLES

The Voice of Radical America

The White House

March 15, 2025

President Donald J. Trump's <u>executive order</u> on Friday will ensure that taxpayers are no longer on the hook for radical propaganda.

Dan Robinson, a 34-year veteran of Voice of America and its former White House correspondent, <u>wrote last year</u>: "I have monitored the agency's bureaucracy along with many of its reporters and concluded that it has essentially become a hubris-filled rogue operation often reflecting a leftist bias aligned with partisan national media. It has sought to avoid accountability for violations of journalistic standards and mismanagement."

- Voice of America's management <u>told</u> staff not to call Hamas and its members terrorists, "except when quoting statements."

- <u>Daily Caller</u>: "Multiple Voice Of America Reporters Have Posted Anti-Trump Content On Social Media"
    - "Multiple Voice of America (VOA) reporters have repeatedly posted anti-Trump comments on their professional Twitter accounts, despite a social media policy requiring employee impartiality on social media platforms."

- Rep. Scott Perry <u>wrote</u> in a 2022 letter that Voice of America has "grown exceedingly partisan over the past several years."
    - A 2016 report from Office of Personnel Management cited by Rep. Perry revealed that Voice of America Persian employees said that outlet tolerated "coercion for partisan political purposes."

**JA84**

  - _The Washington Free Beacon_: "VOA Misallocates Funds and Suppresses Negative Stories About Iran. This Lawmaker Wants To Investigate."

- <u>Voice of America</u>: "What Is 'White Privilege' and Whom Does It Help?"
  - "Today, the phrase is used passionately and widely in the context of racial profiling — police treatment of people as criminal suspects based on their race."

- A 2022 <u>lawsuit</u> claimed Voice of America has "been infiltrated by anti-American, pro-Islamic state interests, and that the message of VOA had been compromised in a manner that was biased toward the Islamic state factions in Iran."

- In October 2020, Voice of America <u>wrote</u> that the "allegations that Russia played a role in perpetuating the scandal to benefit Trump could undermine the emails' credibility" downplaying the validity of the Hunter Biden laptop story.

- In July 2020, Voice of America faced <u>criticism</u> for "sharing a story and video appearing too favorable to presumptive Democratic nominee Joe Biden."

- In September 2019, the Daily Caller <u>reported</u> that Voice of America employed a Russian anti-U.S. propagandist.

- In May 2019, Voice of America <u>fired</u> reporters for their roles in canceling a broadcast midstream after pressure from the Chinese government.

- In March 2019, Voice of America ran a <u>segment</u> about transgender migrants seeking asylum in the United States.

NEWS

ADMINISTRATION

ISSUES

CONTACT

**JA85**

VISIT

GALLERY



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

**JA86**

# EXHIBIT C

An official website of the United States government    Here's how you know

U.S. AGENCY FOR GLOBAL MEDIA

WHO WE ARE    OUR WORK    ENTITIES    NEWS    WORK WITH US

## USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that burdened the taxpayers and enforces Trump's Executive Order to drastically downsize agency

March 15, 2025



**SHARE**

Today, in compliance with President Trump's Executive Order titled, *Continuing the Reduction of the Federal Bureaucracy*, dated March 14, 2025, the US Agency for Global Media initiated measures to eliminate the non-statutory components and functions to the maximum extent consistent with applicable law. USAGM and the outlets it oversees will be reduced to their statutory functions and associated personnel will be reduced to the minimum presence and function required by law.

This action will impact the agency's workforce at USAGM, Voice of America, Office of Cuba Broadcasting, and all Grantees. Most USAGM staff affected by this action will be placed on paid-administrative leave beginning Saturday, March 15, 2025, and remain on leave until further notice.

*"While at USAGM, I vow to fully implement President Trump's executive orders in his mission to reduce the size and scope of the federal government. Today we continue the process of doing that by streamlining our operations to what is statutorily required by law,"* said USAGM Senior Adviser, Kari Lake. *"The US Agency for Global media will continue to deliver on all statutory programs that fall under the agency's purview and shed everything that is not statutorily required. I fully support the President's executive order. Waste, fraud, and abuse run rampant in this agency and American taxpayers shouldn't have to fund it."*

A few of the most egregious findings:

- Massive national security violations, including spies and terrorist sympathizers and/or supporters infiltrating the agency
- Eye-popping self-dealing involving contracts, grants and high-value settlement agreements
- Obscene over-spending including a nearly quarter-of-a-billion-dollar lease for a Pennsylvania Avenue high-rise that has no broadcasting facilities to meet the needs of the agency and included a $9 million commission to a private real estate agent with connections
- $100s-of-millions being spent on fake news companies
- a product that often parrots the talking-points of America's adversaries

This agency is not salvageable.

From top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken. While there are bright spots within the agency with personnel who are talented and dedicated public servants, this is the exception rather than the rule.

It is unfortunate that the work that was done by self-interested insiders in coordination with outside activist groups and radical Leftist advocacy organizations to "Trump-Proof" the agency made it impossible to reform. In fact, they weren't just "Trump-Proofing" the agency from political leadership, they were accountability-proofing the agency from the American people.  They did all this while spending taxpayer money to create false narratives. These were amplified by biased media counterparts with clear conflicts of interest at the Washington Post, NPR and more, to actively cover up their obscene waste, fraud, and abuse.

*"This is a significant step toward restoring the greatness of the United States and promoting freedom and democracy.  Going forward, I am going to ensure accountability will be the norm and not the exception. I appreciate the work of the dedicated public servants and their contributions to the Agency and its outlets. I look forward to moving forward with modernizing the core mission of telling America's story throughout the world in a meaningful, impactful and effective way,"* Lake added.



U.S. AGENCY FOR GLOBAL MEDIA

JA88

# EXHIBIT D

JA89



## Truth Details
2693 replies

**Donald J. Trump** ✓
@realDonaldTrump

I am pleased to announce that Kari Lake will serve as our next Director of the Voice of America. She will be appointed by, and work closely with, our next head of the U.S. Agency for Global Media, who I will announce soon, to ensure that the American values of Freedom and Liberty are broadcast around the World FAIRLY and ACCURATELY, unlike the lies spread by the Fake News Media.

Kari was a beloved News Anchor in Arizona, which supported me by record margins, for over 20 years.

Congratulations Kari!

**9.67k** ReTruths  **40.7k** Likes                                    Dec 11, 2024, 9:14 PM

Reply        ReTruth        Like

# EXHIBIT E

JA91



# EXHIBIT F



# EXHIBIT G

# EXHIBIT H

JA97

6:08

← **Post**

 **Kari Lake** ✔
@KariLake

I moved today to cancel expensive and unnecessary newswire contracts for US Agency Global Media, including tens-of-millions of ...lars in contracts with The Associated Press, ...uters, and Agence France-Presse.

...AGM is an American taxpayer funded News ...ganization with an 83-year history. We should not be paying outside news companies to tell us what the news is—with nearly a billion-dollar budget, we should be producing news ourselves.

And if that's not possible, the American taxpayer should demand to know why.

3:46 PM · 3/13/25 from Earth · **871K** Views

**7,917** Reposts **242** Quotes

**37.1K** Likes **463** Bookmarks

💬  🔁  ♡  🔖  ⬆

**Kari Lake** ✔ @KariLake · 2d

Post your reply

📷  🔍  👥  🔔²  ✉

JA98

# EXHIBIT I

JA99

 Outlook

---

**Important Information: Placement on Administrative Leave**

---

**From** Crystal Thomas <cthomas@usagm.gov>

**Date** Sat 3/15/2025 9:57 AM

**This email provides important information regarding your employment status.**

Pursuant to the Presidential Executive Order <u>Continuing the Reduction of the Federal Bureaucracy – The White House</u> and the Office of Personnel Management <u>Guidance on Probationary Periods, Administrative Leave and Details and additional authorities, including but not limited to, 5 C.F.R. § 630.1403,</u> effective immediately, the United States Agency for Global Media (USAGM) is placing you on administrative leave with full pay and benefits until otherwise notified. This administrative leave is not being done for any disciplinary purpose.

Please note the following:

- **Access to Premises and Systems:** During the period that you are on administrative leave, you are not to enter USAGM premises, access USAGM systems, or attempt to use your position or authority with USAGM in any way without my prior permission or prior permission of a supervisor in your chain of command.

- **Government Property:** Since you will not have any official business during this time, upon request, you will be expected to immediately surrender your official USAGM identification badge and press pass, as well as any keys or other official government property, including documents, records, electronic and telephone devices, and other equipment.

While you are on administrative leave with pay, you must be available by your personal telephone and personal e-mail during normal business hours, as it may be necessary for Agency officials to contact you. To that end, from your personal email, please send an email to <u>HRcustomerservice@usagm.gov</u> providing your personal contact information, including your phone number, email address, and mailing address by Monday, March 17, 2025.

You also must remain available to report to work if directed to do so and will be required to do so within one (1) business day of being contacted by an Agency representative, whether telephonically or electronically. If a situation occurs that would prevent you from reporting to work if contacted (*e.g.*, travel outside of the area, medical circumstances, jury duty, etc.), you must contact Crystal Thomas at <u>CThomas@usagm.gov</u> and provide the information as to your unavailability, so that your administrative leave can be changed to the appropriate leave category.

While on administrative leave, you remain an employee of the Agency. You are required to comply with the instructions of your supervisors, all laws and regulations, and agency policies, including the Broadcasting Administrative Manual (BAM).

We will provide you with updates as soon as they are available. We appreciate your patience and cooperation.

If you have any concerns or questions, please contact Crystal Thomas at <u>cthomas@usagm.gov</u>.

Crystal G. Thomas
Director
Office of Human Resources

**JA100**

P:  202-920-2401
M: 202-765-7950
cthomas@usagm.gov



# EXHIBIT J

**JA102**

 Outlook

---

**Please welcome Kari Lake**

---

**From** USAGM House Announcements <HouseAnnouncements@usagm.gov>

**Date** Thu 2/27/2025 9:33 AM

**To** All Staff <AllStaff@usagm.gov>



---

Colleagues,

It is with great enthusiasm that we welcome Kari Lake to the U.S. Agency for Global Media (USAGM). Kari will serve as Senior Advisor of USAGM, VOA, and OCB. In this capacity she will oversee and advise agency leadership on Administration priorities.

Kari brings a wealth of experience in broadcast journalism, having spent more than two decades as an anchor and reporter in major media markets. Her career began in local television news more than 30 years ago, with roles at KWQC-TV in Davenport, WHBF-TV in Rock Island, and KPNX in Phoenix, AZ, before moving to WNYT in Albany, NY, and ultimately returning to Arizona, where she anchored the top-rated evening news at KSAZ-TV (Fox 10 Phoenix) for over 20 years. Throughout her career, Kari has interviewed prominent leaders, including U.S. Presidents, and earned two Emmys for her international reporting, all while developing a deep understanding of the media landscape.

As Senior Advisor of the Trump Administration, Kari will help USAGM implement the policies and strategies needed to streamline the agency, its networks, and its grantees. Kari's experience in journalism and broadcasting will be invaluable as we continue our mission to clearly and effectively present the policies of the Trump Administration around the world. Please join me in welcoming Kari Lake to USAGM.

Roman Napoli
Chief Financial Officer, carrying out the delegable duties and functions of the Office of the CEO, USAGM

**JA103**

# EXHIBIT K

**JA104**

 Outlook

---

**Message from Acting CEO Regarding Newswire Services**

---

**From** USAGM House Announcements <HouseAnnouncements@usagm.gov>
**Date** Fri 3/14/2025 2:39 PM
**To** All Staff <AllStaff@usagm.gov>



Please be advised that USAGM has determined that its contracts with the following news services will terminate as of 11:59 p.m. Eastern Time today. Please make no further use of Associated Press (AP) and Agence France Presse (AFP) material after this time.

Also note that our Reuters contract expires as of March 31, 2025 and that no further use of that service is permitted after that date.

Flexibility and agility are of vital importance as we utilize taxpayer funds more efficiently and carry out our mission more effectively.  We are confident that our creative workforce will be able to adapt to these changes.

Kind regards,

Victor

**Victor Morales**
Acting CEO



**JA105**

# EXHIBIT L

◀ Mail



X                                                      •••

| Log in | Sign up |

Kari Lake ✔
@KariLake                          Follow    •••

BREAKING—The President has issued an Executive Order titled Continuing the Reduction of the Federal Bureaucracy. It affects USAGM and its outlets VOA and OCB.

If you are an employee of the agency please check your email immediately for more information.



Continuing the Reduction of the Federal Bureaucracy

From whitehouse.gov

9:40 AM · Mar 15, 2025 · **627.5K** Views



🔒 x.com

JA107

# EXHIBIT M

JA108

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

No. 25 Civ. 2390

## DECLARATION OF JOHN DRYDEN

I, John Dryden, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the president of the Voice of America Employees Union, Local 1418, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 1418" or "Union"). AFSCME Local 1418 is affiliated with AFSCME District Council 20 and AFSCME International Union. District Council 20, through its constituent local unions like Local 1418, represents federal civilian employees in agencies and departments across the federal government. I have served as president of Local 1418 since August 2020.

3. Both before and since becoming the local union president, I have been employed by the U.S. Agency for Global Media (USAGM) as a Radio Broadcast Technician for the Voice of America (VOA) in its Radio Studios. I have been employed at VOA for 17 years. VOA is overseen by USAGM, and is an international broadcasting state media network funded by the federal government. Its primary mission is to provide objective news and

1

**JA109**

information about the U.S., the audience's specific region and the world to people who
lack access to objective information. For over 80 years, VOA has broadcast content over
the radio, television, or the internet in almost 50 languages all over the world.

4.  AFSCME Local 1418 represents a collective bargaining unit of approximately 32
    employees who work for USAGM on VOA.  The collective bargaining agreement
    covering these workers is applicable, by its terms, to "all non-supervisory Radio
    Broadcast Technicians employed by USAGM in the Radio Master Control" and "Radio
    Studios" in Washington, D.C., as well as those "assigned to the New York News Bureau"
    in New York City, NY.  Currently, all members of the bargaining unit work in
    Washington, D.C. Some bargaining unit members have been in the past, and may also be
    periodically in the future pursuant to the collective bargaining agreement, assigned to the
    New York News Bureau, which mainly covers the United Nations, when the bureau there
    produces radio programing or audio support for television.

5.  Under the collective bargaining agreement, AFSCME Local 1418 represents two types of
    employees: Radio Broadcast Technicians (RBT) who work in Radio Studios and RBTs
    who work in the Radio Master Control. These employees are generally responsible for
    being present at each language service live broadcast studio at the time the language
    service is producing a live show and engineering the live show for broadcast. These
    employees are responsible for engineering live broadcasts of radio programing by
    running the mixing console in the Radio Studios or working in the Radio Master Control.
    Most of the bargaining unit members work in the Radio Studios. VOA broadcasts
    approximately 49 live radio programs in different languages that these employees must
    engineer to be broadcast. Some of these programs also have video components that are

**JA110**

broadcast on television or the internet. Engineering the radio programming includes setting up and running equipment for the radio broadcasts such as computer programs, audio and video files, microphones, lights, and cameras for programs with video components. Working under the direction of bilingual directors and producers who understand the language of the programing and can communicate in English with the RBTs, these employees operate the broadcast mechanics of live radio programs. RBTs are essential employees that are vital to maintaining uninterrupted broadcasting operations for VOA. For example, these employees are in the building 24 hours during snow emergencies, continued working during the entire pandemic, and must work during government shutdowns as essential staff.

6. AFSCME Local 1418 represents the interests of the VOA's Radio Broadcast Technicians. Our core functions include providing support, guidance, and resources to bargaining unit employees as their officially recognized exclusive representative.

7. As the exclusive representative for the nonsupervisory RBTs, AFSCME Local 1418 enters into collective bargaining negotiations with the USAGM, VOA on a wide variety of terms and conditions of employment and represents bargaining unit members through the negotiated grievance process.

8. AFSCME Local 1418 and the USAGM, VOA are parties to a collective bargaining agreement that memorializes negotiated terms and conditions of employment, benefits, rules, a grievance procedure and other procedures of the workplace.

9. Early on Saturday, March 15, 2025, I received a notice from the Director of Human Resources, Crystal G. Thomas, to my VOA email address informing me that "[p]ursuant to the Presidential Executive Order Continuing the Reduction of the Federal Bureaucracy

**JA111**

– The White House and the Office of Personnel Management Guidance on Probationary Periods, Administrative Leave and Details and additional authorities, including but not limited to, 5 C.F.R. § 630.1403, effective immediately, the United States Agency for Global Media (USAGM) is placing you on administrative leave with full pay and benefits until otherwise notified." The email notice also stated that I no longer had access to USAGM systems or premises and may be required to return government property. The notice further stated that "[w]hile on administrative leave, you remain an employee of the Agency. You are required to comply with the instructions of your supervisors, all laws and regulations, and agency policies, including the Broadcasting Administrative Manual (BAM)." A true and correct copy of this notice is attached hereto as Exhibit 1.

10. Soon after receiving the administrative leave notice, bargaining unit members began notifying the union by phone, email and text message that the USAGM sent these employees the same administrative leave email that I received. I also received a call from a VOA supervisor informing me of the decision to place all bargaining unit members on administrative leave and that employees were prohibited from accessing the VOA offices.

11. On Saturday, March 15, 2025, several bargaining unit members were at the VOA offices working on weekend programing; because Master Control RBTs are required to be present in-person to broadcast programming, we have bargaining unit members on-site 24/7. These members were told by their supervisors to finish their live broadcasts and then to vacate the building because they needed to clear the building out. At approximately 5:00 p.m. on the same day, bargaining unit members lost access to USAGM systems, including email.

4

**JA112**

12. All bargaining unit members were placed on administrative leave on March 15, 2025. USAGM did not provide the union advance notice of the decision to place employees on administrative leave or provide the union with a list of all affected bargaining unit members.

13. On March 19, 2025, I received an email from the USAGM Human Resources Director informing me that I was no longer on administrative leave, and I regained access to my VOA email. However, I was not returned to work as an RBT. As of the date of this declaration, I am not aware of any other bargaining unit members who have been removed from administrative leave and reinstated to their duties of broadcasting radio programing as RBTs.

14. VOA broadcasting ended and went dark on Saturday March 15, 2025 for the first time in the over 80-year history of the agency and radio broadcasting has not resumed as of the date of this declaration. For more than 80 years, a Master Control RBT was required to be in the Radio Master Control Facility 24/7 to make sure the VOA's radio programming was broadcast around the world and for the first time, the Radio Master Control Facility went dark when all RBTs were told they needed to vacate the building.

15. Since the administrative leave notices were sent to affected employees, the union has been flooded with emails, texts, and phone calls from affected employees and other bargaining unit members who are distraught and are concerned about their livelihoods and the mission of their agency. Affected employees have contacted the union to seek information, guidance, and explanations of their rights, including retirement rights for those of retirement age because they are receiving only scant guidance from USAGM.

**JA113**

16. Affected employees are physically and emotionally stressed by the negative impact of the USAGM's decision to place all employees on administrative leave and the implications of this decision on their future employment with the VOA and their livelihoods. Members are worried about their ability to pay for housing, education, daycare, and to provide food for their families. Some members have decided to retire early because they cannot handle the financial uncertainty. Others are concerned that the agency's action will negatively impact their ability to retire. Affected employees are looking to their union to protect them and to provide information on their options if they are eventually terminated. The union has had to research information that in normal circumstances would have been provided by the agency to provide to members and has been forced to seek legal advice and resources from AFSCME International, the parent labor federation of AFSCME District Council 20, on union on members' legal rights.

17. The Union continues to respond to a flood of calls, texts, and emails from bargaining unit members. Members are asking for information on the future of their employment, as they are not getting information from the USAGM. Members are asking how long they will be on administrative leave; how payroll will be processed; how employees can submit timesheets for hours worked up until Saturday March 15 without access to USAGM systems; how can they retrieve their personal belongings left behind at the office; and how their retirement benefits will be affected if the VOA is shutdown. Those that are retirement eligible are asking the Union for advice on submitting retirement applications. The Union is providing almost daily updates by emails and text messages to the entire bargaining unit about what we know and can share about potential legal actions to

**JA114**

challenge the shuttering of the VOA, whether brought by our Union or other parties, and its critical work of broadcasting news and content to the global community.

18. Bargaining unit members and the Union are concerned about the negative impact of the USAGM's decision to shutter the VOA on its critical mission to provide information to people around the world who lack access to objective news. In Broadcasting, if your programing is on every day and suddenly you stop broadcasting your program, the station will begin to lose its audience, and you will never gain them all back. The taxpayers have invested more than 80 years into VOA programing that has built a loyal and broad global audience, and this investment can be destroyed in a very short amount of time. The danger to the public is that the global audience will not get any objective news about their own country or about the U.S. The mission of the agency is not being fulfilled by not broadcasting its programing and paying skilled and essential workers to stay home and not do their important work.  And many of our members do this work because of how deeply we believe in its mission, so we are deeply distraught to see that mission destroyed.

19. One of the most important parts of the VOA's programing that fulfilled the VOA's mission was the daily North Korean program. This broadcast is one of the few ways people in North Korea can get objective news of what is happening in the rest of the world. This programming delivers content that is critical to the North Korean people. For example, this program has a longer than usual weather news cast that provides detailed information about the weather because when people want to defect to China, they must walk there. Being able to check the weather for favorable conditions is crucial for their survival during the dangerous journey. Another important program is the broadcast into

**JA115**

Iran, where the public does not have access to objective news about the outside world and can receive VOA's satellite television broadcast.

20. Since the USAGM decided to place all VOA employees on administrative leave, the Union has had to divert virtually all of its time and resources to engage with the membership on this issue and address their concerns. Since the agency's decision, member representation has become my full-time job. I have been spending at least 8 hours per day addressing the concerns of bargaining unit members who are concerned about the future of their employment and their livelihoods. I have also had to coordinate with the local's executive board, District Council 20 and AFSCME International on how to communicate advice and counsel to our members. The local's vice president has also worked extensive hours each day assisting our affected members and investigating the issue. This representational work for the Union is only increasing because of the mass confusion caused by the abrupt shuttering of the VOA.

21. The substantial increase in emails, phone calls, text messages, and requests for counseling concerning the closing of VOA has diverted resources and time that the union dedicates to its mission of advocating and negotiating for improved workplace conditions, organizing new members, representing employees, and the administrative tasks to maintain the union.

22. Members of the VOA bargaining unit pay voluntary membership dues to the union, which is the union's overwhelming source of operational funding.  The union's budget will be negatively impacted because of the loss of dues if members are terminated, and its bargaining power will be diminished because of the loss of members due to potential terminations. We will also lose membership and dues if members choose to retire as a

8

**JA116**

result of the uncertainty the USAGM has caused. To my knowledge, three members have submitted retirement applications and others are considering doing the same.

23. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Germantown, MD on the 22nd day of March, 2025.

Signed by:

*John Dryden*

98042BA9D222416

John Dryden

**JA117**

# EXHIBIT N

JA118

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 2390

### DECLARATION OF PAULA HICKEY

I, Paula Hickey, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I have worked at United States Agency for Global Media ("USAGM") since November 2, 1998.

3.     I am the Local President of the American Federation of Government Employees, AFL-CIO, Local 1812, ("Local 1812") a labor organization and unincorporated association that represents approximately 900 federal employees at USAGM. Local 1812 is an affiliate of the American Federation of Government Employees ("AFGE").

4.     AFGE has represented employees at USAGM and its predecessor agencies for over 55 years.

5.     AFGE and Local 1812 advocate on behalf of their members and seek to promote dignity, safety, and fairness for government employees.

**JA119**

6.      AFGE, through Local 1812, represents USAGM employees who work in Washington, DC, New York, NY, and Miami FL.

7.      The employees represented by Local 1812 include, but are not limited to, journalists, information technology specialists, and broadcast specialists, at the Voice of America and the Office of Cuba Broadcasting.

8.      On March 6, 2025, all USAGM employees, including those represented by Local 1812, received an email requesting they provide USAGM Human Resources with their personal email address and personal phone number. The email noted stated: "[a]s restructuring, reductions in force (RIFs), and other workforce changes continue across the federal government, USAGM is taking proactive steps to ensure we can communicate with all employees effectively, especially when email access may be limited."

9.      On March 14, 2025, all USAGM employees received an email from acting CEO Victor Morales that USAGM was terminating its news services contracts with the Associated Press and Agence France Presse effective at 11:59 p.m. that day. The email also indicated that USAGM's contract with Reuters would expire on March 31, 2025.

10.     The email from Morales followed a March 13, 2025, post by Kari Lake on X indicating that she had directed the cancellation of USAGM newswire contracts.

11.     The cancellation of newswire contracts impaired Local 1812's members' ability to perform their duties. For instance, broadcast journalists would be unable to produce their programs because USAGM broadcasts often use newswire services to supplement the script, text and video necessary to assemble news packages which are broadcast and streamed from the web.

**JA120**

12.     After the termination of newswire contracts, I received inquiries from many members that were upset and confused about the decision and the effect it had on their ability to perform their work.

13.     On March 15, 2025, I was notified, by an email from Human Resources Director Crystal Thomas that I was being placed on administrative leave. The email also notified me that I would no longer have access to USAGM buildings or systems, and that I was "expected to immediately surrender [my] official USAGM identification badge and press pass, as well as any keys or other official government property, including documents, records, electronic and telephone devices, and other equipment." It is my understanding that almost all USAGM employees, including those represented by Local 1812, were put on administrative leave at the same time and received the same email from Director Thomas.

14.     On or around the same time on March 15, 2025, several USAGM employees working on shows set to broadcast, including Local 1812 members, were told to stop working on their broadcasts and leave their duty stations.

15.     Since March 15, 2025, I have continually received inquiries from USAGM employees and Local 1812 members. Employee have called and emailed me with concerns about their livelihoods and their ability to perform their duties. The employees are relying on Local 1812, as their union, for constant guidance on the situation at USAGM and how it will affect their employment. As a result, Local 1812 has had to seek regular assistance from AFGE's national office and has spent significant time and resources researching employee concerns and responding to employee inquiries.

16.     Local 1812 members and the USAGM employees that AFGE Local 1812 represents have informed me that they are frightened and confused by the situation at USAGM. Members

3

**JA121**

have been required to make significant choices that may involve financial and familial consequences. Members are also concerned about adverse impact shutting down USAGM broadcasts will have on its mission and its ability to retain audiences. USAGM employees, including Local 1812 members, are deeply committed to the mission of USAGM.

17.    Local 1812, has devoted considerable resources in recent days responding to requests and providing guidance about the agency actions at USAGM. On a daily basis, myself or other Local 1812 officers have had to respond to inquiries, seek guidance from AFGE's national union, and investigate the adverse effects USAGM's actions are having on our bargaining unit employees.

18.    If USAGM is dissolved, Local 1812 will be unable to represent its members who are USAGM employees, and AFGE and Local 1812 will also lose hundreds of members. The loss of members will diminish Local 1812's and AFGE's revenues and bargaining power. If USAGM is dissolved, moreover, AFGE and Local 1812 will no longer be able to effectively carry out their mission of representing USAGM bargaining unit employees.

19.    The injuries suffered by Local 1812 and AFGE and its members are ongoing or imminent and will persist unless this Court intervenes.


Executed at Mitchellville, Maryland on the 21st day of March, 2025.


_Paula Hurley_

**JA122**

# EXHIBIT O

JA123

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

No. 25 Civ. 2390

## DECLARATION OF THIBAUT BRUTTIN

I, Thibaut Bruttin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am the Director General of Reporters Sans Frontières ("RSF"). I have worked for RSF for 10 years.

3.     RSF is an international non-profit, non-governmental organization dedicated to protecting the freedom, pluralism and independence of journalism, and to defending those who embody these ideals. Our mission spans from reporting on censorship and attacks on journalists, to advocating for press freedom and the right of the public to access reliable information through government engagement, to directly supporting journalists with physical security and legal assistance.

4.     RSF's correspondents around the globe rely on reporting from Voice of America ("VOA") and the United States Agency for Global Media ("USAGM") grantee networks to perform essential functions.

1

**JA124**

5.      The shutdown of USAGM, and VOA in particular, has caused and will continue to cause irreparable harm to RSF as an advocacy organization, to the correspondents they represent and who affiliate with them, and to the individuals throughout the world who depend on that work and whose interests RSF champions.

6.      Those irreparable harms include depriving correspondents of a trustworthy source of news and information in countries and landlocked or remote regions where VOA is one of the few, if not the only, sources of independent and reliable news; stopping RSF from receiving then disseminating vital public interest information for journalists and public safety; reducing the opportunities for persecuted correspondents' stories to be highlighted and potentially protected; and significantly interfering with the organization's ability to advocate for a free press. The silencing of VOA also impedes RSF's ability to function and forces the organization to lose and waste material resources it otherwise would not have spent and upon which it relies. These harms are not abstract or speculative — they are tangible, ongoing, and in many cases, life-threatening.

7.      RSF has over 150 correspondents who are media workers around the world. In many of the threatened and at-risk countries where RSF and its correspondents operate, VOA is among the most authoritative and indispensable sources of information or provides unique coverage otherwise unavailable. Those countries of operation include Afghanistan, Armenia, Azerbaijan, Bangladesh, Burundi, Cambodia, China (including Hong Kong and Tibet), Colombia, Democratic Republic of Congo, Myanmar, Ukraine, Pakistan, Venezuela, El Salvador, Vietnam, and Zimbabwe.

8.      The destruction of VOA is causing and will continue to cause immediate irreparable damage to RSF. For RSF and its correspondents, VOA is a critical reliable source for monitoring press freedom and political developments.

2

**JA125**

9.      RSF correspondents rely on VOA and USAGM grantees networks as listeners in places where the local media is unreliable. These correspondents — many of whom operate in hostile environments with limited access to credible local media — are now deprived of a trusted source that shaped their reporting, informed RSF's advocacy, and protected their safety. In regions where media is tightly controlled, including parts of Central Europe, Central Asia, Sub-Saharan Africa, Latin America, and Southeast Asia, VOA broadcasts in local languages and provides coverage that cannot be replicated by domestic outlets. Losing VOA erases a critical flow of information for our correspondents.

10.     In Vietnam, an RSF correspondent relies on VOA for many of their news and analytical reports. Without VOA, their work will be severely curtailed, and they will have to expend further energy and resources to gather the information they need — costs that will be billed to RSF, causing further irreparable loss to the organization — and potentially expose themselves to greater danger. That danger stems from having to cultivate additional sources which, in an authoritarian regime, can be perilous, as Vietnam's continuous policy of mass imprisonment of media personnel and the high number of journalistic fatalities around the world attest. In Vietnam alone, VOA journalist Pham Chi Dung is serving a 15-year sentence and three freelance journalists with USAGM grantee Radio Free Asia are also arbitrarily detained because of performing their journalistic activity (Truong Duy Nhat, sentenced to 10 years in prison in 2020; Nguyen Tuong Thuy, sentenced to 11 years in prison in 2021; and Nguyen Lan Thang, sentenced to 6 years in custody in 2023). It is also the case in Myanmar where VOA journalist Sithu Aung Myint was arrested in 2021 on charges of inciting crime, defaming the military and sedition.

11.     For a Tibetan RSF correspondent, one of their main sources of information on the coverage of Tibetan Media organizations comes from two major organizations with the resources

3

to get accurate information out of Tibet to the wider world: Radio Free Asia (which is a USAGM grantee) and VOA Tibetan Services. Defendants' actions will eradicate this essential stream of information that people around the world are entitled to receive, stifle the expression of Tibetans, and irreparably damage the RSF's correspondent's ability to fulfill their journalistic obligations.

12.    RSF's Kenyan correspondent also relies on VOA reporting, especially for information from other African countries. They said that they used VOA "a lot as a source of [their] news and understanding what was happening elsewhere in the continent." That knowledge is an important resource that informs their work.

13.    At a basic level, reporters depend on each other to do their jobs and removing VOA journalists from the equation interferes with that. Shutting off access to trustworthy journalism irreparably prevents journalists and RSF correspondents from performing a crucial function: collaborating to identify reliable information. RSF's Burundian correspondent, for instance, exchanged information with VOA journalists on an ongoing regular basis. He says, "Now I find myself somewhat orphaned, it's as if I've lost friends who encouraged me, who pushed me to improve, to dare to dig for good information."

14.    Every story that doesn't appear, or that is hampered, by the lack of VOA is itself an injury that can never be repaired.

15.    Those irreparable injuries are compounded for RSF correspondents and journalists working in dangerous regions. They don't just rely on VOA to do their jobs but for their own personal safety.

16.    For example, in Ethiopia, VOA is one of the key sources of regular and objective news on Ethiopian affairs and is broadcast in three languages to reach the majority of Ethiopians. VOA's services have been essential sources of information for RSF during critical elections and

4

**JA127**

episodes of political, ethnic and other forms of violence. Our media worker reports, "As a correspondent, I have multiple times used VOA reporting to verify information received from sources on the arrest, prosecution, disappearance and court proceedings of journalists persecuted by all kinds of interest groups in Ethiopia…The loss of VOA services would lead to a closure of a crucial source of information on all press freedom issues and encourage those engaged in the persecution of journalists." In a nation where journalists have been arrested in large numbers, beaten, and even killed, that constitutes a substantial and irreparable harm.

17.    In the Democratic Republic of Congo ("DRC"), journalists must operate in a highly perilous environment, where organized and violent rebels endanger the lives of journalists — including RSF's correspondent — and the populace. Accordingly, since January 2025 RSF was called to provide life-saving support for more than 30 journalists and documented over 50 attacks on newsrooms and journalists in North Kivu in less than a year. VOA's reporting is essential for the people of the country to understand the circumstances in which they find themselves and to respond accordingly. While the people in DRC are under constant threat from M23 Rebels, and local media is prevented from independently reporting on the ongoing conflict via explicit orders and under threat of physical harm, VOA broadcasts honest and indispensable information that would otherwise be censored. Its journalists uncover stories others are unable to report — VOA reporters are famous in DRC for establishing contacts, specifically in Swahili, with the general population and with the average civilian facing danger. Our correspondent journalist in turns relies upon VOA to inform their reporting. With the absence of VOA, both the journalists and the public they serve are deprived of critical information. That is by itself an irreparable injury, and also exposes them to other grave harms and even mortal peril.

JA128

18.     The dismantling of VOA impedes RSF's ability to function and forces our organization to waste material resources it otherwise would not have spent and upon which it relies. Because of USAGM's actions, RSF will incur substantial costs through its assistance programs. We have already provided material support for VOA journalists and anticipate spending more for journalists impacted by VOA's shutdown. These expenses include travel and relocation grants, IT, and other financial and material support. Total spending on assistance to individual journalists in 2024 was around one million Euros, or $1,087,725.02 U.S. dollars. Of that, support to VOA was about 25,000 Euros, or $27,193.13 U.S. dollars. We anticipate spending roughly 125,000 Euros, or $135,965.63 U.S. dollars, on future VOA related cases in the upcoming weeks/months — notwithstanding specific needs-assessment based calculation.

19.     VOA frequently covers RSF's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention; the loss of VOA weakens our ability to amplify press freedom concerns throughout the world. Owing to its foundational mission to expand press freedom around the world, VOA is perhaps the only American media outlet with a dedicated "press freedom desk" that regularly investigates and covers stories concerning press freedom in the United States and around the world. Moreover, there is no media outlet comparable to VOA — its mission, language diversity, reach, and reliability are sui generis. Without VOA, we lose a critical channel for our work. Our operations have already been irreparably frustrated. Because of this, the visibility of press freedom violations has also been reduced, rendering advocacy efforts — including RSF's — less effective and more cost- and labor-intensive, to the detriment of our organization.

20.     RSF correspondents worldwide also rely on VOA to amplify independent journalism and reporting to remote audiences. VOA is one of the few, if not the only, sources of

**JA129**

independent and reliable news in remote regions that have limited access to independent media and journalism. Our correspondents in Bangladesh, Ethiopia, Kenya, Pakistan, South Africa, and Zimbabwe report that rural regions in these nations remain mostly or entirely reliant on radio for news coverage. Consequently, VOA is often the only source of independent, reliable information in these areas, providing programming across multiple languages, including minority languages.

21.    Indeed, where our correspondents rely on VOA to spread stories and protect the free flow of information in regions that don't have access to government and other radio services, the silencing of VOA has already caused significant and irreplaceable loss. Our Zimbabwe correspondent stated that the withdrawal has "brought an end to 23 years of radio services to marginalized areas in remote parts of the country that had become accustomed to Studio 7," VOA's Zimbabwe program, with no practical alternative. Due to its long-standing presence in these regions, communities have become reliant on VOA for critical information. Our Bangladeshi RSF correspondent highlighted that VOA was a source of information during its government transition and continues to help safeguard democracy because it has been a trusted outlet in Bangladesh for so long (he noted that he has listened to "VOA broadcasts since he was a school student").

22.    In China, Hong Kong, and Tibet, VOA provides information that is inaccessible elsewhere and serves a vital role to expose the dangers journalists face, including our RSF Press Freedom laureates Zhang Zhan and Huang Qi. In addition to breaking news of human rights violations, VOA's services disseminate reporting on detained journalists and their families and updates from jails that would otherwise be unavailable without their coverage.

23.    These types of irreparable injuries to the interests of RSF, and to journalism and democracy itself, are precisely why the dismantling of VOA has been cheered by authoritarian regimes, including China, that are notorious for media repression. USAGM's actions will

undoubtedly encourage harsher crackdowns against journalists and press freedom. Actions taken by repressive governments will put RSF staff, their correspondents, their volunteers, and their supporters in grave danger and ultimately cause them further irreparable harm. As part of its work, RSF combats censorship, propaganda, disinformation and rumor. Without VOA, those efforts have been damaged, forcing us to exhaust the organization's resources to replace the lost functionality of VOA.

24.    VOA frequently covers RSF's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention. The eradication of VOA immediately damages our ability to advocate and operate in the most sensitive global hotspots where information warfare dominates and our work is especially important.  In Ukraine, VOA reaches audiences in Russian-occupied territories, which has allowed RSF's message — including exposing threats to the free press, journalists, and affected populations — to reach critical populations and offering an alternative to Kremlin-controlled narratives. That vital  medium has been destroyed. Losing this source will create an information vacuum that will be exploited by pro-Russian media, further limiting the availability of fact-based reporting in areas where it could be a matter of life and death.

25.    RSF's mission is to advocate for the right of every individual, regardless of where they live, to access reliable and independent information. In many regions, VOA has been among the only outlets providing this invaluable resource. For example, VOA was one of the few media outlets that was still able to report on Laos despite its continued repression of journalists, providing Laotian audiences with news in their local languages. Without VOA, Laos will truly become a black hole of information. That is because VOA information from outside and inside of Laos will

**JA131**

vanish — depriving both Laotians and the rest of the world of valuable information and hampering RSF's mission of tracking press freedoms and the security of journalists.

26.    The same is true in Afghanistan. The Taliban has severely restricted local media, and our RSF correspondent reports that VOA's absence will make challenging the Taliban's crackdown on the press increasingly difficult. Both VOA and Radio Free Europe/Azadi Radio have been major sources of information for Afghani journalists and the public, attracting large audiences by covering the country's situation more comprehensively and freely. These two media outlets have a long history of providing information during Afghanistan's tumultuous and war-torn conditions and have become vital information sources. Their absence is an immediate loss that will harm local media and journalists, who will no longer have a reliable source of information. It will take considerable time for any new media organization to build an audience and reach a similar level of credibility and influence with Persian/Dari and Pashto speakers, assuming that a media with such a will exists or could exist given the tremendous pressure exerted by the regime on journalistic work.

27.    USAGM's actions have already and will continue to make RSF's work more difficult, causing irreparable damage. The sudden elimination of VOA has harmed journalists who it is our mission to protect, both in the United States and throughout the world. Many have lost their jobs and livelihoods. Our organization tracks attacks on press freedom, the struggles of journalists, and advocates for free exchange of information globally. Defendants have catalyzed a crisis in all three areas, forcing us to strain resources at a moment when our work is more essential than ever. Without VOA, a domino effect of second-order harms in media ecosystems worldwide has begun. For example, our Latin American correspondents report that, since the shutdown of

**JA132**

VOA, many local media outlets no longer carry international news in their programming. As nations' information spaces silo, RSF's work has been hamstrung.

28.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Paris, France on the 23rd day of March, 2025.

_____
Thibaut Bruttin

JA133

# EXHIBIT P

JA134

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 2390

**DECLARATION OF JON SCHLEUSS**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the International President of The NewsGuild-CWA, AFL-CIO ("TNG-CWA"), a labor union representing more than 27,000 employees. TNG-CWA is the largest labor union representing journalists and media workers in North America.

3. TNG-CWA represents a bargaining unit of about 100 employees of Radio Free Asia (RFA), a news service that provides news, analysis, commentary, and cultural programming to a weekly audience of nearly 60 million who lack access to a free press or live in media environments vulnerable to authoritarian disinformation.

4. RFA operates under a Congressional mandate to deliver uncensored, domestic news and information to China, Tibet, North Korea, Vietnam, Cambodia, Laos, and Burma, among other places in Asia with poor media environments and few, if any, free speech protections. RFA produces news in Burmese, Cantonese, Khmer, Korean, Lao, Mandarin, Tibetan, Uyghur, and Vietnamese for shortwave and medium wave radio, satellite

1

**JA135**

television, and online through websites, apps, and social media platforms. RFA's news
programming in nine languages provides accurate and timely information in countries
whose governments prohibit access to a free press.

5. RFA is a private, nonprofit corporation, funded by the U.S. Congress through an annual
grant from the U.S. Agency for Global Media (USAGM), an independent federal
government agency that oversees all U.S. civilian international media.

6. The mission of USAGM is to inform, engage, and connect people around the world in
support of freedom and democracy. USAGM programs—Voice of America, Radio Free
Europe, Office of Cuba Broadcasting (Radio Marti), RFA, and the Middle East
Broadcasting Networks—all share in common a mission to promote democratic values by
providing accurate, uncensored news and open debate in countries where a free press is
threatened and disinformation is pervasive.

7. TNG-CWA, through its local union, the Washington-Baltimore News Guild, and RFA
are signatories to a private-sector collective bargaining agreement ("CBA"), governed by
the National Labor Relations Act (NLRA), which governs wages, benefits, and other
terms and conditions of employment and runs through December 31, 2025. Under the
CBA, TNG-CWA is recognized as the exclusive collective bargaining agent of all full-
time and regular part-time language service employees, including Journalists, Digital
Content Producers, Administrative Assistants, Administrative/Productive Assistants,
Web/Social Media Editors, Web Outreach Specialists, Production Coordinators, and
Production Specialists employed by RFA in Washington, DC, but excluding all Senior
Editors, including Senior Web/Social Media Editors, Senior Digital Content Producers,
Senior Multimedia Producers, editorial department employees, contractors, professional

JA136

employees, managers, guards, and supervisors as defined in the National Labor Relations Act.

8. On March 13, 2025, a TNG-CWA member at RFA received confirmation from RFA's Executive Editor that USAGM had cut RFA's wire services contracts with the Associated Press and Agence France-Presse—which are an essential tool for journalists that provide the right to republish news produced by hundreds of journalists from those newsrooms. The Executive Editor said RFA employees would lose access to these necessary work tools at the end of that day.

9. On March 15, 2025, RFA's President issued a press release stating that RFA had been informed that day by USAGM that RFA's federal grant agreement, which makes possible RFA's operations in Asia and globally, had been terminated.  RFA's President issued a statement that "[t]he termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would like nothing better than to have their influence go unchecked in the information space. RFA has been foundational in helping U.S. policymakers understand the reality of what's happening in China and other closed countries, bringing transparency and accountability where there is none…. Today's notice not only disenfranchises the nearly 60 million people who turn to RFA's reporting on a weekly basis to learn the truth, but it also benefits America's adversaries at our own expense."

10. On March 19, 2025, RFA employees received notices stating 75% of the U.S. based staff would be placed on unpaid furloughs starting on Friday, March 21, 2025, which is the furloughed employees' last day of pay. RFA's human resources department notified employees on March 19, 2025 who would be subject to furlough. RFA management

JA137

asked TNG-CWA for the ability to determine which employees will be furloughed. RFA management said employees located in other countries will not be subject to the furlough. RFA did not indicate how long the furlough will last, but RFA stated that health insurance and other benefits like life insurance, disability, dental and vision will only be maintained through the end of April 2025, after which RFA will inform furloughed employees of any changes. RFA has, however, already provided employees with information on how to obtain healthcare coverage in anticipation of employees losing health insurance after April 2025.

11. As President of TNG-CWA, these events at RFA have been reported to me directly by bargaining unit members who work for RFA. A core function of our union includes providing support, guidance, and resources to bargaining unit employees as their statutory representative under the NLRA. The changes to the working conditions at RFA due to USAGM funding cuts will require TNG-CWA to bargain over the effects of those changes with RFA. And because the overwhelming majority of TNG-CWA funding comes from bargaining unit employees' membership dues and fees deducted from their paychecks, the furlough and any other action that reduces worker wages due to USAGM cuts will harm TNG-CWA directly by reducing the income it receives and uses to represent the employees' interests.

12. Affected RFA employees are heartbroken and stressed by the negative impact of unpaid furloughs for a large number of colleagues, RFA funding writ large, and the unexpected and abrupt cancellation of their news wire services. These sweeping changes put pressure on their lives, the lives of their families, and decimate their important work for RFA fighting anti-democratic forces by producing news and promoting a free press. For

**JA138**

instance, a Uyghur Service employee reports that their work at RFA has already resulted in severe consequences for their family in China. Due to their reporting on human rights abuses against Uyghurs, they have lost all contact with relatives in China, witnessed family members being harassed by authorities, and had loved ones detained or sent to internment camps as punishment for their work at RFA. The impending furlough exacerbates these risks, as family members may be seen as even more vulnerable to retaliation. Moreover, the silencing of these journalists weakens global efforts to hold authoritarian governments accountable for their actions.

13. The situation at RFA is extremely time-sensitive and requires immediate action. A number of RFA employees are present in the country and work for RFA pursuant to nonimmigrant work visas.  RFA has thus far prioritized continuing the employment for employees in the U.S. on nonimmigrant work visas, while furloughing other staffers. However, because of losing their grant from the U.S. Agency for Global Media, RFA will likely soon not have the resources to continue employing staff in the U.S. on nonimmigrant work visas. If that happens RFA will terminate these employees, requiring them to uproot their lives and return to their home countries where several are likely to face retaliation and persecution because of their press freedom work at RFA. This creates a serious risk of immediate harm. For instance, the majority of employees in Cantonese Service fled from Hong Kong when the Chinese Communist Party led a brutal crackdown on democracy advocates and journalists. They will be targeted by the Chinese government if they are forced to return.

14. Before becoming President of TNG-CWA, I was a journalist for many years, including at the Los Angeles Times where I was a member of TNG-CWA. TNG-CWA also represents

5

**JA139**

journalists at major news organizations such as the New York Times, Wall Street Journal, the Associated Press, Agence France-Presse, the Philadelphia Inquirer, Boston Globe, and many more.

15. Although TNG-CWA members' jobs are based in the United States and Canada, some members, such as reporters and photojournalists, report on stories that require travel to other countries, including countries where USAGM programs, such as RFA, broadcast to combat the lack of a free press.

16. For example, the 2022 Olympic Games were held in Beijing, China—and many stateside TNG-CWA members attended to report. Ahead of the 2022 Olympics, RFA itself reported on the risks to reporters of being present in China where there is no media freedom. "The Chinese government had pledged to respect media freedom, labor rights and peaceful demonstrations during the Olympics. But there is no evidence that it has followed through," RFA reported, citing Amnesty International.  And during the games, Human Rights Watch reported that Chinese media censorship continued, including on both state television and the internet as accessible in China. But the in-country availability of RFA helped to mitigate the inherent dangers to journalists stemming from censorship, by allowing for the free flow of information, over radio airwaves and online, into China.

17. Maintaining a free and independent press is fundamental to the journalistic profession—TNG-CWA members simply cannot do their jobs without it, and the promotion of freedom of the press worldwide is a core part of TNG-CWA's mission.  Article I of the TNG-CWA Constitution, titled "Name and Object," includes in its mission "to improve the working conditions of its members; to guarantee . . . constant honesty in news,

**JA140**

editorials, advertising, and business practices; [and] to raise the standards of journalism and ethics of the industry."

18. USAGM programs, including but not limited to RFA, further TNG-CWA's fundamental organizational mission by (1) improving its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protecting their safety in those countries by allowing for the free flow of information into countries otherwise beset with government censorship; and (3) promoting the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

19. The furlough will also adversely impact the work of these journalists. I know from my own experience as a radio journalist that listeners can be lost when broadcasts go silent. The people who listen to RFA are dependent on it for unbiased news in the despotic countries where they reside and are inundated with state media that is nothing more than propaganda. When RFA goes silent, these people will not only give up on RFA as a news source but also on the ideals of democracy, a free press, and free speech that RFA has fostered in these countries. Even if RFA resumed or was replaced in the future, there is no guarantee listeners will return once the broadcast goes silent. Once listeners or viewers lose access to RFA's programming, they may turn to other sources of information, including state-controlled media, and may not return even if RFA's services are eventually restored. This could result in an irreversible setback to RFA's mission of providing uncensored news and promoting democratic values in these regions.

20. I've received more than two dozen statements from our union members at RFA explaining the impacts the furloughs will have on their personal lives and on their role as

JA141

journalists. These statements are attached to this declaration as Exhibit 1, with union members' names redacted to protect the privacy and safety of these workers. Some of these statements note the risk to RFA journalists personally of losing their nonimmigrant work visas and having to return home to countries where they could be persecuted due to their work for RFA as journalists, such as Vietnam, or China, or the danger that a loss of RFA programing will expose their family members to retaliation abroad. Several of our members highlight their roles as the chief breadwinner in their households, supporting spouses, children and elderly parents. Several identified medical issues that are treated through their employer-provided health insurance. Our members also highlight the value of their work, from reporting on human traffickers, to genocide to coverage of North Korean defectors, and emphasize how the role of the free press in the countries served by RFA will be undermined if RFA's broadcasts are curtailed or eliminated.

Executed at Washington, D.C. on the 23rd day of March, 2025.

_____
JON SCHLEUSS

8

**JA142**

████████

I was raised in South Korea by my grandfather, who came from North Korea.

I was fortunate to study in the United States and was drawn to the mission of delivering information to North Korean citizens.

This passion led me to join Radio Free Asia (RFA), where I have been working for the past three years. I have always found deep fulfillment in my work, but recently, I was hit with the shocking news that the company might shut down.

I had been planning to stay in the U.S. through my work and eventually become an American citizen, but this unexpected development has put my future in jeopardy. Just last year, I purchased a home and am still paying off the mortgage. On top of that, my wife is currently pregnant, and we are expecting our child soon.

Beyond the financial strain, my family is experiencing significant emotional distress due to the uncertainty surrounding our future. I am determined to return to my work—not only for my family but also for the North Korean people who rely on our broadcasts.

I would be truly grateful for any support you can provide.

████████

I am a Researcher at Radio Free Asia (RFA), specializing in audience research across all of RFA's language services. My work ensures that RFA's reporting reaches people in repressive environments where independent news is blocked.

The funding freeze by the U.S. Agency for Global Media (USAGM) has already disrupted my work and created constant uncertainty about my job. I'm worried about my future. My salary covers rent, bills, and daily expenses—losing it suddenly would be devastating for me and my family. The fear of job loss, combined with the intensity of my work, has affected my sleep, focus, and overall well-being.

This is more than just a job to me. My work is highly specialized, and if I'm forced out, I may not find another role like this. The freeze has already stalled my growth and left me feeling stuck.

The funding freeze has taken a great toll on me —financially, emotionally, and professionally. I urge the court to act now and restore RFA's funding before the damage becomes irreversible.

**JA143**

Exhibit 1
Schleuss Declaration

███████

RFA Korean Service has a mission to broadcast radio programs to North Korea, providing them with external information and ensuring their right to know. In addition, through the testimonies of North Korean escapees who have settled in countries such as the United States, South Korea, and Europe, RFA continues to raise issues and hold accountable the human rights violations occurring in North Korea. Escapees have few platforms where they can cautiously share the painful experiences they went through in North Korea and during their escape, including violence, sexual violence, human trafficking, persecution, detention, and forced repatriation.

At RFA, we believe that the ability to send messages to North Korea allows the North Korean people to realize they live without freedom. In particular, North Korean escapees who were caught by Chinese authorities during their escape, are not recognized as refugees. Not recognizing them as refugees is against the international law because they will face serious persecution and imprisonment, and in the worst case, execution if repatriated to North Korea. Escapees speak out for their families and friends who are going through such ordeals, urging an end to these practices.

If the RFA broadcasts stop, the opportunity for people in North Korea to hear the truth will disappear. This is a matter directly connected to the safety and lives of North Korean people. The North Korean regime thoroughly bans its citizens from listening to foreign broadcasts, yet it listens to them itself.

Then the regime impose even harsher laws and policies to control the people. RFA is a critical mechanism that upholds a core value pursued by the United States: protecting freedom of speech and standing against authoritarian systems.

███████

I am ███ from RFA Burmese Service. I have been working at RFA for over seven years. Back in my country, Myanmar, people have been struggling in many different ways after the coup.

Countless innocent lives have been lost to military attacks. Many civilians are arrested just for opposing the junta. The future of our youth is shattered under military conscription. Refugee numbers keep rising as people flee for their lives.

Many people are suffering due to civil war and economic crisis, struggling to survive each day.

Moreover, they are helpless and hopeless in the presence of human rights violations and crimes against humanity.

Through RFA, we share with the world how Burmese people are being oppressed under military rule. Their voices must be heard. Their suffering must not be ignored. And their fight for freedom must not be forgotten.

Especially, in most areas, where the internet access is blocked, people rely on RFA radio for news and information. Our broadcasts remain a vital lifeline for them.

They need RFA as a trusted voice to bring the truth to those who need it most.

---

█████████████

I am a journalist at Radio Free Asia's (RFA) Uyghur language service, where I have spent the past 15 years investigating state repression in China, particularly in the Uyghur region (Xinjiang). My reporting has exposed the mass surveillance, arbitrary detention, and forced labor that Uyghurs and other ethnic minorities endure.

The funding freeze imposed by the U.S. Agency for Global Media (USAGM) is devastating, not only for RFA's mission but for me personally.  This freeze has put my family's financial stability at risk. My salary covers our mortgage, bills, and daily expenses, and I am now deeply worried about how we will make ends meet if RFA is unable to pay us. Even more critically, my health insurance—and that of my entire family—is tied to my employment.

As someone battling diabetes, I rely on daily insulin shots to survive. Losing my job would mean losing my healthcare, putting my health in immediate danger. The stress and uncertainty caused by this funding freeze have severely impacted my mental and physical health. Since learning about USAGM's decision to cancel RFA's grant, I have been unable to sleep properly and frequently suffer from headaches, nausea, and extreme stress. My blood glucose levels—despite daily insulin shots—have skyrocketed, putting me at even greater medical risk.

This situation is not just a financial crisis    it is a direct threat to my health, my family's well-being, and my ability to continue my work. I urge the court to immediately restore RFA's funding before the harm becomes irreversible.

---

█████████████

My name is ████████ and I worked as a journalist at Radio Free Asia (RFA) for seven years, directly contributing to broadcasting efforts targeting North Korea.

I am a South Korean national living alone in the United States, and my employment at RFA has been my sole means of financial support.

The USAGM's decision to freeze funding for RFA, along with the looming possibility of sudden termination, poses an immediate and severe threat to my livelihood. If I am furloughed and subsequently laid off without any preparation or financial assistance, I will face the following challenges:

1. As a South Korean national living alone in the U.S., I will struggle to meet my basic living expenses.

2. My salary is the sole source of income covering my monthly mortgage and other essential costs. Without my job, I will be forced to rely on unemployment benefits, which will be insufficient to cover my mortgage and basic living expenses.

I immigrated to the United States 16 years ago and legally obtained permanent residency. I also relocated to Washington, D.C., specifically for my role at RFA. If my job is abruptly eliminated, I will be left in an extremely precarious financial situation within just one month.

I urge those in decision-making positions to recognize the devastating impact of this funding freeze and potential termination, not only on me but also on many other dedicated journalists who have committed their careers to the mission of independent journalism.

---

████████

I am writing to you today with a heavy heart to express my profound concern regarding the announced closure of Radio Free Asia (RFA). I have dedicated the past 17 years of my life to RFA, having joined the organization in 2008.

On the partition wall of my desk at the RFA office in Washington, D.C., I have proudly displayed a letter from North Korea titled "To ████████, Reporter, Radio Free Asia, Washington, D.C., USA." This letter, a fax I received in April 2012 from a North Korean defector named ████████, began with the words, "Greetings, I am ████████ from North Korea. I am currently in a small city in ████████, China."

In her message, ████████ explained that she had been listening to RFA broadcasts and had memorized my name and fax number. Desperate to escape the watchful eyes of the North Korean authorities in China and reach the free world, she pleaded for our assistance.

**JA146**

This letter served as undeniable proof that our broadcasts reached the people of North Korea and could profoundly impact their destinies. It is with this understanding and a deep sense of purpose that I have spent the last 17 years working joyfully and gratefully at RFA.

My time at RFA has been filled with meaningful experiences. In 2013, I was honored to receive a Bronze Award at the New York Radio Festival for a program I produced covering North Korean defectors who had settled in London after the 2012 Olympics. Despite their newfound freedom, their longing for their homeland remained, evident in their passionate support for the North Korean athletes. This story highlighted the complex emotions and enduring connections of those who have left North Korea.

Just as my broadcasting career flourished at RFA, so too did my family. My two daughters, who were seven and four years old when I joined RFA, have now grown into university students. I have always cherished my work at RFA, finding immense satisfaction in serving as a voice for the voiceless in North Korea.

Therefore, it was with utter shock and devastation that I received the news in March 2025 that RFA, an organization I consider my "home," would be closing its doors. Having built my entire life in the United States alongside my work at RFA, this news has been more impactful than any other event in my life. Sleepless nights are now common as I face the daunting reality of covering my daughters' university tuition and our home mortgage. Furthermore, the prospect of no longer being able to connect with and broadcast to our North Korean listeners, the very people who made my work so fulfilling, is a source of deep despair.

I implore you, esteemed members of Congress, to please extend your support to ensure that RFA can continue its vital broadcasts to the people of North Korea.

When I immigrated to the United States in my thirties after getting married, I carried with me the hope of achieving the "American Dream." I earnestly request your assistance in ensuring that this dream can still have a happy ending.

Thank you for your time and consideration of this urgent matter.

---

█████

My name is ████ and I joined RFA in January 2025 as a Digital Content Producer. At RFA, I have produced videos and podcasts on topics the Vietnamese government desperately wants to keep hidden. My reporting has exposed political corruption, the suppression of free speech, and human rights abuses.

Unlike many of my colleagues who use pseudonyms to protect their identities, I chose to appear on camera, making my face and name publicly known. I believed that reporting from the United States - and RFA's affiliation with the U.S. government - would offer me protection.

Exhibit 1
Schleuss Declaration

On March 14, 2025, an executive order titled "Continuing the Reduction of the Federal Bureaucracy" was signed by President Donald Trump, mandating cuts to the United States Agency for Global Media (USAGM), RFA's overseer. Because my H-1B visa is directly tied to my employment with RFA, the potential dismantling of USAGM now hinders my ability to remain in the U.S.

If I lose my job, I could be forced to return to Vietnam - where I am now a known figure in independent journalism and a direct target for government retaliation.

The Vietnamese government has a long history of persecuting journalists, particularly those affiliated with RFA. Many of my colleagues have been harassed, detained, or imprisoned for their reporting.

I am at high risk of harassment and intimidation by Vietnamese authorities, a prolonged prison sentence for "anti-government propaganda" charges and both physical, psychological abuse. The constant fear of persecution, imprisonment, and potential torture also take a severe toll on my mental health, subjecting me to relentless anxiety, stress, and psychological distress.

Returning to Vietnam is not just a risk - it is a direct threat to my safety. I have spent my career fighting for the truth, and now, that very truth puts me in danger.

I am seeking protection because I know that I will be threatened and tortured if I return. The Vietnamese government sees me and my work as a threat, and they have repeatedly demonstrated that they will go to great lengths to silence voices like mine.

---

████████████

I've been working at Radio Free Asia since May 2017. I started as a contractor and became a regular employee in April 2019. My family grew with Radio Free Asia.

During my employment, I got married, had a baby, and bought a house. This company means so much to me and my family.

What RFA is experiencing now, and what I'm about to experience, furlough or layoff will have a significant impact on my loving family financially.

My family's monthly income is my family's monthly spending. What I get in my paycheck has to be spent in order to sustain my family's daily living.

Exhibit 1
Schleuss Declaration

With a serious car accident I had in October last year, it already added financial burden to my family with car payment for a new car, on top of more than $2500 mortgage per month. Without consistent income from RFA, I do not see a future for my family. Dismantling RFA will also dismantle my family's life.

Not only financially it will impact my family, it will also be a threat to my family's health. With uncertainty that health insurance would continue, we are on the edge of harming my husband's medical condition. My husband, a loving father, is a patient who must take a certain medication daily. I also have a six year old daughter, a kindergartener who is vulnerable to severe illness from various viruses and diseases.

Not only in my personal life, but my heart is also with all those people living in closed countries where they don't have freedom of press. Radio Free Asia's mission to deliver uncensored news is my mission…our mission which must continue.

---

My name is ▮▮▮▮▮▮▮, and for the past three years, I have worked as a journalist for the Korean service at Radio Free Asia (RFA), under the U.S. Agency for Global Media (USAGM). The recent executive order demanding the termination of non-essential USAGM activities and staff layoffs has put my livelihood and the mission I've dedicated myself to at risk. I am writing this letter to share my personal struggles and the devastating impact this decision will have on me and the North Korean people I serve.

For three years, I've poured my heart into delivering uncensored news to the people of North Korea, a country where freedom of the press does not exist. One of the most meaningful moments in my career came when North Korean defectors who visited our office told me they had listened to Radio Free Asia and, through our broadcasts, awakened to the value of democracy—ultimately inspiring them to escape. That day, I felt an overwhelming sense of purpose, knowing my work wasn't just reporting but a lifeline of hope for people yearning for freedom. Now, if this broadcast is silenced, North Koreans will be left with only the state-controlled media, further deepening their indoctrination. The thought of this breaks my heart.

On a personal level, I am consumed with anxiety. The fear of losing the job I love—due to the cutoff of government funding—haunts me every day. I left my beloved parents in South Korea and have endured loneliness and hardship in the U.S., all because I take pride in countering

authoritarian propaganda with truth. But if I lose my job, I won't be able to pay my rent, and the uncertainty keeps me awake at night. Every morning feels like a struggle to face the day.

I have always believed, without a doubt, that America is a great nation. I trust that Congress has the power to stop this crisis. You've allocated funds to USAGM, including Radio Free Asia, to support this mission—a mission that's not just about my job but about keeping hope alive for millions in North Korea. I beg you to hear our voices and take action to reverse this situation.

---

███████████

6:10 AM. In front of the IMF headquarters building. I am the last passenger. After getting off the bus, I absentmindedly walk away as if it were my habit. It takes about 15 minutes to walk to work. I have been doing this for the past three years. I have no choice but to interview North Korean defectors in South Korea. I have been doing this for three years.

I joined RFA at the end of 2010. Thinking back, 15 years have already passed. This is the first time I have worked at one company for this long. The reason I applied to RFA was because it was 'special.' It was special that it was an American broadcasting station, but it broadcasted in Korean, and the fact that the listeners were North Koreans was special. Before I knew it, I was becoming a special reporter.

The purpose of RFA's Korean broadcasting is to deliver accurate and fast news of the world to North Koreans who are living a difficult life in North Korea. It is not a propaganda broadcast that says, "Abolish the leader and gain freedom." Our job is to convey things as they are.

I visited Tanzania in Africa to cover North Korean medical staff who gave patients unnamed medicine and treated them illegally. I met North Korean workers in Kuwait, a Middle Eastern country where they work hard in the middle of the desert while being hit by sandstorms, but most of their income is taken away by North Korean authorities under the pretext of loyalty funds. I drew a lot of attention by analyzing satellite photos and reporting that North Korea was pouring waste from uranium mines directly into the river.

As a result, all North Korean hospitals in Tanzania were closed, and all North Korean workers in Kuwait returned to North Korea due to the timing of the report and the sanctions against North Korea.

I was living with pride in doing meaningful work for the North Korean people, but when I suddenly heard the news that the broadcasting station was closing and that a significant number of employees would be laid off, my heart was truly broken.

I was worried about how I was going to live right now. How was I going to pay the mortgage, water bill, and other utility bills? Tuition and living expenses for my children who are attending graduate school and college are also issues, but what I am most worried about is health insurance. Without health insurance, I would not be able to afford the cost of the medicine I am currently taking. I would not be able to go to the hospital if my children suddenly get sick or get hurt.

I hope that everyone will pay attention and support me so that my family's safety and stability, and my determination to work for the freedom of North Korean people that I made when I joined the company, do not break or disappear in the middle.

---

████████████

I am writing this letter to formally testify to the anticipated impact that my upcoming furlough from Radio Free Asia's (RFA) Uyghur Service will have on my life, my family's financial stability, and the safety of my relatives abroad. While I have not yet been furloughed, my employment at RFA has already exposed me and my loved ones to harassment, intimidation, and retaliation by the Chinese government.

Financial and Personal Hardship

The prospect of losing my position at RFA is already causing significant distress and uncertainty for my family. As the primary provider, I am deeply concerned about my ability to:
• Pay rent and mortgage to ensure stable housing for my family.
• Cover daily living expenses, including food, utilities, and childcare.
• Support my children's education, which could be affected by financial instability.

Without this job, I will lose not only my livelihood but also the sense of security and stability that my family depends on. The stress and anxiety surrounding this situation have already begun affecting our daily lives.

Retaliation Against My Family and Loss of Contact

Even before my impending furlough, my employment at RFA has already resulted in severe consequences for my family back home. Due to my work exposing the Chinese government's human rights abuses against Uyghurs, I have:
• Lost all contact with my relatives in China—the Chinese government has cut off communication, making it impossible for me to check on their safety.
• Witnessed my family members being harassed by authorities simply because they are related to me.
• Had loved ones detained or sent to internment camps as punishment for my work at RFA.

This is not just a fear—it is a reality that has already unfolded for me and my family. The Chinese government has a long history of punishing Uyghurs abroad by targeting their relatives. I have lived under this threat for years, knowing that my reporting at RFA has put my family at risk. Now, with my impending furlough, I fear that my relatives will face even greater danger, as they will be seen as even more vulnerable.

Impact on My Daily Life and Future

Beyond financial and safety concerns, this furlough will have a significant impact on my mental and emotional well-being. I anticipate facing:
• Uncertainty in my career, with limited job opportunities in my field.
• Inability to continue my crucial work, which will hinder efforts to expose human rights abuses in my community.
• Emotional distress, knowing that my family may be at greater risk while I lose my primary platform for advocacy.

This is not just about my personal employment—it is about the silencing of journalists who have dedicated their careers to exposing injustice. The decision to furlough Uyghur journalists from RFA will not only impact our livelihoods but will also weaken global efforts to hold the Chinese government accountable for its actions against Uyghurs.

I urge you to consider the serious consequences of this furlough on my life, my family's security, and the broader Uyghur community. This is not just a personal crisis but a broader issue of press freedom and human rights.

Thank you for your time and attention.

I have a thyroid condition that requires regular medical checkups. This August, I have my annual thyroid ultrasound to make sure things haven't gotten worse. I need to monitor it regularly to check for any signs of cancer. Without my company's health insurance, I simply can't afford the high cost of these medical expenses.

I also have to support my parents. My parents are elderly and already struggling with health issues. They're not in a position to work and earn money.

I'm 35 years old this year. I have to put off my plans to start a family and have children. Brining a child into the world is in such an unstable situation would be the most reckless decision my husband and I could make.

My husband's salary barely covers our mortgage, insurance, and other essentials – there's nothing left after that. And unemployment benefits? There's no way they'll be enough to support a family of four.

Losing my job so suddenly is terrifying—it feels like my entire life is being upended overnight. How am I supposed to survive in this insane economy with no income? This situation isn't just stressful—it's devastating. Please take this situation into consideration and help save me and my colleagues. Thank you.

---

██████████████

For the past three years, I have been reporting on human trafficking stories.

I began, after a mother contacted me, asking for help in rescuing her daughter.

I am proud, that I've been able to help re-unite so many young Lao people with their families.

They called me, asking RFA to help, as authorities in Laos told them they could not do nothing.

Many trafficking victims come from poor families. They have no money to pay the Chinese scammers for their freedom.

Both parents and the young people trapped in scammed centres, all told me that without RFA's help, they would have no future.

Seeing the thousands of people released from scam centres this year, I know that media coverage and RFA helped make that happen.

---

██████████████

My name is ████████████, senior editor of RFA's Lao Service.

I have worked with RFA for 11 years, covered and reported many issues. In particular, human rights violation is the main issue the Lao people are facing. RFA has played an important role in letting their voices be heard outside.

In September 2019, I covered a man arrested with court warrant for land conflict with local authorities. After his arrest was published and human rights group alarmed, he was released in November.

In January 2024, I also reported exclusive news on the arrest of six people in Xieng Khoaung province, northern Laos because they staged the protest for land conflict. In February, they were released.

There are also corruptions, environmental issues, displacement of local people due to hydropower projects I have not stated in the statement since I worked with RFA. For Lao people, RFA not only reports news, but also has become a symbol of speech.

---

My name is ███████████████████ from Cantonese Service of Radio Free Asia (RFA) and an asylum seeker from Hong Kong. I am deeply grateful for the U.S. government and RFA for giving me a safe space to practice independent journalism. To me, it is a very rare opportunity allowing me to keep on fighting for Hong Kong's press freedom and democracy after I was forced to leave my homeland in fear of persecution. I want to keep on fighting with all these brave RFA journalists on the Land of the Free. We don't want to stop here, leaving an unfinished mission with regrets.

All my personal friends, either in Hong Kong or self-exiled to Taiwan or the UK, counted on RFA as the only source of reliable news when Hong Kong is flooded with lies and propaganda of the Beijing authorities. Termination of funding to RFA means the fall of the last bastion of press freedom of Hong Kong, leaving Hongkongers in complete darkness and fear.

I am the only breadwinner of my family. As an alien seeking asylum here in the U.S., I used to be proud of my self-sufficient when I worked for RFA. The closure of RFA just makes my world up-side-down. My mother, who is 89, has just been discharged from the hospital this week after surgeries for her acute internal bleeding and kidney failure. The funding freeze of RFA would make me impossible to pay for my mother's huge medical bills and her follow-up healthcare costs, not to mention my taxes due soon.

Some of my colleagues are relocated to the U.S. office under working visa after RFA closed our Hong Kong office under the threat of the National Security Law. The Hong Kong government

had repeatedly alleged RFA Cantonese journalists for "smearing" the authority, which could be an offence under the draconian national security laws of the city. The shutdown of RFA means my colleagues, and me as well if my asylum application is not approved, would have no choice but return to our homeland and face the persecution of the Hong Kong and Beijing authority for working with RFA, alone!

I sincerely urge the Congress' help to resume funding to RFA.

---

████████████

When I joined RFA nine months ago, it felt unreal. Surrounded by dedicated individuals working on stories half-a-world away and truly making a difference gave me assurance that my work would also have a real impact on people's lives.

Today, as I learned that I and many of my colleagues have been furloughed due to the funding freeze, I cannot help but feel for our organization. Our journalism shines a light on autocratic regimes and provides an alternative voice to their propaganda.

In Laos, the media is controlled by the state. So-called development projects have disrupted the lives of ordinary people. Their concerns often go unheard and unresolved. We are the voice for those people. They message us and ask us to tell their stories. Because of the loss of land and access to resources, many seek labor in neighboring countries, often risking their health and safety. They turn to us when they lose hope. RFA Lao Service has reported these injustices and helped to free victims of scam centers. I am proud to help do this work.

This funding freeze has affected me personally. Not producing content informing our online audience now, I will not be able to survive for more than a couple of months without any income. I moved to the DC area from another state, leaving my home and hoping to make a new start doing something I have come to love. My wife, who has an auto-immune disease, needs constant medical care. I don't know what we will do, where we will soon live, and how my wife will deal with the loss of medical care.

I implore the members of Congress to take action and restore funding to RFA for the sake of my colleagues, for the thousands of whom RFA has helped, and for the millions of people who rely on our honest and courageous reporting.

---

██████

Exhibit 1
Schleuss Declaration

I am writing to you as a dedicated employee of Radio Free Asia (RFA) and someone from Taiwan to share my testimony and urge your support in preventing the dismantling of this vital organization. As a younger member of RFA's workforce, I have had the privilege of working with the organization for over three years, serving both at its headquarters in Washington, D.C., and at its overseas office in Taipei, Taiwan—my home. Through this experience, I have seen firsthand the critical role RFA plays in delivering accurate, unbiased information, especially as tensions between Taiwan and the People's Republic of China grow increasingly tense.

I am deeply troubled by the prospect of RFA's shutdown, particularly given the current situation in the Taiwan Strait. As someone from Taiwan, I have watched with concern as the PRC intensifies its military drills and as my country responds with rare practices of rapid troop mobilization—a step Taiwan does not often take. These developments point to a dangerous escalation, with some warning that conflict could erupt as early as 2027. If war breaks out, misinformation from mainland China will flood the internet, obscuring the truth about what is happening in my region.

Radio Free Asia is uniquely equipped to counter this threat. For years, RFA has provided reliable reporting that cuts through propaganda, offering clarity not only to the U.S. government but also to the global public—including people in Taiwan and beyond. In the event of a conflict, RFA would be an indispensable resource, ensuring that accurate information reaches American policymakers and citizens worldwide who seek to understand the stakes. Shutting it down now, when its work is more essential than ever, would be a profound loss.

I respectfully urge you to advocate for the preservation of Radio Free Asia and to oppose any efforts to dismantle it. This is not just about an organization—it's about ensuring that truth and transparency prevail at a time when they are desperately needed.

Thank you for your time, consideration, and leadership. I hope you will lend your voice to this urgent cause.

---

I have been working at RFA for 19 years and seven months, covering human rights issues such as land confiscation, labor rights, children and women's rights, and environmental concerns and others.

RFA serves as a vital source of information for Burmese people living under military rule. Media in Burma has faced strict censorship since the military coup of 1962.

In 2024 Reporters without Borders (RSF) World Press Freedom Index, Burma ranked 140th out of 180 countries, reflecting its ongoing repression of press freedom.

Burmese people, living under severe restrictions on information, rely on RFA to stay informed about events in the country- news they cannot access through local media and military mouthpiece media.

If RFA cannot operate normally, people lose access to reliable information about what is truly happening in Burma, benefiting the military rulers as they continue to suppress the people.

---

▉▉▉▉▉▉▉▉▉▉

My name is ▉▉▉▉▉▉▉, and I have been a journalist with Radio Free Asia's Lao Service for 25 years. I am here to advocate for continued funding of independent journalism and free press initiatives in Southeast Asia.

Over the decades, I have witnessed our journalists report in countries where news is heavily censored, providing critical information to those who lack access to diverse news sources. In Laos, where people are often afraid to speak to their authorities, RFA serves as a vital platform, amplifying their voices and shedding light on issues that would otherwise remain hidden. Our work:

- Promotes transparency in governance
- Empowers citizens with factual information
- Counters misinformation
- Gives voice to the voiceless.

RFA adheres to strict journalistic ethics, ensuring unbiased, fact-based reporting. I urge you to recognize the essential role RFA plays in promoting democracy, human rights, and freedom of information. Supporting our mission ensures that the people of Laos and beyond continue to have a voice.

---

▉▉▉▉▉▉▉

I write with deep concern regarding the proposed funding cuts to Radio Free Asia (RFA), an organization that has been my professional home for over 15 years and represents a critical pillar of America's commitment to press freedom across Asia.

Since December 2009, I have dedicated my professional life to RFA's mission of providing accurate, unbiased news to people living under authoritarian regimes. My work has focused particularly on human rights, democracy, and women's issues affecting Tibetans and other ethnic

groups with limited access to free press. I have crafted well-organized, distinctively original stories on sensitive topics, utilizing multiple sources to ensure balanced coverage—all while maintaining the highest standards of journalistic integrity.

The proposed funding cuts to RFA come at a time when authoritarian regimes are intensifying their efforts to control information. RFA serves as a vital lifeline for millions seeking accurate information about their own countries and the world beyond. The elimination or reduction of RFA's funding would create an information vacuum that would quickly be filled by state-controlled media serving authoritarian interests.

We have already begun receiving heartbreaking messages from listeners inside Tibet who have heard rumors of these potential cuts. They describe RFA as "the only light in the darkness" and express profound sadness at the prospect of losing access to free news under the repressive Chinese regime. These listeners risk their safety to tune in to our broadcasts, demonstrating the irreplaceable value of our service. For many, RFA represents their sole connection to unfiltered information and the outside world.

Beyond the professional impact, these potential cuts would devastate my family's financial stability. With two children aged 13 and 10 approaching high school and college, I am deeply concerned about funding their education. Without my current position at RFA, I would struggle to build the savings necessary for their tuition and future opportunities.

The uncertainty has already begun affecting our daily lives. I find myself worried about covering our mortgage payments, health insurance premiums, and even weekly grocery bills. These financial concerns have taken a significant toll on my mental wellbeing, as I lie awake at night contemplating how to provide for my family's basic needs should these cuts proceed. My retirement security is also at risk. After 15 years of dedicated service, the prospect of starting over in a new organization at this stage of my career is daunting. The specialized skills I've developed serving RFA's unique mission may not easily transfer to other media organizations.

I respectfully urge you to reconsider the proposed funding cuts to Radio Free Asia. The cost of maintaining RFA's operations is minimal compared to the immense strategic value it provides. By preserving RFA's funding, you will ensure that America continues to stand with those fighting for truth and freedom while protecting the livelihoods of dedicated professionals who have given their careers to this vital mission.

---

█████████

My name is ████████, and I am a designer and web developer at Radio Free Asia's Global Mandarin Service. I previously worked in the Hong Kong office for

two years until it was forced to shut down due to the implementation of Article 23. Fearing persecution, RFA helped me secure a visa to relocate to the U.S. headquarters. Over the past year, I have worked hard to build a new life here—finding housing, handling legal paperwork, making friends, and integrating into American society.

But just as I believed I was finding stability, the White House issued an executive order to shut down Radio Free Asia. My team created *Wainao*, a platform dedicated to telling young Chinese readers the truth about what is happening in China. What we do is not just a job—it is meaningful, it makes a difference. Yesterday, due to funding cuts, *Wainao* went dark, and my entire team was furloughed. The only reason I have not been furloughed yet is because my company, out of deep concern for my visa status, has made every effort to keep my position. But without funding, I will soon lose my visa and face the risk of deportation.

Just a few days ago, I had a job I loved—doing work that mattered. Now, in an instant, I am at risk of losing my legal status in the U.S. and being forced to return to Hong Kong, a place that has been swallowed by the Chinese regime, where independent media and activists are being silenced.

I urge you to recognize the significance of Radio Free Asia, especially in an era where authoritarianism is encroaching on democratic freedoms. Its shutdown would not only be a devastating loss for press freedom but would also personally place me in serious jeopardy.

Thank you for your time and consideration.

---

███████████

My name is ███████, and I have been a journalist with Radio Free Asia (RFA), Burmese Service, since 2008. Over the past 17 years, I have dedicated my career to providing vital news and information to the Burmese people, many of whom live under oppressive regimes where freedom of the press is severely restricted.

I am writing this statement in response to the recent decision to terminate Radio Free Asia, a move that threatens not only my livelihood but also the lives of millions of Burmese people who rely on RFA for accurate, unbiased information. This decision by the Trump administration will have severe consequences on the ability of the Burmese people to access independent news and information, especially at a time when the country faces unprecedented challenges.

For many years, I have worked diligently to provide comprehensive coverage of the situation in Burma, including human rights violations, political repression, and the struggles of ordinary citizens who face censorship and persecution. The Burmese Service of RFA has been a critical source of news for the people of Burma, offering them a chance to learn the truth in an environment where state-controlled media spreads propaganda and misinformation.

The people of Burma deserve the right to access independent news, and this decision will silence a crucial platform that has been their source of hope, information, and accountability. Additionally, the funding cut will have a significant personal impact on my family. As a single mother and the sole provider for my household, I carry the responsibility of ensuring my two daughters are safe, cared for, and given every opportunity to thrive. Their well-being—everything from their education to their everyday needs—depends entirely on my ability to maintain my job.

I urge that this decision be reversed to ensure that the voices of the Burmese people continue to be heard and that independent journalism remains a critical part of our global commitment to human rights and democracy, and the families of the people who have lost their jobs can continue doing their best to hold everything together. I'm asking for your understanding and compassion.

Thank you for your time and consideration.

---

█████████████

My name is ████████████, I joined RFA's Vietnamese Service in September 2022 after graduating from ████████ MA program in Journalism.

This decision came with considerable security risks both to myself and my family who is still living in Vietnam, but I made it with their consent because we all knew it was the right thing to do.

Having lived under Vietnam's Communist Regime our entire life, we have witnessed first-hand serious violations of human rights, in the form of wrongful arrests and unjust deaths in the penitentiary system dating all the way back to aftermath of Vietnam War, when several of my relatives lost their lives in Viet Cong's re-education camps.

The injustice lasted all the way into the modern day, in the form of systemic corruption within Vietnam's federal and local government. The most recent example of this is Decree 168, which allowed the police to issue traffic fines that are multiple times heavier than before, and for the Ministry of Public Security to pocket most of it. And in the last several years, there are hundreds of Vietnamese who are arrested for speaking out for others' human rights, and for their own.

With RFA's grant terminated and the company potentially closing down for good, I face the risk of returning to Vietnam and being arrested immediately upon re-entry because I'm not a Green Card holder yet. And my situation isn't the only precarious one in RFA. On a bigger scale, RFA's potential closure will deprive tens of millions of Vietnamese people of a reliable and uncensored source of news, and effectively give Vietnam's Communist government complete monopoly over the media landscape.

---

█████████████

My name is ████████████, Radio production Coordinator & Administrative Assistance for the Lao Service. I have worked at the RFA for 26 years.

During those 26 years I have experienced and witnessed the efforts of journalists and the daily production of news programs.
RFA staff regularly receives letters, emails, and phone calls from people on a variety of stories and topics we report that their local news will not address.

RFA does not just report news, it has come to be a resource to help document and assist victims from human trafficking, including missing persons, land conflicts, and other human rights concerns. People frequently contact RFA when they feel they cannot get support from their own government officials. I have seen examples where parents and human tracking victims reach out to RFA to report stories and share photographs. And in many cases RFA has been able to verify stories and help reunite families. People will often say they trust RFA more than local authorities to take action and assist with location and reunification.

---

█████████████

I was an audience member of RFA decades ago in my homeland, East Turkistan (also known as XUAR). At that time, the RFA Uyghur Service was the only window to the Free World for the Uyghur people. At first, we used shortwave radio, but after the government shut it down, we relied on VPNs. People risked harsh government punishment just to hear the voice of freedom, sharing the daily program's MP3 files with each other. It was like the Statue of Liberty offering hope, a sense of justice, and faith in victory to those in darkness. Many people were detained and punished by the government simply for listening to this voice of freedom.

Ten years ago, I came to the Free World. Six years ago, I was honored to become a member of Radio Free Asia, at a time when the Uyghur people were facing an ongoing genocide. The RFA Uyghur Service remains the only reliable source for the world to know what is happening to

Uyghurs and other Turkic people in the region. In 2020, the first Trump administration officially declared the Uyghur genocide based on our brave Uyghur journalists' firsthand reporting. Everyone on our team has at least one or more relatives imprisoned or detained in concentration camps.

For us, this job goes far beyond regular journalism—it is a frontline battle against the Chinese Communist Party's autocratic regime. It is the lifeline for Uyghur people seeking help from the outside world. Churchill's words about the brave British fighter pilots perfectly describe our mission: "Never in the field of human conflict was so much owed by so many to so few." Right now, this team and its very foundation are facing dismantlement. Please, save us—not just for the Uyghurs, but for the values that America was founded upon and for the Free World. As my wife said, we will try to endure the personal hardships caused by this abrupt dismantling, but the world cannot. The Uyghurs, Tibetans, Cambodians, Rohingya, and North Koreans—those still living in darkness—cannot. Please, preserve our hope!

---

█████████

My name is ████████. I have been a journalist at Radio Free Asia (RFA) 's Vietnamese service for three years.

In 2011, as an ordinary citizen in Vietnam, I joined a peaceful protest against China's violation of Vietnam's territorial waters. Shortly after, I was arrested, detained, and interrogated by Vietnamese police for an entire day and night. It was a frightening experience, I felt completely isolated, unsure of what would happen to me. But RFA journalists reported on my case, making me realize I was not alone. Their coverage showed me that many people cared and supported those who stood up for their country and freedom.

Since 2022, I have been working for RFA to report on issues that the Vietnamese government tries to hide. I have covered stories about farmers losing their land without fair compensation, fishermen suffering from environmental disasters caused by the Formosa company, and thousands of ethnic minorities facing religious persecution for practicing Christianity. These stories would never appear in state-controlled media, but thanks to RFA, they reached both the public and the international community.

Shutting down RFA would mean that millions of people lose access to an independent and reliable news source. This decision would not only affect journalists like me but also enable authoritarian governments in Vietnam, China, and North Korea to tighten their control over information, suppress free speech, and worsen human rights violations.

I urge Congress to reconsider the decision to cut RFA's funding and restore the necessary budget so that RFA can continue its vital mission.

---

██████████

The termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would relish the opportunity to have their influence go unchecked in the information space.

I am a Web Editor II who worked for the Uyghur Service at RFA for 15 years, starting in 2010. The Uyghur Service has been pivotal in helping U.S. policymakers understand the harsh realities of what's happening in the Uyghur Autonomous Region of China. It has provided a crucial platform to spotlight the struggles of the Uyghur people and drawn global attention to the severe human rights violations they endure. The Uyghur Service's breakthrough reporting on Xinjiang led the first Trump Administration to formally declare genocide against the Chinese government. The courage and dedication of the journalists and staff who have risked their lives to expose and report on the genocide of the Uyghur community are nothing short of remarkable and must be acknowledged.

The decision to shut down this critical service is alarming and raises profound concerns. The Uyghur Service has been a beacon of hope and resilience for countless Uyghurs, serving as a vital channel for international media, activists, and human rights organizations. Its relentless work in exposing the realities on the ground has been instrumental in raising global awareness and shaping policies.

Preserving this service is not just about maintaining a media outlet; it's about defending the fundamental values of freedom, democracy, and human dignity. Uyghurs, whether in their homeland or in the diaspora, deserve to have their voices heard and their stories shared with the world. Within the broader context of U.S.-China relations, the Uyghur Service is an indispensable pillar in combating propaganda and reaffirming the commitment to human rights and the fight against oppression.

I strongly urge decision-makers to reassess the significance of Radio Free Asia's Uyghur Service and recognize its unique and undeniable role in addressing these dire global challenges. At this pivotal moment in history, the international community cannot afford to remain silent in the face of such a critical voice.

# EXHIBIT Q

JA164

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                       Plaintiffs,                  Index No. 25 Civ. 2390

    -against-

KARI LAKE, et al.,

                       Defendants.

**DECLARATION OF STEVEN L HERMAN**

I, Steven L Herman, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a Foreign Service employee of the Voice of America (VOA). VOA is overseen by USAGM, and is an international broadcasting state media network funded by the federal government. I joined VOA, as a Foreign Service employee in 2007.

3. I currently serve as the Chief National Correspondent for the Voice of America. I have been VOA's Chief National Correspondent since February of 2022, following five years of primarily reporting on the executive branch of the U.S. government as VOA's Senior White House Correspondent and then VOA's White House Bureau Chief.

**JA165**

4.   I am a dues paying member of the American Foreign Service Association (AFSA).  From November 2016 to October 31, 2024, I served as the USAGM AFSA representative on AFSA's Governing Board.

5.   AFSA is the professional association and the exclusive labor organization for the U.S. Foreign Service. AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members.

6.   AFSA represents nearly 80 percent of active-duty members of the Foreign Service across six foreign affairs agencies, including the U.S. Agency for Global Media (USAGM). AFSA represents 16 Foreign Service USAGM employees. Fourteen of these Foreign Service employees are assigned to overseas transmitting stations.

7.   AFSA enters into collective bargaining negotiations with the USAGM, VOA on a wide variety of terms and conditions of employment and represents bargaining unit members through the negotiated grievance process.

8.   AFSA bargaining unit members pay voluntary membership dues to AFSA, which is the union's overwhelming source of operational funding.  AFSA's budget will be negatively impacted because of the loss of dues if members are terminated, and its bargaining power will be diminished because of the loss of members due to potential terminations. AFSA will also lose membership and dues if members choose to retire as a result of the uncertainty the USAGM has caused.

9.   On Friday, February 28, 2025 I received an e-mail from USAGM Human Resources, signed by John Featherly, Acting Deputy Director, VOA Programming Directorate, stating that I was immediately being placed on 'excused absence' until a VOA investigation into my social

2

**JA166**

media activity concludes.  The notification stated it was being sent "Pursuant to 3 FAM 3464.1-2; the U.S. Office of Personnel Management's January 20, 2025 Guidance on Probationary Periods, Administrative Leave and Details; and Executive Order 14211 (One Voice for America's Foreign Relations),  The investigation, according to the letter, would examine whether my social media activity "has undermined VOA's audiences' perceptions of the objectivity and/or credibility of VOA and its news operations" concerning the following rules and regulations:

- BAM Title V, Section 530:Social Media Policy,

- BAM Title VII, Section 930: Time and Attendance and Leave Accounting

- VOA News Standards & Best Practices

Executive Order 14211 declares, in part, that "failure to faithfully implement the President's (foreign) policy is grounds for professional discipline, including separation."

The notification to me also stated that "VOA has determined that your absence is in the interest of the Agency and believes that your continued presence in the workplace may otherwise jeopardize legitimate U.S. Government interests. You will continue to receive your full salary and benefits and will remain on Excused Absence until further notice. **During this period, you are not to conduct any business on behalf of the agency (USAGM/VOA) or any other duties associated with your position here.**"

10. On Saturday, March 15, 2025, all USAGM's Foreign Service employees received a notice from the Director of Human Resources, Crystal G. Thomas, placing them on administrative leave. The administrative leave notice stated that "[p]ursuant to the Presidential Executive Order Continuing the Reduction of the Federal Bureaucracy – The White House and the Office of Personnel Management Guidance on Probationary Periods, Administrative Leave

**JA167**

and Details and additional authorities, including but not limited to, 5 C.F.R. § 630.1403,

effective immediately, the United States Agency for Global Media (USAGM) is placing you on

administrative leave with full pay and benefits until otherwise notified. This administrative leave

is not being done for any disciplinary purpose."

11.  The administrative leave notice also made clear that while on administrative leave:

….

- **Access to Premises and Systems**: During the period that you are on administrative
  leave, you are not to enter USAGM premises, access USAGM systems, or attempt to
  use your position or authority with USAGM in any way without my prior permission
  or prior permission of a supervisor in your chain of command.

- **Government Property**: Since you will not have any official business during this
  time, upon request, you will be expected to immediately surrender your official
  USAGM identification badge and press pass, as well as any keys or other official
  government property, including documents, records, electronic and telephone devices,
  and other equipment.

12. USAGM did not provide AFSA advance notice of the decision to place all of its Foreign

Service employees on administrative leave.

13. As I did not have access to my USAGM email, due to my February 28, 2025 placement

on administrative leave, I did not receive Ms. Thomas' administrative leave notification on

March 15, 2025.

14. On the evening of Saturday, March 15, 2025, Foreign Service employees assigned

overseas received a second email from Ms. Thomas stating that their administrative leave status

had been lifted. No additional information or explanation was provided.

4

**JA168**

15. On Monday, March 17, 2025, during a meeting led by William Martin, Director for
Stations and Operations, all FS employees overseas were instructed to:

  i. Shut down all transmitters at our respective stations within two days.

  ii. Request the U.S. Mission to place all locally employed (LE) staff on
   administrative leave, effective immediately.

  iii. Expect to be placed back on administrative leave after a two-day
   shutdown period.

16. VOA's overseas news correspondents remain on administrative leave status. The
Botswana and Germany Station Managers, as well as an employee at the Greenville, North
Carolina Station (all career FS) are on administrative leave. The Sao Tome Station Manager,
Kuwait Deputy Station Manager (who is on a Civil Service excursion), the Philippines Acting
Station Manager (a Civil Service excursioner), the Philippines Plant Supervisor, the Thailand
Deputy Station Manager (Civil Service excursioner), the Thailand Facilities Supervisor and the
Botswana Plant Supervisor have been removed from administrative leave.

17. On March 18, 2025, AFSA inquired with USAGM Labor and Employee Relations (LER)
as to my leave status.

18. On March 20, 2025, LER Specialist Yoko Hoffman responded to AFSA Deputy General
Counsel: "Effective March 15, 2025, and per the notice issued to him on that date, Mr. Herman
has been on administrative leave.  The inquiry regarding Mr. Herman's social media activity is
on hold in light of the current operational status of VOA."

19. AFSA reminded USAGM LER that I did not have access to my USAGM email since
being placed on administrative leave on February 28, 2025. Following this exchange, on March

**JA169**

20, 2025, I received the same administrative leave notification via my personal email address from Ms. Thomas that had been sent to all Foreign Service employees.

20.  As a staff correspondent for VOA since 2007, I have devoted a significant portion of my career to providing accurate, objective and comprehensive news coverage on behalf of the United States, both domestically and internationally. The decision by USAGM to place me and my Foreign Service colleagues on administrative leave, abruptly suspend all programming and thereby silence the U.S. government's primary international broadcasting outlet has caused significant and multifaceted harm. The abrupt cessation of programming has disrupted the core mission of VOA—to inform, engage, and connect people around the world in support of freedom and democracy. The credibility of VOA, carefully built over decades, has been severely undermined, not only damaging our professional reputations but also impairing the ability of journalists to re-establish trust with sources and audiences in the future. The reputational damage inflicted by being placed on administrative leave without clear justification has caused personal and professional harm. For many of us, our careers are defined by our commitment to ethical journalism and public service. The insinuation of wrongdoing or incompetence by such administrative action—carried out without due process—has stigmatized and demoralized dedicated journalists, casting doubt on our integrity and undermining our standing in the professional community. The consequences of these actions extend far beyond our personal circumstances.

21. VOA's foreign correspondents and our other Foreign Service or Civil Service excursion status colleagues, many of whom operate in countries where press freedom is under constant threat, have been placed at heightened risk. Our sudden silence has been interpreted by hostile regimes as a retreat by the U.S. government from its longstanding commitment to press freedom.

**JA170**

Colleagues are rightly concerned that they are or will be being harassed, surveilled or threatened by adversarial governments seeking to exploit the disruption at VOA to target journalists associated with or perceived as sympathetic to U.S. international broadcasting. The long-term consequences of silencing VOA will reverberate globally, eroding the influence and moral authority of the United States at a time when factual, independent journalism is more vital than ever.

22. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at New York, New York on the 23rd day of March, 2025.

_Steven L Herman_
_____
Steven L. Herman

**JA171**

# S Herman AFSA Dec - PW v. Lake (SDNY) FINAL

**Final Audit Report**                                                    2025-03-23

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ███████████████ |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAiONbtCl3FClgjeDct5IWtddT0sZVX4hC |

## "S Herman AFSA Dec - PW v. Lake (SDNY) FINAL" History

🗎 Document created by ███████████████
  2025-03-23 - 4:05:31 PM GMT

📧 Document emailed to Steven Herman (███████████████ for signature
  2025-03-23 - 4:06:17 PM GMT

🗎 Email viewed by Steven Herman (███████████████
  2025-03-23 - 4:08:49 PM GMT

✒ Document e-signed by Steven Herman ███████████████
  Signature Date: 2025-03-23 - 4:09:11 PM GMT - Time Source: server

✅ Agreement completed.
  2025-03-23 - 4:09:11 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT R

**JA173**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                      Plaintiffs,

      -against-

KARI LAKE, et al.,

                   Defendants.

Index No. 25 Civ. 2390

## DECLARATION OF PATSY WIDAKUSWARA

I, Patsy Widakuswara, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am an award-winning journalist and Federal Employee of the Voice of America (VOA), an international broadcasting state media network funded by the federal government and overseen by United States Agency for Global Media (USAGM). I joined VOA in 2003 and since August of 2021, I have served as the agency's White House Bureau Chief. My work includes reporting on the administration by producing accurate, contextual, and balanced web articles, radio and television pieces that supports programming to VOA's 49 language services to enact our Congressionally mandated mission to serve as a consistently reliable and authoritative source of news, to present the policies of the United States clearly and effectively as well as to present responsible discussions and

1

**JA174**

opinion on these policies.[1] My duties also include managing a team of eleven White House correspondents reporting in English, Spanish, Mandarin, Farsi, Russian, Ukrainian, Turkish, Dari, Pashto and Indonesian.

3. On March 15, 2025, I received a directive via email from the Director of USAGM Human Resources, Crystal Thomas that placed me on administrative leave until further notice, barring me from entering USAGM premises and accessing USAGM systems. On the same day, I saw USAGM's March 15, 2025, news release[2]. Those actions have irreparably harmed me in the following ways.

**Irreparable Harm to My Career**

4. I have been a journalist for thirty years, starting from the very bottom of the industry's ladder. For me, as is the case for most if not all journalists who focus on politics and foreign policy, being in the position of White House Bureau Chief is the pinnacle of my career. If VOA is not reinstated, I fear that I will not be able to find employment that is comparable in prestige and pay.

5. In addition, the broad brush used by the Defendants to paint VOA as corrupt, irretrievably broken, coordinating with radical Leftist groups and infiltrated by adversaries means that I am unfairly tainted, which could impact my future career opportunities.

**Irreparable Harm to My Professional Reputation**

6. Throughout my thirty-year career I have placed journalistic integrity as the north star that guides me to report without fear or favor and hold the powerful to account. In the

---

[1] The VOA Charter was signed into law by President Gerald R. Ford on July 12, 1976. The Charter protects the editorial independence and integrity of VOA programming.
[2] https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/

JA175

thousands of reports that I have produced for VOA, my editors and I have taken every measure to practice ethical journalism, by ensuring that information is true and accurate, and our coverage is fair. Our journalism aims to be as objective as possible and never skewed in favor of any one party.

7. I, like most if not all my colleagues, take pride in the fact that more than 80% of our global audience place their trust in VOA.[3] Many of them, like myself, have dedicated years if not decades of our career into building the VOA brand that is seen by an independent media bias monitoring group as "least biased" and ranked "high" in factual reporting.[4] The Defendants' attacks have irreparably damaged VOA's reputation as a credible and trustworthy news source that my colleagues and I have painstakingly built.

8. In addition, the Defendants have painted VOA employees as corrupt, incompetent, and even threats to national security. To be publicly associated with "waste, fraud, and abuse," "spies and terrorist sympathizers," and "fake news" is deeply damaging to my professional reputation and personal dignity.

**Irreparable Emotional Harm**

9. The abrupt and immediate placement on administrative leave has created enormous anxiety for me. With dependents relying on my income, the uncertainty about my future employment and financial stability is causing me extreme emotional distress.

10. In addition, I have dedicated twenty-two years of my life to uphold the VOA Charter that ensures our journalistic independence and integrity. To have that work dismissed as

---

[3] https://www.usagm.gov/2025/01/17/usagm-networks-reached-record-global-audience-in-fy-2024-according-to-new-report/
[4] https://mediabiasfactcheck.com/voice-of-america/

"rotten" and "a national security risk" is deeply demoralizing as it seeks to invalidate my decades of professional commitment.

11. For me and my colleagues who who have spent years or decades dedicating our work to VOA, the Defendants' attacks are emotionally devastating, stripping away not just a job but a sense of mission and purpose. Their assertion that the agency is "not salvageable" sabotages our meaningful work to bring factual, balanced and comprehensive journalism to 360 million weekly global audience, including regular people, civil society activists and decision makers around the world who are facing the onslaught of disinformation and propaganda from U.S. adversaries including Russia, Iran, China and extremist organizations such as ISIS and Al-Qaida. With VOA silenced, there is no one to push back against their messaging and tell America's story.

12. And, given the Defendants' inflammatory rhetoric accusing employees of being security risks, sympathizers of adversaries, and taking part in fraudulent schemes, I fear I can become the target of harassment, threats, or even violence from individuals who take such accusations at face value.

13. The Defendants attacks vilify, discredit, and dehumanize my work and my colleagues' work in a way that causes lasting emotional and professional damage.

Executed at Washington, DC on the twenty third day of March, 2025.

*Patsy Widakuswara*
Patsy Widakuswara (Mar 23, 2025 18:14 EDT)
PATSY WIDAKUSWARA

4

**JA177**

# 01 Revised Widakuswara v3 - New for Signature

**Final Audit Report** 2025-03-23

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ███████████████████████ |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkDntz-EkhPCZWnioZIsPJJFP83H6DvRP |

## "01 Revised Widakuswara v3 - New for Signature" History

🗎 Document created by ████████████████████████
   2025-03-23 - 9:57:16 PM GMT

📧 Document emailed to Patsy Widakuswara ███████████████████ for signature
   2025-03-23 - 9:57:20 PM GMT

🗎 Email viewed by Patsy Widakuswara ████████████████
   2025-03-23 - 10:12:30 PM GMT

✍ Document e-signed by Patsy Widakuswara ██████████████████
   Signature Date: 2025-03-23 - 10:14:30 PM GMT - Time Source: server

✅ Agreement completed.
   2025-03-23 - 10:14:30 PM GMT

Adobe Acrobat Sign

**JA178**

# EXHIBIT S

JA179

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                           Plaintiffs,                              Index No. 25 Civ. 2390

        -against-

KARI LAKE, et al.,

                           Defendants.

**DECLARATION OF JESSICA JERREAT**

I, Jessica Jerreat, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a journalist and an FTE employee of the Voice of America (VOA).  VOA is overseen by USAGM and is an international media network funded by the federal government. I joined VOA as the Press Freedom Editor on March 15, 2020. In that role, I oversee and exercise editorial discretion over the Press Freedom Desk, which provides coverage to VOA's 49 language services and affiliates about attacks, threats and harassment of journalists globally. I am an editor who exercises editorial control, judgment, and discretion.  In the past five years I have built up the Press Freedom Desk from scratch and led several award-winning multimedia projects.

3. On March 15, 2025, I received an email from USAGM's office of human resources informing me that I had been placed on administrative leave, effective immediately, and that during that time I am not to access USAGM premises or systems. I lost access later that day to my VOA email and work systems.

1

**JA180**

4. Due to the actions alleged in the Complaint in this case, I have been irreparably harmed and will continue to be irreparably harmed. Reinstatement might mitigate that harm.

**Irreparable Harm to My Career**

5. As a VOA journalist and Press Freedom Editor I am bound by the Charter and Congress-mandated mission to be a consistently reliable and authoritative source of news to VOA's audience of more than 360 million. VOA for more than 80 years has been a trusted voice to audiences in the most censored countries globally. Today, it has been silenced. In that void, adversaries in Russia and China are celebrating.

6. As the Press Freedom Editor, I provide timely and credible coverage of actions taken by authoritarian regimes to threaten, imprison, or attack journalists. The inability to carry out my assigned role this week prevented the VOA Press Freedom desk from reporting on the March 20, 2025, conviction in New York of two Russians a court says were hired to assassinate my VOA Persian colleague Masih Alinejad. The actions harm my First Amendment rights of Freedom of the Press as a journalist and through that, my role as the Press Freedom Editor who is tasked with exporting those ideals to audiences who look to the U.S. as a beacon of democracy and free media.

7. As the Press Freedom Editor, I hold what I believe to be a unique title and role. I believe VOA is the only news network to have a team dedicated full time to coverage of the challenges confronting media globally today. Because of that, my ability to find a comparable role is limited. Before working at VOA, I had been a senior editor with the nonprofit the Committee to Protect Journalists. The VOA position enabled me to take a passion for championing press freedom and combine it with my already strong background in covering international news. It was a rare opportunity and one I have

**JA181**

worked hard to nurture and build. In my five years at VOA, I have built a beat-centric desk from scratch and led several award-winning projects for web and documentary. I am now denied the ability to continue that work with my dedicated team.

8.  The statements being made weaken trust in VOA as a truly independent news organization and risk damaging my integrity in being able to promote the network as free from government interference.

9.  As a journalist at VOA with 5 years of service that had all been ranked at outstanding in annual reviews, the inability to work has damaged my professional development. The week I was placed on administrative leave I was due to start learning new skills within the newsroom that would have enabled me at a later date to be a more competitive candidate in more senior roles. As the Press Freedom Editor, my team and I have previously reported on issues inside VOA that allow for transparency to audiences. By being placed on administrative leave at short notice, we were denied the opportunity to communicate with our audiences, through balanced, independent news coverage, what is happening. That causes harm both to employment status and also the integrity of the press freedom unit.

10. The misleading comments made in interviews and social media damage the professional reputation of myself and my colleagues by claiming VOA hires spies and terrorist sympathizers. As the Press Freedom Editor, I am acutely aware of how such statements can put my colleagues and I at risk of harm in hostile countries

**Irreparable Harm to My Professional Reputation**

11. As the Press Freedom Editor, statements that suggest a change in VOA's Charter and undermining of the firewall damage my professional reputation as a journalist of integrity

3

**JA182**

and an authoritative voice on media freedom. As Press Freedom Editor and a journalist of nearly 25 years' experience, my professional reputation and credibility will be damaged if a weakening of the Charter and mission means I can no longer publish truly independent, fact-based news.

12. As part of my duties, I speak at conferences and to visiting fellows about the unique role of VOA and its Press Freedom Desk and have always been able to confidently say that the Charter and Firewall ensure that while VOA is Congressionally funded it is also fully independent. The recent statements suggest those protections are being weakened. For example, in announcing Kari Lake as Special Adviser, Acting CEO Victor Morales described USAGM's "mission to clearly and effectively present the policies of the Trump Administration around the world." The USAGM stated mission, per its web page, is to "inform, engage, and connect people around the world in support of freedom and democracy." The statements undermine the 83 years of trust and credibility VOA has built with its audiences as an antidote to propaganda and disinformation. Trust takes decades to build and only a short time to lose. The longer VOA remains off air and unprotected from such statements, the network and the journalists dedicated to its mission risk long lasting harm.

**Irreparable Emotional Harm:**

13. As the Press Freedom Editor who previously reported on efforts in 2020 by a presidentially appointed CEO to breach the editorial firewall (efforts that earned recognition by the National Press Club) I have been under extreme stress that I may be targeted for termination or otherwise harassed or retaliated against. The communication leading up to the March 15, 2025, administrative leave email was already causing

4

**JA183**

emotional stress to myself and my team. The order blocked me from work systems, adding extra anxiety and difficulty in being able to gain clarity on future job security. A follow up email sent to the USAGM official went unanswered.

14. The uncertainty of the process to follow is causing undue anxiety over financial commitments. In recent weeks, comments made publicly by officials saying they wanted the federal workforce to be "traumatically affected," or that called for VOA to be shuttered or suggested a change in the Charter, coupled with buyout offers with limited time and details to weigh the validity of offer have caused high levels of stress and anxiety, an inability to sleep and increased migraine. As a supervisor the actions have harmed the team who directly report to me by creating uncertainty and fear of being unjustly targeted just for doing their work.

15. For five years I have strived to work to the highest standards of journalism and to support the unique history and mission of VOA to broadcast to the most censored countries globally. I have been in awe of the courage of my colleagues on J1 visas who report for VOA in the knowledge it could put them and their families in harms way. My understanding of the J1 program is that the visa is contingent on employment at VOA. If a contract is terminated, the journalist has 30 days to leave the U.S. To see the disregard for the safety of colleagues who if they are terminated and returned to their home countries would face imprisonment, attack or worse is inhumane and, frankly, heartbreaking.

16. To have the body of work VOA produces be described as "giant rot" and not worth salvaging, and to be publicly associated with "waste, fraud, and abuse" or denigrated as

5

fake and biased news produced by Leftist radicals is not only false. It is abusive,

demoralizing and an insult to my career and to the legacy of VOA.

Executed at Alexandria, VA on the 23rd day of March 2025.

Jessica Jerreat (Mar 23, 2025 18:54 EDT)

JESSICA JERREAT

6

**JA185**

# Updated Declaration for Signature

**Final Audit Report** 2025-03-23

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ███████████████████ |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA8ZYee5gYF1MP1-XhGBXgoC09bQA3nBFE |

## "Updated Declaration for Signature" History

📑 Document created by ███████████████████
   2025-03-23 - 10:47:18 PM GMT

📧 Document emailed to Jessica Jerreat ██████████████ for signature
   2025-03-23 - 10:47:22 PM GMT

📑 Email viewed by Jessica Jerreat ██████████████
   2025-03-23 - 10:49:11 PM GMT

✅ Document e-signed by Jessica Jerreat ██████████████
   Signature Date: 2025-03-23 - 10:54:54 PM GMT - Time Source: server

✅ Agreement completed.
   2025-03-23 - 10:54:54 PM GMT

Adobe Acrobat Sign

**JA186**

# EXHIBIT T

JA187

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

               Plaintiffs,

    -against-

KARI LAKE, et al.,

               Defendants.

Index No. 25 Civ. 2390

### DECLARATION OF KATHRYN NEEPER

    I, Kathryn Neeper, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.    I am a plaintiff in this case.

    2.    I am the Director of Strategy and Performance Assessment at USAGM, where I manage the Offices of Policy and Research, Editorials, and Internet Freedom, and oversee USAGM's strategic planning, performance reporting, research, data analytics, and interagency outreach. I joined USAGM's predecessor agency, the Broadcasting Board of Governors, in 2008. I am a resident of the District of Columbia and an FTE of USAGM.

    3.    On Saturday, March 15 at 9:59am, I received an email to my official account from USAGM's Director of Human Resources stating that I was being placed on administrative leave, effective immediately, and that the administrative leave was not for any disciplinary purpose. The email instructed me not to enter USAGM premises, access USAGM systems, or use my position or authority with USAGM in any way without prior permission. Later that day, my agency-issued laptop and mobile phone lost access to all USAGM systems.

    4.    I am now being irreparably harmed and will continue to be irreparably harmed unless I am reinstated.

1

**JA188**

5.      The decision to shut down the agency, and subsequent vague and unsubstantiated allegations of mismanagement, has harmed my reputation as a senior manager at USAGM. I have consistently carried out my duties to the best of my ability, managed a high-performing team, and received the agency's highest possible rating on my last five performance evaluations.

6.      The sudden termination of the organization where I have spent the vast majority of my professional career has been enormously stressful, causing emotional damage. I have spent the subsequent week planning for a suddenly altered future career, and doing my best to help colleagues in precarious situations make plans to protect themselves and their families.

7.      These actions have irreparably harmed my career. I have spent nearly 17 years at this agency, working my way up from an early career fellowship program to a senior strategic role in a large international organization, where I oversee multiple offices and a team of exceptional professionals. There are few comparable roles elsewhere in the public or private sectors, and finding an appropriate match for my skills and abilities will be very difficult.

8.      Based on my experience overseeing research, digital analytics, and performance reporting for VOA and its sister entities, on both new and existing media programs and products, I believe that the interruption of VOA services could cause an unrecoverable loss of audiences. When the USAGM entities have launched service in a new language, or re-launched service in a language that was previously terminated, it has usually taken a period of multiple years to gain enough brand awareness to build a sizeable audience that trusts the programming. In the absence of high-quality information provided by VOA, audiences that previously used the brand will likely turn to readily available information from America's adversaries, including CCP-operated networks, Russian propaganda outlets, and violent extremist propaganda. Once lost, they may never return.

**JA189**

9.      I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed at Washington, D.C. on the twenty third day of March, 2025.

*Kathryn Neeper*

Kathryn Neeper (Mar 23, 2025 16:15 EDT)

KATHRYN NEEPER

3

**JA190**

# 03 Neeper v3 - updated 3-23 - New For Signature

**Final Audit Report**                                                   2025-03-23

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ██████████████████████ |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAE1WMVSRAWBdCgKtNlRwGuKrXPT7Y4vwn |

## "03 Neeper v3 - updated 3-23 - New For Signature" History

📄 Document created by ████████████████████████
  2025-03-23 - 10:12:51 PM GMT

📧 Document emailed to Kathryn Neeper ████████████████ for signature
  2025-03-23 - 10:12:54 PM GMT

📄 Email viewed by Kathryn Neeper ████████████████
  2025-03-23 - 10:13:59 PM GMT

🖋 Document e-signed by Kathryn Neeper ████████████████
  Signature Date: 2025-03-23 - 10:15:53 PM GMT - Time Source: server

✅ Agreement completed.
  2025-03-23 - 10:15:53 PM GMT

# EXHIBIT U

JA192

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                    Plaintiffs,

     -against-

KARI LAKE, et al.,

                    Defendants.

Index No. 25 Civ. 2390

**DECLARATION OF JOHN DOE 1**

1. I, John Doe 1, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

2. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

3. I am a senior journalist at VOA and an FTE of VOA. I have over 15 years of journalistic experience. I am a resident of New York County, New York.

4. I am an editor that exercises editorial control, judgment, and discretion. Before I was placed on administrative leave on March 15, 2025, I had a fulfilling, dynamic and intellectually stimulating job where I worked closely with dozens of a highly skilled journalists representing 10 VOA language services.

5. By placing me on administrative leave without reason, firing all VOA contractors (PSCs) and starting the de facto dismantling of our 83-year-old iconic media institution, the Defendants not only took away the job I deeply loved but deprived me of the privilege of my life – being the source of balanced and uncensored news to the millions of people living under autocratic rule in dozens of countries around the world.

**JA193**

6.  As a result of the Defendants' actions, millions of VOA's audience members lost access to a reliable and trusted source of information. It is my genuine concern that those audience members may never come back to VOA and will be forced to get their information from less trustworthy news sources in the future.

7.  Very few media organizations in the world have VOA's impeccable track record of delivering unbiased news to the most politically restricted regimes. Finding another organization like this and securing a unique role comparable to the one I have had at VOA will be an extremely difficult task, if not an impossible one. Therefore, the Defendants have done irreparable harm to my professional life.

8.  Additionally, given the slander that the Defendants have spread about VOA journalists, irreparable damage has been done to my professional reputation. Therefore, my professional credibility will be damaged unless I am fully reinstated.

9.  The Defendants' actions of abruptly shutting down VOA's broadcasting and creating a high-level of uncertainty caused me significant emotional harm: multiple sleepless nights and anxiety about my future - both professional and financial.

10. Unproven accusations by Defendants of VOA journalists being "spies" and "terrorist sympathizers" will inevitably not only have serious adverse effects on my future career and livelihood, but also on my safety and the safety of my family.

11. As a result of all those actions by the Defendants, I have suffered and continue to suffer irreparable harm. In order to mitigate that harm, at least partially, I have to be fully reinstated.

12. I am asking to appear in this case using a pseudonym because I fear for my physical safety and the physical safety of my family that lives in my home country.  While I am

**JA194**

now a US Citizen, I was born in another country and I have family still living in that country. My home country is governed by an authoritarian regime that would be supportive of the VOA shutdown and upset at anyone who opposed the shutdown as I am doing by being a plaintiff in this case. Due to the parties and issues involved, I believe this case will be widely publicized. I am also concerned that if the defendants in this case learned of my identity, I will be a target for retribution. I fear that if my colleagues are permitted to go back to reporting the news, I will then be a target and singled out for termination.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at New York City, New York on the 23rd day of March, 2025.

*John Doe 1*
John Doe 1 (Mar 23, 2025 18:40 EDT)
_____
JOHN DOE 1

3

**JA195**

# 04 John Doe 1-V5 - New for Signature

**Final Audit Report** 2025-03-23

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ███████████████████████ |
| Status: | Signed |
| Transaction ID: | ██████████████████████ |

## "04 John Doe 1-V5 - New for Signature" History

📄 Document created by ████████████████████████████
2025-03-23 - 10:31:15 PM GMT

📧 Document emailed to John Doe 1 ██████████████ for signature
2025-03-23 - 10:31:18 PM GMT

📄 Email viewed by John Doe 1 ██████████████
2025-03-23 - 10:34:48 PM GMT

✒️ Document e-signed by John Doe 1 ██████████████
Signature Date: 2025-03-23 - 10:40:28 PM GMT - Time Source: server

✅ Agreement completed.
2025-03-23 - 10:40:28 PM GMT

**Adobe Acrobat Sign**

**JA196**

# EXHIBIT V

JA197

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

   -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 2390

**DECLARATION OF JOHN DOE 2**

1. I, John Doe 2, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

2. I am a journalist at VOA and a Full Time Employee (FTE). I joined VOA over 15 years ago. I reside in New York County, New York.

3. I am asking to appear in this case using a pseudonym because I fear for my physical safety and the physical safety of my family that lives in my home country. While I am now a US Citizen, I was born in another country, my home country and still have family in that home country. My home country is governed by an authoritarian regime that would be supportive of the VOA shutdown and upset at anyone who opposed the shutdown as I am doing by being a plaintiff in this case. Due to the parties and issues involved, I believe this case will be widely publicized. I also fear that if the Defendants learn of my identity, I might become target of retribution from the Defendants. I fear that the Defendants might engage in instigation of violence against named parties of this lawsuit. I fear that if VOA journalists are

1

**JA198**

permitted to go back to work at VOA, I would then be a target and singled out for termination.

4. On March 15, 2025, in the morning, I received an email from Crystal Thomas at HR at USAGM that informed me that I was put on paid administrative leave until further notice, and that the leave was not a disciplinary measure. The email stated that I was not to use my work email, work voice mail, and that I had no access to the VOA office. The email also stated that I should, upon request, surrender my work badge and all the work equipment. The email also stated that the decision was "Pursuant to the President Executive Order Continuing the Deduction of Federal Bureaucracy".

5. I am now being and will be irreparably harmed if the USAGM is shuttered and if I am not reinstated to VOA. Over the course of more than 15 years with VOA, I have acquired and developed a set of skills and professional abilities that are unique to VOA and its mission. Now I have a unique professional position in the context of VOA, and it is highly unlikely that I will be able to acquire a comparable professional position and employment outside of VOA. My whole career and my very livelihood will be endangered and very likely shattered as a result of the Defendants' actions.

6. As a professional journalist with more than 15 years of experience at VOA, along with my many VOA colleagues, I have developed a large audience of readers, listeners and viewers who have been following our VOA reporting. My reports, as the reports of my colleagues, have been gathering hundreds of thousands, at times millions of views from the audience oversees. Every minute VOA stays off the air, we are losing our audience which, without our presence on the media market, is likely to turn to less reliable, and to even hostile to the US news sources.

**JA199**

7.  My professional reputation is being and will be irreparably harmed and damaged if the Defendants shutter VOA. As the International Broadcasting Act 1994 establishes, VOA, and myself as its journalist, must deliver news which "is consistently reliable and authoritative, accurate, objective, and comprehensive." Over the past several months, the Defendants and their supporters have engaged in a slander and defamation campaign towards VOA journalists including myself, publicly and on various media platforms, in an effort to destroy our reputation. They called us "the Voice of the Soviet Union," "Voice of Radical America," promoters of foreign propaganda, "a disgrace," "fake news media," "radical left crazy people talking to themselves while torching" taxpayer money," "rotten fish," etc. All these accusations are completely false. I take pride in my reputation as a professional, fair and objective journalist. However my reputation suffers tremendously and may be irreparable because of these unfounded accusations, if VOA is not returned to its operations and I am not reinstated.

8.  I have been profoundly traumatized and disturbed by the intimidation campaign that the Defendants and their supporters have launched against federal employees and civil servants. In several speeches in 2023 and in 2024, the Administration's Director of the Office of Management and Budget (OMB) Russell Vought said: "We want the bureaucrats to be traumatically effected. When they wake up in the morning, we want them not to go to work because they are increasingly viewed as villains". By "bureaucrats" he meant federal workers like myself. I have been receiving intimidating emails from OPM (Office of Personnel Management) suggesting that I resign or take a buy out. I have been asked to report about my weekly accomplishments to OPM, as if regular reporting on my work to my supervisors and editors has not been sufficient or reliable. Federal workers like myself have been vilified and

**JA200**

mocked publicly in the press by the Defendants and their supporters. I am an exemplary, award winning journalist with impeccable record. Because of these assaults, I have been feeling traumatized and unjustly targeted.

Executed at New York, NY on this 23rd day of March 23, 2025.

*John Doe 2*
John Doe 2 (Mar 23, 2025 19:27 EDT)

JOHN DOE 2

**JA201**

# 05 John Doe 2 Updated Sunday v3 - New for Signature - Final

**Final Audit Report**                                        2025-03-23

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ███████████████████████ |
| Status: | Signed |
| Transaction ID: | ███████████████████████ |

## "05 John Doe 2 Updated Sunday v3 - New for Signature - Final" History

🔴 Document created by ██████████████████████████
   2025-03-23 - 11:25:15 PM GMT

📧 Document emailed to John Doe 2 ████████████████ for signature
   2025-03-23 - 11:25:19 PM GMT

🔴 Email viewed by John Doe 2 ██████████████
   2025-03-23 - 11:25:40 PM GMT

✍️ Document e-signed by John Doe 2 ████████████
   Signature Date: 2025-03-23 - 11:27:12 PM GMT - Time Source: server

✅ Agreement completed.
   2025-03-23 - 11:27:12 PM GMT

**Adobe Acrobat Sign**

**JA202**

# EXHIBIT W

**JA203**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

               Plaintiffs,

    -against-

KARI LAKE, et al.,

               Defendants.

Index No. 25 Civ. 2390

## DECLARATION OF JOHN DOE 3

I, John Doe 3, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a PSC, i.e., an independent freelance journalist, working under a contract with the Voice of America (VOA) that is connected to USAGM's foreign exchange programs. I have worked at VOA as a journalist for more than two years. I am also a foreign national who is authorized to work for VOA in the United States under a J-1 visa. I am resident of the District of Columbia.

3. On March 16, 2025, I was told that my contract would be terminated effective March 31, 2025. On March 21, 2025, I was notified that my visa will expire on March 31, 2025. I understand that my J1 visa has a 1-month grace period so I will have to leave the United States by April 30, 2025. Under the terms of the J-1 exchange program, I am obligated to return to my home country after my program ends and reside there for two years. However, as a former U.S government contractor and a journalist, it is not safe for me to return. This has caused me significant stress and emotional trauma.

1

**JA204**

4. If my visa is not renewed, I must return to my home country and I will be irreparably harmed. My home country is governed by an authoritarian regime that has labeled VOA a subversive organization. I risk imprisonment for over 10 years on charges of spreading "false information" for reporting about my home country.

5. I am asking to appear in this case using a pseudonym because I fear for my physical safety and the safety of my family that live in my home country if I used my real name because of the situation in my home country. My home country is governed by an authoritarian regime that would be supportive of the VOA shutdown and upset at anyone who opposed the shutdown as I am doing by being a plaintiff in this case. I expect this case will be widely publicized and that the regime will learn about it. That regime retaliates against those who it opposes and against its former nationals who gain notoriety. I am also concerned that if the defendants in this case learned of my identity, I would be a target for retribution. I fear that if my colleagues are permitted to go back to reporting the news, I would then be a target and singled out for termination.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Washington, D.C. on the 23rd day of March, 2025.

*John Doe 3*
_____
JOHN DOE 3

2

**JA205**

# EXHIBIT X

**JA206**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                     Plaintiffs,

      -against-

KARI LAKE, et al.,

                    Defendants.

Index No. 25 Civ. 2390

## DECLARATION OF JOHN DOE 4

I, John Doe 4, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a PSC (Personal Service Contractor) - an independent journalist, working under a contract with VOA. I reside in the County of Queens, New York.

3. I am a foreign national who is authorized to work for VOA in the United States under a J-1 visa, as part of the USAGM foreign exchange program. On March 16, 2025, I was told that my contract would be terminated effective March 31, 2025 and, as a result, my visa will expire on April 30, 2025.

4. I will be irreparably harmed if I return to my home country. I am a member of the LGBTQ community. My home country persecutes and discriminates against the LGBTQ community. I believe my physical safety will be at risk once I return.

**JA207**

5. As part of LGBTQ community and a human being, the shuttering of USAGM will do irreparable harm to me because: A. I lost my main access to make ends meet and health benefits to support my medical condition, B. It causes distress and emotional damage, and I will lose my access to psychological therapy, C. Going back to my home country will result in further harm due to my sexual orientation and my work that has known to be specializing in minority stories including LGBTQ rights.

6. Kari Lake has referred to us as terrorist sympathizer and spy which cause us irreparable damage to my reputation as seasoned journalist with more than 10 years' experience, and had won awards for the passion I put into my work. Finding new opportunities shall be met with challenge unless I am being reinstated to my work and prove my credibility is not as alleged.

7. I am asking to appear in this case using a pseudonym because I fear for my physical safety and the physical safety of my family that lives in my home country if I used my real name.  My sexual orientation (which I am revealing to the court in this declaration to explain why I fear my contract being terminated and my visa expiring) has not been publicly reported.  I fear discrimination and harm to me and my family in my home country due to my sexual orientation, because of the persecution and discrimination that are levied against LGBTQ people in my home country. I also am concerned that if named in this lawsuit, I would be a target of retribution from my former workplace management.

8. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Queens County, New York on the 23rd day of March, 2025

JA208

*John Doe 4*
John Doe 4 (Mar 23, 2025 20:13 EDT)

JOHN DOE 4

**JA209**

# 07 John Doe 4 v3 - New for Signature

Final Audit Report                                                        2025-03-24

| | |
|---|---|
| Created: | 2025-03-23 |
| By: | ███████████████████ |
| Status: | Signed |
| Transaction ID: | ████████████████████ |

## "07 John Doe 4 v3 - New for Signature" History

📄 Document created by ███████████████████
2025-03-23 - 11:20:39 PM GMT

📧 Document emailed to John Doe 4 ████████████████ for signature
2025-03-23 - 11:20:42 PM GMT

📄 Email viewed by John Doe 4 ████████████
2025-03-24 - 0:09:10 AM GMT

✒️ Document e-signed by John Doe 4 (█████████████)
Signature Date: 2025-03-24 - 0:13:32 AM GMT - Time Source: server

✅ Agreement completed.
2025-03-24 - 0:13:32 AM GMT

**Adobe Acrobat Sign**

**JA210**

# EXHIBIT Y

JA211

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                    Plaintiffs,

        -against-

KARI LAKE, et al.,

                    Defendants.

No. 25 Civ. 2390

## DECLARATION OF CLAYTON WEIMERS

I, Clayton Weimers, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the Executive Director of Reporters without Borders USA ("RSF USA").

3.      RSF USA is a 501(c)(3) non-profit organization headquartered in Washington, D.C. It is the North American affiliate of Reporters Sans Frontières' ("RSF"), in the sense that it operates as a branch of RSF for this region. RSF is an international non-profit, non-governmental organization dedicated to protecting the freedom, pluralism and independence of journalism, and to defending those who embody these ideals, as well as promoting and defending the right of the public to access reliable and pluralistic information.

4.      RSF USA monitors press freedom violations, raises awareness, advocates for policies supporting access to information, exposes bad actors, and mobilizes the public with respect to press freedom issues.

1

**JA212**

5.      RSF USA's work depends on access to VOA's global reporting to monitor

emerging threats and advocate on behalf of dissidents, imprisoned journalists, and press freedom

more broadly.

6.      For much of our work, we rely on direct contact with journalists in regions with

limited access to free press and information. VOA is often the only partner that can facilitate the

free flow of this information to our journalistic partners, including those that are imprisoned

and/or at risk of physical harm. VOA's reach also allows RSF USA to support high-impact

advocacy efforts, including coordination with members of Congress representing constituencies

with strong ties to these regions. Shutting down VOA severely impedes our ability to effectively

accomplish these goals, irreparably damaging our work and mission.

7.      For example, we work closely with the son of Jose Ruben Zamora, a prominent

Guatemalan journalist and dissident, who is currently imprisoned in that nation. Only VOA

provides a direct line of communication to Guatemalan audiences both inside and outside the

country, including diaspora communities in the United States. Without VOA, our ability to work

with the Zamora family, and to advocate for Jose Ruben Zamora, will be severely curtailed.

8.      VOA plays a unique role in sharing RSF USA's findings and campaigns with

diaspora communities across Asia, North America, and Europe. For this work, no other domestic

outlet in those places can match the impact of VOA. Moreover, we rely on VOA's reporting to

inform our research and advocacy. For instance, VOA has been especially important with respect

to our coverage of the jailed Hong Kong journalist Jimmy Lai. That is because VOA, in

particular, is one of the few independent outlets that can reach audiences in Hong Kong, given

the region's repressive media environment. VOA has published interviews with Lai, his family,

and others that directly feed into our research. Without access to this reporting, our work will

2

suffer greatly and we will have to expend significant additional resources to continue advocating for Jimmy Lai. VOA also employs exiled Hong Kong journalists who have an invaluable and irreplaceable perspective when covering these stories, both for audiences in Hong Kong and abroad. These same journalists are themselves imperiled by VOA's closure, facing potential deportation to Hong Kong where they will face certain threats, including interrogation, detention, and forced disappearance.

9.    Our research and publications hold value insofar as they can reach vulnerable groups. Owing to its foundational mission to expand press freedom around the world, VOA is perhaps the only American media outlet with a dedicated "press freedom desk" that regularly investigates and covers stories concerning press freedom in the United States and around the world. VOA frequently covers RSF and RSF USA's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention. Additionally, VOA serves as a reliable source for monitoring media freedom and political developments. Without it, RSF and RSF USA have fewer avenues to communicate urgent issues to global audiences — irreparably frustrating their operations. Further, this reduces the visibility of press freedom violations, rendering advocacy efforts — including RSF and RSF USA's — less effective and more cost- and labor-intensive, to the detriment of the organizations.

10.    RSF USA, in particular, utilizes VOA to disseminate its information work and communicate with vulnerable groups. Both organizations are based in Washington, D.C. and have relationships with correspondents around the world. RSF USA exchanges with VOA are unique, in part owing to VOA's foundational mission — including its dedicated "press freedom desk." I have personally conducted more in-depth interviews with VOA than any other media

3

**JA214**

outlet, which has been an essential part of my job leading our advocacy efforts. Without VOA, I have lost access to this critical irreplaceable channel.

11.    Before VOA's closure, I conducted an interview with VOA to discuss RSF's Press Freedom Index — which assesses countries' press freedom records. VOA translated the interview into multiple languages and distributed it across its network throughout the world. I was therefore able to reach populations that rely solely on VOA radio services. Those audiences are often the ones most impacted by media crackdowns and benefit the most from RSF USA's advocacy. Our ability to address these listeners is critical to our mission and operations, and without VOA we will suffer severe irreparable harm.

12.    Additionally, RSF USA plays a role in interpreting and advocating around press freedom violations in the United States for international audiences, a critical function that VOA enables. From covering the killing of Las Vegas journalist Jeff German to reporting on local press crackdowns like the Marion County Record raid in Kansas, VOA translates domestic incidents into global news — helping us hold the U.S. accountable to its own First Amendment standards while defending American journalists in the global press freedom landscape.

13.    As an affiliate of RSF, I am also aware that RSF USA suffers from all of the same irreparable harms as RSF. That includes stripping our correspondents of access to reliable information they rely upon, in areas where VOA is one of the few, if not the only, sources they have; preventing RSF learning about and transmitting knowledge about journalists, their public safety, and press freedom; and significantly obstructing our ability to advocate for a free press. Losing outlets such as VOA's "press freedom desk" immediately damages our operations. As RSF's North American affiliate, every damage to RSF necessarily deleteriously impacts our

**JA215**

5

ability to function and fundamentally injures our organization, as we work together in a fully integrated way.

14.     I declare under penalty of perjury that the foregoing is true and correct.

Executed at Miami, Florida on the 23rd day of March, 2025.

_____

Clayton Weimers

# EXHIBIT Z



# EXHIBIT AA

**JA219**

 Outlook

---

**Important: Information Request**

---

**From** USAGM House Announcements <HouseAnnouncements@usagm.gov>

**Date** Thu 3/6/2025 7:08 PM

**To** All Staff <AllStaff@usagm.gov>



As restructuring, reductions in force (RIFs), and other workforce changes continue across the federal government, USAGM is taking proactive steps to ensure we can communicate with all employees effectively, especially when email access may be limited.

"To facilitate timely updates on important matters, all employees are **asked** to send an email to HRCustomerService@usagm.gov with their **personal email address and phone number**."

This information will be kept confidential and will not be shared outside of Human Resources.

Please use the following subject line:

**Subject:** Personal Information for [Your Name]

The intent behind this request is solely to enhance the agency's ability to communicate important information with employees in the event that work email access is disrupted or the employee doesn't have access to their work email.
**Employees who choose not to provide their personal contact information will not face any penalties or adverse consequences**; however, they may miss critical agency updates should an unforeseen issue impact our internal communication systems.

**Please submit this information by next, Friday, March 14, 2025, at 5:00PM.**
We appreciate your cooperation and commitment to staying informed during this time.

**JA220**

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

               Plaintiffs,

     -against-

KARI LAKE, et al.,

               Defendants.

No. 25 Civ. 2390

## SUPPLEMENTAL DECLARATION OF JOHN DRYDEN

I, John Dryden, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the president of the Voice of America Employees Union, Local 1418, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 1418" or "Union").

3. At 10:50 p.m. EST on March 25, 2025, I received an email from the U.S. Agency for Global Media's (USAGM) Director of Human Resources that included two attachments, a "Reduction in Force Notification" and an excel spreadsheet with data on the employees affected by the Reduction in Force (RIF). The notice states "This is a notice of management's decision to implement a [RIF] for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months." The notice further states that

1

**JA222**

at least 29 AFSCME Local 1418 bargaining unit members will be affected by the RIF. A true and correct copy of this notice is attached hereto as Exhibit 1.

4. Also included in the email from the USAGM Human Resources Director is an excel spreadsheet with data on the 29 affected employees, which includes 23 Radio Broadcast Technicians (RBT) who work in Radio Studios and 6 who work in Radio Master Control. A true and correct copy of this document is attached hereto as Exhibit 2.

5. AFSCME Local 1418 represents a collective bargaining unit of approximately 32 employees in the position of RBT who work for USAGM at Voice of America (VOA), of which 26 work in Radio Studios and 6 work in Radio Master Control. To my knowledge, 3 members have submitted retirement applications.

6. If USAGM terminates the 29 listed employees and the 3 members referenced above retire, the entire bargaining unit of VOA RBTs will be eliminated. Without any RBTs to engineer radio programing, VOA will not be able to broadcast any live radio programing.

7. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Germantown, MD on the 26th day of March, 2025.

Signed by:

*John Dryden*

John Dryden

98042BA9D222416...

2

**JA223**

# EXHIBIT 1


U.S. AGENCY FOR GLOBAL MEDIA

330 Independence Ave SW, Washington, D.C. 20237

MEMORANDUM FOR    AFSCME

FROM:                          CRYSTAL THOMAS
                                      Director of Human Resources

DATE:                          March 25, 2025

SUBJECT:                    Reduction in Force Notification

This is a notice of management's decision to implement a reduction in force (RIF) for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months.

1. The reason for the reduction in force:

The President's March 14, 2025, executive order *Continuing the Reduction of the Federal Bureaucracy*. Statutory positions and functions will remain.

2. The approximate number of employees who may be affected initially:

Approximately 29 AFSCME bargaining unit employees, but this number is subject to change.

3. The competitive areas and levels that may initially be involved in a reduction in force:

See the accompanying attachment for the competitive areas and levels.

4. The anticipated effective date of the action.

Termination notices may be sent in the next few weeks, with a 60-calendar day period prior to the effective date.

**JA225**

# EXHIBIT 2

| Competitive Area | AFSCME |
|---|---|
| Washington, DC | 29 |

| Position ID |
|-------------|
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170275 |
| V170156 |
| V170156 |
| V170156 |
| V170290 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170275 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170156 |
| V170275 |
| V170290 |
| V170156 |
| V170156 |
| V170275 |
| V170156 |

| Position Title |
| --- |
| V170156.RADIO BROADCAST TECHNICIAN.18660.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16457.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16234.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16246.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.16525.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.17102.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16241.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16452.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16238.IB00.APPR |
| V170290.RADIO BROADCAST TECHNICIAN BROADCAST TECHNICIAN.16557.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16441.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16455.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16440.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18633.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18230.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.17414.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18835.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16237.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16720.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16498.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16236.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16449.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16450.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18783.IB00.APPR |
| V170290.RADIO BROADCAST TECHNICIAN BROADCAST TECHNICIAN.16554.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.16451.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.19037.IB00.APPR |
| V170275.MASTER RADIO BROADCAST TECHNICIAN.18391.IB00.APPR |
| V170156.RADIO BROADCAST TECHNICIAN.18707.IB00.APPR |

**JA229**

| Grade | Competitive Geo |
| --- | --- |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-02 | Washington, DC |
| WB-04 | Washington, DC |
| WB-02 | Washington, DC |

# Exhibit C

**JA231**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

     -against-

KARI LAKE, et al.,

                Defendants.

No. 25 Civ. 2390

**SUPPLEMENTAL DECLARATION OF PAULA HICKEY**

I, Paula Hickey, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over 18 year of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the Local President of the American Federation of Government Employees, AFL-CIO, Local 1812 ("Local 1812") a labor organization and unincorporated association that represents federal employees at the Voice of America (VOA) within the United States Agency for Global Media (USAGM). Local 1812 is an affiliate of the American Federation of Government Employees ("AFGE").

3. At 10:49 p.m. EST on March 25, 2025, I received an email from the USAGM Director for Human Resources that included two attachments, a "Reduction in Force Notification" and an excel spreadsheet with data on the employees affected by the Reduction in Force (RIF). The notice states "This is a notice of management's decision to implement a [RIF] for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's

**JA232**

March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months." The notice further states that at least 594 Local 1812 bargaining unit members will be affected by the RIF. A true and correct copy of this notice is attached hereto as Exhibit 1.

4. Also included in the email from the USAGM Human Resources Director is an excel spreadsheet with data on 594 affected employees, which includes International Broadcasters for Radio, Internet, TV, and Multimedia in dozens of different languages, Technicians, Budget Analysts, and Electronics Engineers, among others. My position was listed at the top of the spreadsheet. A true and correct copy of this document is attached hereto as Exhibit 2.

5. If USAGM terminates the 594 listed employees, the bargaining unit represented by Local 1812 will effectively cease to exist. Without the International Broadcasters, Technicians, Budget Analysts, and Electronics Engineers, or the hundreds of employees encumbering other vital positions, VOA will not be able to provide the services it has offered for 83 years and therefore will not be able to meet its mission to counter propaganda and spread freedom and democracy abroad.

6. VOA broadcasts to populations under authoritarian rule who turn to VOA as a trusted source of news. If VOA cannot meet its mission, the United States will be giving up its voice and leaving open a global communication void.

7. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Mitchellville, Maryland on the 26th day of March, 2025.

_____
Paula Hickey

# EXHIBIT 1

JA235



330 Independence Ave SW, Washington, D.C. 20237

MEMORANDUM FOR        AFGE

FROM:                         CRYSTAL THOMAS
                              Director of Human Resources

DATE:                         March 25, 2025

SUBJECT:                      Reduction in Force Notification

This is a notice of management's decision to implement a reduction in force (RIF) for multiple competitive areas. The agency plans to send termination notices to employees in the next few weeks. Extraordinary circumstances, driven by the President's March 14, 2025 executive order *Continuing the Reduction of the Federal Bureaucracy* and the need to provide clarity to employees necessitate a notification period shorter than three months.

1. The reason for the reduction in force:

The President's March 14, 2025, executive order *Continuing the Reduction of the Federal Bureaucracy*. Statutory positions and functions will remain.

2. The approximate number of employees who may be affected initially:

Approximately 594 AFGE bargaining unit employees, but this number is subject to change.

3. The competitive areas and levels that may initially be involved in a reduction in force:

See the accompanying attachment for the competitive areas and levels.

4. The anticipated effective date of the action.

Termination notices may be sent in the next few weeks, with a 60-calendar day period prior to the effective date.

**JA236**

# EXHIBIT 2

JA237

| Competitive Area | AFGE |
|---|---|
| Washington, DC | 570 |
| New York, NY | 9 |
| SALEM,MARION,OR | 1 |
| SAN ANTONIO,BEXAR,TX | 1 |
| CAPE CORAL,LEE,FL | 1 |
| WARSAW,RICHMOND,VA | 1 |
| NORFOLK (IND CITY),VA | 1 |
| HIGHLAND,MADISON,IL | 1 |
| PHOENIX,MARICOPA,AZ | 1 |
| CRYSTAL LAKE,MCHENRY,IL | 1 |
| KISSIMMEE,OSCEOLA,FL | 1 |
| PORTLAND,CUMBERLAND,ME | 1 |
| LOS ANGELES,LOS ANGELES,CA | 1 |
| PALM BAY,BREVARD,FL | 1 |
| LA SALLE,IL | 1 |
| PASADENA,LOS ANGELES,CA | 1 |
| FRANCONIA,GRAFTON,NH | 1 |

| Position ID |
| --- |
| V136191 |
| V3134 |
| V170260 |
| V158000 |
| V147138 |
| V3317 |
| V169178 |
| V210136 |
| V210135 |
| V220148 |
| V210085 |
| V220009 |
| V158079 |
| V170217 |
| V169161 |
| V240007 |
| V210139 |
| V240051 |
| V210103 |
| V20017 |
| V210085 |
| V210098 |
| V169188 |
| V169188 |
| V170215 |
| V136064 |
| V136087 |
| V136087 |
| V191056 |
| V169161 |
| V220038 |
| V210098 |
| V170213 |
| V190202 |
| V158083 |
| V169188 |
| V210147 |
| V147055 |
| V169077 |
| V210147 |
| V169084 |
| V190166 |
| V220063 |
| V220113 |
| V169188 |

V158083
V210064
V158145
V190202
V210141
V169188
V136206
V170216
V170213
V170216
V170213
V4102
V210064
V8211
V210210
V240028
V210143
V210133
V210142
V210145
V158006
V210064
V7487
V170217
V136064
V8598
V8388
V240071
V220210
V200034
V220032
V230026
Q170273
V200093
V190170
V170259
V169067
V180183
V210081
V169181
V250010
V4090
V114282
V170041
V158098
V170091
V4102

V17210
V170194
V210021
V169083
V190065
V17210
V17210
V17210
V190065
V180025
V17210
V210021
V17210
V170170
V180025
V180025
V210166
V170247
V210166
V180025
V190065
V180025
V190065
V180025
V190065
V210080
V190065
V169083
V190065
V170247
V170158
V190064
V190142
V190041
V190064
V170194
V170194
V190065
V180025
V17210
V170194
V170210
V170194
V220004
V200087
V220004
V190065

V190065
V190065
V170247
V180025
V169011
V170247
V190041
V190041
V220005
V190065
V17210
V170194
V170194
V5733
V170194
V200087
V170194
V9020
V190065
V180025
V190065
V180025
V180025
V180025
V114183
V2049
V190065
V7909
V190065
V180025
V180025
V180172
V180129
V240018
V3134
V3134
V3134
V3134
V3134
V3134
V210124
V136175
V240135
V180174
V170268
V220146
V220054

V114213
V114218
V114213
V200125
V210040
V0921
V114224
V114224
V210040
V158092
V210008
V114213
V114219
V210040
V136192
V190205
V125031
V210123
V210123
V210122
V210122
V230051
V190114
V114177
V210122
V210122
V8084
V210122
V200057
V114139
V190063
V170264
V136052
V147011
V180069
V210040
V170191
V230145
V158177
V200121
V200121
V210167
V220123
V7917
V200121
V210016
V240006

V200070
V220069
V240027
V230146
V180131
V7916
V180050
V180043
V190217
V136122
V136122
V220053
V220039
V210047
V230093
V136231
V230022
V180067
V169122
V210154
V210013
V210013
V169115
V158094
V158094
V230013
V158092
V7916
V230146
V136231
V158092
V136122
V147148
V169159
V7916
V180050
V7916
V158177
V7916
V1018
V158178
V158127
V158177
V7916
V158178
V210027
V7916

V210010
V1017
V136123
V200121
V158178
V210047
V136096
V1020
V3219
V3360
V3220
V7814
V220121
V210171
V240040
V220191
V169132
V170280
V180063
V230116
V7432
V180063
V210047
V158092
V210040
V169101
V0934
V8159
V6666
V170128
V169099
V180128
V7113
V169069
V136051
V200155
V210026
V220015
V230014
V230014
V210083
V190226
V220034
V190221
V220163
V220087
V200071

V220058
V210028
V180122
V190221
V169107
V230117
V210028
V230144
V190221
V169028
V169173
V230053
V210050
V158010
V158206
V190112
V190048
V220168
V170173
V3208
V114268
V220171
V190235
V114317
V210050
V240139
V220156
V170097
V3109
V4084
V158198
V170097
V169028
V250005
V240113
V114197
V210117
V114197
V114267
V136150
V136014
V136014
V210052
V8592
V240085
V158003
V170023

V125184
V169043
V158213
V158002
V125109
V170062
V230139
V230110
V210084
V210009
V136178
V169162
V210084
V240107
V7726
V7217
V190248
V200001
V190159
V169162
V169024
V6422
V5756
V125137
V190249
V6613
V170043
V230103
V190027
V147134
V147118
V190027
V170022
V7907
V180077
V3336
V240056
V136144
V170232
V3334
V210006
V170232
V136144
V210037
V210006
V170057
V210006

V170057
V136144
V136144
V210006
V210006
V136144
V136144
V210006
V210006
V220164
V136144
V136144
V136144
V136144
V210006
V136144
V136144
V136144
V136144
V210006
V210207
V230017
V3324
V3324
V3106
V210006
V158013
V158013
V170232
V170043
V210156
V170065
V8533
V210042
V136181
V180149
V180078
V240009
V240009
V240009
V220075
V220075
V169232
V200107
V1175
V220150
V200107

V200117
V240116
V190031
V180022
V180065
V170207
V4075
V240110
V136035
V240008
V158029
V220150
V220169
V169199
V220208
V210051
V169157
V169157
V114240
V169141
V114240
V169157
V210104
V1114
V210044
V158034
V136125
V114240
V147012
V7228
V200085
V1175
V200085
V200127
V1175
V200114
V170133
V170135
V200110
V190224
V190237
V147085
V210099
V170155
V147015
V210100
V180108

V169169
V230089
V169039
V230130
V170134
V169044
V169171
V169036
V170134
V136246
V180156
V180156
V0903
V0903
V7501
V180156
V190214
V190214
V190214
V158189
V190036
V190036
V190214
V158189
V158140
V169013
V158189
V240039
V240075
V220107
V240031
V240033
V158187
V4090
V4090
V220061
V210066
V210066
V3116
V3116
VV220029
V210217
V210098
V210098
V220036
V180007
V158132

V210098
V210098
V4090
V4090
V220176
V230067
V220151
V210014
V147027
V1156
V3116
V114262
V147026
V220061
V136106
V136106
V147149
V158198
V136106
V158132
V158132
V136192
V7857
V3116
V210014
V210014
V3104
V3116
V170054
V169164
V136153
V8014

| Position Title |
| --- |
| V136191.TECHNICAL INFORMATION SPECIALIST (INGEST COORDINATOR).13913.IB00.APPR |
| V3134.BUDGET ANALYST.15589.IB00.APPR |
| V170260.RECORDS AND INFORMATION MANAGEMENT SPECIALIST.16468.IB00.APPR |
| V158000.ADMINSTRATIVE OFFICER.14587.IB00.APPR |
| V147138.ADMINISTRATIVE OFFICER.14531.IB00.APPR |
| V3317.MULTIMEDIA PRODUCTION SPECIALIST.13080.IB00.APPR |
| V169178.INT BROADCASTER (MULTIMEDIA) (FRENCH).15831.IB00.APPR |
| V210136.MULTIMEDIA SPECIALIST (AMHARIC).18287.IB00.APPR |
| V210135.MULTIMEDIA SPECIALIST (AMHARIC).19562.IB00.APPR |
| V220148.INTERNATIONAL BROADCASTER (MULTIMEDIA) (FRENCH).18793.IB00.APPR |
| V210085.INT BROADCASTER (MULTIMEDIA) (SWAHILI).18540.IB00.APPR |
| V220009.INT BROADCASTER (MULTIMEDIA) (AFAN OROMO).18543.IB00.APPR |
| V158079.INT BROADCASTER (MULTIMEDIA) (FRENCH).18681.IB00.APPR |
| V170217.INT BROADCASTER (MULTIMEDIA) (AMHARIC).18713.IB00.APPR |
| V169161.INT BROADCASTER (MULTIMEDIA) (HAUSA).18714.IB00.APPR |
| V240007.INTERNATIONAL BROADCASTER (MULTIMEDIA) (FRENCH).19561.IB00.APPR |
| V210139.MULTIMEDIA SPECIALIST (ENGLISH).18282.IB00.APPR |
| V240051.INT BROADCASTER (MULTIMEDIA) (KIRUNDI/KINYARWANDA).19954.IB00.APPR |
| V210103.MULTIMEDIA SPECIALIST (HAUSA).18209.IB00.APPR |
| V20017.INT BROADCASTER (MULTIMEDIA) (KIRUNDI/KINYARWANDA)).17558.IB00.APPR |
| V210085.INT BROADCASTER (MULTIMEDIA) (SWAHILI).17993.IB00.APPR |
| V210098.MULTIMEDIA SPECIALIST (ENGLISH).18033.IB00.APPR |
| V169188.INT BROADCASTER (MULTIMEDIA) (FRENCH).17522.IB00.APPR |
| V169188.INT BROADCASTER (MULTIMEDIA) (FRENCH).17527.IB00.APPR |
| V170215.INT BROADCASTER (MULTIMEDIA) (AMHARIC).17557.IB00.APPR |
| V136064.INTERNATIONAL BROADCASTER (RADIO/INTERNET) (KIRUNDI/KINYARWA.17358.IB00.APPR |
| V136087.INT BROADCASTER (MULTIMEDIA) (HAUSA).16894.IB00.APPR |
| V136087.INT BROADCASTER (MULTIMEDIA) (HAUSA).16997.IB00.APPR |
| V191056.INT BROADCASTER (MULTIMEDIA)(SHONA/NDEBELE).17324.IB00.APPR |
| V169161.INT BROADCASTER (MULTIMEDIA) (HAUSA).17201.IB00.APPR |
| V220038.INTERNATIONAL BROADCASTER (MULTIMEDIA) (SHONA/NDEBELE).18403.IB00.APPR |
| V210098.MULTIMEDIA SPECIALIST (ENGLISH).18252.IB00.APPR |
| V170213.INT BROADCASTER (MULTIMEDIA) (TIGRIGNA).17361.IB00.APPR |
| V190202.INT BROADCASTER (MULTIMEDIA) (HAUSA).17962.IB00.APPR |
| V158083.INT BROADCASTER (MULTIMEDIA) (SOMALI).16956.IB00.APPR |
| V169188.INT BROADCASTER (MULTIMEDIA) (FRENCH).16739.IB00.APPR |
| V210147.MULTIMEDIA SPECIALIST (AMHARIC/AFAN OROMO/TIGRIGNA).18173.IB00.APPR |
| V147055.MULTIMEDIA PRODUCTION SPECIALIST.15752.IB00.APPR |
| V169077.INT BROADCASTER (MULTIMEDIA) (SOMALI).15797.IB00.APPR |
| V210147.MULTIMEDIA SPECIALIST (AMHARIC/AFAN OROMO/TIGRIGNA).18172.IB00.APPR |
| V169084.INT BROADCASTER (MULTIMEDIA) (BAMBARA).15556.IB00.APPR |
| V190166.INT BROADCASTER (MULTIMEDIA)(SOMALI).17215.IB00.APPR |
| V220063.DIGITAL MANAGING EDITOR (SWAHILI).19496.IB00.APPR |
| V220113.INTERNATIONAL BROADCASTER (MULTIMEDIA) (HAUSA).18760.IB00.APPR |
| V169188.INTERNATIONAL BROADCASTER (MULTIMEDIA) (FRENCH).17543.IB00.APPR |

**JA252**

V158083.INT BROADCASTER (MULTIMEDIA) (SOMALI).14916.IB00.APPR
V210064.MULTIMEDIA SPECIALIST (FRENCH).17961.IB00.APPR
V158145.INT BROADCASTER (RADIO/TV) (SWAHILI).15055.IB00.APPR
V190202.INT BROADCASTER (MULTIMEDIA) (HAUSA).17267.IB00.APPR
V210141.MULTIMEDIA SPECIALIST (ENGLISH).18175.IB00.APPR
V169188.INT BROADCASTER (MULTIMEDIA) (FRENCH).16957.IB00.APPR
V136206.IB (MULTIMEDIA) (PORTUGUESE).14833.IB00.APPR
V170216.INT BROADCASTER (MULTIMEDIA) (AFAN OROMO).16353.IB00.APPR
V170213.INT BROADCASTER (MULTIMEDIA) (TIGRIGNA).16355.IB00.APPR
V170216.INT BROADCASTER (MULTIMEDIA) (AFAN OROMO).16352.IB00.APPR
V170213.INT BROADCASTER (MULTIMEDIA) (TIGRIGNA).16354.IB00.APPR
V4102.INT BROADCASTER (SWAHILI).12753.IB00.APPR
V210064.MULTIMEDIA SPECIALIST (FRENCH).17924.IB00.APPR
V8211.RADIO PRODUCTION SPEC.9698.IB00.APPR
V210210.INT BROADCASTER (TIGRIGNA) (MULTIMEDIA) (TEAM LEAD).18636.IB00.APPR
V240028.INTERNATIONAL BROADCASTER (AMHARIC) (MULTIMEDIA) (TEAM LEAD).20191.IB00.APPR
V210143.MULTIMEDIA SPECIALIST (ENGLISH).18185.IB00.APPR
V210133.PRODUCER-DIRECTOR.18147.IB00.APPR
V210142.MULTIMEDIA SPECIALIST (ENGLISH).18171.IB00.APPR
V210145.MULTIMEDIA SPECIALIST (ENGLISH).18186.IB00.APPR
V158006.INT BROADCASTER (KIRUNDI).14620.IB00.APPR
V210064.MULTIMEDIA SPECIALIST (FRENCH).17960.IB00.APPR
V7487.INT BROADCASTER (RADIO & INTERNET) (KINYARWANDA).8300.IB00.APPR
V170217.INT BROADCASTER (MULTIMEDIA) (AMHARIC).16349.IB00.APPR
V136064.INT BROADCASTER (RADIO/INTERNET) (KINYARWANDA).14066.IB00.APPR
V8598.INT BROADCASTER (RADIO) (ENGLISH).12016.IB00.APPR
V8388.INT BROADCASTER (RADIO)(PORTUGUESE).10197.IB00.APPR
V240071.INTERNATIONAL BROADCASTER.20213.IB00.APPR
V220210.PROGRAM COORDINATOR.18708.IB00.APPR
V200034.EXECUTIVE PRODUCER (TV)(HAUSA).17403.IB00.APPR
V220032.MULTIMEDIA SPECIALIST (ENGLISH).18363.IB00.APPR
V230026.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PORTUGUESE).18761.IB00.APPR
Q170273.INTERNATIONAL BROADCASTER (MULTIMEDIA) (FRENCH).16496.IB00.APPR
V200093.INTERNATIONAL BROADCASTER (MULTIMEDIA).17484.IB00.APPR
V190170.INT BROADCASTER (MULTIMEDIA) (SOMALI).17218.IB00.APPR
V170259.INT BROADCASTER (MULTIMEDIA) (SOMALI).16475.IB00.APPR
V169067.EXECUTIVE PRODUCER (TV) (SWAHILI).16828.IB00.APPR
V180183.DIGITAL GRAPHICS ARTIST.16925.IB00.APPR
V210081.INT BROADCASTER (MULTIMEDIA) (SWAHILI).18069.IB00.APPR
V169181.EXECUTIVE PRODUCER (TV)(SOMALI).15725.IB00.APPR
V250010.INTERNATIONAL BROADCASTER - EDITOR.20490.IB00.APPR
V4090.GENERAL ASSIGNMENTS REPORTER (ENGLISH).12592.IB00.APPR
V114282.MULTIMEDIA PRODUCTION SPEC.12936.IB00.APPR
V170041.INT BROADCASTER (RADIO) (ENGLISH).15954.IB00.APPR
V158098.PROJECT MANAGER.14942.IB00.APPR
V170091.EXECUTIVE PRODUCER (TELEVISION).16016.IB00.APPR
V4102.INT BROADCASTER (SWAHILI).16829.IB00.APPR

V17210.TV BROADCAST TECHNICIAN (AUDIO).16335.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.17486.IB00.APPR
V210021.MULTIMEDIA SPECIALIST (GRAPHICS).17809.IB00.APPR
V169083.IT SPECIALIST (CUSTSPT).18955.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST (TV PRODUCTION AUTOMATION).18782.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).16333.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).16331.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).16330.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST (TV PRODUCTION AUTOMATION).18837.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).18682.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).16332.IB00.APPR
V210021.MULTIMEDIA SPECIALIST (GRAPHICS).17810.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).16329.IB00.APPR
V170170.TV BROADCAST TECHNICIAN (CAMERA/FLR DIR/LIGHTING).16341.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).18496.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).17242.IB00.APPR
V210166.BROADCAST TECHNICIAN.18205.IB00.APPR
V170247.TELECOMMUNICATIONS SPECIALIST.20415.IB00.APPR
V210166.BROADCAST TECHNICIAN.18204.IB00.APPR
V180025.BROADCAST MAINTENCE TECHNICIAN (MULTIMEDIA).16804.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST (TV PRODUCTION AUTOMATION).18309.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).17296.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).17378.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).17295.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST.17700.IB00.APPR
V210080.IT SPECIALIST (SYSADMIN).19160.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST.17699.IB00.APPR
V169083.LEAD IT SPECIALIST (CUSTSPT).15527.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST.17702.IB00.APPR
V170247.TELECOMMUNICATIONS SPECIALIST.20414.IB00.APPR
V170158.PROGRAM COORDINATOR.16741.IB00.APPR
V190064.TV BROADCAST TECHNICIAN (VIDEO EDITOR).17123.IB00.APPR
V190142.TV MASTER CONTROL TECHNICIAN.17529.IB00.APPR
V190041.IT SPECIALIST (CUSTSPT).17300.IB00.APPR
V190064.TV BROADCAST TECHNICIAN (VIDEO EDITOR).17969.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.18392.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16270.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).17418.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).18618.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).16334.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16266.IB00.APPR
V170210.TV BROADCAST TECHNICIAN (AUDIO).16328.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16296.IB00.APPR
V220004.TV BROADCAST TECHNICIAN (VIDEO EDITOR).18325.IB00.APPR
V200087.AUDIOVISUAL PRODUCTION SPECIALIST.17460.IB00.APPR
V220004.TV BROADCAST TECHNICIAN (VIDEO EDITOR).18324.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).17339.IB00.APPR

V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).17487.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).17417.IB00.APPR
V170247.TELECOMMUNICATIONS SPECIALIST.16485.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).18546.IB00.APPR
V169011.IT SPECIALIST (SYSADMIN).15714.IB00.APPR
V170247.TELECOMMUNICATIONS SPECIALIST.16481.IB00.APPR
V190041.IT SPECIALIST (CUSTSPT).17299.IB00.APPR
V190041.IT SPECIALIST (CUSTSPT).17149.IB00.APPR
V220005.TV BROADCAST TECHNICIAN (VIDEO EDITOR).18302.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST (TV PRODUCTION AUTOMATION).19152.IB00.APPR
V17210.TV BROADCAST TECHNICIAN (AUDIO).19026.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16272.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16298.IB00.APPR
V5733.TV BROADCAST TECHNICIAN.11228.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16293.IB00.APPR
V200087.AUDIOVISUAL PRODUCTION SPECIALIST.17462.IB00.APPR
V170194.TV MASTER CONTROL TECHNICIAN.16292.IB00.APPR
V9020.TV PRODUCTION SPEC.4625.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).18232.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).17253.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).17367.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).16846.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).20112.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).20151.IB00.APPR
V114183.LEAD TELECOMMUNICATIONS SPECIALIST.16864.IB00.APPR
V2049.IT SPECIALIST (CUSTSPT).11614.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPECIALIST (TV PRODUCTION AUTOMATION).18311.IB00.APPR
V7909.IT SPECIALIST (SYSADMIN).9399.IB00.APPR
V190065.AUDIOVISUAL PRODUCTION SPEC (TV PRODUCTION AUTOMATION).18306.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).20092.IB00.APPR
V180025.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).20131.IB00.APPR
V180172.TV BROADCAST TECHNICIAN.16862.IB00.APPR
V180129.IT SPECIALIST (PLCYPLN).16792.IB00.APPR
V240018.BUDGET ANALYST.19326.IB00.APPR
V3134.BUDGET ANALYST.17851.IB00.APPR
V3134.BUDGET ANALYST.17852.IB00.APPR
V3134.BUDGET ANALYST.18429.IB00.APPR
V3134.BUDGET ANALYST.12873.IB00.APPR
V3134.BUDGET ANALYST.13598.IB00.APPR
V3134.BUDGET ANALYST.13611.IB00.APPR
V210124.PROJECT MANAGER.18131.IB00.APPR
V136175.DIGITAL CONTENT COORDINATOR.13902.IB00.APPR
V240135.DEVELOPMENT AND TRAINING PROJECT MANAGER.20336.IB00.APPR
V180174.INFORMATION TECHNOLOGY SPECIALIST (APPSW).16865.IB00.APPR
V170268.SUPV IT SPECIALIST (INET).16866.IB00.APPR
V220146.INT BROADCASTER (MULTIMEDIA).18493.IB00.APPR
V220054.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).18444.IB00.APPR

V114213.INT BROADCASTER (TV) (MANDARIN).15148.IB00.APPR
V114218.INTERNATIONAL BROADCASTER (TELEVISION) (MANDARIN).13755.IB00.APPR
V114213.INTERNATIONAL BROADCASTER (TELEVISION) (MANDARIN).13753.IB00.APPR
V200125.MULTIMEDIA SPECIALIST (MANDARIN).17553.IB00.APPR
V210040.MULTIMEDIA SPECIALIST (MANDARIN).18382.IB00.APPR
V0921.INT BROADCASTER (CANTONESE).13085.IB00.APPR
V114224.INT BROADCASTER (MANDARIN).12808.IB00.APPR
V114224.INT BROADCASTER (MANDARIN).12804.IB00.APPR
V210040.MULTIMEDIA SPECIALIST (MANDARIN).17798.IB00.APPR
V158092.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).16652.IB00.APPR
V210008.MULTIMEDIA SPECIALIST (CANTONESE).17916.IB00.APPR
V114213.INT BROADCASTER (TV) (MANDARIN).12803.IB00.APPR
V114219.INTERNATIONAL BROADCASTER (MANDARIN).13649.IB00.APPR
V210040.MULTIMEDIA SPECIALIST (MANDARIN).17801.IB00.APPR
V136192.INTERNATIONAL BROADCASTER.15926.IB00.APPR
V190205.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).17274.IB00.APPR
V125031.INT BROADCASTER (MANDARIN).13193.IB00.APPR
V210123.CONTRACT SPECIALIST.20333.IB00.APPR
V210123.CONTRACT SPECIALIST.18685.IB00.APPR
V210122.CONTRACT SPECIALIST.19428.IB00.APPR
V210122.CONTRACT SPECIALIST.20289.IB00.APPR
V230051.PROCUREMENT ANALYST.19038.IB00.APPR
V190114.CONTRACT SPECIALIST.18737.IB00.APPR
V114177.OFFICE MGR.13405.IB00.APPR
V210122.CONTRACT SPECIALIST.19090.IB00.APPR
V210122.CONTRACT SPECIALIST.19501.IB00.APPR
V8084.CONTRACT SPECIALIST (SIMPLIFIED ACQUISITIONS).12451.IB00.APPR
V210122.CONTRACT SPECIALIST.20311.IB00.APPR
V200057.PROCUREMENT ANALYST.17530.IB00.APPR
V114139.PROCUREMENT ASSISTANT.12835.IB00.APPR
V190063.AUDIENCE ENGAGEMENT ANALYST.17594.IB00.APPR
V170264.RESEARCH ANALYST.16472.IB00.APPR
V136052.WEB DESIGNER.13739.IB00.APPR
V147011.IT SPECIALIST (INET) WEB DEVELOPER.14111.IB00.APPR
V180069.PROGRAM ANALYST (METRICS).16693.IB00.APPR
V210040.MULTIMEDIA SPECIALIST (MANDARIN).17795.IB00.APPR
V170191.INTERNATIONAL BROADCASTER (MANDARIN).16260.IB00.APPR
V230145.MULTIMEDIA SPECIALIST (KHMER).19454.IB00.APPR
V158177.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).15507.IB00.APPR
V200121.MULTIMEDIA SPECIALIST (INDONESIAN).19210.IB00.APPR
V200121.MULTIMEDIA SPECIALIST (INDONESIAN).19211.IB00.APPR
V210167.MULTIMEDIA SPECIALIST (TIBETAN).18369.IB00.APPR
V220123.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BURMESE).18704.IB00.APPR
V7917.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BURMESE).17401.IB00.APPR
V200121.MULTIMEDIA SPECIALIST (INDONESIAN).17899.IB00.APPR
V210016.INTERNATIONAL BROADCASTER (MULTIMEDIA)(VIETNAMESE).17735.IB00.APPR
V240006.INTERNATIONAL BROADCASTER (MULTIMEDIA) (LAO).19458.IB00.APPR

**JA256**

V200070.RADIO PRODUCTION SPECIALIST (KOREAN).17503.IB00.APPR
V220069.INTERNATIONAL BROADCASTER (MULTIMEDIA) (VIETNAMESE).18384.IB00.APPR
V240027.MULTIMEDIA SPECIALIST (VIETNAMESE).19955.IB00.APPR
V230146.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KHMER).19457.IB00.APPR
V180131.INTL BROADCASTER (MULTIMEDIA) (VIETNAMESE).16816.IB00.APPR
V7916.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BURMESE).17154.IB00.APPR
V180050.INT BROADCASTER (MULTIMEDIA) (BURMESE).16692.IB00.APPR
V180043.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BURMESE).16646.IB00.APPR
V190217.INTERNATIONAL BROADCASTER (MULTIMEDIA) (TIBETAN).17297.IB00.APPR
V136122.ITNL BROADCASTER (KOREAN).16926.IB00.APPR
V136122.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KOREAN).17130.IB00.APPR
V220053.INT BROADCASTER (MULTIMEDIA) (VIETNAMESE).18623.IB00.APPR
V220039.INTERNATIONAL BROADCASTER (MULTIMEDIA) (VIETNAMESE).18405.IB00.APPR
V210047.MULTIMEDIA SPECIALIST (INDONESIAN).17898.IB00.APPR
V230093.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KHMER).19151.IB00.APPR
V136231.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KHMER).16762.IB00.APPR
V230022.INTERNATIONAL BROADCASTER (KOREAN).18759.IB00.APPR
V180067.INTERNATIONAL BROADCASTER (MULTIMEDIA) (THAI).17713.IB00.APPR
V169122.INTERNATIONAL BROADCASTER (MULTIMEDIA) (VIETNAMESE).15610.IB00.APPR
V210154.MULTIMEDIA SPECIALIST (KOREAN).18183.IB00.APPR
V210013.MULTIMEDIA SPECIALIST (KOREAN).17709.IB00.APPR
V210013.MULTIMEDIA SPECIALIST (KOREAN).17710.IB00.APPR
V169115.INTERNATIONAL BROADCASTER (MULTIMEDIA) (LAO).16361.IB00.APPR
V158094.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).16599.IB00.APPR
V158094.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).16592.IB00.APPR
V230013.INT BROADCASTER (MULTIMEDIA) (MANDARIN).18754.IB00.APPR
V158092.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).17335.IB00.APPR
V7916.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BURMESE).17397.IB00.APPR
V230146.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KHMER).19453.IB00.APPR
V136231.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KHMER).15306.IB00.APPR
V158092.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).15609.IB00.APPR
V136122.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KOREAN).17195.IB00.APPR
V147148.INT BROADCASTER (TIBETAN).14570.IB00.APPR
V169159.INTERNATIONAL BROADCASTER (MULTIMEDIA) (VIETNAMESE).16369.IB00.APPR
V7916.INTERNATIONAL BROADCASTER (BURMESE).14828.IB00.APPR
V180050.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BURMESE).17841.IB00.APPR
V7916.INT BROADCASTER (BURMESE).14400.IB00.APPR
V158177.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).16306.IB00.APPR
V7916.INTERNATIONAL BROADCASTER (BURMESE).14402.IB00.APPR
V1018.INTERNATIONAL BROADCASTER (KOREAN).14627.IB00.APPR
V158178.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).15582.IB00.APPR
V158127.INTERNATIONAL BROADCASTER (MULTIMEDIA ) (KHMER).14992.IB00.APPR
V158177.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).15506.IB00.APPR
V7916.INTERNATIONAL BROADCASTER (BURMESE).14401.IB00.APPR
V158178.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).15584.IB00.APPR
V210027.MULTIMEDIA SPECIALIST (THAI).17734.IB00.APPR
V7916.INT BROADCASTER (BURMESE).16389.IB00.APPR

**JA257**

V210010.MULTIMEDIA SPECIALIST (KHMER).17706.IB00.APPR
V1017.RADIO PRODUCTION SPECIALIST (KOREAN).16653.IB00.APPR
V136123.INTL BROADCASTER (MULTIMEDIA) (KOREAN).15738.IB00.APPR
V200121.MULTIMEDIA SPECIALIST (INDONESIAN).17807.IB00.APPR
V158178.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).15100.IB00.APPR
V210047.MULTIMEDIA SPECIALIST (INDONESIAN).17806.IB00.APPR
V136096.INTERNATIONAL BROADCASTER (MULTIMEDIA) (INDONESIAN).15570.IB00.APPR
V1020.INT BROADCASTER (KOREAN).11203.IB00.APPR
V3219.INT BROADCASTER (TV) (TIBETAN).12004.IB00.APPR
V3360.INT BROADCASTER (INDONESIAN).12270.IB00.APPR
V3220.INT BROADCASTER (TV) (TIBETAN).12001.IB00.APPR
V7814.INT BROADCASTER (TIBETAN).8754.IB00.APPR
V220121.DIGITAL EDITOR (KOREAN).18491.IB00.APPR
V210171.INTERNATIONAL BROADCASTER (MULTIMEDIA)(MANDARIN).18213.IB00.APPR
V240040.INT BROADCASTER (MULTIMEDIA) (KOREAN).19819.IB00.APPR
V220191.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KOREAN).18732.IB00.APPR
V169132.MULTIMEDIA PRODUCTION SPECIALIST (TIBETAN).17017.IB00.APPR
V170280.INTERNATIONAL BROADCASTER (TIBETAN).16609.IB00.APPR
V180063.INT BROADCASTER (KOREAN).18178.IB00.APPR
V230116.INTERNATIONAL BROADCASTER (MULTIMEDIA) (KOREAN).19150.IB00.APPR
V7432.TV PRODUCTION SPEC (DIRECTOR) (INDONESIAN).8764.IB00.APPR
V180063.INT BROADCASTER (KOREAN).18072.IB00.APPR
V210047.MULTIMEDIA SPECIALIST (INDONESIAN).17805.IB00.APPR
V158092.INTERNATIONAL BROADCASTER (MULTIMEDIA) (MANDARIN).16914.IB00.APPR
V210040.MULTIMEDIA SPECIALIST (MANDARIN).17799.IB00.APPR
V169101.ELECTRONICS ENGINEER.16492.IB00.APPR
V0934.TELECOMMUNICATIONS SPEC.11178.IB00.APPR
V8159.PROPERTY MANAGEMENT SPEC.10098.IB00.APPR
V6666.ELECTRONICS ENGINEER.10426.IB00.APPR
V170128.MECHANICAL ENGINEER.17323.IB00.APPR
V169099.LOGISTICS MANAGEMENT SPECIALIST.16782.IB00.APPR
V180128.ELECTRONICS ENGINEER.16789.IB00.APPR
V7113.CIVIL ENGINEER.8347.IB00.APPR
V169069.MEDIA DELIVERY SYSTEMS OFFICER.15511.IB00.APPR
V136051.INTERNATIONAL BROADCASTER (ONLINE) (RUSSIAN).13648.IB00.APPR
V200155.LEAD MANAGING EDITOR (RUSSIAN).17619.IB00.APPR
V210026.INTERNATIONAL BROADCASTER (MULTIMEDIA) (RUSSIAN).17817.IB00.APPR
V220015.DIGITAL MEDIA SPECIALIST (RUSSIAN).19015.IB00.APPR
V230014.MULTIMEDIA SPECIALIST (RUSSIAN).18957.IB00.APPR
V230014.MULTIMEDIA SPECIALIST (RUSSIAN).18994.IB00.APPR
V210083.MULTIMEDIA GRAPHICS SPECIALIST (RUSSIAN).18953.IB00.APPR
V190226.INTERNATIONAL BROADCASTER (TV/ONLINE) (ALBANIAN).18422.IB00.APPR
V220034.INT BROADCASTER (TV/ONLINE) (SERBIAN).18651.IB00.APPR
V190221.INTERNATIONAL BROADCASTER (TV/ONLINE) (SERBIAN).19956.IB00.APPR
V220163.PROGRAM COORDINATOR.18848.IB00.APPR
V220087.DIGITAL MEDIA SPECIALIST (UKRAINIAN).18630.IB00.APPR
V200071.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BOSNIAN).17554.IB00.APPR

**JA258**

V220058.MULTIMEDIA GRAPHICS SPECIALIST (RUSSIAN).18541.IB00.APPR
V210028.INTERNATIONAL BROADCASTER (MULTIMEDIA) (UKRAINIAN).18399.IB00.APPR
V180122.INT BROADCASTER (MULTIMEDIA) (UKRAINIAN).16935.IB00.APPR
V190221.INTERNATIONAL BROADCASTER (TV/ONLINE) (SERBIAN).17502.IB00.APPR
V169107.INT BROADCASTER (TV/ONLINE) (UKRAINIAN).15778.IB00.APPR
V230117.MULTIMEDIA SPECIALIST (RUSSIAN).19089.IB00.APPR
V210028.INTERNATIONAL BROADCASTER (MULTIMEDIA) (UKRAINIAN).17819.IB00.APPR
V230144.INTERNATIONAL BROADCASTER (TV/ONLINE) (ALBANIAN).19310.IB00.APPR
V190221.INTERNATIONAL BROADCASTER (TV/ONLINE) (SERBIAN).17501.IB00.APPR
V169028.INT BROADCASTER (TV/ONLINE) (RUSSIAN).16187.IB00.APPR
V169173.INT BROADCASTER (TV/ONLINE) (RUSSIAN).15775.IB00.APPR
V230053.INTERNATIONAL BROADCASTER (TV/ONLINE) (RUSSIAN).19498.IB00.APPR
V210050.MULTIMEDIA SPECIALIST (ALBANIAN).17813.IB00.APPR
V158010.INT BROADCASTER (TV/ONLINE) (RUSSIAN).15731.IB00.APPR
V158206.INT BROADCASTER (TV/ONLINE) (MACEDONIAN).15146.IB00.APPR
V190112.INT BROADCASTER (TV/ONLINE) (RUSSIAN).17167.IB00.APPR
V190048.INT BROADCASTER (TV/ONLINE) (RUSSIAN).17112.IB00.APPR
V220168.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).18547.IB00.APPR
V170173.INVESTIGATIVE WRITER-EDITOR.19127.IB00.APPR
V3208.INT BROADCASTER (SERBIAN).11977.IB00.APPR
V114268.INT BROADCASTER (GEORGIAN).13046.IB00.APPR
V220171.INTERNATIONAL BROADCASTER (RUSSIAN) ONLINE.18840.IB00.APPR
V190235.INTERNATIONAL BROADCASTER (VJ) (ALBANIAN).17419.IB00.APPR
V114317.INT BROADCASTER (TV) (BOSNIAN).12988.IB00.APPR
V210050.MULTIMEDIA SPECIALIST (ALBANIAN).17814.IB00.APPR
V240139.MULTIMEDIA GRAPHICS DESIGNER.20434.IB00.APPR
V220156.INT BROADCASTER (MULTIMEDIA) (RUSSIAN).18642.IB00.APPR
V170097.INT BROADCASTER (MULTIMEDIA) (RUSSIAN).16021.IB00.APPR
V3109.SENIOR ANALYST.18375.IB00.APPR
V4084.INT BROADCASTER (TV) (UKRAINIAN).12895.IB00.APPR
V158198.EDITOR (SPECIALTY).15157.IB00.APPR
V170097.INT BROADCASTER (MULTIMEDIA) (RUSSIAN).16022.IB00.APPR
V169028.INT BROADCASTER (TV/ONLINE) (RUSSIAN).16647.IB00.APPR
V250005.INT BROADCASTER (TV/ONLINE) (UKRAINIAN).20431.IB00.APPR
V240113.FINANCIAL SPECIALIST.20225.IB00.APPR
V114197.ACCOUNTANT (INTERNAL CONTROLS).18794.IB00.APPR
V210117.PAYROLL SPECIALIST.18254.IB00.APPR
V114197.ACCOUNTANT (INTERNAL CONTROL).18806.IB00.APPR
V114267.ACCOUNTANT (ANALYSIS REPORTING AND COMPLIANCE).17282.IB00.APPR
V136150.SENIOR ACCOUNTANT.13830.IB00.APPR
V136014.MULTIMEDIA PRODUCTION SPECIALIST.13602.IB00.APPR
V136014.MULTIMEDIA PRODUCTION SPECIALIST.14837.IB00.APPR
V210052.PRODUCER.17821.IB00.APPR
V8592.IB (RADIO/TV) (ENGLISH).10660.IB00.APPR
V240085.HUMAN RESOURCES SPECIALIST.20214.IB00.APPR
V158003.IT SPECIALIST (SYSADMIN).14575.IB00.APPR
V170023.IT SPECIALIST (INET).15861.IB00.APPR

**JA259**

V125184.IT SPECIALIST (PROJMGT).14853.IB00.APPR
V169043.IT SPECIALIST (INFOSEC).15276.IB00.APPR
V158213.IT SPECIALIST (SYSADMIN).15739.IB00.APPR
V158002.IT SPECIALIST (SYSADMIN).14576.IB00.APPR
V125109.IT SPECIALIST (SYSADMIN).12949.IB00.APPR
V170062.IT SPECIALIST (INFOSEC).16797.IB00.APPR
V230139.IT SPECIALIST (SYSADMIN).19497.IB00.APPR
V230110.INTERNATIONAL BROADCASTER (CREOLE).19459.IB00.APPR
V210084.MULTIMEDIA SPECIALIST (SPANISH).18201.IB00.APPR
V210009.MULTIMEDIA SPECIALIST (SPANISH).17693.IB00.APPR
V136178.INTERNATIONAL BROADCASTER (MULTIMEDIA) (SPANISH).14975.IB00.APPR
V169162.INTERNATIONAL BROADCASTER (CREOLE).15673.IB00.APPR
V210084.MULTIMEDIA SPECIALIST (SPANISH).18169.IB00.APPR
V240107.INTERNET EDITOR (SPANISH).20171.IB00.APPR
V7726.INT BROADCASTER (TV/RADIO) (SPANISH).9034.IB00.APPR
V7217.INT RADIO BROADCASTER (SPANISH).8122.IB00.APPR
V190248.INTERNATIONAL BROADCASTER (MULTIMEDIA) (SPANISH).18076.IB00.APPR
V200001.PLANNING PRODUCER/EDITOR (SPANISH).17705.IB00.APPR
V190159.INTERNATIONAL BROADCASTER (SPANISH).17618.IB00.APPR
V169162.INTERNATIONAL BROADCASTER (CREOLE).15672.IB00.APPR
V169024.INTERNATIONAL BROADCASTER (MULTIMEDIA) (SPANISH).16000.IB00.APPR
V6422.WRITER.10444.IB00.APPR
V5756.WRITER.3835.IB00.APPR
V125137.GRAPHICS SUPPORT SPECIALIST.16092.IB00.APPR
V190249.VIDEO PRODUCTION SPECIALIST.17717.IB00.APPR
V6613.VISUAL INFORMATION SPEC.8504.IB00.APPR
V170043.PUBLIC AFFAIRS SPECIALIST.16854.IB00.APPR
V230103.TELECOMMUNICATIONS SPECIALIST.20011.IB00.APPR
V190027.TELECOMMUNICATIONS SPECIALIST.18005.IB00.APPR
V147134.IT SPECIALIST (NETWORK).14495.IB00.APPR
V147118.IT SPECIALIST (NETWORK).14411.IB00.APPR
V190027.TELECOMMUNICATIONS SPEC.17942.IB00.APPR
V170022.LEAD IT SPECIALIST (INET).15860.IB00.APPR
V7907.IT SPECIALIST (NETWORK).9349.IB00.APPR
V180077.TELECOMMUNICATIONS SPECIALIST.16712.IB00.APPR
V3336.INT BROADCASTER (PERSIAN).12152.IB00.APPR
V240056.TELEVISION EXECUTIVE PRODUCER (PERSIAN).19913.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).16670.IB00.APPR
V170232.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).18291.IB00.APPR
V3334.TV PRODUCTION SPECIALIST (PERSIAN).17587.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).18270.IB00.APPR
V170232.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).17902.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA)(PERSIAN).17842.IB00.APPR
V210037.PRODUCER.17732.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17790.IB00.APPR
V170057.LEAD TV PRODUCTION SPECIALIST (PERSIAN).19607.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17730.IB00.APPR

V170057.LEAD TV PRODUCTION SPECIALIST.18088.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14753.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).15003.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17727.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17729.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14685.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14751.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17728.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17789.IB00.APPR
V220164.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).18715.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14680.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14679.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).13831.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14712.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17788.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14677.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14750.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14758.IB00.APPR
V136144.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).14757.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).17786.IB00.APPR
V210207.INT BROADCASTER (DOMESTIC BEAT CORRESPONDENT)(PERSIAN).18320.IB00.APPR
V230017.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PERSIAN).18678.IB00.APPR
V3324.INT BROADCASTER (SENIOR CORRESPONDENT) (PERSIAN).12194.IB00.APPR
V3324.INT BROADCASTER (SENIOR CORRESPONDENT) (PERSIAN).13143.IB00.APPR
V3106.INT BROADCASTER (ENGLISH-FEATURES).12351.IB00.APPR
V210006.MULTIMEDIA SPECIALIST (PERSIAN).18307.IB00.APPR
V158013.PERFORMANCE REVIEW ANALYST.18686.IB00.APPR
V158013.PERFORMANCE REVIEW ANALYST.18687.IB00.APPR
V170232.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).20335.IB00.APPR
V170043.PUBLIC AFFAIRS SPECIALIST.18780.IB00.APPR
V210156.PUBLIC AFFAIRS SPECIALIST.18357.IB00.APPR
V170065.MANAGEMENT AND PROGRAM ANALYST.15972.IB00.APPR
V8533.MAIL OPERATIONS ASSISTANT.11621.IB00.APPR
V210042.ADMINISTRATIVE OFFICER.18361.IB00.APPR
V136181.ADMINISTRATIVE OFFICER.13961.IB00.APPR
V180149.ADMINISTRATIVE ASSISTANT (OA).16820.IB00.APPR
V180078.PROGRAM ANALYST.16716.IB00.APPR
V240009.IT PROJECT MANAGER (PLCYPLN).19804.IB00.APPR
V240009.IT PROJECT MANAGER (PLCYPLN).19267.IB00.APPR
V240009.IT PROJECT MANAGER (PLCYPLN).19268.IB00.APPR
V220075.GENERAL SERVICES SPECIALIST.18745.IB00.APPR
V220075.GENERAL SERVICES SPECIALIST.20455.IB00.APPR
V169232.SAFETY AND EMERGENCY PREPAREDNESS SPECIALIST.19287.IB00.APPR
V200107.DIGITAL MEDIA SPECIALIST (PASHTO).17534.IB00.APPR
V1175.MULTIMEDIA SPECIALIST (PASHTO).18753.IB00.APPR
V220150.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).19912.IB00.APPR
V200107.DIGITAL MEDIA SPECIALIST (PASHTO).18085.IB00.APPR

V200117.DIGITAL NEWS EDITOR (KURDISH).17994.IB00.APPR
V240116.INTERNATIONAL BROADCASTER (DIGITAL) (TURKISH).20458.IB00.APPR
V190031.GRAPHIC ARTIST (DIGITAL MEDIA).17155.IB00.APPR
V180022.INT BROADCASTER (MULTIMEDIA) (TURKISH/KURDISH).16843.IB00.APPR
V180065.INT BROADCASTER (VJ) (URDU).16730.IB00.APPR
V170207.INT BROADCASTER (MULTIMEDIA) (PASHTO).16676.IB00.APPR
V4075.INT BROADCASTER (ONLINE) (TURKISH).15010.IB00.APPR
V240110.INT BROADCASTER (MULTIMEDIA) (TURKISH).20416.IB00.APPR
V136035.INT BROADCASTER (PASHTO).14117.IB00.APPR
V240008.INTERNATIONAL BROADCASTER (MULTIMEDIA) (TURKISH).19429.IB00.APPR
V158029.INT BROADCASTER (ONLINE) (KURDISH).14805.IB00.APPR
V220150.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).18520.IB00.APPR
V220169.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).18548.IB00.APPR
V169199.INT BROADCASTER (MULTIMEDIA) (BANGLA).15722.IB00.APPR
V220208.EXECUTIVE PRODUCER.18993.IB00.APPR
V210051.MULTIMEDIA SPECIALIST (DARI).17816.IB00.APPR
V169157.INT BROADCASTER (MULTIMEDIA) (PASHTO).15720.IB00.APPR
V169157.INT BROADCASTER (MULTIMEDIA) (PASHTO).15718.IB00.APPR
V114240.INT BROADCASTER (MULTIMEDIA) (PASHTO).17205.IB00.APPR
V169141.INT BROADCASTER (MULTIMEDIA) (URDU).15632.IB00.APPR
V114240.INTERNATIONAL BROADCASTER (PASHTO).13773.IB00.APPR
V169157.INT BROADCASTER (MULTIMEDIA) (PASHTO).16461.IB00.APPR
V210104.INTERNATIONAL BROADCASTER (MULTIMEDIA) (BANGLA).18023.IB00.APPR
V1114.INT BROADCASTER (DARI).15412.IB00.APPR
V210044.MULTIMEDIA SPECIALIST (PASHTO).17802.IB00.APPR
V158034.INT BROADCASTER (UZBEK).14804.IB00.APPR
V136125.INTERNATIONAL BROADCASTER (MULTIMEDIA) (DARI).13774.IB00.APPR
V114240.INT BROADCASTER (MULTIMEDIA) (PASHTO).16763.IB00.APPR
V147012.INT BROADCASTER (BANGLA).14161.IB00.APPR
V7228.INT BROADCASTER (AZERBAIJANI).7329.IB00.APPR
V200085.INTERNATIONAL BROADCASTER (MULTIMEDIA)(URDU).17474.IB00.APPR
V1175.INT BROADCASTER (PASHTO).11861.IB00.APPR
V200085.INTERNATIONAL BROADCASTER (MULTIMEDIA)(URDU).17473.IB00.APPR
V200127.SENIOR TELEVISION SPECIALIST (PRODUCER)(KURDISH).18108.IB00.APPR
V1175.MULTIMEDIA SPECIALIST (PASHTO).18383.IB00.APPR
V200114.MULTIMEDIA SPECIALIST (PASHTO).17545.IB00.APPR
V170133.INT BROADCASTER (MULTIMEDIA) (TURKISH).16119.IB00.APPR
V170135.INT BROADCASTER (MULTIMEDIA) (PASHTO).16139.IB00.APPR
V200110.MULTIMEDIA SPECIALIST (TURKISH).17541.IB00.APPR
V190224.EDITOR (BRIDGE).17547.IB00.APPR
V190237.EXECUTIVE PRODUCER (TV) (URDU).17329.IB00.APPR
V147085.TV PRODUCTION SPECIALIST (URDU).14533.IB00.APPR
V210099.INTERNATIONAL BROADCASTER (MULTIMEDIA) (PASHTO).18177.IB00.APPR
V170155.INT BROADCASTER (MULTIMEDIA) (PASHTO).16186.IB00.APPR
V147015.INT BROADCASTER (DARI).14116.IB00.APPR
V210100.INTERNATIONAL BROADCASTER (MULTIMEDIA) (DARI).18176.IB00.APPR
V180108.EDITOR (DIGITAL) (DEEWA).17111.IB00.APPR

**JA262**

V169169.SPECIAL PROJECTS MANAGER.15683.IB00.APPR
V230089.AUDIOVISUAL PRODUCTION SPECIALIST.19023.IB00.APPR
V169039.EXECUTIVE PRODUCER (TV) (TURKISH).15267.IB00.APPR
V230130.EXECUTIVE PRODUCER (TV).19067.IB00.APPR
V170134.INT BROADCASTER (MULTIMEDIA) (KURDISH).19016.IB00.APPR
V169044.EXECUTIVE PRODUCER (TV) (KURDISH).18622.IB00.APPR
V169171.SENIOR EDITOR (MULTIMEDIA) (DARI).15681.IB00.APPR
V169036.INT BROADCASTER (MULTIMEDIA) (UZBEK).15261.IB00.APPR
V170134.INT BROADCASTER (MULTIMEDIA) (KURDISH).16142.IB00.APPR
V136246.SENIOR ANALYST.16175.IB00.APPR
V180156.IT SPECIALIST (CUSTSPT).17896.IB00.APPR
V180156.IT SPECIALIST (CUSTSPT).17897.IB00.APPR
V0903.IT SPECIALIST (CUSTSPT).12014.IB00.APPR
V0903.IT SPECIALIST (CUSTSPT).12013.IB00.APPR
V7501.IT SPECIALIST (CUSTSPT).12885.IB00.APPR
V180156.IT SPECIALIST (CUSTSPT).17220.IB00.APPR
V190214.TELECOMMUNICATIONS SPECIALIST(BROADCASTING MEDIA TECHNOLOGY).18083.IB00.APPR
V190214.TELECOMMUNICATIONS SPECIALIST (BROADCAST MEDIA TECHNOLOGY).17995.IB00.APPR
V190214.TELECOMMUNICATIONS SPECIALIST(BROADCASTING MEDIA TECHNOLOGY).18181.IB00.APPR
V158189.TELECOMMUNICATIONS SPECIALIST.17190.IB00.APPR
V190036.INFORMATION TECHNOLOGY SPECIALIST (CUSTSPT).17116.IB00.APPR
V190036.INFORMATION TECHNOLOGY SPECIALIST (CUSTSPT).17115.IB00.APPR
V190214.TELECOMMUNICATIONS SPECIALIST(BROADCASTING MEDIA TECHNOLOGY).18056.IB00.APPR
V158189.TELECOMMUNICATIONS SPECIALIST.17191.IB00.APPR
V158140.IT SPECIALIST (CUSTSPT).15016.IB00.APPR
V169013.LEAD IT SPECIALIST (CUSTSPT).15210.IB00.APPR
V158189.TELECOMMUNICATIONS SPEC.15139.IB00.APPR
V240039.IT SPECIALIST (SYSADMIN).19903.IB00.APPR
V240075.IT SPECIALIST (CUSTSPT).20226.IB00.APPR
V220107.MANAGEMENT AND PROGRAM ANALYST.20470.IB00.APPR
V240031.BROADCAST MAINTENANCE TECHNICIAN (MULTIMEDIA).19456.IB00.APPR
V240033.LEAD TV PRODUCTION SPECIALIST.19495.IB00.APPR
V158187.IB (MULTIMEDIA).19579.IB00.APPR
V4090.GENERAL ASSIGNMENTS REPORTER (ENGLISH).12591.IB00.APPR
V4090.GENERAL ASSIGNMENTS REPORTER (ENGLISH).18071.IB00.APPR
V220061.INT BROADCASTER (ENGLISH).18711.IB00.APPR
V210066.AUDIENCE ENGAGEMENT ANALYST.17938.IB00.APPR
V210066.AUDIENCE ENGAGEMENT ANALYST.18430.IB00.APPR
V3116.INTERNATIONAL BROADCASTER (ENGLISH).12357.IB00.APPR
V3116.INT BROADCASTER (ENGLISH).12364.IB00.APPR
VV220029.PRESS FREEDOM MULTIMEDIA REPORTER.18812.IB00.APPR
V210217.U\.S\. POLITICS AND POLICY REPORTER.18658.IB00.APPR
V210098.INTERNATIONAL BROADCASTER (DOMESTIC BEAT).18170.IB00.APPR
V210098.INTERNATIONAL BROADCASTER (DOMESTIC BEAT CORRESPONDENT).18014.IB00.APPR
V220036.EDITOR (BRIDGE).18350.IB00.APPR
V180007.GRAPHIC ARTIST.16578.IB00.APPR
V158132.EDITOR (STORY).17303.IB00.APPR

**JA263**

V210098.INTERNATIONAL BROADCASTER (DOMESTIC BEAT CORRESPONDENT).18017.IB00.APPR
V210098.INTERNATIONAL BROADCASTER (DOMESTIC BEAT CORRESPONDENT).18015.IB00.APPR
V4090.GENERAL ASSIGNMENTS REPORTER (ENGLISH).13978.IB00.APPR
V4090.GENERAL ASSIGNMENTS REPORTER (ENGLISH).12589.IB00.APPR
V220176.MEDIA ASSET DISPOSITION SPECIALIST.18573.IB00.APPR
V230067.IT SPECIALIST (INET).18828.IB00.APPR
V220151.MANAGEMENT AND PROGRAM ANALYST (FINANCIAL).18519.IB00.APPR
V210014.AUDIOVISUAL PRODUCTION SPECIALIST.17695.IB00.APPR
V147027.INTERNATIONAL BROADCASTER (TV/INTERNET).14135.IB00.APPR
V1156.INT BROADCASTER (INTERNET).11423.IB00.APPR
V3116.INT BROADCASTER (ENGLISH).12363.IB00.APPR
V114262.INT BROADCASTER (ENGLISH).12378.IB00.APPR
V147026.TV PRODUCTION SPECIALIST.14137.IB00.APPR
V220061.INT BROADCASTER (ENGLISH).18627.IB00.APPR
V136106.WRITER EDITOR (INTERNET).19348.IB00.APPR
V136106.WRITER EDITOR (INTERNET).13814.IB00.APPR
V147149.INT BROADCASTER (MULTIMEDIA).14910.IB00.APPR
V158198.EDITOR (SPECIALTY).15156.IB00.APPR
V136106.WRITER EDITOR (INTERNET).18891.IB00.APPR
V158132.EDITOR (STORY).15037.IB00.APPR
V158132.EDITOR (STORY).15042.IB00.APPR
V136192.INTERNATIONAL BROADCASTER.14622.IB00.APPR
V7857.TECHNICAL INFORMATION SPECIALIST.14347.IB00.APPR
V3116.INT BROADCASTER (ENGLISH).12370.IB00.APPR
V210014.AUDIOVISUAL PRODUCTION SPECIALIST.17694.IB00.APPR
V210014.AUDIOVISUAL PRODUCTION SPECIALIST.17697.IB00.APPR
V3104.INT BROADCASTER (VIDEO PHOTOGRAPHER).12301.IB00.APPR
V3116.INTERNATIONAL BROADCASTER (ENGLISH).13640.IB00.APPR
V170054.TECHNICAL INFORMATION SPECIALIST (DIGITAL ASSET).15950.IB00.APPR
V169164.INTERNATIONAL BROADCASTER.19860.IB00.APPR
V136153.TECHNICAL INFORMATION SPECIALIST (DIGITAL ASSET).13839.IB00.APPR
V8014.STAFF ASSISTANT (TYPING).9256.IB00.APPR

| Grade | Competitive Geo |
|-------|-----------------|
| GS-12 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-11 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |

**JA265**

| GS-12 | Washington, DC |
|-------|----------------|
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GG-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |

**JA266**

| | |
|---|---|
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |

**JA267**

| | |
|---|---|
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | PALM BAY,BREVARD,FL |
| GS-14 | PASADENA,LOS ANGELES,CA |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |

| | |
|---|---|
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | PHOENIX,MARICOPA,AZ |
| GS-13 | PORTLAND,CUMBERLAND,ME |
| GS-12 | SAN ANTONIO,BEXAR,TX |
| GS-12 | HIGHLAND,MADISON,IL |
| GS-09 | SALEM,MARION,OR |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | NORFOLK (IND CITY),VA |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-09 | Washington, DC |
| GS-09 | Washington, DC |
| GS-13 | KISSIMMEE,OSCEOLA,FL |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | New York, NY |
| GS-12 | New York, NY |
| GS-12 | CRYSTAL LAKE,MCHENRY,IL |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |

| | |
|---|---|
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |

**JA270**

| | |
|---|---|
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GG-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GG-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-14 | FRANCONIA,GRAFTON,NH |
| GS-13 | Washington, DC |
| GS-11 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-15 | Washington, DC |
| GS-12 | New York, NY |
| GS-13 | New York, NY |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |

**JA271**

| GS-12 | Washington, DC |
|-------|----------------|
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | CAPE CORAL,LEE,FL |
| GS-12 | WARSAW,RICHMOND,VA |
| GS-11 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |

**JA272**

| | |
|---|---|
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-15 | Washington, DC |
| GS-12 | New York, NY |
| GS-13 | New York, NY |
| GS-12 | LOS ANGELES,LOS ANGELES,CA |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |

**JA273**

| GS-12 | Washington, DC |
|-------|----------------|
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-06 | Washington, DC |
| GS-11 | Washington, DC |
| GS-11 | Washington, DC |
| GS-08 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |

**JA274**

| | |
|---|---|
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GG-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GG-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |

**JA275**

| GS-13 | Washington, DC |
|-------|----------------|
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-14 | Washington, DC |
| GS-14 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | New York, NY |
| GS-13 | New York, NY |
| GS-13 | New York, NY |
| GS-13 | LA SALLE,IL |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |

| | |
|---|---|
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-11 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-13 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-12 | Washington, DC |
| GS-07 | Washington, DC |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, *et al.*,

Plaintiffs,

- v -

KARI LAKE, *et al.*,

Defendants.

No. 25 Civ. 2390 (JPO)

## DECLARATION OF CRYSTAL THOMAS

I, CRYSTAL THOMAS, hereby make the following declaration pursuant to 28 U.S.C. §
1746:

1.    I have been the Director of Human Resources for the U.S. Agency for Global Media
("USAGM") since 2024.   I base this declaration on knowledge and information I have gained in
the course of performing my official duties.

2.    In that capacity, I have personal knowledge of, and direct involvement, in personnel
decisions for USAGM.

3.    USAGM currently employs a total of approximately 1,147 full-time employees.  As
of March 14, 2025, USAGM had active employment contracts with 598 personal service
contractors.

4.    Nearly all of USAGM's workforce has been located in the Washington, D.C. area.
Specifically, USAGM currently has approximately 1,040 full time federal employees with duty
stations in the Washington, D.C. area.  In addition, as of March 14, 2025, USAGM contracted with
approximately 475 personal services contractors in the Washington, D.C. area.  In contrast, as of
the same date, USAGM employed only 14 full-time federal employees and contracted with only 25
personal services contractors in the New York City area.

**JA278**

5.      On March 14, 2025, President Trump issued an Executive Order directing that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law" (the "Executive Order").    *See* Continuing the Reduction of the Federal Bureaucracy, https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ (Mar. 14, 2025).

6.      On March 15, 2025, pursuant to the Executive Order, USAGM placed 1,042 full-time employees on administrative leave with full pay and benefits. On March 16, 2025, and terminated the contracts with all personal services contractors, who will be paid through March 31, 2025. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order.

7.      In the course of that implementation, on March 25, 2025, I sent an email to 33 employees who work at Office of Cuba Broadcasting recalling them from administrative leave effective March 26, 2025. As of the end of the day on March 26, 2025, I can confirm that all employees were on work status. I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025.

8.      In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 31 other employees from administrative leave.

9.      The American Federal Government Employees Local 1812 ("AFGE") serves as the exclusive representative for a bargaining unit consisting of approximately 713 USAGM employees. On March 25, 2025, I sent an email to the AFGE Local 1812 President enclosing a preliminary

2

**JA279**

notification to the union stating USAGM's intent to implement a reduction in force ("RIF") for multiple competitive areas in USAGM in furtherance of the Executive Order.

10.     The American Federation of State, County and Municipal Employees Local 1418, AFL-CIO ("AFSCME") serves as the exclusive representative for a bargaining unit consisting of approximately 33 USAGM employees.  On March 25, 2025, I sent an email to the AFSCME Local 1418 President, enclosing a preliminary notification to the union stating USAGM's intent to implement a RIF for multiple competitive areas in furtherance of the Executive Order.

11.     Both of the foregoing notifications informed the respective unions of USAGM's intention to implement a RIF in a manner consistent with USAGM's Negotiated Labor Management Agreements ("NLMA") with each union.

12.     The notifications that were issued will not directly result in the termination of any USAGM employee.  Rather, it is a first step in the process of conducting a RIF, pursuant to the NLMAs with each respective union.  Additional steps in the RIF process with both unions will include, among other things, impact and implementation bargaining to the extent requested by the unions; providing additional information to the unions, including responding to union information requests; providing the unions with retention registers; and specific notice to bargaining unit employees.  Each of these steps would occur prior to removing any bargaining unit employees in the RIF implementation process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 27, 2025
        Washington, District Columbia

**Crystal G Thomas**   Digitally signed by
                       Crystal G Thomas
                       Date: 2025.03.27
                       14:09:55 -04'00'

CRYSTAL THOMAS

3

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 1015-RCL

## <u>DECLARATION OF JON SCHLEUSS</u>

I, Jon Schleuss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I have previously provided testimony in declarations dated March 23, 2025, and March 27, 2025. I am the President of The NewsGuild-CWA ("TNG-CWA"), a labor union that represents a private sector bargaining unit of Radio Free Asia ("RFA") employees. RFA is a broadcaster that is funded by grants from the United States Agency for Global Media ("USAGM").

3.     RFA management conveyed to me that, as of the date of this declaration, USAGM provided RFA funds it owed for March, but hasn't provided funds owed for April. Typically, USAGM sends a request at the end of each month for funds due in the upcoming month. Those funds are typically approved and released to RFA within the first week of that month. RFA submitted a financial plan and requested the rest of the funds due to RFA through

1

**JA281**

September, which covers the period of Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("2025 Continuing Resolution"). RFA management told me that, prior to the March 14 executive order, they met weekly with USAGM staff, but that USAGM hasn't been communicating with RFA since mid-March.

4.      On March 21, RFA furloughed the majority of its employees in the bargaining unit represented by TNG-CWA. That staff remains in unpaid status. TNG-CWA members have now received their last, partial paycheck, covering the period they worked before the furloughs. As a result, TNG-CWA is now losing those members' dues. RFA management told me that they are unable to bring back furloughed employees because of uncertainty regarding what USAGM will do.

5.      RFA announced to staff on April 11 that "Due to uncertainty regarding April funds and future fund distributions to all grantees, RFA is forced to maintain our current furlough status for the foreseeable future. It's still nearly impossible to determine what the remaining FY25 or FY26 budget allocations will be, which is requiring us to prepare our organization's contingency plans in case RFA's current and future budget stays flat or is decreased." RFA management has clarified to me that, as long as there remains uncertainty regarding whether USAGM will comply fully with its obligation to disburse grant funds to RFA throughout the entire fiscal year, RFA will not be able to return staff to paid status.

6.      If USAGM doesn't distribute funds to RFA in a reliable way guaranteeing several months of stability, furloughed staff may lose health insurance coverage as soon as May 1. RFA told staff on April 11 that they will tell staff during the week of April 14 whether RFA will have the funds to extend health benefits to furloughed staff in May. RFA said it has to prioritize using the delayed March funds to cover deferred expenditures from that month. And even if RFA can

**JA282**

afford to extend health insurance benefits for furloughed workers, RFA's insurance provider will not cover employees who have not worked for 60 days. That means insurance will end for workers furloughed on March 21 by the end of May unless RFA is able to bring furloughed staff back into work status.

    7.     Losing health insurance coverage would be devastating to our members, as the examples below show. Each of the individuals discussed below is a member of TNG-CWA employed by RFA. Each wishes to remain anonymous for fear of reprisal and because they are sharing personal and sensitive health information.

    a.     James Doe 1 is a furloughed worker with several chronic health issues. He has Parkinson's disease and diabetes. He takes medicine that is uncommon and would be expensive without health insurance. He takes two types of medications to treat his diabetes and two types to treat his Parkinson's disease. Without insurance, he would not be able to afford to treat his medical issues. Moreover, his whole family is on his health insurance plan through RFA, including his wife and two children.

    b.     James Doe 2 is a furloughed worker with several health issues. He has diabetes that requires insulin and high blood pressure that requires regular medicine. He has suffered at least two strokes and takes medication as a result. He had a kidney transplant in 2010 and takes medicine for that condition. He also goes to therapy regularly. He depends on health insurance in order to afford treatment for his medical conditions. His wife and daughter are also on his employer-provided health insurance.

3

**JA283**

c.  Jane Doe 1 is currently furloughed from RFA and has several chronic health issues that are treated with her employer-provided health insurance. She takes medicine and daily insulin shots to treat her diabetes. She also takes medicine daily to treat her cholesterol and high blood pressure. She would not be able to afford her medication without health insurance.

8.  RFA employs 35 workers on H1B visas, including TNG-CWA members. Many are from repressive countries, including Vietnam and Hong Kong, that persecute journalists for reporting the news. RFA has prioritized keeping those employees in pay status, but because of USAGM's recent inconsistency in funding, RFA has begun to furlough employees working in the United States on work visas. RFA management began notifying employees, including TNG-CWA members, on April 14 that some employees on H1B visas will be furloughed beginning April 18.  If USAGM continues to refuse to fund RFA's grant, RFA management told me that RFA will continue to furlough employees, placing visa-holding employees at risk of being deported to their home countries where they could face threats, harassment, or imprisonment for their work as journalists.

9.  RFA broadcasts news on shortwave and medium wave radio, satellite television and publishes news online through websites, apps and social media platforms. RFA broadcasts its programs over shortwave radio through a combination of U.S. government-operated transmitters and a variety of short-wave lease facilities. I understand from RFA management that USAGM has cut RFA's access to these transmitters under contract with USAGM. I understand from RFA management that USAGM has, without notice, shuttered their ability to broadcast over satellite and radio, shrinking their transmission time down from 56 hours to 7 hours over the last month. These broadcasts previously reached audiences in Tibet, North Korea and other

4

**JA284**

locations where governments suppress access to a free press. RFA journalists told me that listeners have called them asking for the broadcasts to be turned back on.

Executed in Washington, D.C. on April 14, 2025.

_____

Jon Schleuss

# <u>DECLARATION OF THOMAS YAZDGERDI</u>

I, Thomas Yazdgerdi, declare the following under penalties of perjury:

1.      I am a member of the Senior Foreign Service at the Department of State and am the President of the American Foreign Service Association (AFSA). AFSA is both a professional association and the exclusive employee representative for the U.S. Foreign Service. It represents approximately 18,000 active-duty members of the Foreign Service at the Department of State, the United States Agency for Global Media (USAGM), and other U.S. foreign affairs agencies.  As AFSA President, I regularly communicate with our members through AFSA-wide messages and often hear directly from our members. Similarly, AFSA staff is in daily contact with members serving domestically and overseas.

2.      On March 14, 2025, President Trump issued the Executive Order (EO), *Continuing The Reduction of the Federal Bureaucracy*, with the intent of effectively eliminating the US Agency for Global Media (USAGM). An article published on the White House website the next day states that the EO "will ensure that taxpayers are no longer on the hook for radical propaganda."

3.      Since then VOA has gone dark. AFSA members, across our constituent agencies, have advised that operations ceased on March 15, 2025.  For example, the postings on the VOA news site, https://www.voanews.com, are dated

**JA286**

on or before March 15.[1]  AFSA members have further advised about specific

concerns raised by specific posts across the globe. Below, are eight examples from

cables recently sent by various overseas missions to Department of State leadership

(the specific cable is identified by its number).

4.      None of the cables contain classified information. Like all cables at

this level, they have been classified Sensitive But Unclassified (SBU). The Foreign

Affairs Manual defines SBU information as "information that is not classified for

national security reasons, but that warrants/requires administrative control and

protection from public or other unauthorized disclosure for other reasons."  See 12

FAM 541.  Such information is typically produced in response to Freedom of

Information Act (FOIA) requests, unless FOIA exempt.

5.      I reasonably believe the information disclosed herein evidences

violations of law, rule, or regulation, gross mismanagement, a gross waste of

funds, an abuse of authority, or a substantial and specific danger to public health or

safety. The disclosures are therefore protected under the federal whistleblower

laws.  See 5 U.S.C. § 2302(b)(8) (Prohibited Personnel Practices).

---

[1] See, e.g., the following front page stories accessed on April 15, 2025:  Starmer: 'Sooner or Later' Russia Must Yield to Peace (March 15, 2025), available at https://www.voanews.com/a/starmer-sooner-or-later-russia-must-yield-to-peace/8011681.html; *VOA Kurdish: Syria's Interim Constitution Raises Fears of Sectarian Division* (March 15, 2025), available at https://www.voanews.com/a/voa-kurdish-syria-s-interim-constitution-raises-fears-of-sectarian-division-/8011267.html; and *US to Expel South Africa Ambassador as Relations Deteriorate* (March 14, 2025), available at https://www.voanews.com/a/us-government-shutdown-likely-averted-democrats-fracture/8011226.html.

**JA287**

6.    **Botswana (25 Gaborone 144):**

With U.S. Agency for Global Media (USAGM) likely scaling back operations significantly, Post has lost its most potent interagency partner in the fight against Chinese media influence in Botswana. … Absent USAGM content via the Voice of America (VOA) or another similar source, Xinhua News Agency and Sputnik will be the primary sources of re-distributed international news wire content in Botswana, including those that broadly shape narratives about the United States.

7.    **Cuba (25 Havana 150):**

Radio and TV Martí have long been regarded as vital sources of uncensored news for Cubans, countering state-controlled narratives. … Meanwhile Castro's cronies amplified messages that celebrated the closure of Radio and TV Martí as a victory for the regime and signals a change in U.S. priorities away from the island.

8.    **Kosovo (25 Pristina 278)**

RFE/RL and VOA have advanced U.S. strategic interests and countered adversarial narratives in the Balkans. The space created through withdrawal of these outlets will most likely be filled by foreign actors such as China, Russia, and others, undermining U.S. influence and policy.

9.    **Kuwait (25 Kuwait 278)**

USAGM's broadcasts into Iran counter the regime's propaganda, offering an uncensored perspective on U.S. foreign policy and Iran's destabilizing role in the region. The programming has been vital in providing uncensored, independent news to Iranian audiences, directly challenging Tehran's tightly controlled state narratives. The closure of this critical platform would not only weaken the effectiveness of U.S. messaging on pivotal issues critical to the Maximum Pressure campaign, including Iran's regional provocations, the activities of groups such as Hamas, Hizballah, and the Houthis, as well as broader U.S. policy objectives, but also limit efforts to promote democratic values and human rights. The Iranian regime's repeated grievances about USAGM Kuwait broadcasts underscore its impact in undermining the credibility of the regime's propaganda and allow it an unchallenged stranglehold on information accessible to the Iranian people. By abandoning this broadcasting capability, the United States

**JA288**

would relinquish a powerful tool for influencing regional narratives and, in doing so, strengthen adversarial voices that seek to challenge U.S. policies and objectives.

…

USAGM's closure will clear the path for adversarial nations, particularly China, to seize the opportunity to enhance their state-run media presence. With the end of U.S. broadcasts not only in Iran but throughout the Middle East, we will witness a shift toward pro-China and pro-Iran messaging throughout the region, expanding their influence and further eroding U.S. influence.

…

As regional tensions intensify, particularly between Iran and Israel, the shutdown of the USAGM station marks a pivotal shift with potentially far-reaching implications across the Gulf region, reducing U.S. influence over critical media narratives. While the Iranian regime would benefit from the removal of a significant source of pressure on its authority, adversaries like China are poised to exploit the larger strategic vacuum, with China also likely to expand its own regional presence. If the current trend continues, U.S. soft power in the region could face serious erosion, and the message of U.S. commitment to media freedom and our capacity to maintain stability would be undermined.

10. **Nigeria (25 Lagos 160)**

For over four decades, USAGM had served as a counterweight to foreign influence and propaganda operations, building a network of 40 affiliate radio and TV stations across Nigeria. Each week VOA content reaches 19 million Nigerians …

While the move to reduce spending by scaling back USAGM operations will save taxpayer dollars, it will also enable outlets like China Global Television Network (CGTN), Russia's RT, and the emerging Russian-led, UAE-based Viory network to expand their reach.

… China may capitalize on the USAGM retreat to expand its soft power reach in Nigeria, while Russia's influence, which has waned, may be revitalized in the absence of USAGM from Nigeria. Without VOA's trusted reporting from the American perspective, the United

4

**JA289**

States has lost not only a tool to counter adversaries in the information space, but also an effective mechanism for advancing U.S. interests directly into the homes of millions of Nigerians.

**(25 Abuja 508)**

VOA Hausa, with an annual budget of around $3.3 million, reaches 16.9 million weekly listeners out of a potential 60 million Hausa speakers in West Africa. It is a targeted, cost-effective tool to counter the messaging of these competitors and extremists, delivering a distinct U.S. perspective to Hausa-speaking communities, as well as access to credible Islamic voices of moderation and opposition to terrorism. In countering our adversaries, whether competitors such as China and Russia or extremist groups, VOA Hausa is an indispensable asset increasing America's diplomatic strength and helping secure our interests against extremists. As ten Northern Nigerian civil society organizations wrote to Ambassador Mills to ask for reconsideration of VOA Hausa's closure, "VOA Hausa is a beacon of hope and a source of credible information" for millions of Nigerians and Africans across the continent.

… The reduction in USAGM operations, including VOA Hausa, risks ceding critical ground to China and Russia, who are intensifying Hausa-language media efforts to sway West Africa's Hausa speakers. …  Without VOA Hausa's $3.33 million budget sustaining its 10 million weekly listeners, local Nigerian media affiliates may turn to these strategic competitors for content, amplifying foreign influence over a demographic pivotal to regional stability. Similarly, VOA Hausa's outreach plays a key role in neutralizing extremist messaging. The vacuum caused by no VOA Hausa counter-messaging will be filled by bad actors' narratives and will erode U.S. influence in Nigeria's Hausa-speaking north, where VOA's credible reporting countered both extremist propaganda from groups like Boko Haram and the strategic messaging of adversarial states.

11. **Pakistan (25 Islamabad 450)**

Shuttering VOA's Pashto service will leave a critical news and information gap along the Afghanistan-Pakistan border, where military, jihadist, and extremist narratives and disinformation dominate the media landscape.

5

**JA290**

12. **Serbia (25 Belgrade 322)**

The potential shuttering of USAGM outlets would leave a significant void in objective, fact-based coverage of China in Serbia's media space-just as one of Serbia's fastest-growing cable news operations, Telekom Srbija's Newsmax Balkans channel (an affiliate of U.S.-based Newsmax), was poised to strike an agreement with USAGM to share reporting resources, significantly expanding the audience for USAGM-produced content among the Serbian mainstream.

… China and other adversaries will fill the void left by USAGM content "in weeks, not months," one prominent foreign affairs reporter told us.

13. **United Kingdom (25 London 714)**

The closure of VOA Persian and Radio Farda eliminates key partners in communicating USG priorities and messages to the Iranian people and regime, and it cedes media space to the foreign malign influence of the Iranian regime.

… A 2023 survey from the GAMAAN Institute (the non-profit the Group for Analyzing and Measuring Attitudes in Iran) found that nearly 35 percent of Iranians inside Iran "often or sometimes" watch VOA Persian, while nearly 30 percent "often or sometimes" listen to Radio Farda.

…

Iranian state-run propaganda outlets rejoiced at the news of the closure of VOA Persian. Iranian state TV broadcast a show … welcoming the shutdown …. Describing the two outlets as a "waste of U.S. taxpayers' dollars," the show said their shutdown will serve as a "lesson" for the Iranian opposition that "the United States is not trustworthy."

…

**JA291**

A former Iran International journalist said, "I am heartbroken. It's very bad news for journalists and very good news for the Islamic Republic."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  April 16, 2025

_____
THOMAS YAZDGERDI

7

**JA292**

## DECLARATION OF JOHN DOE 4

I, John Doe 4, declare under penalty of perjury that the foregoing is true and correct:

1. I am a plaintiff in this case, captioned as *Widakuswara v. Lake*, No. 25-cv-01015-RCL (D.D.C).

2. I am a PSC (Personal Service Contractor) and a member of the US Agency for Global Media (USAGM) workforce.

3. On March 16, 2025, I was informed that my contract was to be terminated, effective March 31, 2025.

4. On March 28, 2025, a Temporary Restraining Order (TRO) was entered in this case (ECF No. 54). The TRO temporarily enjoins the defendants, including USAGM, from taking "any action to reduce USAGM's workforce (whether employees, contractors, or grantees)."

5. On March 29, 2025, I received an email from USAGM, with the subject "PSC Status," stating:

> Please be advised that the termination of your personal services contract is on hold until further notice. During this time, you will remain on administrative leave and will continue to receive your regular pay and benefits. We will keep you informed as the situation develops.

**JA293**

6. A copy of the email is attached as Exhibit 1.  USAGM did not reinstate my contract or suspend its termination at any time prior to March 29.

7. On April 15, 2025, I also learned that USAGM has informed the PSC health insurance carriers that coverage is to terminate April 30, 2025.

8. My concern about involuntary termination and the required departure from the United States remains.  I am a visible member of the media and fear that my friends and family members residing in my home country risk retaliation for their associations with me should I be forced to leave the United States in the very public manner associated with the present circumstances.

Dated;  April 16, 2025

/s/
_____
JOHN DOE 4

**JA294**

## EXHIBIT 1

From: **J.R. Hill** <chill@usagm.gov>
Date: Sat, Mar 29, 2025 at 5:36 PM
Subject: PSC Status
To: J.R. Hill <chill@usagm.gov>
Cc: John Hoddinott <jhoddinott@usagm.gov>, PSC Inquiries <pscinquiries@usagm.gov>


Good evening

 Please be advised that the termination of your personal services contract is on hold until further notice. During this time, you will remain on administrative leave and will continue to receive your regular pay and benefits. We will keep you informed as the situation develops.

If you have any questions, please don't hesitate to reach out.


Thank you


J.R. Hill

USAGM/CON

Branch Chief

VOA, OCB and USAGM

 o

 c

**JA295**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

    -against-

KARI LAKE, et al.,

                Defendants.

Index No. 25 Civ. 1015-RCL

## **DECLARATION OF JON SCHLEUSS**

      I, Jon Schleuss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

      1.      I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

      2.      I have previously provided testimony in declarations filed in this case. I am the President of The NewsGuild-CWA ("TNG-CWA"), a labor union that represents a private sector bargaining unit of Radio Free Asia ("RFA") employees. RFA is a broadcaster that is funded by grants from the United States Agency for Global Media ("USAGM").

      3.      In my prior declaration dated March 23, 2025, I testified that TNG-CWA members report on stories that require travel to other countries, including countries where USAGM programs broadcast.

      4.      I also testified that TNG-CWA members rely on USAGM programs because they (1) improve its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protect their safety in those countries by allowing

**JA296**

for the free flow of information into countries otherwise beset with government censorship; and (3) promote the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

5.      Specifically, TNG-CWA members rely on RFA broadcasts while abroad. They also rely on Voice of America and Radio Free Europe/Radio Liberty news reporting and broadcasts.

6.      The silencing of these broadcasts and online reporting has harmed TNG-CWA members by depriving them of access to information that informs their professional work and their personal safety while reporting abroad.

Executed in Washington, D.C. on April 17, 2025.

Jon Schleuss

**JA297**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PATSY WIDAKUSWARA**, *et al.*,

    *Plaintiffs*,

**v.**

**KARI LAKE**, in her official capacity as
Senior Advisor to the Acting CEO of the
United States Agency for Global Media, *et
al.*,

    *Defendants*.

**Case No. 1:25-cv-1015-RCL**
**Case No. 1:25-cv-0887-RCL**

---

**MICHAEL ABRAMOWITZ**, et al.,

    *Plaintiffs*,

**v.**

**KARI LAKE**, in her official capacity as
Senior Advisor to the Acting CEO of the
United States Agency for Global Media, *et
al.*,

    *Defendants*.

## <u>ORDER</u>

On April 22, 2025, this Court entered a preliminary injunction (PI) after concluding that

the defendants' actions pursuant to Executive Order 14238, "Continuing the Reduction of the

Federal Bureaucracy," violated numerous provisions of the Administrative Procedure Act (APA).

*See* Order, No. 25-cv-1015 (RCL) ("*Widakuswara* Docket"), ECF No. 99; Order, No. 25-cv-887

(RCL) ("*Abramowitz* Docket"), ECF No. 29.  The Court enjoined the defendants as follows:

> 1) take all necessary steps to return USAGM employees and contractors to their
> status prior to the March 14, 2025 Executive Order 14238, "Continuing the
> Reduction of the Federal Bureaucracy," including by restoring all USAGM

**JA298**

employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA [Voice of America] programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).

Order, *Widakuswara* Docket, ECF No. 99.  The Court entered a corresponding PI in *Abramowitz* specifically tailored to the defendants' actions regarding VOA.  Order, Abramowitz Docket, ECF No. 29.  The defendants have filed a "Motion for a Partial Stay Pending Appeal" in both cases [ECF No. 102, *Widakuswara* Docket] [ECF No. 32, *Abramowitz* Docket].  For the reasons contained herein, the defendants' Motion is **DENIED**.

Of note, the defendants characterize this Motion as a "partial stay" because they claim that they are not seeking a stay of the third portion of the Court's PI: to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)."  Mot. at 10 (citing this Court's PI Order).  Notwithstanding the defendants' characterization, the effect of the order they request would be to stay the third portion of the PI Order: a stay of the first portion of the PI would stay the implementation of the third, because VOA cannot resume programming if all staff remains on leave indefinitely.  And in their Motion and accompanying declarations, defendants do not indicate any plans to resume VOA broadcasting, as is required by the third portion of the PI order.  The Court therefore analyzes this Motion as one for a full stay of this Court's PI order.

"[T]he factors regulating the issuance of a stay" include "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

**JA299**

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  The Court addresses each in turn.

As the Court discussed in its Memorandum Opinion accompanying the PI Order, the defendants are not likely to succeed on the merits, and indeed, have opted not to argue the merits of the plaintiffs' arbitrary and capricious challenge at all, which formed the bedrock of this Court's holding.  *See Widakuswara v. Lake*, No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *13 (D.D.C. Apr. 22, 2025).

The defendants also do not establish that irreparable harm to the government would occur absent a stay.  Regarding the Court's injunction mandating compliance with congressional appropriations statutes, defendants argue that this obligation will cause irreparable harm to the government because the government is "unlikely to recover" the funds in the event that the D.C. Circuit finds that the defendants have been wrongfully enjoined.  Mot. at 10.  But this is not an accurate characterization of the defendants' harm: financial harm is typically not irreparable unless "the loss threatens the very existence of the movant's business." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  Though USAGM must continue to dispense congressional appropriations to RFA and MBN under this Court's injunction, if the D.C. Circuit later holds for the defendants, the money that was disbursed will not "threaten the very existence" of USAGM, and the defendants could seek to recover the funds via other litigation avenues in the future.  In short, ordering the payment of congressionally appropriated money to the intended recipient, and for its intended use, does not amount to irreparable harm to the federal government.  The indefinite withholding of appropriations from international broadcasting outlets,

**JA300**

however, does cause irreparable harm. *See Widakuswara*, 2025 WL 1166400, *16 (detailing irreparable harm to the network grantees, including the shuttering of their businesses entirely).

The defendants devote more discussion to the purported irreparable harm to the defendants regarding the impact on their personnel actions. Defendants represent their understanding of the preliminary injunction as follows: "Rather than narrowing [the injunction] to those employees or contractors who may have been removed or terminated as a result of Executive Order 14238, the Court includes every single 'employee and contractor, who were placed on leave or terminated,' which includes those who may have been placed on administrative leave or terminated for other causes, including, but not limited to, misconduct, performance issues, or security violations." Mot. at 6. Notably, this is the first time in this litigation that the defendants have argued that any of the personnel actions taken since March 14, 2025 were taken for any reason *other than* in response to the Executive Order. And the record belies this belated characterization—indeed, in the March 15 email placing 1,300 VOA employees on administrative leave, the USAGM Director of HR states that the placement was "not for any 'disciplinary purpose.'" Compl. ¶ 74, *Widakuswara* Docket, ECF No. 1. If anything, the defendants have consistently represented that every action at issue in this litigation taken since March 14, 2025, has been in direct response to the Executive Order. *See* Defs.' Opp'n to Mot. for Preliminary Injunction, ECF No. 88, at 3 (listing the actions taken by USAGM since March 14, 2025 and characterizing them as "[i]n furtherance of the OPM Memorandum and the Executive Order."). The PI therefore orders the defendants to return all those employees and contractors affected by the defendants' actions to their status pre-March 14, 2025, the day the Executive Order issued. Such relief is properly tailored to undo the defendants' actions here.

**JA301**

Furthermore, the defendants interpret the injunction as "prevent[ing] [USAGM] from executing any employment action, including placing any employee on administrative leave for any reason whatsoever." Mot. at 10. They argue that this "creates irreparable harm by hamstringing the agency's personnel operations," Mot. at 4, and also believe that "the Court has prohibited the Agency from making use of any reductions in force regardless of reason," Mot. at 7. But the Court's preliminary injunction does not reach so far. The injunction is tailored to undoing the agency's unlawful actions in furtherance of the Executive Order and returning to the pre-March 14 status quo. When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order, such as "misconduct, performance issues, or security violations" to which they allude—such execution of normal operations would, to the contrary, be in accordance with the status quo pre-March 14.[1]

This is not, as the defendants believe, a determination by the Court that USAGM's status pre-March 14, 2025 is the "benchmark for minimum statutory compliance." Mot. at 2. This Court's relief is based on a finding that defendants' actions since March 14, 2025, in their purported attempt to comply with the Executive Order, have likely contravened the APA. Because a PI "is a stopgap measure . . . intended to maintain a status quo,'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012), it is appropriately tailored relief to order the defendants to reverse their illegal actions and return to the status quo before the illegal actions took place.

---

[1] The defendants also argue that "[t]he injunction prohibits [USAGM] from engaging in contract negotiations, oversteps [USAGM's] broad discretion in setting terms of the grant agreements, and prevents [USAGM] from finalizing any subsequent contract termination even if [USAGM] determines that the contracts are unnecessary for the agency to fulfill its statutory functions." Mot. at 7. But the PI does not bar any of these activities. USAGM can still, with this PI in place, take actions pursuant to its statutory mandate and in compliance with the APA. The actions that the plaintiffs challenge in this lawsuit likely contravene the APA, as the Court has found. *See generally Widakuswara*, 2025 WL 1166400.

JA302

As for the final two *Hilton* considerations, the issuance of the stay will "substantially injure the other parties interested in the proceeding." *Hilton*, 481 U.S. at 776. Immediate compliance with the PI is necessary to avert the irreparable harm that is soon to befall the plaintiffs. *See Widakuswara*, 2025 WL 1166400, at *16–17 (detailing the irreparable harm to the plaintiffs absent injunctive relief). And staying the Court's PI is not in the public interest, particularly given that absent the PI, the defendants will continue their actions in contravention of numerous federal laws, including the International Broadcasting Act, relevant congressional appropriations acts, and the APA.

For the foregoing reasons, it is hereby **ORDERED** that the defendants' Motion for Partial Stay Pending Appeal is **DENIED**.

The defendants also request that "even if the Court is not prepared to issue a stay that lasts throughout appellate proceedings," that "the Court issue a temporary stay of these aspects of the injunction until the D.C. Circuit resolves a motion for a partial stay that Defendants intend to file" later today. Mot. at 4. For the same reasons explained *supra*, this request is **DENIED**.

**IT IS SO ORDERED.**

Date: April 25, 2025
3:45 P.M.

Royce C. Lamberth
United States District Judge

6

**JA303**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MICHAEL ABRAMOWITZ**, *et al.*,

    *Plaintiffs*,

**v.**

    Case No. **1:25-cv-887-RCL**

**KARI LAKE,** *in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al.,*

    *Defendants.*

### ORDER

Before the Court is the plaintiffs' Motion for a Preliminary Injunction, which seeks to enjoin the defendants from dismantling Voice of America (VOA) in response to Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," announced by President Trump on March 14, 2025. The plaintiffs ask this Court to cancel the orders putting approximately 1,300 VOA employees on administrative leave, cancel the termination of contracts with approximately 500 personal service contractors (PSCs) with VOA, cease dismantling VOA, and restore VOA's personnel and operating capacities. For the reasons contained in the Memorandum Opinion in the related case, *Widakuswara v. Lake*, 25-cv-1015, the plaintiffs' Motion for a Preliminary Injunction is **GRANTED**. Because the relief sought here is narrower than the relief granted in *Widakuswara*, the Court enters the instant Order so that this case may alongside *Widakuswara* for the purposes of appellate review. The Court provides a brief overview of the distinctions between the cases and the relevant procedural history below.

The plaintiffs here are Michael Abramowitz, the current director of VOA; Anthony Michael LaBruto, an International Multimedia Journalist in the English to Africa Service in the

**JA304**

Africa Division of VOA; and J. Doe, a personal service contractor (PSC) with VOA.  Compl.

¶¶ 19–22.  On March 26, 2025, the plaintiffs filed their Complaint against Defendant Kari Lake,

Senior Advisor to the Acting CEO of the U.S. Agency for Global Media (USAGM), and Defendant

Victor Morales, Acting CEO of USAGM, in their official capacities, as well as USAGM as an

organization.  *Id.* ¶¶ 23–25.  The Complaint alleges that the defendants' actions regarding VOA,

since the issuance of the EO, violate of the Administrative Procedure Act (Count I), constitutional

separation of powers principles (Count II), the Take Care Clause (Count III), and were *ultra vires*

(Count IV).  The plaintiffs moved for a temporary restraining order (TRO) and preliminary

injunction (PI) that same day.  *See* Mot. for TRO and PI, ECF No. 4.

Separately, on March 28, 2025, in *Widakuswara*, Judge Oetken of the Southern District of

New York granted Plaintiffs' motion for a TRO and ordered as follows:

> Defendants, and those acting in concert with them, are temporarily enjoined from
> taking any further actions to implement or effectuate the March 14, 2025 Executive
> Order entitled "Continuing the Reduction of the Federal Bureaucracy" as to
> USAGM and the March 15, 2025 email issued to all VOA staff, or take any action
> to reduce USAGM's workforce (whether employees, contractors, or grantees),
> included but not limited to
> (i)     proceeding with any further attempt to terminate, reduce-in-force, place on
>         leave, or furlough any USAGM employee, or contractor,
> (ii)    terminating (or proceeding with terminating as announced) any USAGM
>         grant or contract or proceeding with terminating any USAGM Personal
>         Services Contractors (PSCs) who received notice after March 14, 2025 that
>         their contract would be terminated, including but not limited to John Doe 3
>         and John Doe 4 who received notice that their contracts would be terminated
>         on March 31, 2025, or
> (iii)   closing any USAGM office or requiring employees or contractors in
>         overseas offices to return to the United States.

March 28 TRO at 21–22.  Upon the issuance of that TRO, the plaintiffs here notified the

Court that they would withdraw their motion for a TRO and confer with the defendants regarding

a briefing schedule for the pending PI Motion.  The plaintiffs moved for an expedited PI briefing

schedule, *see* ECF No. 15, which the defendants opposed, ECF No. 16.  Then on April 1, 2025,

**JA305**

the defendants moved to stay all proceedings or, in the alternative, for a longer briefing schedule to allow for the Southern District of New York to rule on the pending PI motion in *Widakuswara*. Mot. to Stay, ECF No. 17.

With those motions still pending, on April 4, 2025, the defendants filed a Notice [ECF No. 20] of the decision in the Southern District of New York to transfer the *Widakuswara* case to the District of Columbia and requested that the parties file a status report on April 9, 2025. The Court granted this request, ECF No. 21, and the parties filed two proposed schedules, ECF No. 22. The Court ordered the parties to adhere to the briefing schedule in *Widakuswara*, given the significant overlap of issues, and ordered a joint hearing for both cases. Min. Order of Apr. 10, 2025. The hearing took place on April 17, 2025, during which counsel for *Widakuswara* plaintiffs and the plaintiffs here, and the defendants (which are the same in both cases), all presented argument. The plaintiffs here focused specifically on the actions taken with regard to VOA and sought relief pertaining to VOA specifically.

The Court has granted the PI in *Widakuswara* as it pertains to VOA, ordering the defendants to "restore all USAGM employees and personal service contractors who were terminated pursuant to the Executive Order 14238, 'Continuing the Reduction of the Federal Bureaucracy,' to their status prior to March 14, 2025" and to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news . . . .'" *See* Preliminary Injunction Order, No. 25-cv-1015 (RCL), ECF No. 98. This relief encompasses the relief sought by the plaintiffs here. For the reasons contained in the memorandum opinion accompanying the preliminary injunction Order in *Widakuswara*, the Court hereby

**JA306**

**ORDERS** that here, the plaintiffs' Motion for a Preliminary Injunction, ECF No. 4, is

**GRANTED**.

Date: _4-22-25_
_2:45 P.M_

Royce C. Lamberth
United States District Judge

**JA307**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL ABRAMOWITZ *et al.* | |
| *Plaintiffs,* | |
| –v.– | **Case No. 25-cv-00887 (RCL)** |
| KARI LAKE, *in her official capacity as Special Advisor to the Acting CEO of the United States Agency for Global Media*; | |
| VICTOR MORALES, *in his official capacity as Acting Chief of the United States Agency for Global Media*; | |
| and | |
| UNITED STATES AGENCY FOR GLOBAL MEDIA | |
| *Defendants.* | |

## DECLARATION OF MICHAEL ABRAMOWITZ

1.      I am the director of the Voice of America (VOA), the largest United States-funded international broadcaster. Until recently, VOA employed approximately 1,300 employees in total, including around 1,000 journalists. Approximately 500 of VOA's employees, including approximately 450 journalists and representing approximately forty percent of VOA's workforce, are personal service contractors (PSCs), who work fulltime under contract with VOA.

2.      On March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA in addition to me, received notice from USAGM that we were being placed on administrative leave "until further notice." In addition, on March 16, 2025, 500 PSCs already on administrative leave—who are fulltime employees and virtually all of whom are working-level

**JA308**

journalists or technical product staff—were informed that their contracts would be terminated as of March 31, 2025.

3.       As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years. VOA has not produced any journalism since March 15, 2025. It has not updated its website since that time. And it has not broadcasted over the airwaves since that time. Its website is frozen, its radio and television channels are looping filler material, and its newsroom is shuttered.

4.       On March 28, 2025, a court in the Southern District of New York issued a temporary restraining order (TRO) in a related matter *Widakuswara v. Lake,* No. 25 Civ. 2390, (S.D.N.Y. Mar. 28, 2025), ECF No. 54, which temporarily prevents any further action to dismantle VOA, including by terminating the 500 PSCs. What that court did not do, however, was terminate the administrative leave for me or the other 1300 employees that were placed on administrative leave and thus VOA broadcasting remains shuttered.

5.       For VOA to meet its statutory obligations, most or all of the 1300 employees that were placed on administrative leave must be brought back. And for the reasons described below, the longer VOA employees are kept on administrative leave, the harder it is going to be for VOA to continue to meet its statutory obligation even if all such employees are taken off of administrative leave.

6.       VOA's staff and journalists throughout the organization have already begun looking for other employment. VOA staff have specialized skills and unique contacts across the globe which will be lost if these current employees move elsewhere.

7.       Overseas stringers (freelancers) also are crucial to VOA's ability to cover breaking news all over the world. Because all stringer contracts (as well as the contracts with organizations

**JA309**

that help VOA identify stringers) have been terminated, unless VOA employees administrative leave is ended, VOA will quickly lose the ability to reenter into arrangements with stringers as they will be compelled to enter into other contractual agreements.

8.      Similarly, VOA relies on news wire services for video, image and content on breaking news, but those contracts have also been cancelled. In addition, contracts with all 18 Africa transmitting stations have been eliminated. These transmitting stations are critical to VOA's coverage of news to African nations. Until VOA employees administrative leave is ended, VOA is unable to reestablish those relationships and contracts.

9.      Likewise, contracts with most of VOA's vendors, which allow VOA to operate, have been terminated. These vendors provide the resources that enable VOA to meet its statutory mission. Without them there will be no video, no images, no editing, and minimal support regarding digital, TV and radio transmission.

10.     With each passing day it will become increasingly difficult and costly to reinstate or replace cancelled contracts that are needed for basic operations. Renegotiation by vendors, new public competitions, and potential contractor changes increase costs and inefficiencies to the government. The government will likely receive worse services and goods at higher prices.

11.     VOA is also losing its audience. Until recently, VOA had a weekly audience of 352 million people, the largest audience of any international broadcaster. Now VOA is blacked out on television and radio, which brought VOA 75% of its audience. As a result of the shutdown, affiliates will soon have no choice but to make contractual arrangements to substitute other programming, leaving VOA without affiliates should it remain off air for a significant period of time.

**JA310**

12.     In addition, for years, VOA has invested in world-class digital media experts, tools, and training to build some of the largest and most loyal online audiences. In just two weeks, VOA has seen precipitous declines in audience engagement across all major digital platforms including but not limited to Instagram, Facebook, YouTube, and X. The numbers are dramatic -- dropping from millions of views and engagements per day down to thousands or less.

13.     A quick return to production might recapture attention, but in the fast-moving online media, every day dark represents major losses to hard-won reach and influence. Audiences will look for different sources of information and as time elapses, VOA will not be able to get back its extraordinary audience share in many countries.

14.     Major events, both domestic and abroad, are represented fairly by VOA and establish baseline understanding in target markets. The longer VOA's steady reporting is absent in target markets, the more state propaganda and disinformation define reality.

On this 2nd day of April 2025, I declare under penalty of perjury under the laws of the District of Columbia that the foregoing declaration is true and correct.

_____

Michael Abramowitz

JA311

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL ABRAMOWITZ *et al.*,<br><br>*Plaintiffs,*<br><br>–v.–<br><br>KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*;<br><br>VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*;<br><br>and<br><br>UNITED STATES AGENCY FOR GLOBAL MEDIA,<br><br>*Defendants.* | **Case No. 25-cv-00887** |

## DECLARATION OF MICHAEL ABRAMOWITZ

1.      I am the director of the Voice of America (VOA), the largest United States-funded international broadcaster. Until recently, VOA provided multimedia cultural programming and news in 49 languages and reached an estimated 362 million people across the world weekly.  VOA falls under the umbrella of the United States Agency for Global Media (USAGM), and its work is overseen by the chief executive officer of USAGM.

2.      Before the actions at issue in this case, VOA employed approximately 1,300 employees in total, including around 1,000 journalists.  Approximately 500 of VOA's employees, including approximately 450 journalists and representing approximately forty percent of VOA's workforce, are personal services contractors (PSCs), who work fulltime under contract with VOA,

**JA312**

an arrangement that has become increasingly prevalent in government in recent years. Many of these PSCs are key VOA journalists and some come from authoritarian countries and moved to the United States to deliver truthful reporting to those living abroad.

3.      On April 19, 2024, Amanda Bennett, then the CEO of USAGM, with the unanimous approval of the International Broadcasting Advisory Board (IBAB), appointed me to be the director of VOA. Because the VOA director position is currently a senior civil service position, I was also required to apply to the federal government's Senior Executive Service. My application was approved by the federal Office of Personnel Management on June 11, 2024.

4.      I have dedicated much of my life to public service. Prior to becoming the director of VOA, I was the president of Freedom House, a nonprofit organization that promotes democracy and human rights, from 2017 to 2024. Before that, I was the director of the United States Holocaust Memorial Museum's Levine Institute for Holocaust Education. The bulk of my career has been devoted to journalism. I spent 24 years as a journalist at *The Washington Post*, where I was national editor and then a White House correspondent.

5.      VOA launched during the height of World War II in 1942. Its mission was to counter Nazi propaganda through truthful, impartial reporting delivered to German citizens who lived under the Nazi regime.

6.      Since that time, VOA has expanded to be a global voice for telling America's story to the world. It has modeled freedom of speech and freedom of the press, and it has demonstrated those values every day through its reporting to audiences living under authoritarianism and other countries where authoritarians are spreading false narratives about the United States.

7.      During the Cold War, VOA broadcasts reached behind the Iron Curtain and disseminated truthful reporting to those living under Soviet rule. For example, world-famous

**JA313**

Czech tennis star Martina Navratilova has recalled listening to VOA broadcasts while living under the Soviet regime. Likewise, VOA reporting was a key source of news for student protestors at Tiananmen Square in 1989, and it continues to reach Chinese listeners who have no other access to reliable news and information.  Because delivering truthful, impartial reporting to those living under authoritarian regimes has always been a threat to those regimes' existence, authoritarian regimes have consistently sought to block access to VOA programming.  Many of VOA's journalists, who hail from such countries and who speak directly to these audiences, face possible detention and persecution abroad for reporting the news.

8.      Like all news agencies, editorial independence is integral to VOA's success and its ability to meet its mission of accurately, objectively, and impartially reporting the news to a worldwide audience.  Through meeting this mission, VOA serves U.S. interests abroad by demonstrating the values of free speech, free opinion, and a free press.  Through its journalism, VOA also explains the United States to foreign audiences and provides accurate news and information to those in authoritarian countries deprived of access to such news.

9.      VOA was codified into law by the Smith-Mundt Act in 1948.

10.     Congress codified VOA's charter in the Foreign Relations Authorization Act of 1977.  VOA's charter, codified today in 22 U.S.C. § 6202(c), requires that VOA carry out certain broadcasting and news-producing activities.

11.     To maintain VOA's independence and to ensure that VOA and its sister entities remain credible in the eyes of the global public, Congress has mandated that certain principles be followed by newsroom staff and the executive-branch officials that oversee U.S. broadcast entities.  Similarly, Congress has devised, via statute, certain structures to help insulate newsroom staff at U.S. broadcast entities from undue political influence.

**JA314**

12.     Consistent with these missions, in 1994 Congress passed the International Broadcasting Act (IBA), which lays out the overarching principles that guide U.S. international broadcasting and insulates U.S. broadcast agencies' newsroom staff from certain executive branch officials.  These statutory provisions embody the "firewall" between journalists and executive branch officials who must not interfere with the reporting at the entities.

13.     By law, U.S. international broadcasting must "be conducted in accordance with the highest professional standards of broadcast journalism" and U.S. broadcast networks must produce "news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6205(a)(5), (b)(1).  Moreover, federal law requires that certain executive-branch officials outside the newsrooms "respect the professional independence and integrity of the [United States Agency for Global Media], its broadcasting services, and the grantees of the [United States Agency for Global Media]."  *Id.* § 6204(b).

14.     Today, by law VOA is required to carry out a variety of statutory functions in addition to those enumerated in its charter and in other provisions of U.S. code.  Under 22 U.S.C. § 6202(a)(1), "United States international broadcasting shall," among other requirements laid out in the statute, "be designed so as to effectively reach a significant audience."  Similarly, Congress mandated that "United States international broadcasting shall include," a variety of programming and operational capacity as described by statute.  *See* 22 U.S.C. § 6202(b)(1)–(10).

15.     Accordingly, through statute, Congress required that VOA broadcast and produce the news to reach wide audiences across the globe, and it prescribed that this news must adhere to high journalistic standards.  Congress also requires that the CEO of USAGM "respect the professional independence and integrity of [USAGM], its broadcasting services, and the grantees of [USAGM]."  22 U.S.C. § 6204(b).

**JA315**

16.     Federal law also diffuses oversight and supervision of U.S. international broadcast entities across numerous individuals in an effort to promote VOA's editorial independence.

17.     Following a number of controversies surrounding former USAGM CEO Michael Pack's running of USAGM and perceived interference with the work of newsroom staff, Congress modified the relationship between the USAGM CEO and the heads of U.S. international broadcasting networks, including VOA.

18.     Congress made these changes through the 2021 National Defense Appropriations Act (NDAA).

19.     Prior to Pack's tenure as CEO, the CEO had full authority to appoint and remove the heads of the broadcast entities as well as members of the entities' boards.

20.     The 2021 amendments, however, require that a Presidentially appointed, Senate-confirmed, and party-balanced board of seven, known as the International Broadcasting Advisory Board (IBAB), approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM.  22 U.S.C. § 6205(e)(1). This structure protects the directors of United States international broadcasting entities from arbitrary removal, and forges consensus around who should lead these entities' non-partisan work.

21.     Donald Trump was elected the 47th president of the United States in November 2024.  On December 11, 2024, then-President-elect Trump announced his intent that Kari Lake lead VOA as its director.  After taking office, however, President Trump fired all members of the IBAB, except the Secretary of State who is a member of the Board.

22.     As Kari Lake has publicly acknowledged, she could not be immediately appointed to be the head of VOA because her appointment requires approval by the IBAB, which is now

**JA316**

vacant.  On March 3, 2025, President Trump appointed Lake as a "Senior Advisor" to Victor Morales, the Acting USAGM CEO.

23.     On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" VOA's "statutory functions and associated personnel to the minimum presence and function required by law."  One day later, on March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA in addition to me, received notice from USAGM that we were being placed on administrative leave "until further notice."

24.     On or before March 14, 2025, Defendants terminated contracts with the Associated Press, Reuters, and Agence France-Presse.  They also notified VOA employees to stop using material from these wire services.

25.     On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and request the respective Missions to place all locally employed staff on administrative leave.  Other employees were also told to expect to be placed on administrative leave following the two-day shutdown period.

26.     On March 16, 500 personal services contractors (PSCs) already on administrative leave—who are fulltime employees and approximately ninety percent of whom are key reporters working to deliver vital news—were informed that they will be terminated as of March 31, 2025.

27.     As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years.  VOA has not produced any journalism since March 15, 2025.  It has not updated its website since that time.  And it has not broadcast over the airwaves since that time.

**JA317**

28.     The above-mentioned actions were implemented and ordered by the defendants in this litigation.  Defendants have made clear that they intend the cessation of VOA's broadcasting and reporting activities to continue indefinitely, and that VOA will be effectively dismantled.

29.     A March 15, 2025, USAGM press release stated that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." VOA is the largest broadcast agency in USAGM, which oversees five other broadcast agencies.

30.     I accepted my appointment to be the director of VOA with the knowledge and understanding that federal law requires, through the statutory firewall, that newsroom staff at VOA and other U.S. broadcast entities be free from interference from certain executive-branch officials so that these staff may truthfully and accurately report the news.  Further, I was aware of the IBAB's role in approving the appointments and removals of the heads of U.S. international broadcast networks, and that this structure was put in place to promote the independence of U.S. international broadcast entities, like VOA, and to ensure that consensus choices run the networks.

31.     I understand that, under federal law, 22 U.S. § 6205, I have a statutory right to remain the director of VOA until the CEO removes me with the approval by a majority vote of the IBAB or until the IBAB votes by a supermajority to unilaterally remove me from my position.

32.     When I accepted this statutorily protected role, it was with the understanding that I would be directing a prominent, reputable news agency that enjoys broad bipartisan support.  It was also with the understanding that VOA has the capacity to meet its statutory obligations to produce and broadcast the news to significant global audiences.

33.     After placing nearly all VOA employees, including me, on administrative leave, defendants are now initiating the mass termination of approximately 500 PSCs, including many of

7

**JA318**

VOA's most experienced journalists, editors, and technical staff. These personnel—those placed on leave and those whose terminations have been noticed—are essential to VOA's operations and are individuals that I rely upon to fulfill VOA's statutory mission. These actions have led to VOA going dark for the first time in its 83-year history. VOA has not published or aired a single piece of news content since March 15, 2025. Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered.

34.     Many of VOA's employees are foreign employees in the United States on J-1 visas. If terminated, they may be forced to return to countries with a practice of imprisoning dissenting voices. Two VOA foreign contributors have already been imprisoned in Myanmar and Vietnam. Recently, state media in an authoritarian country issued death threats to VOA journalists for their work. I worry about the safety of VOA employees.

35.     Today, many VOA employees and employees on leave and with personal services contracts are looking for jobs. The longer employees are on administrative leave, the less likely it is that employees will return to VOA if given the opportunity. For the PSCs, if their contracts are terminated on March 31, they will be even less likely—and in the case of foreign employees with terminated visas, potentially unable—to return to VOA if given the opportunity.

36.     I thought long and hard about filing this lawsuit, and I came to the conclusion that I had to in order to save an 83-year-old institution that has fought communism and authoritarianism since its inception. I had hoped to help the new VOA director improve the agency, and I had started that process during my tenure, but I have not been given the chance to talk with the new Administration. I believe strongly in democracy and the peaceful transfer of power that has taken place in this country for over 200 years.

**JA319**

37.     When this Administration took drastic action, I felt I had to respond.  I am speaking for all of those who are afraid to speak.  One of my fellow plaintiffs is unnamed because of the fear of retribution from the governments and regimes that he or she fled and came to America to oppose.  And some of my colleagues face imprisonment, torture and possible death if they are returned to their home countries, as they are here on J-1 visas.  As the Director of Voice of America, which was established by Congress, I feel I must act on behalf of the 1,300 employees of VOA to save this important network.

38.     Defendants have effectively taken away my right—and undermined my responsibilities—to lead a reputable and revered U.S. international broadcasting network.  Serving as the head of VOA, the country's largest and most influential government-funded international broadcast entity, is a unique privilege.

39.      Indeed, my entire career, including my decades as a journalist and years spent advocating for a free press and other freedoms, put me in the position to be considered for the directorship of VOA.  I accepted this appointment to be director of VOA with the knowledge and understanding that VOA would continue producing first-rate news and reporting to be disseminated to a global audience and that I could be removed only through the approval by a majority vote of the IBAB.

40.     Defendants' actions have dismantled a network that had hundreds of millions of weekly listeners across the globe and a reputation for delivering truthful and impartial news to those living under authoritarian regimes.  I have not only lost the functional right to lead VOA: VOA has been taken away from me, from VOA employees, and from its worldwide listeners.

41.      Losing the right to continue directing VOA due to defendants' actions is a multifaceted harm.

**JA320**

42.     Moreover, although I have not technically been terminated, defendants' actions have completely dismantled the VOA that existed just 11 days ago and that enjoyed a listenership of hundreds of millions of people across the globe and the reputation to go with that.  When I accepted my position, I took the helm of a strong, independent United States media organization that has earned repute and trust across the world for decades.  And I have directed VOA consistent with Congress's vision.  Of course, as I am now on administrative leave, I simply cannot do my job.  Even if the decision to place me on administrative leave were reversed, allowing defendants' actions to stand will leave VOA incapable of meeting its statutory requirements to produce and disseminate first-rate journalism to global audiences.  In other words, their actions have hampered my ability to meaningfully lead the VOA that Congress created.

43.     Each day to which I am entitled to remain as director and to continue leading the VOA that Congress envisioned is invaluable to me.  Each day that VOA remains shuttered is a day that I lose the right to continue leading this revered institution in meeting its statutory requirements.

44.     Additionally, defendants have justified their actions based on severe, unfounded criticisms of VOA and the broader universe of United States international broadcasting.  Defendant Kari Lake and other members of the administration have stated that USAGM and its networks are rife with fraud, produce anti-American content, and are a waste of taxpayer funds.  These accusations severely harm VOA's reputation as a non-partisan, objective news broadcasting network, and they severely harm the reputations of VOA employees.

45.     That harm to VOA's reputation similarly harms my own reputation and that of my colleagues.  Again, I accepted the VOA directorship because of the stellar reputation VOA has historically enjoyed and the bipartisan support for the network.  That reputation is under attack by

**JA321**

defendants who have effectively suggested that I am a partisan at the helm of a network that does more harm than good to United States interests.

46.     Defendants' unfounded criticisms of VOA has also negatively affected how the public perceives me and VOA journalists. Defendants' negative, untrue, and unverified statements are amplified by myriad criticisms that have been levied against me online. In reaction to defendants' statements, members of the public have accused me of supporting censorship and declared that I am unfit to run VOA.

47.     Defendants' actions have also strained the goodwill and long-term relationships I have cultivated with our business partners. By abruptly terminating contracts with the Associated Press, Reuters, and Agence France Presse, defendants have fractured these institutional relationships. My credibility, along with VOA's, has been jeopardized.

On this 25th day of March 2025 I declare under penalty of perjury that the foregoing declaration is true and correct.

Michael Abramowitz

Michael Abramowitz

JA322

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MICHAEL ABRAMOWITZ *et al.*

      *Plaintiffs,*

      −v.−

KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*;

VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*;

      and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

      *Defendants.*

**Case No. 25-cv-00887**

---

# DECLARATION OF ANTHONY MICHAEL LABRUTO

1.      For the past two years, I have worked under a personal services contract for Voice of America (VOA), the largest United States-funded international broadcaster, which provides multimedia cultural programming and news in 49 languages and reaches an estimated 362 million people across the world weekly.

2.      Specifically, I have worked as an International Multimedia Journalist in the English to Africa Service in the Africa Division which broadcasts across all of Africa and the African diaspora (African communities worldwide) in 16 different languages.  The division, which provides reports via television, radio and digital platforms, licenses programs to 1000 affiliate stations in Africa.

**JA323**

3.      My area of reporting has been focused primarily on the United States Congress. The types of reports I have provided during my time with VOA have covered a wide range of subjects of interest to African citizens.  For example, I have reported on military and security bills under consideration, the United States Agency for International Development grants, and the United States President's Emergency Plan for AIDS Relief (PEPFAR), which is a global health initiative designed to address the global HIV/AIDS epidemic.

4.      On March 15, 2025, I received an email (in my VOA email account) from J.R. Hill informing me that I was being placed on indefinite administrative leave.  One hour later my access to VOA email was terminated.  Several days later I received a second email (this one to my personal email) informing me that the termination was not due to a disciplinary issue.

5.      On March 16, 2025, I received a Termination Notice and Termination for Convenience Form notifying me that my personal services contract (which was not set to expire until June 30, 2025) was being terminated effective March 31, 2025.

6.      I am concerned that the abrupt shutdown of VOA will negatively impact the relationships I have built with media outlets around the world and the trust of the audiences I have had the privilege to serve.  My termination will also harm VOA's broader mission because the content I produce reaches significant African audiences.

7.      I believe that immediate injunctive relief from this Court is necessary to protect the credibility and the independence of VOA.

On this 25th day of March 2025 I declare under penalty of perjury that the foregoing declaration is true and correct.

Anthony Michael LaBruto

2

**JA324**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MICHAEL ABRAMOWITZ *et al.*

　　　　*Plaintiffs,*

　　　　–v.–

KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*;

VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*;

　　　　and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

　　　　*Defendants.*

**Case No. 25-cv-00887**

---

**DECLARATION OF J. DOE NO. 2**

1.　　Since 2022, I have been working under a personal services contract for Voice of America (VOA), the largest United States-funded international broadcaster, which provides multimedia cultural programming and news in 49 languages and reaches an estimated 362 million people across the world weekly.

2.　　Specifically, I have been working as a journalist in one of the foreign country divisions, which broadcasts across that country and its diaspora (foreign country communities living worldwide).

3.　　This division provides reports via television (including on channels in the country for which I report), radio and digital platforms.

**JA325**

4.      My reporting has focused on a range of important issues in the United States that are of interest to the citizens of the country for which I report who live across the world.  For example, I have reported on U.S. elections, Congressional actions, foreign policy, and social issues in the United States and the country for which I report.

5.      On March 14, 2025, I was in my office in Washington D.C. when I discovered that we no longer had access to Reuters or AP.

6.      On March 15, 2025, after learning about the U.S. Agency for Global Media executive order, I drove to my office in Washington, D.C. to pick up my personal camera that I used in my work and stored in my office.  I was denied access to my office.  I subsequently learned that I had been placed on administrative leave.  Shortly thereafter, my access to VOA email was terminated.

7.      On March 16, 2025, I received a Termination Notice and Termination for Convenience Form (via the pay portal) notifying me that my personal services contract (which was not set to expire until June 30, 2025) was being terminated effective March 31, 2025.

8.      If I am terminated on March 31, my J-1 visa will terminate, and I will be required to leave the United States by the end of April 2025.  My spouse's J-2 visa, which allows the spouse of a J-1 visa holder to accompany or join them in the U.S. for the duration of the J-1 program, will also end.

9.      Due to a medical condition, my physician has recommended against air travel for at least the next 5 months.

10.      Because I am losing my job as will my spouse (when the J-2 visa lapses), we will be left with no financial support and no medical insurance. In addition, my spouse and I (expecting

**JA326**

to stay in the United States for several more years) purchased a town house and now have a mortgage we will be unable to pay.

11.    I have asked to file under the pseudonym J. Doe No. 2 because I fear that I may face retaliation for filing this lawsuit from those opposed to the work of VOA.

12.    I am also concerned that the abrupt shut down of VOA could negatively impact the relationships I have built with media outlets and the trust of the audiences I have had the privilege to serve.  Further, my work reaches significant audiences, and so my termination will hurt VOA's ability to meet its statutory mission.

13.    I believe that immediate injunctive relief from this Court is necessary to protect the credibility and the independence of VOA.

On this 25th day of March 2025 I declare under penalty of perjury that the foregoing declaration is true and correct.

 /s/ J. Doe No. 2<br>
J. Doe No. 2

JA327

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| RADIO FREE ASIA,<br><br>                         *Plaintiff,*<br><br>v.<br><br>UNITED STATES, et al.,<br><br>                         *Defendants.* | No. 25-cv-907-RCL |
| MIDDLE EAST BROADCASTING<br>NETWORKS, INC.<br><br>                         *Plaintiff,*<br><br>v.<br><br>UNITED STATES, et al.,<br><br>                         *Defendants.* | No. 25-cv-966-RCL |

## ~~[PROPOSED]~~ ORDER GRANTING RADIO FREE ASIA AND MIDDLE EAST BROADCASTING NETWORKS, INC.'S OPPOSED MOTION TO ENTER ORDER GRANTING PRELIMINARY INJUNCTION

This matter came before the Court on Radio Free Asia and the Middle East Broadcasting

Networks, Inc.'s (together, Plaintiffs) Motions for Preliminary Injunction (Case No. 25-cv-907,

ECF No. 12[1]; Case No. 25-cv-966, ECF No. 11). After consideration of those motions and all

related filings, it is hereby ORDERED that Plaintiffs' motions are GRANTED for substantially

the same reasons raised in Plaintiffs' memoranda in support of their motions. Plaintiffs have

established a likelihood of success on the merits and will suffer irreparable harm in the absence

---

[1]    While RFA's motion was initially styled as a motion for a temporary restraining order, as
noted in the Court's April 10, 2025 order, "[t]he parties have agreed to convert Radio Free Asia's
Motion for a Temporary Restraining Order into a Motion for a Preliminary Injunction."

**JA328**

of an injunction, and the balance of equities and public interest favor immediate relief. The Court therefore PRELIMINARILY ENJOINS the Defendants, pending further order of this Court, to restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks, Inc. such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated.

**SO ORDERED**:


_April 25, 2025_
_3:00 pm_
Date

The Honorable Royce C. Lamberth
United States District Judge

2

**JA329**

## Declaration of Kevin W. Fleming

1.      I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      RFA is a private, not-for-profit organization incorporated in the District of Columbia with tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  RFA's registered address and corporate headquarters is 2025 M Street NW in Washington, D.C.

## A.    RFA Background

3.      RFA is a self-governing, independent, nonpartisan, not-for-profit news organization.  Over the course of its nearly 30 years of existence, RFA has developed into one of the most comprehensive news operations in the world, broadcasting in ten languages, with staff across 34 countries in Asia and reaching more than 60 million people each week.  Since its inception in 1994, RFA has been funded by the U.S. government through federal grants from the United States Agency for Global Media (USAGM) and its predecessor.

4.      After Congress enacted the U.S. International Broadcasting Act to fund independent journalism as a means of providing independent, accurate news to counter the harmful propaganda of America's adversaries, Congress recognized that some of the most repressive regimes in the world were found in Asia.  In response, Congress created RFA.  Congress mandated that RFA's mission would be to "provide accurate and timely information, news, and commentary about events in Asia and elsewhere" and serve as a "forum" to "Asian nations whose people do not fully enjoy freedom of expression."  22 U.S.C. § 6208(b).

5.      Consistent with that mission, RFA promotes democratic values by providing accurate, uncensored news and a forum for open debate in Asian countries where citizens do not enjoy full freedom of expression and where local media is controlled by the state or otherwise not independent.  Since its inception, RFA has provided a counterbalance to the Chinese Communist Party (CCP) and other government-controlled media.  It has exposed egregious human rights abuses like the Uyghur genocide in Xinjiang, in addition to providing breakthrough coverage of the CCP's cover-up of COVID-19 fatalities, the unfolding crisis in Myanmar since the 2021 coup, and the journeys of North Korean defectors.  RFA's work is based on the conviction that the first requirement of democracy is a well-informed citizenry,

1

**JA330**

and its reporting has won prestigious awards and been cited by major media outlets and publications.

6.    For almost three decades, RFA has, without interruption, fulfilled its statutory purpose by providing individuals in countries across Asia, including China, Burma, Cambodia, Laos, Vietnam, and North Korea, access to accurate and timely information, news, and commentary about events in Asia and elsewhere.

7.    It has taken years for RFA to develop the structure, expertise, goodwill, and trust to operate in 10 languages and 34 countries, many of which have governments that are unfriendly to the United States.

8.    Today, RFA has over 400 employees, in addition to hundreds of journalists, stringers (freelance journalists), and contractors, and it has offices overseas in Taipei, Bangkok, Seoul, Istanbul, and Dharamsala.

**B.    RFA's Funding Structure**

9.    Congress formally established funding for RFA in 1994.  Since then, Congress has appropriated funding for RFA every year.

10.    One hundred percent of RFA's funding comes from its annual congressional appropriation.  Without its congressionally appropriated funding, RFA cannot continue to operate and will be forced to shut down permanently.

11.    Every year, RFA enters into a grant agreement with USAGM; the agreements award funds on an ongoing basis as they are appropriated, whether by annual appropriations acts or continuing resolutions.

12.    In addition,, during years when Congress has made a full-year appropriation, USAGM requests, and RFA provides, an annual program plan that describes RFA's plans for the coming fiscal year along with a corresponding monthly cost breakdown.  Typically, during the last week of a month, USAGM requests a monthly plan from RFA for the upcoming month.  On rare occasions, USAGM has requested monthly plans for three months at a time.

13.    Once the congressionally appropriated funds are obligated via a grant agreement, USAGM is responsible for disbursing funds to RFA.  RFA generally receives

JA331

funds on a month-to-month basis. At the end of a month, RFA makes a letter drawdown request for the upcoming month. In the ordinary course, USAGM acknowledges receipt and causes the funds to be transferred to RFA's bank account by the Department of Treasury. RFA usually receives funding the first week of the new month.

## C.    USAGM's Refusal to Provide RFA's Congressionally Appropriated Funding

14.    For fiscal year 2024, Congress appropriated $60,830,000 to RFA in the Further Consolidated Appropriations Act of 2024

15.    On September 26, 2024, Congress passed a continuing resolution appropriating amounts for fiscal year 2025 from October 1, 2024, to December 20, 2024, at the same funding levels for fiscal year 2024 ($60,830,000). USAGM subsequently executed a grant agreement amendment (FAIN: 1065-25-GO-00001) on October 10, 2024, obligating $11,663,384 for RFA for October and November 2024. RFA received $5,830,182 of those funds on October 14, 2024, and $5,833,202 of those funds on November 13, 2024.

16.    On December 21, 2024, Congress passed another continuing resolution appropriating funding for fiscal year 2025 (from December 21, 2024, to March 14, 2025), at the same funding levels as for fiscal year 2024.

17.    Before then, in August 2024, USAGM and RFA had begun the usual process for executing a new grant agreement for fiscal year 2025. From August 2024 to January 2025, RFA and USAGM exchanged edits and revisions to the grant agreement. On January 16, 2025, the fiscal year 2025 grant agreement (FAIN: 1065-25-GO-00001) was executed. USAGM obligated $13,451,372 of the appropriated amount to RFA through February 28, 2025. On January 21, 2025, RFA received those funds, representing $5,882,510 for December 2024, $5,785,964 for January 2025, and $1,782,898 for February 2025.

18.    At the end of February 2025, RFA tried to ensure that USAGM would grant and disburse the remaining funding that had been appropriated for its use in the Second Continuing Resolution for the period through March 14, 2025. In response, USAGM represented that it would provide funds for the March 1 through 14 period once funds for all of March had been appropriated by Congress, but it still has not done so. USAGM's stated reason for not disbursing those funds was that it typically prefers not to disburse partial-month payments to grantees. On March 13, 2025, USAGM sent RFA an amended grant agreement for the month of March and requested that RFA submit a funding request for March 1 through 31, 2025. The agreement would have awarded RFA an additional

**JA332**

$4,631,068, bringing its total for Fiscal Year 2025 to $29,745,824. RFA's president signed the agreement on March 13, 2025.

19.    USAGM did not, however, countersign or disburse any money to RFA for the period of March 1 through 31, 2025. After RFA's president signed the amended grant agreement for March 2025, the finance team at USAGM assured RFA staff that Victor Morales, the acting CEO of USAGM, would soon counter-sign the agreement, but he never did so.

20.    At the same time on March 13, 2025, RFA requested disbursements for the month of March. RFA submitted the required documentation to USAGM at that time as well. However, USAGM never fulfilled this request, despite confirming receipt of RFA's March 13 request.

21.    On March 14, 2025, Congress passed a continuing resolution appropriating funding for RFA for the remainder of fiscal year 2025, from March 15, 2025 to September 30, 2025, at the same levels as fiscal year 2024. As a proportion of the fiscal year 2024 level specified ($60,608,145), the appropriated amount is $35,493,389 for RFA for the period of March through September 2025. USAGM failed to take any steps to provide RFA its funding even after it was appropriated.

22.    On March 15, 2025, RFA received a letter from Kari Lake, Senior Advisor to the CEO of USAGM, purporting to terminate RFA's grant agreement because the "award no longer effectuates agency priorities." The letter cited a March 14 Executive Order, which provided that the "non-statutory components and functions of" specified agencies, including USAGM, "shall be eliminated to the maximum extent consistent with applicable law." A true and correct copy of that letter is attached as Exhibit 1 to this Declaration.

23.    Lake's March 15 letter advised that RFA could "object to or challenge" the termination decision via an appeal addressed to Lake. RFA submitted such an appeal on March 19, 2025. The letter argued that USAGM's "unilateral termination" of RFA's grant lacked any "basis in law or fact" and violated both federal statutes and the U.S. Constitution. On March 20, a USAGM official informed me that Lake said she would not be responding to that appeal.

24.    The letter RFA received on March 15 purported to terminate RFA's grant agreement with USAGM effective immediately. *See* Ex. 1. The total outstanding amount that Congress has appropriated to RFA, but that USAGM has refused to provide is

**JA333**

$4,631,068 for the month of March. USAGM's refusal to disburse funds in this manner is without precedent in RFA's history.

25.    The letter also instructed RFA that it needed to commence its closeout "responsibilities as set forth in 2 C.F.R. § 200.344-46" immediately. The letter threatened RFA with "appropriate enforcement actions" for failure to comply. RFA estimates that complying with those procedures would cost more than $50 million. That amount consists of (1) breaking numerous commercial leases in seven countries, including RFA's lease at its Washington, D.C. headquarters ($17,824,479.49); (2) terminating RFA's contracts with vendors around the world ($800,000) (3) terminating and paying severance for hundreds of employees, stringers, and contractors across 34 countries, including (a) RFA's union employees who are covered by a collective bargaining agreement, (b) RFA's staff in foreign countries, (c) RFA's contractors, and (d) RFA's non-union employees ($32,515,933); and (3) emergency relocation services for the 33 employees currently working on H1B visas ($218,300). Because USAGM is currently withholding RFA's congressionally appropriated funding and will not release RFA from its closeout obligations while the merits of RFA's injunction are resolved, there is no way for RFA to accomplish this.

**D.    Without Appropriated Funds, RFA Will Be Forced out of Existence**

26.    Due to the lack of funding for March, RFA has furloughed over 200 employees, or 75% of its U.S.-based staff, has stopped accepting work from stringers around the world because of any inability to compensate them, and has terminated or suspended 93% of independent contractor agreements for domestic and international freelance journalists. While RFA has some savings to pay its employees' health insurance through April, absent any additional funding, RFA will have no choice but to close the vast majority of its operations at the end of that month. This process will involve terminating all RFA's contracts with freelance journalists, terminating its leases and contracts, and laying off staff. Without its congressionally appropriated funds, RFA will be forced to stop the vast majority of its journalistic work and may ultimately cease to exist as an organization.

**E.    The Impact of USAGM's Refusal to Provide Appropriated Funds**

27.    USAGM's refusal to provide appropriated funds has had and will continue to have several immediate impacts.

28.    First and most fundamentally, failing to provide RFA with its congressionally appropriated funding has interfered with RFA's mission by requiring it to cease essentially all

**JA334**

broadcasting and news operations. RFA reaches 60 million people every week. Stopping news coverage in countries where there are few, if any, alternative news sources apart from state-controlled or state-influenced media means that millions of people will be cut off from access to free and independent media coverage of critical events. This will irrevocably harm RFA's reputation, trust, and credibility with the many people who rely on RFA for news.

29.    Second, RFA's loss of funding will have a devastating impact on its reporters around the world. RFA collaborates with freelance journalists who report from some of the countries most hostile to independent reporting in the world such as China and North Korea. Recruiting freelance journalists in these countries is extremely challenging due to the personal and professional risks involved. RFA has spent decades developing relationships with local freelance journalists, whose language skills and cultural knowledge are essential to RFA's work. Terminating these relationships will undermine RFA's reputation as a reliable partner and in some cases may prevent RFA from being able to reestablish relationships with those journalists and their sources again.

30.    Many of RFA's journalists and staff are unable to safely work from their home countries so they are working on visas outside of them, including in the United States on non-immigrant, employment-based visas. RFA's loss of funding means that these journalists could lose their employment status, putting them at imminent risk of losing their work visas. Because many of our employees' home countries are hostile to the United States and a free and open press, if deported some would face immediate arrest or imprisonment upon arrival.

31.    If RFA is forced to shutter its operations, many of its journalists will be placed in harm's way. Already many RFA journalists have faced threats to their personal security arising from their reporting. RFA journalists and their family members are constantly targeted by the regimes that they cover, and have been subject to arrest, torture, imprisonment and ill treatment in prison, abduction, denial of legal representation, physical surveillance, online harassment, and publication of their personal information online (doxxing). RFA helps protect its journalists from these dangers by advising on physical and digital safety, providing safety equipment, conducting risk assessments prior to news assignments, conducting safety trainings, helping detained journalists secure legal representation, and assisting staff with relocation, including bringing them to safety in the United States. If RFA's congressionally appropriated funding is not restored, it will not be able to provide such assistance to its journalists, and the security of those journalists and their families will be endangered. RFA has reporters working in countries like Cambodia and China where, absent RFA's resources, they will likely face prosecution and imprisonment. In addition, RFA has journalists in Vietnam, Cambodia, Myanmar, and the

**JA335**

Philippines who are already incarcerated. RFA has worked to connect these journalists with legal representation when able. Those services will effectively cease if RFA is shut down.

32.    As a result of USAGM's withholding of congressionally appropriated funds, RFA journalists across the world are faced with terrifying uncertainty about their status. They are experiencing high levels of stress and anxiety about what will happen to them and to their families if their employment ends.

33.    Third, RFA's loss of funding will impose unrecoverable financial losses on the organization. RFA is responsible for leases in eight different countries and has other financial obligations around the world. RFA will be forced to default on these obligations without congressionally appropriated funds. RFA has payments due on its lease for its Washington, D.C. headquarters that it will not be able to pay next month without having to furlough the remaining 25% of its U.S.-based staff.

34.    Fourth, terminating RFA's operations and laying off its entire staff, even temporarily, will damage RFA's reputation as an employer and reliable partner in difficult-to-reach countries. RFA has devoted significant resources and decades of work to building up its staff and language capabilities, as well as its reputation and brand. For example, since its inception RFA has worked to build networks and connect with audiences in Tibet and Xinjiang, an autonomous region in northwestern China where 12 million mostly Muslim Uyghurs live. These networks have been difficult to develop due to how closed these regions are and how few people speak the relevant languages. Due to the dangerous environments in which these networks operate, reestablishing them will be challenging—if not impossible.

35.    More broadly, RFA exists to provide independent news coverage that is outside of the control of the governments in which RFA operates. Ceasing news coverage, even temporarily, will allow the state-controlled or state-influenced media in these countries to fill the gap with coverage that is distorted to favor the narratives favored by the local governments. This could have an immeasurable impact on reducing democratic access to information and setting back the work of independent journalism in these countries. For example, just today, a devastating earthquake struck central Myanmar, which is governed by a military junta that has repeatedly taken steps to limit the dissemination of information and forums for dissent, including by cutting off access to the internet and social media services. The unfolding crisis there reaffirms the urgent need for RFA's reliable journalism in countries with limited or no freedom of speech and the press.

**JA336**

I declare under penalty of perjury that the foregoing is true and correct.

Dated this **28** day of March, 2025.

Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

JA337

# Exhibit 1



330 Independence Ave SW, Washington, D.C. 20237

**NOTICE OF GRANT TERMINATION**

March 15, 2025

Dear Radio Free Asia (Bay Fang | FangB@RFA.org),

This letter provides notice that the U.S. Agency for Global Media (USAGM) is terminating your federal grant, FAIN: 1065-25-GO-00001 and any other grants with USAGM, effective March 15, 2025. *See* 2 C.F.R. § 200.341.

The award no longer effectuates agency priorities. Therefore, pursuant to 2 C.F.R. § 200.340, Article VIII(a) in your grant award, and the President's March 14, 2025 executive order mandating that the USAGM eliminate all non-statutorily required activities and functions, the USAGM hereby terminates grant FAIN: 1065-25-GO-00001 and any other grants with USAGM in its entirety effective March 15, 2025. *See Continuing the Reduction of the Federal Bureaucracy*, E.O. (March 14, 2025).

If you wish to object to or challenge this termination decision, you must do so either via email or certified mail within 30 days of the date of this termination notice. Your appeal should contain the following:

1. a copy of the written notice of termination;
2. the date you received the written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of disallowed costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342. Appeals should be addressed to the undersigned.

You are encouraged to carefully review and discharge your closeout responsibilities as set forth in 2 C.F.R. § 200.344-46, your award instrument, and the USAGM's Terms and Conditions of the Award Agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the USAGM filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking other appropriate enforcement actions, which could impact your eligibility for future grants. *See id.* § 200.344(i). Finally, you are reminded of your duties regarding retention of grant records for at least three years after the submission of your final financial report. *See* 2 C.F.R. § 200.334.

Thank you,

*Kari Lake*

Kari Lake
Senior Advisor to the Acting CEO with Authorities Delegated by Acting CEO

1

**JA339**

klake@usagm.gov
330 Independence Ave SW, Washington, D.C. 20237

**JA340**

## Declaration of Tamara Sabljak Bralo

1.    I am the Director of Newsroom Safety and Security for Radio Free Asia. (RFA). I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties.

2.    If RFA's appropriated funds continue to be withheld, RFA and its journalists will face threats to their personal and physical security, as well as threats to their cybersecurity and their personal identifying information contained in RFA's systems. Journalists will also face potential deportation to countries where they and their family members could be prosecuted and imprisoned for their RFA reporting.

## A.    The Impact of USAGM's Refusal to Provide Appropriated Funds to the Personal Security of Our Journalists

3.    RFA relies on freelance journalists in other countries to do some of its most critical reporting. Many of these journalists, especially those reporting in or about Vietnam, Cambodia, Hong Kong, China, and Myanmar, have faced threats to their personal security arising from their reporting. RFA journalists and their family members are constantly targeted for their reporting by the regimes they cover, including by having been subject to arrest, torture, imprisonment and ill treatment in prison, abduction, denial of legal representation, physical surveillance, online harassment, and publication of their personal information online (doxxing).

4.    For example, in 2017, when much of the world was unaware of the situation, RFA was the first to report on a broad campaign in China's Xinjiang Uyghur Autonomous Region under which the Chinese government detained thousands of Uyghurs and other ethnic groups in re-education camps. After the publication of that story, more than 50 family members of RFA journalists were held in prison camps and jails and some were sentenced to prison.

5.    The Chinese government has repeatedly surveilled RFA journalists and subjected them to online harassment. It has disclosed the government identification pictures of RFA journalists online and labeled them as traitors; RFA has publicly reported many of these incidents to the FBI, and USAGM also has addressed such incidents through other government channels. Around every significant anniversary, such as the Tiananmen Square anniversary, RFA staff experience higher-than-normal levels of attacks.

**JA341**

6. Since USAGM terminated RFA's grant and suspended its congressionally appropriated funding, RFA staff, particularly those located in Taiwan, have been the subject of increased online harassment. In addition, our journalists in the United States and abroad have had their private information published on the internet (doxxing).

7. Knowing the risks of providing accurate reporting broadcast into regimes that want to suppress the truth, RFA has supported its journalists in danger by helping them to secure legal representation when possible, in some instances conducting risk assessments for journalists out on assignment, providing safety trainings, assisting journalists with relocation, and bringing staff to safety in the United States. For example, RFA hired legal counsel to represent RFA journalists who were interrogated about their stories and sources by Malaysian police.

8. There are six RFA journalists who, as a result of their reporting, are currently incarcerated in countries where RFA broadcasts. In Vietnam, four journalists are in prison and one is under house arrest. In Cambodia, two journalists have ongoing legal cases. One RFA journalist is currently incarcerated in Myanmar. If RFA is unable to access congressionally appropriated funds, these individuals will be left without representation or anyone to advocate on their behalf.

9. Without the ability to draw on congressionally appropriated funds, RFA will no longer be able to protect its journalists who are operating in authoritarian countries from the threats they routinely face. These services are necessary for RFA journalists to do their work in countries where reporting involves great personal and physical risk. If RFA cannot provide these services, the lives and work of RFA journalists will be endangered.

10. Due to the dire cash flow situation caused by USAGM's refusal to provide the funds that Congress appropriated to RFA, RFA has furloughed 75% of its staff in the United States and will be forced to terminate contracts with journalists living outside the United States by the end of April. If these journalists are terminated, they face losing not only their salaries, but also the services that RFA provides to ensure their safety. In my view and experience, in many cases, there is a protective element that comes with being employed by an organization closely affiliated with the U.S. government—by abandoning our journalists now, I worry that it signals open season and that adverse governments will feel that they can move to arrest former RFA employees and contractors with impunity.

**JA342**

**B.    USAGM's Refusal to Provide Appropriated Funds Will Cause RFA Journalists to be Deported to Dangerous Countries Where They Will Be at Risk of Imminent Harm**

11.    RFA's workforce consists of dozens of journalists who fled authoritarian regimes in countries such as Cambodia, Vietnam, Kazakhstan, Cambodia, and China who are living and working on non-immigrant, employment-based visas in the United States. Their residency is dependent on their employment at RFA.  Some of these journalists have shown their faces on broadcasts reporting on their home countries as well as other regions. Should these individuals lose their legal status in the United States, they will be forced to leave the United States and, when they have to return to their home countries, some will likely be arrested upon arrival.  RFA currently has seven people on its staff from Cambodia, Vietnam, and China who would face immediate arrest upon being returned to their home countries.

**C.    USAGM's Refusal to Provide Appropriated Funds Will Damage RFA's Cyber Security**

12.    RFA is frequently targeted by cyberattacks from the governments of the countries on which RFA reports and in which its journalists operate.  As a result, RFA works with a number of vendors who provide services to identify and respond to cyberattacks and other security threats to RFA servers, cloud-based systems, desktops, laptops and mobile devices.  If RFA is unable to access its congressionally appropriated funding, it will be unable to pay these vendors.  In addition, some of RFA's critical cybersecurity defense digital safety tools have monthly licenses that will lapse in thirty days if there is a delay in payment.

13.    Losing these vendors and tools would severely weaken the organization's cybersecurity posture.  RFA would face increased risks of successful cyberattacks, data breaches, and system instability and its ability to detect, respond to, and prevent security incidents would be significantly impaired.  In addition, ongoing security projects would be disrupted, freezing RFA's current security mechanisms in place and rendering it unable to pursue ongoing and future security upgrades.

14.    Shutting down RFA's cybersecurity mechanisms greatly increases the chances that cyber attackers will gain access to RFA's systems, leading to system damage, network disruption, and data loss—especially because the loss of RFA's funding is publicly known. Such damage would risk the personal data of over 300 people in 34 countries, including in countries where RFA journalists risk their lives to provide accounts of the actions of

**JA343**

authoritarian regimes. Allowing these attackers to gain access to RFA's systems endangers the lives of those journalists.

**D.    The Long-Term Impacts of the Funding Freeze to RFA's Operations**

15.    If RFA is forced to close its doors and cease its activities, including essential security services, journalists will be left unprotected and, in many cases, face deportation to dangerous countries, where they will be prosecuted and imprisoned. This will destroy the trust, credibility, and relationships RFA has built over decades with its journalists who rely on RFA for their continued safety.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 28 day of March, 2025.

Tamara Sabljak Bralo
Director of Newsroom Safety and Security
Radio Free Asia

**JA344**

# EXHIBIT A

JA345

**Supplemental Declaration of Kevin W. Fleming**

1.      I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      This declaration supplements my March 28, 2025, declaration with an updated snapshot of RFA's current finances.

3.      Since March 15, 2025, RFA has taken a number of steps to conserve funds, including belt-tightening measures, like furloughing over 250 employees (78% of its U.S.-based staff).  RFA has also stopped accepting work from stringers around the world and has terminated or suspended 93% of its independent contractor agreements for domestic and international freelance journalists.

4.      At present, RFA has approximately $12 million cash on hand.  That is not enough money to last past May 16, 2025, given RFA's obligations to pay employees their salary and benefits and to make mandatory payments on leases and vendor contracts, in addition to severance owed to union members.

5.      RFA can extend the date of its extinction only by taking steps like furloughing the remaining 22% of its domestic staff and ultimately laying off the approximately 300 people it employs in the United States and abroad.

6.      But, if RFA takes those steps, it will exist only as a shell of its former self.  It will be operated by a skeleton staff, be in default or delinquent on a number of leases, and be forced to stop broadcasting in the majority of its active countries altogether.  At that point, RFA's creditors will no doubt seek to recoup their funds, and RFA likely will be forced into bankruptcy.

7.      In that barebones state, RFA will be able to survive a few months more, until it would have to file for bankruptcy in late summer 2025.

8.      If May 16, 2025, passes without RFA's funding restored, it will be extremely difficult—if not impossible—for RFA to ever again resume its work given the reputational and network impacts discussed in my first declaration, in addition to the very real (and growing) prospect of bankruptcy.

9.      Certainty of funding is critical to RFA's operation and financial management.  At the outset of the fiscal year, RFA creates an annual budget and financial plan by month based on the total annual appropriation amount.

10.     RFA can function only if it receives its funding at regular, predictable intervals.  RFA's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

1

**JA346**

11.    In the past, RFA and USAGM have taken up to five months negotiating RFA's annual grant agreement.  For example, they negotiated the fiscal year 2025 grant agreement, which USAGM terminated on March 15, 2025, from August 2024 until January 2025.  During the pendency of those negotiations, USAGM continued to disburse to RFA its appropriated funds, for the simple reason that without regular disbursements, RFA cannot function.

12.    Since 2024, RFA has spent approximately $5 million per month on expenses like lease payments, vendor payments, payroll, health insurance, utilities, and other basic operating expenses.

13.    The last time that RFA received a drawdown of its annual appropriation was on April 9, 2025, when RFA received approximately $4.63 million.

14.    That payment was too little, too late—those funds belatedly covered RFA's March operating expenses.  But RFA is still waiting on its April funding, which it historically has received within the first week of the month.

15.    RFA's conservative fiscal management and the steps outlined above have allowed it to survive at reduced operating levels despite not receiving its April funding, but it cannot survive past May 16, 2025, without taking drastic steps that will irreparably harm the organization and its future.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _16_ day of April, 2025.


_Kevin W. Fleming_
Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

2

**JA347**

## Declaration of Deirdre Kline

1.      I am the Chief Operating Officer at Middle East Broadcasting Networks, Inc. (MBN).  I make the statements in this Declaration based both on my personal knowledge and on information gained in the performance of my duties.

2.      I have been an employee of MBN since March 2004.

3.      MBN was incorporated as a nonprofit organization on April 25, 2003, in the District of Columbia.  MBN has tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.  MBN's registered address is 7600 Boston Boulevard, Springfield, VA, which is the location of its corporate headquarters.

4.      MBN is a self-governing, independent, nonpartisan, not-for-profit news organization.  Over the course of the past two decades, MBN's broadcasting and digital platforms have gained respect and trust in the region they serve.

5.      Consistent with standards set forth in the International Broadcasting Act, MBN's Articles of Incorporation provide that MBN shall "provide news which is consistently reliable, authoritative, accurate, objective, and comprehensive; provide a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society; clearly and effectively present the policies of the United States Government and responsibly discuss those policies and provide information about developments in the Middle East region.  The Corporation shall be a forum for a variety of opinions and voices from within Middle East nations, and thereby promote the right of freedom of opinion and expression, including the freedom to 'seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights and in the spirit of open communication of information and ideas."

55065541.1                                      1

**JA348**

6.      Consistent with its Articles, MBN promotes democratic values by providing accurate, uncensored news and open debate in countries throughout the Middle East and North Africa ("MENA"), including in those countries where freedom of expression is constrained and local news media are either controlled by the state or otherwise limited in independence.  Since its inception, MBN has provided a critical counterbalance to the anti-American and sectarian propaganda prevalent in the region's media.  MBN's work is based on its commitment to democracy and its conviction that the first requirement of democracy is a well-informed citizenry.

7.      MBN was created in response to the terrorist attacks of September 11, 2001.  Specifically, the 9/11 Commission called on the United States to fund independent television and radio journalism in the Arab world.  In 2003, Congress recognized that need by setting aside start-up funding for Middle East Television, which later became Middle East Broadcasting Networks, Inc.  Television was chosen as the primary platform for the new enterprise because television—then as now—is by far the most popular platform for receiving news and information in the region.

8.      In the more than two decades since its creation, MBN has, without interruption, fulfilled Congress's mandate by giving people in countries across the region access to accurate and timely information, news, and commentary about events that affect their lives, their region, and the world.  In particular, MBN provides a balanced and complete picture of the United States to viewers in the Middle East and North Africa.  MBN's flagship platform—Alhurra TV—went live on February 14, 2004.  A separate channel—Alhurra TV-Iraq—made its debut in April 2004.  The federal government's Radio Sawa service became part of MBN

**JA349**

in 2005. MBN also operates the website alhurra.com and multiple branded social media accounts.

9.      MBN provides news and information in Arabic via satellite television and multiple digital platforms to the residents of 22 countries in the Middle East and North Africa. It operates television studios in Dubai and Springfield, Virginia; all broadcasting originates in the United States. MBN also has staff in Beirut, Lebanon. Alhurra TV's daily schedule is composed of news, discussion and investigative programs, and documentaries.

10.      MBN has devoted decades to developing the structure, expertise, and trust necessary to operate successfully in a region where religious and political persecution are common, many governments are unfriendly to the United States, and press freedom is virtually non-existent.[1] MBN's fact-based reporting and investigative programs have provided critical information and perspectives unavailable on other platforms—thus allowing MBN to counter the violent extremism and anti-American propaganda of messaging from groups like the Islamic State of Iraq and Syria and other extremist groups.

11.      Today, according to research conducted by the United States Agency for Global Media ("USAGM") in conjunction with MBN, as many as 28.2 million viewers watch Alhurra TV per week; MBN has a weekly reach of approximately 34 million adults via MBN's platforms as a whole.

---

[1]      The MENA region is among the most dangerous and difficult for journalists in the world. Each year, Reporters Without Borders conducts a survey of world press freedom, pursuant to which countries are rated from "good" to "very serious" based on political context, legal framework, economic context, socioculture context, and safety. *See* Reporters Without Borders, 2024 World Press Freedom Index, available at https://rsf.org/en/2024-world-press-freedom-index-journalism-under-political-pressure. Of the 22 countries served by MBN, only two received satisfactory scores; the remaining 20 are equally divided between "difficult" and "very serious."

**JA350**

12.    MBN's digital platforms also have large audiences.  The alhurra.com website enjoyed more than 311 million page views in 2024; more than 33 million people follow MBN's branded social media accounts.

### *Funding Structure*

13.    Congress formally established funding for MBN in 2003, pursuant to the Emergency Wartime Supplemental Appropriations Act.

14.    From its inception in April 2003, MBN has been funded pursuant to a series of Grant Agreements with USAGM, an independent federal agency.  MBN is a grantee of USAGM.  USAGM (and its predecessor, the Broadcasting Board of Governors) has consistently funded MBN for nearly 22 years.

15.    One hundred percent of MBN's funding comes from annual congressional appropriations.  Without access to its congressionally appropriated funding, MBN cannot continue to operate and will be forced to shut down.

16.    Every year, MBN enters into a Grant Agreement with USAGM.  Its most recent Grant Agreement was signed by USAGM on February 27, 2025.

17.    Before the new fiscal year even begins, MBN prepares projected monthly financial plans for the entire upcoming fiscal year.

18.    Concurrently, USAGM and MBN begin the separate process of negotiating a grant agreement for that year.  During those negotiations, which can sometimes last months, USAGM continues to make disbursements, in accordance with the projected monthly financial plans.

19.    USAGM typically disburses funds to MBN on a monthly basis.

20.    At the end of a month, MBN gets ready to request, and USAGM gets ready to disburse, annual appropriation funds for the coming month.

**JA351**

21.     **First**:  The process typically begins with USAGM requesting from MBN a financial plan for the next quarter, meaning financial plans by month for the coming three months.

22.     **Second**:  MBN prepares and returns a financial plan (by month) for the upcoming quarter.  In MBN's experience, these monthly plans are a formality because USAGM already has received and reviewed all of the monthly plans at the outset of the fiscal year.  The monthly plan is a *pro forma* document disclosing how MBN intends to use the funds for the coming months.  It also serves as a schedule reflecting drawdown requests against the annual appropriation total.

23.     **Third**:  Within a matter of days, USAGM prepares and sends to MBN a grant agreement "amendment" which covers the next month.  Sometimes, USAGM chooses to prepare an amendment for multiple months' worth of funding at a time.

24.     **Fourth**:  MBN signs the amendment and typically returns it to USAGM along with a letter drawdown request.  The letter drawdown request includes the dollar amount to be deposited in MBN's bank account, as reflected in the corresponding monthly financial plan.

25.     **Fifth**:  USAGM countersigns the amendment and sends it back to MBN.  At the same time, USAGM acknowledges receipt of MBN's letter request and coordinates with the Department of the Treasury to transfer the funds into MBN's account.  MBN typically receives the funds within two-to-four business days.

26.     Other than returning the countersigned amendment and disbursing the funds, there is no discrete step whereby USAGM "approves" the monthly financial plan.

27.     Steps one through five above are typically completed within five-to-ten business days, usually beginning the penultimate week of the outgoing month.  As a result,

**JA352**

MBN receives its monthly funding at the end of the outgoing month or during the first few days of the new month.

28.    On March 14, 2025, Congress passed a continuing resolution appropriating funding for MBN from March 15, 2025, through September 30, 2025, at the same level as fiscal year 2024.

29.    On March 15, 2025, Defendant Kari Lake, Senior Advisor to the Acting CEO of USAGM, sent a letter to MBN.  A true and correct copy of the letter is attached as Exhibit 1 to this Declaration.  Defendant Lake's Letter purported to terminate MBN's February 27, 2025 Grant Agreement, effective immediately.

30.    The letter also instructed MBN that it needed to commence its "closeout responsibilities as set forth in 2 CFR § 200.344-46."  The letter threatened MBN with "appropriate enforcement actions" for any failure to comply.  At present, MBN cannot do so.

31.    The cited regulations state that a grantee "must liquidate all financial obligations incurred under the Federal award no later than 120 calendar days after the conclusion of the period of performance [i.e., March 15, 2025]."  2 C.F.R. § 200.344(c).

32.    MBN estimates that complying with its obligation to wind down operations could cost up to $50,000,000.  Those costs include contractual termination fees on leases; payments of outstanding invoices and cancellation fees to vendors; mandatory end of service and other payments to its overseas staff; financial obligations (including severance) to its staff in the United States; and relocation expenses for the more than 100 employees whose visas are employment-based and who would be forced to leave the United States and the United Arab Emirates if their jobs were eliminated.  MBN does not have sufficient funds to honor these obligations or pay these costs.

**JA353**

33.     Defendant Lake's letter further advised that MBN could "object to or challenge" the termination decision by submitting an appeal directly to Defendant Lake within 30 days. MBN timely submitted its appeal on March 27, 2025, explaining that USAGM "has no lawful basis to withhold funds that Congress specified must reach MBN's coffers." MBN requested that USAGM respond to MBN's appeal by 5:00 PM on March 31, 2025, and advised USAGM that, absent rescission of the grant termination, "considering the severe and irreparable harm that MBN is already experiencing, MBN will be forced to take appropriate legal action to restore its funding." USAGM has not provided a response to the appeal even though the 5:00 PM March 31, 2025 deadline has come and gone.

34.     On March 31, 2025, confronting an increasingly dire financial situation, MBN submitted a drawdown request for its April funding along with financial plans by month for the remainder of the fiscal year. For the month of April, USAGM and MBN do not have a signed grant agreement "amendment" (due to the March 15 grant termination).

35.     On the same day, March 31, USAGM pointed out an administrative error (an inconsistency between the amount listed in the April financial plan and the letter drawdown request). MBN corrected the error by submitting a revised funding request that same day.

36.     If March had proceeded as normal (without the March 15 termination letter), USAGM and MBN would have had a finalized grant agreement amendment no later than March 28, and MBN would have received its April disbursement between March 31 and April 3, 2025. To date, no funds have been disbursed.

### *Financial Impact of Grant Termination*

37.     USAGM's refusal to provide congressionally appropriated funds to MBN has already *significantly* affected MBN and threatens to permanently shutter MBN.

**JA354**

38.    MBN currently employs more than 500 people: including approximately 386 in the United States (its headquarters), 99 in Dubai (its regional production hub), and 18 in Beirut, Lebanon.

39.    In the days following USAGM's March 15, 2025 Letter, MBN was forced to take extraordinary steps to preserve its limited remaining cash reserves. On March 23, 2025, MBN was forced to furlough more than 360 of its U.S. employees (about 95% of its domestic staff) for a period of 14 days. Without funds available, MBN anticipates that it will need to lay-off the majority of its staff both in the United States and abroad—at least 400 people. On April 9, 2025, MBN sent a Worker Adjustment and Retraining Notification ("WARN") Act notice to all employees, domestic and international, indicating that MBN will be "forced to terminate the employment of a significant number of people in the coming days or weeks." According to the notice, "by the end of next week, most employees will no longer be employed."

40.    The staffing changes caused by the furlough forced MBN to reduce its live television newscasts and digital presence.

41.    Any failure by USAGM to provide MBN with its congressionally appropriated funding will continue to have dire consequences for MBN and its employees and will fundamentally interfere with MBN's congressionally mandated mission.

42.    First, a loss of funding would require MBN to cease all broadcasting and all news operations.[2] The anticipated lay-offs described above are intended to help MBN stay

---

[2]    USAGM's actions have already damaged MBN's ability to provide complete coverage of important news to the critical region it serves. For more than a decade, USAGM has had enterprise-wise newswire service contracts with the Associated Press, Reuters, and Agence-France Presse. Prior to its participation in these enterprise-wide contracts, for which MBN pays

afloat a few weeks past April but not in any recognizable or near operational capacity. Indeed, MBN's brand is centered on its television channel, Alhurra TV, which will soon go off the air unless MBN receives its congressionally appropriated funds.

43.    MBN has an unduplicated weekly reach of approximately 34 million adults in the region.  If the Alhurra TV Channel goes dark, it will halt news coverage provided to countries where there are few, if any, alternative news sources save state-influenced or sectarian media.  This will mean that millions of people will be cut off from their only source of free and independent media coverage of critical events, including, particularly, events in the United States.  It will also mean that America will lose its voice in the region, allowing hostile regimes to fill the gap with skewed coverage.  These consequences are anathema to MBN's mission and will irrevocably harm MBN's reputation, trust, and credibility with everyone who relies on its platforms for news.

44.    Second, loss of funding would mean that approximately 350 people in the United States would lose their jobs in the near future.  Approximately 40 members of MBN's U.S. staff work pursuant to work-related visas, which require them to be working and paid for their work to remain here; otherwise, they and their families would be required to leave the United States within 30 days, many to home countries (including Syria and Yemen) with

---

significant fees, MBN had its own contracts with these companies.  Having access to Associated Press, Reuters, and Agence-France Presse is essential to MBN's ability to fulfill its mission, as these services have global infrastructure that allows them to reach locations to which MBN has no access.  MBN, for example, cannot afford to hire journalists to cover all the regions outside the Middle East and North Africa.  For those reasons, MBN relies on video, audio, and text reports from these reputable sources to supplement its own news reporting.  Yet, without any notice to MBN, USAGM terminated its contracts with the Associated Press and Agence-France Presse on March 13, 2025.  Defendant Lake posted on social media about the terminations prior to notifying MBN about them.  *See* Exhibit 2.  MBN further lost access to Reuters under the enterprise-wide contract as of March 31, 2025.

**JA356**

populations or governments hostile to MBN's mission, to journalists in general, and, particularly, to the work done by those employed at MBN. Already the Department of State has asked MBN to confirm the status of these employees.

45.      Third, in Dubai, where MBN operates its regional production center, most employees' residency is based on their work for MBN. For them, loss of funding would mean loss of employment status, putting them at risk of losing their work visas, leading to their deportation and that of their families. Because many of these employees' home countries are hostile to the United States and to a free and open press, they could face significant consequences upon their return. Without funding, MBN will be forced to lay-off nearly every employee in Dubai and Lebanon.

46.      Fourth, loss of funding will impose unrecoverable financial losses on MBN. MBN is responsible for leases and other significant financial obligations in the United States and throughout the region. Absent funding, MBN will be forced to default on these obligations. For example, MBN has payments due on its lease for its offices in Dubai and Washington, D.C. that it is unable to pay.

47.      Fifth, terminating MBN's operations and laying off almost its entire staff, even temporarily, would damage MBN's reputation as an employer and a reliable partner both at home and throughout the region, particularly in countries where that reputation was hard won and remains fragile. MBN has devoted significant resources and decades of work to building its relationships and brand. Due to the environment in which it works, reestablishing trust and credibility will be difficult if not impossible.

48.      Sixth, MBN's loss of funding would have a devastating impact on its ability to recruit reporters throughout the region. MBN's reporting operations depend heavily on its

**JA357**

ability to recruit and retain journalists from the countries it serves. Nearly all of MBN's

reporters, editors, and producers are originally from the Middle East and North Africa. Their

native language fluency and deep cultural understanding are critical to producing high-quality

journalism that resonates with audiences in 22 Arabic-speaking countries. Moreover, MBN

contracts with journalists who report from some of the countries most hostile to independent

reporting, including Syria, Sudan, and Yemen. Recruiting freelance journalists in these

countries is extremely challenging due to the personal and professional risks involved. MBN

has spent two decades developing relationships with local journalists in the region.

Terminating those relationships will undermine MBN's reputation as a reliable partner and in

some cases may prevent MBN from being able to reestablish relationships with those

journalists and their sources again. Put simply, trust may be irrevocably broken.

49.    Seventh, MBN's mission is to provide independent news coverage outside of

the control of the governments in the countries to which it broadcasts. Ceasing news

coverage, even temporarily, will allow state-influenced media in these countries to fill that

empty space with coverage—particularly of the United States—that is distorted to favor the

narratives favored by local governments and extremists. Indeed, local extremists have already

celebrated news of the cancellation of MBN's grant online, labeling MBN's staff members

"traitors," "mercenaries," and "American mouthpieces." These tweets are meant to incite and

to put MBN staff members at risk.

50.    Eighth, MBN relies on journalists throughout the region to do some of its most

critical reporting. Some of these journalists have faced threats to their personal security

arising from their reporting. MBN journalists and their family members have been targeted

by the groups and governments that they cover; they have been threatened, surveilled,

**JA358**

harassed online, and subjected to physical violence. MBN helps protect its journalists from these dangers by advising on physical safety, providing safety equipment, conducting risk assessments prior to news assignments, conducting safety trainings, and assisting staff with relocation. If MBN's congressionally appropriated funding is not restored, it will not be able to provide such assistance to its journalists, endangering the security of those journalists and their families.

### *MBN's Journalists Deserve Continued Support for Their Critical Work*

51.     MBN's journalists provide timely, uncensored, factual news and information to millions of viewers and readers throughout the Middle East and North Africa. Their television audience stretches across five time zones, from the Atlantic Ocean to the Arabian Sea; their digital audience is global.

52.     From its inception, MBN's journalists have reported on the ground from regional hot spots and war zones, including Iraq, Lebanon, Israel, Sudan, and Gaza. Their daily work has placed them in danger. Their continued commitment to MBN's mission under these circumstances continues to be remarkable and deserves continued support.

53.     MBN opened its first office in Baghdad in 2004; the location was bombed twice during MBN's tenancy.

54.     MBN's accurate and in-depth coverage of religious and governmental corruption in Iraq has led to government sanctions and personal threats to its journalists.

55.     On August 31, 2019, MBN broadcast a documentary (produced in-house) about corruption within the Sunni and Shiite Muslim endowments (bodies that administer religious sites and real estate), including institutions tied to the Grand Ayatollah Ali al-Sistani. Two days later, Iraq's Communications and Media Commission suspended MBN's license

**JA359**

and business operations, and ordered its Baghdad office closed for three months. Protests against MBN (ordered or encouraged by the officials identified in the documentary) erupted; protesters were encouraged to attack MBN's office and its journalists. MBN's journalists were threatened in broad daylight; some needed to be extracted for their own safety. MBN's journalists were surveilled, and the named targets of a publicly circulated "arrest list." MBN eventually moved its local operations center to Erbil. On local Iraq television, leaders of pro-Iranian militias vowed revenge on the "enemy" (including Israel, America, and Alhurra TV).

56.    In addition to the attacks in Iraq following the August 2019 documentary, MBN journalists have faced numerous other threats, further underscoring the importance of their work in providing independent journalism in the MENA region.

57.    For example, in May 2005, an MBN reporter was shot and killed as he left his home in Basra. A group calling itself "The Iman al-Hassan al-Basri Brigades" claimed credit for his murder.

58.    In August 2012, an MBN reporter crossed into Syria, where witnesses later told MBN he came under gunfire. He was never heard from again.

59.    In January 2017, two Baghdad-based reporters were injured while covering the liberation of Mosul.

60.    In April 2023, MBN journalists in Sudan were shot at and had to be relocated.

61.    In November 2023, a Gaza-based reporter had to evacuate her hotel room when it came under rocket fire; she was forced to take shelter in her car near a hospital, where she continued to work.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the <u>9th</u> day of <u>April</u> 2025, in <u>Springfield, VA.</u>

Deirdre Kline

**JA361**

# EXHIBIT 1

JA362


**U.S. AGENCY FOR GLOBAL MEDIA**

330 Independence Ave SW, Washington, D.C. 20237

**NOTICE OF GRANT TERMINATION**

March 15, 2025

Dear Middle East Broadcasting Networks, Inc. (Raji Kalra | rkaira@mbn-news.com),

This letter provides notice that the U.S. Agency for Global Media (USAGM) is terminating your federal grant, FAIN: MN01-25-GO-00001 and any other grants with USAGM, effective March 15, 2025. *See* 2 C.F.R. § 200.341.

The award no longer effectuates agency priorities. Therefore, pursuant to 2 C.F.R. § 200.340, Article VIII(a) in your grant award, and the President's March 14, 2025 executive order mandating that the USAGM eliminate all non-statutorily required activities and functions, the USAGM hereby terminates grant FAIN: MN01-25-GO-00001 and any other grants with USAGM in its entirety effective March 15, 2025. *See Continuing the Reduction of the Federal Bureaucracy*, E.O. (March 14, 2025).

If you wish to object to or challenge this termination decision, you must do so either via email or certified mail within 30 days of the date of this termination notice. Your appeal should contain the following:

1. a copy of the written notice of termination;
2. the date you received the written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of disallowed costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342. Appeals should be addressed to the undersigned.

You are encouraged to carefully review and discharge your closeout responsibilities as set forth in 2 C.F.R. § 200.344-46, your award instrument, and the USAGM's Terms and Conditions of the Award Agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the USAGM filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking other appropriate enforcement actions, which could impact your eligibility for future grants. *See id.* § 200.344(i). Finally, you are reminded of your duties regarding retention of grant records for at least three years after the submission of your final financial report. *See* 2 C.F.R. § 200.334.

Thank you,

*Kari Lake*

Kari Lake
Senior Advisor to the Acting CEO with Authorities Delegated by Acting CEO

1

**JA363**

klake@usagm.gov
330 Independence Ave SW, Washington, D.C. 20237

**JA364**

# EXHIBIT 2

**JA365**



# EXHIBIT A

JA367

## Supplemental Declaration of Deirdre Kline

1.    I am the Chief Operating Officer (COO) of Middle East Broadcasting Networks, Inc. (MBN).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.    This declaration supplements my April 9, 2025 declaration with an updated snapshot of MBN's current finances.

3.    Since March 15, 2025, MBN has been forced into survival mode and has taken extraordinary steps to preserve its limited remaining cash reserves.

4.    On March 23, 2025, MBN furloughed more than 95% of its domestic staff for a period of two weeks.

5.    During that time, the organization tried in vain to access its annual appropriation.  On March 26, 2025, MBN CEO Jeff Gedmin emailed Defendant Kari Lake requesting a meeting to discuss MBN.  He received no response.  On April 2, 2025, MBN attempted to draw down its April funding.  To date, it has not received disbursement of any funds from that request.

6.    With no additional funds coming in and no sense of when that might change, on April 12, 2025, MBN terminated the employment of 514 people, more than 90% of its entire organization.  Worldwide, fewer than 45 people remain employed by MBN.

7.    Among those terminated were: (a) all staff at MBN's Dubai production center (save two administrative employees); (b) all staff at its Beirut bureau; (c) all overseas correspondents in Egypt, Algeria, Turkey, Jordan, Sudan, Libya, Syria, Yemen, the West Bank, Gaza, Iraq, Israel, Morocco, and Tunisia; (d) all broadcast operations staff (save two people to manage programming reruns on Alhurra TV and two IT administrators); (e) all MBN engineers; (f) members of the finance, human resources, communications, and research teams; and (g) more than 95% of MBN's television staff.

8.    Because of those mass layoffs, MBN has been forced to reduce its live television newscasts and digital presence dramatically.

9.    Once a robust 24/7 news operation with more than 12-hours of live news per day, in addition to award-winning documentary and talk-show programs, Alhurra TV now shows rerun programming 8 hours per day.  The rest of the day, viewers see a notice to tune in later.

10.    No longer able to cover the news round the clock on its website, MBN now produces only four-to-five short videos and a few articles a day, if that.

1

**JA368**

11.    MBN had no choice but to gut its organization because, without laying off the vast majority of its employees, MBN would have been insolvent by April 18, 2025.

12.    As of April 17, 2025, MBN will have approximately $4.3 million cash on hand.

13.    Even after the drastic cuts described above, MBN will be able to survive only until May 31, 2025.

14.    MBN can further extend its extinction only by taking steps like declaring bankruptcy, ending all content production, and laying off its remaining staff.

15.    Already, MBN is a shell of its former self.

16.    Currently, just 38 staff members are working at MBN.[1]  At the start of this litigation, MBN employed more than 500 people, including more than 380 in the United States.

17.    MBN is delinquent on its leases in Springfield, Virginia, in Washington, D.C., and in Dubai and has been forced to cut back broadcasting, as described above.  Without access to its annual appropriation, MBN's payments to vendors are also late.  Soon, MBN's creditors will no doubt seek to recoup their funds, and MBN will almost certainly be forced into bankruptcy.

18.    If MBN's congressionally appropriated funding does not reach MBN before May 31, 2025, the organization will cease to exist except on paper.

19.    It will be extremely difficult—if not impossible—for MBN ever again to resume its work; its reputation as a faithful employer, trusted news source, and robust independent organization is in tatters.

20.    Many of MBN's former employees—who made enormous sacrifices to move half-a-world away for the opportunity to work in the U.S. and experience a free press—feel betrayed by the same government they once idealized.  Former employees, many of whom immigrated to the United States from the region to serve MBN's mission, also feel betrayed.

21.    Certainty of funding is critical to MBN's operation and financial management.  At the outset of the fiscal year, MBN creates an annual budget and month-by-month financial plan—both premised on the total of its annual appropriation.

---

[1] An additional handful remain employed but are currently furloughed and not working.  MBN has not terminated their employment because they are each facing challenging health and other issues.

**JA369**

22.    MBN can function only if it receives its funding at regular, predictable intervals.  MBN's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

23.    In the past, MBN and USAGM have negotiated grant agreements for months on end.  During the pendency of those negotiations, USAGM continued to disburse to MBN its funds.  Both parties understood that without regular disbursements, MBN cannot function.

24.    Since 2024, MBN has spent approximately $7 to $8 million per month on expenses such as lease payments, vendor payments, payroll, health insurance, utilities, and other basic operational necessities.

25.    The last time that MBN received a drawdown of its annual appropriation was on February 28, 2025, when it received approximately $7.46 million.

26.    MBN is still waiting on its April funding, which it historically has received within the first week of the month.

27.    The drastic steps that MBN has taken, outlined above, have allowed it to survive despite not receiving its April funding, but it cannot survive past May 31, 2025 without irreparable harm to itself, its future, and its very existence.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16 day of April, 2025.


Deirdre Kline
Chief Operating Officer
Middle East Broadcasting Networks, Inc.

JA370

**Second Supplemental Declaration of Kevin W. Fleming**

1.      I am the Chief Operating Officer (COO) of Radio Free Asia (RFA).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.      This declaration supplements my March 28 and April 16, 2025, declarations with an updated snapshot of RFA's current finances.

3.      In my April 16 declaration, I explained that RFA had furloughed 250 employees (78% of its U.S.-based staff); that RFA had stopped accepting work from stringers around the world; and that RFA had terminated or suspended 95% of independent contractor agreements for domestic and international freelance journalists.

4.      Since then, RFA's situation has grown more dire.

5.      In addition to the actions listed above, we have now suspended 100% of temporary staff and 20% of international staff.  Those measures were necessary in order to conserve funds so that RFA could continue to pay out money associated with employment terminations, like accrued leave.  RFA continues to try to protect its staff during this difficult time.

6.      As a result of the measures described above, RFA has been unable to generate content and programming on air and online as it previously did.  Due to RFA's drastically reduced staffing levels, there has been no new content produced from multiple editorial divisions.  Currently, radio programming has been reduced by approximately 89%.  RFA now broadcasts just seven hours *per week*.  Online, RFA's written content is down by 48% and its video content is down by 60%.  The impact on programming will become only more pronounced in the coming weeks, with four additional language services expected to go dark in May, as RFA continues to preserve as much cash as possible.

7.      In my April 16 declaration, I explained that RFA had $12 million cash on hand.  That figure is now $10 million.

8.      Based on our funds, I initially projected that RFA would have enough money to stay afloat through May 16, 2025.  Since then, RFA made the decision to retain certain key staff members who are visa holders for as long as possible.  RFA also calculated that in order to pay for health insurance for all furloughed staff, and cover some critical operational costs, it would need to move ahead with layoffs one week earlier than planned.  RFA now expects that it does not have enough funds to get through May 9, 2025, absent extreme measures.

9.      On May 9, 2025, RFA will be forced to lay off the approximately 340 people it employs in the United States and abroad.  That is 90% of the entire organization.

10.     After May 9, RFA will exist in name only.  There will be even fewer staff left, even more minimal broadcasting, and RFA likely will be looking at bankruptcy in late summer 2025.  Even before then, however, it will default on its bills and certain employee-related obligations.

11.     On April 18, 2025, RFA wrote to USAGM's Chief Financial Officer to follow up on RFA's April drawdown request.  RFA specifically noted that its "April funding drawdown request remains pending."  RFA reminded USAGM that USAGM's March 15, 2025 "termination" of RFA's grant had been enjoined, and that its current grant agreement (which USAGM signed on January 16, 2025) therefore was operative.

12.     On April 24, 2025, RFA wrote to the USAGM Chief Financial Officer to note again that its fully executed grant agreement from January "is operative" and that "RFA is still waiting for disbursement of its April funds and is preparing to submit its May drawdown request in the coming days."

13.     RFA specifically asked the USAGM Chief Financial Officer when USAGM "intend[ed] to disburse April funds."

14.     To date, RFA has not received its April funds, which ordinarily it would have received within the first week of April.  It is now nearly May, and RFA is running on fumes.

15.     For the reasons I previously explained, if May 9, passes without RFA's funding restored, it will be extremely difficult—if not impossible—for RFA to ever again resume its work, given the reputational and network impacts previously explained.

16.     As I previously explained, certainty of funding is critical to RFA's operation and financial management.  At the outset of the fiscal year, RFA creates an annual budget and financial plan by month based on the total annual appropriation amount.

17.     RFA can function only if it receives its funding at regular, predictable intervals.  RFA's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

18.     RFA's conservative fiscal management and the steps outlined above have allowed it to survive at reduced operating levels despite not receiving its April funding, but it will not be able to survive for much longer.  Already the organization has suffered irreparable harm.  After May 9, 2025, the organization will effectively cease to exist as it once did.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __27__ day of April, 2025.

**JA372**

_Kevin W. Fleming (Apr 27, 2025 18:11 EDT)_

Kevin W. Fleming
Chief Operating Officer
Radio Free Asia

3

## Second Supplemental Declaration of Deirdre Kline

1.     I am the Chief Operating Officer (COO) of Middle East Broadcasting Networks, Inc. (MBN).  I make the statements in this declaration based on my personal knowledge and information gained in the performance of my duties as COO.

2.     This declaration supplements my April 9 and April 16, 2025 declarations with an updated snapshot of MBN's current finances.

3.     In my April 16 declaration, I explained that MBN furloughed more than 95% of its domestic staff for a period of two weeks beginning on March 23, 2025.  I also explained that on April 12, 2025—when MBN still had not received its April funds (or any indication of when they might be disbursed)—MBN was forced to terminate the employment of 514 people, more than 90% of its entire organization.

4.     Because MBN did not have sufficient funds to pay out earned annual leave, severance, and other end-of-service benefits, people who worked at MBN for decades, and relied on those benefits, were left with nothing.

5.     In my April 16 declaration, I stated that fewer than 45 people remain employed at MBN.  By May 2, that number will be 36 because MBN will be forced to make additional cuts.  At the start of this litigation, MBN employed more than 500 people, including more than 380 in the United States.

6.     In my previous declaration, I indicated that MBN had approximately $4.3 million cash on hand.  By May 2, that figure will be approximately $2.5 million.

7.     Since I submitted my previous declarations, MBN has informed the State Department that nearly all of MBN's employees on a visa program have been terminated. Former employees who worked at MBN pursuant to visas must leave the United States within 30 days.  At MBN, these former employees include one person who has stage four cancer and another who is eight months pregnant.  Others have had to pull their children out of school and leave their lives behind to go back to their home countries.

8.     On April 18, 2025, MBN wrote to USAGM's Chief Financial Officer to follow up on MBN's April drawdown request.  MBN specifically noted that its "April funding drawdown request remains pending."  MBN reminded USAGM that USAGM's March 15, 2025 "termination" of MBN's grant had been enjoined, and that its current grant agreement (which USAGM signed on February 27, 2025) therefore was operative.

9.     On April 24, 2025, MBN wrote to the USAGM Chief Financial Officer to note again that its fully executed grant agreement from February "is operative" and that "MBN is still waiting for disbursement of its April funds and is preparing to submit its May drawdown request in the coming days."

1

**JA374**

10.    MBN specifically asked the USAGM Chief Financial Officer when USAGM "intend[ed] to disburse April funds."

11.    To date, MBN has not received its April funds, which it historically has received within the first week of the month.

12.    MBN currently exists as a shell of its former self.  It can further extend its extinction only by taking steps like declaring bankruptcy, ending all content production (already drastically reduced), and laying off its remaining staff.

13.    The skeleton staff is still working, many with reduced pay, and like their former colleagues, they will end their time at MBN without severance or annual leave payouts.  These employees will also be ineligible to continue their health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act, or COBRA, because without funding, MBN will be forced to cancel its healthcare insurance plan.

14.    MBN is delinquent on its leases in Springfield, Virginia, in Washington, D.C., and in Dubai and has been forced to cut back broadcasting, as described in my April 16 declaration.  Without access to its annual appropriation, MBN's payments to vendors are also late.  Soon, MBN's creditors will no doubt seek to recoup their funds, and MBN will almost certainly be forced into bankruptcy.

15.    If MBN's congressionally appropriated funding does not reach MBN before May 31, 2025, the organization will cease to exist except on paper.

16.    It will be impossible for MBN ever again to resume its work; its reputation as a faithful employer, trusted news source, and robust independent organization is in tatters.

17.    Certainty of funding is critical to MBN's operation and financial management.  At the outset of the fiscal year, MBN creates an annual budget and month-by-month financial plan—both premised on the total of its annual appropriation.

18.    MBN can function only if it receives its funding at regular, predictable intervals.  MBN's entire structure relies on timely disbursements—it does not have vast reserves of money to keep it afloat during periods of indefinite delay.

19.    As of April 28, 2025, it will have been two months since MBN received any of its congressional annual appropriation from USAGM.

20.    The drastic steps that MBN has taken, outlined above and in my previous declarations, have allowed it to survive despite not receiving its April funding, but it cannot survive past May 31, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

2

Dated this **27** day of April, 2025.


Deirdre Kline
Chief Operating Officer,
Middle East Broadcasting Networks, Inc.

3

# Appendix A

INTERNATIONAL FISHERIES COMMISSIONS

The agreement includes $65,719,000 for International Fisheries Commissions. Funds appropriated under this heading are allocated according to the following table:

### INTERNATIONAL FISHERIES COMMISSIONS
[Budget authority in thousands of dollars]

| Commission/Activity | Budget Authority |
|---|---|
| Great Lakes Fishery Commission | 50,000 |
| *Lake Champlain and Lake Memphremagog Basins* | *10,000* |
| *Grass Carp* | *1,000* |
| *Lake Memphremagog Fishery* | *500* |
| Inter-American Tropical Tuna Commission | 1,750 |
| Pacific Salmon Commission | 5,868 |
| International Pacific Halibut Commission | 4,582 |
| Other Marine Conservation Organizations | 3,519 |
| **Total** | **65,719** |

## RELATED AGENCY

### UNITED STATES AGENCY FOR GLOBAL MEDIA

INTERNATIONAL BROADCASTING OPERATIONS

The agreement includes $857,214,000 for International Broadcasting Operations, of which $42,861,000 may remain available until September 30, 2025. Funds appropriated under this heading are allocated according to the following table:

### INTERNATIONAL BROADCASTING OPERATIONS
[Budget authority in thousands of dollars]

| Entities/Grantees | Budget Authority |
|---|---|
| Federal Entities | |
| Mission Support | 225,640 |
| *Office of Technology, Services, and Innovation* | *174,440* |
| Office of Cuba Broadcasting | 25,000 |
| Voice of America | 260,032 |
| Subtotal | 510,672 |

14

**JA378**

| | |
|---|---|
| Independent Grantee Organizations | |
| Radio Free Europe/Radio Liberty | 142,212 |
| Radio Free Asia | 60,830 |
| Middle East Broadcasting Networks | 100,000 |
| Open Technology Fund | 43,500 |
| Subtotal | 346,542 |
| **Total** | **857,214** |

*Consultation.*—Not less than 30 days prior to the submission of the operating plan required by section 7062(a) of the Act for funds appropriated or otherwise made available under this heading, the United States Agency for Global Media (USAGM) Chief Executive Officer (CEO) shall consult with the Committees on Appropriations on the allocation of funding by entity and the use of the 2023 Language Service Review (LSR) and other information to inform agency operations. The operating plan shall also clearly identify resources allocated in fiscal year 2024 for the new headquarters building.

*Language Service Review.*—Not later than 60 days after the date of enactment of the Act, the USAGM CEO shall submit a report to the Committees on Appropriations detailing the process and outcome of the 2023 LSR and the status of implementation of strategies for language services following the 2022 LSR.

*Mission Support.*—The agreement updates the name of "International Broadcasting Bureau" in the above table to "Mission Support", consistent with the December 2023 congressional notification to the Committees on Appropriations.

*Networks.*—The USAGM CEO is directed to use the expertise of Office of Cuba Broadcasting to inform programming about Cuba by other USAGM networks.

*New Headquarters Building.*—Not later than 90 days after the date of enactment of the Act, the USAGM CEO shall submit a report to the Committees on Appropriations detailing updated plans for the new headquarters relocation, including timelines and estimated costs.

*Open Technology Fund.*—Funds made available for the Open Technology Fund should be made available for grants for innovative methods to reach audiences inside of Cuba. Not later than 45 days after the date of enactment of the Act, the USAGM CEO shall consult with the Committees on Appropriations on such grants.

**JA379**

# Appendix B

# GRANT AGREEMENT
## BETWEEN THE
## U.S. AGENCY FOR GLOBAL MEDIA AND
## RADIO FREE ASIA

### FAIN: 1065-25-GO-00001

**GRANT FUNDS TABLE**

|  | FY 2025 PROGRAM PLAN | Previous Award Total | Current Award | New Award Total | Currency gain/(loss) (Informational)[1] |
|---|---|---|---|---|---|
| **FUNDING** | Continuing Resolution | $11,663,384 | $13,451,372 | $25,114,756 | ($4,489) |

Preamble

This Grant Agreement ("Agreement") is between the **U.S. AGENCY FOR GLOBAL MEDIA** (hereinafter "USAGM" or the "Agency") and **RADIO FREE ASIA** (hereinafter "RFA," the "Non-Federal Entity," or "NFE"), a nonprofit organization incorporated in the District of Columbia. USAGM enters into this Agreement under the authority provided by the U.S. International Broadcasting Act of 1994, as amended, 22 U.S.C. §§ 6201 et seq. (the "International Broadcasting Act") and other authorization or appropriation acts that provide authority for such activities. The Assistance Listing Number (ALN)    for USAGM is **90.500**. The **Unique Entity ID (UEI#)** for the Non-Federal Entity is **G22JVJGLK725. The Federal Award Identification Number (FAIN) for this Award for Financial Assistance is 1065-25-GO-00001**.

WHEREAS, USAGM is the United States Government agency responsible for non-military U.S. Government-funded international broadcasting pursuant to the authorities set forth in the International Broadcasting Act;

WHEREAS, among the purposes of the activities supported by the International Broadcasting Act is to "promote the right of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights," 22 U.S.C. § 6201(1);

WHEREAS, USAGM's mission is "to inform, engage, and connect people around the world in support of freedom and democracy;"

WHEREAS, in furtherance of this mission and as authorized by the International Broadcasting Act, USAGM makes and supervises a grant to the Non-Federal Entity for broadcasting and related activities in order to provide news and information of the highest journalistic standard to countries that have limited or no access to free press and media, and, in furtherance thereof, USAGM has

---

[1] Reported on RFA Foreign Currency Loss Report - November 30, 2024.

decided to make a grant for these purposes pursuant to the terms and conditions stated herein; and WHEREAS, USAGM believes that it would be in the interests of United States international broadcasting and the USAGM mission to take advantage of the operational independence and flexibilities of its private nonprofit Non-Federal Entities, as consistent with the requirements of the International Broadcasting Act and other federal laws and regulations that arc applicable to Non-Federal Entities, including the statutory requirement that duplication of language services and technical operations between the Non-Federal Entity and USAGM or USAGM-funded broadcasting entities be reduced to the extent appropriate, as determined by USAGM.

NOW, THEREFORE, USAGM agrees to make, and the Non-Federal Entity agrees to accept, the grant of funds in accordance with the following provisions:

Article I – THE GRANT

a.  Amount of Grant.  The USAGM hereby grants an amount of $25,114,756 to the Non-Federal Entity for operations during FY 2025, as made available pursuant to the Continuing Appropriations Act, 2025, Division A of P.L. 118-83 (September 26, 2024)[2] and P.L. 118-158 (December 21, 2024)[3], with an automatic extension, pursuant to 2 C.F.R. § 200.308(g)(2), of the period of performance for the following fiscal year. The USAGM hereby grants to RFA funds for the planning and operating expenses relating to international broadcasting in order to carry out the purposes set forth in the laws referenced in the preamble to this Agreement, expressly P.L. 103-236 TITLE III—UNITED STATES INTERNATIONAL BROADCASTING ACT[4], as amended, for the grant period October 1, 2024, through September 30, 2025, unless the source of funding otherwise dictates. The funding amount will be based upon Continuing Resolution rates until the enactment of the Fiscal Year (FY) 2025 USAGM appropriation, or any future Continuing Resolution, at which point the grant shall be amended to comply with such Congressional action and/or the final FY 2025 appropriation. This funding will support planning and operational costs detailed in RFA's FY 2025 approved financial plan.

b.  Use of the Grant Funds. The Non-Federal Entity may use the Grant Funds solely for planning and operating expenses related to international broadcasting and administration thereof.  The Grant Funds are provided solely for the purposes and in the amounts approved by USAGM and as set forth in the Approved Financial Plan (as such term is defined in Article VII hereof and subject to the review procedures and adjustments described therein).

c.  Funds provided under a partial-year Continuing Resolution (CR) are subject to the terms and conditions set forth in Article VII (b)(5) and those otherwise required under a partial-

---

[2] Continuing Appropriations Act, 2025, Division A of P.L. 118-83 (138 Stat. 1524) (September 26, 2024) may also be cited as the ''FY2025 Continuing Appropriations and Extensions Act'' (through 12/20/2024) - H.R. 9747.

[3] Continuing Appropriations Act, 2025, Division A of P.L. 118-83 (138 Stat. 1524) (September 26, 2024) may also be cited as the ''FY2025 Continuing Appropriations and Extensions Act'' (through 12/20/2024) - H.R. 9747.

[4] TITLE III—UNITED STATES INTERNATIONAL BROADCASTING ACT, SEC. 301, may also be cited as the "United States International Broadcasting Act of 1994."

year CR.

## Article II – USAGM OVERSIGHT AND ITS LIMITATIONS

a.  As provided in the International Broadcasting Act of 1994, as amended, including 22 U.S.C. § 6209(c), the Non-Federal Entity is a private, nonprofit corporation, and nothing in this Agreement may be construed to make the Non-Federal Entity a Federal agency or instrumentality.

b.  USAGM's oversight and supervision of the Grant Funds are subject to limitations in applicable law.

c.  USAGM acknowledges and affirms the safeguards contained in the United States International Broadcasting Act meant to preserve the journalistic independence and integrity of USAGM programming. Accordingly, USAGM and RFA agree that (i) RFA shall produce "news which is consistently reliable and authoritative, accurate, objective, and comprehensive" (Section 6202(b)(1) of the International Broadcasting Act); (ii) RFA shall enjoy full editorial independence in order to maintain its "professional independence and integrity" (Section 6204(b) of the International Broadcasting Act); and (iii) RFA's editorial decisions shall be insulated from interference from those outside of the network. To that end, no U.S. Government official—including the USAGM CEO, the Secretary of State, and the Inspector General—may attempt to influence the content or editorial choices of the Non-Federal Entity in a manner that is not consistent with the highest standards of professional broadcast journalism or take any other action that may tend to undermine the journalistic credibility or independence of USAGM or its broadcasters.

## Article III – PROGRAMMING PRODUCED WITH GRANT FUNDS

a.  The Non-Federal Entity shall use the Grant Funds to provide objective, editorially independent news and information programming that is consistent with the relevant principles and standards set forth in the International Broadcasting Act and the strategy for U.S. international broadcasting as determined and implemented by the USAGM. Nothing herein shall be interpreted to cause the Non-Federal Entity to violate the highest standards of professional journalism.

b.  The Non-Federal Entity shall produce news and information programming in the language(s) described in the Approved Program Plan and associated Approved Financial Plan, as defined in Article VII hereof. Upon USAGM's request, the Non-Federal Entity shall provide USAGM a detailed written schedule of the programs produced with the Grant Funds, including the languages and media in which such programs were produced.

## Article IV – DISTRIBUTION OF PROGRAMMING PRODUCED WITH GRANT FUNDS

a.  Subject to the limitations of Article IV(c), the Non-Federal Entity acknowledges and agrees that USAGM is authorized to provide for distribution of the programming that is paid for with the Grant Funds over the global network of broadcasting and transmission facilities

**JA383**

owned and/or operated by USAGM or, as the case may be, through affiliated networks arranged by USAGM ("USAGM Global Distribution Network"). Subject to the limitations of Article IV(c), the Non-Federal Entity shall provide the programming that it produces with the Grant Funds to USAGM for distribution over the USAGM Global Distribution Network.

b.  The Non-Federal Entity may not use Grant Funds for the purpose of concluding affiliate or other distribution agreements, except as approved in writing by USAGM or otherwise authorized under this agreement. Unpaid affiliate agreements must be consistent with the USAGM's strategy for US international broadcasting, as described in Article III (a).

c.  The Non-Federal Entity grants to USAGM a worldwide, non-exclusive, royalty-free and perpetual license to broadcast, use, distribute and create derivative works from those of the Non-Federal Entity's original programs that contain no materials provided by or licensed from any third parties. The Non-Federal Entity grants USAGM a worldwide, non-exclusive, royalty-free license to broadcast and otherwise use those of the Non-Federal Entity's programs that are legally available for such licensing and use.

When obtaining materials from third parties for inclusion in its original programming, the Non-Federal Entity agrees to use reasonable best efforts to secure sufficient rights to permit the Non-Federal Entity to license to USAGM (on a non-exclusive, worldwide and royalty-free basis) the right to broadcast the resulting original programming; provided, however, that the Non-Federal Entity shall not be required to do so where the acquisition of such rights would materially and detrimentally affect the Non-Federal Entity's ability to secure its own license from said third parties. The Non-Federal Entity shall provide, without charge, information concerning, and DVD or other electronic copies of, any of its programs to USAGM upon USAGM's request.

d.  The Non-Federal Entity hereby grants to USAGM, and USAGM hereby accepts, an irrevocable, royalty-free, fully paid-up, non-exclusive, sublicense-able, perpetual license during the Grant Term to use the Non-Federal Entity's registered and unregistered trademarks. USAGM's use of the Non-Federal Entity's trademarks shall be limited to use in conjunction with broadcasting or otherwise disseminating the Non-Federal Entity's materials to USAGM's audiences for the purpose of furthering the USAGM mission.

e.  The Non-Federal Entity may sell content produced under this Grant Agreement; however, nothing herein shall authorize the Non-Federal Entity to charge the United States Government, or any of its instrumentalities, for access to its content, nor shall anything herein authorize any violations of any applicable statutory limitations on domestic dissemination. At the request of the Chief Executive Officer of USAGM (the "CEO"), the Non-Federal Entity shall provide the CEO sufficient information to make any determinations required by USAGM or otherwise required by the CEO's oversight responsibilities, including to assess revenue earned, as well as the purposes for which such revenue is used.

## Article V – COOPERATION WITH USAGM GOVERNANCE OF UNITED STATES

INTERNATIONAL    BROADCASTING

As a condition of its receipt and use of the Grant Funds provided hereunder, the Non-Federal Entity shall cooperate with USAGM's governance of U.S international broadcasting under the International Broadcasting Act as follows:

a.  The Non-Federal Entity's articles of incorporation, by-laws, or other constitutional documents shall provide that the corporate leadership and Board of Directors of the Non-Federal Entity be selected in accordance with the International Broadcasting Act and other relevant provisions of law.

b.  The Non-Federal Entity shall cooperate in the processes and protocols of USAGM as follows:

    1.  The Non-Federal Entity shall report such information to USAGM as may be reasonably requested by USAGM in the format and within the timeframe so requested to the extent permitted by applicable law.  Consistent with USAGM's desire to foster transparency, USAGM's request will include information regarding the purpose of the request.

    2.  In order to facilitate coordinated communications among the elements of US International Broadcasting, the Non-Federal Entity will endeavor to inform the USAGM Office of Congressional Affairs of communications or meetings with the State Department, House and Senate, staff and Members.

    Nothing in the paragraph above shall prevent the Non-Federal Entity (i) from responding to specific requests for information, documents or materials from Congress, (ii) from engaging in routine communications with Congress, or (iii) from engaging in communications in the regular pursuit of newsgathering activities.  The Non-Federal Entity shall inform USAGM in a timely manner about such requests for information and the responses to those requests.  The Non-Federal Entity acknowledges that federal rules and regulations including 31 U.S.C. § 1352 and 2 CFR 200.450 prohibit Non-Federal Entities from using appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any U.S. Government agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making, extension, continuation, renewal, amendment, or modification of any Federal grant.

    3.  The Non-Federal Entity shall not disclose any information expressly designated in writing as confidential to USAGM to any third party not authorized by USAGM to receive it.  The Non-Federal Entity further agrees to take all steps reasonably necessary to protect the confidentiality of the confidential information and to prevent the confidential information from falling into the public domain or into the possession of unauthorized persons.  The Non-Federal Entity shall have no obligation of confidentiality with respect to information that (A) was known to the Non-Federal Entity prior to receiving any of the confidential information from USAGM, (B) has become publicly known through no wrongful act of the Non-Federal Entity, or (C) was

**JA385**

received by the Non-Federal Entity from a third party without restriction as to the use and disclosure of the information.

4. The Non-Federal Entity shall participate in activities of the U.S. International Media Coordinating Committee (ICC) in accordance with the U.S. International Broadcasting Act.

5. Nothing in this agreement shall require the Non-Federal Entity to take actions which impair appropriate Congressional oversight or the operations of the USAGM Inspector General.

## Article VI – MUTUAL ASSISTANCE TO PROMOTE UNITED STATES INTERNATIONAL BROADCASTING

a.    In the spirit of cooperation among USAGM-sponsored entities and in order to promote the efficient use of Grant Funds and Agency resources, USAGM and the Non-Federal Entity will use their reasonable best efforts to render assistance to each other to promote the interests of U.S. international broadcasting and the implementation of USAGM's strategy.

b.    The Non-Federal Entity shall make reasonable efforts to provide or facilitate provision of administrative or other services or resources to USAGM or other USAGM-sponsored broadcasting entities in order to promote implementation of USAGM's strategy. Grant Funds shall be available for services to USAGM or other USAGM-sponsored entities where cost effective and consistent with the USAGM strategic plan as determined by USAGM. Consistent with its desire to foster transparency, USAGM's request for assistance will include information regarding the purpose of the request for such assistance. USAGM shall not be required to reimburse the Non-Federal Entity for Grant Funds used to provide such assistance but will reimburse the Non-Federal Entity for costs that are more than de minimis. USAGM will endeavor to make such requests in a manner that does not interfere with the Non-Federal Entity's ability to discharge its responsibilities under this Agreement and, where necessary to achieve the request, to provide resources to assist the Non-Federal Entity in fulfilling such requests. The Non-Federal Entity shall notify USAGM of any expenditures it makes on provision of services to USAGM and other USAGM-sponsored entities.

c.    All assistance contemplated under this Article VI shall be rendered in a manner consistent with applicable law and regulations.

## Article VII – ADMINISTRATION OF THE GRANT

a.    Development and Review of the Approved Program Plan

Definition. As used in this Agreement, the term "**Approved Program Plan**" (also known as the "Program Plan" or "Operating Plan" or "Spend Plan") shall consist of (i) a comparison between the congressional budget justification (CBJ) funding levels, (ii) the most recent congressional directives or approved funding levels, and (iii) the

funding levels proposed by USAGM, along with a clear, concise, and informative description/justification submitted to the Appropriations Committee.

1. Required Program Plan. The Agency's Program Plan is required to be submitted to Congress no later than 45 days after the date of enactment of the annual appropriations act, which provides details on the uses of funds at the program, project, and activity (PPA) levels (and typically found in the associated joint explanatory statement accompanying the bill). To achieve this deadline, subject to guidance from the Agency, the Non-Federal Entity shall submit the information described in paragraphs one (1) through three (3) of this subsection.

2. Program Plan Detail. The NFE's submission will be dictated by the Data Call Guidance provided by USAGM. The submission will include updated Entity Budget Tables by division and applicable language service, updated broadcast hours, transfers between entities/PPAs, Full Time Equivalent (FTE) Employees, and narratives for proposed investments and/or reductions.

3. Approval. If the Program Plan includes changes in the level of funding for any PPA, or other notification and reprogramming requirements, these changes shall be included in the Program Plan. Once incorporated, the Program Plan is submitted to the appropriate committees of Congress. Following the submission of the Program Plan to Congress, full-year funding is distributed to the NFE contingent upon receipt and approval by USAGM of a more detailed financial plan (defined more fully in Article VII (b)(1) through (5)). The NFE's financial plan shall reconcile to the funding levels included in the Approved Program Plan.

b.    Development and Review of the Approved Financial Plan

Definition. As used in this Agreement, the term "**Approved Financial Plan**" shall mean (i) the financial plan for use of Grant Funds that is approved by USAGM in accordance with the procedures set forth in this Article VII; (ii) any modification to such plan that is approved by USAGM during the term of this Agreement; and (iii) any proposal or modification of such proposal during a Continuing Resolution as referenced in Article VII (b)(5) below.

1. Financial Plan Required. Unless otherwise determined by USAGM, prior to entering into this Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available), the Non-Federal Entity shall submit to USAGM a proposed detailed financial plan consistent with the strategy, purposes, and language services approved by USAGM, and covering the full amount of the Grant.

2. Financial Plan Detail. The Non-Federal Entity's proposed base year financial plan shall delineate the Non-Federal Entity's anticipated monthly expenditures for each budget line item, broken down by Domestic and Overseas. Budget line items will be defined by the USAGM.

3.  Approval of the Proposed Financial Plan. USAGM will make a good faith effort to either approve the submitted financial plan within ten days or respond with requests for plan adjustments or additional information. USAGM shall transmit any disapproval of the proposed financial plan prior to the execution of the Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available). The Approved Financial Plan shall be provided to the Non-Federal Entity with the executed version of the Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available).

4.  Relationship of the Approved Financial Plan to the Approved Program Plan. The Approved Financial Plan serves as the funding drawdown schedule; it should be the NFE's estimate of monthly and/or period operating costs. The Approved Financial Plan should directly correlate to the Approved Program Plan, subject to USAGM approved changes in plans or directions that occur over the course of the year following the Approved Program Plan.

5.  Financial Plan during a Partial-Year Continuing Resolution (CR). If appropriations for the full-year amount of the Grant Funds are not available to USAGM at the time USAGM and the Non-Federal Entity enters into this Agreement, the Non-Federal Entity shall provide, with each request for funding, an explanation of funding requirements for the period covered by the funding request and two subsequent months. Unless otherwise determined by law or approved by USAGM, such requirements shall include only the minimum amounts of Grant Funds reasonably necessary to sustain current operations under the partial-year Continuing Resolution.

Financial Plans during a CR shall correlate to the last Approved Program Plan or Enacted Level from the Prior Year, subject to guidance from the Agency. No later than 30 days after enactment of an appropriation covering the fiscal year, the Non-Federal Entity shall submit a proposed detailed Financial Plan for approval in accordance with paragraphs one (1) through five (5) of this subsection. The Non-Federal Entity shall operate at a rate of obligation under its CR financial plan until USAGM approval of the financial plan in accordance with this paragraph.

c.  USAGM will provide Grant Funds to the Non-Federal Entity by the U.S. Treasury electronic funds transfers through the Automated Clearing House System. USAGM will make disbursements in monthly increments or on such other basis as may be consistent with the Approved Financial Plan.

d.  Reporting and Review of Use of Grant Funds

The USAGM Chief Executive Officer (CEO) has established that the frequency required for financial reporting for the Non-Federal Entity will transition from monthly to quarterly reporting for the (1) Federal Financial Report (FFR)(SF-425); (2) Statement of Obligations and Disbursements (SOD) Report; (3) Exchange Rate Report; and (4)

Unfunded Liability Report, *provided that* the Non-Federal Entity maintains an unmodified audit opinion on the Single Audit/Uniform Audit with no findings and collateral for advanced cash, and that no other unusual circumstances exist that would require more frequent reporting (for example, more frequent reporting is necessary for the effective monitoring of the Federal award).

WHEREAS the Non-Federal Entity currently maintains an unmodified audit opinion on the Single Audit/Uniform Audit and collateral for advanced cash, [Effective 01.01.2025, and corresponding to the second quarter of fiscal year 2025] the USAGM hereby updates the annual grant agreement by inserting a new paragraph for <u>Article VII – ADMINISTRATION OF THE GRANT</u> d. Reporting and Review of Use of Grant Funds with the following:

Program monitoring of Grant Funds is required to determine that adequate progress is being made towards USAGM's objectives; that expenditures are in line with relevant statutes, regulations, and agency administrative requirements; and that federal funds are used responsibly. One component of grant monitoring includes the submission and review of reports.

The following chart details the summary of the NFE report submissions, due dates, and submission methods:

**JA389**

## SUMMARY OF NFE REPORT SUBMISSIONS

|   | Report Title and Form | Frequency/Due Date | Submission Method |
|---|---|---|---|
| 1. | **FFR using Form SF-425** | Quarterly: 30 days after the end of the prior quarter. Annual: 30 days after Period of Performance (POP) end date [Reporting Frequency Change Effective 01.01.2025] | grantreports@usagm.gov |
| 2. | **SOD using Template** | Quarterly: 30 days after the end of the prior quarter Annual: 30 days after POP end date [Reporting Frequency Change Effective 01.01.2025] | grantreports@usagm.gov |
| 3. | **Year-End Advance: Preliminary Trial Balance** | **Grant Validation:** <br> July 31, 2025 <br> 1. Audited 2024 Trial Balance <br> 2. Leave activities – including leave payout <br> August 30, 2025 <br> 1. USAGM will send an email for explanation on items that has unusual fluctuation. The grantee must provide explanations with 7 business days. <br> **Grant advance:** <br> October 7, 2025 <br> 1. Final August 2025 trial balance <br> 2. September 2025 preliminary trial balance <br> 3. Additional estimates (estimated payroll, travel , commitment estimates and other misc. costs ) | cfointernalcontrolsteam @usagm.gov |

| | | 4. Preliminary SF-425s<br>5. Carry over requests<br>6. Bank statements as of 9/30<br><u>October 15, 2025</u><br>1. Updated September 2025 preliminary trial balance<br>2. Estimate of "related party" financial transactions with USAGM and the basis for determining the amounts (for the SFFAS 47 disclosure). USAGM will provide the prior year disclosure prior to this date for revisions/confirmations. | |
|---|---|---|---|
| 4. | **Exchange Rate Report** | Quarterly: 30 days after the end of the prior quarter. Annual: 30 days after POP end date [Reporting Frequency Change Effective 01.01.2025] | grantreports@usagm.gov |
| 5. | **Status of Vacancy and Staffing Report** | Vacancy: 30th day after the end of each quarter. Staffing: 30 days after the end of the fiscal year | grantreports@usagm.gov |
| 6. | **Unfunded Liability Template** | Beginning of the fiscal year with updates reported on the quarterly financial reports [Reporting Frequency Change Effective 01.01.2025] | grantreports@usagm.gov |
| 7. | **Report on Equipment and Equipment Disposition** | 7 days before disposal of equipment; Annual property equipment inventory: 90 days after POP end date | grantreports@usagm.gov or Storage Media |

**JA391**

| 8. | Other Reviews & Reports | As Requested | Per Guidance |
|----|-------------------------|--------------|--------------|

Reporting Requirements. The Non-Federal Entity shall provide to USAGM the following quarterly and annual reports within thirty (30) calendar days of their respective coverage periods, unless otherwise indicated above or approved by USAGM.

1. Federal Financial Report (FFR) (SF-425) – Per 2 CFR 200.328, financial reporting is required by all recipients of federal funding. The Office of Management and Budget (OMB) specifies that grant recipients use Standard Form-425 for financial reporting to track the status of financial data tied to a particular Federal grant award. A separate SF-425 shall be submitted per Grant Agreement for each fiscal year; USAGM may require a separate SF-425 for special or earmarked funding. Each SF-425 Report will include the Federal Award Identification Number (the FAIN) and the fiscal year (FY) of the funding. This report will be submitted until all funding for the specific grant is fully obligated and expended.

2. Statement of Obligations and Disbursements (SOD) Report - for each quarter, a statement obligations and cash disbursements in U.S. dollars with the level of detail described in Article VII(a)(2), together with such additional information as USAGM may request from time to time. As requested by USAGM, the Non-Federal Entity shall justify in detail its use of Grant Funds against items defined in the Approved Financial Plan.

3. Year-End Advance - 2025 Year-End Trial Balance (TB) and Cash Balance report due by – Schedule of Deliverables provided in "SUMMARY OF NFE REPORT SUBMISSIONS" Table above, bullet 3, for Year-End (YE) Reporting, USAGM in order to prepare the fiscal year-end accruals requires the NFE to provide the trial balance for the year ending September 30, 2025. USAGM understands that the TB will not be final. USAGM may also require the NFE to provide estimated payroll, travel, and other miscellaneous Costs, including commitment numbers. In addition, USAGM will need an estimate of any "related party" financial transactions with USAGM and the basis for determining the amounts. Questions for the Trial Balance report should be directed to e-mail: cfointernalcontrolsteam@usagm.gov.

4. Exchange Rate Report – USAGM requires that the Non-Federal Entity report quarterly on foreign currency exchange rate gains and/or losses providing source documentation per 2 CFR 200.440.

5. Status of Vacancy and Staffing Reports.

    a. Organizational Chart. The Non-Federal Entity shall submit an organizational chart based on the above table's listed requirements. Should the NFE be reorganized at any point during the fiscal year, NFE will provide USAGM with an updated organizational chart.

FY 2025 RFA GRANT AGREEMENT – FAIN: 1065-25-GO-00001 - 12 | Page

**JA392**

     b.  Report on Vacancies.  Not later than 30 days after the end of each quarter of the fiscal year, the Non-Federal Entity shall submit a report to USAGM listing personnel vacancies as of the end of the quarter. This report should be organized by Division (i.e., Office or Language Service as they appear in associated budget documents such as the Congressional Budget Justification and/or Program Plan). The report shall include the Position Title; a Unique Vacancy Identifier (i.e., a position number or alpha numeric combination that remains with the vacancy); Grade Level, Annual Salary; Date Vacant and Expected Hire Date.  The provision of such report to USAGM is solely to facilitate USAGM's budget planning and reporting to Congress and does not imply that the Non-Federal Entity is required to seek USAGM approval to fill personnel vacancies.

     c.  Report on Staffing.  Not later than 30 days after the end of each fiscal year, the Non-Federal Entity shall submit a report to USAGM listing positions including its domestic and foreign national positions (full- and part-time staff) filled as of the end of the fiscal year.

6.  Unfunded Liabilities from Previous Year(s).  Unfunded liabilities are debt obligations that do not have sufficient funds set aside to pay the debt. There may be certain liabilities of the NFE where the future payment obligations exceed the amount of funds available at a specific time. Examples of unfunded liabilities may include employee annual leave balances and pension and health benefits for retirees. The NFE should provide a list of these liabilities to USAGM annually at the end of the fiscal year with updates reported on the quarterly financial reports.

7.  Report on Equipment and Equipment Disposition.  In accordance with 2 CFR Part 200, the Non-Federal Entity shall submit annually to USAGM an inventory of all equipment and no later than 90 days after the initial grant term ends.  Requests for disposition instructions concerning property purchased with Grant Funds with an estimated fair market value (at the time of such disposition) of U.S. $10,000 or more must be submitted to USAGM 7 days in advance of the proposed disposition. If USAGM has not notified the Non-Federal Entity that the disposition is disapproved, the disposition will be deemed approved.

8.  Other Reports and Reviews.  The Non-Federal Entity shall prepare and submit to USAGM such other reviews and reports on expenditures and obligations as USAGM may request on a schedule to be provided periodically by USAGM. Consistent with its desire to foster transparency, USAGM's requests will include information regarding the purpose of the request for such other reviews and reports.

e.  Site Visits.  The USAGM will conduct site visits consistent with the purposes of appropriate grantee oversight consistent with 2 CFR 200.329 to each Non-Federal Entity headquarters site (domestic/overseas) and to a select bureau(s) of the NFE each fiscal year, depending on funding, and unless there are findings that merit additional follow-up (e.g., audit findings).  The timing of the visits will be coordinated with the

**JA393**

appropriate NFE personnel. The USAGM will prepare a checklist of items to review and discuss with the NFE. USAGM will not conduct inquiries into grantee operations that could be deemed to violate statutory protections regarding the independence of the network's editorial decision-making and journalism. After the visit, USAGM will prepare a draft report that will identify any observations or areas of improvement and will provide the NFE an opportunity to respond and comment on it within a reasonable time prior to USAGM's finalizing the report.

f.     Comparability Studies. USAGM may perform compensation comparability studies annually. These studies will be used to evaluate the NFE's salary and other compensation rates in relation to the salary and compensation under Title 5 of the United States Code or the foreign relations laws of the United States for comparable locations [overseas]. The NFE will coordinate with a USAGM-designated contractor (a Designated Contractor"), if necessary, to complete these studies and produce a report.

Comparability studies will assess the compensation comparability among federal and NFE organizations to include salary, benefits, and other forms of compensation for employees based inside and outside of the United States. The Non-Federal Entity agrees to the following:

1.    Provide USAGM or any Designated Contractor with the following compensation components:
    a.  Base Salary/Wages
    b.  Additional compensation components (overtime and night differentials)
    c.  Bonuses and Awards
    d.  Benefits Prevalence to include retirement, health insurance premiums, life insurance, social security and Medicare, short-and long-term disability, commuter benefits, fitness/gym allowances/memberships, parking, perquisites, etc.
    e.  Paid time-off practices (vacation, illness, holidays, etc.)
    f.  Expatriate practices for those positions identified as eligible for overseas/expatriate benefits.

g.    The Non-Federal Entity shall maintain at its principal offices full and complete records and books of account, in accordance with generally accepted accounting principles, covering the financial details applicable to the Grant. The Non-Federal Entity shall maintain separate accountability for funds provided under this Agreement. The Non-Federal Entity shall expend these funds only on the operating costs authorized by this Agreement and in compliance with 2 CFR Part 200, Subpart E (Cost Principles), with the clarifications set forth in Attachment B, unless it receives prior written approval of USAGM to do otherwise.

h.    In accordance with 2 CFR 200.308, the Non-Federal Entity is required to report deviations from the Approved Financial Plan to USAGM. The Non-Federal Entity shall make reasonable efforts to provide prior notice of anticipated deviations. The

Non-Federal Entity may not transfer Grant Funds among individual line items approved in the financial plan if the cumulative amount of such transfers exceeds, or is expected to exceed, 10 percent of the total budget in the Approved Financial Plan unless otherwise approved by USAGM.

i.   Unless otherwise approved by USAGM, the Non-Federal Entity shall provide five (5) days advance notification to the grantreports@usagm.gov of any new contract whose total value exceeds U.S. $500,000 [Reporting Threshold Change Effective 01.01.2025] and any new lease whose total value exceeds U.S. $200,000. Notification should include and answer the following:

   a.   Purpose of contract/lease;
   b.   Was market research conducted for contract and/or lease;
   c.   Was competition considered for the contract/lease, in accordance with the Federal Procurement Standards (set forth in 2 C.F.R. §§ 202.317 *et seq.*);
   d.   The POP of the contract/lease (total number of years, months, etc.);
   e.   The cost associated with the contract/lease (total costs along with annual cost for base year and option years, including, as appropriate, escalation costs).

j.   Return of Funds.

   1.   The Non-Federal Entity shall return to USAGM at the conclusion of the fiscal year any portion of the Grant Funds that are not required for a legally binding transaction or designated by the Non-Federal Entity for a purpose and in an amount consistent with the Approved Financial Plan, if instructed to do so by USAGM.

   2.   Any and all interest earned on Grant Funds provided to the Non-Federal Entity pursuant to this Agreement shall be returned to the U.S. Government on an annual basis in accordance with the requirements of 2 CFR 200.305.

   3.   Expenditures by the Non-Federal Entity that are not consistent with the Approved Financial Plan or otherwise permitted by this Agreement shall be recovered by the Non-Federal Entity and promptly refunded to USAGM.

k.   Grant Closeout. Closeout is the process, as governed by 2 CFR 200.344, in which USAGM determines that a grant has been fully performed, the established POP has ended, and all administrative actions pertaining to the grant have been completed. Closeout is initiated by the Office of the Chief Financial Officer (OCFO)/Budget (B) sending notice to the NFE 30 days before the POP of a grant ends, informing the NFE that the grant will be closed out. If there are cases where the grant's POP has been completed and the Grant Agreement should be extended beyond the POP, the OCFO/B will notify the NFE of this change and will coordinate all actions through the USAGM Office of General Counsel (OGC) and the NFE.

   1.   Any grant funds not obligated and disbursed by USAGM to the NFE at the time the POP expires revert to USAGM unless otherwise agreed to in writing by USAGM. The

NFE should not enter into an obligation without receiving the funding first from USAGM.

2. In accordance with 2 CFR 200.344, no later than 120 calendar days after the end date of the POP, the NFE must submit all financial, performance, and other reports as required under this Agreement. Within 120 calendar days after the end date of the POP, the NFE shall liquidate all financial obligations incurred under this Agreement, unless the USAGM authorizes an extension in writing; provided, however, that in the event that USAGM, through its issuance of either an amendment that extends the POP of this Agreement or a new grant agreement with a new POP, determines that the required work of the Federal award utilizing obligated funds is ongoing and has not yet been completed by the NFE, this requirement shall not apply.

3. If the NFE completes all closeout requirements, USAGM shall complete all actions for the closeout no later than one year after the POP end date unless otherwise directed by authorizing statutes.

4. If the NFE does not submit all reports in accordance with 2 CFR 200.344 and this Agreement, USAGM shall proceed to close out with the information available within one year of the POP end date.

5. If the NFE does not submit all reports in accordance with 2 CFR 200.344 within one year of the POP end date, USAGM may report the NFE's material failure to comply with this Agreement with the OMB-designated integrity and performance system. USAGM may also pursue other enforcement actions per 2 CFR 200.339.

6. A grant is not fully performed if aspects of the approved Financial Plan continue to remain uncompleted, and USAGM agrees that the items are still to be validly completed.

*l.* Under 2 CFR §200.305, the Non-Federal shall deposit and maintain advance payments of Federal Funds in insured accounts whenever possible. 2 CFR §200.305 also provides that the Non-Federal Entity must maintain such advance payments in interest-bearing accounts. In addition, the Non-Federal Entity will ensure any amounts above the insured level are placed in a Financial Institution that pledges collateral security.

Article VIII – REGULATORY COMPLIANCE

a. The Parties acknowledge and agree that the Parties are subject to all Federal laws and regulations pertaining to Federal grants, including the following: 22 U.S.C. § 6201 et seq., 31 U.S.C. §§ 7502 and 1352, 41 U.S.C. § 702, 31 U.S.C. § 6301 et seq. (the Federal Grant and Cooperative Agreement Act) and implementing regulations, and 2 CFR Part 200.

b. Allowability of costs incurred under this Agreement will be determined in accordance with 2 CFR Part 200, pursuant to certain clarifications specified in Attachment B and subject to any exceptions granted by authorization or appropriation laws.

c.  The Non-Federal Entity shall comply with the covenants and other contracting provisions set forth in Attachment D.

d.  The Non-Federal Entity shall comply with grant limitations in the International Broadcasting Act and/or any appropriations statute that is applicable to the Non-Federal Entity, including, without limitation, any set forth in Attachment D.

e.  The Non-Federal Entity shall deliver all required certifications identified in Attachment E upon execution of this Grant Agreement.

f.  No Grant Funds may be used for the following purposes:

    1.  To pay any salary or other compensation or enter into any contract providing for the payment of salary or compensation, in excess of the rates established for comparable positions under Title 5 of the United States Code, or the foreign relations laws of the United States.

    2.  To pay first-class air travel for any employee of the Non-Federal Entity, or the relative of any employee.

g.  The Non-Federal Entity shall comply with all applicable U.S. laws and regulations, including, without limitation, the copyright and other intellectual property rights laws of the United States.

h.  When engaging outside the United States in activities that require the use of Grant Funds, the Non-Federal Entity shall exercise due diligence to ascertain the local laws and regulations, applicable to the Non-Federal Entity's activities in the relevant country(ies) where such activities shall be undertaken. The Non-Federal Entity shall promptly notify USAGM in writing in the event that the Non-Federal Entity or any of its employees or contractors is undergoing prosecutorial actions such that those actions are likely to cause reputational damage to USAGM or the United States Government.

i.  Consistent with 2 CFR 200.113, the NFE shall disclose, in a timely manner, in writing to the Office of Inspector General (OIG) for the Department of State, with a copy to the USAGM CEO, all violations of Federal criminal law involving fraud, bribery, or illegal gratuities potentially affecting the Federal award. Sub-recipients must disclose, in a timely manner, in writing to the OIG and to the prime recipient (pass-through entity) all violations of Federal criminal law involving fraud, bribery, or illegal gratuities potentially affecting the Federal award. Failure to make required disclosures can result in any of the remedies described in 2 CFR 200.339. Disclosures must be sent to: U.S. Department of State Office of Inspector General, P.O. Box 9778, Arlington, VA 22219. Website: https://stateoig.gov/hotline  Phone: 1-800-409-9926 or 202-647-3320

j.  The NFE's agreement to execute work in accordance with 2 CFR 200 includes the specific requirement under 2 CFR 200.217 to comply with whistleblower rights and protections under 41 U.S.C. 4712. The NFE is expected to inform all of its employees of whistleblower

**JA397**

rights and protections in writing.

Article IX – FUNDRAISING

The Non-Federal Entity may not engage in fundraising from other sources except in accordance with the principles of fundraising to be agreed by USAGM and the Non-Federal Entity. The Non-Federal Entity is prohibited from using any Federal funds to finance its fundraising efforts.

Article X – PERSONNEL SECURITY POLICY

a.    Security Policies Generally. The Non-Federal Entity shall adopt and implement such security policies as are required by federal law, regulation, or Executive Order.

b.    Investigations. USAGM is subject to laws, regulations, and Executive Orders that establish policy for security vetting of Federal employees, contractors, and (in certain instances) grantees. Accordingly, employees or contractors of the Non-Federal Entity may be required to undergo investigations conducted by USAGM or other authorized U.S. Government agencies, if both of the following conditions apply:

(1) the NFE employee or contractor requires access to Federal Government space (including any Federally-owned or leased building or its grounds), information (including classified information or other proprietary, non-public information), information technology systems (including any information technology system used or operated by an executive agency, by a contractor of an executive agency, or by another organization on behalf of an executive agency), staff (including any Federal employee or contractor), or other assets of the Federal Government;

AND

(2) the NFE employee or contractor could, by the nature of their access or duties, adversely affect the integrity or efficiency of the Federal Government.

c.    Determinations. The Non-Federal Entity has been delegated authority to determine which of its employee or contractor positions meet both conditions (1) and (2) in Article X.b, subject to guidance on making this determination provided by USAGM.

d.    Position Designation for Positions Subject to Federal Investigation. Any Non-Federal Entity employee or contractor position that meets both conditions (1) and (2) in Article X.b as determined by the Non-Federal Entity pursuant to Article X.c requires position designation using the Office of Personnel Management's Position Designation Tool. To the extent permitted by applicable law, the Non-Federal Entity will provide USAGM a position description, statement of work, or equivalent document describing the duties of any positions that require position designation.

e.    Investigative Standards for Positions Subject to Federal Investigation. Non-Federal Entity employees and contractors who meet both conditions (1) and (2) in Article X.b as

**JA398**

determined by the Non-Federal Entity pursuant to Article X.c, and who are U.S. Citizens or who have lived in the U.S. for at least three years, are subject to the same investigative standards, policies, and procedures as those that apply to U.S. civil service employees. Non-Federal Entity employees and contractors who meet both conditions (1) and (2) in Article X.b, and who have not lived in the U.S. for at least three years, may be subject to alternative investigative standards, policies, and procedures, subject to approval by the Office of Personnel Management and the Office of the Director of National Intelligence.

f.     <u>Positions not Subject to Federal Background Investigation</u>. Non-Federal Entity positions that do not meet both conditions (1) and (2) in Article X.b should still receive some pre-employment vetting as a matter of good management. For these positions, any pre-employment vetting is the responsibility of the Non-Federal Entity, which should be conducted by security personnel or a security vendor of the Non-Federal Entity's choice and in accordance with the Non-Federal Entity's security policy.

g.     <u>Costs</u>. The Non-Federal entity is responsible for the cost of the Federal investigations described in Article X.b and any pre-employment vetting described in Article X.f.

h.     <u>Responsibility for Personal Data</u>. USAGM and the Non-Federal Entity are individually and separately responsible for complying with applicable privacy and data-protection laws.

## Article XI – IT NETWORK SECURITY POLICY

Any material breach of the Non-Federal Entity's IT network security policies, or any incident that materially affects the integrity or operations of the Non-Federal Entity's IT network system, shall be reported to USAGM's Chief Information Officer within twenty-four (24) hours of detection. These incidents shall include, but are not limited to, the following:

a.     Unauthorized access to any of the social media or web site content management systems used by the Non-Federal Entity that the NFE becomes aware of.

b.     Disruption or denial of service for production or distribution systems.

c.     Unauthorized modification or removal by an outside party of the Non-Federal Entity's data that the NFE becomes aware of.

d.     The Non-Federal Entity will comply with U.S. government best practices for IT as established by OMB to the extent that such practices apply to the NFE. Upon USAGM's request, the Non-Federal Entity will make available its information security policies to USAGM to ensure a secure computing environment.

e.     All Non-Federal Entity personnel with authority to enter into contracts for the acquisition or leasing of Information Technology products, upon availability of training, shall complete USAGM-provided Capital Planning and Investment Control (CPIC) training, or another appropriate training identified by USAGM designed to ensure that IT

investments integrate strategic planning, budgeting, procurement, and management of IT in support of the NFE's mission and business needs.

## Article XII – AUDITS AND INSPECTIONS

a.  All records required to be kept in order to comply with the terms and conditions of this Agreement, including financial records, supporting documentation, statistical records, bid solicitations, evidence of shipment for commodities, procurement and service contracts and all other NFE records pertinent to a federal award, shall be maintained by the Non-Federal Entity for a period of at least three (3) years from the date of the submission of the final expenditure report, in a manner that will permit verification of the Non-Federal Entity's compliance with its representations, warranties, and obligations contained in this Agreement. If any litigation, claim, or audit is started before the expiration of the 3-year period, the records shall be retained until such litigation, claim, or audit has been resolved. In compliance with 2 CFR 200.334(c), the retention period for real property and equipment records starts with the date of disposition. The retention period for program income records starts at the end of the Non-Federal Entity's fiscal year in which the income is earned. 2 CFR 200.334(e).

b.  The Non-Federal Entity acknowledges the audit requirements set forth in 2 CFR Part 200, Subpart F (Audit Requirements). The audit package and the data collection form shall be submitted to the Federal Audit Clearinghouse 30 days after receipt of the auditor's report(s), or 9 months after the end of the fiscal year (06.30.2025)– whichever comes first.

c.  Operations of the Non-Federal Entity, as related to use of the Grant Funds, may be audited by the Government Accountability Office (GAO) in accordance with such principles and procedures and under such rules and regulations as may be prescribed by the Comptroller General of the United States. Any such audit shall be conducted at the place or places where accounts of the Non-Federal Entity are normally kept.

d.  Representatives of the GAO shall have access to all books, accounts, records, reports, files, papers, and property belonging to or in use by the Non-Federal Entity, pertaining to such financial transactions and necessary to facilitate an audit. Such representatives shall be afforded full facilities for verifying transactions with any assets held by depositories, fiscal agents, and custodians. All such books, accounts, records, reports files, papers, and property of the Non-Federal Entity, shall remain in the possession and custody of the Non-Federal Entity.

  The Non-Federal Entity acknowledges that the Inspector General of the United States Department of State is authorized to exercise the authorities of the Inspector General Act of 1978 with respect to the Non-Federal Entity.

## Article XIII SERVICE REVIEWS AND OTHER CONTENT ASSESSEMENTS

a.  In accordance with 22 U.S.C. § 6204(a)( 22)(A), the Non-Federal Entity is required to conduct content reviews, at least annually or more frequently at the discretion of the USAGM CEO,

consisting of a review of at least 10 percent of available unique weekly content from any selected week from the previous year, which shall be conducted, to the extent practical, by fluent language speakers and experts without direct affiliation to the language service being reviewed, who are seeking any evidence of unprofessional content or content otherwise inconsistent with the highest standards of professional journalism. The results of these content reviews shall be submitted to the Office of Policy and Research, the head of the respective language service, and the USAGM CEO.  Such reviews shall not interfere with the NFE's professional journalistic independence.

b.  In accordance with 22 U.S.C. § 6204(a)( 22)(C), the USAGM CEO is authorized to launch a review, using external, native-language and regional experts, the results of which are to be reported to the appropriate committees of Congress, to determine if a widespread pattern of violations of the Non-Federal Entity's established editorial principles are detected, including its Standards of Ethical Journalism. The Non-Federal Entity shall cooperate with such expert reviews and agrees to provide the USAGM CEO, or his/her authorized representatives, with any information requested for the purpose of conducting such expert reviews.  Such reviews shall not interfere with the NFE's professional journalistic independence.

c.  USAGM shall conduct reviews throughout the POP to measure the Non-Federal Entity's performance in achieving the purposes of this Agreement and in line with § 200.301 Performance measurement. Such reviews shall be conducted at reasonable times and upon notice to the Non-Federal Entity. USAGM's Office of Policy and Research ("OPR") is responsible for coordinating USAGM policy and research engagement with USAGM networks (Federal and Non-Federal) in support of the agency's mission and strategic objectives. USAGM performance is measured by OPR through research and review in the following areas of effort:

    1.  Strategic alignment, including agency Strategic Plan formulation, Language Service Review (LSR) prioritization and language service strategies, and other strategic reviews as requested by USAGM.

    2.  Data collection and analysis, including ensuring that all performance research and data is centrally accessible to OPR and in compliance with Agency data governance standards, is vetted using established quality control/quality assurance practices, and supports the Agency's Impact Model Framework.

    3.  Knowledge and data management, including contributing to the Smart Management and Audience Research Tool (SMART), data.usagm.gov, Impact Tracker, and the data management system.

    4.  Performance management, including setting performance targets in the annual budget, and reporting performance results for the Performance and Accountability Report (PAR).

    5.  Monitoring, including compliance with Agency program review guidelines and procedures for violations of journalistic standards.

d. To ensure continuous and cooperative planning and operations hereunder, the Non-Federal Entity shall permit USAGM or its authorized representatives, including the Inspector General, to visit the Non-Federal Entity's facilities and to inspect the facilities, activities, and work pertinent to the grant, both in the United States and abroad, and to interview personnel engaged in the performance of the Grant to the extent deemed necessary by USAGM. USAGM, however, shall not exercise any prepublication review of the substance of any broadcast or print publication of the Non-Federal Entity.

## Article XIV – FAILURE TO COMPLY WITH THE TERMS OF THE GRANT

In the event that the Non-Federal Entity fails to comply with any material term of this Grant, then USAGM shall have the right to suspend or terminate the Non-Federal Entity's use of the Grant Funds by providing written notice to the Non-Federal Entity in accordance with the provisions in 2 CFR Part 200; provided, however, that the Non-Federal Entity shall have    14 days from the receipt of such notice to cure any such failure to comply. (The Non-Federal Entity may seek an extension from USAGM.)

In the event USAGM suspends or terminates the Non-Federal Entity's use of Grant Funds, the Non-Federal Entity shall forthwith return to USAGM any portion of the Grant Funds in its possession or control to USAGM. Any such termination or suspension shall be without further obligation by USAGM or the United States.

In the event that the Non-Federal Entity reasonably believes that the USAGM has breached Article II, the Non-Federal Entity shall report the breach to the USAGM CEO. If the NFE believes that the breach involves the USAGM CEO, then they should contact the USAGM General Counsel or State Department OIG.

## Article XV – POINTS OF CONTACT

For USAGM, the following person, or anyone otherwise designated by the CEO, shall be deemed to be the point(s) of contact for the Non-Federal Entity with respect to the provisions of this Agreement:

> Roman Napoli
> Chief Financial Officer
> Tel: (202) 230-0564
> Email: rnapoli@usagm.gov

For the Non-Federal Entity, the following person(s) or anyone otherwise designated by the President shall be deemed to be the point(s) of contact for the Non-Federal Entity with respect to the provisions of this Agreement:

> Bay Fang
> President
> Tel: (202) 309-2019

Email: FangB@RFA.org

Article XVI – AMENDMENTS

The terms of this Agreement may be amended by mutual written consent between USAGM and the Non-Federal Entity.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year specified below:

**RADIO FREE ASIA**                                        **U.S. AGENCY FOR GLOBAL MEDIA**

BY _____         Amanda  Digitally signed by
                                                            Bennett  Amanda Bennett
                                                                     Date: 2025.01.16
                                                                     16:00:26 -05'00'
Bay Fang                                               BY_____
President                                              Amanda Bennett
                                                       Chief Executive Officer

DATE ___01/15/2025___                         DATE _____

**ATTACHMENT A**

The Board of the Broadcasting Board of Governors (BBG Board) on June 3, 2011, adopted "rules of the road" governing expectations regarding interactions among the elements of United States International Broadcasting (USIB), specifically (i) the federal agency (now called the U.S. Agency for Global Media); (ii) the Voice of America (VOA) and Office of Cuba Broadcasting (OCB); and (iii) USAGM's private Non-Federal Entities: Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), and Middle East Broadcasting Networks (MBN) (collectively, "Non-Federal Entities"). The Agency structure has changed significantly since then. It is now headed by a Senate Confirmed Chief Executive Officer. Nevertheless, the core principle of governance set forth therein in still relevant, namely that to fulfill the Agency's statutory mission, the elements of USIB shall work together "in a spirit of collegiality, transparency, mutual respect, and good communication with peers and colleagues," in a manner consistent with the requirement, per 22 USC 6204(b), that the Agency respect the professional independence and integrity of the networks.

**JA404**

**ATTACHMENT B**

Allowability of costs incurred under this Agreement will be determined in accordance with 2 CFR Part 200, Subpart E (Cost Principles), with the following clarifications:

a.    All operating costs are determined to be direct costs.  (See 2 CFR 200.413)

b.    The following expenses, insofar as they are reasonable and necessary to further the purpose of the grant, are authorized. (Relevant paragraphs of 2 CFR Part 200 are noted in parentheses.)

    1.    Official representation expenses necessary to further the mission of the Non-Federal Entity are not to exceed the amount in the Approved Financial Plan unless otherwise authorized by USAGM.  (See Department of State Standardized Regulations (DSSR), Sections 300 (Representation Allowances) – 330 (Prohibitions))

    2.    Capital expenditures for general purpose equipment. (See 2 CFR 200.439)

    3.    Overtime, extra-pay shift, and multi-shift premiums. (See 2 CFR 200.430)

    4.    Participant support costs (See 2 CFR 200.456)

    5.    Costs of legal, accounting, and consulting services, and related costs, incurred in connection with organization and reorganization. (See 2 CFR 200.435; 200.455 & 200.462)

    6.    Public information and relations service costs. (See 2 CFR 200.421)

    7.    Publication and printing costs. (See 2 CFR 200.461)

    8.    Foreign travel costs as specified in the Approved Financial Plan.  (See 2 CFR 200.475)

    9.    The cost of advertising the availability of publications, recordings, or services of the Non-Federal Entity, subject to limitations in applicable law or regulation.

**JA405**

# ATTACHMENT C

1. COVENANT AGAINST CONTINGENT FEES

   The Non-Federal Entity warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees, bona fide established commercial or selling agencies maintained by Non-Federal Entity for the purpose of securing business. For breach or violation of this warranty, USAGM shall have the right to annul this Agreement without liability or in its discretion to deduct from the Agreement price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

2. EQUAL OPPORTUNITY

   During the performance of this Agreement, the Non-Federal Entity agrees that it will not discriminate against an employee or applicant for employment because of race, creed, color, sex, national origin, religion, age, or disability in accordance with all applicable Federal laws and regulations prohibiting discrimination in employment including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. 2000e, et seq.; section 504 of the Rehabilitation Act of 1973, as amended; 29 U.S.C. 794; the Age Discrimination Employment Act of 1975, as amended; and 42 U.S.C. 6101, et seq. The provisions of this paragraph shall apply to employment actions including, but not limited to, employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship. The Non-Federal Entity shall continue to include in all solicitations or advertisements for employees placed by or on behalf of the Non-Federal Entity language stating that "Non-Federal Entity is an equal opportunity employer committed to work force diversity."

3. AIR TRAVEL

   The Non-Federal Entity agrees that all travel paid for with the Grant Funds will comply with the "Fly America Act" (49 U.S.C. § 40118).

4. CONVICT LABOR

   In connection with the performance of work under this grant, the Non-Federal Entity agrees not to employ any person undergoing sentence of imprisonment except as provided by 18 U.S.C. 3622 and Executive Order No. 11755, December 29, 1973, as amended.

5. THE NON-FEDERAL ENTITY SHALL COMPLY WITH:

   a.  Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d et seq., which prohibits discrimination on the basis of race, color, sex, or national origin in

**JA406**

programs and activities receiving Federal financial assistance.

b.    Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of handicap in programs and activities receiving Federal financial assistance.

c.    The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs or activities receiving Federal financial assistance.

d.    The 2019 National Defense Authorization Act, section 889(b), which prohibits federal award recipients from using grant funds for certain purposes, and the implementing regulations found at 2 CFR 200.216.

JA407

## ATTACHMENT D

### GRANT LIMITATIONS – RADIO FREE ASIA

A.    The headquarters of the Non-Federal Entity and its senior administrative and managerial staff must be in a location which ensures economy, operational effectiveness, and accountability to the USAGM CEO.

B.    Any contract entered into by the Non-Federal Entity shall specify that all obligations are assumed by the Non-Federal Entity and not by the United States Government.

C.    Any lease agreement entered into by the Non-Federal Entity shall be, to the maximum extent possible, assignable to the United States Government.

D.    The Non-Federal Entity shall make every reasonable effort to ensure that administrative and managerial costs for operation of the Non-Federal Entity should be kept to a minimum and, to the maximum extent feasible, should not exceed the costs that would have been incurred if the Non-Federal Entity had been operated as a Federal entity, rather than as a Non-Federal Entity.

**JA408**

# ATTACHMENT E

1.   CERTIFICATION REGARDING LOBBYING

The Non-Federal Entity shall sign the Certification (Attachment F) Concerning Lobbying Activities that it will comply with 31 U.S.C. § 1352 concerning the use of appropriated funds for lobbying activities. If no appropriated funds have been paid or will be paid for lobby activities, the Non-Federal Entity shall submit Standard Form LLL, "Disclosure of Lobbying Activities."

2.   CERTIFICATION REGARDING DRUG-FREE WORKPLACE REQUIREMENTS

The Non-Federal Entity shall sign the Certification (Attachment G) Regarding Drug Free Workplace Requirements: Drug-Free Workplace Act of 1988 that it will provide a drug-free workplace in accordance with the Drug-Free Workplace Act of 1988, 22 CFR 513, Subpart F.

3.   FEDERAL DEBT STATUS

Under OMB Circular No. A-129, the Non-Federal Entity must certify that it is not delinquent on payment of any Federal debt.  The Non-Federal Entity shall sign the Certification (Attachment H) Regarding Federal Debt Status.

4.   DEBARMENT AND SUSPENSION

Executive Order 12549 of February 18, 1986, as clarified by Executive Order 12689 of August 15, 1989, requires uniform Federal rules on non-procurement debarment and suspension from certain transactions with the Government, *except as modified by 22 U.S.C. 6205 (as amended under Public Law 118-159)*. The May 26, 1988 Federal Register (53 Fed. Reg. 19161) contains these rules, which, among other things, require signature by Non-Federal Entities of the Certification (Attachment I) Regarding Debarment and Suspension.

5.   STANDARDS OF ETHICAL CONDUCT

The Non-Federal Entity will publish written policy guidelines, as approved by USAGM, on conflict of interest and avoidance thereof.  These guidelines will reflect federal laws and must cover financial interest, gifts, gratuities and favors, nepotism, political activity and foreign affiliations, outside employment, and use of company assets.  These rules must also indicate how outside activities, relationships, and financial interests are reviewed by the responsible Non-Federal Entity official(s).  The Non-Federal Entity will ensure that each employee is given a copy of the policy and notified that, as a condition of employment under the grant, the employee must abide by the terms of the policy.

**ATTACHMENT F**

Certification Concerning Lobbying Activities

The undersigned certifies, to the best of his or her knowledge and belief that:

(1) No federal funds have been paid or will be paid, by or on behalf of the undersigned, to any person influencing or attempting to influence an officer or employee of any U.S. Government agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan or cooperative agreement.

(2) No registrant under the Lobbying Disclosure Act of 1995 has made lobbying contacts on behalf of the undersigned with respect to this grant.

(3) The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was made when this contract was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

Radio Free Asia

_1/15/2025_
Date

Bay Fang
President

**JA410**

## ATTACHMENT G

### Certification Regarding Drug Free Workplace Requirements
### Drug-Free Workplace Act of 1988

The Non-Federal Entity certifies that it will provide a drug-free workplace by (a) publishing a statement notifying employees that the unlawful manufacture, distribution dispensation, possession or use of a controlled substance is prohibited in the Non-Federal Entity's workplace and specifying that action that will be taken against employees for violation of such prohibitions; (b) establishing a drug-free awareness program to inform employees about (1) the dangers of drug abuse in the workplace, (2) the Non-Federal Entity's policy of maintaining a drug-free workplace, (3) any available drug counseling, rehabilitation, and employee assistance programs, and (4) the penalties that may be imposed on employees for drug abuse violations (c) making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a), (d) notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will (1) abide by the terms of the statement and (2) notify the employer of any criminal drug statute conviction for a violation occurring in the workplace not later than five days after such conviction; (e) notifying the agency within ten days after receiving notice under subparagraph (d) (2) from an employee or otherwise receiving actual notice of such conviction; (f) taking one of the following actions with respect to any employee who is so convicted: (1) taking appropriate personnel action against such an employee, up to and including termination, or (2) requiring such an employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and (g) making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

Radio Free Asia

_____

Bay Fang
President

Date 1/15/2025

**JA411**

## ATTACHMENT H

### Certification Regarding Federal Debt Status
### (OMB Circular A-129)

The Non-Federal Entity certifies to the best of its knowledge and belief that it is not delinquent in the repayment of any federal debt.

Radio Free Asia

_____          _____1/15/2025_____
                                          Date

Bay Fang
President

**JA412**

**ATTACHMENT I**

Certification Regarding Debarment and Suspension

The Non-Federal Entity certifies to the best of its knowledge and belief that it and its principals: (a) are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excided from covered transactions by any Federal department or agency; (b) have not, within a three year period preceding this grant, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state or local) transaction or contract under a public transaction; violation of Federal or state anti-trust statutes; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property; (c) are not presently indicted or otherwise criminally or civilly charged by a governmental entity (Federal, state or local) with any of the offenses enumerated in paragraph (b) of this certification; and (d) have not within a three-year period preceding this grant had one or more public transactions (Federal, state or local) terminated for cause of default.

Radio Free Asia

_____

Bay Fang
President

01/15/2025
Date

**JA413**

## Radio Free Asia
### FY 2025 FINANCIAL PLAN
**October 1, 2024 Through March 31, 2025**

| Radio Free Asia and Global Mandarin | October NET | November NET | December NET | January NET | February NET | March 1-14 NET | March 15-31 NET | Total As of Q2 FY25 |
|---|---|---|---|---|---|---|---|---|
| **PERSONNEL COSTS** | | | | | | | | |
| Salaries | 2,899,675 | 2,921,501 | 2,921,501 | 3,034,394 | - | 1,335,874 | 1,622,109 | **14,735,054** |
| Benefits | 1,300,328 | 1,307,931 | 1,307,931 | 1,312,011 | - | 128,470 | 155,997 | **5,512,668** |
| **Total Salaries & Benefits** | **4,200,003** | **4,229,432** | **4,229,432** | **4,346,405** | **-** | **1,464,344** | **1,778,106** | **20,247,722** |
| **NON-PERSONNEL COSTS** | | | | | | | | **-** |
| Contract Services | 514,617 | 553,593 | 559,865 | 594,491 | 453,400 | 284,279 | 345,194 | **3,305,439** |
| Travel & Allowances | 84,422 | 85,000 | 25,356 | 27,956 | 24,884 | 11,240 | 13,647 | **272,505** |
| Office Space | 468,552 | 439,586 | 542,266 | 458,126 | 473,214 | 196,391 | 238,474 | **2,816,609** |
| General & Administrative Expenses | 562,588 | 525,591 | 525,591 | 358,986 | 831,400 | 135,210 | 164,183 | **3,103,549** |
| Technical & Capital Expenses | - | - | - | - | - | - | - | **-** |
| **Total General Operating Expenses** | **1,630,179** | **1,603,770** | **1,653,078** | **1,439,559** | **1,782,898** | **627,120** | **761,498** | **9,498,102** |
| **TOTAL RADIO FREE ASIA and GLOBAL MANDARIN** | **5,830,182** | **5,833,202** | **5,882,510** | **5,785,964** | **1,782,898** | **2,091,464** | **2,539,604** | **29,745,824** |

USAGM APPROVAL STATEMENT: USAGM Financial Plan Approval applies to RFA's Operations for December 01, 2024 through February 28, 2025 in the amount of $13,451,372. Approval of the amounts reflected on this financial plan are not to be misconstrued as a pro-rated amount of an annual budget for FY 2025. FY 2025 annual budgets will be distributed when a full-year appropriation is enacted and the FY 2025 USAGM Program Plan is finalized. Initiation of new programs (aka "New Starts") is prohibited under the Continuing Resolution (CR). Please spend prudently during the CR period.



**U.S. AGENCY FOR GLOBAL MEDIA** | UNITED STATES BROADCASTING BOARD OF GOVERNORS

FINANCIAL PLAN APPROVAL

Amanda Bennett
Digitally signed by Amanda Bennett
Date: 2025.01.16 16:01:22 -05'00'

Amanda Bennett | Chief Executive Officer          Date

**JA414**

| RFA Operations | October NET | November NET | December NET | January NET | February NET | March 1-14 NET | March 15-31 NET | Total As of Q2 FY25 |
|---|---|---|---|---|---|---|---|---|
| **PERSONNEL COSTS** | | | | | | | | **-** |
| Salaries | 2,786,390 | 2,808,216 | 2,808,216 | 2,916,702 | - | 1,282,721 | 1,557,568 | **14,159,813** |
| Benefits | 1,256,138 | 1,263,741 | 1,263,741 | 1,266,376 | - | 107,859 | 130,971 | **5,288,826** |
| **Total Salaries & Benefits** | **4,042,528** | **4,071,957** | **4,071,957** | **4,183,078** | **-** | **1,390,580** | **1,688,539** | **19,448,639** |
| **NON-PERSONNEL COSTS** | | | | | | | | **-** |
| Contract Services | 475,855 | 514,831 | 521,103 | 537,902 | 396,811 | 258,721 | 314,161 | **3,019,384** |
| Travel & Allowances | 80,573 | 81,151 | 21,507 | 24,107 | 24,107 | 10,888 | 13,220 | **255,553** |
| Office Space | 459,531 | 430,565 | 533,245 | 449,105 | 464,193 | 192,317 | 233,527 | **2,762,483** |
| General & Administrative Expenses | 552,089 | 515,092 | 515,092 | 348,487 | 820,901 | 130,468 | 158,424 | **3,040,553** |
| Technical & Capital Expenses | - | - | - | - | - | - | - | |
| **Total General Operating Expenses** | **1,568,048** | **1,541,639** | **1,590,947** | **1,359,601** | **1,706,012** | **592,394** | **719,332** | **9,077,973** |
| **TOTAL RFA OPERATIONS** | **5,610,576** | **5,613,596** | **5,662,904** | **5,542,679** | **1,706,012** | **1,982,974** | **2,407,871** | **28,526,612** |

USAGM APPROVAL STATEMENT: USAGM Financial Plan Approval applies to RFA's Operations for December 01, 2024 through February 28, 2025 in the amount of $13,451,372. Approval of the amounts reflected on this financial plan are not to be misconstrued as a pro-rated amount of an annual budget for FY 2025. FY 2025 annual budgets will be distributed when a full-year appropriation is enacted and the FY 2025 USAGM Program Plan is finalized. Initiation of new programs (aka "New Starts") is prohibited under the Continuing Resolution (CR). Please spend prudently during the CR period.



U.S. AGENCY FOR GLOBAL MEDIA | UNITED STATES BROADCASTING BOARD OF GOVERNORS

FINANCIAL PLAN APPROVAL

Amanda Bennett
Digitally signed by Amanda Bennett
Date: 2025.01.16 16:01:47 -05'00'

Amanda Bennett | Chief Executive Officer          Date

**JA415**

| Global Mandarin | October NET | November NET | December NET | January NET | February NET | March 1-14 NET | March 15-31 NET | Total As of Q2 FY25 |
|---|---|---|---|---|---|---|---|---|
| **PERSONNEL COSTS** | | | | | | | | **-** |
| Salaries | 113,285 | 113,285 | 113,285 | 117,692 | - | 53,153 | 64,541 | **575,241** |
| Benefits | 44,190 | 44,190 | 44,190 | 45,635 | - | 20,611 | 25,026 | **223,842** |
| **Total Salaries & Benefits** | 157,475 | 157,475 | 157,475 | 163,327 | - | 73,764 | 89,567 | **799,083** |
| **NON-PERSONNEL COSTS** | | | | | | | | **-** |
| Contract Services | 38,762 | 38,762 | 38,762 | 56,589 | 56,589 | 25,558 | 31,033 | **286,055** |
| Travel & Allowances | 3,849 | 3,849 | 3,849 | 3,849 | 777 | 352 | 427 | **16,952** |
| Office Space | 9,021 | 9,021 | 9,021 | 9,021 | 9,021 | 4,074 | 4,947 | **54,126** |
| General & Administrative Expenses | 10,499 | 10,499 | 10,499 | 10,499 | 10,499 | 4,742 | 5,759 | **62,996** |
| Technical & Capital Expenses | - | - | - | - | - | - | - | |
| **Total General Operating Expenses** | 62,131 | 62,131 | 62,131 | 79,958 | 76,886 | 34,726 | 42,166 | **420,129** |
| **TOTAL GLOBAL MANDARIN** | 219,606 | 219,606 | 219,606 | 243,285 | 76,886 | 108,490 | 131,733 | **1,219,212** |

USAGM APPROVAL STATEMENT: USAGM Financial Plan Approval applies to RFA's Operations for December 01, 2024 through February 28, 2025 in the amount of $13,451,372. Approval of the amounts reflected on this financial plan are not to be misconstrued as a pro-rated amount of an annual budget for FY 2025. FY 2025 annual budgets will be distributed when a full-year appropriation is enacted and the FY 2025 USAGM Program Plan is finalized. Initiation of new programs (aka "New Starts") is prohibited under the Continuing Resolution (CR). Please spend prudently during the CR period.



U.S. AGENCY FOR GLOBAL MEDIA | UNITED STATES BROADCASTING BOARD OF GOVERNORS

FINANCIAL PLAN APPROVAL

Amanda Bennett
Digitally signed by Amanda Bennett
Date: 2025.01.16 16:02:04 -05'00'

Amanda Bennett | Chief Executive Officer                     Date

**JA416**

# Appendix C

# GRANT AGREEMENT
## BETWEEN THE
## U.S. AGENCY FOR GLOBAL MEDIA AND
## MIDDLE EAST BROADCASTING NETWORKS, INC.

### FAIN: MN01-25-GO-00001

**GRANT FUNDS TABLE**

|  | **FY 2025 PROGRAM PLAN** | **Previous Award Total** | **Current Award** | **New Award Total** | **Currency gain/(loss) (Informational)[1]** |
|---|---|---|---|---|---|
| **FUNDING** | Continuing Resolution | $38,847,331 | $7,465,569 | $46,312,900 | $23,703.63 |

Preamble

This Grant Agreement ("Agreement") is between the **U.S. AGENCY FOR GLOBAL MEDIA** (hereinafter "USAGM" or the "Agency") and **MIDDLE EAST BROADCASTING NETWORKS, INC.** (hereinafter "MBN," the "Recipient," or "Recipient"), a nonprofit organization incorporated in the District of Columbia. USAGM enters into this Agreement under the authority provided by the U.S. International Broadcasting Act of 1994, as amended, 22 U.S.C. §§ 6201 et seq. (the "International Broadcasting Act") and other authorization or appropriation acts that provide authority for such activities. The Catalog of Federal Domestic Assistance (**CFDA**) **Number** for USAGM is **90.500**. The **Unique Entity ID (UEI#)** for the Recipient is **KXNLLV3U8Z64. The Federal Award Identification Number (FAIN) for this Award for Financial Assistance is MN01-25-GO-00001.**

WHEREAS, USAGM is the United States Government agency responsible for non-military U.S. Government-funded international broadcasting pursuant to the authorities set forth in the International Broadcasting Act;

WHEREAS, among the purposes of the activities supported by the International Broadcasting Act is to "promote the right of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights," 22 U.S.C. § 6201(1);

WHEREAS, USAGM's mission is "to inform, engage, and connect people around the world in support of freedom and democracy;"

WHEREAS, in furtherance of this mission and as authorized by the International Broadcasting Act, USAGM makes and supervises a grant to the Recipient for broadcasting and related activities in order to provide news and information of the highest journalistic standard to countries that have

---

[1] Reported on the MBN Exchange Rate Report - December 31, 2024.

limited or no access to free press and media, and, in furtherance thereof, USAGM has decided to make a grant for these purposes pursuant to the terms and conditions stated herein; and

WHEREAS, USAGM believes that it would be in the interests of United States international broadcasting and the USAGM mission to take advantage of the operational independence and flexibilities of its private nonprofit Non-Federal Entities, as consistent with the requirements of the International Broadcasting Act and other federal laws and regulations that are applicable to Non-Federal Entities, including the statutory requirement that duplication of language services and technical operations between the Recipient and USAGM or USAGM-funded broadcasting entities be reduced to the extent appropriate, as determined by USAGM.

NOW, THEREFORE, USAGM agrees to make, and the Recipient agrees to accept, the grant of funds in accordance with the following provisions:

Article I – THE GRANT

a. Amount of Grant. The USAGM hereby grants an amount of $46,312,900 to the Recipient for operations during FY 2025, as made available pursuant to the Continuing Appropriations Act, 2025, Division A of P.L. 118-83 (September 26, 2024)[2] and P.L. 118-158 (December 21, 2024)[2] . The USAGM hereby grants to MBN funds for the planning and operating expenses relating to international broadcasting in order to carry out the purposes set forth in the laws referenced in the preamble to this Agreement, expressly P.L. 103-236[3] TITLE III—UNITED STATES INTERNATIONAL BROADCASTING ACT[4], as amended, for the grant period October 1, 2024, through September 30, 2025, unless the source of funding otherwise dictates. The funding amount will be based upon Continuing Resolution rates until the enactment of the Fiscal Year (FY) 2025 USAGM appropriation, or any future Continuing Resolution, at which point the grant shall be amended to comply with such Congressional action and/or the final FY 2025 appropriation. This funding will support planning and operational costs detailed in MBN's FY 2025 approved financial plan.

b. Use of the Grant Funds. The Recipient may use the Grant Funds solely for planning and operating expenses related to international broadcasting and administration thereof. The Grant Funds are provided solely for the purposes and in the amounts approved by USAGM and as set forth in the Approved Financial Plan (as such term is defined in Article VII hereof and subject to the review procedures and adjustments described therein).

c. Funds provided under a partial-year Continuing Resolution (CR) are subject to the terms

---

[2] Continuing Appropriations Act, 2025, Division A of P.L. 118-83 (138 Stat. 1524) (September 26, 2024) may also be cited as the ''FY2025 Continuing Appropriations and Extensions Act'' (through 12/20/2024) - H.R. 9747.

[2] Continuing Appropriations Act, 2025, Division A of P.L. 118-158 (December 21, 2024) may also be cited as the "FY2025 Continuing Appropriations and Extensions Act section within the American Relief Act, 2025" (through 03/14/2025) – H.R. 10545

[3] TITLE III—UNITED STATES INTERNATIONAL BROADCASTING ACT, SEC. 301, may also be cited as the "United States International Broadcasting Act of 1994."

[4] TITLE III—UNITED STATES INTERNATIONAL BROADCASTING ACT, SEC. 301, may also be cited as the "United States International Broadcasting Act of 1994."

and conditions set forth in Article VII (b)(5) and those otherwise required under a partial-year CR.

## Article II – USAGM OVERSIGHT AND ITS LIMITATIONS

a.    As provided in the International Broadcasting Act of 1994, as amended, including 22 U.S.C. § 6209(c), the Recipient is a private, nonprofit corporation, and nothing in this Agreement may be construed to make the Recipient a Federal agency or instrumentality.

b.    USAGM's oversight and supervision of the Grant Funds are subject to limitations in applicable law.

c.    USAGM acknowledges and affirms the safeguards contained in the United States International Broadcasting Act meant to preserve the journalistic independence and integrity of USAGM programming. Accordingly, USAGM and MBN agree that (i) MBN shall produce "news which is consistently reliable and authoritative, accurate, objective, and comprehensive" (Section 6202(b)(1) of the International Broadcasting Act); (ii) MBN shall enjoy full editorial independence in order to maintain its "professional independence and integrity" (Section 6204(b) of the International Broadcasting Act); and (iii) MBN's editorial decisions shall be insulated from interference from those outside of the network. To that end, no U.S. Government official—including the USAGM CEO, the Secretary of State, and the Inspector General—may attempt to influence the content or editorial choices of the Recipient in a manner that is not consistent with the highest standards of professional broadcast journalism or take any other action that may tend to undermine the journalistic credibility or independence of USAGM or the MIDDLE EAST BROADCASTING NETWORKS, INC..

## Article III – PROGRAMMING PRODUCED WITH GRANT FUNDS

a.    The Recipient shall use the Grant Funds to provide objective, editorially independent news and information programming that is consistent with the relevant principles and standards set forth in the International Broadcasting Act and the strategy for US International Broadcasting as determined and implemented by the USAGM. Nothing herein shall be interpreted to cause the Recipient to violate the highest standards of professional journalism.

b.    The Recipient shall produce news and information programming in the language(s) described in the Approved Program Plan and associated Approved Financial Plan, as defined in Article VII hereof. Upon USAGM's request, the Recipient shall provide USAGM a detailed written schedule of the programs produced with the Grant Funds, including the languages and media in which such programs were produced.

## Article IV – DISTRIBUTION OF PROGRAMMING PRODUCED WITH GRANT FUNDS

a.    Subject to the limitations of Article IV(c), the Recipient acknowledges and agrees that USAGM is authorized to provide for distribution of the programming that is paid for with

the Grant Funds over the global network of broadcasting and transmission facilities owned and/or operated by USAGM or, as the case may be, through affiliated networks arranged by USAGM ("USAGM Global Distribution Network"). Subject to the limitations of Article IV(c), the Recipient shall provide the programming that it produces with the Grant Funds to USAGM for distribution over the USAGM Global Distribution Network.

b.      The Recipient may not use Grant Funds for the purpose of concluding affiliate or other distribution agreements, except as approved in writing by USAGM or otherwise authorized under this agreement. Unpaid affiliate agreements must be consistent with the USAGM's strategy for US International Broadcasting, as described in Article III(a).

c.      The Recipient grants to USAGM a worldwide, non-exclusive, royalty-free and perpetual license to broadcast, use, distribute and create derivative works from those of the Recipient's original programs that contain no materials provided by or licensed from any third parties. The Recipient grants USAGM a worldwide, non-exclusive, royalty-free license to broadcast and otherwise use those of the Recipient's programs that are legally available for such licensing and use.

When obtaining materials from third parties for inclusion in its original programming, the Recipient agrees to use reasonable best efforts to secure sufficient rights to permit the Recipient to license to USAGM (on a non-exclusive, worldwide and royalty-free basis) the right to broadcast the resulting original programming; provided, however, that the Recipient shall not be required to do so where the acquisition of such rights would materially and detrimentally affect the Recipient's ability to secure its own license from said third parties. The Recipient shall provide, without charge, information concerning, and DVD or other electronic copies of, any of its programs to USAGM upon USAGM's request.

d.      The Recipient hereby grants to USAGM, and USAGM hereby accepts, an irrevocable, royalty-free, fully paid-up, non-exclusive, sublicense-able, perpetual license during the Grant Term to use the Recipient's registered and unregistered trademarks. USAGM's use of the Recipient's trademarks shall be limited to use in conjunction with broadcasting or otherwise disseminating the Recipient's materials to USAGM's audiences for the purpose of furthering the USAGM mission.

e.      The Recipient may sell content produced under this Grant Agreement; however, nothing herein shall authorize the Recipient to charge the United States Government, or any of its instrumentalities, for access to its content, nor shall anything herein authorize any violations of any applicable statutory limitations on domestic dissemination. At the request of the Chief Executive Officer of USAGM (the "CEO"), the Recipient shall provide the CEO sufficient information to make any determinations required by USAGM or otherwise required by the CEO's oversight responsibilities, including to assess revenue earned, as well as the purposes for which such revenue is used.

Article V – COOPERATION WITH USAGM GOVERNANCE OF UNITED STATES INTERNATIONAL BROADCASING

As a condition of its receipt and use of the Grant Funds provided hereunder, the Recipient shall cooperate with USAGM's governance of U.S. International Broadcasting under the International Broadcasting Act as follows:

a.     The Recipient's articles of incorporation, by-laws, or other constitutional documents shall provide that the corporate leadership and Board of Directors of the Recipient be selected in accordance with the International Broadcasting Act and other relevant provisions of law.

b.     The Recipient shall cooperate in the processes and protocols of USAGM as follows:

   1.   The Recipient shall report such information to USAGM as may be reasonably requested by USAGM in the format and within the timeframe so requested to the extent permitted by applicable law.  Consistent with USAGM's desire to foster transparency, USAGM's request will include information regarding the purpose of the request.

   2.   In order to facilitate coordinated communications among the elements of US international broadcasting, the Recipient will endeavor to inform the USAGM Office of Congressional Affairs in advance of communications or meetings with the State Department, House and Senate staff and Members.

   Nothing in the paragraph above shall prevent the Recipient (i) from responding to specific requests for information, documents or materials from Congress, (ii) from engaging in routine communications with Congress, or (iii) from engaging in communications in the regular pursuit of newsgathering activities.  The Recipient shall inform USAGM in timely manner about such requests for information and the responses to those requests.  The Recipient acknowledges that federal rules and regulations including 31 U.S.C. § 1352 and 2 CFR 200.450 prohibits Non-Federal Entities from using appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any U.S. Government agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making, extension, continuation, renewal, amendment, or modification of any Federal grant..

   3.   The Recipient shall not disclose any information expressly designated in writing as confidential by USAGM to any third party not authorized by USAGM to receive it. The Recipient further agrees to take all steps reasonably necessary to protect the confidentiality of the confidential information and to prevent the confidential information from falling into the public domain or into the possession of unauthorized persons.  The Recipient shall have no obligation of confidentiality with respect to information that (A) was known to the Recipient prior to receiving any of the confidential information from USAGM, (B) has become publicly known through no wrongful act of the Recipient, or (C) was received by the Recipient from a third party without restriction as to the use and disclosure of the information.

   4.   The Recipient shall participate in activities of the U.S. International Media

Coordinating Committee (ICC) in accordance with the International Broadcasting Act.

5. Nothing in this agreement shall require the Recipient to take actions which impair appropriate Congressional oversight; or the operations of the USAGM Inspector General.

## Article VI – MUTUAL ASSISTANCE TO PROMOTE UNITED STATES INTERNATIONAL BROADCASTING

a.   In the spirit of cooperation among USAGM-sponsored entities and in order to promote the efficient use of Grant Funds and Agency resources, USAGM and the Recipient will use their reasonable best efforts to render assistance to each other to promote the interests of US international broadcasting and the implementation of USAGM's strategy.

b.   The Recipient shall make reasonable efforts to provide or facilitate provision of administrative or other services or resources to USAGM or other USAGM-sponsored broadcasting entities in order to promote implementation of USAGM's strategy.  Grant Funds shall be available for services to the USAGM or other USAGM-sponsored entities where cost effective and consistent with the USAGM strategic plan as determined by USAGM. Consistent with its desire to foster transparency, USAGM's request for assistance will include information regarding the purpose of the request for such assistance. USAGM shall not be required to reimburse the Recipient for Grant Funds used to provide such assistance, but may reimburse the Recipient for costs that are more than de minimis. USAGM will endeavor to make such requests in a manner that does not interfere with the Recipient's ability to discharge its responsibilities under this Agreement and, where necessary to achieve the request, to provide resources to assist the Recipient in fulfilling such requests.  The Recipient shall notify USAGM of any expenditures it makes on provision of services to USAGM and other USAGM-sponsored entities.

c.   All assistance contemplated under this Article V shall be rendered in a manner consistent with applicable law and regulations.

## Article VII – ADMINISTRATION OF THE GRANT

a.   Development and Review of the Approved/Program Plan

Definition. As used in this Agreement, the term "**Approved Program Plan**" (also known as the "Program Plan" or "Operating Plan" or "Spend Plan") shall consist of (i) a comparison between the congressional budget justification (CBJ) funding levels, (ii) the most recent congressional directives or approved funding levels, and (iii) the funding levels proposed by USAGM, along with a clear, concise, and informative description/justification submitted to the Appropriations Committee.

1. Required Program Plan.  The Agency's Program Plan is required to be submitted to Congress no later than 45 days after the date of enactment of the annual appropriations act, which provides details on the uses of funds at the program, project, and activity

(PPA) levels (and typically found in the associated joint explanatory statement accompanying the bill). To achieve this deadline, subject to guidance from the agency, the Recipient shall submit the information described in paragraphs one (1) through three (3) of this subsection.

2. Program Plan Detail. The Recipient's submission will be dictated by the Data Call Guidance provided by USAGM. The submission will include updated Entity Budget Tables by division and applicable language service, updated broadcast hours, transfers between entities/PPAs, Full Time Equivalent (FTE) Employees, and narratives for proposed investments and/or reductions.

3. Approval. If the Program Plan includes changes in the level of funding for any PPA or other notification and reprogramming requirements, these changes shall be included in the Program Plan. Once incorporated the Program Plan is submitted to the appropriate committees of Congress. Following the submission of the Program Plan to Congress, full-year funding is distributed to the Recipient contingent upon receipt and approval by USAGM of a more detailed financial plan (defined more fully in Article VII(b)(1) through (5)). The Recipient financial plan shall reconcile to the funding levels included in the Approved Program Plan.

b.    Development and Review of the Approved Financial Plan

Definition. As used in this Agreement, the term "**Approved Financial Plan**" shall mean (i) the financial plan for use of Grant Funds that is approved by USAGM in accordance with the procedures set forth in this Article VII; (ii) any modification to such plan that is approved by USAGM during the term of this Agreement; and (iii) any proposal or modification of such proposal during a Continuing Resolution as referenced in Article VII (b)(5) below.

1. Financial Plan Required. Unless otherwise determined by USAGM, prior to entering into this Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available), the Recipient shall submit to USAGM a proposed detailed financial plan consistent with the strategy, purposes, and language services approved by USAGM, and covering the full amount of the Grant.

2. Financial Plan Detail. The Recipient's proposed financial plan shall delineate the Recipient's anticipated monthly expenditures for each budget line item, broken down by Domestic and Overseas. Budget line items will be defined by the USAGM.

3. Approval of the Proposed Financial Plan. USAGM shall transmit any disapproval of the proposed financial plan prior to the execution of the Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available). The Approved Financial Plan shall be provided to the Recipient with the executed version of the Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available).

4. Relationship of the Approved Financial Plan to the Approved Program Plan. The Approved Financial Plan serves as the funding drawdown schedule; it should be the Recipient's estimate of monthly and/or period operating costs. The Approved Financial Plan should directly correlate to the Approved Program Plan, subject to USAGM approved changes in plans or directions that occur over the course of the year following the Approved Program Plan.

5. Financial Plan during a Partial-Year Continuing Resolution (CR). If appropriations for the full-year amount of the Grant Funds are not available to USAGM at the time USAGM and the Recipient enters into this Agreement, the Recipient shall provide, with each request for funding, an explanation of funding requirements for the period covered by the funding request and two subsequent months. Unless otherwise determined by law or approved by USAGM, such requirements shall include only the minimum amounts of Grant Funds reasonably necessary to sustain current operations under the partial-year Continuing Resolution.

Financial Plans during a CR shall correlate to the last Approved Program Plan or Enacted Level from the Prior Year, subject to guidance from the Agency. No later than 30 days after enactment of an appropriation covering the fiscal year, the Recipient shall submit a proposed detailed Financial Plan for approval in accordance with paragraphs one (1) through five (5) of this subsection. The Recipient shall operate at a rate of obligation under its CR financial plan until USAGM approval of the financial plan in accordance with this paragraph.

c. USAGM will provide Grant Funds to the Recipient by the U.S. Treasury electronic funds transfers through the Automated Clearing House System. USAGM will make disbursements in monthly increments or on such other basis as may be consistent with the Approved Financial Plan.

d. Reporting and Review of Use of Grant Funds

Program monitoring of Grant Funds is required to determine that adequate progress is being made towards USAGM's objectives; that expenditures are in line with relevant statutes, regulations, and agency administrative requirements; and that federal funds are used responsibly. One component of grant monitoring includes the submission and review of reports.

The following chart details the summary of the Recipient report submissions, due dates, and submission methods:

### SUMMARY OF RECIPIENT REPORT SUBMISSIONS

|   | Report Title and Form | Frequency/Due Date | Submission Method |
|---|---|---|---|
| 1. | FFR using Form SF-425 | Monthly: 30 days after the end of the prior month. | grantreports@usagm.gov |

| | | | |
|---|---|---|---|
| | | | |
| **2.** | **SOD using Template** | Monthly: 30 days after the end of the prior month.<br>Annual: 30 days after POP end date | grantreports@usagm.gov |
| **3.** | **Exchange Rate Report** | Monthly: 30 days after the end of the prior month. | grantreports@usagm.gov |
| **4.** | **Year-End Advance: Preliminary Trial Balance** | **Grant Validation:**<br>July 31, 2025<br>   1. Audited 2024 Trial Balance<br>   2. Leave activities – including leave payout<br>August 30, 2025<br>   1. USAGM will send an email for explanation on items that has unusual fluctuation. The grantee must provide explanations with 7 business days.<br>**Grant advance:**<br>October 7, 2025<br>   1. Final August 2025 trial balance<br>   2. September 2025 preliminary trial balance<br>   3. Additional estimates (estimated payroll, travel, commitment estimates and other misc. costs)<br>   4. Preliminary SF-425s<br>   5. Carry over requests<br>   6. Bank statements as of 9/30<br>October 15, 2025<br>   1. Updated September 2025 preliminary trial balance<br>Estimate of "related party" financial transactions with USAGM and the basis for | cfointernalcontrolsteam@usagm.gov |

| | | determining the amounts (for the SFFAS 47 disclosure).   USAGM will provide the prior year disclosure prior to this date for revisions/confirmations. | |
|---|---|---|---|
| 5. | **Status of Vacancy and Staffing Report** | Vacancy: 30th day after the end of each quarter Staffing: 30 days after the end of the fiscal year | grantreports@usagm.gov |
| 6. | **Unfunded Liability Template** | Beginning of the fiscal year with updates reported on the monthly financial reports | grantreports@usagm.gov |
| 7. | **Report on Equipment and Equipment Disposition** | 7 days before disposal of equipment; Annual Summary: 90 days after POP end date | grantreports@usagm.gov or Storage Media |
| 8. | **Other Reviews & Reports** | As Requested | Per Guidance |

Reporting Requirements.  The Recipient shall provide to USAGM the following monthly and annual reports within thirty (30) calendar days of their respective coverage periods, unless otherwise indicated above or approved by USAGM.

1. Federal Financial Report (FFR) (SF-425) – Per 2 CFR 200.328, financial reporting is required by all recipients of federal funding.  The Office of Management and Budget (OMB) specifies that grant recipients use this form for financial reporting to track the status of financial data tied to a particular Federal grant award. A separate SF-425 shall be submitted per Grant Agreement for each fiscal year; USAGM may require a separate SF-425 for special or earmarked funding. Each SF-425 Report will include the Federal Award Identification Number (the FAIN) and the fiscal year (FY) of the funding.  This report will be submitted until all funding for the specific grant is fully obligated and expended.

2. Statement of Obligations and Disbursements (SOD) Report - for each month, a statement obligations and cash disbursements in U.S. dollars with the level of detail described in Article VII(a)(2), together with such additional information as USAGM may request from time to time.  As requested by USAGM, the Recipient shall justify in detail its use of Grant Funds against items defined in the Approved Financial Plan.

3. Exchange Rate Report – USAGM requires that the Recipient report monthly on foreign currency exchange rate gains and/or losses providing source documentation per 2 CFR 200.440.

4. Year-End Advance - 2025 Year-End Trial Balance (TB) and Cash Balance report due by – Schedule of Deliverables provided in "SUMMARY OF RECIPIENT REPORT SUBMISSIONS" Table above, bullet 3, for Year-End (YE) Reporting, USAGM in

order to prepare the fiscal year-end accruals requires the Recipient to provide the trial balance for the year ending September 30, 2025. USAGM understands that the TB will not be final. USAGM may also require the Recipient to provide estimated payroll, travel, and other miscellaneous Costs, including commitment numbers. In addition, USAGM will need an estimate of any "related party" financial transactions with USAGM and the basis for determining the amounts. Questions for the Trial Balance report should be directed to e-mail: cfointernalcontrolsteam@usagm.gov.

5.  Status of Vacancy and Staffing Reports.

    a.  Organizational Chart. The Recipient shall submit an organizational chart based on the above table's listed requirements. Should the Recipient be reorganized at any point during the fiscal year, Recipient will provide USAGM with an updated organizational chart.

    b.  Report on Vacancies. Not later than 30 days after the end of each quarter of the fiscal year, the Recipient shall submit a report to USAGM listing personnel vacancies as of the end of the quarter. This report should be organized by Division (i.e. Office or Language Service as they appear in associated budget documents such as the Congressional Budget Justification and/or Program Plan). The report shall include the Position Title; a Unique Vacancy Identifier (i.e. a position number or alpha numeric combination that remains with the vacancy); Grade Level, Annual Salary; Date Vacant and Expected Hire Date. The provision of such report to USAGM is solely to facilitate USAGM's budget planning and reporting to Congress and does not imply that the Recipient is required to seek USAGM approval to fill personnel vacancies.

    c.  Report on Staffing. Not later than 30 days after the end of each fiscal year, the Recipient shall submit a report to USAGM listing positions including its domestic, foreign national (full and part-time staff), and contractor positions (full- and part-time staff) filled as of the end of the fiscal year.

6.  Unfunded Liabilities from Previous Year(s). Unfunded liabilities are debt obligations that do not have sufficient funds set aside to pay the debt. There may be certain liabilities of the Recipient where the future payment obligations exceed the amount of funds available at a specific time. Examples of unfunded liabilities may include employee annual leave balances and pension and health benefits for retirees. The Recipient should provide a list of these liabilities to USAGM at the beginning and end of the fiscal year.

7.  Report on Equipment and Equipment Disposition. In accordance with 2 CFR Part 200, the Recipient shall submit annually to USAGM an inventory of all equipment and no later than 90 days after the POP ends. Requests for disposition instructions concerning property purchased with Grant Funds with an estimated fair market value (at the time of such disposition) of U.S. $10,000 or more must be submitted to USAGM 7 days in

advance of the proposed disposition. If USAGM has not notified the Recipient that the disposition is disapproved, the disposition will be deemed approved.

8. Other Reports and Reviews. The Recipient shall prepare and submit to USAGM such other reviews and reports on expenditures and obligations as USAGM may request on a schedule to be provided periodically by USAGM. Consistent with its desire to foster transparency, USAGM's requests will include information regarding the purpose of the request for such other reviews and reports.

e.    Site Visits. The USAGM will conduct site visits consistent with the purposes of appropriate grantee oversight consistent with 2 CFR 200.329 to each Recipient headquarters site (domestic/overseas) and to a select bureau(s) of the Recipient each fiscal year, depending on funding, and unless there are findings that merit additional follow-up (e.g., audit findings). The timing of the visits will be coordinated with the appropriate Recipient personnel. The USAGM will prepare a checklist of items to review and discuss with the Recipient. USAGM will not conduct inquiries into grantee operations that could be deemed to violate statutory protections regarding the independence of the network's editorial decision-making and journalism. After the visit, USAGM will prepare a draft report that will identify any observations or areas of improvement and will provide the Recipient an opportunity to respond and comment on it within a reasonable time prior to USAGM's finalizing the report

f.    Comparability Studies. USAGM may perform compensation comparability studies annually. These studies will be used to evaluate the Recipient's salary and other compensation rates in relation to the salary and compensation under Title 5 of the United States Code or the foreign relations laws of the United States for comparable locations [overseas]. The Recipient will coordinate with a USAGM designated contractor, if necessary, to complete these studies and produce a report.

Comparability studies will assess the compensation comparability among federal and Recipient organizations to include salary, benefits, and other forms of compensation for employees based inside and outside of the United States. The Recipient agrees to the following:

1. Provide USAGM or any Designated Contractor with the following compensation components:
   a. Base Salary/Wages
   b. Additional compensation components (overtime and night differentials)
   c. Bonuses and Awards
   d. Benefits Prevalence to include retirement, health insurance premiums, life insurance, social security and Medicare, short-and long-term disability, commuter benefits, fitness/gym allowances/memberships, parking, perquisites, etc.
   e. Paid time-off practices (vacation, illness, holidays, etc.)
   f. Expatriate practices for those positions identified as eligible for overseas/expatriate benefits.

2. Comply with USAGM directives applicable to USAGM-funded salary and benefits costs both domestically and globally which are necessary for USAGM to properly exercise its oversight and supervision or other authority under the International Broadcasting Act, or any other provision of law.

3. Follow USAGM or any Designated Contractor instructions applicable to collecting organizational and job position data in different ways – including through interviews and existing job documentation - in order to evaluate the relative scope, complexity, responsibilities and contribution of roles and positions

Recipient shall comply with data requests from USAGM or any Designated Contractor, which may include the following additional data regarding pay and benefit practices:
   a. Individual employee data from various human resources systems will be collected and analyzed and may include length of service, location of work and other data points that would be useful for analyzing the data.
   b. Current policies across the organization will also be analyzed and summarized.
   c. Additional compensation components may be collected as determined by the USAGM or any Designated Contractor.

g. The Recipient shall maintain at its principal offices full and complete records and books of account, in accordance with generally accepted accounting principles, covering the financial details applicable to the Grant. The Recipient shall maintain separate accountability for funds provided under this Agreement. The Recipient shall expend these funds only on the operating costs authorized by this Agreement and in compliance with 2 CFR Part 200, Subpart E (Cost Principles) unless it receives prior written approval of USAGM to do otherwise.

h. In accordance with 2 CFR 200.308, the Recipient is required to report deviations from the Approved Financial Plan to USAGM. The Recipient shall make reasonable efforts to provide prior notice of anticipated deviations. The Recipient may not transfer Grant Funds among individual line items approved in the financial plan if the cumulative amount of such transfers exceeds, or is expected to exceed, 10 percent of the total budget in the Approved Financial Plan unless otherwise approved by USAGM.

i. Unless otherwise approved by USAGM, the Recipient shall provide five (5) days advance notification to the grantreports@usagm.gov of any new contracts exceeding U.S. $500,000 and any new leases exceeding U.S. $200,000. Notification should include and answer the following:

   a. Purpose of contract/lease;
   b. Was market research conducted for contract and/or lease;
   c. Was competition considered for the contract/lease;
   d. The POP of the contract/lease (total number of years, months, etc.);

JA430

    e.  The cost associated with the contract/lease (total costs along with annual cost for base year and option years, including, as appropriate, escalation costs).

j.  Return of Funds.

    1.  The Recipient shall return to USAGM at the conclusion of the fiscal year any portion of the Grant Funds that are not required for a legally binding transaction or designated by the Recipient for a purpose and in an amount consistent with the Approved Financial Plan, if instructed to do so by USAGM.

    2.  Any and all interest earned on Grant Funds provided to the Recipient pursuant to this Agreement shall be returned to U.S. Government on an annual basis in accordance with the requirements of 2 CFR 200.305.

    3.  Expenditures by the Recipient that are not consistent with the Approved Financial Plan or otherwise permitted by this Agreement shall be recovered by the Recipient and promptly refunded to USAGM.

k.  Grant Closeout.  Closeout is the process, as governed by 2 CFR 200.344, in which USAGM determines that a grant has been fully performed, the established POP has ended, and all administrative actions pertaining to the grant have been completed. Closeout is initiated by the Office of the Chief Financial Officer (OCFO)/Budget (B) sending notice to the Recipient 30 days before the POP of a grant ends, informing the Recipient that the grant will be closed out. If there are cases where the grant's POP has been completed and the Grant Agreement should be extended beyond the POP, the OCFO/B will notify the Recipient of this change and will coordinate all actions through the USAGM Office of General Counsel (OGC) and the Recipient.

    1. Any grant funds not obligated and disbursed by USAGM to the Recipient at the time the POP expires revert to USAGM unless otherwise agreed to in writing by USAGM.  The Recipient should not enter into an obligation without receiving the funding first from USAGM.

    2.  In accordance with 2 CFR 200.344, no later than 120 calendar days after the end date of the POP, the Recipient must submit all financial, performance, and other reports as required under this Agreement.  Within 120 calendar days after the end date of the POP, the Recipient shall liquidate all financial obligations incurred under this Agreement, unless the USAGM authorizes an extension in writing.

    3.  If the Recipient completes all closeout requirements, USAGM shall complete all actions for the closeout no later than one year after the POP end date unless otherwise directed by authorizing statutes.

    4.  If the Recipient does not submit all reports in accordance with 2 CFR 200.344 and this Agreement, USAGM shall proceed to close out with the information available within one year of the POP end date.

**JA431**

5. If the Recipient does not submit all reports in accordance with 2 CFR 200.344 within one year of the POP end date, USAGM may report the Recipient's material failure to comply with this Agreement with the OMB-designated integrity and performance system. USAGM may also pursue other enforcement actions per 2 CFR 200.339.

6. A grant is not fully performed if aspects of the approved Financial Plan continue to remain uncompleted, and USAGM agrees that the items are still to be validly completed.

I. Under 2 CFR §200.305, the Non-Federal shall deposit and maintain advance payments of Federal Funds in insured accounts whenever possible. 2 CFR §200.305 also provides that the Recipient must maintain such advance payments in interest-bearing accounts and consistent with 2 CFR 200.305(b)(12) returned annually. In addition, consistent with 31 CFR §202.6, the Recipient must ensure that a Financial Institution receiving public money pledge collateral security in the amount required by the Secretary of Treasury.

Article VIII – REGULATORY COMPLIANCE

a. The Parties acknowledge and agree that the Parties are subject to all Federal laws and regulations pertaining to Federal grants, including the following: 22 U.S.C. § 6201 et seq., 31 U.S.C. §§ 7502 and 1352, 41 U.S.C. § 702, 31 U.S.C. § 6301 et seq. (the Federal Grant and Cooperative Agreement Act) and implementing regulations, and 2 CFR Part 200.

b. Allowability of costs incurred under this Agreement will be determined in accordance with 2 CFR Part 200, pursuant to certain clarifications specified in Attachment B and subject to any exceptions granted by authorization or appropriation laws.

c. The Recipient shall comply with the covenants and other contracting provisions set forth in Attachment D.

d. The Recipient shall comply with grant limitations in the International Broadcasting Act and/or any appropriations statute that is applicable to the Recipient, including, without limitation, any set forth in Attachment D.

e. The Recipient shall deliver all required certifications identified in Attachment E upon execution of this Grant Agreement.

f. No Grant Funds may be used for the following purposes:

1. To pay any salary or other compensation or enter into any contract providing for the payment of salary or compensation, in excess of the rates established for comparable positions under Title 5 of the United States Code, or the foreign relations laws of the United States.

2. To pay first-class travel for any employee of the Recipient, or the relative of any employee.

g. The Recipient shall comply with all applicable U.S. laws and regulations, including, without limitation, the copyright and other intellectual property rights laws of the United States.

h. When engaging outside the United States in activities that require the use of Grant Funds, the Recipient shall exercise due diligence to ascertain the local laws and regulations applicable to the Non-Federal Entity's activities in the relevant country(ies) where such activities shall be undertaken. The Recipient shall promptly notify USAGM in writing in the event that the Recipient or any of its employees or contractors is undergoing prosecutorial actions such that those actions are likely to cause reputational damage to USAGM or the United States Government.

i. Consistent with 2 CFR 200.113, the Recipient shall disclose, in a timely manner, in writing to the Office of Inspector General (OIG) for the Department of State, with a copy to the USAGM CEO, all violations of Federal criminal law involving fraud, bribery, or illegal gratuities potentially affecting the Federal award. Sub-recipients must disclose, in a timely manner, in writing to the OIG and to the prime recipient (pass-through entity) all violations of Federal criminal law involving fraud, bribery, or illegal gratuities potentially affecting the Federal award. Failure to make required disclosures can result in any of the remedies described in 2 CFR 200.339. Disclosures must be sent to: U.S. Department of State Office of Inspector General, P.O. Box 9778, Arlington, VA 22219. Website: https://stateoig.gov/hotline  Phone: 1-800-409-9926 or 202-647-3320

j. The Recipient's agreement to execute work in accordance with 2 CFR 200 includes the specific requirement under 2 CFR 200.300(b) to comply with whistleblower rights and protections under 41 U.S.C. 4712. The Recipient is expected to inform all of its employees of whistleblower rights and protections in writing.


Article IX – FUNDRAISING

The Recipient may not engage in fundraising from other sources except in accordance with the principles of fundraising to be agreed by USAGM and the Recipient. The Recipient is prohibited from using any Federal funds to finance its fundraising efforts.

Article X – PERSONNEL SECURITY POLICY

a. Security Policies Generally. The Recipient shall adopt and implement such security policies as are required by federal law, regulation, or Executive Order.

b. Investigations. USAGM is subject to laws, regulations, and Executive Orders that establish policy for security vetting of Federal employees, contractors, and (in certain instances) grantees. Accordingly, employees or contractors of the Recipient may be

required to undergo investigations conducted by USAGM or other authorized U.S. Government agencies, if both of the following conditions apply:

(1) the Recipient employee or contractor requires access to Federal Government space (including any Federally-owned or leased building or its grounds), information (including classified information or other proprietary, non-public information), information technology systems (including any information technology system used or operated by an executive agency, by a contractor of an executive agency, or by another organization on behalf of an executive agency), staff (including any Federal employee or contractor), or other assets of the Federal Government;

AND

(2) the Recipient employee or contractor could, by the nature of their access or duties, adversely affect the integrity or efficiency of the Federal Government.

c.  <u>Determinations.</u> The Recipient has been delegated authority to determine which of its employee or contractor positions meet both conditions (1) and (2) in Article X.b, subject to guidance on making this determination provided by USAGM.

d.  <u>Position Designation for Positions Subject to Federal Investigation.</u> Any Recipient employee or contractor position that meets both conditions (1) and (2) in Article X.b as determined by the Recipient pursuant to Article X.c requires position designation using the Office of Personnel Management's Position Designation Tool. To the extent permitted by applicable law, the Recipient will provide USAGM a position description, statement of work, or equivalent document describing the duties of any positions that require position designation.

e.  <u>Investigative Standards for Positions Subject to Federal Investigation.</u> Recipient employees and contractors who meet both conditions (1) and (2) in Article X.b as determined by the Recipient pursuant to Article X.c, and who are U.S. Citizens or who have lived in the U.S. for at least three years, are subject to the same investigative standards, policies, and procedures as those that apply to U.S. civil service employees. Recipient employees and contractors who meet both conditions (1) and (2) in Article X.b, and who have not lived in the U.S. for at least three years, may be subject to alternative investigative standards, policies, and procedures, subject to approval by the Office of Personnel Management and the Office of the Director of National Intelligence.

f.  <u>Positions not Subject to Federal Background Investigation.</u> Recipient positions that do not meet both conditions (1) and (2) in Article X.b should still receive some pre-employment vetting as a matter of good management. For these positions, any pre-employment vetting is the responsibility of the Recipient, which should be conducted by security personnel or a security vendor of the Recipient's choice and in accordance with the Recipient's security policy.

g.    <u>Costs</u>. The Recipient is responsible for the cost of the Federal investigations described in Article X.b and any pre-employment vetting described in Article X.f.

h.    <u>Responsibility for Personal Data</u>. USAGM and the Recipient are individually and separately responsible for complying with applicable privacy and data-protection laws.

## Article XI – IT NETWORK SECURITY POLICY

Any material breach of the Recipient's IT network security policies, or any incident that materially affects the integrity or operations of the Recipient's IT network system, shall be reported to USAGM's Chief Information Officer within twenty-four (24) hours of detection.  These violations shall include, but are not limited to, the following:

a.    Unauthorized access to any of the social media or web site content management systems used by the Recipient that the Recipient becomes aware of.

b.    Disruption or denial of service for production or distribution systems.

c.    Unauthorized modification or removal of the Recipient's data that the Recipient becomes aware of.

d.    The Non-Federal Entity will comply with USAGM Statutory and OMB Regulatory Policy as it applies to grantees. The Recipient will coordinate its IT policy with USAGM IT policy to ensure a secure IT computing environment.

e.    All Recipient personnel with authority to enter into or to initiate or authorize or contracts for the acquisition or leasing of Information Technology products must complete USAGM-provided Capital Planning and Investment Control (CPIC) training, or another appropriate training identified by USAGM designed to ensure IT investments integrate strategic planning, budgeting, procurement, and management of IT in support of entity missions and business needs.

## Article XII – AUDITS AND INSPECTIONS

a.    All records required to be kept in order to comply with the terms and conditions of this Agreement, including financial records, supporting documentation, statistical records, bid solicitations, evidence of shipment for commodities, procurement and service contracts and all other Recipient records pertinent to a federal award, shall be maintained by the Recipient for a period of at least three (3) years from the date of the submission of the final expenditure report, in a manner that will permit verification of the Recipient's compliance with its representations, warranties, and obligations contained in this Agreement.  If any litigation, claim or audit is started before the expiration of the 3-year period, the records shall be retained until such litigation, claim or audit has been resolved. In compliance with 2 CFR 200.334(c), the retention period for real property and equipment records starts with the date of disposition. The retention period for program income records starts at the end of the Recipient's fiscal year in which the income is earned. 2 CFR 200.334(e).

b.    The Recipient acknowledges the audit requirements set forth in 2 CFR Part 200, Subpart F (Audit Requirements). The audit package and the data collection form shall be submitted to the Federal Audit Clearinghouse 30 days after receipt of the auditor's report(s), or 9 months after the end of the fiscal year (06.30.2025) – whichever comes first.

c.    Operations of the Recipient, as related to use of the Grant Funds, may be audited by the Government Accountability Office (GAO) in accordance with such principles and procedures and under such rules and regulations as may be prescribed by the Comptroller General of the United States.  Any such audit shall be conducted at the place or places where accounts of the Recipient are normally kept.

d.    Representatives of the GAO shall have access to all books, accounts, records, reports, files, papers, and property belonging to or in use by the Recipient, pertaining to such financial transactions and necessary to facilitate an audit.  Such representatives shall be afforded full facilities for verifying transactions with any assets held by depositories, fiscal agents, and custodians.  All such books, accounts, records, reports files, papers, and property of the Recipient, shall remain in the possession and custody of the Recipient.

The Recipient acknowledges that the Inspector General of the United States Department of State is authorized to exercise the authorities of the Inspector General Act of 1978 with respect to the Recipient.

## Article XIII SERVICE REVIEWS AND OTHER CONTENT ASSESSEMENTS

a.    In accordance with 22 U.S.C. § 6204(a)(22)(A), the Recipient is required to conduct content reviews, at least annually or more frequently at the discretion of the USAGM CEO, consisting of a review of at least 10 percent of available unique weekly content from any selected week from the previous year, which shall be conducted, to the extent practical, by fluent language speakers and experts without direct affiliation to the language service being reviewed, who are seeking any evidence of unprofessional content or content otherwise inconsistent with the highest standards of professional journalism.  The results of these content reviews shall be submitted to the Office of Policy and Research, the head of the respective language service, and the USAGM CEO.  Such reviews shall not interfere with the Recipient's professional journalistic independence.

b.    In accordance with 22 U.S.C. § 6204(a)(22)(C), the USAGM CEO is authorized to launch a review, using external, native-language and regional experts, the results of which are to be reported to the appropriate committees of Congress, to determine if a widespread pattern of violations of the Recipient's established editorial principles are detected, including its Standards of Ethical Journalism. The Recipient shall cooperate with such expert reviews and agrees to provide the USAGM CEO, or his/her authorized representatives, with any information requested for the purpose of conducting such expert reviews.  Such reviews shall not interfere with the Recipient's professional journalistic independence.

c.    USAGM shall conduct reviews throughout the POP to measure the Recipient's performance

**JA436**

in achieving the purposes of this Agreement and in line with § 200.301 Performance measurement. Such reviews shall be conducted at reasonable times and upon notice to the Recipient. USAGM's Office of Policy and Research ("OPR") is responsible for coordinating USAGM policy and research engagement with USAGM networks (Federal and Non-Federal) in support of the agency's mission and strategic objectives. USAGM performance is measured by OPR through research and review in the following areas of effort:

1. Strategic alignment, including agency Strategic Plan formulation, Language Service Review (LSR) prioritization and language service strategies, and other strategic reviews as requested by USAGM.

2. Data collection and analysis, including ensuring that all performance research and data is centrally accessible to OPR and in compliance with Agency data governance standards, is vetted using established quality control/quality assurance practices, and supports the Agency's Impact Model Framework.

3. Knowledge and data management, including contributing to the Smart Management and Audience Research Tool (SMART), data.usagm.gov, Impact Tracker, and the data management system.

4. Performance management, including setting performance targets in the annual budget, and reporting performance results for the Agency Performance Plan / Agency Performance Report (APP/APR).

5. Monitoring, including compliance with Agency program review guidelines and procedures for violations of journalistic standards.

d. To ensure continuous and cooperative planning and operations hereunder, the Recipient shall permit USAGM or its authorized representatives, including the Inspector General, to visit the Recipient's facilities and to inspect the facilities, activities, and work pertinent to the grant, both in the United States and abroad, and to interview personnel engaged in the performance of the Grant to the extent deemed necessary by USAGM. USAGM, however, shall not exercise any prepublication review of the substance of any broadcast or print publication of the Recipient.

Article XIV – FAILURE TO COMPLY WITH THE TERMS OF THE GRANT

In the event that the Recipient fails to comply with any material term of this Grant, then USAGM shall have the right to suspend or terminate the Recipient's use of the Grant Funds by providing written notice to the Recipient in accordance with the provisions in 2 CFR Part 200.

In the event USAGM suspends or terminates the Recipient's use of Grant Funds, the Recipient shall forthwith return to USAGM any portion of the Grant Funds in its possession or control to USAGM. Any such termination or suspension shall be without further obligation by USAGM or the United States.

b.    The Recipient acknowledges the audit requirements set forth in 2 CFR Part 200, Subpart F (Audit Requirements). The audit package and the data collection form shall be submitted to the Federal Audit Clearinghouse 30 days after receipt of the auditor's report(s), or 9 months after the end of the fiscal year (06.30.2025) – whichever comes first.

c.    Operations of the Recipient, as related to use of the Grant Funds, may be audited by the Government Accountability Office (GAO) in accordance with such principles and procedures and under such rules and regulations as may be prescribed by the Comptroller General of the United States. Any such audit shall be conducted at the place or places where accounts of the Recipient are normally kept.

d.    Representatives of the GAO shall have access to all books, accounts, records, reports, files, papers, and property belonging to or in use by the Recipient, pertaining to such financial transactions and necessary to facilitate an audit. Such representatives shall be afforded full facilities for verifying transactions with any assets held by depositories, fiscal agents, and custodians. All such books, accounts, records, reports files, papers, and property of the Recipient, shall remain in the possession and custody of the Recipient.

The Recipient acknowledges that the Inspector General of the United States Department of State is authorized to exercise the authorities of the Inspector General Act of 1978 with respect to the Recipient.

## Article XIII SERVICE REVIEWS AND OTHER CONTENT ASSESSEMENTS

a.    In accordance with 22 U.S.C. § 6204(a)(22)(A), the Recipient is required to conduct content reviews, at least annually or more frequently at the discretion of the USAGM CEO, consisting of a review of at least 10 percent of available unique weekly content from any selected week from the previous year, which shall be conducted, to the extent practical, by fluent language speakers and experts without direct affiliation to the language service being reviewed, who are seeking any evidence of unprofessional content or content otherwise inconsistent with the highest standards of professional journalism. The results of these content reviews shall be submitted to the Office of Policy and Research, the head of the respective language service, and the USAGM CEO. Such reviews shall not interfere with the Recipient's professional journalistic independence.

b.    In accordance with 22 U.S.C. § 6204(a)(22)(C), the USAGM CEO is authorized to launch a review, using external, native-language and regional experts, the results of which are to be reported to the appropriate committees of Congress, to determine if a widespread pattern of violations of the Recipient's established editorial principles are detected, including its Standards of Ethical Journalism. The Recipient shall cooperate with such expert reviews and agrees to provide the USAGM CEO, or his/her authorized representatives, with any information requested for the purpose of conducting such expert reviews. Such reviews shall not interfere with the Recipient's professional journalistic independence.

c.    USAGM shall conduct reviews throughout the POP to measure the Recipient's performance

---

**JA438**

in achieving the purposes of this Agreement and in line with § 200.301 Performance measurement. Such reviews shall be conducted at reasonable times and upon notice to the Recipient. USAGM's Office of Policy and Research ("OPR") is responsible for coordinating USAGM policy and research engagement with USAGM networks (Federal and Non-Federal) in support of the agency's mission and strategic objectives. USAGM performance is measured by OPR through research and review in the following areas of effort:

    1. Strategic alignment, including agency Strategic Plan formulation, Language Service Review (LSR) prioritization and language service strategies, and other strategic reviews as requested by USAGM.

    2. Data collection and analysis, including ensuring that all performance research and data is centrally accessible to OPR and in compliance with Agency data governance standards, is vetted using established quality control/quality assurance practices, and supports the Agency's Impact Model Framework.

    3. Knowledge and data management, including contributing to the Smart Management and Audience Research Tool (SMART), data.usagm.gov, Impact Tracker, and the data management system.

    4. Performance management, including setting performance targets in the annual budget, and reporting performance results for the Agency Performance Plan / Agency Performance Report (APP/APR).

    5. Monitoring, including compliance with Agency program review guidelines and procedures for violations of journalistic standards.

d.   To ensure continuous and cooperative planning and operations hereunder, the Recipient shall permit USAGM or its authorized representatives, including the Inspector General, to visit the Recipient's facilities and to inspect the facilities, activities, and work pertinent to the grant, both in the United States and abroad, and to interview personnel engaged in the performance of the Grant to the extent deemed necessary by USAGM. USAGM, however, shall not exercise any prepublication review of the substance of any broadcast or print publication of the Recipient.

## Article XIV – FAILURE TO COMPLY WITH THE TERMS OF THE GRANT

In the event that the Recipient fails to comply with any material term of this Grant, then USAGM shall have the right to suspend or terminate the Recipient's use of the Grant Funds by providing written notice to the Recipient in accordance with the provisions in 2 CFR Part 200.

In the event USAGM suspends or terminates the Recipient's use of Grant Funds, the Recipient shall forthwith return to USAGM any portion of the Grant Funds in its possession or control to USAGM. Any such termination or suspension shall be without further obligation by USAGM or the United States.

In the event that the Recipient reasonably believes that USAGM has breached Article II, the Recipient shall report the breach to the USAGM CEO. If the RECIPIENT believes that the breach involves the USAGM CEO, then they should contact the USAGM General Counsel or State Department OIG.

Article XV – POINTS OF CONTACT

For USAGM, the following person, or anyone otherwise designated by the CEO, shall be deemed to be the point(s) of contact for the Recipient with respect to the provisions of this Agreement:

> Roman Napoli Chief Financial Officer
> Tel: (202) 230-056
> Email: Email: rnapoli@usagm.gov

For the Recipient, the following person(s), shall be deemed to be the point(s) of contact for the Recipient with respect to the provisions of this Agreement:

> Raji Kalra
> Acting Chief Financial Officer
> Tel: (703) 852-9333
> E-mail: rkaira@mbn-news.com

Article XVI – AMENDMENTS

The terms of this Agreement may be amended by mutual written consent between USAGM and the Recipient.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year specified below:

**MIDDLE EAST BROADCASTING NETWORKS, INC.**

BY _____

Jeffrey Gedmin
President

DATE _____

**U.S. AGENCY FOR GLOBAL MEDIA**

Roman Napoli
*Digitally signed by Roman Napoli*
*Date: 2025.02.27 12:15:35 -05'00'*

BY_____

Roman Napoli
CFO, Acting with the Delegations for the Chief Executive Officer

DATE _____

JA440

## ATTACHMENT A

The Board of the Broadcasting Board of Governors (BBG Board) on June 3, 2011, adopted "rules of the road" governing expectations regarding interactions among the elements of United States International Broadcasting (USIB), specifically (i) the federal agency (now called the U.S. Agency for Global Media); (ii) the Voice of America (VOA) and Office of Cuba Broadcasting (OCB); and (iii) USAGM's private Non-Federal Entities: Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), and Middle East Broadcasting Networks (MBN) (collectively, "Non-Federal Entities"). The Agency structure has changed significantly since then. It is now headed by a Senate Confirmed Chief Executive Officer. Nevertheless, the core principle of governance set forth therein in still relevant, namely that to fulfil the Agency's statutory mission, the elements of USIB shall work together "in a spirit of collegiality, transparency, mutual respect, and good communication with peers and colleagues," in a manner consistent with the requirement, per 22 USC 6204(b), that the Agency respect the professional independence and integrity of the networks.

**ATTACHMENT B**

Allowability of costs incurred under this Agreement will be determined in accordance with 2 CFR Part 200, Subpart E (Cost Principles), with the following clarifications:

a.    All operating costs are determined to be direct costs.  (See 2 CFR 200.413)

b.    The following expenses, insofar as they are reasonable and necessary to further the purpose of the grant, are authorized. (Relevant paragraphs of 2 CFR Part 200 are noted in parentheses.)

1.    Official representation expenses necessary to further the mission of the Recipient are not to exceed the amount in the Approved Financial Plan unless otherwise authorized by USAGM.  (See Department of State Standardized Regulations (DSSR), Sections 300 (Representation Allowances) – 330 (Prohibitions))

2.    Capital expenditures for general purpose equipment. (See 2 CFR 200.439)

3.    Overtime, extra-pay shift, and multi-shift premiums. (See 2 CFR 200.430)

4.    Participant support costs (See 2 CFR 200.456)

5.    Costs of legal, accounting, and consulting services, and related costs, incurred in connection with organization and reorganization. (See 2 CFR 200.435; 200.455 & 200.462)

6.    Public information and relations service costs. (See 2 CFR 200.421)

7.    Publication and printing costs. (See 2 CFR 200.461)

8.    Foreign travel costs as specified in the Approved Financial Plan.  (See 2 CFR 200.475)

9.    The cost of advertising the availability of publications, recordings, or services of the Recipient, subject to limitations in applicable law or regulation.

JA442

## ATTACHMENT C

1. COVENANT AGAINST CONTINGENT FEES

   The Recipient warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees, bona fide established commercial or selling agencies maintained by Recipient for the purpose of securing business. For breach or violation of this warranty, USAGM shall have the right to annul this Agreement without liability or in its discretion to deduct from the Agreement price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

2. EQUAL OPPORTUNITY

   During the performance of this Agreement, the Recipient agrees that it will not discriminate against an employee or applicant for employment because of race, creed, color, sex, national origin, religion, age, or disability in accordance with all applicable Federal laws and regulations prohibiting discrimination in employment including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. 2000e, et seq.; section 504 of the Rehabilitation Act of 1973, as amended; 29 U.S.C. 794; the Age Discrimination Employment Act of 1975, as amended; and 42 U.S.C. 6101, et seq. The provisions of this paragraph shall apply to employment actions including, but not limited to, employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship. With regards to its employment, procurement, and contracting practices, the Recipient will not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws. The Recipient acknowledges that its compliance with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code. The Recipient certifies that it does not operate any programs promoting "diversity, equity, and inclusion" that violate any applicable Federal anti-discrimination laws.

3. AIR TRAVEL

   The Recipient agrees that all travel paid for with the Grant Funds will comply with the "Fly America Act" (49 U.S.C. § 40118).

4. CONVICT LABOR

   In connection with the performance of work under this grant, the Recipient agrees not to employ any person undergoing sentence of imprisonment except as provided by 18 U.S.C. 3622 and Executive Order No. 11755, December 29, 1973, as amended.

5.    THE RECIPIENT SHALL COMPLY WITH:

a.    Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d et seq., which prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving Federal financial assistance.

b.    Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of handicap in programs and activities receiving Federal financial assistance.

c.    The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs or activities receiving Federal financial assistance.

d.    The 2019 National Defense Authorization Act, section 889(b), which prohibits federal award recipients from using grant funds for certain purposes, and the implementing regulations found at 2 CFR 200.216.

## **ATTACHMENT D**

GRANT LIMITATIONS – MIDDLE EAST BROADCASTING NETWORKS, INC.

Not Applicable.

JA445

## ATTACHMENT E

1.    CERTIFICATION REGARDING LOBBYING

The Recipient shall sign the Certification (Attachment F Concerning Lobbying Activities that it will comply with 31 U.S.C. § 1352 concerning the use of appropriated funds for lobbying activities. If no appropriated funds have been paid or will be paid for lobby activities, the Recipient shall submit Standard Form LLL, "Disclosure of Lobbying Activities."

2.    CERTIFICATION REGARDING DRUG-FREE WORKPLACE REQUIREMENTS

The Recipient shall sign the Certification (Attachment G) Regarding Drug Free Workplace Requirements: Drug-Free Workplace Act of 1988 that it will provide a drug-free workplace in accordance with the Drug-Free Workplace Act of 1988, 22 CFR 513, Subpart F.

3.    FEDERAL DEBT STATUS

Under OMB Circular No. A-129, the Recipient must certify that it is not delinquent on payment of any Federal debt. The Recipient shall sign the Certification (Attachment H) Regarding Federal Debt Status.

4.    DEBARMENT AND SUSPENSION

Executive Order 12549 of February 18, 1986, as clarified by Executive Order 12689 of August 15, 1989, requires uniform Federal rules on non-procurement debarment and suspension from certain transactions with the Government. The May 26, 1988 Federal Register (53 Fed. Reg. 19161) contains these rules, which, among other things, require signature by Non-Federal Entities of the Certification (Attachment I) Regarding Debarment and Suspension.

5.    STANDARDS OF ETHICAL CONDUCT

The Recipient will publish written policy guidelines, as approved by USAGM, on conflict of interest and avoidance thereof. These guidelines will reflect federal laws and must cover financial interest, gifts, gratuities and favors, nepotism, political activity and foreign affiliations, outside employment, and use of company assets. These rules must also indicate how outside activities, relationships, and financial interests are reviewed by the responsible Recipient official(s). The Recipient will ensure that each employee is given a copy of the policy and notified that, as a condition of employment under the grant, the employee must abide by the terms of the policy.

JA446

## ATTACHMENT F

### Certification Concerning Lobbying Activities

The undersigned certifies, to the best of his or her knowledge and belief that:

(1) No federal funds have been paid or will be paid, by or on behalf of the undersigned, to any person influencing or attempting to influence an officer or employee of any U.S. Government agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan or cooperative agreement.

(2) No registrant under the Lobbying Disclosure Act of 1995 has made lobbying contacts on behalf of the undersigned with respect to this grant.

(3) The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was made when this contract was made or entered into.  Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code.  Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

Middle East Broadcasting Networks, Inc.

Jeffrey Gedmin
President

Date    Feb. 24, 2025

**JA447**

**ATTACHMENT G**


<u>Certification Regarding Drug Free Workplace Requirements</u>
<u>Drug-Free Workplace Act of 1988</u>


The Recipient certifies that it will provide a drug-free workplace by (a) publishing a statement notifying employees that the unlawful manufacture, distribution dispensation, possession or use of a controlled substance is prohibited in the Recipient's workplace and specifying that action that will be taken against employees for violation of such prohibitions; (b) establishing a drug-free awareness program to inform employees about (1) the dangers of drug abuse in the workplace, (2) the Recipient's policy of maintaining a drug-free workplace, (3) any available drug counseling, rehabilitation, and employee assistance programs, and (4) the penalties that may be imposed on employees for drug abuse violations (c) making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a), (d) notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will (1) abide by the terms of the statement and (2) notify the employer of any criminal drug statute conviction for a violation occurring in the workplace not later than five days after such conviction ; (e) notifying the agency within ten days after receiving notice under subparagraph (d) (2) from an employee or otherwise receiving actual notice of such conviction; (f) taking one of the following actions with respect to any employee who is so convicted: (1) taking appropriate personnel action against such an employee, up to and including termination, or (2) requiring such an employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and (g) making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).



Middle East Broadcasting Networks, Inc.


_____          _____
Jeffrey Gedmin                                          Date
President

JA448

**ATTACHMENT H**

<u>Certification Regarding Federal Debt Status</u>
<u>(OMB Circular A-129)</u>

The Recipient certifies to the best of its knowledge and belief that it is not delinquent in the repayment of any federal debt.

Middle East Broadcasting Networks, Inc.

_____           _____
Jeffrey Gedmin                                    Date
President

**JA449**

**ATTACHMENT I**

**Certification Regarding Debarment and Suspension**

The Recipient certifies to the best of its knowledge and belief that it and its principals : (a) are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excided from covered transactions by any Federal department or agency; (b) have not, within a three year period preceding this grant, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state or local) transaction or contract under a public transaction; violation of Federal or state anti-trust statutes; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property; (c) are not presently indicted or otherwise criminally or civilly charged by a governmental entity (Federal, state or local) with any of the offenses enumerated in paragraph (b) of this certification; and (d) have not within a three-year period preceding this grant had one or more public transactions (Federal, state or local) terminated for cause of default.

Middle East Broadcasting Networks, Inc.

_____                    F.S. 24, 2025
Jeffrey Gedmin                                      Date
President

**JA450**

**ATTACHMENT J**

<u>Certification Regarding Federal Anti-Discrimination Laws</u>
<u>(Executive Order 14173)</u>

The Recipient certifies that it does not operate any "diversity, equity, and inclusion" (DEI) programs that violate applicable Federal anti-discrimination laws.

Middle East Broadcasting Networks, Inc.

_____     Feb 24, 2025

Jeffrey Gedmin                                                        Date
President

JA451

# Middle East Broadcasting Networks
### FY 2025 Must Pay Financial Plan
### October 01, 2024 Through March 31, 2025

| | October Total | November Total | *December 01-20 Total* | December 21-31 Domestic | December 21-31 Overseas | *December 21-31 Total* | December Total | January Domestic | January Overseas | January Total | February Domestic | February Overseas | February Total | March Domestic | March Overseas | March Total | October to March Domestic Total | October to March Overseas Total | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Salaries & Benefits** | | | | | | | | | | | | | | | | | | | |
| Salaries | 5,057,350 | 4,857,350 | *4,321,840* | - | - | - | 4,321,840 | 3,902,438 | 938,984 | 4,841,422 | 3,902,438 | 938,984 | 4,841,422 | 3,851,438 | 938,984 | 4,790,422 | 23,412,092 | 5,297,714 | 28,709,806 |
| Benefits | 962,438 | 940,850 | *819,534* | - | - | - | 819,534 | 741,821 | 132,323 | 874,144 | 741,821 | 132,323 | 874,144 | 721,984 | 132,323 | 854,307 | 4,508,619 | 816,798 | 5,325,417 |
| **TOTAL, Salaries & Benefits** | 6,019,788 | 5,798,200 | *5,141,374* | - | - | - | 5,141,374 | 4,644,259 | 1,071,307 | 5,715,566 | 4,644,259 | 1,071,307 | 5,715,566 | 4,573,422 | 1,071,307 | 5,644,729 | 27,920,711 | 6,114,514 | 34,035,223 |
| **General Operating Expenses** | | | | | | | | | | | | | | | | | | | |
| Pers Svc Contractors/Consultants | 139,867 | 139,867 | *188,586* | 99,751 | 19,116 | *118,867* | 307,453 | 100,626 | 15,930 | 116,556 | 100,626 | 15,930 | 116,556 | 100,626 | 15,930 | 116,556 | 831,717 | 105,138 | 936,855 |
| News and Video Content | - | - | *270* | - | - | *-* | 270 | - | - | - | - | - | - | - | - | - | - | 270 | 270 |
| Licenses/Legal | 45,521 | 45,521 | *42,001* | 33,059 | 462 | *33,521* | 75,522 | 37,549 | 385 | 37,934 | 37,549 | 385 | 37,934 | 37,549 | 385 | 37,934 | 277,825 | 2,541 | 280,366 |
| Program Acquisition | 23,883 | 23,883 | *-* | 15,794 | 8,089 | *23,883* | 23,883 | 13,162 | 6,741 | 19,903 | 13,162 | 6,741 | 19,903 | 13,162 | 6,741 | 19,903 | 86,868 | 44,490 | 131,358 |
| Production Support | 503,847 | 503,847 | *116,220* | 319,477 | 119,242 | *438,719* | 554,939 | 307,171 | 112,702 | 419,873 | 307,171 | 112,702 | 419,873 | 307,171 | 112,702 | 419,873 | 2,085,207 | 737,045 | 2,822,252 |
| Technical Support & Translation | 218,945 | 218,945 | *31,576* | 218,872 | 73 | *218,945* | 250,521 | 182,393 | 61 | 182,454 | 182,393 | 61 | 182,454 | 182,393 | 61 | 182,454 | 1,235,371 | 402 | 1,235,773 |
| Travel | 55,345 | 55,345 | *3,860* | 51,227 | 4,118 | *55,345* | 59,205 | 42,689 | 3,432 | 46,121 | 42,689 | 3,432 | 46,121 | 42,689 | 3,432 | 46,121 | 283,128 | 25,130 | 308,258 |
| Advertising and Outside Promotions | 39,405 | 39,405 | *-* | 39,405 | - | *39,405* | 39,405 | 32,838 | - | 32,838 | 32,838 | - | 32,838 | 32,838 | - | 32,838 | 216,729 | - | 216,729 |
| Rent, Utilities | 301,242 | 301,242 | *257,921* | 112,794 | 84,778 | *197,572* | 455,493 | 180,387 | 70,648 | 251,035 | 180,387 | 70,648 | 251,035 | 282,000 | 146,000 | 428,000 | 1,414,703 | 573,344 | 1,988,047 |
| Equipment | 11,822 | 11,822 | *-* | 6,156 | 5,666 | *11,822* | 11,822 | 5,130 | 4,722 | 9,852 | 5,130 | 4,722 | 9,852 | 11,286 | 10,388 | 21,674 | 40,014 | 36,830 | 76,844 |
| Hardware and Software Maintenance | 482,861 | 482,861 | *107,069* | 478,680 | 4,181 | *482,861* | 589,930 | 398,900 | 3,484 | 402,384 | 398,900 | 3,484 | 402,384 | 301,950 | 3,484 | 305,434 | 2,642,859 | 22,995 | 2,665,854 |
| Administration | 277,263 | 277,263 | *111,123* | 238,987 | 38,276 | *277,263* | 388,386 | 199,156 | 31,897 | 231,053 | 199,156 | 31,897 | 231,053 | 178,156 | 31,897 | 210,053 | 1,363,472 | 251,599 | 1,615,071 |
| **TOTAL, GOE** | 2,100,001 | 2,100,001 | *858,626* | 1,614,202 | 284,001 | *1,898,203* | 2,756,829 | 1,500,001 | 250,002 | 1,750,003 | 1,500,001 | 250,002 | 1,750,003 | 1,489,820 | 331,020 | 1,820,841 | 10,478,163 | 1,799,514 | 12,277,677 |
| **TOTAL, MBN FY25 Financial Plan** | 8,119,789 | 7,898,201 | *6,000,000* | 1,614,202 | 284,001 | *1,898,203* | 7,898,203 | 6,144,260 | 1,321,309 | 7,465,569 | 6,144,260 | 1,321,309 | 7,465,569 | 6,063,242 | 1,402,327 | 7,465,569 | 38,398,874 | 7,914,026 | 46,312,900 |

**USAGM APPROVAL STATEMENT:** USAGM Financial Plan Approval applies to MBN's Operations for March 01, 2025 through March 31, 2025 in the amount of $7,465,569 for a grant total of $46,312,900. Approval of the amounts reflected on this financial plan are not to be misconstrued as a pro-rated amount of an annual budget for FY 2025. FY 2025 annual budgets will be distributed when a full-year appropriation is enacted and the FY 2025 USAGM Program Plan is finalized. Initiation of new programs (aka "New Starts") is prohibited under the Continuing Resolution (CR). Please spend prudently during the CR period.



FINANCIAL PLAN APPROVAL

Roman Napoli

Digitally signed by Roman Napoli
Date: 2025.02.27
12:16:38 -05'00'

Roman Napoli | CFO
Acting with the Delegations for the CEO

_____
Date

# JA452

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 1, 2025

Patsy Widakuswara, et al.,

     Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

     Appellants

**No. 25-5145**

**1:25-cv-00887-RCL**

Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

     Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

     Appellants

**JA453**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                    **September Term, 2024**

**No. 25-5150**

**1:25-cv-00966-RCL**

Middle East Broadcasting Networks, Inc.,

> Appellee

> v.

United States of America, et al.,

> Appellants

**No. 25-5151**

**1:25-cv-00907-RCL**

Radio Free Asia,

> Appellee

> v.

United States of America, et al.,

> Appellants

**JA454**

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                          **September Term, 2024**

**No. 25-5158**

**1:25-cv-00799-RCL**

RFE/RL, Inc.,

      Appellee

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

**BEFORE:**   Pillard, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the motions for an administrative stay and stay pending appeal in Nos. 25-5144, 25-5145, 25-5150, and 25-5151, the responses thereto, the replies, and the letters; and the emergency motion for an administrative stay and stay pending appeal in No. 25-5158, the response thereto, and the motion for expedited consideration, it is

**ORDERED** that the following orders, or parts thereof, are administratively stayed pending further order of the court:

In No. 25-5144, provision (2) of the district court's preliminary injunction filed April 22, 2025;

In No. 25-5150, the district court's preliminary injunction filed April 25, 2025;

In No. 25-5151, the district court's preliminary injunction filed April 25, 2025;

Page 3

**JA455**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                    **September Term, 2024**

In No. 25-5158, the district court's temporary restraining order filed April 29, 2025.

The purpose of this administrative stay is to give the court sufficient opportunity to consider the emergency motions for stay pending appeal and should not be construed in any way as a ruling on the merits of those motions.  See D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024).

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
       Amy Yacisin
       Deputy Clerk

Page 4

**JA456**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                          **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 3, 2025

Patsy Widakuswara, et al.,

      Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

      Appellants


**No. 25-5145**                          **1:25-cv-00887-RCL**


Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

      Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants


**JA457**

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                                              **September Term, 2024**

**No. 25-5150**

**1:25-cv-00966-RCL**

Middle East Broadcasting Networks, Inc.,

      Appellee

   v.

United States of America, et al.,

      Appellants

**No. 25-5151**

**1:25-cv-00907-RCL**

Radio Free Asia,

      Appellee

   v.

United States of America, et al.,

      Appellants

    **BEFORE:**    Pillard*, Katsas, and Rao, Circuit Judges

### <u>O R D E R</u>

    Upon consideration of the motions for stay pending appeal filed in the above-captioned cases, the responses thereto, and the replies; and the administrative stay entered on May 1, 2025, it is

    *Judge Pillard dissents from the grant of the motions for stay.

**JA458**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                    **September Term, 2024**

**ORDERED** that the motions for stay pending appeal be granted.  The following orders, or parts thereof, are stayed pending further order of the court:

In No. 25-5144, provisions (1) and (2) of the district court's preliminary injunction filed April 22, 2025;

In No. 25-5145, the district court's preliminary injunction filed April 22, 2025, to the extent the relief granted falls within provisions (1) and (2) of the April 22, 2025 preliminary injunction in No. 25-5144;

In No. 25-5150, the district court's preliminary injunction filed April 25, 2025;

In No. 25-5151, the district court's preliminary injunction filed April 25, 2025.

A *per curiam* concurring statement and a dissenting statement of Judge Pillard are attached.  It is

**FURTHER ORDERED** that the administrative stay entered in Nos. 25-5144, 25-5150, and 25-5151 be dissolved.

**Per Curiam**

FOR THE COURT:
Clifton B. Cislak, Clerk

BY:     /s/
        Amy Yacisin
        Deputy Clerk

**JA459**

PER CURIAM:  For the following reasons, we grant the government's motion for a stay pending appeal.

I

The United States Agency for Global Media oversees six federally funded broadcast networks.  One of these, Voice of America, is operated by government employees and contractors.  Others, including Radio Free Asia and Middle East Broadcasting Networks, operate as private, non-profit corporations.  Through appropriations, Congress has allocated specific funding for the private networks, which USAGM disburses through grants.  *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043.  In response, USAGM placed over 1,000 employees on administrative leave, terminated nearly 600 personal-service contractors, and terminated RFA's and MBN's grant agreements for the 2025 fiscal year. *Widakuswara v. Lake*, No. 25-CV-1015, 2025 WL 1166400, at *3 (D.D.C. Apr. 22, 2025).  USAGM further directed its personnel abroad to cease broadcasting through VOA.  *Id.*

Various plaintiffs, including USAGM employees, contractors, and grantees, filed lawsuits to challenge these actions in our district court.  In one of the cases, the district court granted a preliminary injunction requiring USAGM to (1) restore its employees and contractors to their pre-March 14 status, (2) restore its FY 2025 grants with RFA and MBN, and (3) restore VOA as "a consistently reliable and authoritative

**JA460**

2

source of news." *Widakuswara*, 2025 WL 1166400, at *18. The court granted parallel relief in the other cases.

USAGM appealed and sought a stay of the first two portions of the preliminary injunction. Because of imminent funding deadlines, parties on both sides have requested expedited consideration of the stay motion.[1]

II

To resolve the stay motion, we consider whether the government is likely to prevail on appeal, any irreparable harm to the government, harms to the plaintiffs and others, and the public interest. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009). Applying these factors, we conclude that a stay is warranted.

A

The government is likely to succeed on the merits because the district court likely lacked subject-matter jurisdiction to enjoin USAGM's personnel actions and to compel the agency to restore RFA's and MBN's FY 2025 grants.

1

The district court likely lacked jurisdiction over USAGM's personnel actions. "We have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't*

---

[1] Radio Free Europe, another private network funded by USAGM, filed a similar suit and received a temporary restraining order. *See RFE/RL, Inc. v. Lake*, No. 25-CV-799, 2025 WL 1232863 (D.D.C. Apr. 29, 2025). The government has filed a separate motion to stay that order, which we do not resolve here.

3

*of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009).  Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government.[2]  *See*, *e.g.*, 5 U.S.C. §§ 1204, 7121–22, 7701 (Merit Systems Protection Board); *id*. § 1214 (Office of the Special Counsel); *id*. § 7104 (Federal Labor Relations Authority); 22 U.S.C. § 4107 (Foreign Service Labor Relations Board); *id.* § 4136 (Foreign Service Grievance Board); 41 U.S.C. §§ 7103–05 (Civilian Board of Contract Appeals). These remedial schemes "provide[] the exclusive procedures by which federal employees" may pursue employment- and contractor-related claims.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019); *see, e.g.*, *Am. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460, 1461–62 (D.C. Cir. 1990) (foreign-service labor-related claims must go through FSLRB); *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) (Contract Disputes Act provides exclusive remedial scheme for covered contracts).  "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions."  *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009).  "And that principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

---

[2]  The dissent doubts that Congress's chosen administrative methods could meaningfully process agency-wide claims for over 1,000 employees.  But administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters.  *See* Order on Stay Request, *Special Counsel ex rel. John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5 (single MSPB order staying termination of nearly 6,000 employees).

4

The district court nonetheless justified the injunction on the ground that "this case is not simply a collection of employment disputes" because the "facts on the record and on the ground" suggest USAGM is being "dismantl[ed]." *Widakuswara*, 2025 WL 1166400, at *11. And in their stay briefing, plaintiffs expressly frame their claims as challenging the "wholesale shuttering of VOA" and seeking to undo "broad government actions" to "dismantl[e] an entire federal agency." Abramowitz Opp'n to Stay Mot. at 13, 18; Widakuswara Opp'n to Stay Mot. at 14. Yet plaintiffs may not use the APA to mount "wholesale" challenges to an agency's "entire program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) (cleaned up). The APA cause of action, like its sovereign-immunity waiver, provides for judicial review of "discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see* 5 U.S.C. §§ 702, 704. The "dismantling" that plaintiffs allege is a collection of "many individual actions" that cannot be packaged together and "laid before the courts for wholesale correction under the APA." *Nat'l Wildlife Fed'n*, 497 U.S. at 893.[3] Thus, while USAGM's employees and contractors might have viable, discrete claims with respect to their individual personnel actions, those claims must be pursued through other remedial channels.

2

The district court also likely lacked jurisdiction to restore RFA's and MBN's FY 2025 grants.

---

[3] Before the district court and here, the government maintained that plaintiffs fail to challenge any discrete, circumscribed agency action as required under the APA and instead seek judicial review of the agency's general compliance with its statutory mandate. *See* Opp. to Preliminary Injunction 30; Stay Mot. 22–23.

5

The Tucker Act vests the Court of Federal Claims with jurisdiction over claims against the United States "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). We have long held that this jurisdictional grant, where it applies, is exclusive and thus bars application of the sovereign-immunity waiver set forth in the APA. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022); *see* 5 U.S.C. § 702 (providing that APA waiver of sovereign immunity is inapplicable where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"). For Tucker Act purposes, whether a claim is "founded upon" a contract hinges on "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Crowley*, 38 F.3d at 1106 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). If a claim against the United States is contractual "at its essence," district courts have no power to resolve it. *Id.* (quoting *Megapulse*, 672 F.2d at 967). The same rule applies to claims for breach of grant agreements executed through binding government contracts. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–40 (Fed. Cir. 2021).

The Supreme Court recently applied these principles to issue a stay pending appeal in a case substantially similar to this one. In *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), a district court entered an order "enjoining the Government from terminating various education-related grants." *Id.* at 968. The Supreme Court stayed the order pending the disposition of an appeal to the First Circuit and any ensuing petition for certiorari. *Id.* at 696. The Court concluded that the district court likely lacked jurisdiction to bar termination of the grants, because the Tucker Act likely conferred jurisdiction over the dispute on the CFC. *Id.* Therefore, "the APA's limited waiver of immunity d[id]

**JA464**

6

not extend" to the injunction at issue, which the Court described as an "order[] to enforce a contractual obligation to pay money." *Id.* (cleaned up).

That reasoning controls this case. Congress created a contractual scheme for allocating funds to the grantees. It authorizes USAGM to fund RFA, MBN, and other networks through "grants and cooperative agreements." 22 U.S.C. § 6204(a)(5). Likewise, the governing appropriation statute allocates specific funding amounts for "grants" to those networks. 2024 Appropriations Act, 138 Stat. at 735. In the grants at issue here, USAGM, acting through its Chief Executive Officer, promised to pay the appropriated funds to the networks in monthly installments. In return, the networks promised to use the funds to advance statutory objectives and to comply with all program requirements. These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes. *Columbus Reg'l Hosp.*, 990 F.3d at 1338–39.

By the district court's own telling, the dispute here arose when USAGM terminated these agreements. *Widakuswara*, 2025 WL 1166400, at *3. The district court ordered "restor[ation] [of] the FY 2025 grants" and "disbursement to RFA and MBN of the funds Congress appropriated." *Id.* at *18. Whether phrased as a declaration that the agreements remain in force, or an order to pay the money committed by those agreements, the injunction in substance orders specific performance of the grant agreements—a quintessentially contractual remedy. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985). And it is the inherently contractual nature of the relief afforded—

**JA465**

7

*not* any characterization of the relief as money damages—that makes the CFC the exclusive forum for this suit. *See Ingersoll-Rand*, 780 F.2d at 79–80 (holding a plaintiff "may not sidestep" CFC jurisdiction by "avoiding a request for damages," when their request relief "amount[s] to a request for specific performance"); *see also Crowley*, 38 F.4th at 1107 (cautioning against "creative drafting of complaints … to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)).

To distinguish *California*, the plaintiffs stress that Congress appropriated specific sums for RFA and MBN. Accordingly, plaintiffs contend, they may file an APA claim—independent of and antecedent to their grant agreements—to force USAGM to disburse the appropriated amounts. But plaintiffs overread the governing statutes, which do not give the networks an unqualified right to the appropriated funds. Rather, they allocate funds for the networks, which may be disbursed only as grants. *See* 2024 Appropriations Act, 138 Stat. at 735. If these statutes created any entitlement for the networks at all, they at most would require USAGM to enter grants obligating the appropriated amounts to the networks. *Cf. Train v. City of New York*, 420 U.S. 35, 40–43 & n.9 (1975).[4] Thus, any APA claim under these statutes would have to allege that the government failed to enter a grant agreement obligating

---

[4] And even then, USAGM may impose various conditions on a network's receipt of the appropriated funds. *See* 22 U.S.C. § 6208(c) (listing "limitations and restrictions" to be contained in "[a]ny grant agreement"); 2024 Appropriations Act, 138 Stat. at 735 ("funds appropriated under this heading shall be made available in accordance with the principles and standards" of the statute). Moreover, even after USAGM has entered into grant agreements, the agency still may "award the grant … to another entity" if, "at any time," it determines that the network "is not carrying out the [statutory] functions … in an effective and economical manner." 22 U.S.C. § 6208(g).

**JA466**

8

the appropriated amount. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199–200 (Fed. Cir. 1997) (*NCMS*). But here, USAGM *did* obligate the appropriated funds through grants, thereby satisfying whatever duty (if any) it had under the appropriation statutes. *See Widakuswara*, 2025 WL 1166400, at *4–*5. Once the agency entered these contracts, it incurred a new obligation: Unlike the relevant statutes, the grant agreements require the government to make *monthly* payments to the networks—the very obligation prompting this highly expedited stay litigation. Accordingly, the claims of government nonpayment necessarily challenge its performance under the grants. Such claims are squarely contract claims under the Tucker Act. *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368–69 (Fed. Cir. 2021) (explaining *NCMS*); *see also Ingersoll-Rand*, 780 F.2d at 78–80 (Tucker Act applies to claims that the government's termination of a contract violated statutes or regulations incorporated therein).[5]

The plaintiffs' non-APA claims regarding grant money are unlikely to fare any better. Below, plaintiffs raised mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers,

___

[5] The dissent describes 22 U.S.C. § 6208(c)(5) as significantly limiting the circumstances in which USAGM may terminate grants. However, that provision sets forth when grants may be "terminated *without fiscal obligation to the United States*." 22 U.S.C. § 6208(c)(5) (emphasis added). It thus confirms our conclusion that Congress contemplated financial liability under the grant as the remedy for any breach. The dissent also notes that the government cannot prevent enforcement of statutes through the APA merely by incorporating the statutes into contracts. The dissent is correct on that point. *See Megapulse*, 672 F.2d at 967. But in this statute, Congress chose to use a contractual mechanism for obligating the appropriated funds, rather than creating a freestanding statutory entitlement.

9

and *ultra vires* claims. And before our Court, plaintiffs argue that "serious constitutional question[s]" would arise if we concluded that the CFC had exclusive jurisdiction, as that would deprive them of meaningful judicial review of their constitutional claims. Widakuswara Opp'n to Stay Mot. at 18 (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). But these constitutional claims simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims. *Dalton v. Specter*, 511 U.S. 462, 472–74 (1994); *see also Ingersoll-Rand*, 780 F.2d at 78 (Tucker Act governs challenge to contract termination, "despite plaintiff's allegations of statutory and constitutional violations" (cleaned up)).[6] Moreover, these claims fall short for the same reason as plaintiffs' APA claims: At most, the statutes in question required USAGM to allocate the appropriated amounts through grants enforceable as contracts, which USAGM has done.

B

On balance, the remaining *Nken* factors support a stay.

*Irreparable Harm.* The government has shown that it will face irreparable harm absent a stay. As to the reinstatement of USAGM employees and personal-service contractors: The Executive Branch has a significant interest in maintaining control over personnel matters. *See Sampson v. Murray*, 415

---

[6] In the district court, the *Widakuswara* plaintiffs also raised Appointments Clause and First Amendment claims. The district court did not address them in granting the preliminary injunction, *Widakuswara*, 2025 WL 1166400, at *5 n.13, *15 n.26, and the plaintiffs do not assert them as grounds for denying a stay. So, we do not consider these claims in resolving these stay motions.

10

U.S. 61, 83 (1974).  In requiring the restoration of all employees and contractors to their pre-March 14 status, the injunction interferes with this important responsibility.  This intrusion is particularly harmful because it implicates the Executive Branch's foreign-affairs authority.  USAGM is responsible for "present[ing] the views of the United States Government" and "support[ing] United States foreign policy objectives" in the international community.  22 U.S.C. § 6202(b)(3), (4).  By depriving the Executive Branch of control over the individuals involved in its international broadcasting, the injunction threatens its prerogative to "speak with one voice" on behalf of the United States in foreign affairs.  *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

As to the restoration of the grants:  Absent a stay, USAGM would be forced to imminently pay out some $15 million to RFA and MBN.  And RFA and MBN have attested they intend to spend these funds "immediately."  Network Opp'n to Stay Mot. at 22.  Because the district court did not require plaintiffs to post any injunction bond, *Widakuswara*, 2025 WL 1166400, at *17,[7] USAGM cannot recover these funds even if it should prevail in its appeal.  Under these circumstances, harm to the government is irreparable.  *See California*, 145 S. Ct. at 969.

---

[7] Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added).  The "precise purpose" of such a bond is to ensure that a defendant can be fairly compensated for injury stemming from a wrongfully granted injunction.  *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).

**JA469**

11

*Harm to Others.* Plaintiffs identify various harms that they and others may incur absent a stay, including loss of employment, the possible collapse of MBN and RFA, the elimination of a union's bargaining unit, and the removal of alien employees and contractors to countries hostile to the free press. Although we appreciate the gravity of these harms, there remain several avenues for their remediation. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("[T]he injury must be beyond remediation."). Loss of government employment generally does not constitute irreparable injury, *see Sampson*, 415 U.S at 91–92 & n.68, especially since employees seeking to challenge their termination or placement on administrative leave may seek emergency stays from the Office of Special Counsel and MSPB, *see* 5 U.S.C. § 1214(b). Personal-service contractors may likewise challenge their termination under the Contract Disputes Act, and unions may file complaints on behalf of their members before the FLRA. *E.g.*, *Ho v. United States*, 49 Fed. Cl. 96, 101 (2001) (CFC exercising jurisdiction over personal-service contract), *aff'd*, 30 F. App'x 964 (Fed. Cir. 2002); *see* 41 U.S.C. § 7101 *et seq.*; 5 U.S.C. § 7118. Journalists may seek relief in immigration proceedings to avoid potential persecution based on their political opinions. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158 (asylum); *id.* § 1231(b)(3) (withholding of removal). As for MBN and RFA, they may seek to recover any wrongfully withheld grant funds in the CFC. 28 U.S.C. § 1491(a)(1). Indeed, for almost a month, the Supreme Court has made clear that the CFC is likely the only forum open to them. *See California*, 145 S. Ct. at 968.[8]

---

[8] We need not consider any potential harm from shuttering VOA; the district court ordered USAGM to resume VOA's statutorily required programming levels, and the government has not sought to stay that provision of the injunction.

JA470

12

*Public Interest*.    Plaintiffs allege that USAGM's implementation of the Executive Order has violated numerous statutory requirements.    At this stage of the litigation, the government has raised jurisdictional, not merits, defenses.    Of course, we recognize that the public has an interest in the Executive Branch's compliance with congressional mandates. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).    By the same token, however, the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress.    Because personnel and grant disputes directly concern the public fisc, Congress has limited the resolution of these potentially costly claims to specialized tribunals such as the MSPB and the CFC.    We must respect those boundaries no less than the substantive and appropriations provisions governing the operation of USAGM.

PILLARD, *Circuit Judge*, dissenting:    Defendants are unlikely to succeed on the merits: They have not persuasively established that the district court lacked authority to enter the preliminary injunction.  Meanwhile, Voice of America, Radio Free Asia, and Middle East Broadcasting Networks face severe and irreparable harm absent injunctive relief.  Voice of America has gone dark for the first time since 1942.  Radio Free Asia and Middle East Broadcasting Networks face imminent collapse if they do not receive the funding Congress directed to each of them by name. The purpose of a stay pending appeal is to maintain the status quo until a case can be fully adjudicated on its merits.  This stay does the opposite, silencing Voice of America for the foreseeable future and eliminating Radio Free Asia and Middle East Broadcasting Networks' ability to see this case through to the end.

## I.

Defendants are not likely to succeed on the merits.  They do not claim that any court would likely hold that they are carrying out the will of Congress.  They argue instead that other entities should have heard plaintiffs' claims.  Part A describes the strong likelihood that the plaintiffs who worked for Voice of America did not have to spend years attempting to channel their claims through federal labor and employment administrative processes before they could file this suit under the Administrative Procedure Act to set aside the Agency's efforts to dismantle the work of Congress.  It also defends the scope of the district court's preliminary injunction as commensurate with defendants' baby-with-the-bathwater approach to asserting their "policy priorities."  Part B turns to the strong likelihood that the district court had jurisdiction over the claims of Radio Free Asia and Middle East Broadcasting

**JA472**

2

Networks, contrary to contentions that those claims belong in the Court of Federal Claims.

## A.

On March 14, 2025, the President signed Executive Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, directing USAGM to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law," and to eliminate "the non-statutory components and functions" of the agency "to the maximum extent consistent with applicable law." 90 Fed. Reg. 13043 (Mar. 14, 2025). The EO directed the head of USAGM to report its compliance to OMB with an explanation of "which components or functions of the governmental entity, *if any*, are statutorily required and to what extent." *Id*. (emphasis added).

The very next day, USAGM's website featured a statement announcing that the Agency—which it described as producing "radical propaganda," "rot from top to bottom"—is "irretrievably broken" and "not salvageable."[1] Apparently having concluded that *none* of the functions of Voice of America or the foreign affiliate networks is statutorily required, the agency's acting leadership proceeded to dismantle all of them.

To that end, the district court found, defendants "took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions." *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025). The day

---

[1] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. AGENCY FOR GLOBAL MEDIA (Mar. 15, 2025), https://perma.cc/YQA4-3TVA.

3

after the EO was signed, the agency's acting leadership sent a boilerplate e-mail to 1,042 of the 1,147 full-time employees placing them on administrative leave and another such email to each USAGM affiliated network terminating its grant on the ground that it "no longer effectuates agency priorities." *Id.* at *3 & n.5. The next day, the government cancelled all USAGM personal service contracts. It then instructed all the USAGM foreign news services to shut down their transmitters and place locally employed staff on leave. USAGM prepared to send termination notices to every radio broadcast technician working for it anywhere in the world who was not already in the process of retiring. *Id.* at *3. The government informed plaintiff AFGE of its plan to terminate 594 employees who are AFGE members. *Id.*

As a result of those wholesale actions, USAGM's flagship station, Voice of America, stopped reporting the news "for the first time in its 80-year existence." *Id.* Voice of America's affiliate networks abroad went dark or switched to airing only music. Widakuswara Compl. ¶ 82.

The statute is clear: Voice of America must "serve as a consistently reliable and authoritative source of news." 22 U.S.C. § 6202(c)(1). The government touts that it did not challenge part (3) of the injunction compelling its compliance with that statutory directive. Gov't Stay Mot. 1. But the significance of that caveat—beyond the purely symbolic—remains a mystery. The district court found as fact that the Agency has placed on leave or terminated all the VOA employees and contractors who are necessary to fulfilling that mandate. *See* Widakuswara Compl. ¶ 83 (*all* transmitters abroad shuttered and *all* locally employed staff placed on administrative leave). And there is no reason to conclude that the government is in fact complying with the injunction to get Voice of America back up and running. Plaintiff Abramowitz

**JA474**

4

emailed Defendants Lake and Morales the morning after the district court entered the injunction, asking about their plans to bring VOA staff back to work. He received no response. Abramowitz Opp'n 21. No status report or other filing or source of information suggests that Voice of America has resumed broadcasting the news.

In support of its emergency motion for a stay pending appeal in the Voice of America cases, the government contends it is likely to succeed on the merits in its defense against the claims of Voice of America's employees for two related reasons. First, as a threshold matter, it asserts that the district court lacked jurisdiction over the employee plaintiffs' claims because the employees did not first seek relief from the Merit Systems Protection Board (MSPB) (for employment disputes), the Federal Labor Relations Authority (FLRA) (for labor disputes), or the Office of Special Counsel (for prohibited personnel practices). Gov't Stay Mot. 20-21. Second, the government argues that the preliminary injunction is overbroad in ways that are unsupported by the claims the district court held were likely to succeed. Gov't Stay Mot. 19-21.

1. The administrative channeling defense is inapposite here. The government contends that plaintiffs must treat their wholesale removal from the workplace as if it were an aggregation of individualized employment actions. It suggests that the correct response is for each of the hundreds of employees to proceed with a separate, identical administrative claim at the MSPB or FLRA. I would not indulge any such fiction. Defendants themselves never did. They took broad, blunt, and decisive action to gut USAGM and VOA. They sent identical notices to all VOA employees. Widakuswara Compl. ¶ 74. Nothing about each decision or its execution was individualized. No employment-related rationale was

5

offered—except the cold comfort that the action was *not* for any "disciplinary purpose." *Id.*

Defendants give no realistic indication why administrative exhaustion is required here other than to weakly suggest that, viewed as individual employment actions, some "may be entirely lawful." Gov't Stay Mot. 21. The government leaves unsaid how review by the agencies it identifies could discern in any individualized sense how a wholesale removal of public sector employees from their jobs without employment-related grounds, notice, or prospects for return "may" be found to be lawful—or not—by the employment-review agencies to which they would direct the plaintiffs.

Even taken at face value, the government's channeling argument is unlikely to succeed. *See Widakuswara*, 2025 WL 1166400, at *10-11. Channeling plaintiffs' claims to administrative bodies designed to adjudicate individual employment or labor disputes would entirely shut off meaningful judicial review of the claims plaintiffs assert. The VOA plaintiffs challenge the dismantling of USAGM through the wholesale placement of employees on administrative leave with one boilerplate letter. The agency took that action without any employee-related justification. The announced reason defendants acted as they did was to dismantle a broadcaster whose mission and operation they disdain. That is not a "*covered* agency action[]" that must proceed through the administrative review scheme. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5-6, 10 (2012) (emphasis added). Nor is the action challenged here a matter of federal sector "employee relations" that must proceed through the Federal Labor Relations Authority. *Cf. Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). The plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as

6

it is the means by which they challenge defendants' unlawfully halting the work of Voice of America and shutting it down.

The channeling defense does not in any event reach all claims in the VOA cases. As the district court pointed out, *Widakuswara*, 2025 WL 1166400, at *10, there is no scenario in which the claims the nonprofit press organizations or personal service contractors raise could conceivably be channeled through the Federal Service Labor-Management Relations Statute, the Civil Service Reform Act, or the Foreign Service Act. There is no administrative agency from which plaintiffs Reporters Without Borders, Reporters Sans Frontières, or personal service contractors John Does 3 and 4 might seek relief, even if it made sense for them to try. Given defendants' failure to acknowledge or address the lack of any administrative process available to these plaintiffs, there is no basis to conclude the threshold challenge to the district court's jurisdiction to hear these plaintiffs' APA and constitutional claims is likely to succeed.

Plus, all the employees raise constitutional claims, including under the First Amendment, separation of powers, and the Take Care Clause. The government fails to acknowledge those claims. Constitutional claims are collateral to any review afforded by the Civil Service Reform Act and the Federal Service Labor-Management Relations Statute. Article III courts may retain jurisdiction over employment claims of federal employees that raise constitutional challenges. *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984) (retaining jurisdiction over allegation that officials responsible for reduction-in-force action held office in violation of the Appointments Clause); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996) (retaining jurisdiction over employee's First Amendment claim). The agencies' lack of expertise or capacity to address plaintiffs' properly framed

**JA477**

7

APA and constitutional claims is another reason the channeling requirement is unlikely to apply to them. *See generally*, *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 194 (2023) ("The Commission knows a good deal about competition policy, but nothing special about the separation of powers."). Far more likely—and certainly more appropriate in every practical sense—is that the government's mass action to eliminate virtually all the agency's employees, like its action of wholesale elimination of the agency's contractors, is subject to review directly in the district court to determine whether it was arbitrary or unlawful under the APA and in excess of the executive's unilateral authority.

2.   The plaintiffs are also likely to succeed in defending the district court's injunction restoring the VOA employees to their pre-March 15 status as relief properly tailored to the employee-plaintiffs' claims.   The government protests that the district court issued a "broad programmatic order" to enforce compliance with a "broad statutory mandate," which they claim exceeds the bounds of judicial review of agency actions set by *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) and *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55 (2004). Gov't Stay Mot. 22-23.   The fashioning of effective equitable relief is highly discretionary and context-specific.   As applied here, the government's cookie-cutter objection to the injunction in this case, entered by a highly experienced and able district judge based on a powerful record of extraordinary and categorical government conduct, does not persuade.

The scope of plaintiffs' claims and the preliminary relief granted to preserve their chance of permanent relief should they prevail differs in important ways from what the Court deemed problematic in *Lujan* and *SUWA*.   The plaintiffs in *Lujan* challenged the Department of the Interior's operations in reviewing, classifying, and developing plans for various public

**JA478**

8

lands. 497 U.S. at 890. As the Supreme Court observed, the "so-called 'land withdrawal review program'" they challenged was plaintiffs' own construct. *Id*. The complaint did not "refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations," but to a "continuing" and "constantly changing" amalgam of discretionary activities. *Id*. Unsurprisingly, the Court saw no final, reviewable agency action in the "program" to which plaintiffs objected. The conduct plaintiffs challenge in this case is discrete and clear: halting the work of virtually all the employees working at Voice of America and bringing the operation of that station to a halt. What they asked the district court to revive and protect is no more than what Congress prescribed. The kind of difficulty described in *Lujan* is absent here. Here, there is no "continuing" and "constantly changing" set of agency operations being placed before the court.

This case is also not a "programmatic" challenge to agency policies and does not, contrary to the government's remonstrance, require the court to run the agency. Defendants rely on *SUWA*, in which the Supreme Court rejected plaintiffs' request to force the Bureau of Land Management to comply with a statutory obligation to manage certain public lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 542 U.S. at 65 (quoting 43 U.S.C. § 1782(c)). Plaintiffs there urged the district court to order their preferred managerial regime by making the agency promulgate rules to prohibit the use of off-road vehicles. The Court observed that the statute at issue "assuredly [did] not mandate, with the clarity necessary to support judicial action . . . the total exclusion of [off-road vehicle] use." *Id.* at 66. Unlike in *SUWA*, plaintiffs are not seeking to direct the court to bring into being an alternative suite of broadcast stations to the one that Congress defined and funded. Instead, there is a "completed universe" of agency actions that plaintiffs have alleged, and the

9

district court agreed, are unlawful. Again, because they are likely to succeed in that claim, I would deny the stay.

The government cannot seriously contend on this posture that the relevant statutes—or more foundationally the constitutional separation of powers—permit the President to wholly scupper Voice of America and its affiliated Networks. Defendants characterize the claims as an impermissible attempt to clump together "many individual actions" and impermissibly challenge them as one under the APA. The fact that the government elected to take many unlawful agency actions in short order—thereby putting the whole agency on the chopping block—does not exempt their violations from judicial scrutiny. See *Widakuswara*, 2025 WL 1166400, at *11. Yes, the pace and scope of the government's destructive efforts present the courts with remedial challenges in this and many other recent cases. But the very volume of lawbreaking and the scope of operational functioning laid waste does not add up to courts losing the power to determine the lawfulness of agency action. And the government has not meaningfully disputed that the statute mandates "with the clarity necessary to support judicial action" that the USAGM operations Congress ordered be established and funded must continue to exist absent congressional action to the contrary.

**B.**

Defendants are similarly unlikely to succeed on the merits of their challenge to the preliminary injunction as it applies to Radio Free Asia (RFA) and Middle East Broadcasting Networks (MBN) (the Networks). Federal laws passed by Congress require the allocation of specified grant funding to the Networks. Nonetheless, defendants purported to terminate the Networks' grant agreements and are withholding funds allocated to them on the stated grounds that each grant award

**JA480**

10

"no longer effectuates agency priorities." Plaintiffs sued to halt defendants' impoundment of those funds.

The Networks claim that the defendants' funding freeze is in violation of the International Broadcasting Act and related statutes, and that its defiance of Congress's directives in those laws is *ultra vires* and unconstitutional. The government counters that plaintiffs' claims sound in contract, so must be dismissed because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over contract claims against the federal government. That "restrictive—and unprecedented— interpretation of [the district court's jurisdiction] should be rejected because the remedy available to the [plaintiffs] in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA" and the Constitution. *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988).

"This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969-70 (D.C. Cir. 1982), and it is clear from the Networks' complaint that this is not a "disguised," *id.* at 969, run-of-the-mill contract action "within the unique expertise of the Court of Claims," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). At its core, the Networks' suit challenges the government's assertion that it may disregard specific congressional funding directives when it disagrees with Congress's policy choices. Interpreting the Tucker Act to deny the district court jurisdiction over a matter with such "serious implications for our constitutional structure," *In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013), is utterly inconsistent with both this court's and the Supreme Court's longstanding understanding of the Tucker Act as providing the exclusive forum for a narrow category of

**JA481**

12

formatting altered).  Here, the plaintiffs' asserted rights arise from federal statutes and the Constitution, and they exist independent of any contract with USAGM.  *See* MBN Compl. ¶¶ 58-60, 65-68, 77-97; RFA Compl. ¶¶ 58-60, 65-68, 77-97. As such, the Networks' claims belong in the district court, not the Court of Claims.

First, the Networks claim that the government has acted contrary to the APA, the Networks' governing statutes, and congressional appropriations.  By freezing their funding, defendants have placed them in dire financial consequences and will force them out of existence within a matter of days. Federal law established Radio Free Asia and Middle East Broadcasting Networks and required allocation of funds to those specific, named entities to enable them to "provide accurate and timely information, news, and commentary" to Asia and the Middle East, and to "be a forum for a variety of opinions and voices from within Asian nations whose people do not fully enjoy freedom of expression."  22 U.S.C. § 6208(a)-(b); *see* Emergency Wartime Supplemental Appropriations Act of 2003, Pub. L. No. 108-11, 117 Stat. 559, 562 (2003).  Congress, with the President's approval, appropriated funds earmarked for MBN and RFA to carry out statutorily assigned functions.  Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (requiring appropriated funds to be "allocated in accordance with the table included … in the explanatory statement described in section 4"); Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (table designating $60,830,000 to be allocated to RFA and $100,000,000 to MBN).

13

The Networks also point to Congress's direction that funds appropriated for RFA and MBN "*shall* be allocated" to those entities. 2024 Appropriations Act, 138 Stat. at 735 (emphasis added); 22 U.S.C. § 6204(a)(5) (USAGM is to "make and supervise" the grants to the networks). And Congress expressly requires USAGM to provide RFA and MBN virtually all the funds appropriated for each network, strictly confining USAGM's reprogramming authority to at most 5% of a network's allocation. 2024 Appropriations Act, 138 Stat. at 735; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025). The statute allows USAGM to terminate a grant to RFA only for "failure to comply with" the requirement "that grant funds be used only for activities consistent with" the statute. 22 U.S.C. § 6208(c)(5). Those specific provisions govern over the general regulatory prerogative the government cites. The Agency has not asserted that RFA or MBN did anything inconsistent with their statutory mandates, but it has nonetheless acted to "terminate" their grants and freeze all their funding. Plaintiffs bring a classic APA challenge to the Agency's impoundment of funds—agency action that is both arbitrary and heedless of Congress's commands.

In sum, Congress called for the Networks to be established as private nonprofit entities supported by federal appropriations. It called for them to be maintained for the purpose of broadcasting uncensored journalism, especially to countries that restrict freedom of speech. And Congress made appropriations explicitly allocating funds to RFA and MBN by name. Those provisions tightly restrict the use of the Networks' funds for any other purpose. The Networks claim that the Agency acted contrary to those congressional directives when it impounded funds appropriated to support their operations. Their claims that the Agency violated the

14

International Broadcasting Act and the 2024 and 2025 Appropriations Acts thus arise from statute, not from contract.

Second, the complaint raises various constitutional claims. Plaintiffs allege that defendants acted beyond the Executive's authority by effectively repealing duly enacted law establishing the Networks for specified purposes and by freezing the funds Congress allotted to them. They frame those claims as violations of the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause. MBN Compl. ¶¶ 77-97; RFA Compl. ¶¶ 77-97. Constitutional claims for injunctive or declaratory relief face no sovereign immunity bar, per the *Larson-Dugan* exception. *See Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under [the *Larson-Dugan*] exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity") (internal quotation marks omitted); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963). The government's stay motion does not dispute that the Court of Claims could not adjudicate plaintiffs' constitutional claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), and the government does not appear to contest the district court's jurisdiction over them.

Defendants dispute plaintiffs' framing of their claims as statutory and constitutional. They argue that, because the Networks are funded by grants, plaintiffs' challenge to the impoundment must be treated as a breach of contract claim that belongs in the Court of Claims. Reply at 3. That misapprehends the plaintiffs' case. Their claim of entitlement rests on USAGM's alleged contravention of applicable statutory and constitutional constraints—not the terms of any particular contract. As the Networks note, if the grant

15

agreements never existed at all, they would have the same claims against USAGM. RFA/MBN Br. 14. The Congressional basis of their entitlement precedes the individual grants that deliver their allocations. *Cf. Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). USAGM's use of grants as a vehicle to deliver appropriated funds to the Networks does not "automatically transform" their case into a contract action. *Megapulse*, 672 F.2d at 968.

What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual. *Crowley*, 38 F.4th at 1109-10 (claim was statutory, not contractual, when it "require[d] primarily an examination of the statutes"). Judge Bork's opinion for our court in *Maryland Department of Human Resources v. U.S. Department of Health and Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), illustrates the point. We recognized there that the state's claim to funding under a federal grant-in-aid program for social workers' training expenses bore some resemblance to "a request for specific performance of a contract that obliges the promisor to pay money." *Id*. at 1449. But we held that, because "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," the state's claim of entitlement was not within the Court of Claims' jurisdiction over contracts with the government. *Id*. (quoting *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985)).

The majority submits that, "[o]nce the agency entered these contracts" appropriating the congressionally specified funds to the Networks, "it incurred a new obligation" to make monthly grant payments, and any claims of nonpayment "are squarely contract claims under the Tucker Act." Maj. at 8. But

16

we have long since rejected the notion that "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971. As we explained in *Megapulse*, the majority's premise allows the government to "avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities. Because government involvement in any such activities would thereby also constitute a breach of a contract term, any injunction would be equivalent to an award of specific performance, which, as a matter of public policy, is not available against the government." *Id*. There, we held that "[w]e cannot accept such an interpretation of the law." *Id*. The majority does not explain under what authority or reasoning it decides that it can accept such an interpretation today.

2. Consider next the type of relief sought. On this point, "[t]he crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit." *Crowley*, 38 F.4th at 1107. Here we must look at the causes of action in plaintiffs' complaints. *Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007) ("Jurisdiction is determined by looking to the complaint."). RFA and MBN seek injunctive and declaratory relief. No count sounds in contract, and none seeks money damages for breach. Plaintiffs' claims therefore do not belong in the Court of Claims, which exists to provide a centralized, specialized forum to resolve "actions based on government contracts," *Megapulse*, 672 F.2d at 967, which result in "naked money judgment[s] against the United States," *Bowen*, 487 U.S. at 905; *see also Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

True, courts must be wary of plaintiffs who seek to avoid Tucker Act jurisdiction by "disguising a money claim as a claim requesting a form of equitable relief." *Kidwell*, 56 F.3d

**JA487**

17

at 284. But that risk is not present here. The reality that the Networks' *funding* is at stake does not change the analysis: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *Kidwell*, 56 F.3d at 284 (prospect that "success on the merits may obligate the United States to pay the complainant" does not make a claim one for "money damages").

The Supreme Court in *Bowen* distinguished orders for specific relief—there, an order directing the Secretary to reverse his refusal to financially reimburse the state—from money damages. Money damages "refers to a sum of money used as compensatory relief" that "substitutes for that which ought to have been done." 487 U.S. at 895, 910. When plaintiffs seek funds under statutory entitlement, rather than as compensation for losses suffered, the funds are not "money damages" for purposes of the Tucker Act. *Md. Dep't of Hum. Res.*, 763 F.2d at 1446; *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997). Unlike disgorgement of funds owed, "money damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost." *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).

The type of relief plaintiffs seek is unavailable in the Court of Federal Claims, which "has no power to grant equitable relief." *Bowen*, 487 U.S. at 905. RFA and MBN are seeking more than the restoration of their past-due funding for April; they also request a declaration that USAGM is "required by law to take all necessary steps" to ensure that USAGM disburses to them "all congressionally appropriated funds through September 30, 2025" and an injunction against future withholding of congressionally appropriated funds. RFA Compl. 24-25; MBN Compl. 24-25. The Court of Federal

**JA488**

18

Claims' lack of authority to address these aspects of plaintiffs' claims underscores why it is not the appropriate court.  *See Crowley*, 38 F.4th at 1109; *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201.  When a private entity funded by federal appropriations has "a cooperative, ongoing relationship" with the agency "in the allocation and use of the funds," a simple money judgment is unlikely to be fitting relief.  *Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201.

3.    The stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not change the landscape.  Unlike the Networks here, the *Department of Education* plaintiffs raised no constitutional claim.  Their only claim was to sums awarded to them in previously awarded discretionary grants.  Those plaintiffs were not entities created by statute and designated by Congress to receive specified sums.  The equities there were also very different:  The Court relied on the *Department of Education* plaintiffs' representation that they had financial resources, even without the grant funding, to keep their programs running during the litigation.  RFA and MBN have no financial cushion and are on the verge of collapse.

This case is more like *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025), in which the Supreme Court declined to stay interim injunctive relief despite assertions that the plaintiffs' statutory claims were really claims for monetary relief that belonged in the Court of Claims.  *See id.* at 756 (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, JJ., dissenting from the denial of the application to vacate the district court's order).  The plaintiffs in *AIDS Vaccine Advocacy Coalition*, like the Networks here, claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the

**JA489**

19

Constitution.  As here, their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes.   To the extent that the Supreme Court's action on emergency stay orders influences how we apply binding precedent of that court and this one, it favors denying the stay here as in *AIDS Vaccine Advocacy Coalition*.

## II.

1.   Plaintiffs in each case have established that they will suffer irreparable injury if the district court's preliminary injunction is stayed.  The plaintiffs in the two VOA lawsuits will be substantially and irreparably injured by the stay.  VOA has not published or aired a single piece of news content since March 15, 2025.  Abramowitz Decl. ¶ 33.  "Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered."  *Id.*   VOA's journalists have been unable to exercise their First Amendment rights to free speech and free press.  And the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 559 (D.C. Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

Each day that passes without VOA publishing any content only compounds the irreparable harm:  The stifling of its distinctive journalistic voice, the erosion of its audience, and the breach of the trust of every reporter and listener who has relied on its broadcasts.  The blight on VOA's reputation, and that of the United States, when a publicly sponsored news source with an eight-decade track record of reliability is shuttered under accusations of fraud, waste, and producing "anti-American content," Abramowitz Decl. ¶¶ 44-45, will

**JA490**

20

only fester while the preliminary injunction is stayed. The asserted harm to VOA's reputation is irreparable. *See, e.g.*, *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997).

VOA employees also will be exposed to irreparable professional and personal consequences absent injunctive relief. For example, plaintiff John Doe 3, a foreign national on a J-1 visa, is a journalist working for VOA as a personal service contractor. Widakuswara Compl. ¶ 22. His home country is governed by an authoritarian regime that has labeled VOA a "subversive organization." *Id*. John Doe 4 is a VOA contractor whose home country is hostile to LGBTQ people like himself. *Id.* ¶ 23. The district court found that "defendants' actions virtually ensure that Does 3 and 4 will be subject to deportation immediately," and may face elevated risks in their home countries because of the work they did under the auspices of USAGM. *Widakuswara*, 2025 WL 1166400, at *16.

That the USAGM employees and personal service contractors are currently receiving full pay and benefits does not erase the harm. The government's own announced assessment that the existing agency was beyond repair spells widespread terminations once the injunction is stayed. The district court recounted the March 25, 2025, notice from USAGM's HR Director to Plaintiff AFGE that it had decided to terminate 594 AFGE members working for USAGM. *Widakuswara*, 2025 WL 1166400, at *3. That notice is a red flag for USAGM employees once the preliminary injunction is lifted. As to the personal service contractors, they are currently receiving full pay and benefits only because of court intervention; USAGM withheld the termination order only after the U.S. District Court for the Southern District of New York issued a temporary restraining order to halt it.

**JA491**

21

Widakuswara Opp'n 2 n.2.  The district court also foresaw irreparable harm to plaintiff Reporters Sans Frontières in the absence of a preliminary injunction because "VOA's silence injured [its] ability to distribute its broadcasting and amplify press freedom concerns." *Widakuswara*, 2025 WL 1166400, at *8.  Defendants have not challenged that finding on appeal.

2.  RFA and MBN face existential harm absent injunctive relief.  Contrary to defendants' assertions, the imminent injuries that the affiliated Networks and their employees face cannot be remedied by money damages at some unspecified date in the future.  RFA "now expects that it does not have enough funds to get through May 9, 2025, absent extreme measures."  Second Fleming Decl. ¶ 8.  At the start of this litigation, MBN employed more than 500 people.  Because USAGM withheld its statutorily mandated funding, by April 12 MBN had been forced to lay off 90 per cent of those employees.  Second Kline Decl. ¶ 3.  Layoffs of remaining staff and the organization's bankruptcy are imminent once the preliminary injunction is stayed.  *Id.* ¶ 12.  The network "will cease to exist except on paper" no later than May 31, 2025.  *Id.* ¶ 15.  That existential threat should have moved this court to deny the government's stay motion.

RFA employees, represented by Plaintiff NewsGuild-CWA in the *Widakuswara* suit, also face unplanned, costly, and stressful dislocations they would not have suffered absent the agency's challenged actions.  Many RFA employees, including NewsGuild members—work in the United States under H1-B visas.  Schleuss Decl. ¶ 8.  Losing their jobs likely means deportation to their home countries.  Professionals who have served the USAGM mission of bringing objective news coverage to people living under repressive regimes, including in some cases their own home countries, may have to return to countries "that persecute journalists for reporting the news,"

**JA492**

22

making them all the more vulnerable because of the service they have rendered to USAGM. *Id.*

3. Meanwhile, the government is unable to identify substantial harm it would suffer if the preliminary injunction were not stayed. It principally points to the order's restriction of its authority to manage the agency and its employees. The nature of injunctive relief is to interfere with what the enjoined party would otherwise do. And when agency action that a court concludes is likely unlawful is on a grand scale, an appropriate preliminary injunction must have scope commensurate to that of the challenged deeds. That much is unavoidable. The district court nonetheless made clear it respected the government's lawful prerogatives. In denying its motion for stay pending appeal, the court reiterated that USAGM retains its discretionary management authority: "When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order . . . such execution of normal operations would, to the contrary, be *in accordance with* the status quo pre-March 14." Order Denying Motion for Stay Pending Appeal at 5 [ECF No. 104] (emphasis added).

Defendants also protest that the preliminary injunction "does not account for the various costs associated with reinstating all employees and contractors." Gov't Stay Mot. 25. Again, the cost of that restoration is proportionate to the dislocation the government chose to undertake. There are less precarious ways to effect institutional change that might be easier to dial back. In eschewing them, the government presumably accepts the heightened risk calculus attending its preferred approach. But it cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

**JA493**

23

Nor has the government demonstrated that restoration of congressionally appropriated funds to the Networks amounts to irreparable harm. Plaintiffs have shown that they are likely entitled to that relief. The government may be right that it would be unable to recover that money once handed over. The Networks are entirely dependent on it to stay afloat and, if they had it in hand, would promptly use it for that purpose. That said, the harm to the government from being required to release funds that are statutorily earmarked for the very purpose and entity to which the injunction directs them—funds that are legally restricted against reprogramming to other functions or entities—seems less substantial than the loss of the same amount of money might be in another circumstance.

4. That leaves only the public interest. Duly enacted legislation, fashioned by Congress and signed by the President, is a strong indicator of where the public interest lies. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Congress founded, supported, and expanded the family of USAGM broadcast networks. It started with Voice of America to counter Nazi propaganda. In response to the need to more actively counter anti-American narratives with concrete and timely factual reporting, Congress has established affiliate networks in various regions of the world—Europe, Asia, and the Middle East. Dismantling that family of networks cannot be squared with the public interest. By contrast, restoring VOA, RFA, and MBN to operate as Congress intended, providing news that that is "consistently reliable and authoritative, accurate, objective, and comprehensive" serves the interest of the American people. 22 U.S.C. § 6202(b).

The district court's preliminary injunction was tailored to provide necessary relief to the plaintiffs while the courts work to resolve their claims on the merits. The panel errs in staying

24

that injunction.  Rather than preserving the relative positions of the parties, this stay all but guarantees that the networks will no longer exist in any meaningful form by the time this case is fully adjudicated.  I regret that networks charged with exemplifying the ideals of free speech, free opinion, and a free press to the world at large are silenced by our own government's action in disregard of the expressed will of Congress—actions that, as the district court most ably explained, are likely to be found unlawful.

I respectfully dissent.

**JA495**

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5150**                    **September Term, 2024**

**1:25-cv-00966-RCL**

**Filed On:** May 7, 2025

Middle East Broadcasting Networks, Inc.,

      Appellee

    v.

United States of America, et al.,

      Appellants


**No. 25-5151**

**1:25-cv-00907-RCL**


Radio Free Asia,

      Appellee

    v.

United States of America, et al.,

      Appellants


**JA496**

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5150**                                                      **September Term, 2024**

**No. 25-5158**

**1:25-cv-00799-RCL**

RFE/RL, Inc.,

      Appellee

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

**BEFORE:**    Srinivasan, Chief Judge, and Henderson*, Millett, Pillard, Wilkins,
Katsas*, Rao*, Walker*, Childs, Pan, and Garcia, Circuit Judges

## O R D E R

     Upon consideration of the emergency petition for rehearing en banc in Nos. 25-
5150 and 25-5151, which requests en banc reconsideration and vacatur of the court's
May 3, 2025 order entered in Nos. 25-5144, 25-5145, 25-5150, and 25-5151 granting
the government's motions for stay pending appeal in those cases, and the response
thereto; the emergency petition for initial hearing en banc in No. 25-5158, which the
court construes as a petition for rehearing en banc requesting en banc reconsideration
and vacatur of the court's May 7, 2025 order entered in No. 25-5158 granting the
government's motion for stay pending appeal in that case, and the response thereto;
and the Rule 28(j) letter in No. 25-5158,  it is

     **ORDERED**, on the court's own motion, that the following parts of the court's May
3, 2025 order in Nos. 25-5144, 25-5145, 25-5150, and 25-5151 be administratively
stayed pending further order of the court:

     In No. 25-5144, staying provision (2) of the district court's preliminary injunction
filed April 22, 2025;

     In No. 25-5150, staying the district court's preliminary injunction filed April 25,
2025;

**JA497**

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5150**                                    **September Term, 2024**

In No. 25-5151, staying the district court's preliminary injunction filed April 25, 2025.  It is

**FURTHER ORDERED,** on the court's own motion, that the court's May 7, 2025 order entered in No. 25-5158 be administratively stayed pending further order of the court.

The purpose of this administrative stay is to give the court sufficient opportunity to consider the emergency petitions and should not be construed in any way as a ruling on the merits of those petitions.  See D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024).


**Per Curiam**


**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:     /s/
Elbert Lestrade
Deputy Clerk


*Circuit Judges Henderson, Katsas, Rao, and Walker dissent from this order.  Separate dissenting statements of Circuit Judges Katsas and Rao are attached.  Circuit Judges Henderson, Katsas, and Walker join in the statement of Circuit Judge Rao.  Circuit Judges Rao and Walker join in the statement of Circuit Judge Katsas.

KATSAS, *Circuit Judge*, dissenting: Judge Rao's dissent, which I join, explains the equitable and procedural considerations cutting against the putative administrative stay entered by the *en banc* Court, which effectively requires the government to pay out over $25 million in disputed grants. I write separately to explain another consideration cutting strongly in the same direction: The government is likely to succeed on the merits of the underlying appeals.

I

The United States Agency for Global Media oversees six federally funded broadcast networks. Three of them—Radio Free Asia, Middle East Broadcasting Networks, and Radio Free Europe/Radio Liberty—operate as private, non-profit corporations. Through appropriations, Congress has allocated specific funding for these networks, which USAGM disburses through grant agreements. *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043. In response, USAGM terminated grant agreements with RFA, MBN, and RFE/RL. Parties affected by the downsizing filed several lawsuits in our district court to stop it. In one of these lawsuits, the district court granted a preliminary injunction requiring USAGM to restore its FY 2025 grants with RFA and MBN. *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *18 (D.D.C. Apr. 22, 2025). The court entered the same relief in separate lawsuits filed by RFA and MBN. *Radio Free Asia v. United States*, No. 25-cv-907, 2025 WL 1291342, at *1 (D.D.C. Apr. 25, 2025) (consolidated with MBN lawsuit). In the suit brought by

**JA499**

2

RFE/RL, after USAGM terminated the FY 2025 agreement, the district court ordered USAGM to enter a successor agreement on the same terms as the predecessors and to disburse funds to RFE/RL consistent with its terms. *RFE/RL v. Lake*, No. 25-cv-799, 2025 WL 1232863, at *10 (D.D.C. Apr. 29, 2025).

The government appealed all these orders and sought stays pending appeal. On May 3, a motions panel of this Court granted stays in the *Widakuswara*, *RFA*, and *MBN* appeals. On May 7, applying reasoning from that stay order, the same panel granted a further stay in the *RFE/RL* appeal. RFA, MBN, and RFE/RL sought *en banc* review of these stays. The *en banc* Court now grants a putative administrative stay of both stay orders. That action effectively requires the government to pay out over $25 million in disputed April grant funds.

Because the putative administrative stay effectively decides the merits regarding the disputed April grant funds, it should rest on the traditional stay factors, which include likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009).

II

The RFA, MBN, and RFE/RL appeals turn on whether the district court had jurisdiction to consider their claims. In my view, it likely did not.

This question implicates the line between (1) statutory claims against the government reviewable in district court through the Administrative Procedure Act and (2) contract claims against the government reviewable only in the Court of Federal Claims through the Tucker Act. The APA waives the federal government's sovereign immunity for claims "seeking relief other than money damages," but it withdraws the waiver to the extent that "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5

**JA500**

3

U.S.C. § 702. The Tucker Act waives sovereign immunity by giving the Court of Federal Claims jurisdiction over claims against the United States "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). For such contract claims, the Tucker Act is exclusive, displacing claims that might otherwise fall within the scope of the APA waiver. *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). To decide whether a claim is contractual for Tucker Act purposes, we consider both the "source of the rights upon which the plaintiff bases its claims" and the "type of relief sought." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

These appeals raise the question of how those principles apply where Congress has allocated appropriated funds to specific recipients, but mandated that the funds be distributed through grant agreements. On the one hand, the governing appropriations statute provides that specific sums of money "shall be allocated" to specific grantees, including RFA, MBN, and RFE/RL. Appropriations Act of 2024, 138 Stat. at 735. According to the networks, that gives them a *statutory* entitlement to receive the appropriated and allocated funds, independent of and antecedent to the terms of any particular grant agreement that may serve as a vehicle for distributing the allocated funds to the statutory beneficiaries. On the other hand, Congress required the funds to be distributed to grantees through *contracts*. It permitted USAGM to "make and supervise grants and cooperative agreements" with the networks, without authorizing any other kind of distribution mechanism. 22 U.S.C. § 6204(a)(5). Furthermore, it provided that grants to RFA "shall be made pursuant to a grant agreement" imposing binding terms on RFA. *Id.* § 6208(c)(5). Likewise, it provided that grants to RFE/RL "shall only be made in compliance with a grant agreement" imposing binding terms on RFE/RL. *Id.* § 6207(g). Thus, in the grant agreements at issue, USAGM promised to pay to the grantee

**JA501**

4

its allotted share of appropriated funds.  *See*, *e.g.*, Grant Agreement Between the U.S. Agency for Global Media and Radio Free Asia Art. 1.a (Jan. 15, 2025).  And in return, each grantee promised to meet various program requirements as set forth in the grant itself and the underlying statute.  *See*, *e.g.*, *id.* Arts 1.b, II–XIV.  These agreements, reflecting a bargained-for exchange of promises, create government contracts for Tucker Act purposes.  *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–39 (Fed. Cir. 2021).  Under *Megapulse*, the Tucker Act plainly would cover any claims seeking to enforce the government's contractual promise to pay the allocated funds, which would render the APA waiver inapplicable.

In essence, the networks contend that while they could seek to enforce the contractual promises to pay, they need not do so because the appropriation statute itself entitles them to receive the appropriated funds as allotted.  The networks invoke the principle that agencies "must follow statutory *mandates* so long as there is appropriated money available" for doing so.  *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *see Train v. City of New York*, 420 U.S. 35, 41–43 & n.9 (1975) (enforcing statutory mandate to "allocate" or "allot" appropriated funds).  But appropriations merely provide budget authority for agencies to incur "financial obligations" for specified purposes; to the extent they are mandatory, they compel the agency not necessarily to disburse funds right away, but only to form enforceable contractual or other commitments for disbursing them.  GAO, Principles of Federal Appropriations Law Ch. 2, at 2–1 (4th ed. 2016 revision) ("Budget Authority: Authority to Obligate"); *see Train*, 420 U.S. at 46 (rejecting asserted agency "power to withhold funds from allotment *and obligation*") (emphasis added); *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 308 (2020) ("The Government may incur an obligation by contract or by statute"); *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (when appropriation lapses,

5

"unobligated funds revert back into the general treasury"). Here, the statute requires appropriated funds to be "allocated" pursuant to a statutory formula. Appropriations Act of 2024, 138 Stat. at 735. Assume this means that *all* of the appropriated funds must be so "allocated," as the networks contend. In *RFA* and *MBN*, the agency satisfied this statutory duty when it obligated all the appropriated funds in the FY 2025 grant agreements, which created the contractual obligations to disburse the funds as required by the agreements. And in *RFE/RL*, the agency would satisfy this statutory duty by entering a successor agreement obligating the funds at issue. So, while the statutes invoked by the networks would support jurisdiction over APA claims to *obligate* the disputed funds through grant agreements, they could not support jurisdiction over claims for *payment* under the ensuing contracts. For this reason, the motions panel concluded that the government was likely to succeed on its contention that the Tucker Act barred the district court from ordering USAGM to pay the disputed sums to the networks.

The networks object that this analysis treads too much into the merits of their underlying claims, as opposed to the jurisdiction of the district court to hear them. But the stay orders did not decide the merits of any contract claim for breach of the relevant grant agreements. And they assumed, but did not decide, that the networks could have brought an APA claim to enforce the statutory command that the "appropriated" funds had to be "allocated" consistent with a statutory formula. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *4 (D.C. Cir. May 3, 2025). The panel merely concluded that, under the appropriations principles set forth above, no such claim would support the remedy sought by the networks and ordered by the district court—an injunction compelling the government to disburse all of the allotted funds to the networks. *See id.* And because any such injunction would in substance compel specific performance of the grant agreements, it would

6

involve what *Megapulse* described as a "disguised contract action" covered by the Tucker Act. *See* 672 F.2d at 967–68. In any event, nothing of substance turns on whether the bottom line here is packaged as a conclusion that (1) the appropriation statute does not create an entitlement to receive money (thereby defeating plaintiffs' claims on the merits) or (2) the monetary relief ordered necessarily involves enforcement of the grant agreements (thereby depriving the district court of jurisdiction over the claims). Finally, there is nothing untoward with examining the relevant statutory scheme—involving allotted appropriations distributed through contractual grant agreements—to assess the substance of the claims at issue. To the contrary, the proper application of *Megapulse* turns on substance, not labels—*i.e.*, whether the claim at issue is contractual "at its essence." *See id.* at 967. Making that assessment does not involve an impermissible consideration of merits issues as opposed to jurisdictional ones.

The networks also claim support from *Bowen v. Massachusetts*, 487 U.S. 879 (1988). In *Bowen*, the Supreme Court held that specific monetary relief, as opposed to substitutionary monetary relief, does not involve "money damages" within the meaning of section 702. *See id.* at 893–96. In other words, if a plaintiff seeks to enforce an alleged statutory entitlement to money, the claim involves "relief other than money damages" for APA purposes. *See id.* That holding has no relevance here. As explained above, the Tucker Act does not bar application of section 702 on the ground that contract claims seek money damages; instead, it does so by impliedly forbidding the award of contract-like remedies on disguised contract claims—including remedies that amount to specific performance. *See Transohio Savings Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("*Bowen* did not involve a contract and it did not address the 'impliedly forbids' limitation on the APA's waiver of sovereign immunity"), *abrogated on other grounds as*

**JA504**

7

*recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985) (Tucker Act bars awards of specific performance); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985) (same). The networks also invoke *Bowen*'s further holding that relief in the Court of Federal Claims is not always an "adequate" remedy to foreclose APA review under 5 U.S.C. § 704. That holding is also inapplicable to these cases, which turn on what counts as "impliedly forbid[ding]" relief within the meaning of section 702, not what counts as an "adequate" alternative under section 704.

Beyond *Bowen*, the networks primarily invoke *Maryland Department of Human Resources v. HHS*, 763 F.2d 1441 (D.C. Cir. 1985), which involved block-grants to States under Title XX of the Social Security Act. *See id.* at 1443. But we specifically held that the disallowance of reimbursements at issue there was not contractual within the meaning of the Tucker Act, and we thus had no occasion to consider "the preclusive effects of the Tucker Act" on the APA sovereign-immunity waiver. *Id.* at 1449. Here, in contrast, the grant agreements clearly constitute government contracts for Tucker Act purposes, *see Columbus Reg'l Hosp.*, 990 F.3d at 1338–39, and the networks do not contend otherwise.

The networks also invoke Federal Circuit precedent, but it cuts against their position as well. The networks highlight *National Center for Manufacturing Sciences v. United States*, 114 F.3d 196 (Fed. Cir. 1997) (*NCMS*), which held that the APA, not the Tucker Act, governed claims that a statute required "allotted" funds to be "distributed" to the plaintiffs. *See id.* at 198. However, the claim in that case was that the allotted funds should be "obligated" through the formation of a new grant agreement. *See id.* at 202. Later, the Federal Circuit confirmed that *NCMS* had involved a claim for access to

8

"appropriated but unobligated funds"—which would have required the agency "to expand [its] existing contractual relationship or to create a new one." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1369 (Fed. Cir. 2021). *NCMS* is thus inapposite to the claims of RFA and MBN because USAGM did obligate all of the funds allocated to them by entering into binding grant contracts. As for the claims of RFE/RL, we may assume *arguendo* that the district court had jurisdiction to compel it to form an extended grant agreement obligating more of the allotted funds. Even so, that would not create jurisdiction to then specifically enforce the agreement through an order compelling payment under the agreement. Litigation involving the Lummi Tribe confirms all of this: In those cases, the Federal Circuit recognized APA jurisdiction over suits where tribes claimed a statutory entitlement to "larger … grants" than ones the government had already entered. *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017). At the same time, that Court confirmed Tucker Act jurisdiction over related claims challenging the government's performance under *existing* grants. *See Lummi Tribe of Lummi Rsrv., Wash. v. United States*, 788 F. App'x 717, 720–24 (Fed. Cir. 2019).

Finally, the networks contend that the remedies available in the CFC, which include money damages but not prospective relief to compel specific performance, are not good enough. The extent of remedies available on contract claims against the government is of course a policy choice for Congress. Their limited nature is not, in my view, good reason to strain to recharacterize contract claims as something else.

\*    \*    \*    \*

For these reasons, and those stated by Judge Rao, I respectfully dissent from the grants of the administrative stays.

Rao, *Circuit Judge*, dissenting: When is an administrative stay not an administrative stay? When it forces the government to release over $25 million in grant funds with no hope of recovery, even if the government ultimately prevails on the merits, as it is likely to do here.

The "administrative stay" entered by the en banc majority is highly unusual. The ordinary purpose of an administrative stay is to "freeze legal proceedings until the court can rule on a party's request for expedited relief." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (cleaned up). As the court's order recognizes, an administrative stay does not adjudicate the underlying merits of an appeal, but rather gives "the court sufficient opportunity to consider" the pending emergency motion. Order at 2 (citing D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024)). Yet today's order goes far beyond preserving the status quo. By lifting the panel's stay of the district court's orders, the court forces the government to immediately disburse millions of dollars in grant funds to the plaintiffs. The practical effect of this administrative stay is to decide the plaintiffs are entitled to government funding now.

The majority offers no rationale for this extraordinary exercise of judicial power. In granting a stay pending appeal, the panel held that the district court lacked jurisdiction to restore the grants for two of the plaintiffs; that, on the merits, the district court erroneously ordered the government to enter an agreement with the third plaintiff; and that the government would suffer irreparable harm because it is unlikely to recover the funds once they are disbursed.[1] *See Widakuswara v. Lake*,

---

[1] The district court did not require the plaintiffs to post a bond to ensure the government could be compensated should it ultimately prevail on appeal. *See Widakuswara v. Lake*, No. 1:25-cv-1015, 2025 WL 1166400, at *17 (D.D.C. Apr. 22, 2025).

2

No. 25-5144, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025); Order, *RFE/RL, Inc. v. Lake*, No. 25-5158 (D.C. Cir. May 7, 2025). The panel reached these conclusions in part based on the Supreme Court's recent stay in *Department of Education v. California*, 145 S. Ct. 966, 968–69 (2025). Today's order offers no explanation as to whether the panel's holding was erroneous. Absent any such justification, it is difficult to see how the plaintiffs are entitled to the millions of taxpayer dollars released by the court's order.

Even if the en banc majority believes the plaintiffs are likely to suffer irreparable injury absent our intervention, the timing of the court's order is mystifying and unsupported by the record. Two of the plaintiffs—Middle East Broadcasting Networks and Radio Free Europe/Radio Liberty—have attested they can survive without government funding until at least the end of May. MBN En Banc Petition at Add. 91–92; RFE/RL En Banc Petition at Add. 31–32. And the third plaintiff—Radio Free Asia—has attested only that it will be forced to terminate most of its employees if it does not receive funding by May 9. RFA Stay Opp. at Add. 1. Radio Free Asia does not explain why this harm will be irreparable beyond vague assertions of "reputational and network impacts." *Id.* at Add. 2; *see Widakuswara*, 2025 WL 1288817, at *5 (finding the plaintiffs "may seek to recover any wrongfully withheld grant funds in the" Court of Federal Claims). For at least two of the plaintiffs, and likely all three, there is no reason for this court to rush out millions of dollars in government funding. By contrast, once the government disburses the grant money, there is no possibility of later recovery because, as the plaintiffs attest, they operate almost entirely on federal funds and therefore will be unable to reimburse the government.

Despite the government's immediate and irreparable harm, not to mention its likelihood of success on the merits, the en

**JA508**

3

banc court picks a side and effectively orders a multi-million dollar judgment in favor of the plaintiffs. When the plaintiffs requested a decision from this court in time to seek Supreme Court review, the panel issued its stay order on a highly expedited schedule. The en banc court affords no similar grace to the government. Instead, it issues an "administrative stay" forcing the government to pay out the grants, with scant time to seek review from the Supreme Court. This gambit stretches our en banc standards and is an abuse of the court's remedial discretion. I respectfully dissent.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5150**                    **September Term, 2024**

**1:25-cv-00966-RCL**

**Filed On:** May 9, 2025

Middle East Broadcasting Networks, Inc.,

      Appellee

   v.

United States of America, et al.,

      Appellants


**No. 25-5151**

**1:25-cv-00907-RCL**

Radio Free Asia,

      Appellee

   v.

United States of America, et al.,

      Appellants

**JA510**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5150**                                    **September Term, 2024**

**No. 25-5158**

**1:25-cv-00799-RCL**

RFE/RL, Inc.,

      Appellee

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

## O R D E R

It is **ORDERED**, on the court's own motion, that the Clerk issue the attached statement of Circuit Judge Pillard, concurring in the en banc court's May 7, 2025 order entering an administrative stay.

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:   /s/
      Selena R. Gancasz
      Deputy Clerk

**JA511**

PILLARD, *Circuit Judge*, concurring:

We all agree that an administrative stay can be useful and appropriate to preserve the *status quo* for a brief period while the court considers a pending request for emergency relief. And we all agree that a stay is meant to "freeze legal proceedings until the court can rule," not to predetermine the merits of the appeal. Diss. Op. (Rao, J.) at 1 (quoting *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring)). All also agree that the administrative stay here (as may often be the case) has a real-world consequence: It temporarily allows preliminary injunctions commanding immediate release of impounded funds to go back into effect.

It is also undisputedly true, though, that there are substantial interests—and asserted irreparable harms—in both directions. In response to requests for emergency relief, Judge Lamberth held hearings and found that Radio Free Asia, Middle East Broadcasting Networks, and Radio Free Europe / Radio Liberty would very soon be forced to shut down if the government continued to withhold their funding. *See Widakuswara v. Lake*, No. 25-1015, 2025 WL 1166400, at *16 (D.D.C. Apr. 22, 2025); *Radio Free Asia v. United States*, No. 25-907, 2025 WL 1291342, at *1 (D.D.C. Apr. 25, 2025); First Fleming Decl. ¶ 26; No. 25-907, ECF No. 12 Attach. 2; First Kline Decl. ¶ 39, No. 25-966, ECF No. 11 Attach. 3. As Radio Free Asia's Chief Operating Officer attested in its petition for action by the *en banc* court: "After May 9, RFA will exist in name only." Second Fleming Decl. ¶ 10, RFA/MBN Emergency Pet. Add. 89. The government does not challenge—and presents no ground for questioning—that attestation.

In short, while there is harm to the government from unblocking the district court's injunctions, there is also harm to the networks from blocking injunctive relief. The networks have no source of funding other than their monthly allotments.

**JA512**

The undisputed record evidence is that they cannot exist much longer without that funding. In that context, suspending all payments to the networks would not maintain the *status quo*.

How, then, to compare the competing assertions of irreparable harm in deciding whether to enter an administrative stay? As I have elsewhere explained, the government does not argue that, at the end of the day, it is entitled to keep the networks' funding. It insists only that the litigation must proceed in the Court of Claims. *See RFE/RL* Order Granting Stay Pending Appeal, No. 25-5158 (D.C. Cir. May 7, 2025), Dissent at 3 (Pillard, J.). The administrative stay has the consequence of requiring the government to distribute the networks' past-due funding to prevent their imminent collapse while we consider the government's jurisdictional argument. In my view, the merits of that question do not counsel against the administrative stay. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *10-14 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting).

The *en banc* court's decision to pause for a brief time is not a rushed effort to choose one side or the other. Instead of jumping directly to resolving the petitioners' request to vacate the panel's emergency stay after very little time to examine the issue—in a context in which, per unchallenged affidavit evidence, one organization would exist in name only within three days of the petition's filing—the *en banc* court pushed pause to allow further consideration of litigation that has developed at breakneck speed. The *en banc* court's stay prevents the plaintiff networks from going under while the court engages in that consideration.

**JA513**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 22, 2025

Patsy Widakuswara, et al.,

     Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

     Appellants

**No. 25-5145**

**1:25-cv-00887-RCL**

Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

     Appellees

    v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

     Appellants

**BEFORE:**   Srinivasan, Chief Judge, and Henderson, Millett, Pillard, Wilkins,
Katsas, Rao, Walker, Childs, Pan, and Garcia, Circuit Judges

## O R D E R

Upon consideration of the petitions for rehearing en banc, which move for en
banc reconsideration and vacatur of the court's May 3, 2025 order; the responses
thereto; and the letters regarding case status, it is

**JA514**

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                                                    **September Term, 2024**

**ORDERED** that the motions be denied insofar as the motions request en banc reconsideration and vacatur of the court's May 3, 2025 order staying the following:

In No. 25-5144, provision (1) of the district court's preliminary injunction filed April 22, 2025;

In No. 25-5145, the district court's preliminary injunction filed April 22, 2025, to the extent the relief granted falls within provision (1) of the April 22, 2025 preliminary injunction in No. 25-5144.

A majority of the judges eligible to participate did not vote in favor of the motions in this regard.  Statements concerning this order will follow at a later time.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk

**JA515**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 28, 2025

Patsy Widakuswara, et al.,

     Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

     Appellants

**No. 25-5145**

**1:25-cv-00887-RCL**

Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

     Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

     Appellants

**JA516**

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5144**                                   **September Term, 2024**

**No. 25-5150**

**1:25-cv-00966-RCL**

Middle East Broadcasting Networks, Inc.,

> Appellee

> v.

United States of America, et al.,

> Appellants

**No. 25-5151**

**1:25-cv-00907-RCL**

Radio Free Asia,

> Appellee

> v.

United States of America, et al.,

> Appellants

**BEFORE:**   Srinivasan, Chief Judge, and Henderson*, Millett, Pillard, Wilkins, Katsas*, Rao*, Walker*, Childs, Pan, and Garcia, Circuit Judges

## O R D E R

Upon consideration of the petitions for rehearing en banc, which move for en banc reconsideration and vacatur of the court's May 3, 2025 order; the responses thereto; the administrative stay entered by the en banc court on May 7, 2025; and the letters regarding case status, it is

**ORDERED** that the motion for en banc reconsideration and vacatur in No. 25-5145 be denied.  The en banc court's May 22, 2025 order denied the relief requested

**JA517**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                        **September Term, 2024**

by the appellees related to provision (1) of the district court's preliminary injunction challenged in No. 25-5144, and the appellees state that this case raises no question pertaining to provision (2) of that preliminary injunction, see Pet., No. 25-5145, at 4 n.3. It is

**FURTHER ORDERED** that, in Nos. 25-5150 and 25-5151, the motion for en banc reconsideration and vacatur be granted and the government's motion for stay pending appeal be denied.  A majority of the judges eligible to participate voted in favor of the motion for en banc reconsideration and vacatur, and the government has not satisfied the stringent requirements for a stay pending appeal.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024).

The jurisdictional argument advanced by the government in Nos. 25-5150 and 25-5151 raises an important issue, as indicated by its recurrence in a number of recent cases.  See, e.g., Am. Bar Ass'n v. U.S. Dep't of Just., No. 25-cv-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025); S. Educ. Found. v. U.S. Dep't of Educ., No. 25-cv-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025).  At this initial stage, substantially for the reasons explained by Judge Pillard, see Pet. Add., Nos. 25-5150 & 25-5151, at 19–42 (Pillard, J., dissenting), the government has not made the requisite "strong showing" of a likelihood of success on the merits of its appeals in these cases, Nken, 556 U.S. at 434.  This order of course does not constrain the ability of the panel that hears the government's appeals to reach any conclusion following full merits briefing and argument.

Additionally, apart from whether the government ultimately prevails in these appeals, the government has not contested the appellee grantee networks' claims of irreparable injury if the government's requested stay were maintained during the appeals' pendency—including the grantee networks' submissions that suspension of the government's monthly grant payments to them will promptly and severely threaten their continued viability, rendering them unable to exist except as a formal matter and making it unlikely that they could recover even if they ultimately prevail on their claims.  See Pet. Add., Nos. 25-5150 & 25-5151, at 89, 92.  For its part, the government explains that it will be irreparably harmed because, if it prevails in the appeals, it could not retrieve any monthly payments it makes to the grantee networks in the interim.  See Gov't En Banc Resp., Nos. 25-5150, 25-5151, & 25-5158, at 13.  But in arguing for a stay, the government has not contended that it will ultimately prevail in establishing an entitlement to those funds; it instead has argued solely that, as a jurisdictional matter, the entitlement must be determined in another forum (the U.S. Court of Federal Claims).  See Order Granting Stay Pending Appeal, No. 25-5158 (D.C. Cir. May 7, 2025), Dissent at 3 (Pillard, J.).  In these circumstances, the government has not shown

JA518

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5144**                    **September Term, 2024**

that the equities weigh in favor of a stay pending appeal in Nos. 25-5150 and 25-5151.
It is

**FURTHER ORDERED** that the motion for en banc reconsideration and vacatur
in No. 25-5144 be denied.  In their claims of irreparable injury arising from the court's
May 3, 2025 order staying provision (2) of the district court's preliminary injunction,
appellees' asserted injuries are entirely derivative of the suspension of monthly grant
payments to Radio Free Asia.  See Pet., No. 25-5144, at 15–16.  This order's grant of
en banc reconsideration and vacatur in No. 25-5151 addresses those asserted injuries.
It is

**FURTHER ORDERED** that the May 7, 2025 administrative stay entered by the
en banc court as to Nos. 25-5144, 25-5150, and 25-5151 be dissolved.  It is

**FURTHER ORDERED** that the above-captioned cases be scheduled for oral
argument on the same day and before the same panel.  It is

**FURTHER ORDERED**, on the court's own motion, that the parties submit within
7 days of the date of this order a proposed schedule and format for the briefing of the
above-captioned cases on an expedited basis.  The parties are strongly urged to submit
a joint proposal and are reminded that the court looks with extreme disfavor on
repetitious submissions and will, where appropriate, require a joint brief of aligned
parties with total words not to exceed the standard allotment for a single brief.  Whether
the parties are aligned or have disparate interests, they must provide _detailed_
justifications for any request to file separate briefs or to exceed in the aggregate the
standard word allotment.  Requests to exceed the standard word allotment must specify
the word allotment necessary for each issue.

**<u>Per Curiam</u>**

                              **FOR THE COURT:**
                              Clifton B. Cislak, Clerk

                    BY:    /s/
                              Selena R. Gancasz
                              Deputy Clerk

*Circuit Judges Henderson, Katsas, Rao, and Walker dissent from the grant of en banc
reconsideration and vacatur and the denial of the motion for stay pending appeal in
Nos. 25-5150 and 25-5151.  A dissenting statement of Circuit Judge Katsas is attached.
Circuit Judges Henderson, Rao, and Walker join in the statement of Circuit Judge
Katsas.

KATSAS, *Circuit Judge*, dissenting in part: These appeals arise from the government's efforts to downsize the United States Agency for Global Media (USAGM) pursuant to Executive Order 14238. 90 Fed. Reg. 13043 (Mar. 14, 2025). In implementing the Executive Order, USAGM sought to cancel its grants with affiliated radio networks. Various plaintiffs sued, and the district court ordered USAGM to—among other things—restore grants with Radio Free Asia and Middle East Broadcasting Networks. The government appealed these preliminary injunctions and sought interim stays, which a motions panel of this Court granted. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam). The *en banc* Court now vacates the stays in Nos. 25-5150 and 25-5151. I respectfully dissent from that part of the order because, in my view, the panel's stay decisions were correct.

The district court lacked jurisdiction to order continued funding for the affiliated networks. In substance, those orders compel specific performance of the networks' contracts with USAGM. The orders thus resolve contract claims against the federal government, which, by operation of the Tucker Act, fall within the exclusive jurisdiction of the Court of Federal Claims. The panel's order granting stays pending appeal, and my dissent from the *en banc* Court's administrative-stay order, fully explain my position on this issue. *See Widakuswara*, 2025 WL 1288817, at *3–5; *Middle E. Broad. Networks, Inc. v. United States*, No. 25-5150, 2025 WL 1378735, at *1–4 (D.C. Cir. May 7, 2025) (Katsas, J., dissenting).

The majority denies the government's stay motions based on its conclusions that (1) the government is unlikely to prevail on its Tucker Act contention and (2) the balance of harms tips for the networks because the government has not yet staked out a merits defense of its decision to terminate the grants. This reasoning seems to me difficult to reconcile with *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam).

**JA520**

In that case, a district court ordered the government to continue funding certain education grants, despite the government's argument that the Tucker Act gave the Court of Federal Claims exclusive jurisdiction over the claims at issue. In granting a stay pending appeal, the Supreme Court concluded that the government was likely to succeed on its Tucker Act argument that the district court lacked jurisdiction. *See id.* at 968–69. Moreover, the Court granted the stay even though the government had not further argued that it would likely succeed on the merits when defending its grant terminations in the Court of Federal Claims. *See id.* at 974 & n.2 (Jackson, J., dissenting).

In this case, the majority considers the government's lack of a merits defense only in assessing the balance of interim harms, and only after concluding that the government is unlikely to succeed on its jurisdictional objection. As noted above, *California* makes clear that the lack of an asserted merits defense is not necessarily fatal in a stay posture. But in any event, the majority's reasoning does not suggest that a stay pending appeal would have been inappropriate had it agreed that jurisdiction was likely lacking. And in my view, no such suggestion would be tenable.

**JA521**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5144**                                    **September Term, 2024**

**1:25-cv-01015-RCL**

**Filed On:** May 28, 2025

Patsy Widakuswara, et al.,

     Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media, et al.,

     Appellants

**No. 25-5145**

**1:25-cv-00887-RCL**

Michael Abramowitz, in his official capacity as
Director of Voice of America, et al.,

     Appellees

   v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

     Appellants

**O R D E R**

     Upon consideration of the May 22, 2025 order in the above-captioned cases,
which indicated that statements concerning that order would follow at a later time,

**JA522**

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5144**                                    **September Term, 2024**

attached are statements of Chief Judge Srinivasan and Circuit Judge Pillard.  Circuit Judges Millett, Pillard, Wilkins, Childs, Pan, and Garcia join in the statement of Chief Judge Srinivasan.


                                        **FOR THE COURT:**
                                        Clifton B. Cislak, Clerk

                            BY:    /s/
                                   Selena R. Gancasz
                                   Deputy Clerk

**JA523**

SRINIVASAN, *Chief Judge*, respecting the denial of reconsideration en banc:

In arguing against en banc reconsideration of the panel's stay of provision (1) of the district court's preliminary injunction while these appeals are pending, the government relies on the continued operation of provision (3) of the preliminary injunction. *See* Gov't En Banc Resp. 1, 8–9. That provision, which remains unstayed, requires the government to restore Voice of America (VOA) programming so as to fulfill VOA's statutory mandate. *Id.* at 3–4. Although the government relies on the continued operation of provision (3), the government also asserts that the district court lacks any authority under that provision "to order personnel actions beyond those that the [government itself] determines are necessary or appropriate to carry out its statutory mandate." *Id.* at 7. The court's denial of en banc reconsideration of course should not be understood to accept or treat with the government's assertion in that regard. Rather, insofar as the issue may arise in further proceedings in the district court, that court presumably would consider it in the first instance.

**JA524**

PILLARD, *Circuit Judge*, respecting the denial of reconsideration *en banc*: Even as we deny further consideration of the stay order, I remain convinced that the panel should not have entered an emergency stay of the district court's preliminary injunction. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *6-16 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting). Yet the standard for the full court's intervention is unmet because nothing in the panel's stay order prevents the district court from enforcing the unchallenged prong 3 of the injunction, which requires defendants to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,'" as mandated by 22 U.S.C. § 6202(c). *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *18 (D.D.C. Apr. 22, 2025). As the dissenting member of the emergency panel, I write briefly to provide context for the *en banc* court's action and explain how it squares with my understanding of the district court's remedial authority.

Plaintiffs challenged the decision to "shutter[] VOA and forc[e] it off the air" in contravention of "statutes which require that VOA continue producing and broadcasting news that meets high editorial standards." Abramowitz Compl. ¶ 122. The district court confirmed its own jurisdiction and held it likely that the agency acted arbitrarily under the APA in halting VOA's operation. *Widakuswara*, 2025 WL 1166400, at *11-14. Indeed, it was "hard to fathom a more straightforward display of arbitrary and capricious actions." *Id*. at *14. A panel of this court granted defendants' motion for an emergency stay without opining on the action's arbitrariness, however, because it deemed defendants likely to succeed on jurisdictional grounds. *See Widakuswara*, 2025 WL 1288817, at *2-3.

Given its holdings of likelihood that it has jurisdiction, and that the agency acted arbitrarily in shutting down VOA, the district court did not abuse its discretion when it provisionally

**JA525**

"set aside" that action, 5 U.S.C. § 706(2), by preliminarily enjoining the agency to revert to the pre-violation status quo, *Widakuswara*, 2025 WL 1166400, at *13-15.  *Cf. Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) ("Vacatur is the normal remedy when we are faced with unsustainable agency action.") (internal quotation marks omitted).  Requiring an agency to undo an arbitrary action is standard fare.

The district court accordingly ordered reinstatement of employees and contractors to restore the *status quo ante*, thereby preventing irreparable harm to the plaintiffs and serving the public interest.  VOA had stopped broadcasting, and its website had not been updated in over a month. *Widakuswara*, 2025 WL 1166400, at *3.  The court found that the agency's action "dismantling [the] human infrastructure required to run USAGM [and] VOA" would "halt agency function in the short term and threaten the efficacy of the agency in the long-term." *Id*. at *16 (quoting March 28 TRO, *Widakuswara v. Lake*, No. 25-cv-02390 (S.D.N.Y. Mar. 28, 2025)).  Once the panel stayed the preliminary injunction, approximately 584 of VOA's personal service contractors (97% of the total) received termination notices dated May 15 with effective dates between May 21 and May 30.  Abramowitz Supp. Decl. (May 16, 2025) ¶¶ 1-2.  Plaintiffs aver that, "if allowed to become effective," the termination of these personal service contractors "will make it impossible for VOA to carry out its daily operations." *Id.* ¶ 9.

Defendants have not challenged the district court's findings of irreparable harm, and their own claim of harm is unpersuasive.  They assert that the district court has impeded their control over employment decisions and failed to account for the costs of restoring the VOA employees to work.  Gov't En Banc Resp. 12.  But the government cannot complain of

**JA526**

costs it imposes on itself through unlawful action.    *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).  The balance of hardships therefore favors the plaintiffs.  So, too, does the public interest:  Congress established VOA and gave it an explicit statutory mandate to provide "reliable[,] authoritative, accurate, objective, and comprehensive" news. 22 U.S.C. § 6202(b)(1).

That brings us to the nub of the denial of *en banc* relief, which is whether the first prong of the district court's preliminary injunction was "mismatch[ed]" to the violation. Gov't En Banc Resp. 1.  Under prong 1, the agency must "take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025, Executive Order 14238 . . . including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025." *Widakuswara*, 2025 WL 1166400, at *18.  In my view, that provision was well tailored to the defendants' arbitrary and unlawful action.

First, the district court acted with full cognizance of and respect for the agency's discretion to decide, within legal bounds, how many employees and personal service contractors it needs to carry out lawful policy reform.  As the court explained, "the injunction does not prevent USAGM from executing personnel decisions," or taking other actions regarding employee relations, contract negotiations, or contract terminations, "pursuant to its statutory mandate and in compliance with the APA."  Order Denying Stay 5 & n.1, No. 25-cv-1015 (D.D.C. Apr. 25, 2025) [ECF No. 104] [hereinafter Order Denying Stay].  The court expressly disavowed fixing the previous staffing of VOA as the "benchmark for minimum statutory compliance." *Id.* at 5.

**JA527**

Second, given that the government had not proposed any narrower injunction, it is unclear what else the district court could have done. While "an injunction must be narrowly tailored to remedy the harm shown," "[t]hat principle . . . does not require district courts enjoining unconstitutional government policies to fashion narrower, ostensibly permissible policies from whole cloth" where, as here, the government has framed no alternative. *J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019). The court is not required to guess what nonarbitrary policy the administration might adopt to restore VOA programming and fulfill the agency's statutory mandate.

Third, the government argues that the continued vitality of prong 3 of the preliminary injunction renders prong 1 fatally overbroad. The very same argument was made to the district court, which—permissibly, in my view—rejected it. *See* Order Denying Stay 2. With no policy before it for operating VOA in a new and streamlined manner, the court had nothing but the *status quo ante* against which to tailor its order.

Fourth, the preliminary injunction, as the district court explained, "is a stopgap measure . . . intended to maintain a status quo." Order Denying Stay 5 (citation omitted). Defendants assert in their briefing to us that the challenged relief is unnecessary because they have started to bring back "some" VOA employees. Gov't En Banc Resp. 7-8. But they have made no such factual showing. And, unless the Court of Appeals is ready to assume the role of the district courts, we should not decide such questions in advance of presentation to and decision by the district judge.

In view of all the district court did to support and tailor the relief it granted, I would not have stayed prong 1 of the district court's preliminary injunction. That said, *en banc* review is not

**JA528**

a mere error-correction mechanism. And, in any event, this court has not limited the district court's remedial options going forward. The district judge retains the power to require the agency's compliance with its statutory obligations. *See Nat'l Ass'n of Regul. Util. Comm'rs v. U.S. Dep't of Energy*, 680 F.3d 819, 820 (D.C. Cir. 2012), *and* 736 F.3d 517, 520-21 (D.C. Cir. 2013). And he has authority to modify the preliminary injunction as circumstances develop, even while the appeal of the preliminary injunction is pending. FED. R. CIV. P. 62(d). I have confidence that Judge Lamberth can and will afford fitting relief so that defendants meet their acknowledged obligation to ensure that VOA operates consistently with the International Broadcasting Act, including 22 U.S.C. § 6202 and 6204(b).

Because the government has repeatedly emphasized its broad discretion to determine what levels of staffing are necessary at VOA, I add a note of caution. While the agency does have discretion regarding how it discharges its statutory responsibilities, that discretion is neither boundless nor shielded from judicial review and remediation. It is a basic rule of our constitutional system that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). The courts bring their full authority to bear in reviewing claims that executive actors have "disregard[ed] . . . statutory obligations that apply to the Executive Branch" or refused "to follow a law imposing a mandate or prohibition on the Executive Branch." *Id.* at 266. Nothing in the action of the *en banc* court changes that.

**JA529**