**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 22, 2025**

**Nos. 25-5144, 25-5145, 25-5150, 25-5151**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

PATSY WIDAKUSWARA, *et al.*,
*Plaintiffs-Appellees,*
v.
KARI LAKE, *et al.*,
*Defendants-Appellants.*

MICHAEL ABRAMOWITZ, *et al.*,
*Plaintiffs-Appellees,*
v.
KARI LAKE, *et al.*,
*Defendants-Appellants.*

MIDDLE EAST BROADCASTING NETWORKS, INC.,
*Plaintiff-Appellee,*
v.
UNITED STATES OF AMERICA, *et al.*,
*Defendants-Appellants.*

RADIO FREE ASIA,
*Plaintiff-Appellee,*
v.
UNITED STATES OF AMERICA, *et al.*,
*Defendants-Appellants.*

On Appeals from the United States District Court
for the District of Columbia
Nos. 25-cv-01015, 25-cv-887, 25-cv-966, 25-cv-907 (Hon. Royce C. Lamberth)

## BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, COMMITTEE TO PROTECT JOURNALISTS, PEN AMERICA, PRESS FREEDOM CENTER AT THE NATIONAL PRESS CLUB, AND SOCIETY OF PROFESSIONAL JOURNALISTS IN SUPPORT OF AFFIRMANCE

Bruce Brown
Lisa Zycherman
Gabriel Rottman
Mara Gassmann
Grayson Clary
Renee M. Griffin
Ellen Goodrich
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bbrown@rcfp.org

*Counsel for Amici Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), amici curiae the Reporters Committee for Freedom of the Press, Committee to Protect Journalists, PEN American Center, Inc., Press Freedom Center at The National Press Club, and Society of Professional Journalists ("amici") certify as follows:

A. Parties and Amici

There have been no changes to the parties, intervenors, and amici since the filing of the parties' briefs, except for the above-named additional amici, who were not amici in the district court:  PEN American Center, Inc., Press Freedom Center at The National Press Club, and Society of Professional Journalists.

B.  Rulings Under Review

References to the rulings at issue appear in Appellants' and Appellees' briefs.

C. Related Cases

References to related cases within the meaning of Circuit Rule 28(a)(1)(C) appear in Appellees' brief.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Committee to Protect Journalists is a nonprofit organization no parent corporation and no stock.

PEN American Center, Inc. ("PEN America") has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Press Freedom Center at the National Press Club is a fiscally sponsored entity of the National Press Club Journalism Institute, the 501(c)(3) affiliate of the National Press Club, created to further advance work on behalf of threatened journalists.  It has no other parents, no subsidiaries, and issues no stock.

The Society of Professional Journalists is a non-stock corporation with no parent company.

ii

## TABLE OF CONTENTS

**Page:**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.......... i

CORPORATE DISCLOSURE STATEMENT......................................................ii

TABLE OF AUTHORITIES.................................................................................iv

STATUTES AND REGULATIONS....................................................................1

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE......1

RULE 29(a)(4)(E) CERTIFICATION................................................................2

CERTIFICATE REGARDING SEPARATE BRIEFING....................................3

SUMMARY OF ARGUMENT ...........................................................................4

ARGUMENT.......................................................................................................9

I.     The editorial independence of the Networks is essential to their
       mission and the safety of their reporters....................................................9

II.    Allowing the Executive to shutter the Networks unilaterally would
       sabotage the independence that makes them effective.........................20

III.   The District Court had jurisdiction to avert irreparable harm to the
       independence that makes the Networks' credible and effective.........27

CONCLUSION ..................................................................................................31

CERTIFICATE OF COMPLIANCE .................................................................32

CERTIFICATE OF SERVICE ..........................................................................33

**TABLE OF AUTHORITIES**

**Page(s):**

**Cases:**

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*,
   Nos. 25-00400 & 25-00402, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ..........25

*Andrade v. Lauer*,
   729 F.2d 1475 (D.C. Cir. 1984) ...................................................................29

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) .....................................................................................29

*City & County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018)......................................................................25

*Husain v. Springer*,
   494 F.3d 108 (2d Cir. 2007)..........................................................................22

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) .....................................................................................24

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ......................................................................25

*Koala v. Khosla*,
   931 F.3d 887 (9th Cir. 2019).........................................................................22

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ......................................................................29

*Newspaper Guild of Greater Phila., Local 10 v. NLRB*,
   636 F.2d 550 (D.C. Cir. 1980) .......................................................................7

*Radio Free Asia v. United States*,
  Nos. 25-CV-907-RCL & 25-CV-966-RCL, 2025 WL 1291342
  (D.D.C. Apr. 25, 2025) ...................................................................................27

*Ralis v. RFE/RL, Inc.*,
  770 F.2d 1121 (D.C. Cir. 1985) .................................................. 5, 8, 14, 20, 26

*See Widakuswara v. Lake*,
  No. 1:25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) .............27

*Tripp v. Dep't of Def.*,
  284 F. Supp. 2d 50 (D.D.C. 2003) ..................................................................22

*Turner v. U.S. Agency for Glob. Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020) ............................................... 5, 6, 15, 22, 23

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................................23

*Widakuswara v. Lake*,
  773 F. Supp. 3d 46 (S.D.N.Y. 2025) ................................................................3

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ....................... 28, 29

**Statutes:**

22 U.S.C. § 6205.................................................................................. 1, 5, 22, 26

22 U.S.C. § 6208.............................................................................................30

22 U.S.C. § 6202................................................................................ 5, 7, 16, 28

Emergency Wartime Supplemental Appropriations Act,
  Pub. L. No. 108-11, 117 Stat. 559 (2003) .......................................................10

Foreign Relations Authorization Act, Fiscal Year 1977,
Pub. L. No. 94-350, § 503, 90 Stat. 823 (1976) ..................................................14

International Broadcasting Act,
Pub. L. No. 93-129, 87 Stat. 456 (1973) ...............................................................9

National Defense Authorization Act for Fiscal Year 2017,
Pub. L. No. 114-328, § 1288, 130 Stat. 2000 (2016) .........................................16

National Defense Authorization Act for Fiscal Year 2021,
Pub. L. No. 116-183, 134 Stat. 3388 (2021) ......................................................16

Omnibus Consolidated and Emergency Supplemental Appropriations Act,
Pub. L. No. 105-277, § 1323, 112 Stat. 2681 (1998) .........................................16

United States International Broadcasting Act of 1994,
Pub. L. No. 103-236, § 305, 108 Stat. 382 (1994) ............................................15

**Rules:**

Fed. R. App. P. 29 ................................................................................................2, 3

Circuit Rule 29 .....................................................................................................2, 3

**Other Authorities:**

Aruna Viswanatha, *China Gets More Airtime Around the World as Voice
of America Signs Off,* Wall St. J. (July 13, 2025) ..............................................21

Balen Saih, *VOA Kurdish: Syria's Interim Constitution Raises Fears of
Sectarian Division*, Voice of Am. (Mar. 15, 2025).............................................11

Ben Johansen, *US Scrambles to Bring Back VOA's Persian Service Amid
Iran-Israel conflict*, Politico (June 13, 2025) .....................................................12

David Bauder, *Trump Adviser Kari Lake Testifies in Hearing on U.S.
Agency That Runs Voice of America*, PBS News (June 25, 2025) ....................13

Dilshad Anwar, *VOA Kurdish: Senior ISIS Leader Killed in Iraqi Intelligence Operation*, Voice of Am. (Mar. 15, 2025)......................................11

Editorial Bd., *A U.S. Retreat in the War of Ideas*, Wall St. J. (Mar. 19, 2025) ...............................................................................................11

Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025) .............................6

Gregory Mitrovich, Hoover Inst., Cold War Broadcasting Impact 12 (2004)..............................................................................................................9

*Gunmen Kill Reporter, Young Son in Basra*, Comm. to Protect Journalists (Feb. 9, 2005) .............................................................................18, 19

Gursel Tokmakoglu (@GurselTockmakogl), X (June 25, 2025 at 16:52 ET) ...............................................................................................................23

H.R. Rep. No. 510, 93d Cong., 1st Sess. 3–5 (1973), reprinted in 1973 U.S. Code Cong. & Ad. News 2271, 2272–74..................................................14

Jasmine Baehr, *Exclusive: Kari Lake Says VOA's Persian News Service 'Rising to the Occasion' Amid Iran-Israel Conflict*, Fox News (June 14, 2025)...............................................................................................12

Jason Rezaian, *These 10 Jailed Journalists Worked for U.S. Outlets That Trump Silenced*, Wash. Post (Mar. 20, 2025)..............................................17, 18

Jon Allsop, *Strikes on Iran Reverberate Through the Media*, Columbia Journalism Rev. (June 17, 2025) ....................................................................12

Liam Scott, *Foreign journalists who worked for U.S.-funded outlets could face persecution*, Foreign Policy (Apr. 15, 2025). ............................................18

Margaret Brennan, *After Hundreds of Radio Free Asia Staff Placed on Leave, Some Fear Deportation*, CBS (Mar. 21, 2025) ........................................10

Marina Adami & Natalia Zhdanova, *As Trump Guts US Global Media Agency, Thousands of Journalists Are Left in Limbo*, Reuters Inst. (Apr. 8, 2025) ................................................................................18

Matthew Rice, *Trump's Special Envoy Rips Voice of America, Radio Free Europe as a "Relic of the Past"*, N.Y. Sun, (Feb. 10, 2025) ...............................24

*Myanmar Jails Filmmaker Shin Daewe for Life for Buying a Drone*, Comm. to Protect Journalists (Apr. 4, 2024) ...............................................................19

*Myanmar Journalist Sithu Aung Myint Sentenced to Additional 7 Years in Prison*, Comm. to Protect Journalists (Dec. 13, 2022)....................................19

*Reporters Committee Letter: Congress Must Protect Voice of America's Editorial Independence*, Reps. Comm. for Freedom of the Press (Apr. 28, 2020) ...............................................................................................1

Sara Fischer, *VOA's Iran Mess*, Axios (June 24, 2025) ......................................13

*Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease That Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. Agency for Glob. Media (Mar. 15, 2025) .............................................................................................24

Serge Schmemann, *Freedom's Frequencies Fall Silent*, N.Y. Times (Mar. 24, 2025) ..............................................................................................11

*The Voice of Radical America*, The White House (Mar. 15, 2025)...................6, 23

U.S. Agency for Global Media, Audience and Impact: Overview for 2019 (2019)...............................................................................................15

U.S. Agency for Global Media, Audience and Impact: Overview for 2025 (2025)..........................................................................................16, 17

U.S. Dep't of State Off. of Inspector Gen., *Inspection of the Broadcasting Board of Governors' Middle East Broadcasting Networks* (Feb. 2017)........10, 30

*Vietnam Sentences 3 Independent Journalists to More Than 10 Years in Prison*, Comm. to Protect Journalists (Jan. 5, 2021) ........................................19

Voice of Am., *VOA's First Broadcasts: "The News May Be Good or Bad; We Shall Tell You the Truth"* (YouTube Mar. 8, 2012)........................................4

## STATUTES AND REGULATIONS

All applicable statutes are contained in the brief for Appellant.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), Committee to Protect Journalists ("CPJ"), PEN American Center, Inc. ("PEN America"), Press Freedom Center at The National Press Club, and Society of Professional Journalists ("SPJ") (together, "amici").[1]

As organizations that rely on and are committed to defending First Amendment freedoms, such as the right to gather and report the news, amici have a powerful interest in ensuring that the constitutional rights of all journalists, including working journalists at the U.S. Agency of Global Media ("USAGM") networks, are not infringed, *see, e.g.*, *Reporters Committee Letter: Congress Must Protect Voice of America's Editorial Independence*, Reps. Comm. for Freedom of the Press (Apr. 28, 2020), https://perma.cc/34QC-8G5D, and that USAGM officials comply with

---

[1]   A statement of interest for each amicus organization is set forth in the addendum below.

1

Congress's instruction to "respect[] the professional integrity and editorial independence" of the networks, 22 U.S.C. § 6205(d)(6)(A).  Amici share an interest in the protection of USAGM networks from political interference, and in safeguarding their editorial independence as news outlets.  Because of this interest, lead amicus Reporters Committee and amicus CPJ together filed a brief in each of the underlying District Court cases.

While the government seeks to cabin this appeal to jurisdictional issues, amici weigh in to emphasize that the Administration's actions to dismantle the USAGM networks are pernicious in respects that make the exercise of jurisdiction and availability of emergency relief proper and vitally important.

All parties to this appeal have consented to the filing of this brief, and amici file it pursuant to Fed. R. App. P. 29(a)(2) and D.C. Circuit Rule 29(b).

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund

preparing or submitting the brief; and no person—other than amici, their

members, or counsel—contributed money that was intended to fund

preparing or submitting the brief.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), amici certify that this brief is

necessary to provide broader context for the immediate and future

consequences that reversal of the District Court's injunction and denial of

jurisdiction in this case would have for the USAGM networks and their

reporters and that amici are uniquely positioned to provide the Court with

that perspective.  *See Widakuswara v. Lake*, 773 F. Supp. 3d 46, 60 (S.D.N.Y.

2025).

**SUMMARY OF ARGUMENT**

For over half a century, the U.S. Agency for Global Media ("USAGM") has funded public broadcasting overseas, enabling its networks to serve as vital sources of news and information for hundreds of millions of people around the world. From inception, the United States' publicly funded overseas broadcasting has staked its claim to the audience's trust on the USAGM networks' credibility and autonomy. In some countries, these networks, including Voice of America ("VOA"), Middle East Broadcasting Networks ("MBN"), and Radio Free Asia ("RFA") (collectively, "the Networks"), are the only viable alternative to state-controlled media. As VOA's first transmission in 1942 announced to the world, "The news may be good or bad; we shall tell you the truth." *See* Voice of Am., *VOA's First Broadcasts: "The News May Be Good or Bad; We Shall Tell You the Truth"* (YouTube Mar. 8, 2012), https://tinyurl.com/y2ccoc28. Through their work producing credible, independent journalism, the Networks and their reporters "export[] the cardinal American values of free speech, freedom of the press, and open

4

debate to the dark corners of the world where independent, objective coverage of current events is otherwise unavailable." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341–42 (D.D.C. 2020).

To do this, the Networks must, as Congress recognized when creating them, operate with "professional integrity and editorial independence." 22 U.S.C. § 6205(d)(6)(A). In other words, they must be— and be seen by their audience as—"independent broadcasters," not just "house organs for the United States Government." *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985). It is this independence that affords the Networks the ability to be influential newsgatherers and broadcasters.

Lawmakers crafted the legislation underlying USAGM to ensure the Networks can operate with the autonomy necessary to secure the audience's trust and produce news free from political tampering that "is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6202(b)(1). Those values, codified in the statutory text, are vital to the work, and safety, of USAGM journalists around the world. And they are backstopped by the constitutional

5

protections afforded to reporters at the Networks, who retain First Amendment rights that limit the U.S. government's authority to intrude on editorial decision-making—particularly where the government is seeking to suppress certain content for political reasons. *See Turner*, 502 F. Supp. 3d at 376. Yet with the stroke of a pen, the Administration has moved to eliminate USAGM, Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025), https://perma.cc/F9SY-ZDEE, and refused to disburse congressionally appropriated funds for the Networks, resulting in a significant reduction of the Networks' workforce. It did so on the view that the Networks produce "radical propaganda" that is "anti-Trump." *The Voice of Radical America*, The White House (Mar. 15, 2025), https://perma.cc/8L6A-P9CS. And now, the Government presses the theory that federal district courts lack jurisdiction to grant any meaningful relief before its actions irreparably damage the autonomy that makes the Networks effective.

That attack on Congress's design and VOA's journalism not only threatens to shutter VOA for the tenure of this Administration; if left

6

unredressed now, it would severely undermine the Networks' credibility going forward.  If the Networks can be subject to the whims of any given presidential administration—because an official's disagreement with the content of the reporting could lead the Executive Branch to fire USAGM reporters and effectively shutter the Networks, leaving them too decimated to operate—audiences will be less likely to trust the broadcasters to produce "consistently reliable and authoritative" news reported consistent with the "highest professional standards."  22 U.S.C. § 6202(a)(5), (b)(1). Such a scenario is a grave threat to any future ability to operate.  *See Newspaper Guild of Greater Phila., Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980) ("[C]redibility is central to the[] ultimate product and to the conduct of the enterprise.").  The concern is especially grave here, where the Networks' journalists report on countries where their safety may be at risk if they are perceived to be agents of the U.S. government and if their jobs and funding are suddenly terminated without notice.

The toll on the Networks has already been substantial, and absent the District Court's injunction, the dismissal of the agency's workforce will

cause further, and irreversible, damage to the Networks' reputation and their ability to serve their central purpose, even if Congress or a future Administration attempts to revive their vital work.  Prompt adjudication of the Networks' claims in this Court is essential to averting these risks and continued harm, and denial of jurisdiction would make meaningful relief all but impossible.  The government argues that the Court of Claims is the proper forum for this litigation, but that court has no power to grant the equitable relief that is required for the constitutional claims brought by Plaintiffs-Appellees.  The statutory and constitutional bases for the claims are central to the emergency relief ordered by the District Court.

The Administration continues to violate Plaintiffs-Appellee's First Amendment rights and lacks the authority to discard Congress's "manifest" intent—consistently expressed over the course of five decades—that the Networks "enjoy independence in programming and broadcasting decisions."  *Ralis*, 770 F.2d at 1125.  For the reasons set forth herein, amici urge the Court to hold that it has jurisdiction to consider Plaintiffs' claims and to affirm the District Court's injunction.  Without

8

meaningful relief now, it may be too late to safeguard the independence of the Networks and physical security of their journalists, who work to bring accurate news and information, and represent freedom and democratic values, to many dark corners of the world.

## ARGUMENT

**I.     The editorial independence of the Networks is essential to their mission and the safety of their reporters.**

For the better part of a century, USAGM Networks have, consistent with their congressional mandate, ensured that *bona fide* reporting and "freedom of opinion and expression" can reach countries that do not have a free press.  International Broadcasting Act, Pub. L. No. 93-129, 87 Stat. 456, 457–58 (1973).  Thanks to the Networks, global audiences, including those living under repressive regimes, have access to accurate news and information about events in their own countries and around the world. *See, e.g.*, Gregory Mitrovich, Hoover Inst., Cold War Broadcasting Impact 12 (2004) (describing VOA's role during the Chernobyl disaster providing "invaluable information to East European, Russian, and Ukrainian audiences about the dangers of radiation and the steps they needed to take

9

to avoid radiation poisoning" while state media remained silent).  As an example, RFA was formed after the Tiananmen Square Massacre to give people in China and others living in an authoritarian regime access to an "unbiased news service," and "to broadcast facts into countries where governments are afraid of them."  Margaret Brennan, *After Hundreds of Radio Free Asia Staff Placed on Leave, Some Fear Deportation*, CBS (Mar. 21, 2025), https://perma.cc/9ZMQ-EH9T.  MBN, meanwhile, was formed pursuant to the Emergency Wartime Supplemental Appropriations Act, Pub. L. No. 108-11, 117 Stat. 559 (2003), amid the Iraq War and tumult in the Middle East, in order to "provide objective, accurate, and relevant news and information through television, radio, and the internet to 22 Arabic-speaking nations."  U.S. Dep't of State Off. of Inspector Gen., *Inspection of the Broadcasting Board of Governors' Middle East Broadcasting Networks*, at 1 (Feb. 2017).

In the last hours before Appellants abruptly shuttered the agency on March 15, VOA was gathering and publishing news on important international issues such as concerns about Syria's interim constitution and

10

Iraq's killing of an ISIS leader.  Balen Saih, *VOA Kurdish: Syria's Interim Constitution Raises Fears of Sectarian Division*, Voice of Am. (Mar. 15, 2025), https://perma.cc/8DKL-A5NR; Dilshad Anwar, *VOA Kurdish: Senior ISIS Leader Killed in Iraqi Intelligence Operation*, Voice of Am. (Mar. 15, 2025), https://perma.cc/5LFV-GRFD.  Through their independent journalism, these networks have won the trust of audiences "in countries where media are controlled by governments that lie about the world."  Editorial Bd., *A U.S. Retreat in the War of Ideas*, Wall St. J. (Mar. 19, 2025), https://bit.ly/4iJxUp1; *see also* Serge Schmemann, *Freedom's Frequencies Fall Silent*, N.Y. Times (Mar. 24, 2025), https://tinyurl.com/5xxxu6sh (discussing value of USAGM networks in Russia and beyond).

And despite its position in this litigation, last month the Administration sought to rely temporarily on the skilled reportorial staff of USAGM amidst the escalating Iran-Israel conflict and in the wake of the U.S. bombing of Iranian nuclear sites.  According to published news reports, USAGM "scramble[d]" to resume VOA's Farsi-language service, telling "employees placed on administrative leave to immediately return to

their roles providing counter-programming to Iranian state media as the

conflict . . . escalated . . . ."  Ben Johansen, *US Scrambles to Bring Back VOA's*

*Persian Service Amid Iran-Israel conflict*, Politico (June 13, 2025),

https://www.politico.com/news/2025/06/13/voa-persian-service-iran-israel-

00406092*; see also, e.g.*, Jon Allsop, *Strikes on Iran Reverberate Through the*

*Media*, Columbia Journalism Rev. (June 17, 2025),

https://www.cjr.org/the_media_today/iran-israel-nuclear-deal-trump-

framing-farsi-voa.php (reporting that "move" to recall terminated

employees was being "interpreted by some observers as a belated

acknowledgment of the vital role that it can play in keeping Iranian

audiences informed and countering state propaganda").

Senior Advisor Kari Lake praised the small group of reinstated VOA

journalists for "rising to the occasion to cover" the "[h]istory . . . being

made" in the region.  Jasmine Baehr, *Exclusive: Kari Lake Says VOA's Persian*

*News Service 'Rising to the Occasion' Amid Iran-Israel Conflict*, *Fox News* (June

14, 2025), https://www.foxnews.com/media/exclusive-kari-lake-voas-

persian-news-service-rising-occasion-amid-iran-israel-conflict.amp.

Nevertheless, while prior to the Executive Order the VOA broadcast "24/7" to its Iranian audience, in the 72 hours after the U.S.'s bombing of the three Iranian nuclear sites, it aired "just 75 minutes" of Farsi content for that audience. Sara Fischer, *VOA's Iran Mess*, Axios (June 24, 2025), https://www.axios.com/2025/06/24/voa-s-iran-mess-media-trends. A week later, USAGM again terminated most of the recalled VOA Persian staffers. *Id.*; *see also* David Bauder, *Trump Adviser Kari Lake Testifies in Hearing on U.S. Agency That Runs Voice of America*, PBS News (June 25, 2025), https://www.pbs.org/newshour/politics/watch-live-trump-adviser-kari-lake-testifies-in-hearing-on-u-s-agency-that-runs-voice-of-america ("Employees at Voice of America's Persian-language branch that broadcasts in Iran, were hurriedly called back into work at the outset of the Israel-Iran war, only for most of them to be laid off less than a week later.").

Since their inception, USAGM Networks, by design, have stood in contrast to government propaganda arms around the world. Since their earliest days, bipartisan majorities in Congress have recognized that

13

independent, professional broadcasters at the Networks would advance

"[t]he long-range interests" of the United States if they had the editorial

independence to report the news and become a trusted source of

information.  *See* Foreign Relations Authorization Act, Fiscal Year 1977,

Pub. L. No. 94-350, § 503, 90 Stat. 823, 831 (1976) (stating that VOA will

"win the attention and respect of listeners" by reporting in a way that is

"accurate, objective, and comprehensive.").  Congress has consistently

rejected opportunities "to transform [USAGM networks] from independent

broadcasters into house organs for the United States Government," which

it saw "as inimical to the fundamental mission of those stations."  *Ralis*, 770

F.2d at 1125 (citing H.R. Rep. No. 510, 93d Cong., 1st Sess. 3–5 (1973),

*reprinted in* 1973 U.S. Code Cong. & Ad. News 2271, 2272–74).

And for good reason.  The Networks can accomplish their goals only

if they maintain meaningful independence—both actual independence and

the perception of it—from political control.  *See Ralis*, 770 F.2d at 1125.  The

"outlets are not intended to promote uncritically the political views and

aspirations of a single U.S. official, even if that official is the U.S.

President."  *Turner*, 502 F. Supp. 3d at 342 (recognizing the First

Amendment rights of journalists at Voice of America and rejecting effort to

subvert statutory "firewall" protecting them).  Listeners turn to these

stations as an alternative to state media, not as their second state-media

option.  *See, e.g.*, U.S. Agency for Global Media, Audience and Impact:

Overview for 2019, at 17 (2019) (finding that videos fact-checking local

disinformation are among VOA and RFE/RL's most popular offerings in

Russia).  Editorial independence for these newsrooms is therefore "central

to [the] success of this critical foreign policy" embodied in the USAGM

statute.  *Turner*, 502 F.Supp. 3d at 342.

The framework carefully crafted and repeatedly preserved by

Congress reflects that commitment.  In 1994, when Congress acted to

consolidate non-military broadcasting into USAGM, it also established firm

guardrails protecting the networks' autonomy—including the requirement

that agency leadership "respect the[ir] professional independence and

integrity."  United States International Broadcasting Act of 1994, Pub. L.

No. 103-236, § 305, 108 Stat. 382, 436 (1994).  Congress retained that

15

requirement when it reorganized the Networks in 1998, *see* Omnibus

Consolidated and Emergency Supplemental Appropriations Act, Pub. L.

No. 105-277, § 1323, 112 Stat. 2681, 2681–780; it did so again when it

reorganized them further in 2016, *see* National Defense Authorization Act

for Fiscal Year 2017, Pub. L. No. 114-328, § 1288, 130 Stat. 2000, 2548; and

then again in 2021 when it revised the structure in response to attacks on

Voice of America's independence, *see* National Defense Authorization Act

for Fiscal Year 2021, Pub. L. No. 116-183, 134 Stat. 3388, 4023.  Those

guarantees make possible Congress's goal of establishing Networks whose

journalism will be "consistently reliable and authoritative, accurate,

objective, and comprehensive"—not politically motivated.  22 U.S.C.

§ 6202(b)(1).

Today, the Networks' independence and commitment to high-quality

journalism remains their core value, helping them attract a massive

audience.  USAGM networks collectively report to a staggering 427 million

viewers and listeners across all media.  *See* U.S. Agency for Global Media,

Audience and Impact: Overview for 2025, at 1 (2025),

16

https://perma.cc/KLY4-HYMX.  And that audience trusts the Networks to provide them with factual information about global politics, economic developments, and other subjects.  Ninety-eight percent of RFA's weekly audience finds the stations to be trustworthy; 80 percent of listeners said they rely on RFA to help them form opinions on important issues.  *Id.* at 2.  Similar statistics exist for VOA and MBN.  *Id.* (86 percent of VOA's weekly listeners and 83 percent of MBN's weekly listeners find them to be trustworthy; 79 percent of VOA listeners and 69 percent of MBN listeners rely on the organizations to form opinions on important issues).  The Networks could not have achieved that degree of success had they operated as, or been seen as, a Ministry of Truth that could be redirected or dismantled with a single stroke by any given president.

Nor could USAGM reporters do their work safely under those circumstances.  In fulfilling their role, these journalists often report on events in hostile foreign countries, where they risk retaliation and threats to their physical safety.  *See, e.g.*, Jason Rezaian, *These 10 Jailed Journalists Worked for U.S. Outlets That Trump Silenced*, Wash. Post (Mar. 20, 2025),

17

https://bit.ly/4j6N1Z9.  Some of them are freelancers who still live in those nations, and the sudden elimination of their funding has left them without security and in immediate danger of physical harm.  *Id.*  Other journalists have fled their native countries and continue to report on events there from the United States, but now—without jobs—they risk the loss of legal status and removal to a country run by a hostile government that resents their coverage.  Marina Adami & Natalia Zhdanova, *As Trump Guts US Global Media Agency, Thousands of Journalists Are Left in Limbo*, Reuters Inst. (Apr. 8, 2025), https://shorturl.at/BfGrp; Liam Scott, *Trump's media crackdown endangers reporters worldwide:  Foreign journalists who worked for U.S.-funded outlets could face persecution*, Foreign Policy (Apr. 15, 2025), https://shorturl.at/gFvrZ.

The dangers are very far from hypothetical.  As amicus CPJ has documented, at least 11 journalists and media workers who worked for or contributed to the Networks or their regional outlets have been killed in connection with their work.  For example, Abdul-Hussein Khazal, a correspondent for MBN-funded television station Al-Hurra, was shot dead

in Iraq in 2005 alongside his 3-year-old son. *Gunmen Kill Reporter, Young Son in Basra*, Comm. to Protect Journalists (Feb. 9, 2005), https://perma.cc/TR47-NF3A. Al-Hurra's news director believed Khazal "was killed because he was a journalist." *Id.* Other journalists at the Networks have been imprisoned by authorities in the nations they report on, and according to USAGM, at least 10 remain imprisoned today. *See, e.g., Myanmar Journalist Sithu Aung Myint Sentenced to Additional 7 Years in Prison*, Comm. to Protect Journalists (Dec. 13, 2022), https://perma.cc/ZN7W-T33A (reporter imprisoned in Myanmar for sedition and dissemination of "false news"); *Vietnam Sentences 3 Independent Journalists to More Than 10 Years in Prison*, Comm. to Protect Journalists (Jan. 5, 2021), https://perma.cc/HR9E-54F6 (reporter sentenced to 11 years in prison in Vietnam for "making, storing, and disseminating documents and materials for anti-state purposes"); *Myanmar Jails Filmmaker Shin Daewe for Life for Buying a Drone*, Comm. to Protect Journalists (Apr. 4, 2024), https://perma.cc/6RN2-DKQN (reporter sentenced to life in prison in Myanmar for possession of an unregistered video drone to film a

documentary); *Our Journalists, Under Threat*, U.S. Agency for Glob. Media (Mar. 15, 2025), https://shorturl.at/KFeXM. Each attack on the independence of the Networks not only threatens their ability to serve their fundamental mission—it endangers the lives and liberty of the reporters dedicated to bringing that news to the world's audiences.

**II.    Allowing the Executive to shutter the Networks unilaterally would sabotage the independence that makes them effective.**

By executive order, the President has moved to dismantle USAGM, terminate most of its reporters, and effectively shutter the agency based on his disagreement with the Networks' content and desire to control their coverage. That move violates the First Amendment and disregards Congress's "manifest" intent that the networks "enjoy independence in programming and broadcasting decisions." *Ralis*, 770 F.2d at 1125. If the gambit succeeds, the damage to the project of federally funded broadcasting overseas will be long-felt and possibly irreparable. Some of the Networks' reporters may face new danger in or from their home countries. The Networks, historically lauded for their independence, suffer reputational harm as political actors attempt to influence their content.

20

Even if a future Administration or future Congress were to restore the impounded funds, these Networks will have lost reporters, sources, loyal listeners and the institutional knowledge of decades-old newsrooms. In other words, they will have lost a toe-hold in many parts of the world that are already being occupied by others. *See* Aruna Viswanatha, *China Gets More Airtime Around the World as Voice of America Signs Off*, Wall St. J. (July 13, 2025), https://perma.cc/Q2NQ-W3HNhttps://perma.cc/Q2NQ-W3HN. Moreover, the knowledge that a threat of a complete gutting of financial support hangs over the Networks' heads—a Sword of Damocles waiting to fall if their coverage angers the President—risks chilling their speech and would almost inevitably undermine the steadfastly-earned quality of autonomy that made the Networks' vital and separated them from state-run propaganda.

Defendants' actions, unlawful under both the First Amendment and constitutional separation-of-powers principles, thus impose real and irreparable harms. That they violate the First Amendment is clear. When the government chooses to establish a news organization with true

21

"editorial independence," 22 U.S.C. § 6205(d)(6)(A), the First Amendment holds policymakers to their promise. *See Turner*, 502 F. Supp.3d at 381–82 (VOA journalists enjoy First Amendment rights against editorial tampering); *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 56 (D.D.C. 2003) (concluding that Congress intended *Stars and Stripes*, the military newspaper, "to operate like other commercial newspapers, and enjoy First Amendment protections and prohibitions"). For example, "all the circuits that have considered the issue have determined" that when "a public university creates or subsidizes a student newspaper and imposes no *ex ante* restrictions on the content" of that the newspaper, "neither the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment." *Koala v. Khosla*, 931 F.3d 887, 903 n.9 (9th Cir. 2019) (quoting *Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007)). The same principle controls here, where Congress expressly established USAGM as an institution with "editorial independence." 22 U.S.C. § 6205(d)(6)(A).

22

There can be no question, too, that the Constitution does not allow the government to shut down a particular press outlet "because of disagreement with the message [it] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The Networks' journalists enjoy First Amendment rights, yet here, the Administration's actions "not only penalize and chill speech," but "appear to do so on the basis of perceived viewpoint." *Turner*, 502 F. Supp. 3d at 381. President Trump and Administration officials have been public about their perception of the Networks as biased and their dissatisfaction with the content of some of the reporting. *See, e.g.*, Gursel Tokmakoglu (@GurselTockmakogl), X (June 25, 2025 at 16:52 ET), https://x.com/GurselTokmakogl/status/1937977120854319359 (quoting President Trump's post, "'Why would a Republican want Democrat "mouthpiece," Voice of America (VOA), to continue? It's a TOTAL, LEFTWING DISASTER — No Republican should vote for its survival. KILL IT!'"); *The Voice of Radical America*, The White House (Mar. 15, 2025), https://perma.cc/8L6A-P9CS (framing Executive Order as a response to alleged "radical propaganda" produced by VOA); *Senior Advisor Kari Lake*

*Cancels Obscenely Expensive 15-Year-Lease That Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. Agency for Glob. Media (Mar. 15, 2025), https://perma.cc/T95P-2ZLA (asserting that Networks "parrot[] the talking-points of America's adversaries"); *see also* Matthew Rice, *Trump's Special Envoy Rips Voice of America, Radio Free Europe as a "Relic of the Past"*, N.Y. Sun, (Feb. 10, 2025), https://perma.cc/CR8F-7Q4M (reporting on Presidential Special Envoy Ric Grenell's statements that Radio Free Europe journalists are "far left activists").

In any context, this sort of avowed discrimination on the basis of a media organization's perceived viewpoint is "poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring).  But it would cause special damage here, where any future listeners, readers, and watchers would predictably assume—with good reason—that any resuscitated Networks can now only distribute information that aligns with the policy preferences of whichever president holds office at the time.  This

24

harm will persist for administrations (and generations) to come even if the agency's functions are later restored.

Separate and apart from the First Amendment, constitutional principles governing the separation of powers also prohibit Defendants from acting to dismantle the Network in violation of Congress's intent. "[I]f [Congress's] authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections.'" *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, Nos. 25-00400 & 25-00402, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013)); *see also City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("[T]he Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."). And that fundamental separation-of-powers principle has special importance on the facts of this case, where tolerating this degree of presidential control would make a nullity of Congress' stated goal of

25

maintaining the Networks as independent networks rather than politicized "house organs for the United States Government."  *Ralis*, 770 F.2d at 125.

Congress has, through clear and consistent statutory language, insisted that USAGM networks remain outlets for journalism not dictated by the government.  Because of the freedom Congress has codified, the Networks have earned trust and built reputations that have allowed their journalists to gather and disseminate news to audiences without other access to independent sources of news.  But if a President has the unilateral power to effectively shutter the Networks at any time, the foundation for that reliability crumbles without the prospect of repair.  That result contravenes the express will of Congress, and the President lacks the constitutional authority to overturn Congress's judgment that independent reporting, produced with true "editorial independence," 22 U.S.C. § 6205(d)(6)(A), best serves the interests of the United States.

Absent affirmance of the District Court's injunction, the Administration's termination of Network employees and unilateral shuttering of the Networks will put at risk the entire model of federally

funded networks, not just today but well into the future, and the safety of reporters who have committed their careers to producing credible journalism under exceptionally challenging and dangerous conditions. The imminent, irreparable harms that follow from the Executive Order call for maintaining the stay.

### III. The District Court had jurisdiction to avert irreparable harm to the independence that makes the Networks' credible and effective.

The District Court rightly found that emergency restoration of the Networks' employees and grant agreements was necessary to avoid destruction of the Networks before it was too late. *See Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *16–17 (D.D.C. Apr. 22, 2025) ("[T]he irreparable harm that the plaintiffs allege impacts the very existence of USAGM, the health and safety of its journalists and employees, and the interests of the millions of reporters and listeners who depend on USAGM's programming."); *Radio Free Asia v. United States*, Nos. 25-CV-907-RCL & 25-CV-966-RCL, 2025 WL 1291342, at *1 (D.D.C. Apr. 25, 2025). Defendants seek to vacate that relief by recharacterizing Plaintiffs' existential claims as employment grievances controlled by the Civil Service

27

Reform Act (CSRA) or contract disputes controlled by the Tucker Act. *See*

Appellants' Br. at 27, 49. Not so, as Judge Pillard already articulated.

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *8–10 (D.C. Cir. May

3, 2025) (Pillard, J., dissenting). And neither the Court of Claims nor the

CSRA could provide the Networks with prompt, meaningful equitable

relief. *Id.* at *10–13. Channeling this case to those forums would thus all

but guarantee irreparable harm to their independence. *Id.* at *14–15.

For one, the "employees and contractors" implicated by the District

Court's order include the Networks' journalists carrying out the day-to-day

work of reporting "news which is consistently reliable and authoritative,

accurate, objective, and comprehensive," without editorial interference by

government actors. 22 U.S.C. § 6202(b)(1). Defendants' en-masse

termination of these journalists, then, is not a run-of-the-mill employment

action: It strikes at the heart of the Networks' mission, which is protected

constitutionally and statutorily. Reporting requires reporters, and their

unlawful termination under this Executive Order not only halts their

important work but also jeopardizes their audience's perception of them as

28

independent and reliable sources of information.  Defendants' actions

violate and irreparably harm Plaintiffs' constitutional rights, *see supra* Part

II, and the CSRA thus does not deprive this Court of jurisdiction.  *See*

*Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984) ("[A]ppellants need

not exhaust administrative remedies for their nonconstitutional claims

before bringing their constitutional claims in federal court.").

Further, the Court of Claims "has no power to grant" the equitable

relief sought by Plaintiffs-Appellees.  *Bowen v. Massachusetts*, 487 U.S. 879,

905 (1988).  That the relief the Networks seek—a continuance of funds

during the pendency of the case to maintain the status quo—is beyond the

powers of the Court of Claims is not surprising, given that Plaintiffs-

Appellees claims do not sound in contract.  *See id.*; *Widakuswara*, 2025 WL

1288817, at *10–13 (Pillard, J., dissenting).  It was Congress—not a

contract—that created the Networks, set out their mandates, and has

funded their journalism.  Though the MBN's and RFA's grant agreements

are implicated, Plaintiffs' claims "at [their] essence" do not sound in

contract.  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) ("[W]e

must not [interpret the Tucker Act] in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.")[2]  Without the injunctive relief the Networks' seek in these suits, they will remain shuttered until the end of the proceedings when funding is restored, which could take years, by which time any relief would come too late.  *See supra* at 20-21.

This Court therefore has jurisdiction to hear Plaintiffs' claims and decide appropriate relief to redress those violations.  Relief short of the District Court's preliminary injunction will irreparably harm the Networks' ability to produce reliable and independent journalism moving forward, breaking from the requirements laid out by Congress and the Constitution. This Court should reject that result.

---

[2]   Congress directed funds to MBN and RFA via the grant agreements so that they could freely carry out the broader mission of "provid[ing] objective, accurate, and relevant news and information through television, radio, and the internet" to nations of geopolitical importance in the Middle East and Asia.  *See* U.S. Dep't of State Off. of Inspector Gen., *supra*, at 1; 22 U.S.C. § 6208 (establishing RFA).

30

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to affirm the preliminary injunction entered by the District Court.

Dated: July 28, 2025                Respectfully submitted,

                         /s/ *Bruce Brown*
                         Bruce Brown
                            *Counsel of Record for Amici Curiae*
                         Lisa Zycherman
                         Gabriel Rottman
                         Mara Gassmann
                         Grayson Clary
                         Renee M. Griffin
                         Ellen Goodrich
                         REPORTERS COMMITTEE FOR
                          FREEDOM OF THE PRESS
                         1156 15th Street NW, Ste. 1020
                         Washington, DC 20005
                         Telephone: 202.795.9300
                         bbrown@rcfp.org

                         *Counsel for Amici Curiae*

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,129 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype font.

Dated: July 28, 2025

/s/ *Bruce Brown*
Bruce Brown
*Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 28, 2025, I electronically **re-filed** the foregoing

brief with the United States Court of Appeals for the District of Columbia

Circuit, using the appellate CM/ECF system. All parties are registered

CM/ECF users, and service upon them will be accomplished by the

appellate CM/ECF system.

Dated: July 28, 2025

/s/ *Bruce Brown*
Bruce Brown
  *Counsel of Record for Amici Curiae*

## ADDENDUM:  STATEMENTS OF INTEREST
## OF INDIVIDUAL AMICI CURIAE

**The Reporters Committee for Freedom of the Press** is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, today its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect journalists.

**The Committee to Protect Journalists** is an independent, nonprofit organization that was founded in 1981 to promote press freedom worldwide. It defends the right of journalists to report the news without fear of reprisal. CPJ is a global organization headquartered in New York City. CPJ's board of directors is composed of prominent journalists, media executives, and leaders from related professions.

**PEN American Center, Inc. ("PEN America")** is a nonpartisan nonprofit organization working at the intersection of literature and human

rights. Founded in 1922, PEN America advocates for free expression and the interests of writers and journalists in the United States and abroad. Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide. PEN America protects press freedom and journalists in the United States by combatting disinformation, defending journalists against online abuse, and supporting local news. PEN America's PEN/Barbey Freedom to Write Center also works to protect journalists at risk internationally.

**The Press Freedom Center at the National Press Club** is dedicated to defending press freedom and supporting those who risk their lives to report the truth. Because journalists around the world face growing threats—from imprisonment and violence to exile and dislocation--The Press Freedom Center assists detained, threatened or exiled journalists through advocacy, direct support and community. The organization's genesis and story, including the detained and exiled journalists, its leadership has aided, can be found at https://www.press.org/freedom-center.

**The Society of Professional Journalists ("SPJ")** is a nonprofit membership organization devoted to improving and protecting journalism. It is the nation's most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press. SPJ, through its International Community forum, brings together a community of journalists who believe in the protection of journalism globally and work to encourage the free practice of journalism in all countries.